IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| YOLANDA JACKSON, as Administrator of the Estate of Kevin Curtis, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Case No. 20 C 0900 |
| WEXFORD HEALTH SOURCES, INC., et al., ) ) ) ) | |
| Defendants. ) | Hon. David W. Dugan |

**PLAINTIFF'S RESPONSE TO THE WEXFORD
DEFENDANTS' PARTIAL MOTION TO DISMISS**

Plaintiff, Yolanda Jackson, as Administrator of the Estate of Kevin Curtis, hereby responds to the Motion to Dismiss filed by Defendants Wexford Health Sources, Inc., Eva Leven, and Mohammed Siddiqui (the Wexford Defendants) (Dkt. 23), stating as follows:

**INTRODUCTION**

Kevin Curtis arrived in the health care unit at Menard early on September 5, 2018 in clear need of emergency medical attention. He was catatonic and unresponsive, and had recently been placed on crisis watch because of a concern that he might harm himself. These are uniformly understood as signs of a likely medical emergency requiring immediate medical attention. But instead of transferring Mr. Curtis to a hospital for emergency medical treatment, or evaluating and treating him on site, Defendants Leven and Siddiqui declined to provide Mr. Curtis with any medical or mental health care. Instead, they ordered him to be returned to his cell. He was found dead hours later.

Mr. Curtis's mother and administrator of his estate has sued Defendants Leven and Siddiqui and their employer, Wexford, along with employees of the Illinois Department of

Corrections (IDOC) for violating her son's constitutional rights and for related violations of state law. The Wexford Defendants have moved to dismiss Defendant Siddiqui entirely and moved to dismiss the conspiracy and failure-to-intervene claims against Defendant Leven. They have also moved to dismiss Plaintiff's *respondeat superior* claim against Wexford. The Wexford Defendants do *not* seek dismissal of Plaintiff's section 1983 claim against Defendants Leven and Wexford, or Plaintiff's state-law claims against them under the Wrongful Death Act and Survival Act.

The Wexford Defendants' motion to dismiss Defendant Siddiqui rests upon a fundamental misreading of the allegations in Plaintiff's Complaint. And their arguments in support of dismissal of the conspiracy and failure-to-intervene claims against Defendant Leven are premised on the same error. When taken in light most favorable to Plaintiff, as required at the motion-to-dismiss stage, Plaintiff's Complaint has adequately alleged claims against Defendants Siddiqui, Leven, and Wexford under section 1983 and Illinois state law. Defendants' motion should be denied.

## FACTS

By approximately March of 2018, Kevin Curtis was a prisoner at Menard Correctional Center, a prison operated by the IDOC. Dkt. 1 (Compl.) ¶ 20. Mr. Curtis had a documented history of schizophrenia and had been classified by IDOC and Wexford staff as "seriously mentally ill"—a designation that required medical and mental health staff to closely monitor his health. *Id*. ¶ 22. On August 31, 2018, Mr. Curtis was placed on crisis watch at Menard based on a determination by staff that he was at significant risk of self-harm. *Id.* ¶ 23. Mr. Curtis was taken to a cell in an area at Menard specifically designated for individuals on crisis watch, and was permitted to have only a crisis smock, crisis blanket and mattress, and finger foods. *Id.* ¶ 24.

From August 31, 2018 until his death on September 5, 2018, correctional staff were required to perform a visual and verbal "check" on Mr. Curtis at 10-minute intervals each day. *Id.* ¶ 25.

On the morning of September 5, 2018, a correctional officer discovered during one of these checks that Mr. Curtis was catatonic and completely unresponsive. *Id.* ¶ 26. Correctional staff immediately brought Mr. Curtis to the infirmary in his cellhouse, and then to the health care unit at Menard. *Id.* ¶ 27. Dr. Mohammed Siddiqui, a physician at Menard, and Dr. Eva Leven, the Mental Health Services Director at Menard, were present in the health care unit when Mr. Curtis arrived and observed his catatonic state. *Id.* ¶¶ 13-14, 27-30. Despite observing Mr. Curtis's obvious need for emergency medical care, Defendants Siddiqui and Leven took no meaningful action to provide Mr. Curtis with an evaluation or treatment. *Id.* ¶¶ 27-30. Instead, they simply obtained a blood and urine sample from Mr. Curtis, and directed correctional staff to return Mr. Curtis to his cell. *Id.* ¶ 30.

