IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| YOLANDA JACKSON, as Administrator of the Estate of Kevin Curtis,<br><br>    Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-0900-DWD<br><br>Hon. David W. Dugan |

**PLAINTIFF'S MOTION TO COMPEL
DEFENDANT WEXFORD TO PRODUCE DOCUMENTS**

Plaintiff Yolanda Jackson, as Administrator for the Estate of Kevin Curtis, hereby respectfully requests that this Court enter an Order compelling Wexford to produce responsive documents withheld based on claimed state-law privileges inapplicable in this federal question case. In support of her request, Plaintiff states as follows:

**INTRODUCTION**

This motion seeks an order compelling Wexford to produce documents it is withholding based on two state peer-review privileges and a state work-product privilege. There are two categories of documents at issue: (1) a set of eight documents identified by name in a privilege log produced by Wexford, Ex. 8, and (2) a set of documents unknown in number generally referred to by Wexford as "quality assurance" documents and communications that have not been logged or otherwise specifically identified. Ex. 9 at 1.

The Court should grant Plaintiff's motion to compel for three reasons. First, in a

federal question case like this one, state-law privileges do not apply. Second, even if this Court were to entertain an argument by Wexford to create a new federal peer-review privilege, that argument should be rejected because appellate and district courts throughout the country (including the Seventh Circuit) have rejected the same or similar requests to create a federal peer-review privilege, which in any event would not even cover Wexford or the documents at issue. Finally, this Court should reject Wexford's invocation of a work-product privilege because the evidence makes clear the documents are part of Wexford's ordinary course of business and not prepared in anticipation of litigation.

## BACKGROUND

Kevin Curtis died at Menard Correctional Center on September 5, 2018. Dkt. 1 (Pl.'s Compl.) ¶ 26. On the day of his death, an IDOC administrator, Dr. Lisa Goldman, saw Mr. Curtis outside of the health care unit being escorted back to his cellhouse in a wheelchair. Ex. 1 (Incident Report). He appeared totally catatonic. *Id.*; *see also* Ex. 2 (Email Correspondence) at 3. Dr. Goldman continued on into the health care unit at Menard, where she saw that a urine sample that had been collected from Mr. Curtis was dark—a sign of dehydration. Ex. 3 (Investigational Interview) at 2. Shortly after her interaction with Mr. Curtis, Dr. Goldman obtained medical records from 2016 reflecting Mr. Curtis's prior hospitalization for catatonia. Ex. 2 at 3.

Dr. Goldman immediately emailed Defendant Dr. Eva Leven, the Mental Health Services Director employed by Wexford to oversee mental health care at Menard, to raise the alarm about Mr. Curtis's safety. *Id.* She told Dr. Leven that, "[in her] clinical opinion we need to intervene quickly for the dehydration" and expressed concern that

2

"with a combination of this heat" the dehydration "could be lethal." *Id.*

Following Dr. Goldman's email, a Wexford psychiatrist rediagnosed Mr. Curtis with catatonia. Ex. 4 (Psychiatric Progress Note) at 5; *see also* Ex. 2 at 1. Even so, Defendants did nothing to address Mr. Curtis's dehydration. And although labs were ordered for Mr. Curtis, they were not ordered urgently or "stat" and so were not returned until the day after Mr. Curtis had died. Ex. 5 (Lab Results). Those lab results showed that as of the morning of September 5, Mr. Curtis's sodium levels were critically high—a clear sign of dehydration. *Id.*; *see also* "Hypernatremia (High Level of Sodium in the Blood)," MERK MANUAL, *available at* https://www.merckmanuals.com/home/hormonal-and-metabolic-disorders/electrolyte-balance/hypernatremia-high-level-of-sodium-in-the-blood (last visited Sept. 23, 2022).

Plaintiff has brought suit over Mr. Curtis's death, naming as Defendants Dr. Leven, Dr. Mohammed Siddiqui, Menard's medical director, and Wexford Health Sources, the corporation that contracts with the IDOC to provide medical and mental health care to incarcerated individuals, among others. Plaintiff's claim against Wexford alleges that the corporation maintains widespread practices whereby health care staff: (1) fail to adequately examine or diagnose patients in their care, (2) fail to create treatment plans to assure continuity of care, and (3) fail or refuse to refer prisoners for treatment in outside facilities when such a referral is necessary or proper. Dkt. 1 ¶ 57.

