IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF ILLINOIS

YOLANDA JACKSON,                              )
                                             )
                    Plaintiff,               )
                                             )
vs.                                          )
                                             )
WEXFORD HEALTH SOURCES, INC.,                )
EVA LEVEN,                                   )    Case No. 3:20-cv-00900-DWD
MOHAMMED SIDDIQUI,                           )
GAIL WALLS,                                  )
NICKOLAS MITCHELL,                           )
CHARLIE FRERKING,                            )
JEREMY FRERICH, and                          )
ANDREW BENNETT,                              )

                    Defendants.

MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court are Plaintiff's Supplemental Motions to Compel (Docs. 139 & 142), which are directed at Defendant Wexford Health Sources, Inc. ("Wexford"). Defendant Wexford filed Responses to the Supplemental Motions to Compel (Docs. 146 & 147), to which Plaintiff replied (Docs. 150 & 151). For the reasons explained below, the Court **GRANTS** each Supplemental Motion to Compel (Docs. 139 & 142).

## I. Background

Decedent, Kevin Curtis, died while incarcerated at Menard Correctional Center. (Doc. 1, ¶ 1). Shortly before his death, Decedent allegedly received inadequate medical care from Defendants after he fell into a catatonic and unresponsive state. (Doc. 1, ¶¶ 26-30). Plaintiff, as the mother and administrator of Decedent's estate, filed a 6-count

Complaint against Defendants. (Doc. 1, generally). Specifically, Plaintiff alleged deliberate indifference by all Defendants under the Eighth Amendment and 28 U.S.C. § 1983 (Count I), a conspiracy by all Defendants under § 1983 (Count II), a failure to intervene by all Defendants under the Eighth Amendment and § 1983 (Count III), a wrongful death action against all Defendants under 740 ILCS 180/1 (Count IV), a survival action against all Defendants under 755 ILCS 5/27-6 (Count V), and *respondeat superior* liability against Defendant Wexford (Count VI). (Doc. 1, generally). Plaintiff alleged, "there exist policies and/or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare." (Doc. 1, ¶¶ 55-61, 68, 73).

Plaintiff initially filed Motions to Compel (Docs. 95 & 106) on September 28 and November 18, 2022. Thereafter, Defendant Wexford filed its related Responses (Docs. 102 & 110). However, the parties did not comply with the "Discovery Dispute" provisions of the Court's Case Management Procedures, which the Court mandates before its consideration of any motion to compel. (Doc. 121). Therefore, on January 12, 2023, the parties were ordered to meet and conduct a discovery conference to discuss all unresolved discovery disputes. (Doc. 121). The parties were given a deadline to submit a joint written discovery report, related to the unresolved discovery disputes and the Motions to Compel, to the Court. (Doc. 121). The parties complied with these directives, so the matter was set for a Discovery Dispute Conference with the Court. (Doc. 136).

At that Discovery Dispute Conference, which was held on March 30, 2023, the Court considered Plaintiff's Motions to Compel and the parties' Joint Written Discovery Report, which outlined, *inter alia*, six areas that remained in dispute. At the Discovery

Dispute Conference, four of the six disputed areas were either deferred, resolved by the Court, or resolved by agreement. (Doc. 138). Therefore, after the Discovery Dispute Conference, only two areas, related to Plaintiff's Motions to Compel, remained in dispute. (Doc. 138). With respect to those two areas of dispute, the Court deferred ruling and directed the parties to meet and confer about whether the outstanding issues could be resolved without the involvement of the Court. (Doc. 138). If necessary, after the meet and confer, Plaintiff was directed to file Supplemental Motions to Compel. (Doc. 138).

On April 14, 2023, Plaintiff filed Supplemental Motions to Compel (Docs. 139 & 142), as permitted by the Court's Order at Doc. 138.[1] Defendant Wexford filed Responses to the Supplemental Motions to Compel (Docs. 146 & 147) on April 28, 2023. Thereafter, on May 12, 2023, Plaintiff filed Replies (Docs. 150 & 151) in support of the Supplemental Motions to Compel. A discussion of these filings is incorporated into the analysis below.

## II. Analysis

Under Federal Rule of Civil Procedure 26(b)(1), the scope of discovery, unless otherwise limited by the Court, is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and [is] proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

---

[1]In the Supplemental Motions to Compel, Plaintiff states: "To reduce the volume of filings this Court needs to consider…to decide Plaintiff's motion[s] to compel, Plaintiff has incorporated the relevant portions of the initial motion[s]…into the body of th[ese] motion[s]. Accordingly, the Court need not review Plaintiff's prior motion[s] to assess her position on these issues." (Docs. 139, pg. 1, n. 1; 142, pg. 1, n. 1). Therefore, the initial Motions to Compel (Docs. 96 & 106) are **TERMINATED**.

Fed. R. Civ. P. 26(b)(1).

The Court has "extensive discretion" to decide discovery matters. *See Motorola Solutions, Inc. v. Hytera Comms. Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019); *see also Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995) ("Because the district court is far better situated to pass on discovery matters, [the Seventh Circuit] review[s] its discovery decisions for an abuse of discretion."). Courts may refuse discovery of matters that are "of 'marginal relevance,' " and it is an assessment of proportionality that is essential. *See Motorola Solutions, Inc.*, 365 F. Supp. at 924 (citation to internal quotations omitted); *see also Armour v. Santos*, No. 19-cv-678, 2022 WL 16572006, *2 (S.D. Ill. Nov. 1, 2022) (stating "relevancy" is broadly construed to encompass matters bearing on, or reasonably leading to matters bearing on, issues in the case, and "proportionality" requires a common sense, experiential, careful, and realistic assessment of the actual need).

