RYAN HERRINGTON  Volume II
June 21, 2023

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS

EAST ST. LOUIS DIVISION

_____

YOLANDA JACKSON, as Administrator )
of the Estate of KEVIN CURTIS, )
#Y22898, )
 )
 Plaintiff, )
 )
        vs.                       ) No. 3:20-cv-00900-DWD
 )
WEXFORD HEALTH SOURCES, INC., EVA )
LEVEN, MOHAMMED SIDDIQUI, GAIL WALLS, )
NICKOLAS MITCHELL, CHARLES FRERKING, )
JEREMY FRERICH, and ANDREW BENNETT, )
 )
Defendants. )
_____

Deposition Upon Oral Examination Of

RYAN HERRINGTON

Volume II

_____


7:40 a.m.

June 21, 2023

415 Capitol Way North

Olympia, Washington




REPORTED BY:  Yvonne A. Gillette, RPR, CCR No. 2129.

```
 1   A        No.
 2   Q        Did you review any Wexford written
 3   guidelines or policies that you found to be
 4   inadequate?
 5   A        I did not cite to any policies.
 6   Q        Okay.  I want to shift gears and talk about
 7   your methodology.  And --
 8   A        Maybe 30 seconds, please.
 9   Q        Yes.
10            THE WITNESS:  What time is it?
11            MS. GRADY:  It's 11:11.
12   A        Okay.  Go ahead.
13   Q        Did you perform a sampling of these patients
14   in order to conduct your study?
15            MS. GRADY:  Object to form.  Vague.
16   A        No.
17   Q        Okay.  Did you determine what patients'
18   records you were going to review?
19   A        No.
20   Q        Okay.  Do you understand the importance of
21   sampling a given population to ensure that the sample
22   group is a true representation of the population
23   without error?
24            MS. GRADY:  Objection.  Form.  Incomplete
25   hypothetical.  You can answer.
```

```
 1   A        Yes.
 2   Q        Did you create a methodology for unbiased
 3   sampling of the IDOC population?
 4            MS. GRADY:  Same objections.
 5   A        No.
 6   Q        Do you know what methodology, if any, was
 7   used in obtaining the sampling of the patients that
 8   you reviewed?
 9   A        I don't know.  I wasn't privy to the
10   processes of procurement of records.
11   Q        Okay.  Sampling errors caused by sampling
12   design can create selection bias; is that true?
13            MS. GRADY:  Objection.  Form.  Vague.
14   Incomplete hypothetical.
15   A        In some circumstances, yes.
16   Q        To ensure reliability and valid inferences
17   from a given sample, probability sampling techniques
18   should be used to obtain unbiased results.  Do you
19   agree with that?
20            MS. GRADY:  Same objection. Calls for
21   speculation.  You can answer.
22   A        Can you ask that again?
23   Q        Yeah.  To ensure reliable and valid
24   inferences from a sample, probability sampling
25   techniques should be used to obtain unbiased results.
```

1  Do you agree?

2  A          Let me think for just a second.  I'm
3  thinking because these are all sentinel events.  This
4  series of twelve cases are not like randomly taken
5  from the IDOC population.  These are people that had
6  adverse health effects already.  So they're -- they're
7  what we call sentinel events.  So the term we use is
8  these are patients that we know have had an adverse
9  outcome.  So what we're looking for is what exposures
10 they had, and that includes lack of proper medical
11 care, what exposures they had.  And so you -- now that
12 I've said that to myself, can you ask your question
13 one more time?

14 Q          Yeah.  To ensure reliable and valid
15 inferences from a sample, probability sampling
16 techniques should be used to obtain unbiased results.
17 Do you agree?

18           MS. GRADY:  Same objections.  Go ahead.

19 A          I do, except I think what you're getting at
20 is random sampling.  And this is not random sampling.

21 Q          So --

22           MS. GRADY:  Hold on.  He's going to finish
23 his answer.

24           MS. KINKADE:  I'm not --

25           MS. GRADY:  Absolutely not.  He's going to

1   finish his answer.  Please continue, Dr. Herrington.
2   A          What I was trying to explain is -- and this
3   is all probability related too as well.  But I think
4   what you're reading, the context of what you're
5   reading is when you're doing a random -- like a random
6   sampling of a population.  What this review is is not
7   a random sampling.  This is a sentinel event review.
8              So I have to answer your questions the way
9   you're posing them, but I just want to make sure that
10  the context of this review is not -- it's not a random
11  sampling of Wexford patients.  It can't be because
12  these are patients that have already suffered an
13  adverse event.
14             What we could do is, if we could, get
15  records for every single death that occurred under
16  Wexford in Illinois over a certain period of time.
17  And depending on how large that population is, we
18  could extract from that a random sampling.  But we
19  can't do that in this setting because this is not a
20  random sampling.  These are sentinel events.  It's a
21  little bit different process.
22  Q          So a sentinel event, is that -- are you
23  meaning that the same as adverse event?
24  A          Well, adverse events aren't necessarily
25  sentinel events.  I mean, people get infections after

