EXHIBIT B

```
              IN THE UNITED STATES DISTRICT COURT
           IN AND FOR THE SOUTHERN DISTRICT OF ILLINOIS
                     EAST ST. LOUIS DIVISION


 _____
                                        )
 YOLANDA JACKSON, as Administrator      )
 of the Estate of KEVIN CURTIS,         )
 #Y22898,                               )
                                        )   No.  3:20-cv-00900-DWD
              Plaintiff,                )
                                        )
      v.                                )
                                        )
 WEXFORD HEALTH SOURCES, INC.,          )
 EVA LEVEN, MOHAMMED SIDDIQUI,          )
 GAIL WALLS, NICKOLAS MITCHELL,         )
 CHARLES FRERKING, JEREMY FRERICH,      )
 and ANDREW BENNETT,                    )
                                        )
              Defendants.               )
 _____ )_____



                DEPOSITION UPON ORAL EXAMINATION
                              OF
                     RYAN HERRINGTON, M.D.


 _____



                      (Via Videoconference)

                             * * *



 U.S. LEGAL FILE NO.:  6478454

 DATE OF PROCEEDINGS:  TUESDAY, NOVEMBER 7, 2023
```



92

1      A.   Well, I mean, I just read the reports or reviewed

2    them.  I didn't, like, conscientiously ask myself if I --

3    you're asking me did I assume that they're accurate?

4      Q.   Yes.

5      A.    So I assumed that they were, like, credibly

6  written, so yes, I did assume they were accurate.

7           And what I will is that when I was able to

8  cross-reference charts between Lippert and my assessment, I

9  found that there was substantial agreement between what I

10 found and what Lippert found; and so I think if I were to

11 make an assessment of whether overall I thought Lippert was

12 accurate, the answer is "yes."

13     Q.    And are you talking about cross-referencing

14 specific patients' care or what did you cross-reference?

15     A.    Well, there were some patients in the review I

16 did that were Lippert and some that weren't, and of the

17 ones that I felt matched Lippert, I thought there was

18 agreement, substantial agreement between my assessment and

19 theirs.

20          I trust my judgment and my methodology, and so

21 any assumption that I made that Lippert was accurate was

22 reinforced through the course of my expert work on the

23 Curtis case that we're discussing today.

24     Q.    And do you have an unredacted version of the

25 report that identifies the names of the patients in the

                                                        93

1  2014 Lippert report?

2      A.     No.  Those are all redacted.

3      Q.     Were you asked to assume it to be true that the
4   patients that you reviewed were, in fact, patients that
5   were identified in the Lippert report?

6             MS. GRADY:  Objection; misstates his report.
7   I'll also object to the scope.  Again, we're going back to
8   the things that counsel had more than twelve hours'
9   opportunity to depose Dr. Herrington about concerning his
10  original report.

11                 (To the witness)  You can go ahead, Doctor.

12                 (To counsel)  And I'll ask that we please
13  keep this tied to the rebuttal report, given the
14  substantial additional time that's already been provided
15  for counsel to depose Dr. Herrington on the first one.

16     Q.     (Ms. Kinkaide continuing)  I'm on page 6.  Do you
17  need me to repeat the question or have you still got it?

18     A.     No; I think I still have it.

19            So I didn't have, like, Social Security numbers
20  or patient I.D. numbers to cross-reference; but when I saw,
21  like, almost exact clinical information, like this patient
22  fell in the bathroom on this day and the age was the same,
23  that was enough for me to conclude on a more-likely-than-not
24  basis that it was the same patient.

25     Q.     How did you know to even look to cross-reference?

                                                    94

1      A.    I just --

2            MS. GRADY:  (To the witness)  Hold on, Doctor.

3                 I'm going to object because I think that

4      calls for potential communications between counsel and

5      Dr. Herrington that is expressly protected from disclosure

6      by Rule 26(b).

7                 (To the witness)  I'm going to advise you

8      not to answer, Dr. Herrington.

9      Q.    (Ms. Kinkaide continuing)  Are you taking her

10     advice?

11     A.    Yes.

12     Q.    So it sounds like you're refusing to tell me how

13     it was that you decided to cross-reference the cases that

14     you reviewed with the cases laid out in the Lippert report.

15           MS. GRADY:  That wasn't your question.  Is that

16     the question you're asking?