Menard's Treatment Unit Administrator, Dr. Lisa Goldman, was also present in the health care unit and was deeply concerned about the Defendants' disregard of Mr. Curtis's obviously emergent condition. *Id.* ¶¶ 31-32. She raised her concerns directly with Dr. Leven, who refused to take any further action and instead reported that she would follow up with Mr. Curtis the following day after testing him for syphilis. *Id.* ¶ 32. Ms. Goldman persisted and explained to Dr. Leven that Mr. Curtis had tested negative for syphilis a year earlier and thus his distress was not attributable to syphilis. *Id.* ¶ 33. Ms. Goldman urged Dr. Leven to transfer Mr. Curtis to a hospital and told Dr. Leven that Mr. Curtis could not wait until the following day to receive medical care. *Id.* ¶¶ 33-34. Yet Dr. Leven still refused to take any further action. *Id.* ¶ 33.

Mr. Curtis could not ambulate back to his cell and instead had to be taken back in a wheelchair. *Id.* ¶ 30. After being returned to his cell, correctional staff were required to resume

their 10-minute checks on Mr. Curtis. *Id.* ¶ 36. But Officer Nickolas Mitchell, who is also a defendant, stopped performing any checks, abandoning the crisis watch section of the cellhouse and falsifying documents to make it appear as though he had performed the required checks. *Id.* ¶¶ 36-40, 45. Eventually, in the early evening hours of September 5, Mr. Curtis was found dead in his cell. *Id.* ¶ 43-44. He was taken back to the health care unit at Menard where he was formally pronounced deceased at 6:30 p.m. *Id.* ¶ 44. A subsequent autopsy determined that Mr. Curtis died as a result of a probable intoxication from an unknown substance. *Id.* ¶ 46.

## DISCUSSION

Dismissal for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is proper only where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). Federal Rule 8(a) "requires only a plausible short and plain statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (internal quotation marks omitted). In assessing a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff[]." *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

I.  **Plaintiff Has Adequately Pled Her Section 1983 and State-Law Claims Against Dr. Siddiqui.**

The Wexford Defendants have moved to dismiss all of Plaintiff's claims against Dr. Siddiqui. Dkt. 23 at 7-8. Defendants argue that this is appropriate because, they contend,

4

Plaintiff's Complaint does not allege "that Dr. Siddiqui ever saw Mr. Curtis, knew of his specific condition . . . treated Mr. Curtis, or was otherwise involved in his care on September 5, 2018." *Id.* at 8. Defendants' contention is wrong. A fair reading of Plaintiff's Complaint makes clear that Plaintiff *has*, in fact, alleged that Dr. Siddiqui was in the health care unit on September 5, 2018 when Mr. Curtis was brought there in a catatonic state, that Dr. Siddiqui noted Mr. Curtis's catatonia, but took no action to provide Mr. Curtis with the emergency medical care he clearly needed and instead directed correctional staff to return Mr. Curtis to his cell.

Specifically, Plaintiff has alleged that shortly after 9:00 a.m., Mr. Curtis was brought "to the health care unit at Menard" where he "remained in a catatonic state." Dkt. 1 ¶ 27. Plaintiff has also alleged that despite knowing how serious Mr. Curtis's catatonic state was, "Wexford staff in the health care unit, *including Defendants Leven and Siddiqui*, took no meaningful action to address [Mr. Curtis's] obvious medical emergency." *Id.* ¶ 30 (emphasis added). Instead, "staff"—which the allegations make clear include Dr. Siddiqui himself—"merely obtained a blood and urine sample from [Mr. Curtis] and immediately directed correctional staff to return him to his cell." *Id.* In these paragraphs, which the Court is required to credit at this point, Plaintiff has alleged that Dr. Siddiqui (1) was present in the health care unit on the morning of September 5, 2018 when Mr. Curtis arrived, and (2) took no meaningful action despite appreciating the emergent nature of Mr. Curtis's medical condition. Indeed, any reading of these allegations as alleging something *other* than Dr. Siddiqui's presence in the health care unit on September 5 when Mr. Curtis arrived would run afoul of the requirement to construe Plaintiff's allegations in the light most favorable to her.[1] *See, e.g., Taha v. Int'l Bhd. of Teamsters, Local*