In response to Plaintiff's discovery requests, Wexford has indicated that it is withholding a number of responsive documents pursuant to the Illinois Medical Studies Act, 735 ILCS 5/8-2101. Ex. 6 (Defs.' 2d Supp. Resp. to Pl.'s Req. for Prod.) at 11-12 (Req. No. 41); Ex. 7 (Pl.'s Aug. 5, 2022 Letter to Defs.) at 8-9 (noting that following a

Rule 37 conference, impasse had been reached regarding Wexford's refusal to produce responsive quality assurance documents based on invocation of the Illinois Medical Studies Act). Wexford has produced a privilege log that details some, but not all, of the responsive documents being withheld. Ex. 8 (Wexford's Priv. Log); *see also* Ex. 9 (Defense Counsel's Aug. 9, 2022 Email to Pl.) at 1 (noting that Wexford is withholding documents "on the privilege log *and* documents/communication[s] that [are] considered quality assurance" (emphasis added)). Specifically, in addition to the eight documents identified on its privilege log, Wexford has confirmed that there are other so-called "quality assurance" documents and communications that are being withheld. *Id.* Plaintiff thus does not know how many additional documents are at issue.

Wexford's is withholding these responsive documents based on three purported privileges: (1) the Illinois Medical Studies Act, 735 ILCS 5/8-2101; (2) the Illinois Long-Term Care Peer Review and Quality Assessment and Assurance Protection Act, 745 ILCS 55/1; and (3) Illinois's work-product privilege. *See generally* Ex. 8. The documents identified on the privilege log appear to relate to Mr. Curtis's case in particular, *id.*, while the other responsive documents being withheld relate to Wexford's purported quality assurance efforts more generally. *See* Ex. 6 at 11 (Req. No. 41, which seeks documents related to "[q]uality assurance or continuous quality improvement processes" at Menard).

The parties have met and conferred regarding the applicability of the state-law privileges to this case and the documents being withheld but have reached impasse. Ex. 7 at 8-9, 14. Plaintiff accordingly brings this motion in compliance with Local Rule 7.1.

4

## DISCUSSION

Rule 26(b) of the Federal Rules of Civil Procedure provides that a plaintiff is entitled to discovery regarding any nonprivileged matter that is relevant to her claims and proportional to the needs of the case. Fed. R. Civ. P. 26(b). It is Wexford's burden to establish the existence and applicability of the privileges it is asserting in this case. *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000); *Johnson v. Smith*, 2006 WL 8455937, at *2 (S.D. Ill. Aug. 1, 2006).

As noted above, Wexford has invoked three privileges under Illinois state law. These state-law privileges do not apply in federal-question cases, and Plaintiff's motion should thus be granted without further inquiry. But even if this Court were to address a theoretical argument by Wexford to create a new federal peer-review privilege on its merits, that argument fails, as every court to have considered the question has decided no such privilege exists. Moreover, the privileges at issue do not even apply on their own terms to the documents and parties in this case. And even if the Court considers Wexford's invocation of the work-product doctrine under state law to be sufficient to invoke the federal work-product doctrine (which it should not), the documents being withheld are not work product and Wexford has failed to establish otherwise.

## I. Wexford Has Only Invoked State-Law Privileges Which Do Not Apply to Federal-Question Cases.

This case concerns the violation of Mr. Curtis's constitutional rights by Wexford and its employees, conferring this Court with federal-question jurisdiction pursuant to

5

28 U.S.C. § 1331.[1] In such a case, it is well established under Supreme Court and Seventh Circuit precedents that claims of privilege are governed by federal (not state) law. *Univ. of Penn. v. EEOC*, 493 U.S. 182, 188 (1990); *Northwestern Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 925 (7th Cir. 2004) ("Illinois privilege does not govern in federal-question suits"); *see also* Fed. R. Evid. 501.

This alone is sufficient reason to grant Plaintiff's motion to compel, as Wexford has only invoked privileges pursuant to Illinois state law:

> Illinois Medical Studies Act, 735 ILCS 5/8-2101 et seq.; Quality Assessment and Assurance Protection Act, 745 ILCS 55/1 *et seq*; WORK PRODUCT DOCTRINE: *Consolidation Coal Co. v. Bucyrus-Eric Co.*, 89 Ill. 2d 103, 110, 432 N.E.2d 250, 253 (Ill. 1983).