Likewise, decisions on motions to compel discovery are within the broad discretion of the Court. *See Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006) (citing *Meyer v. Southern Pacific Lines*, 199 F.R.D. 610, 611 (N.D. Ill. 2001)). Notably, when ruling on motions to compel, " 'courts have consistently adopted a liberal interpretation of the discovery rules.' [Citation]." *See id.* (quoting *Wilstein v. San Tropai Condo. Master Ass'n*, 189 F.R.D. 371, 375 (N.D. Ill. 1999)); *accord Traffix USA, Inc. v. Bay*, No. 21-cv-2093, 2022 WL 2046282, *2 (N.D. Ill. June 7, 2022). With these general legal principles in mind, the Court turns to the separate Supplemental Motions to Compel.

### A. Plaintiff's First Supplemental Motion to Compel (Doc. 139)[2]

Plaintiff seeks an order compelling Defendant Wexford to produce certain quality assurance documents, including eight documents named in Defendant Wexford's privilege log, peer review documents created by and relating to Defendant Wexford and its employees, and documents reflecting audits of the healthcare services at Menard Correctional Center. (Doc. 139, pg. 1). Defendant Wexford is withholding those documents based on Illinois state-law privileges, namely, the privileges contained in the Illinois Medical Studies Act (735 ILCS 5/8-2101) and the Illinois Long-Term Care Peer Review and Quality Assessment and Assurance Protection Act (745 ILCS 55/1 *et seq.*). (Doc. 139, pgs. 1, 5). Section 8-201 of the Illinois Medical Studies Act, in part, states:

> All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of…[certain public health and other medical entities], used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services.

735 ILCS 5/8-2101; *see also Green v. Meeks*, No. 20-cv-463, 2023 WL 1447817, *2 (S.D. Ill. Feb. 1, 2023) ("The [Illinois Medical Studies Act, Section 8-2101,] 'protects the records, reports, notes, and the like, of hospitals, hospital committees, medical societies, and other

---

[2]The parties have agreed to the scope of the requests related to the First Supplemental Motion to Compel. (Doc. 139, pg. 6). However, the parties continue to dispute the applicability of the Illinois state-law privileges, which could bar the productions altogether. (Doc. 139, pg. 6).

review groups used in the course of internal quality control or medical study for the purpose of improving morbidity and mortality, or for improving patient care.' ").

Likewise, Section 55/4 of the Illinois Long-Term Care Peer Review and Quality Assessment and Assurance Protection Act, in part, provides:

> All proceedings and communications of a peer review or a quality assessment and assurance committee shall be privileged and confidential and shall not be revealed except pursuant to specific written procedures of the sponsoring organization.
>
> The proceedings and records of such a committee shall be held in confidence, and shall not be subject to discovery or introduction into evidence in any civil action against a long-term care professional or facility arising out of the matters which are the subject of evaluation and review by such committee….However, information, documents or records otherwise available from original sources shall not be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee.

745 ILCS 55/4.

Notwithstanding these privileges, Plaintiff argues the above-described documents must be produced for three reasons: (1) the Illinois state-law privileges do not apply in this federal question case; (2) even if the Court entertained Defendant Wexford's arguments, other courts have rejected requests for a federal peer-review privilege; and (3) the Illinois state-law privileges do not protect the requested documents. (Doc. 139, pg. 2). The Court limits its analysis to Plaintiff's first two arguments.

As to those arguments, Plaintiff emphasizes this case involves a violation of Decedent's constitutional rights by Defendant Wexford and its employees. (Doc. 139, pg. 7). In other words, the case presents a federal question under 28 U.S.C. § 1331, and claims of privilege are governed by federal, not state, law. (Doc. 139, pg. 7). Since Defendant

Wexford invokes Illinois state-law privileges, rather than federal common law privileges, Plaintiff argues this argument, by itself, may end the Court's inquiry. (Doc. 139, pgs. 7-8).

Further, Plaintiff argues the "rooting out" of violations of federal law, including through discovery in a § 1983 action that alleges inadequate medical care, outweighs any interest in the confidentiality of the peer-review process. (Doc. 139, pgs. 8-10). Specific to this case, Plaintiff argues the balancing of interests "strongly favors access to the discovery" because "[a] report generated in response to [Decedent]'s death is crucial…in this case, which not only concerns claims related to [Decedent]…but also a *Monell* claim concerning Wexford policy, practices, and procedures." (Doc. 139, pg. 10). Similarly, Plaintiff states "documents reflecting Wexford's evaluation of deaths prior to [Decedent]'s death (and what, if anything, Wexford did in response to those evaluations), and documents reflecting Wexford's own assessment of and changes to its relevant policies and practices," is relevant to whether Defendant Wexford maintained inadequate policies and practices for purposes of a *Monell* claim. (Doc. 139, pgs. 10-11). Therefore, Plaintiff argues this Court, like all others, should reject any federal peer-review privilege.

In response to these arguments, Defendant Wexford indicates it has "produced thousands of records," including 9,000 emails, 19,000 pages of records, and six days of surveillance video. (Doc. 146, pg. 1). It seeks to withhold six emails and three documents, arguing an "undeniable public interest in medical entities performing internal quality improvement reviews" warrants an application of the Illinois state-law privileges. (Doc. 146, pgs. 1-2). Defendant Wexford characterizes the case as involving medical malpractice claims, which necessitates an application of the Illinois state-law privileges to ensure

medical professionals effectively engage in self-evaluation of their peers to advance quality healthcare. Further, Defendant Wexford suggests the requested documents do not contain information, beyond what has already been produced in discovery, regarding Decedent's death, so Plaintiff has already received the policy directing the internal quality improvement review and the blank forms utilized in that review. (Doc. 146, pg. 9). In Defendant Wexford's view, Plaintiff has failed to meaningfully articulate why that documentation is insufficient, the reasons she is unable to obtain the requested information through other means, and the ways in which she will be prevented from establishing a valid claim without the requested documents. (Doc. 146, pgs. 9-10).