1   operations all the time.  Those are all adverse
2   events, but they're not necessarily sentinel events
3   because we expect a certain percentage of people to
4   get postoperative infections.
5   Q       Okay.
6   A       What we don't expect is for people to die
7   from mismanagement of Coumadin.  We don't expect
8   people to die from failure to recognize people that
9   are dehydrated.  We don't expect people to die from
10  progressive cirrhosis.  That's not -- that's not
11  timely referred to a transplant center.  We don't
12  expect people to die from delays to local hospitals
13  and emergency departments when their medical condition
14  is so amazingly, just amazingly irresponsibly
15  unstable.
16          Some of these cases were so frankly poorly
17  managed that I had to go outside and get a breath of
18  fresh air.  I was struck by some of the just careless
19  disregard for a patient's prospect of remaining alive
20  that I was just -- I had to go outside for a couple of
21  these.  It was so poor.
22  Q       I'm going to object to nonresponsive.  If
23  you want to give those opinions, we can talk about
24  additional time.
25              MS. GRADY:  Absolutely not.  We're not

1   talking about additional time.
2   Q        I just want to make sure to answer the
3   questions that are before us.
4            MS. GRADY:  I just want to state for the
5   record, because now it appears to be necessary, there
6   was an agreement at the end of the deposition
7   yesterday that there would be no further time beyond
8   noon and no requests for further time.  So you have
9   had nearly twelve hours with this doctor.  That is
10  more than a sufficient amount of time.
11           There's not going to be a request for
12  additional time, and Wexford has expressly agreed to
13  that.  So there's not going to be any further requests
14  to that effect.
15           MS. ARMSTRONG:  I'm going to join that
16  objection as nonresponsive.
17  Q        Okay.  So we're dealing with twelve cases
18  where an individual died, correct?
19  **A        Correct.**
20  Q        We know all the individuals who died within
21  the Illinois Department of Corrections since 2000 to
22  2020; is that correct?
23           MS. GRADY:  Objection.  Form.
24  **A        I don't know.**
25  Q        Have you not reviewed the Illinois

```
 1   Department of Corrections Adult Institute Inmate Death
 2   Calendar for every given year within the Department of
 3   Corrections?
 4   A       I've tried to look at that, but I couldn't
 5   understand how to get -- to get meaningful data.  So I
 6   wasn't able to get very far with that, but I actually
 7   did try to look that up.
 8   Q       So you saw a spreadsheet that lists the
 9   number of patients that died every year, right?
10   A       I remember seeing spreadsheets, but I didn't
11   understand how to like technically look at that data.
12   And I -- I can just tell you, I tried to look at that.
13   And I -- I didn't -- I don't feel like I got very far
14   with it.  But if that data is prepared for me in a way
15   that I can understand it, I would be happy to look at
16   it.
17   Q       The question is, the spreadsheet listed the
18   number of deaths per year, correct?
19   A       I don't remember.
20   Q       Okay.  It lists the institutions in which
21   the individuals were incarcerated?
22   A       I don't -- I just don't remember.
23   Q       And it listed the date of deaths of the
24   individuals?
25   A       I'm sorry.  I just don't remember.  I can
```

1   only tell you I tried to look at that.

2   Q         If your answer is "I don't know", that's
3   fine.  It listed the cause of death for each of the
4   individuals as well?

5             MS. GRADY:  Objection.  Form.  Misstates the
6   records.

7   A         So I don't -- I don't know.  But what I
8   would also say is some of these patients didn't have
9   autopsies.  Some of these patients I had to learn for
10  myself what the cause of death was.  One of the
11  things, you know, if I were to look at that
12  spreadsheet, I would to have some sort of assurance
13  that that spreadsheet itself is actually accurate.

14  Q         Since we have a list of all the names of
15  individuals who died every single year in the
16  Department of Corrections, there could be a random
17  sampling of the deaths that have occurred, fair?

18            MS. GRADY:  Objection.  Incomplete
19  hypothetical.

20  A         That could happen.

21  Q         And I wasn't only referring to a random
22  sampling before.  My question -- there are actually
23  four different types of probability sampling that can
24  occur.  Random sampling, systematic sampling,
25  stratified sampling, and cluster sampling, right?

```
 1   A          That's correct.
 2   Q          And none of those were done here?
 3              MS. GRADY:  Object to form.  Incomplete
 4   hypothetical.  You can answer.
 5   A          Well, we have a population of twelve.  But
 6   my point is that these are all -- these are all
 7   patients who have already had an event.  And I also --
 8   I also know that -- well, I mean, I'm not part of any
 9   efforts to obtain, you know, an entire population.  I
10   can only tell you that I'd be happy to do that if I
11   were able to.  But what I have here is twelve cases.
12   These are -- these are cases where the adequacy is
13   not -- not a hard decision to make.
14   Q          Doctor, I'm asking about sampling methods.
15              MS. GRADY:  Hold on.  We're going to let him
16   finish his answer.
17              MS. KINKADE:  I --
18              MS. GRADY:  Absolutely not.  We are not
19   going to be interrupting the witness.  I'm sorry if
20   you have used your time in a way that leads at 1:22
21   with 18 minutes left that you --
22              MS. KINKADE:  It's not about my time.  It's
23   about responding to the question.
24              MS. GRADY:  Absolutely not.  You do not
25   interrupt the witness.  That is rule number one in
```