17           MS. KINKAIDE:  That is the question I'm asking.

18           MS. GRADY:  Can you restate it so I can decide

19     whether I need to object.

20           MS. KINKAIDE:  Can the court reporter restate it

21     for me?

22                      (The record was read, as requested.)

```
23          MS. GRADY:  I think he did answer that question,
24   and then I think the question was "How did you even know to
25   cross-reference them?"  That was the question I objected to
```

                                    95

```
 1   and advised Dr. Herrington to not respond to pursuant to
 2   Rule 26(b)(4).
 3          MS. KINKAIDE:  And if you can just let me speak
 4   for a moment, then I asked the question that she read
 5   initially, "Are you refusing to answer?"  And you said, "Is
 6   that the question," and I said, "Yes, that's the question,"
 7   so that is the question I'm posing.
 8              (To the reporter)  Can you read that
 9   question back, the "Are you refusing to answer..."
10   question.
11                  (The record was read, as follows:
12                  "QUESTION:  So it sounds like
13                  you're refusing to tell me how it was
14                  that you decided to cross-reference
15                  the cases that you reviewed with the
16                  cases laid out in the Lippert
17                  report.")
18          MS. GRADY:  I'm going to object.  That misstates
19   the question that was posed and the objection that was
```

20    raised.  That question has not been asked.

21            (To the witness)  Go ahead.

22            MS. KINKAIDE:  That is the question.  That's what

23    I'm asking right now.

24            MS. GRADY:  You're asking if he's refusing to

25    tell you how he decided, but that's not the original

                                                              96

1     question you asked.  Do you want to ask that question?  Ask

2     that question.

3             MS. KINKAIDE:  That's what I've been trying to

4     do.  That's what I'm doing.  I had her repeat it to ask

5     that question to the, Doctor.

6             MS. GRADY:  I see.  Okay, I'm sorry.

7         Q.   (Ms. Kinkaide continuing)  Have you got it,

8     Dr. Herington?

9         A.   No, I don't have it.

10            MS. KINKAIDE:  (To the reporter)  Can you read it

11    one more time for us.

12                    (The record was read, as follows:

13                    "QUESTION:  So it sounds like

14                you're refusing to tell me how it was

15                that you decided to cross-reference

```
16                    the cases that you reviewed with the
17                    cases laid out in the Lippert
18                    report.")
19          MS. GRADY:  Objection; misstates the testimony.
20              (To the witness)  Go ahead, Doctor.
21     A.   So if I'm understanding the question, it's how is
22   it that I decided to cross-reference patients in this
23   case-series review I did in Curtis and Lippert.
24          MS. GRADY:  (To the witness)  Hold on, Doctor.
25   That's actually not the question, and that matters because
```

                                                                97

```
1    the answer to that question is protected.  She's asking you
2    whether you're refusing to testify about how you decided.
3       A.   I guess I just don't understand the question.
4    I'm not refusing to testify.  It's just that Lippert -- you
5    know, as an expert I want to use as much documentation as I
6    have access to to generate opinions, and Lippert was
7    available and then these twelve cases were available, and
8    so it made sense to me to see if there was information in
9    Lippert that I could review to potentially assist me in
10   opinion formulation.
11      Q.   (Ms. Kinkaide continuing)  Do you understand that
12   there were over 600 deaths in the Department of Corrections
```

13      during the time frame at issue?

14              MS. GRADY:  Objection; vague as to time frame.

15      A.      Yes.

16      Q.      (Ms. Kinkaide continuing)  And did you decide to

17      cross-reference the cases you reviewed with the Lippert

18      report as part of your methodology?  Was that your choice?

19              MS. GRADY:  I'm going to object and instruct the

20      witness not to answer.  I think as phrased it calls for

21      things around creation of draft reports that are protected

22      from disclosure by 26(b)(4).

23      Q.      (Ms. Kinkaide continuing)  Are you taking the

24      advice of counsel?

25      A.      Yes.


                                                                98

1       Q.      And you're refusing to answer that question based

2       on the advice?

3       A.      Yes.

4       Q.      Were you informed by counsel to cross-reference

5       specifications in the Lippert report with the cases that

6       you reviewed in this case?