---

[1] Notably, Defendants argue that Plaintiff has failed to allege Dr. Siddiqui's presence in the health care unit on September 5 by omitting the very portion of Plaintiff's Complaint that alleges Dr. Siddiqui's presence. *Compare* Dkt. 23 at 8 ("(d)espite knowing the seriousness of catatonia . . . (Dr.) Siddiqui took no meaningful action to address Kevin's obvious medical emergency."), *with* Dkt. 1 ¶ 30 ("Despite

5

*781*, 947 F.3d 464, 469 (7th Cir. 2020) (plaintiff's complaint must be construed in the light most favorable to him).

Plaintiff's allegations are consistent with contemporaneous accounts of what happened. Reports generated as part of an investigation into Mr. Curtis's death indicate that Dr. Leven told investigators that she (Dr. Leven) assessed Mr. Curtis "per her department" and that Dr. Siddiqui "evaluated [Mr. Curtis] within his department."[2] And when confronted by investigators with Dr. Goldman's accusations that Mr. Curtis should have been promptly sent to a hospital, Dr. Siddiqui did not deny that he encountered Mr. Curtis in the health care unit on September 5 or was involved in the handling of Mr. Curtis's care, but rather told investigators that "medical and mental health informed Menard administration of [Mr. Curtis's] condition" and that Mr. Curtis was "treated mentally for erratic behavior." These statements support Plaintiff's allegation that Dr. Siddiqui was in the health care unit on September 5 when Mr. Curtis arrived, and indicate that discovery is likely to prove that Plaintiff's allegations are true. *Geinosky*, 675 F.3d at 745 n.1. Defendants' arguments that Plaintiff has failed to allege Dr. Siddiqui's personal involvement in this case are based on an improper reading of Plaintiff's Complaint and should be rejected.

Having alleged Dr. Siddiqui's personal involvement in the misconduct that caused Mr. Curtis's death, there can be no dispute that Plaintiff has adequately alleged that Dr. Siddiqui

---

knowing the seriousness of catatonia, Wexford staff in the health care unit, including Defendants Leven and Siddiqui, took no meaningful action to address Kevin's obvious medical emergency."). Defendants are obviously not free to ignore or omit factual allegations in a plaintiff's complaint that undermine their arguments. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (plaintiffs are entitled to have their complaints considered holistically at the motion-to-dismiss stage).

[2] Although the statements by Defendants Leven and Siddiqui were not expressly alleged in Plaintiff's Complaint, the Seventh Circuit has held plaintiffs are permitted to "elaborate on [their] factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The statements of Defendants Leven and Siddiqui are not being submitted as evidence—indeed, Plaintiff strongly disputes many of the facts asserted by the Defendants in their statements—but are instead being offered "for illustrative purposes" to demonstrate that this Court can and should conclude that Dr. Siddiqui was personally involved in the constitutional and statutory violations at issue in the case. *Id.*

violated Mr. Curtis's constitutional rights when he denied Mr. Curtis medical care. To prove a claim for denial of medical care under the Eighth Amendment, the plaintiff must allege that the prisoner suffered from an objectively serious medical condition, and that the defendant was deliberately indifferent to that condition. *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc). Plaintiff has alleged that Mr. Curtis suffered from an objectively serious medical condition—catatonia and unresponsiveness—and Defendants do not contend otherwise. Dkt. 1 ¶ 28 ("Catatonia is a medical emergency."); *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) ("A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.").