Ex. 8 (reflecting that each document is being withheld based on an identical claim to privilege). Wexford has not claimed that any of these privileges are based on federal common law, as Federal Rule of Evidence 501 requires, and they have accordingly waived any such claim. *See Brooks v. Gen. Cas. Co.*, 2007 WL 218737, at *2 (E.D. Wis. Jan. 26, 2007); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 88 (N.D. Ill. 1992).

---

[1] This remains true even where, as here, a plaintiff's complaint contains one or more pendent state-law claims. *Mem'l Hosp. for McHenry Cnty. v. Shadur*, 664 F.2d 1058, 1061 n.3 (7th Cir. 1981).

**II. This Court Should Not Invent a New Federal Peer-Review Privilege to Protect Wexford from Producing Responsive Documents.**

**A. Courts Have Uniformly Rejected the Creation of a Federal Peer-Review Privilege.**

Wexford has not invoked any purported federal privileges in withholding the documents identified on its privilege log, and this Court should not permit them to do so now. *See Brooks*, 2007 WL 218737, at *2. But even if the Court does allow Wexford to argue for the creation of a federal peer-review privilege, that argument would fail. The Supreme Court has determined that a peer-review privilege does not exist in litigation over federal civil rights. In *University of Pennsylvania*, the Supreme Court refused to recognize a peer-review privilege that was nearly identical to the state-law privilege that Wexford asserts here. 493 U.S. at 189-90. The Court recognized that confidentiality is "important to the proper functioning of [a] peer review process" in any institution, and nevertheless held that rooting out violations of federal law outweighed any interest in maintaining confidentiality of the peer-review process. *Id.* at 193; *see also id.* ("Indeed, if there is a 'smoking gun' to be found . . . it is likely to be tucked away in peer review files.").

In fact, even before *University of Pennsylvania*, the Seventh Circuit expressly declined to recognize any privilege under the Illinois's Medical Studies Act in a federal-question case. *Shadur*, 664 F.2d at 1062-63. In *Shadur*, the court, like the Supreme Court in *University of Pennsylvania*, found that the public interest in enforcing federal claims outweighed the interest in maintaining confidentiality of a peer-review process. *Id.* at 1063. The Seventh Circuit articulated this rule even more broadly in *Hamdan*: "This court has declined to recognize a federal peer-review privilege, reasoning that the

7

need for truth outweighs the state's interest in supplying the privilege." 880 F.3d at 421. Of course, the Seventh Circuit's holding in *Hamdan* is binding on this Court.

*Hamdan*'s holding is also in line with every other appellate court that has considered this issue. *See Bost v. Wexford Health Sources, Inc.*, 2017 WL 3084953, at *4 (D. Md. June 19, 2017) ("Every circuit court that has addressed the issue of a federal medical peer review privilege has flatly rejected the assertion.").[2] And, "nearly every United States district court that has addressed the issue in the context of section 1983 litigation brought on behalf of jail or prison inmates has rejected the assertion of privilege." *Jenkins v. DeKalb County*, 242 F.R.D. 652, 659 (N.D. Ga. 2007).[3] In fact, at least one court in this District previously rejected Wexford's own invocation of the Illinois Medical Studies Act in a case involving the death of a prisoner. Ex. 10 (*Miller v. Hodge, et al.*, No. 14 C 1071, Dkt. 90 (S.D. Ill. May 8, 2015)) at 1. In reaching these

---

[2] For instance, the Ninth Circuit has rejected the privilege in section 1983 cases like this one involving claims against a correctional healthcare provider. *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005). And the Fourth and Eleventh Circuits have rejected the privilege in section 1985 claims for discrimination. *Adkins v. Christie*, 488 F.3d 1324, 1326-30 (11th Cir. 2007); *Virmani v. Novant Health Inc.*, 259 F.3d 284, 289-93 (4th Cir. 2001); *see also Pearson v. Miller*, 211 F.3d 57, 67 (3d Cir. 2000) (although comity is a concern in determining whether to recognize a state-law privilege, "[t]he appropriateness of deference to a state's law of privilege is diminished . . . in cases in which a defendant state actor [is] alleged to have violated citizens' federal rights"); *ACLU v. Finch*, 638 F.2d 1336, 1343-44 (5th Cir. 1981) (recognizing the strong interest in vindicating constitutional rights under section 1983, as compared the weaker interest in comity).