Now, Defendant Wexford, as the party seeking to invoke a privilege and as the opponent of discovery, has the burden of establishing the applicability of the Illinois state-law privileges. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 86 (N.D. Ill. 1992) (*U.S. v. White*, 950 F.2d 426, 430 (7th Cir. 1991)). Under Federal Rule of Evidence 501, "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege," unless provided otherwise by the U.S. Constitution, a federal statute, or the Supreme Court rules. *See* Fed. R. Evid. 501; *see also Hamdan v. Indiana University Health North Hospital, Inc.*, 880 F.3d 416, 421 (7th Cir. 2018) ("[F]ederal courts apply the federal common law of evidentiary privileges—not state-granted privileges—to claims…that arise under federal law."); *Kodish,* 235 F.R.D. at 450 (stating the federal common law of privileges applies where the principal claim arises under federal law and there is pendent jurisdiction over a state claim); *Green*, No. 20-cv-463, 2023 WL 1447817, *2 ("As the Seventh Circuit and other district courts in this circuit

have recognized, 'the privilege arising under the IMSA is not binding on this Court where Plaintiff's principal claims arise under 42 U.S.C. § 1983,' as they do here."). While Rule 501 provides the courts with flexibility to develop rules of privilege on a case-by-case basis, the Supreme Court stated it is "disinclined to exercise this authority expansively," especially where Congress considered the competing concerns but did not provide the privilege. *See University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 189 (1990) (quoting *Trammel v. U.S.*, 445 U.S. 40, 51 (1980); *Branzburg v. Hayes*, 408 U.S. 665, 706 (1972)).

That said, federal courts may still consider the law of the state in which the case arose to determine if a privilege should be recognized by federal law. *See Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981). This is because "[a] strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *See id.* (quoting *U.S. v. King*, 73 F.R.D. 103, 105 (E.D. N.Y. 1976)). Further, if "a 'state holds out the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule.' [Citation]." *See id.* (quoting *Lora v. Board of Education*, 74 F.R.D. 565, (E.D. N.Y. 1977)).

The Supreme Court has advised that an evidentiary privilege is not created and applied "unless it 'promotes sufficiently important interests to outweigh the need for probative evidence.' " *See University of Pennsylvania*, 493 U.S. at 189 (quoting *Trammel*, 445 U.S. at 51). Privileges are strictly construed because testimonial exclusionary rules and privileges contravene the fundamental principle that the public has a right to every man's evidence. *See id.* (quoting *Trammel*, 445 U.S. at 50). In other words, evidentiary privileges

are disfavored because they impede fact-finding by excluding relevant information from the case. *See Hamdan*, 880 F.3d at 421 (citing *University of Pennsylvania*, 493 U.S. at 189; *U.S. v. Nixon*, 418 U.S. 683, 710 (1974); *U.S. v. Wilson*, 960 F.2d 48, 50 (7th Cir. 1992); *Shadur*, 664 F.2d at 1061). Therefore, when deciding whether to recognize a privilege, the Court "should 'weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege[] and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case.' [Citation]." *See Shadur*, 664 F.2d at 1061 (quoting *Ryan v. Comm'r of Internal Revenue*, 568 F.2d 531, 543 (7th Cir. 1977)); *accord Johnson v. Dart*, 309 F. Supp. 3d 579, 581 (N.D. Ill. 2018).

Notably, in the context of a prison, safety and efficiency may operate as goals affecting care. *See Johnson*, 309 F. Supp. 3d at 582 (quoting *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005)). For this reason, a review related to a deceased inmate does not necessarily involve the straightforward evaluation of medical care that might otherwise occur in a civilian context. *See id.* (quoting *Jenkins v. DeKalb County, Georgia*, 242 F.R.D. 652, 660 (N.D. Ga. 2007)). Such a review "is likely to contain far more 'nonmedical' information such as whether and when jail officials notified medical officials of a particular problem, whether there was a reason for nonmedical officials to have monitored a situation more closely, and perhaps provide insight into jail customs or policies." *See id.* (citing *Jenkins*, 242 F.R.D. at 660). Therefore, in a § 1983 case, the Northern District of Illinois has noted " 'it is peculiarly important that the public have access to the assessment by peers of the care provided.' " *See id.* (quoting *Agster*, 422 F.3d at 839).

Here, the Court agrees with Plaintiff that the circumstances of this case warrant an order compelling the documents withheld by Defendant Wexford. In arguing to the contrary, Defendant Wexford conflates Plaintiff's claims, which arise under § 1983, the Eighth Amendment to the United States Constitution, and Illinois law, with medical malpractice claims. However, ordinary claims of medical malpractice do not involve the same federal interests as the claims now alleged by Plaintiff. *See Johnson*, 309 F. Supp. 3d at 582; *see also Green*, No. 20-cv-463, 2023 WL 1447817, *3 (finding the recognition of a peer-review privilege would come at a cost to federal policy, where Defendant Wexford "wrongfully compare[d]" the plaintiff's § 1983 claims, related to inadequate care stemming from deliberate conduct and widespread practices and policies impacting the medical care of all IDOC prisoners, which were described as more difficult to prove and entirely separate from tort liability, to medical malpractice claims). Indeed, it defies reason to suggest that the exclusion of the evidence at issue, which Plaintiff argues is relevant to Defendant Wexford's actions both before and after Decedent's death, would not come at a substantial cost to Plaintiff's ability to prove her claims and vindicate alleged violations of Decedent's rights under federal law. *See Shadur*, 664 F.2d at 1061-63 (Seventh Circuit declining to apply the privilege contained in the Illinois Medical Studies Act, where, *inter alia*, the policy behind that privilege was substantial but, in an antitrust case as opposed to a medical malpractice case, an application of the privilege could deny evidence necessary to bringing the action); *Johnson*, 309 F. Supp. 3d at 581 (finding "[t]he very existence" of a quality assurance review committee, as well as its evaluations and recommendations in a mortality review, was important in deciding whether defendants

were providing adequate medical care to inmates, as " '[a]dequate medical care is not only measured by remedial steps after injury but also by evaluation and affirmative steps taken by quality assurance committees' ").