1   these depositions, and you have enforced that with me.
2           MS. KINKADE:  I'm going to call the Court if
3   you don't stop interrupting me.
4           MS. GRADY:  We're going to allow the witness
5   to answer the question.  Please continue,
6   Dr. Herrington.
7   **A       What was the question?**
8   Q       There are four --
9           MS. GRADY:  Can you read it back, please?
10          MS. KINKADE:  I can say it.
11  Q       (Ms. Kinkade continuing.)  There are four
12  probability sampling methods, random sampling,
13  systematic sampling, stratified sampling, and cluster
14  sampling.  Were any of those methods used in sampling
15  the individuals in this case?
16  **A       This is not a random sampling.  This would**
17  **not be a stratified sample.  This would not be a**
18  **cluster sample.  I don't know -- I don't remember what**
19  **systemic sampling is.  So this is a -- this is twelve**
20  **cases.  I don't -- I can't speak -- I don't remember**
21  **what systemic sampling is.**
22  Q       Okay.  That's fine.  Sampling size is
23  important in order to be able to determine whether the
24  sample can provide any insight into a relationship
25  that would exist more generally in the environment; is

1   that true?
2           MS. GRADY:  Object to form.  Vague.
3   Incomplete hypothetical.  You can answer.
4   A       So you're asking about sample size.  That is
5   important when you're drawing inferences between
6   variables.  In this case, the variable we're looking
7   at is did the patient live, or did the patient die?
8   And in all of these cases we looked at, the patient
9   died.  So it's -- it's a number twelve.  They're all
10  sentinel events, but the -- it's still a valid tool to
11  make generalizations and opinions because the mistakes
12  that were made were so outrageous.
13          I think -- I understand what you're getting
14  at is you're trying to look into the validity of my
15  work here.  And I understand that.  I think if the
16  decision of inadequate versus adequate -- I think if
17  the difference was smaller and more subtle, then you
18  would need the methodology that you're talking about.
19  Large sample size, randomness.  But here, the outcomes
20  were so bad, and the decision making was so
21  breathtakingly poor that these are still valid
22  conclusions and opinions to make based on a number of
23  twelve.
24  Q       Did you pick the number twelve for patients
25  that you reviewed?

```
 1   A        No.
 2   Q        Did you perform any mathematical equation to
 3   determine what number of death reviews should be
 4   conducted in order to determine a statistical power
 5   analysis that can generalize your findings into the
 6   community?
 7            MS. GRADY:  Objection.  Form.  Incomplete
 8   hypothetical.  You can answer.
 9   A        No.
10   Q        Okay.  Did you perform a root cause analysis
11   of -- in any of these cases?
12            MS. GRADY:  Same objections.
13   A        Root cause analysis, I think, for a lot of
14   these would be a very good practice.  And I don't see
15   any evidence that Wexford did root cause analysis.
16   And that speaks to one of my conclusions, which is
17   on -- bear with me.
18   Q        Just to remind you, the question was whether
19   you performed root cause analysis in any of these.
20   A        Well, the answer is sort of -- I mean, root
21   causes are what is fundamentally wrong with this
22   system, which is why I have entitled at the bottom of
23   page 48 is:  Why did these deaths occur in the manner
24   in which they occurred?  That speaks to a methodology
25   that's consistent with RCA or root cause analysis.
```

```
 1              But I talked about clinical supervision that
 2    I thought was insufficient.  And I talked about a lot
 3    of time spent in collegial review.  I talked about
 4    continuous quality improvement and ineffective
 5    mortality review.  That's -- that would be part of a
 6    root cause analysis.  Not sending patients to the
 7    hospital and not hiring practitioners with, you know,
 8    proper credentials.
 9    Q        Did you review the credentials of any of the
10    practitioners that you reviewed?
11    A        I used a piece of the Lippert report to
12    speak to that.  I mean, I -- I can't do my own
13    investigation for that.  I pulled it out of the
14    Lippert report.  You know, if this is incorrect, and
15    you have documentation otherwise, I'd be happy to
16    consider that.  But I think that the -- I think the
17    doctor managing the Coumadin case, I think he was like
18    a radiologist.
19    Q        What about the credentialing of
20    Dr. Siddiqui, Dr. Floreani, Dr. Leven,
21    Mr. Moldenhauer, Ms. Zimmer?  Did you find any
22    inadequacies in their credentialing?
23             MS. GRADY:  Objection.  Compound.  You can
24    answer.
25    A        I don't recall that I really got into that.
```