7               MS. GRADY:  Same objection and same advice.

8                   (To the witness)  Dr. Herrington, that

9   calls expressly for communications this time that are

10  protected from disclosure by Rule 26(b)(4) because they do

11  not relate to any of the exceptions set forth in that rule.

12       Q.   (Ms. Kinkaide continuing)  Are you taking the

13  advice?

14       A.   Yes.

15       Q.   And you're refusing to answer based on the

16  advice?

17       A.   Yes.

18            MS. KINKAIDE:  Madame Court Reporter, can you

19  please certify this portion of the transcript.

20            THE REPORTER:  I will index all of the questions

21  not answered in the index on page 3 of the transcript.

22            MS. GRADY:  Ms. Kinkaide, can I ask you to avoid

23  any unnecessary need to involve the court.  Can you just

24  tell me section of 26(b)4(c) you believe that your

25  questions relate to that would allow the question to be

                                                          99

1   answered?

2             MS. KINKAIDE:  We can discuss that on the break

3   but I have limited time.  I've asked it a bunch of times.

4   It's pretty straightforward.

5                 I've also already told you that it's

6   assumptions that were provided to the doctor that these

7   patients were, in fact, identified in the Lippert report.

8           MS. GRADY:  Oh.  If you want to ask that, I

9   agree.  You're more than welcome to ask him whether he made

10  any assumptions or whether counsel told him to make any

11  assumptions about the identity of any of the individuals

12  and how they compared to the Lippert report at all.  I

13  agree that that's fair game, so to be clear, my objection

14  does not cover that.

15          MS. KINKAIDE:  I think my question covers the

16  rest.  You're clearly not going to waive the objection and

17  he's following your advice, so I'm going to have to take it

18  up later but we can take it up on a break, but I've got

19  more in the limited time I have left.

20          MS. GRADY:  That's fine.  As part of the

21  certification of this question, I'd just like to note that

22  I've expressly requested to receive that information and I

23  would be happy to be take it up at a break.  That would be

24  fine.  I would just like that to be part of the record, as

25  well.

123

1    I do just want to basically, like, close this thing on the
2    privilege issue.
3              So I think I agree with you that if there
4    are any questions about assumptions that were made,
5    Dr. Herrington would be required to answer those question,
6    so I just want to make sure we're on the same page.
7              And the same is true with documents
8    provided to him I just want to make sure we're on the same
9    page.  It would be true that if we provided him only
10   portions of documents or directed him to review only
11   portions of documents, then those questions would be fair
12   game, too, but I think the questions as asked, we are going
13   to stand on the objections.
14             Okay.  We can go back on.  Thanks.
15       Q.    (Ms. Kinkaide continuing)  So the eleven patients
16   in addition to Mr. Curtis, those patients' names, were they
17   provided to you by counsel?
18       A.    Yes.
19       Q.    Were you ever informed why those patients were
20   selected?
21             MS. GRADY:  I'm going to object that that calls

```
22   for discussions protected by Rule 26(b)(4).
23        Q.   (Ms. Kinkaide continuing)  Are you going to
24   answer the question?
25        A.   I'm going to decline to answer that question.
```

                                    124

```
1         Q.   Is that based on her advice?
2         A.   Yes.
3              MS. KINKAIDE:  (To the reporter)  I would ask to
4    certify that question for the same reasons.
5         Q.   So getting back to your report, how did
6    Mr. Freeman die, in your mind?
7         A.   I don't have an opinion on Mr. Freeman.
8         Q.   How did Mr. Murray die, in your mind?
9         A.   I don't have an opinion on Mr. Murray.
10        Q.   On page 10 of your report when you talk about
11   "highly sensitive testing," what specific testing are you
12   referring to?
13        A.   So "highly-sensitive testing" comes from the
14   "Comments" -- "highly sensitive liquid chromatography,
15   quadruple time of" -- I think it's "light mass
16   spectrometry."  My copy is a little fuzzy, but that's where
17   the "highly sensitive" language came from.
```

18      Q.      What is the error rate for that test?

19      A.      It doesn't say.

20      Q.      Do you know?

21      A.      I don't.  I focused on the word "highly."  That's

22  the word I looked at -- "high sensitivity."

23      Q.      And "high sensitivity" means it's going to pick

24  up mass particles; that it's not going to miss particle; is

25  that right?