Similarly, Plaintiff's allegations and the reasonable inferences that flow from those allegations sufficiently allege that Dr. Siddiqui was deliberately indifferent to Mr. Curtis's serious medical condition. *Petties*, 836 F.3d at 728 (to establish deliberate indifference, plaintiff must show that defendant "*actually* knew of and disregarded a substantial risk of harm"). Plaintiff has alleged that Dr. Siddiqui knew that Mr. Curtis was catatonic and further knew that Mr. Curtis's catatonia and unresponsiveness put him at substantial risk of harm. Dkt. 1 ¶¶ 28-30 (alleging that Dr. Siddiqui "kn[ew] the seriousness of catatonia"); *see also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). And Plaintiff has further alleged that despite that awareness, Dr. Siddiqui took no meaningful action in response. Dkt. 1 ¶ 30; *Petties*, 836 F.3d at 729 (deliberate indifference can be proven by showing that defendant "ignore[d] a request for medical assistance" or by showing that "a particular course of medical treatment (or lack thereof) is obvious enough," among other ways). These allegations are

sufficient to state a claim against Dr. Siddiqui under section 1983 for denial of medical care, and Defendants' cursory arguments to the contrary simply rely on an erroneous reading of Plaintiff's Complaint.

Because Plaintiff's allegations are sufficient to state a section 1983 claim against Dr. Siddiqui for violation of Mr. Curtis's Eighth Amendment rights, they are necessarily sufficient to state a claim against Dr. Siddiqui for negligence or willful and wanton misconduct under Illinois's Wrongful Death Act and Survival Act. *Bragado v. City of Zion/Police Dep't*, 839 F. Supp. 551, 554 (N.D. Ill. 1993) ("The definition of 'willful and wanton' [under Illinois law] is essentially the same as the definition of 'deliberate indifference' under the federal constitutional law."); *see also Perez v. Town of Cicero*, 2011 WL 4626034, at *9 (N.D. Ill. Sept. 30, 2011) (determining that summary judgment on a willful and wanton claim necessarily follows from summary judgment on a deliberate indifference claim when based on the same alleged conduct); *cf. Petties*, 836 F.3d at 728 (Eighth Amendment requires a showing far greater than negligence to establish liability). The only argument raised by Defendants to the contrary again relies on the erroneous assumption that Dr. Siddiqui did not encounter Mr. Curtis on September 5, and was otherwise not involved in the handling of Mr. Curtis's case. Dkt. 23 at 8. But as explained in detail above, Plaintiff's Complaint does allege Dr. Siddiqui's personal involvement with Mr. Curtis on September 5, and Plaintiff has therefore sufficiently alleged claims under Illinois state law for Dr. Siddiqui's negligence or willful and wanton misconduct.

Because Plaintiff has adequately alleged her claims against Dr. Siddiqui for denial of medical care under section 1983 and for violation of the Wrongful Death Act and Survival Act, the Court should deny the Wexford Defendants' request to dismiss Dr. Siddiqui from this case.

**II.     Plaintiff Has Adequately Pled a Claim for Conspiracy Against Defendants Siddiqui and Leven.[3]**

Section 1983 imposes liability for conspiracy when "two or more persons act[] in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). There is no heightened pleading standard for conspiracy claims. *Mays v. Evans*, 2018 WL 278746, at *3 (S.D. Ill. Jan. 3, 2018); *Senalan v. Curran*, 78 F. Supp. 3d 905, 914 (N.D. Ill. 2015). At the pleading stage, the Seventh Circuit has held that "it is enough . . . to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002); *see also Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006) ("[C]ourts require the plaintiff to allege the parties, the general purpose, and the approximate date of the conspiracy."); *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (reversing district court's dismissal of conspiracy claims because it erroneously held that "a claim of conspiracy [must] be pleaded with specificity"); *Sánchez v. Vill. of Wheeling*, 447 F. Supp. 3d 693, 705 (N.D. Ill. 2020).

Because conspiracies are often carried out clandestinely, direct evidence is rarely available and plaintiffs typically must rely on circumstantial evidence to plead and prove conspiracy claims. *Beaman*, 776 F.3d at 511; *Xie v. City of Chicago*, 2016 WL 6193981, at *10 (N.D. Ill. Oct. 24, 2016). Accordingly, when assessing the adequacy of allegations regarding a conspiracy claim, courts should examine the complaint in its entirety, rather than particular allegations in isolation. *See, e.g., Geinosky*, 675 F.3d at 749-50 (finding that complaint stated a claim for conspiracy based on pattern alleged even where there were "only rather conclusory *direct* allegations of conspiracy" (emphasis added)).