[3] *See also, e.g., Bost*, 2017 WL 3084953, at *4-5; *Dunn*, 163 F. Supp. 3d at 1211; *Johnson v. Cook Cnty.*, 2015 WL 5144365, at *3-5 (N.D. Ill. Aug. 31, 2015); *McLaughlin v. Tilden*, 2015 WL 888921, at *2 (C.D. Ill. Feb. 27, 2015); *Grabow v. Cnty. of Macomb*, 2013 WL 3354505, at *9 (E.D. Mich. July 3, 2013); *Williams v. Univ. Med. Ctr. of S. Nevada*, 760 F. Supp. 2d 1026, 1031 (D. Nev. 2010); *Estate of Belbachir v. Cnty. of McHenry*, 2007 WL 2128341, at *6 (N.D. Ill. July 25, 2007); *Lewis v. Cnty. of Henry*, 2006 WL 1843336, at *2 (S.D. Ind. June 29, 2006); *Weiss v. Cnty. of Chester*, 231 F.R.D. 202, 207 (E.D. Pa. 2005); *Atteberry v. Long United Hosp.*, 221 F.R.D. 644, 648 (D. Colo. 2004); *Leon v. County of San Diego*, 202 F.R.D. 631, 637 (S.D. Ca. 2001).

conclusions, these courts have performed a careful review of the justifications for recognizing a peer-review privilege and determined that the need for discovery in section 1983 cases involving denials of medical care outweighed the policy interests advanced by the states in creating these state-law privileges. *E.g., Dunn*, 163 F. Supp. 3d at 1206–08; *Johnson*, 2015 WL 5144365, at *5. In addition, courts have recognized that Congress has repeatedly considered and refused to recognize this privilege under federal law, strongly indicating that Congress did not intend a peer-review privilege to be recognized as a matter of federal law. *E.g., Agster*, 422 F.3d at 839.

In Plaintiff's case, the balance of these interests strongly favors allowing Plaintiff the discovery. A report made in response to Mr. Curtis's death is crucial discovery in this case, which not only concerns claims related to Mr. Curtis individually, but also a *Monell* claim concerning Wexford policy, practices, and procedures. Dkt. 1 ¶ 57. Repeatedly, courts have permitted exactly the discovery Plaintiff seeks here for *Monell* discovery. *See, e.g., Bost*, 2017 WL 3084953, at *2; *Johnson*, 2015 WL 5144365, at *4-5; *McLaughlin*, 2015 WL 888921, at *2.

This Court should join the chorus of federal appellate and district courts that have flatly rejected assertions of a federal peer-review privilege, and order Wexford to produce the responsive documents it is withholding.

### B. The Illinois State-Law Privileges Do Not Apply to the Documents Wexford is Withholding.

As discussed above, this Court should follow the guidance of appellate and district courts across the country and reject any argument to create a new federal peer-review privilege. But the peer-review privileges that Wexford invokes fail for an additional, and entirely independent reason: they do not protect the documents that

Wexford is withholding.

There can be little dispute that the second privilege invoked by Wexford, the "Long-Term Care Peer Review and Quality Assessment and Assurance Protection Act," 745 ILCS 55/1, does not apply to Wexford. The Act governs only documents created for or by a "[l]ong-term care provider," which under the Act's clear definitions, does not include Wexford. 745 ILCS 55/2 (long-term care provider means "any nursing home, sheltered care home or home for the aged"); *see also Pietro v. Marriot Senior Living Servs., Inc.*, 810 N.E.2d 217, 570-71 (Ill. App. Ct. 2004) (strictly construing the types of facilities included within the ambit of 745 ILCS 55/1). There can be no reasonable dispute that Wexford is not a nursing home, sheltered care home, or home for the aged. *See City of Evanston v. Ridgeview House, Inc.*, 349 N.E.2d 399, 402 (Ill. 1976) (sheltered care homes are homes for "people who are not capable of independent living and who need some type of nursing care").