Further, it is unclear to the Court that Plaintiff could merely "obtain the same information through other means," as suggested by Defendant Wexford. *See Johnson*, 309 F. Supp. 3d at 582 (declining to apply the privilege contained in the Illinois Medical Studies Act, in § 1983 case involving a post-death investigation ordered by a jail, where, *inter alia*, it did not appear the plaintiff could obtain the requested information regarding medical care from other sources and that information was important, if not critical, to the plaintiff's deliberate indifference claims, *Monell* claims, and state law indemnification claims). In short, the Court now **FINDS** the policy furthered by the Illinois state-law privileges does not outweigh the need for Defendant Wexford to disclose all probative evidence in discovery. *See University of Pennsylvania*, 493 U.S. at 189; *Shadur*, 664 F.2d at 1061; *Johnson*, 309 F. Supp. 3d at 581. Accordingly, the Court will not allow the Illinois state-law privileges, which have also been rejected by other courts in this circuit, to block the production of the evidence withheld by Defendant Wexford. *See Hamdan*, 880 F.3d at 421 (Seventh Circuit noting "[t]his court has declined to recognize a federal peer-review privilege, reasoning that the need for truth outweighs the state's interest in supplying the privilege"); *Green*, No. 20-cv-463, 2023 WL 1447817, *3 (stating the court would not allow the peer-review privilege to block the production of relevant evidence in a § 1983 case, where "[t]he federal interest in providing constitutionally adequate medical care to those incarcerated 'overrides the state interest animating the IMSA privilege.' [Citation]. ").

Therefore, the First Supplemental Motion to Compel (Doc. 139) is **GRANTED**.

Defendant Wexford is **DIRECTED** to produce the disputed documents within 7 days.

### B. Plaintiff's Second Supplemental Motion to Compel (Doc. 142)

Now at issue are four spreadsheets, tendered by Defendant Wexford to Plaintiff,

that are not in a "native, usable format." (Doc. 142, pg. 3). Also at issue are five documents

that Defendant Wexford has partially redacted on the basis of relevance. (Doc. 142, pgs.

2-3). Plaintiff seeks an order compelling the production of the four spreadsheets in a

"native, usable format," and the five documents without redactions. (Doc. 142, pg. 3).[3]

### 1. Controlling Legal Principles

Whether a party may unilaterally redact nonresponsive or irrelevant portions of

responsive documents, before producing them to the opposing party, is a question that

has divided the courts. *See Hansen v. Country Mutual Ins. Co.*, No. 18-cv-244, 2020 WL

5763588, *4 (N.D. Ill. Sept. 28, 2020) (citing *Shell Offshore, Inc. v. Eni Petroleum US LLC*, No.

16-cv-15538, 2017 WL 11536165, *3-4 (E.D. La. Aug. 28, 2017)); *Vasquez v. Indiana

University Health, Inc.*, No. 21-cv-1693, 2023 WL 3450809, *2 (S.D. Ind. May 15, 2023); *see

also U.S. Equal Emp't Opportunity Comm'n v. Dolgencorp, LLC*, No. 13-cv-4307, 2015 WL

2148394, *2 (N.D. Ill. May 5, 2015) (noting courts have allowed such redactions but that is

"the exception rather than the rule"); *A+ Auto Serv., LLC v. Republic Servs. of South Carolina,

LLC*, No. 21-cv-1492, 2022 WL 2903314, *1 (D. S.C. July 14, 2022) ("District courts have

---

[3]Since the Discovery Dispute Conference, the parties have reached an agreement, without the Court's involvement, about the documents and testimony related to the *Lippert* matter. (Doc. 142, pgs. 1-2). Further, the parties have reached partial agreements as to Defendant Wexford's redactions on the basis of relevance and the format of its spreadsheets. (Doc. 142, pgs. 2-3). As such, only the five partially redacted documents and the four spreadsheets, referenced above, remain in dispute.

both permitted and prohibited redactions of unresponsive portions of relevant documents."). The decisions of those courts, however, "are not irreconcilable." *See A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *1; *accord U.S. ex rel. Simms v. Austin Radiological Ass'n*, 292 F.R.D. 378, 386 (W.D. Tex. 2013) (quoting *Beverage Distribs., Inc. v. Miller Brewing Co.*, No. 8-cv-1112, 2010 WL 1727640, *4 (S.D. Ohio April 28, 2010)).

The courts that have refused to allow unilateral redactions have reasoned: (1) the producing party is not harmed by the production of irrelevant or sensitive information that is subject to a protective order, restricting the dissemination and use of information, and the protective order renders the redactions unnecessary and potentially disruptive to the orderly resolution of the case; (2) courts should not be burdened with *in camera* reviews of redacted documents for the purpose of confirming the relevance or irrelevance of redacted information as opposed to protecting material that could waive a privilege; (3) redactions alter potential evidence, such that a party should not be allowed to take it upon him or herself to decide, unilaterally, the context necessary for the unredacted portions of the document and the uselessness of redacted information to the case; and (4) unilateral redactions breed suspicion, especially where there is a lack of trust between the parties. *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4 (quoting *Beverage Distribs., Inc.*, No. 8-cv-1112, 2010 WL 1727640, *4; *Simms*, 292 F.R.D. at 385-87; *Bartholomew v. Avalon Capital Group, Inc.*, 278 F.R.D. 441, 451 (D. Minn. 2001)); *see also A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2 (quoting this reasoning and noting "in cases where redactions were approved by a court, 'the number of redacted documents appeared to be small[] and the content of the redactions was readily apparent' ");

*Bonddesk Group, LLC*, No. 15-cv-1085, 2017 WL 4863202, *2 (E.D. Wisc. Oct. 26, 2017) (noting similar reasoning and that the practice of redacting for unresponsiveness and irrelevance finds no expressed support in the Federal Rules of Civil Procedure).