---

[3] Plaintiff has not brought a claim against Wexford Health Sources, Inc. directly for conspiracy.

Plaintiff's Complaint in this case has provided sufficient notice of the contours of Plaintiff's conspiracy claim to the Wexford Defendants. Plaintiff has alleged that Defendants Siddiqui and Leven conspired amongst themselves and with Defendant Walls (the Health Care Unit Administrator at Menard) on September 5, 2018 to deprive Mr. Curtis of constitutionally adequate medical care. Dkt. 1 ¶ 63. Plaintiff has alleged the individuals involved in the conspiracy (Siddiqui, Leven, and Walls), the general purpose of the conspiracy (to deny Mr. Curtis medical care), and the date (September 5, 2018), and "no greater specificity is required to survive a motion to dismiss." *Sánchez*, 447 F. Supp. 3d at 705 (citing *Hoskins*, 320 F.3d at 764).

Moreover, Plaintiff's Complaint as a whole provides even more support for the plausibility of Plaintiff's conspiracy claims. Defendants Siddiqui and Leven were both present in the health care unit on September 5, 2018 when Kevin Curtis was brought there in a catatonic state. *Id.* ¶¶ 26-30. And both Siddiqui and Leven took the same action in response to Mr. Curtis's obviously emergent state: nothing. *Id.* ¶ 30. When Dr. Goldman raised concerns about Mr. Curtis's health and requested that he be taken to a hospital for evaluation, Siddiqui and Leven persisted in their refusal to evaluate Mr. Curtis or provide him medical care. *Id.* ¶¶ 30-34. Given Defendants Siddiqui's and Leven's respective roles in the health care unit—a physician chiefly responsible for the medical care of prisoners at Menard, and the Mental Health Services Director chief responsible for the mental health care of prisoners at Menard, *id.* ¶¶ 13-14, it is reasonable to infer that they communicated about Mr. Curtis's catatonic state and reached an agreement to deny Mr. Curtis medical care, rather than each Defendant independently deciding to send him back to his cell without any evaluation or treatment. *See Walker v. Atchison*, 2020 WL 1235682, at *8 (S.D. Ill. Mar. 13, 2020) (denying summary judgment on plaintiff's conspiracy claim in

part because the defendants "were all present together at the same time" when they encountered plaintiff and failed to take action in response to notice of a serious risk of harm).

Indeed, as noted above, in her interview with investigators after Mr. Curtis's death, Dr. Leven said that she was informed every day *with* medical doctors of Mr. Curtis's condition and that on September 5, 2018, she knew that Dr. Siddiqui had evaluated Mr. Curtis "within his department." And Dr. Siddiqui told investigators that both medical and mental health staff had "informed Menard Administration of [Mr. Curtis's] condition." These statements further support an inference that Defendants Siddiqui and Leven discussed Mr. Curtis and reached an agreement to deny him care in response. *See Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 790 (N.D. Ill. 2013) (denying motion to dismiss conspiracy claim in part because it was more plausible to conclude that each defendant's misconduct occurred "in the context of an agreement" to secure a wrongful conviction "than that, by some wild coincidence" each defendant independently decided to commit unconstitutional conduct).

Defendant Walls (who has not yet filed a responsive pleading and thus has not yet moved to dismiss any claims against her) joined this agreement after she was approached by Dr. Goldman, who continued to raise concerns about Mr. Curtis's emergent medical conditions. Dkt. 1 ¶ 35. Plaintiff has alleged that in response to Dr. Goldman's concerns, Defendant Walls took no action to ensure that Mr. Curtis received any meaningful medical or mental health care, *id.* ¶ 35, and it is accordingly reasonable to infer that Ms. Walls's inaction in response to Dr. Goldman's concerns—the identical response taken by Defendants Siddiqui and Leven—was the result of communications with Defendants Siddiqui and Leven, and an agreement to join their conspiracy, rather than a coincidental, independent desire to deny Mr. Curtis obviously necessary medical care. *See Starks*, 946 F. Supp. 2d at 790. Defendants Walls was Menard's Health Care

11

Unit Administrator—the IDOC employee chiefly responsible for medical and mental health care at Menard—and accordingly was required to work closely with Wexford medical and mental health staff at the prison. Dkt. 1 ¶ 15. Although this Court need not determine whether Plaintiff has sufficiently alleged Ms. Walls's participation in the conspiracy to deny the Wexford Defendants' motion to dismiss, the allegations in Plaintiff's Complaint permit a reasonable inference that she did.