Similarly, Illinois appellate courts have indicated that the Illinois Medical Studies Act, 735 ILCS 5/8-2101, does not apply to Wexford. *See Pietro*, 810 N.E.2d at 223. In *Pietro*, the court strictly construed Section 8-2101 of the Act, and found that assisted living facilities are *not* within the purview of the Act. *Id.* ("[T]he statute does not protect data of 'other health care delivery entities or facilities.' Rather, it protects data of 'medical organizations under contract with . . . other health care delivery entities or facility.'"). Like the assisted living facility in *Pietro*, Wexford is not under contract with a healthcare facility; rather, it is under contract with a *correctional* facility. Accordingly, the Illinois Medical Studies Act does not apply to Wexford. *Id.*

Wexford has further failed to show that even if it is within the purview of the

10

Illinois Medical Studies Act, the documents it has withheld are protected by the Act. Importantly, the Act does not protect "all information used for internal quality control" and instead covers *only* "documents generated specifically for the use of a peer-review committee . . . ." *Webb v. Mount Sinai Hosp. & Med. Ctr.*, 807 N.E.2d 1026, 1033 (Ill. App. Ct. 2004); *Chicago Trust Co. v. Cook Cnty. Hosp.*, 698 N.E.2d 641, 646 (Ill. App. Ct. 1998 (collecting cases). Documents created "in the ordinary course of the hospital's medical business" are not covered by the Act, nor are documents created "for the purpose of rendering legal opinions or to weigh potential liability risk . . . ." *Webb*, 807 N.E.2d at 1033; *see also Frigo v. Silver Cross Hosp. & Med. Ctr.*, 876 N.E.2d 697, 718 (Ill. App. Ct. 2007) ("The Act was never intended to shield hospitals from potential liability and legal advice is not a goal of the protection offered by the Act." (cleaned up)).

As set forth in *Frigo* and *Webb*, the work-product privilege and the Illinois Medical Studies Act are mutually exclusive. Documents created because of anticipated litigation are expressly not covered by the Act, and conversely, documents created pursuant to a peer-review process designed to improve care are covered by the Act only if they are created without a litigious purpose in mind. Wexford's attempt to simultaneously invoke both of these mutually exclusive privileges demonstrates that they cannot meet their burden to establish that either privilege applies.

Even if that were somehow not the case, there is no evidence in the record to support any assertion that the documents at issue were created by a peer-review committee, and not simply documents created in the course of Wexford's ordinary business that are not protected by the Act. *See Webb*, 807 N.E.2d at 1033. Indeed, the record demonstrates that these documents are not created as part of any peer-review

11

committee. The document entitled "Serious Event and Incident Report Form," for example, was created on September 5—the date of Mr. Curtis's death—and from the face of the document, appears to be simply a "report" informing about a "serious event and incident" (i.e., Mr. Curtis's death) and not documents created by a peer review committee. *See Frigo*, 876 N.E.2d at 718 (documents created in the ordinary course of business are not protected by the Act, even if they are later used in the peer-review process). Similarly, the "Death Notification," "Mortality Review Worksheet," and "Morbidity Survey Report," all of which were created the day after Mr. Curtis's death, appear to be reporting and notification documents—documents created in the course of Wexford's ordinary business—and not the product of a functioning and assembled peer review committee. *Kopolovic v. Shah*, 967 N.E.2d 368, 376 (Ill. App. Ct. 2012) ("Information generated or created before the time that the relevant committee became aware of the incident that the information relates to, or before the committee met to address the incident, is not 'information of' the committee and cannot be made privileged by its later submission to the committee."). And there can certainly be no way that the "QA Emergency Reporting Form," created on August 31 (six days before Mr. Curtis died) could be part of any assembled peer review committee. *Id.*

Wexford has further failed to establish that the undated document entitled "Quality Improvement Morality Committee" and the unspecified documents and communications that Wexford has withheld based on its belief that the documents are "considered quality assurance" are within the purview of the Act. Notably, the Act "does not protect information of any type of quality control group found in any corporate setting but, rather, specific committees capable of evaluating patient care." *Pietro*, 810

12

N.E.2d at 224; *see also Johnson v. Dart*, 309 F. Supp. 3d 579, 581 (N.D. Ill. 2018) (noting that many courts have "found the Illinois Medical Studies Act privilege (or a similar state law medical privilege) inapplicable and ordered production of information related to post-death investigations." (collecting cases)). Wexford has provided no information as to how these documents were created, what committee was assembled to create them, and who are members of any such committee.