However, redacting documents in discovery is sometimes appropriate. *See RBS Citizens, N.A.*, 291 F.R.D. at 222 (citing *Abbott v. Lockheed Martin Corp.*, No. 6-cv-0701, 2009 WL 511866, *3 (S.D. Ill. Feb. 27, 2009); *Nauman v. Abbott Labs.*, No. 4-cv-7199, 2006 WL 1005959, *8 (N.D. Ill. April 12, 2006); *Beauchem v. Rockford Prods. Corp.*, No. 1-cv-50134, 2002 WL 1870050, *2 (N.D. Ill. Aug. 13, 2002); *McCurdy v. Wedgewood Capital Mgmt. Co.*, No. 97-cv-4304, 1998 WL 961897, *3 (E.D. Pa. Dec. 31, 1998); *Makowski v. SmithAmundsen LLC*, No. 8-cv-6912, 2012 WL 1634832 (N.D. Ill. May, 9, 2012)). For example, if a document contains unresponsive information that is particularly sensitive, *e.g.*, information violating a third-party's privacy, then redactions or production under an "attorneys' eyes only" provision may be appropriate. *See Vasquez*, No. 21-cv-1693, 2023 WL 3450809, *2 (quoting *F.F.T., LLC v. Sexton*, No. 19-cv-3027, 2020 WL 3258623, *4 (S.D. Ind. June 15, 2020)). In this instance, redactions may be permissible if the redacted information is not necessary to the context of the unredacted information and the redacting party "provides 'an adequate explanation as to exactly what was redacted for relevance, which permits…challenge[s] [to] any of those redactions if she does not believe that they are irrelevant.' " *See id.* (quoting *Greenbank v. Great Am. Assurance Co.*, No. 18-cv-239, 2019 WL 6522885, *12 (S.D. Ind. Dec. 4, 2019)). It has been recognized, though, that some redaction cases involve the redaction of sensitive information *that is also irrelevant*. *See Dolgencorp, LLC*, No. 13-cv-4307, 2015 WL 2148394, *2 (citing *Diak v. Dwyer, Costello & Knox, P.C.*, 33

F.3d 809, 813 (7th Cir. 1994); *Kirsch v. Brightstar Corp.*, No. 12-cv-6966, 2014 WL 4560978,

*6 (N.D. Ill. Sept. 11, 2014);  *RBS Citizens, N.A.*, 291 F.R.D. at 222-23) (Emphasis added).

Notably, in this case, the Court's HIPAA-Qualified Protective Order (Doc. 95)

"governs all discovery related to the exchange or dissemination of information or the

production of documents designated as" protected health information ("PHI"), including

that of third parties.[4] (Doc. 95, pgs. 11-12). "The parties may seek the PHI for non-parties

from any covered entity or entities identified in any disclosure or discovery response,

medical record, inmate file, or testified to at any deposition, or identified by any other

discovery tool." (Doc. 95, pg. 13). The HIPAA-Qualified Protective Order requires, *inter*

*alia*, disclosures to be designated as "Attorneys' Eyes Only" or "Attorneys' Eyes Only:

Confidential Document Produced Pursuant to Protective Order Entered in 20-cv-900-

DWD," used only in this proceeding, stored in accordance with the Privacy Standards,

read by only the attorneys and certain other identified individuals, and returned or

disposed of at the termination of this proceeding. (Doc. 95, pgs. 11-14).

Further, a party may redact information, produced in discovery, when it believes

necessary. (Doc. 95, pgs. 9, 14-15). The HIPAA-Qualified Protective Order states:

> To the extent that a party believes it has a right to redact information, it may
> redact such information, provided that, if a party redacts information from
> an "Attorneys' Eyes Only" matter and the face of the document itself does
> not make clear and obvious the nature of the information redacted, the
> party shall provide in writing a specific category of information redacted
> (for example, social security number).

---

[4] " 'PHI' shall mean protected health information as that term is used in HIPAA and the Privacy
Standards. 'PHI' includes, but is not limited to, health information, including demographic information,
relating to (a) the past, present, or future physical or mental condition of an individual, (b) the provision
of care to an individual, or (c) the payment for care provided to an individual, which identifies the
individual or which reasonably could be expected to identify the individual. (Doc. 95, pg. 10).

(Doc. 95, pgs. 14-15). The HIPAA-Qualified Protective Order also expressly states nothing contained therein "shall be deemed a waiver of the right of any party to object to a request for discovery on the basis of relevance, materiality, privilege, overbreadth, undue burden or expense, or any other recognized objection to discovery." (Doc. 95, pg. 15).