The Wexford Defendants argue, in a single sentence without explanation, that a "conspiracy cannot exist solely between members of the same entity." Dkt. 23 at 3. By failing to offer any explanation about how this statement bears on the motion to dismiss, the Wexford Defendants have forfeited this argument. *Batson v. Live Nation Ent't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("perfunctory and underdeveloped" arguments are forfeited); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (same). Even on its merits, this argument fails. First, as discussed above, Plaintiff has alleged that Defendants Siddiqui and Leven, employees of Wexford, conspired with Defendant Walls, who is employed by the IDOC. Dkt. 1 ¶¶ 13-15. As such, Plaintiff's conspiracy claim against the Wexford Defendants is not confined solely to employees of a single entity (Wexford), but rather includes an employee from the IDOC.

Second and more importantly, the Wexford Defendants' brief fails to explain the intracorporate conspiracy doctrine (the term used by courts to describe a rule against a conspiracy claim for employees of the same entity) or acknowledge its limits. The single authority cited by Defendants, *Nosair v. Federal Bureau of Prisons*, 2013 WL 5835733, at *4 (S.D. Ill. Oct. 30, 2013), does not even address a section 1983 conspiracy claim. In *Nosair*, the district court dismissed a plaintiff's claim under 42 U.S.C. § 1985 against federal officials for conspiracy, relying on the Seventh Circuit's holding in *Payton v. Rush-Presbyterian-St. Luke's*

12

*Medical Center*, 184 F.3d 623, 632-33 (7th Cir. 1999), that a *section 1985* conspiracy claim "cannot exist solely between members of the same entity . . . so long as all are working in the corporation's (or governmental entity) interest." The Seventh Circuit has never held that the intracorporate conspiracy doctrine applies to section 1983 claims and has repeatedly reversed dismissal of section 1983 conspiracy claims that would otherwise fall within the purview of the doctrine. *See, e.g., Geinosky*, 675 F.3d at 750 (reversing dismissal of section 1983 conspiracy claim brought against eight police officers, all of whom were employed by the City of Chicago and worked in the same unit); *Walker*, 288 F.3d at 1008 (reversing dismissal of section 1983 conspiracy claim brought against correctional officers and a former governor, all of whom were employed by the State of Wisconsin); *see also Harris v. Kuba*, 2003 WL 27383917, at *3 (S.D. Ill. Dec. 17, 2003) (finding intracorporate conspiracy doctrine inapplicable to section 1983 conspiracy claims). Courts in this Circuit have repeatedly rejected invocation of the doctrine in cases like this one, where the employing entity is alleged to maintain a related unlawful practice "that permeates the ranks of the organization's employees." *Thomas v. City of Blue Island*, 178 F. Supp. 3d 646, 654 (N.D. Ill. 2016); *see also Harris v. City of Chicago*, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020) (doctrine only applies when employees act within scope of their employment in joint pursuit of "entity's lawful business"). Simply put, the intracorporate conspiracy doctrine is inapplicable to Plaintiff's section 1983 conspiracy claim in this case given the allegations raised, and Wexford has offered no arguments to the contrary.

Because Plaintiff has adequately pled a section 1983 claim for conspiracy against Defendants Siddiqui and Leven, and because the intracorporate conspiracy doctrine does not apply to this case, the Wexford Defendants' motion to dismiss this claim should be denied.

### III. Plaintiff Has Adequately Pled a Failure-to-Intervene Claim Against Defendants Siddiqui and Leven.[4]

The Wexford Defendants next seek dismissal of Plaintiff's claims against them for failing to intervene to prevent the violation of Mr. Curtis's constitutional rights. Defendants' arguments in favor of dismissal appear to be based on the same misreading of Plaintiff's Complaint as lacking any allegations that Dr. Siddiqui was present in the health care unit at Menard on September 5, 2018. Dkt. 23 at 6. But with a fair reading of Plaintiff's Complaint, assuming the veracity of the factual allegations and taking all reasonable inferences in Plaintiff's favor, Plaintiff has adequately pled a claim against Defendants Siddiqui and Leven for failure to intervene.