To the contrary, it is Plaintiff's understanding that Elaine Gedman, a senior Wexford executive,[4] oversees Wexford's so-called "quality assurance" efforts, rendering documents created pursuant to such efforts outside the purview of the Act. *Id.* (finding documents created by a "resident care committee" outside of the purview of the Act because its members included corporate administrators and it was thus unqualified to provide professional self-evaluation regarding the adequacy of patient care). And it is further Plaintiff's understanding that many of these so-called "quality assurance" efforts are also done as part of Wexford's risk management initiatives, and involve Joseph Ebbitt, Wexford's Director of Risk Management and Legal Affairs. *See Nielson v. SwedishAmerican Hosp.*, 80 N.E.3d 706, 726 (Ill. App. Ct. 2017) (documents created for a dual purpose of quality assurance and risk management are not within the purview of the Act). To the extent Wexford contends otherwise, it was their burden to establish—a burden they have failed to meet.[5] *See* Ex. 8; *see also Webb*, 807 N.E.2d at

---

[4] Ms. Gedman's official job title at Wexford is Executive Vice President and Chief Administrative Officer.

[5] Wexford has similarly failed to provide any information or evidence establishing that the two sets of emails in its privilege log are within the purview of the Act. Ex. 8 at 1. The privilege log does not detail who wrote the emails, who received the emails, what peer review committee supposedly generated the emails, or any other details as to why Wexford contends they are protected by the Act. Wexford has accordingly failed to meet its burden under the

1034 (the party invoking the Act to resist discovery bears the burden to establish the documents are covered by the Act, and that party similarly "bear[s] the burden of any failure to make a more complete record" (cleaned up)).

None of this parsing of the documents should be necessary because Illinois privileges do not apply to a federal question case and this Court should not invent a new federal peer-review privilege that courts throughout the country have unanimously rejected. But even on their own terms, neither of the Illinois peer-review statutes Wexford has cited cover the documents it is withholding from discovery. This Court should compel those documents' production.

### III. Wexford's Documents Do Not Constitute Work Product.

Wexford's work product assertion fares no better than its claim of state law privilege. First, it has invoked *only* Illinois's work-product privilege, which does not apply in this case. By specifically invoking only the state-law work-product privilege, it has forfeited any argument that the federal work-product doctrine protects the documents. *In re Grand Jury Proceedings*, 220 F.3d at 571 (it is Wexford's burden to establish the existence of the privilege and its application to the documents).

Even on the merits of a hypothetical invocation of the federal work-product privilege, Wexford's argument would fail. Wexford's contract with the IDOC *requires* Wexford to create the mortality review documents being withheld. Ex. 11 (IDOC/Wexford Contract Excerpt) at 43 (Section 7.1.5). And lest there be any doubt, a subsequent provision of the contract makes clear that any documents, like the mortality reviews, created by Wexford pursuant to the contract belongs to the State of Illinois,

---

Act. *See Webb*, 807 N.E.2d at 1034.

and not Wexford. *Id.* at 32 (Section 4.7). Put simply, the documents Wexford has withheld are generated as part of Wexford's ordinary course of business and belong to the State rather than to Wexford personally. Accordingly, they cannot be considered work product—a designation which applies only to documents created in anticipation of litigation. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010) ("The work-product doctrine protects documents prepared by attorneys in anticipation of litigation for the purpose of analyzing and preparing a client's case."). There is simply no basis for Wexford to assert that these documents were created in anticipation of litigation, rather than as part of Wexford's routine and contractually required operations. This Court should reject Wexford's invocation of the work-product doctrine.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant her motion to compel and order Wexford to produce the documents it is currently withholding based on inapplicable state-law privileges.

September 28, 2022

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Sarah Grady
Howard Kaplan
KAPLAN & GRADY LLC
1953 N. Clybourn Ave., Suite 274
Chicago, Illinois 60614
(312) 852-2184
sarah@kaplangrady.com
howard@kaplangrady.com

15

## CERTIFICATE OF SERVICE

      I, Sarah Grady, an attorney, hereby certify on September 28, 2022, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.

      /s/ Sarah Grady
      Sarah Grady
      Attorney for Plaintiff