In light of this HIPAA-Qualified Protective Order, the Court would be remiss not to mention that Defendant Wexford has been in a similar situation before another Judge in this District. *See Green v. Meeks*, No. 20-cv-463, 2021 WL 3631264 (S.D. Ill. July 14, 2021). In that case, the Court reconsidered its prior finding that a qualified protective order, substantially similar to that entered in the present case, sufficiently protected the PHI of non-parties from unauthorized disclosures. *See id*. at *1, (Doc. 122). On reconsideration, the Wexford Defendants argued the operative ESI Protocol required the disclosure of a significant amount of non-party PHI. *See id*. at *2. For example, "many of the documents…produced to Plaintiff [we]re spreadsheets that contain[ed] only one entry regarding the decedent and the information for hundreds, and in some cases thousands, of other inmates." *See id*. Since the plaintiff's claims pertained to "a niche of medical care," the Wexford Defendants argued "a broad exposure of [PHI] of other inmates with conditions that do not pertain to the treatment of…[the "niche medical care"] would not advance the resolution of this case. *See id*. Therefore, the Wexford Defendants requested that the Court limit the amount of non-party PHI that could be exposed. *See id*. Specifically, the Wexford Defendants requested that "they only be ordered to disclose information on inmates who were diagnosed with…diseases [related to "the niche

medical care"] at Menard Correctional Center from the date when [the decedent] arrived until his death." *See id*. The IDOC Defendants similarly requested for the Court to limit the disclosure of individually identifiable health information from the PHI of any current and former IDOC inmate, other than the decedent, through redactions. *See id*.

The Court rejected the Defendants' arguments, finding "the Qualified Protective Order entered pursuant to [HIPAA]…adequately protect[ed] the health information of non-parties from unauthorized disclosure." *See id*. at *4. (citing *Haywood v. Wexford Health Sources, Inc.*, No. 16-cv-3566, 2021 WL 2254968, *5-6 (N.D. Ill. 2021), for the proposition that it "allow[ed] the disclosure of [PHI] of non-parties pursuant to a protective order that met the requirements under HIPAA," and *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 925 (7th Cir. 2004), for the proposition that "HIPAA does not create a privilege against production or admission of evidence…[but] a procedure for obtaining protected medical records in litigation"). *See id*. at *4. Moreover, in light of the fact that the plaintiff presented a *Monell* claim, *i.e.*, a claim the decedent died due to the widespread customs and practices of Defendant Wexford, "she [wa]s entitled to a 'broad and substantial amount of discovery." *See id*. at *4 (citing *Hildreth v. Butler*, 960 F.3d 420 (7th Cir. 2020)). The Court emphasized that the plaintiff was "required to show 'systemic and gross deficiencies' that…impacted others in IDOC custody." *See id*. at *4. Ultimately, the Court declined to limit discovery to information relating to inmates with decedent's disease at Menard Correctional Center or to the disclosure of information of non-party inmates via the redaction of individual identifiers. *See id*. at *4. (citing *Hildreth*, 960 F.3d at 426).

### 2. Arguments as to the Four Spreadsheets

Now, Plaintiff argues the four spreadsheets, produced by Defendant Wexford, are "completely indecipherable." (Doc. 142, pg. 10). Exhibits C and D purportedly show information only as to Decedent, "with other individuals excised from the list," and mere headings of charts, respectively. (Doc. 142, pg. 10). Plaintiff suggests this is "patently inappropriate" since, under Federal Rule of Civil Procedure 34, the documents must be produced as they are kept in the course of business and/or in a reasonably useful form. (Doc. 142, pg. 10). Further, Plaintiff argues the Court's HIPAA-Qualified Protective Order supports an order for the spreadsheets, which are "highly relevant to her claims," to be produced with all information viewable. (Doc. 142, pgs. 10-11, 13). Three spreadsheets purportedly track money Defendant Wexford spent on prisoners who were sent offsite for evaluation or treatment, which Plaintiff argues is "directly relevant" to her *Monell* claims and the treatment of patients when "dollars are directly on the line." (Doc. 142, pgs. 11-13). The fourth spreadsheet tracks prisoners who, like Decedent, were prescribed antipsychotic medication. (Doc. 142, pg. 13). Finally, as discussed above, Plaintiff notes Defendant Wexford was recently required to produce "scores of spreadsheets…[,] reflecting medical care for patients at Menard and the IDOC in both unredacted PDF and native Excel format," in *Green*. (Doc. 142, pg. 11). She seeks the same result here.

In response, Defendant Wexford argues Plaintiff is seeking the PHI of over 100,000 prisoners across multiple states, which it has objected to based on disproportionality and the fact that the information may be privileged or barred from disclosure. (Doc. 147, pgs. 1, 4). Further, Defendant Wexford states Plaintiff's requests were not made with

particularity under Federal Rule of Civil Procedure 34. (Doc. 147, pgs. 2-3). Although she claims that the PHI is related to her *Monell* claim, Defendant Wexford argues none of the information is responsive to her discovery requests or related to the facts of Decedent's care. (Doc. 147, pgs. 1. 4). Defendant Wexford emphasizes its belief that it "is abiding by state and federal laws not to frivolously disclose an essentially complete database of [PHI] of non-parties, including HIV status, mental illness, etc., wholly and completely irrelevant to this case" and protected by law. (Doc. 147, pgs. 4, 8). Defendant Wexford also stresses, "[t]he only information Plaintiff does not have is the medical and mental health information of *other* prisoners," including their "specific conditions, medications, and names." (Doc. 147, pgs. 5-6) (Emphasis in original). Defendant Wexford also notes the HIPAA-Qualified Protective Order was not a discovery order and the parties did not waive their objections. (Doc. 147, pgs. 7-8). Defendant Wexford asks the Court to take on the burden of reviewing the requested information *in camera* in order to show that the requested information is disproportionate, a disclosure would constitute "a gross disregard" for third-party PHI, and a disclosure would put it at an unnecessary risk of unlawful disclosures. (Doc. 147, pgs. 2, 4, 13).[5]

### 3. Arguments as to the Five Documents Containing Redactions

Next, Plaintiff emphasizes that Defendant Wexford does not invoke a privilege or the work-product doctrine to support its redactions. (Doc. 142, pg. 5). Further, Plaintiff argues the redacted documents are "unquestionably responsive" to discovery requests

---

[5]Ironically, Defendant Wexford makes this request while also bemoaning the prospect that it "would be required to review the contents of over 100,000 prisoner's information to redact for privilege and incur the risk of legal consequences if any unintentional disclosures [we]re made." (Doc. 147, pg. 8).

because they each discuss Decedent and/or his death and there is "good reason" to believe the redacted information itself renders the documents responsive to discovery requests. (Doc. 142, pgs. 8-9). For example, Exhibit A "withhold[s] information regarding other prisoners who were sent offsite for care—information that Plaintiff has expressly requested" and is covered by the HIPAA-Qualified Protective Order. (Doc. 142, pgs. 8-9).