To state a claim for failure to intervene under section 1983, a plaintiff must allege that "[a] constitutional violation has been committed by a [state actor]; *and* the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). In this case, Plaintiff has alleged that Defendants Siddiqui and Leven were both present in the health care unit on September 5, 2018, when Mr. Curtis was brought in in a catatonic state. Dkt. 1 ¶¶ 26-30. It takes little by way of inference to reach the conclusion that Defendants Siddiqui and Leven, both of whom were responsible for the medical and mental health of prisoners at Menard, were each aware that the other was violating Mr. Curtis's constitutional rights by denying him the emergency medical care he so clearly needed. *See Piercy v. Whiteside Cnty.*, 2016 WL 1719802, at *7 (N.D. Ill. Apr. 29, 2016) (denying motion to dismiss plaintiff's failure-to-intervene claim because complaint permitted conclusion that defendants knew of the failure by other defendants to provide medical care and

---

[4] Plaintiff has not brought a claim against Wexford Health Sources, Inc. directly for failing to intervene.

nevertheless failed to intervene). Certainly there could be no doubt that Defendants Siddiqui and Leven became aware of the other's denial of constitutionally adequate medical care when their orders to correctional staff to return Mr. Curtis to his cell resulted in Mr. Curtis's departure from the health care unit (in a wheelchair) without further evaluation or treatment. Dkt. 1 ¶ 30. There can similarly be no doubt that Defendants Siddiqui and Leven had ample opportunity to intervene to stop the ongoing denial of constitutionally adequate medical care to Mr. Curtis. The Complaint plainly alleges that Mr. Curtis remained in his cell from shortly after 9:00 a.m. until the "early evening hours" of September 5, when Mr. Curtis was discovered dead in his cell. *Id.* ¶¶ 27, 30, 43-44. These allegations are sufficient to state a failure-to-intervene claim against Defendants Siddiqui and Leven. *See Taylor v. Wexford Health Sources, Inc.*, 2016 WL 3227310, at *5 (N.D. Ill. June 13, 2016) (denying motion to dismiss failure-to-intervene claim based on similar allegations).

The Wexford Defendants construe Plaintiff's failure-to-intervene against Defendant Leven as alleging that "she should have intervened in her own care" and argue that such a claim is "duplicative" of Plaintiff's deliberate indifference claim against her. Dkt. 23 at 6. As explained above, Plaintiff's failure-to-intervene claim against Defendant Leven is not based on her own misconduct. But to be clear, there can be no argument that Plaintiff's failure-to-intervene claims against any of the Defendants are duplicative. Courts have recognized that although a claim for failing to provide medical care and a claim for failing to intervene both allege inaction as the basis for liability, "they stem from different duties" and "are not commensurate." *Winchester v. Marketti*, 2012 WL 2076375, at *6 (N.D. Ill. June 8, 2012). And even if there is some overlap between Plaintiff's section 1983 claims, that is no basis to dismiss any one of the claims. *Boothe v. Sherman*, 66 F. Supp. 3d 1069, 1077-78 (N.D. Ill. 2014) ("there is no rule preventing a

15

plaintiff from alleging multiple legal theories as bases for recovering on a single injury, particularly at the pleading stage"). Any argument that the failure-to-intervene claim should be dismissed as duplicative must accordingly be rejected.

Because Plaintiff has adequately pled a failure-to-intervene claim against Defendants Siddiqui and Leven, the Wexford Defendants' motion to dismiss this claim should be denied.

### IV. As a Private Company, Wexford Should Be Subject to Respondeat Superior Liability Rather Than *Monell*.

Count VI of Plaintiff's Complaint alleges *respondeat superior* liability against Wexford for Plaintiff's state-law and section 1983 claims. Dkt. 1 ¶¶ 88-91. Wexford seeks dismissal of that claim insofar as it alleges *respondeat superior* liability for Plaintiff's section 1983 claims. Dkt. 23 at 6-7. "Under respondeat superior, an employer may be held liable for the negligent, willful, malicious or even criminal acts of its employees when those acts are committed within the scope of [the employee's] employment." *Johnson v. Cook Cnty.*, 526 F. App'x 692, 697 (7th Cir. 2013) (citing *Adames v. Sheahan*, 233 Ill.2d 276, 298 (2009) (quotation marks omitted)).