In response, Defendant Wexford notes the HIPAA-Qualified Protective Order "foresees and allows for objections and redactions" to documents requested in discovery. (Doc. 147, pg. 11). In addition, Defendant Wexford believes it has complied with that Order by identifying the nature of the information redacted, *i.e.*, the PHI of third parties. (Doc. 147, pg. 11). Defendant Wexford then addresses the redactions.[6] With respect to 181 of the 182 pages of patient information relevant to page 2 of Exhibit A, pertaining to outpatient reports throughout Illinois, Defendant Wexford adopts the arguments made above with respect to the four spreadsheets. (Doc. 147, pgs. 11-12).[7] Page 3 of Exhibit A is relevant to a 94-page document that outlines the inpatient PHI of prisoners throughout Illinois. (Doc. 147, pg. 12). The redactions are to the PHI of the other prisoners and not to that of Decedent. (Doc. 147, pg. 12). Page 4 of Exhibit A is relevant to a 6-page document that notes the procedures performed at Menard Correctional Center. (Doc. 147, pg. 12). The redactions are to the services provided to other prisoners, as well as to a charge for the service provided to Decedent. (Doc. 147, pg. 12).[8] Page 5 of Exhibit A is relevant to a

---

[6]To Plaintiff's surprise, Defendant states the pages produced in discovery were "an excerpt of a larger document reflecting" that third-party PHI. (Docs. 147, pgs. 11-12; 151, pgs. 1-2).

[7]With respect to 1 of the 182 pages relevant to page 2 of Exhibit A, Defendant Wexford states it will remove the redaction and produce that page to Plaintiff. (Doc 147, pg. 11).

[8]Defendant Wexford agreed to remove this redaction. (Doc. 147, pg. 12).

23-page document of approved authorizations for medical conditions of prisoners at various facilities. (Doc. 147, pg. 12). The redactions are to services provided to other prisoners and not to those provided to Decedent. (Doc. 147, pg. 12). Pages 6 and 7 of Exhibit A are a marketing email containing publications from throughout the country, one of which that involves Decedent and was produced. (Doc. 147, pg. 12). The redactions were made due to unresponsiveness and irrelevance to Decedent. (Doc. 147, pg. 12).

### 4. Application of Controlling Legal Principles

Here, upon reviewing the Exhibits attached to the Second Supplemental Motion to Compel, the Court finds Defendant Wexford's productions are inadequate under the above-discussed legal authorities. Exhibits C and D, which relate to the four spreadsheets at issue, largely comprise blank pages with column headings as the only produced information. (Docs. 142-4, pgs. 2-14; 142-5, pgs. 2-16). The column headings include the phrases, to name a few, "inpatient" and "MENARDI," "MEMORIAL HOSP (CHESTER)," "INITIAL HOSPITAL CARE," "TRAUMA," "Outpatient" and "MENARDI," "AMBULANCE RSPN & TREATMENT NO TRNSPRT," multiple pages with Decedent's name, "Diagnosis Description," and "Procedure Description." (Docs. 142-4, pgs. 2-3, 5-7, 9-12; 142-5, pgs. 4-5, 9-10). Based on these terms, and the others not referenced, the Court finds the information not produced falls within Plaintiff's discovery requests. *See, e.g.*, (Doc. 142-3, pgs. 6-10). The Court also finds those requests are particularized and proportional to the needs of this case. *See* Fed. R. Civ. P. 26(b)(1); *Motorola Solutions, Inc.*, 365 F. Supp. at 924; *Armour*, No. 19-cv-678, 2022 WL 16572006, *2.

Further, while certain productions related to "Inmates on Anti-Psychotics" include the "drug name" and prescribing "doctor name" in an unredacted form, the "medical record #" and "inmate name" are redacted. (Doc. 142-4, pgs. 15-23). Another production, depicting the same information, is blank. (Doc. 142-5, pg. 16). Similarly, Defendant Wexford admits Exhibit A, relating to the five redacted documents for which Defendant Wexford does not invoke a privilege, contains redactions to outpatient reports throughout Illinois, the inpatient PHI of prisoners in Illinois, the medical procedures performed at Menard Correctional Center, authorizations for medical conditions of prisoners at various facilities, and a marketing email with news publications. (Doc. 147, pgs. 11-12). The redactions are made to the PHI and services provided to other prisoners or, in the case of the email, based on relevance or responsiveness. (Doc. 147, pgs. 11-12).

However, in light of the above authorities, the Court's HIPAA-Qualified Protective Order, and the fact that Plaintiff brings *Monell* claims, the Court finds Defendant Wexford's redactions to or withholding of information from Exhibits A, C, and D is unnecessary and inappropriate. Defendant Wexford spills a large amount of ink, unnecessarily, arguing its productions are appropriately limited to Decedent and need not extend to third-party prisoners. (Doc. 147, pgs. 4-8). That is obviously not the case, as the third-party PHI in Defendant Wexford's possession is, without a doubt, critical to Plaintiff's claims under *Monell*. Further, due to the nature of those claims, Plaintiff is entitled to a broad and substantial amount of discovery. *See Awalt v. Marketti*, No. 11-cv-6142, 2012 WL 6568242, *3 (N.D. Ill. Dec. 17, 2012); *accord Green*, No. 20-cv-463, 2021 WL

3631264, *4. In short, Defendant Wexford may not "excise" other individuals "from the list" or merely provide the headings from the spreadsheets. (Doc. 142, pgs. 10, 11-13).