Wexford argues that the doctrine of *respondeat superior* cannot apply to Wexford, and that the company should instead benefit from the more stringent standard of liability that the Supreme Court imposed for municipalities in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). But the Supreme Court has never extended its holding in *Monell* to private corporations like Wexford. And although the Seventh Circuit has required plaintiffs to meet the standard of liability discussed in *Monell* in order to prevail on section 1983 claims against corporations like Wexford, *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982), it has also said that it is time to revisit this issue. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014).

16

In *Shields*, the Seventh Circuit cautioned that "[w]e should not insulate employers from *respondeat superior* liability under § 1983 without powerful reasons to do so." *Shields*, 746 F.3d at 792. The court noted that the text and legislative history of section 1983 do not support the extension of *Monell* to private companies, and observed that "current Supreme Court precedent seems to support rather than reject *respondeat superior* liability for private corporations." *Id.* at 793. This outcome also tracks the distinction in qualified immunity jurisprudence between public and private corporations. *Id.* at 793-94; *see also Petties*, 836 F.3d at 734 ("qualified immunity does not apply to private medical personnel in prisons"). And as a matter of policy, the financial incentives for private corporations like Wexford to "provide substandard care" weigh in favor of permitting *respondeat superior* liability to deter misconduct. *Id.* at 794. In sum, the Seventh Circuit has observed that all considerations of law and policy support recognizing a claim of *respondeat superior* liability against Wexford for constitutional violations.

Since the Seventh Circuit issued its opinion in *Shields*, the court has not had an opportunity to revisit the question in an appropriate case—though it has repeatedly signaled its readiness to do so, including in an en banc opinion. *See, e.g., Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) ("We questioned in *Shields* whether private corporations might also be subject to *respondeat superior* liability, unlike their public counterparts, but we have no need in the present case to address that question and thus we leave it for another day." (citation omitted)); *see also Gaston v. Ghosh*, 920 F.3d 493, 495 (7th Cir. 2019) (declining to consider a section 1983 *respondeat superior* claim against Wexford because plaintiff failed to establish a constitutional violation and thus a claim against Wexford even under the doctrine of *respondeat superior* would necessarily fail).

As such, although Plaintiff acknowledges that *Iskander*'s holding that *Monell* applies to private corporations like Wexford continues to be binding law in this District, this case presents an opportunity to revisit that precedent and recognize the availability of *respondeat superior* liability against private corporations like Wexford for section 1983 claims.

Assuming that this Court applies *Iskander* and finds that Plaintiff may not maintain a *respondeat superior* claim against Wexford under section 1983, the Court should not dismiss Count VI of Plaintiff's Complaint in its entirety. Count VI also alleges *respondeat superior* liability against Wexford on Plaintiff's state-law claims. Dkt. 1 ¶¶ 89-90. Such liability is clearly proper under Illinois law for violations of state law committed by Wexford's employees while acting within the scope of their employment, and Wexford does not contend otherwise. *Estate of Crandall v. Godinez*, 2015 WL 1539017, at *5 (C.D. Ill. Mar. 31, 2015) (under Illinois law, "an employer can be liable for the torts of his employee when those torts are committed within the scope of the employment"); *Adames*, 233 Ill. 2d at 298 (same). As such, to the extent that Wexford seeks dismissal of Count VI in its entirety, their request should be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny the Wexford Defendants' partial motion to dismiss.

                 Respectfully submitted,

                 /s/ Sarah Grady
                 Sarah Grady
                 Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Sarah Grady
Steve Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
sarah@loevy.com

## CERTIFICATE OF SERVICE

      I, Sarah Grady, an attorney, hereby certify that on December 14, 2020, I served a copy of the foregoing via the CM/ECF system, which effected service on all counsel of record.

      /s/ Sarah Grady
      Sarah Grady
      Attorney for Plaintiff