Moreover, the reasoning underpinning other courts' refusals to allow unilateral redactions in discovery fully applies to Exhibits A, C, and D in this case. *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4; *A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2; *IDC Fin. Pub., Inc.*, No. 15-cv-1085, 2017 WL 4863202, *2; *Vasquez*, No. 21-cv-1693, 2023 WL 3450809, *2. First, the Court has entered a HIPAA-Qualified Protective Order. (Doc. 95). And, even if a relevant document contains unresponsive but "particularly sensitive" information, it is appropriate to allow redactions *or* the production of the information under an "attorneys' eyes only" provision. *See Vasquez*, No. 21-cv-1693, 2023 WL 3450809, *2. Based on the specific provisions of that HIPAA-Qualified Protective Order, which are described in detail above, the irrelevant or sensitive information produced by Defendant Wexford in relation to Exhibits A, C, and D will be protected from improper dissemination and use.[9] *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4; *A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2; *see also Green*, No. 20-cv-463, 2021 WL 3631264, *1-2, 4 (presenting similar circumstances to this case). That being the case, and due to the relevancy of the information to Plaintiff's claims, the Court finds Defendant Wexford's redactions are unnecessary and disruptive to an orderly resolution of the case. *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4 (ordering the defendant to produce unredacted copies

---

[9]In light of these specific provisions, it is only through the attorney's own oversight or lack of diligence that the Court's HIPAA-Qualified Protective Order, which neither party claims does not comport with HIPAA, would prove ineffective to protect third-party PHI. If such a situation arises, through the fault of the attorneys, the Court's response will be swift and the consequences will be severe.

of documents redacted in discovery, in a case where a confidentiality order was entered, after finding the line of authority that precludes a producing party from unilaterally redacting responsive documents on the basis of unresponsiveness or irrelevancy was persuasive); *Dolgencorp, LLC*, No. 13-cv-4307, 2015 WL 2148394, *2 (finding the defendant failed to establish redacted information was sufficiently sensitive on the basis of relevance, especially where a confidentiality order was entered in the case and the information, as described, did not seem to be particularly susceptible to misuse); *Simms*, 292 F.R.D. at 387 (ordering the defendant to produce unredacted versions of its documents, where, *inter alia*, "[a]ny concerns regarding confidentiality [we]re sufficiently addressed by the protective order in th[e] suit").

Second, despite Defendant Wexford's request, the burden of reviewing redacted documents, *in camera*, to confirm the relevance or irrelevance of information, is ordinarily not a task for the Court. *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4; *A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2. Indeed, here, Defendant Wexford has not claimed a privilege relating to the Second Supplemental Motion to Compel, so the Court declines to conduct an *in camera* review that further serves to keep Plaintiff "in the dark" about its unilateral redactions. *See RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 223 (N.D. Ill. 2013) (noting courts should not conduct *in camera* document reviews, to decide mere relevancy issues in discovery, absent extraordinary circumstances).

Third, by its own admissions, Defendant Wexford's redactions alter potential evidence related to third-party prisoners and Plaintiff's *Monell* claims. *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4; *A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2.

The Court agrees with the authority stating it is not for Defendant Wexford, without any participation by Plaintiff, to decide the context necessary for unredacted information or to determine the uselessness of the redacted information, especially where each category of information is arguably relevant to Plaintiff's claims. *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4; *A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2; *see also Vasquez*, No. 21-cv-1693, 2023 WL 3450809, *2 (stating redactions are disfavored since what constitutes relevant information is often a matter of judgment, and irrelevant information in a relevant document may be highly useful to the context of relevant information).

Fourth, it should come as no surprise to the parties that Defendant Wexford's redactions have likely precipitated a certain level of suspicion and a lack of trust in this case. *See Hansen*, No. 18-cv-244, 2020 WL 5763588, *4; *A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2. Defendant Wexford's redactions are substantial and made to a large swath of relevant information. *See A+ Auto Serv., LLC*, No. 21-cv-1492, 2022 WL 2903314, *2. Further, the issues related to the Supplemental Motions to Compel, which have been the subject of multiple discovery conferences and a hearing before the Court, have lingered for months. Still, the parties remain at an impasse. Even Defendant Wexford notes it "is not a question about whether the context is responsive, it is instead that Plaintiff's counsel does not believe what she has been told." (Doc. 147, pg. 13). But, as discussed in this Memorandum & Order, Plaintiff's counsel need not blindly take Defendant Wexford at its word. *See IDC Fin. Pub., Inc.*, No. 15-cv-1085, 2017 WL 4863202, *3 (finding there was a potential for abuse in the practice of redacting for unresponsiveness or irrelevance, where the defendants did not assert any privilege, but

instead objected based on a blanket assertion that the redacted information did not apply to the plaintiff, and the plaintiff could disagree with the defendants' relevance decisions without taking their "word for it").

Therefore, the Second Supplemental Motion to Compel (Doc. 142) is **GRANTED**. Defendant Wexford is **DIRECTED** to fully produce the disputed documents, in an unredacted form that comports with Rule 34(b)(2)(E), the other authorities discussed herein, and the Court's HIPAA-Qualified Protective Order (Doc. 95), within 7 days.[10]

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** the First and Second Supplemental Motions to Compel (Docs. 139 & 142).

**SO ORDERED.**

Dated: July 5, 2023.

DAVID W. DUGAN
United States District Judge

---

[10]The parties may also stipulate to certain production procedures. *See* Fed. R. Civ. P. 34(E).