IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF ILLINOIS

YOLANDA JACKSON,        )
                             )
          **Plaintiff,**     )
                             )
**vs.**                        )
                             )
**WEXFORD HEALTH SOURCES, INC.,** )   **Case No. 3:20-cv-00900-DWD**
**EVA LEVEN, MOHAMMED** )
**SIDDIQUI, GAIL WALLS,** )
**NICKOLAS MITCHELL, CHARLIE** )
**FRERKING, JEREMY FRERICH, and** )
**ANDREW BENNETT,**        )
                             )
         **Defendants.**   )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court are Defendants' Motion for Sanctions (Doc. 158) ("Motion") and the parties' Second Joint Written Discovery Report ("JWDR"). Plaintiff filed a Response in Opposition to the Motion (Doc. 159) and Defendants filed a Reply in Support of the Motion (Doc. 160). The Court's rulings on these matters are set forth in the sections below.

## I. Background

Decedent, Kevin Curtis, died while incarcerated at Menard Correctional Center. (Doc. 1, ¶ 1). Shortly before his death, Decedent allegedly received inadequate medical care from Defendants after he fell into a catatonic and unresponsive state. (Doc. 1, ¶¶ 26-30). Plaintiff, as the mother and administrator of Decedent's estate, filed a 6-count Complaint against Defendants. (Doc. 1, generally). Specifically, Plaintiff alleged deliberate indifference by all Defendants under the Eighth Amendment and 28 U.S.C.

§ 1983 (Count I), a conspiracy by all Defendants under § 1983 (Count II), a failure to intervene by all Defendants under the Eighth Amendment and § 1983 (Count III), a wrongful death action against all Defendants under 740 ILCS 180/1 (Count IV), a survival action against all Defendants under 755 ILCS 5/27-6 (Count V), and *respondeat superior* liability against Defendant Wexford (Count VI). (Doc. 1, generally).[1] Plaintiff alleged, "there exist policies and/or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare." (Doc. 1, ¶¶ 55-61, 68, 73).

The Court is no stranger to the parties' various scheduling and discovery disputes. For over a year now, the parties have fought tooth-and-nail over those disputes, which have clearly consumed the parties' time and required the Court's close attention. Specifically, the parties have repeatedly required the Court's intervention in disputes that are usually capable of resolution by the parties on their own, namely, disputes over a HIPAA-Qualified Protective Order and the setting of scheduling and discovery deadlines that do not implicate the dates for completing discovery, filing dispositive motions, or proceeding to trial. *See*, *e.g.*, (Docs. 95, 132, 138, 156, 164). Also, once the parties complied with the Court's Case Management Procedures, the Court was asked to resolve more substantive issues in a 35-page First JWDR, two motions to compel, and two supplemental motions to compel. (Docs. 96, 106, 138-139, 142). The Court did so in a

---

[1] Count VI was subsequently dismissed. (Doc. 61).

lengthy Memorandum & Order that arguably overlaps with some of the instant issues. (Doc. 157). Five days after the entry of that Memorandum & Order, Defendants jointly filed the Motion. (Doc. 158). Thereafter, the parties submitted the 37-page Second JWDR.

Now, it is not lost upon the Court that the above circumstances often characterize zealous advocacy and hard-fought litigation. However, when the disputes of the parties indicate a pattern of unnecessarily prolonging discovery or effecting the deposition of a nonparty expert witness, like Dr. John Shields, the Court is forced to the brink of sanctions. The parties are well aware their disputes cannot be allowed to have that effect on this case, and they have been encouraged by the Court to find common ground when appropriate. Therefore, while the Court finds sanctions based on the Motion are presently unwarranted, the attorneys are warned that any bad faith in the remainder of discovery or a repeat of the behavior at Dr. Shields's deposition will be deemed sanctionable.

With that said, the Court notes all of the instant issues have been briefed exhaustively by the parties. The Court resolves the issues in the separate sections below.

## II. Defendants' Motion

As alluded to above, the Motion relates to the deposition of Dr. Shields on June 9, 2023. (Doc. 158). Dr. Shields is a forensic psychologist who tendered a 41-page report under Federal Rule of Civil Procedure 26(a)(2)(B). Defendants seek sanctions due to the "wholly or partially non-responsive" answers given by Dr. Shields, the "legal objections and commentary on the nature of the questions" by Dr. Shields, Plaintiff's attorney's failure to instruct Dr. Shields on how to properly conduct himself in the deposition or to intervene in order to assist in a fair examination by Defendants, and Plaintiff's attorney's

lodging of improper objections for the purpose of delaying the deposition and guiding Dr. Shields's answers. (Doc. 158, pgs. 1-2). Defendants discuss these bases for sanctions in separate sections of the Motion. When doing so, Defendants devote around 13 of the 23 pages of the Motion to block quotations from the deposition. The behavior of Plaintiff's attorney and Dr. Shields allegedly served to "run[] out the clock" on the deposition, which lasted seven hours of on-the-record time, and limit Defendants' ability to "probe his findings and opinions." (Doc. 158, pgs. 6-7). Defendants complain that they were "[un]able to ask all the questions they prepared for the deposition." (Doc. 158, pg. 6).

Initially, Defendants take issue with the alleged unresponsive answers of Dr. Shields. (Doc. 158, pgs. 3, 5-13). For example, Defendants argue "Dr. Shields either could not or would not admit that medical opinions are outside his scope of practice." (Doc. 158, pg. 3). The answers provided on this line of questioning were "troubling for a variety of reasons," including that "it is undisputed and noncontroversial that psychologists cannot practice medicine." (Doc. 158, pgs. 5-6). Similarly, Defendants complain that Dr. Shields was unresponsive when asked to "tell…[Defense Counsel in] which cases" he testified or provided a written report about memory retention or loss. (Doc. 158, pgs. 7-8). Dr. Shields was also allegedly unresponsive when asked about dates between which Decedent sought mental health services, the medical condition from which Decedent died, and, despite being allowed by Defendant Wexford's attorney to frame the question, whether he "conducted any scientific experiments…identify[ing]…how many questions a witness should be able to remember in a deposition." (Doc. 158, pgs. 8, 10-12).

Defendants then submit the behavior of Dr. Shields changed from unresponsive to disruptive, openly hostile, and obstructionist because he asserted "a narrative that needs to be heard" related to Defendants' "due diligence" in treating Decedent, which could have resulted in a "very different" outcome. (Doc. 158, pg. 9). This resulted in an objection as unresponsive by Defendant Wexford, a threat from Defendant Wexford that there would be "challenges to the payment of this deposition" if the behavior of Dr. Shields continued, and multiple objections by Plaintiff's attorney on the grounds that Defendant Wexford's attorney was argumentative. (Doc. 158, pg. 9). Dr. Shields had the following response to Defendant Wexford's attorney's threat to withhold payment: "[W]hatever you want to do about payment, I could care less, to tell you the truth. I could absolutely care less, it means nothing to me. What…means more to me than payment for my time here is that this story be told, and it be told completely." (Doc. 158, pg. 9).

Next, Defendants challenge the "condescending" commentary and answers of Dr. Shields, which "served to heighten tension and create hostility." (Doc. 158, pgs. 5-6, 13). An example of the offending commentary was Dr. Shields's prefacing of an answer with the statement, "so, let me help you this way." (Doc. 158, pg. 6). On two other occasions, Defendant Wexford's attorney, based on the deposition transcript, made a statement that she intended as a question. (Doc. 158, pgs. 13-14). In the first instance, Dr Shields indicated, "I'm not hearing the question, though. You're making a statement. I apologize. What's the question?" (Doc. 158, pg. 14). In the second instance, Plaintiff's attorney asked "[i]s that a question?" and stated "[s]ounds like a statement" before Dr. Shields indicated "I'm not sure what the question is. I'm sorry." (Doc. 158, pg. 14). Defendant Wexford's

attorney then accused Dr. Shields of "know[ing] what the question [wa]s." (Doc. 158, pg. 14). Defendants also argue "Dr. Shields made inappropriate comments complaining about when counsel w[ould] get to other parts of his report." (Doc. 158, pg. 13).

Finally, Defendants claim Plaintiff's attorney and Dr. Shields raised improper objections during the deposition. (Doc. 158, pgs. 15-20). Defendants note Plaintiff's attorney raised numerous objections on the grounds that the questions, *inter alia*, called for a legal conclusion, were vague, misstated the evidence, or were asked and answered. (Doc. 158, pgs. 16-20). Defendant's attorney also purportedly raised speaking objections and objections to objections. (Doc. 158, pgs. 16-20). Moreover, Defendants suggest Dr. Shields improperly "lodged his own objections." Defendants specifically claim Dr. Shields showed "open hostility and [a] refusal to meaningfully provide answers" by commenting on the foundation for a question, suggesting an email communicated a hearsay statement based on a custodial officer's report, assuming the authenticity of a document before answering a question, indicating a question was argumentative, noting a misunderstanding of the relevance for a question, identifying the vagueness of the context for a hypothetical or question and the terminology used by Defendant Wexford's attorney, recognizing questions about hearsay and whether Defendant Leven could prescribe psychiatric medication "under Illinois law" called for a legal conclusion, and suggesting a belief that certain questions were already asked and answered. (Docs. 158, pg. 15; 158-1, pgs. 22, 26, 41, 57, 65, 85, 94, 110, 114, 193, 235-37, 225-26, 267, 303). Plaintiff's attorney allegedly failed to control Dr. Shields, which Defendants suggest shows a "coordinated effort to delay the deposition and deny…discovery." (Doc. 158, pg. 16).

In response, Plaintiff initially asserts that Defendants, who allegedly refused to prepay for more than three hours of Dr. Shields's time, were not entitled to force Dr. Shields to provide their desired answer or to ask every question they prepared in advance of the deposition. (Doc. 159, pgs. 1, 3). Plaintiff indicates Defendants, at no time, requested additional time to depose Dr. Shields or sought to go beyond the 7-hour limit set by federal rule. (Doc. 159, pgs. 2, 4, 18). Nevertheless, Dr. Shields allegedly agreed to sit for 20 additional minutes to permit questioning by the non-Wexford attorneys, which was a "professional courtesy" that Defendant Wexford allegedly refused to extend to those Defendants. (Doc. 159, pgs. 1, 4-5, 17). Plaintiff notes, however, the IDOC's attorney was unable to question Dr. Shields at the deposition, which Plaintiff's attorney was allegedly forced to terminate at 6:50 p.m. (Doc. 159, pg. 5). Plaintiff argues Dr. Shields answered all questions, "often repeatedly, even when counsel threatened the witness or unnecessarily antagonized him" and "attack[ed]…[his] integrity and character." (Doc. 159, pgs. 1-2).

As to the allegation that Dr. Shields was unresponsive during the deposition, Plaintiff submits that Dr. Shields answered questions truthfully and completely. (Doc. 159, pg. 10). Plaintiff again argues Dr. Shields merely failed to provide the answers desired by Defendants. (Doc. 159, pg. 10). Plaintiff states Dr. Shields's unwillingness to "wholly cede" issues to Defendants, who posed questions that "were unclear and called for nuanced answers," is not sanctionable. (Doc. 159, pgs. 11-12, 16). Relatedly, Plaintiff suggests Defendants could not "waste their own time asking wholly irrelevant questions" and "lodg[ing] unprofessional accusations," then accuse Plaintiff's attorney and Dr. Shields of impeding the deposition. (Doc. 159, pgs. 12, 17). Also, Plaintiff's

attorney argues it was proper to insist that Dr. Shields complete his answers, when interrupted, because they were responsive to the questioning. (Doc. 159, pgs. 8-9).

Plaintiff notes Defendants accuse Dr. Shields of contaminating the atmosphere of the deposition, despite the fact Defendant Wexford's attorney threatened to withhold payment of Dr. Shields's now overdue witness fee, call the Court during the deposition, and seek to have testimony stricken. (Doc. 159, pgs. 12-13). Plaintiff suggests other complaints, related to Dr. Shields's ability to hear or understand the questions, could have been attributable to "occasional audio issues" on Zoom. (Doc. 159, pgs. 14-15).

Further, Plaintiff's attorney argues he raised appropriate and succinct objections. (Doc. 159, pgs. 1-2). He never interrupted the questioning with lengthy soliloquies, attempted to coach Dr. Shields, or instructed Dr. Shields not to answer a question. (Doc. 159, pg. 8). Plaintiff suggests intervening in the questioning of Dr. Shields, as Defendants argue was required during the deposition, could have been construed as attempts to improperly instruct Dr. Shields on how to answer questions. (Doc. 159, pg. 8).

Here, the Court declines to exercise its discretion to impose sanctions under the authorities cited by Defendants. *See Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017). Initially, the Court notes it cannot shift the entirety of the blame for the combative nature of the deposition onto Plaintiff's attorney and Dr. Shields, as Defendants request. Notably, while castigating Plaintiff's attorney and Dr. Shields for their alleged misdeeds during the deposition, Defendants conveniently ignore that Defendant Wexford's attorney also repeatedly objected to Dr. Shields's answers and threatened to "challenge[]…the payment of the deposition," to call the Court, and to seek to strike the

testimony. It appears, to date, Dr. Shields still has not been fully paid for his participation in the deposition. For obvious reasons, the Court is reluctant to impose sanctions that are requested, in part, by a party who contributed to the issues that arose at the deposition.

Under 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct cases in any court of the United States…who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." However, Plaintiff's attorney neither " 'acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice" nor advanced "a claim…without a plausible legal or factual basis and lack in justification,' " as required by § 1927. *See Estate of Perry*, 872 F.3d at 463 (quoting *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014)); *U.S. v. Rogers Cartage Co.*, 794 F.3d 854, 862 (7th Cir. 2015); *see also In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985) ("If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious. To put this a little differently, a lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law.").

With respect to the alleged failure to instruct or otherwise intervene in the questioning of Dr. Shields, the Court tends to agree with Plaintiff's attorney that such action could have resulted in accusations of obstruction or coaching the witness, leading to further issues at the deposition. And, even if that action was necessary for the reasons articulated by Defendants, meaning Plaintiff's attorney was negligent in failing to act,

that generally does not justify § 1927 sanctions. *See Boyer v. BNSF Railway Co.*, 824 F.3d 694, 708 (7th Cir. 2016) (citing *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013); *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184-85 (7th Cir. 1992)). Further, although Defendants' excerpts from the deposition transcript indicate Plaintiff's attorney lodged objections during the deposition and engaged in occasional commentary with Defendant Wexford's attorney, the Court finds, for the reasons discussed below, that conduct does not justify § 1927 sanctions. *See* 28 U.S.C. § 1927; *Estate of Perry*, 872 F.3d at 463; *Rogers Cartage Co.*, 794 F.3d at 862; *In re TCI Ltd.*, 769 F.2d at 445.

Under Federal Rule of Civil Procedure 30(d)(2), "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Rule 30(d)(2) is discretionary and, unlike § 1927, allows any appropriate sanction against a party, non-party, or attorney. *See Ollison v. Wexford Health Sources, Inc.*, 337 F.R.D. 165, 172 (C.D. Ill. 2020); *Johnson v. Statewide Inv. Servs.*, Inc., No. 20-cv-1514, 2021 WL 825653, *2 (N.D. Ill. March 4, 2021). As was the case in the context of § 1927, though, the Court finds the circumstances do not warrant sanctions under Rule 30(d)(2).

Again, Defendants' excerpts from the deposition transcript indicate Plaintiff's attorney lodged objections to Defendant Wexford's attorney's questioning. However, Plaintiff's attorney had a duty to object to questions that he believed were inappropriate, and it is only when an attorney repeatedly lodges improper objections or engages in other actions that impede, delay, or frustrate the fair examination of the deponent that sanctions are appropriate under Rule 30(d)(2). *See Otis v. Demarasse*, 399 F. Supp. 3d 759,

765 (E.D. Wisc. 2019) (quoting Federal Civil Jury Instructions of the Seventh Circuit, 1.06). Plaintiff's attorney's conduct clearly did not rise to that level at Dr. Shields's deposition. Indeed, even repeated objections by Plaintiff's attorney at Dr. Shields's deposition, by itself, would not violate Rule 30(d)(2). *See Otis*, 399 F. Supp. at 765.

Also, while he occasionally engaged in commentary with Defendant Wexford's attorney, the excerpts from the deposition transcript indicate Plaintiff's attorney's objections, for the most part, were "stated concisely in a nonargumentative and nonsuggestive manner." *See* Fed. R. Civ. P. 30(c)(2). Likewise, the objections were largely " 'limited to those that under Rule 32(d)(3) might be waived if not made at that time, i.e., objections on grounds that might be immediately obviated, removed, or cured.' " *See Otis*, 399 F. Supp. at 765 (quoting Fed. R. Civ. P. 30(d), advisory committee notes (1993 amendments)) (noting such objections include those to "form," that is, to questions that are leading, lacking in foundation, assuming facts not in evidence, mischaracterizing the evidence, vague or misleading, not appropriate in light of the deponent's personal knowledge, speculative, asked and answered, argumentative, or compound); *compare Johnson*, 2021 WL 825653, *2 (noting the advisory committee's comments instruct that argumentative objections, suggestive objections, and directions not to answer may disrupt, prolong, and frustrate a deposition). To the extent Plaintiff's attorney's objections deviated from these authorities, as Defendants assert, the Court, in its discretion, finds they did not impede, delay, or frustrate the fair examination of Dr. Shields, as to justify Rule 30(d)(2) sanctions. *See Lair for Estate of Lair v. Reyes*, No. 18-cv-1017, 2020 WL 9718813, *13 (S.D. Ill. March 17, 2020) (finding the conduct of defense counsel did not impede,

delay, or frustrate the fair examination of a deponent under Rule 30(d)(2), where the deposition excerpts identified by the plaintiff included several form objections and at times "a narrative bent…for the purpose of clarification" and the lodging of an objection to the scope of the deposition, but no instructions not to answer or other directions).

The Court is of the same opinion with respect to Dr. Shields. To be sure, it is generally inappropriate for a witness to comment on the form or direction of an attorney's questioning, as Dr. Shields had a tendency of doing here. However, upon reviewing the examples provided by Defendants, the Court finds Dr. Shields's objections did not so impede, delay, or frustrate Defendants' examination as to warrant Rule 30(d)(2) sanctions. It appears to the Court that Dr. Shields's comments were brief prefaces to his otherwise detailed answers. In other words, Dr. Shields almost immediately answered Defendants' questions notwithstanding the unnecessary "objections." As to the other commentary noted by Defendants, it is the attorneys who set the tone at a deposition and who should avoid fanning the flames. The Court is not inclined to allow attorneys to contribute to the deterioration of civility and decorum at a deposition, then nit-pick a non-attorney witness's testimony to wield its discretion to levy Rule 30(d)(2) sanctions.

In the same vein, the Court disagrees with Defendants that the excerpts from the deposition transcript indicate Dr. Shields's answers were wholly unresponsive. Indeed, at times, Defendants are simply mistaken when claiming that Dr. Shields provided unresponsive or otherwise inappropriate answers. To be sure, he provided unnecessarily verbose, long, layered, and detailed answers to Defendants' questions, but the Court, having reviewed the pertinent testimony, and while empathetic to counsel's frustration

in having to deal with a loquacious witness, declines to find that is sanctionable behavior. It is clear from the excerpts of the deposition transcript that Dr. Shields, who submitted a 41-page report in this case under Rule 26(a)(2)(B), believed specificity and nuance was necessary to fully and completely answer Defendants' attorneys' questions. The Court certainly cannot assign an improper intent to "run out the clock" on the deposition by Dr. Shields or Plaintiff's attorney, as Defendants request.

It is telling, as is discussed further below, that Defendants did not seek to suspend the deposition or to re-depose Dr. Shields under the federal rules due to his alleged unresponsiveness. Further, Plaintiff is correct that Defendants, at times, conflate Dr. Shields's responsiveness, or lack thereof, with his apparent inability to provide the answers that they desired or thought were appropriate. Obviously, a motion for sanctions is not the proper vehicle for challenging the weight and credibility of expert testimony, no matter how "undisputed and noncontroversial" the topic is to Defendants. (Doc. 157, pg. 5). In short, the circumstances do not warrant an exercise of the Court's discretion to impose sanctions against Plaintiff's attorney and/or Dr. Shields under Rule 30(d)(2). *See Ollison*, 337 F.R.D. at 172 (concluding Rule 30(d)(2) sanctions would be inappropriate absent bad faith or illegitimate objections during a deposition, where, *inter alia*, "nothing in the deposition transcript demonstrate[d]…that counsel acted for some…inappropriate purpose," the case "ha[d] been for some time[] very contentious litigation," and the challenged conduct showed frustration by counsel but did not proceed from "normal human emotion when zealously representing one's client" to "unprofessional conduct").

Next, the Court finds it would be inappropriate to impose sanctions under Federal Rule of Civil Procedure 37. Rule 37(a)(1) provides, "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). Specific to the present circumstances, under Rule 37(a)(3)(B)(i), "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if…a deponent fails to answer a question asked under Rule 30 or 31." Fed. R. Civ. P. 37(a)(3)(B)(i). During a deposition, the questioning party may complete or adjourn the examination before moving for that order. *See* Fed. R. Civ. P. 37(a)(3)(C); *see also* Fed. R. Civ. P. 30(d)(3)(A) ("At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party…. If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order."); Fed. R. Civ. P. 30(d)(3)(C) (stating "Rule 37(a)(5) applies to the award of expenses" related to a motion to terminate or limit a deposition); Fed. R. Civ. P. 37(a)(5) (outlining when a party can obtain expenses for a motion for an order compelling a disclosure or discovery).

Here, perhaps tellingly, Defendants did not attempt to proceed under the above provisions. This is despite the strong language used by Defendants to describe the offending conduct in the Motion and the fact that evasive or incomplete answers, such as those allegedly provided by Dr. Shields, are treated as failures to answer. *See* Fed. R. Civ. P. 37(a)(4); *Johnson*, 2021 WL 825653, *2 (recognizing, when a deponent fails to answer a question under Rule 30, Rule 37(a) expressly allows the party seeking discovery to first

move for an order compelling an answer then, if the motion to compel is granted, to obtain as a matter of right the reasonable expenses incurred from the motion to compel). Also, critically, Defendants do not argue Plaintiff's attorney or Dr. Shields otherwise violated an order of the Court. Since it is the failure to comply with a court order, written or perhaps oral, that justifies the imposition of sanctions under Rule 37(b), the Court finds it would be inappropriate to take that action based on the Motion. *See* Fed. R. Civ. P. 37(b); *Halas v. Cons. Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994); *see also Donelson v. Hardy*, 931 F.3d 565, 569 (7th Cir. 2019) ("Federal Rule of Civil Procedure 37 permits sanctions…when a party 'fails to obey an order to provide or permit discovery.' "); *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 729 F.2d 469, 472 (7th Cir. 1984)) (same).

Finally, based on the above, the Court declines to impose sanctions pursuant to its inherent authority. *See Donelson*, 931 F.3d at 569 ("[S]anctions issued under the court's inherent powers are justified if the offender willfully abuses the judicial process or litigates in bad faith."); *Rogers Cartage Co.*, 794 F.3d at 863 ("But 'when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power.' "). As such, the Motion is **DENIED**. If Defendants wish to re-depose Dr. Shields, they should work with Plaintiff in good faith to set the appropriate parameters for that deposition. If an agreement cannot be reached, then Defendants may file a motion, supported by the applicable authorities, that requests leave to re-depose Dr. Shields. *See* Fed. R. Civ. P. 30(a)(2) (outlining the circumstances when a party must obtain, and the court must grant, leave to take a deposition); Fed. R. Civ. P. 30(d)(1) ("Unless otherwise stipulated or

ordered by the court, a deposition is limited to one day of 7 hours. The court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination."). The collective attorneys are again warned that sanctions may be become warranted if they repeat the behavior from Dr. Shields's first deposition.

### III. The JWDR

Next, the Court addresses the issues presented in the 37-page JWDR. Initially, under Rule 26(b)(1), the scope of discovery, unless limited by the Court, is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and [is] proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

The Court has "extensive discretion" to decide discovery matters. *See Motorola Solutions, Inc. v. Hytera Comms. Corp.*, 365 F. Supp. 3d 916, 924 (N.D. Ill. 2019); *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995) ("Because the district court is far better situated to pass on discovery matters, [the Seventh Circuit] review[s] its discovery decisions for an abuse of discretion."). Courts may refuse discovery of matters that are "of 'marginal relevance,'" and it is an assessment of proportionality that is essential. *See Motorola Solutions, Inc.*, 365 F. Supp. at 924 (citation to internal quotations omitted); *see also Armour v. Santos*, No. 19-cv-678, 2022 WL 16572006, *2 (S.D. Ill. Nov. 1, 2022) (stating "relevancy"

is broadly construed to encompass matters bearing on, or reasonably leading to matters bearing on, issues in the case, and "proportionality" requires a common sense, experiential, careful, and realistic assessment of the actual need). With these general principles in mind, the Court considers the issues presented in the JWDR below.[2]

### A. Responses to Request No. 7 in Plaintiff's
### Third Set of Requests for Production

Request No. 7 in Plaintiff's Third Set of Requests for Production states: "Provide all documents maintained by Wexford regarding deaths in custody from intoxication and/or overdose from 2010-2020." (Exhibit A, pgs. 5-6). In the JWDR, Plaintiff notes she has offered to narrow the timeframe of Request No. 7 to the six years preceding Decedent's death, *i.e.*, from the timeframe of 2013 to 2018. (JWDR, pg. 4). Plaintiff further notes, according to the IDOC's Adult Institution Inmate Deaths, which has been produced in this case, the IDOC has only identified six deaths attributable to overdose during that timeframe. (JWDR, pgs. 4-5). Plaintiff claims that Wexford has refused to produce any responsive documents or a privilege log that details any responsive documents that are withheld. (JWDR, pgs. 5-6). She also claims the responsive documents are undeniably relevant and proportional to the needs of the case. (JWDR, pg. 5).

In their Response to Request No. 7, Defendants Wexford and Leven objected on numerous grounds, including that the Request is overly broad, unduly burdensome, and

---

[2]The Court notes, since Defendants Wexford and Leven initially raised objections to Plaintiff's discovery requests in January 2023, certain of those objections were addressed by the Court in the Memorandum & Order resolving Plaintiff's Motions to Compel. (Docs. 96, 106, 139, 142, 157). Further, in the JWDR, Defendants Wexford and Leven do not expand upon every objection raised in written discovery. The Court limits its rulings to the arguments, presented in the JWDR, deemed worthy of discussion.

unproportional to the needs of the case. (Exhibit A, pgs. 5-6). In the JWDR, Defendants Wexford and Leven argue Plaintiff's requests "are well past the eleventh hour" and "seek broader discovery, including records of deaths and other medical and mental health care of other prisoners in the IDOC." (JWDR, pgs. 9-11). Even so, Defendants Wexford and Leven submit that they were unable to identify any deaths from confirmed intoxication or overdose, other than that of Decedent and two others for whom autopsies have been produced, between 2017 and 2021. (JWDR, pg. 10). Defendants Wexford and Leven suggest Plaintiff is unnecessarily increasing the burden of discovery. (JWDR, pgs. 10-11).

Here, Defendants Wexford and Leven do not expand upon any privilege in the JWDR. And, notably, Plaintiff submits that they have refused to provide a privilege log. Further, the Court agrees with Plaintiff that documents "regarding deaths in custody from intoxication and/or overdose" are highly relevant due to the nature of Plaintiff's claims in this case. The Court also disagrees with Defendants Wexford and Leven that the production of such documents would not be proportional to the needs of the case. The documents are clearly important to the issues in the case and its resolution. Therefore, the Court finds the burden or expense of producing the documents does not outweigh the likely benefit. The objection(s) by Defendants Wexford and Leven to producing "documents maintained by Wexford regarding deaths in custody from intoxication and/or overdose," as limited by Plaintiff to 2013-2018, is **OVERRULED**.

### B. Responses to Requests Nos. 4 and 6 in Plaintiff's Third Set of Requests for Production

Request No. 4 in Plaintiff's Third Set of Requests for Production states: "Provide all documents maintained by Wexford regarding deaths in custody at Menard from 2012-2018." (Exhibit A, pg. 3). Similarly, Request No. 6 in Plaintiff's Third Set of Requests for Production states: "Provide all documents maintained by Wexford regarding deaths in custody from dehydration from 2010-2020." (Exhibit A, pg. 4). Plaintiff indicates, like Request No. 7, she has narrowed Request No. 4 to the years 2014 to 2018. (JWDR, pg. 12). Plaintiff submits, according to the IDOC's Adult Institution Inmate Deaths chart, Request No. 4 would include documentation related to 42 individuals. (JWDR, pg. 12). Further, as to Request No. 6, Defendant Wexford has purportedly indicated a reasonable inquiry yielded only one such death in Illinois. (JWDR, pg. 12). However, Plaintiff indicates Defendant Wexford has not provided any information about the documents it possesses in relation to deaths in custody from dehydration outside of Illinois. (JWDR, pg. 12). Plaintiff posits, "[t]here can be no dispute that documents about other deaths at the prison where…[Decedent] died and deaths from the same condition that Plaintiff's experts have opined caused…[Decedent's] death are centrally relevant." (JWDR, pg. 13).

In their Responses to Requests Nos. 4 and 6, Defendants Wexford and Leven invoke many of the same objections that were raised in response to Request No. 7. (Exhibit A, pgs. 3-4). In the JWDR, Defendants Wexford and Leven argue Requests Nos. 4 and 6 are overbroad, unduly burdensome, and disproportionate. (JWDR, pg. 14). Also, in addition to the objections related to timeliness and the burden of production, Defendants Wexford and Leven note Plaintiff now seeks information on the deaths, by any cause, of prisoners in other states. (JWDR, pg. 14). Despite Plaintiff's suggestion to

the contrary, Defendants Wexford and Leven submit that would implicate 53 deaths between 2014 and 2018. (JWDR, pg. 14). Most of those deaths, however, were allegedly caused by cancer, advanced heart disease, or suicide. (JWDR, pg. 14). Defendants Wexford and Leven state "there is no feasible way" they could make the requisite productions in time for Plaintiff's experts to review and provide opinions on those deaths before the close of discovery. (JWDR, pg. 14). If the requested documents were really necessary or reasonable, then Plaintiff would have sought them sooner. (JWDR, pg. 14).

Here, Defendants Wexford and Leven again fail to expand on any claimed privilege. It is also unclear whether, as to these documents, Defendants Wexford and Leven provided a privilege log. In any event, the Court fails to see how Defendants Wexford and Leven, in light of Plaintiff's claims, can argue "documents maintained by Wexford regarding deaths in custody at Menard" are not relevant or proportional to the needs of the case. Obviously, such documents are important to the issues in the case and its resolution. As such, the Court finds the burden or expense of producing the documents does not outweigh the likely benefit. The objection(s) by Defendants Wexford and Leven to producing "documents maintained by Wexford regarding deaths in custody at Menard," as limited by Plaintiff to 2014 to 2018, is **OVERRULED**.

The Court is of the same opinion with respect to the "documents maintained by Wexford regarding deaths in custody from dehydration from 2010-2020," even though that request is not limited to Menard Correctional center or Illinois facilities. It should come as no surprise to Defendants Wexford and Leven, in light of Plaintiff's claims under *Monell* and the circumstances surrounding Decedent's death, that Plaintiff seeks such

documents. As such, the objection(s) to producing "documents maintained by Wexford regarding deaths in custody from dehydration from 2010-2020" is **OVERRULED**.

## C. Responses to Request No. 11 in Plaintiff's Third Set of Requests for Production

Request No. 11 in Plaintiff's Third Set of Requests for Production states: "Documents sufficient to Identify all patients at Menard sent offsite (i.e., outside of the Department of Corrections) for evaluation and/or treatment by one or more mental health providers. Please note this request is limited to the timeframe of January 1, 2014 through January 1, 2020." (Exhibit A, pg. 7). Defendant Wexford allegedly does not know whether any documents responsive to that Request exist because it "refuses to conduct any investigation." (JWDR, pg. 16). Plaintiff also suggests Defendant Wexford fails to understand the scope of her request. (JWDR, pg. 16). Plaintiff clarifies that she is not seeking the identity of patients who were sent offsite for issues that might have a mental health component or who were transferred within the IDOC. (JWDR, pg. 17).

In their Response to Request No. 11, Defendants Wexford and Leven again invoke many of the same objections that were raised in response to Request No. 7. (Exhibit A, pgs. 7-8). Likewise, in the JWDR, Defendants Wexford and Leven reassert their objections on the basis of overbreadth, the burden of production, and untimeliness. (JWDR, pg. 20). However, Defendants Wexford and Leven dispute that they refused to provide documents responsive to Request No. 11. (JWDR, pg. 18). Defendants Wexford and Leven note that Plaintiff was directed to the care of Decedent, who was sent offsite by mental

health staff on August 31, 2018. (JWDR, pg. 18). Defendants Wexford and Leven then note that they explained to Plaintiff "off-site care is not tracked separately for mental health conditions" and "there [i]s no one way that would capture all responsive information." (JWDR, pgs. 18-19). They also state "[t]here were 26 authorizations for off-site care related to mental health diagnoses at Menard" between January 2014 and December 2020, but "that dataset is based on claims and authorization data and is not a complete list of patients that were sent off-site for mental health care." (JWDR, pg. 19). For example, chest pain could have been diagnosed and approved for off-site care, but the chest pain and treatment could also have an underlying mental health component such as anxiety." (JWDR, pg. 19). Defendants Wexford and Leven suggest, as it pertains to this case, "an overdose would not be tracked as a mental health authorization." (JWDR, pg. 19).

Here, in the JWDR, Defendants Wexford and Leven discuss, without supporting citations, an "absolute" psychiatrist/patient privilege, claiming it bars them from "searching through voluminous records that they are prohibited by law from disclosing." (JWDR, pgs. 19-20). However, as it has done in other instances in this case, the Court notes that it has entered a HIPAA-Qualified Protective Order (Doc. 95) that protects third-party protected health information ("PHI"). For example, with certain caveats, the HIPAA-Qualified Protective Order allows limited redactions when a party deems it appropriate, *e.g.*, in the case of a social security number. Defendants Wexford and Leven have not argued the provisions of the HIPAA-Qualified Protective Order are insufficient to protect third-party PHI in this case. No other privileges are specifically discussed, and it is unclear if a privilege log has been tendered to Plaintiff in relation to these document.

Further, Defendants Wexford and Leven concede that Decedent was sent offsite by mental health staff on August 31, 2018. Therefore, it appears to the Court that "Documents sufficient to Identify all patients at Menard sent offsite (i.e., outside of the Department of Corrections) for evaluation and/or treatment by one or more mental health providers," limited to the timeframe of January 1, 2014 through January 1, 2020," are relevant to the case. And, as Plaintiff stresses, she is not seeking the identity of patients who were sent offsite for issues that *might* have a mental health component or who were transferred within the IDOC. (JWDR, pg. 17). This limitation would seem to allay Defendant Wexford and Leven's concerns about the tracking of mental health conditions and capturing of all responsive information. Defendants Wexford and Leven would be responsible for producing, upon a reasonable inquiry, documents within the language of the request, namely, "Documents sufficient to Identify all patients at Menard sent offsite (i.e., outside of the Department of Corrections) for evaluation and/or treatment by one or more mental health providers." The Court finds that production is proportional to the needs of the case, as those documents are important to the issues, the resolution of the case, and the burden or expense does not outweigh the likely benefit. The objection(s) to Request No. 11 in Plaintiff's Third Set of Requests for Production is **OVERRULED**.

### D. Responses to Interrogatories Nos. 17 and 19 in Plaintiff's Second Set of Interrogatories

Interrogatory No. 17 in Plaintiff's Second Set of Interrogatories states: "If your response to Request to Admit No. 27 is anything other than an unqualified admission, please detail what action Eva Leven took on September 5, 2018 to ensure that Kevin

Curtis's dehydration was addressed, who (if anyone) Dr. Leven communicated with as part of that action and how those communications occurred, and what response (if any) Dr. Leven received regarding the action(s) that she took." (Exhibit B, pg. 3; Exhibit C, pg. 3). Interrogatory No. 19 of Plaintiff's Second Set of Interrogatories states: "Please Identify the 'Wexford Regional Manager' identified on page P002756 who 'was present' for the Menard visit by the Lippert experts." (Exhibit B, pg. 4).

Plaintiff notes, with respect to Interrogatory No. 17, Defendant Leven is central to this case. (JWDR, pg. 20). At her deposition, Defendant Leven allegedly failed to recall or had only vague recollections of her actions in response to Decedent's medical needs. (JWDR, pg. 20). Defendant Leven also allegedly "disavowed any knowledge" of the actions or identities of the individuals with whom she communicated. (JWDR, pg. 21). Plaintiff argues Interrogatory No. 17 merely follows up on that deposition testimony, noting Rule 33 requires parties and their attorneys to provide available responsive information. (JWDR, pg. 21). In relation to Interrogatory No. 19, Plaintiff notes the "Wexford Regional Manager" visited Menard and opined "that 'there were no problems at the facility and no areas of concern from her perspective," which is a claim that "stands in stark contrast" to the findings in the 2018 Lippert Report and the evidence in this case. (JWDR, pg. 22). Plaintiff also argues no privilege protects the identity of the "Wexford Regional Manager" and there is no burden caused by its disclosure. (JWDR, pgs. 22-23).

In their Answer to Interrogatory No. 17, Defendants Wexford and Leven objected on the basis that it was cumulative and unduly burdensome. (Exhibit B, pg. 3; Exhibit C, pg. 4). Defendants Wexford and Leven noted that Plaintiff possessed Decedent's medical

records, twice deposed Defendant Leven, propounded excessive written discovery, and had ample opportunity to inquire on the issue. (Exhibit B, pg. 3; Exhibit C, pg. 3). In its Answer to Interrogatory No. 19, Defendant Wexford argued the identity of the "Wexford Regional Manager" is "wholly unrelated" and, in light of the breadth of discovery, is disproportionate to the needs of the case. (Exhibit B, pg. 4). In the JWDR, Defendants Wexford and Leven jointly argue Interrogatories Nos. 17 and 19 request a narrative of everything done by Defendant Leven, despite the fact that she has already responded to interrogatories and been deposed twice. (JWDR, pg. 23).

Here, the Court disagrees with Defendants Wexford and Leven that Interrogatory No. 17 is cumulative, is unduly burdensome, or improperly calls for a narrative. Rather, the Court is of the belief that the objection borders on the frivolous. Identification takes little effort compared to the expenditure of time required of Plaintiff's counsel and now this Court to address the objection. And, the objection itself seems to ignore Rule 33 which requires a party to provide an answer based on all of the information within his or her knowledge. *See Gevas v. Baldwin*, No. 18-cv-3165, 2020 WL 6781801, *3 (N.D. Ill. Nov. 18, 2020); *see also* Fed. R. Civ. P. 33(a)(2) ("An interrogatory may relate to any matter that may be inquired into under Rule 26(b)."). Again, Interrogatory No. 17 seeks information that is reasonably within Defendant Leven's knowledge, is highly relevant, and is not overly broad.

Also, Interrogatory No. 17 is not objectionable merely because it may call for an answer in narrative form. *See Gevas*, 2020 WL 6781801, *3. Unlike requests to admit, which may be answered with one-word responses, "interrogatories frequently require a more

detailed answer." *See id*. Further, although Defendant Leven has been deposed twice in this case and responded to other written discovery, "a party is not prevented from obtaining an interrogatory response just because the information may be discovered through an alternate discovery device." *See id*. (citing *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 256, 259 (N.D. Ill. 1979)). The discovery devices available to the parties are complementary and not alternative or exclusive. *See id*. (quoting *Beijing Choice Elec. Tech. Co. v. Contec. Med. Sys. USA Inc.*, No. 18-cv-825, 2020 WL 1701861, *6 (N.D. Ill. Apr. 8, 2020)). The Court emphasizes, though, Interrogatory No. 17 must merely be answered "to the extent that…[Defendants Wexford and Leven have] knowledge or such is readily ascertainable." *See Gingerich v. City of Elkhart Probation Dept.*, 273 F.R.D. 532, 541 (N.D. Ind. 2011); *see also Loft, Inc. v. Corn Prods. Refining Co.*, 103 F.2d 1, 6 (7th Cir. 1939) ("As to some of the matters defendants claim that they have no knowledge, and such an answer is sufficient unless as a matter of law they are required to have knowledge."). In light of Plaintiff's claims that Defendant Leven failed to recall, was vague in her recollections, or disavowed certain events, it is not lost upon the Court that Plaintiff may simply be dissatisfied with Defendant Leven's otherwise responsive answers at the deposition, such that the issue is really one of weight or credibility. After all, Plaintiff has not sought relief related to a deponent's failure to answer under any other provision of the federal rules.

As to Interrogatory No. 19, the information contemplated, *i.e.*, the identity of "the 'Wexford Regional Manager'…who 'was present' for the Menard visit by the Lippert experts," is clearly relevant. This is especially true where Plaintiff argues the Regional Manager opined " 'there were no problems at the facility and no areas of concern from

her perspective." Also, Defendant Wexford cannot seriously contest the proportionality and absence of a burden in disclosing the single identity of that Wexford Regional Manager. Accordingly, the objections to Interrogatories Nos. 17 & 19 are **OVERRULED**.

### E. The Expert Fee of Dr. Shields

As stated in Section II above, a dispute arose over the payment of Dr. Shields's fee. (JWDR, pg. 24). Plaintiff argues, under the mandates of Rule 26(b)(4)(E), the party who notices a deposition of a retained expert must pay for his or her time, unless there would be a "manifest injustice." (JWDR, pg. 24). Plaintiff states, "the parties expressly agreed that the Wexford Defendants would 'pay for whatever time [they] used." (JWDR, pg. 24). At present, Dr. Shields is owed an outstanding balance of $2,425.00. (JWDR, pg. 24).

Defendants Wexford and Leven reiterate the alleged unprofessionalism, hostility, and unresponsiveness of Dr. Shields at his deposition. (JWDR, pg. 26). They also repeat Plaintiff's attorney's alleged obstruction of the deposition. (JWDR, pg. 26). Since the behavior of Plaintiff's attorney and Dr. Shields was unreasonable, Defendants Wexford and Leven argue the outstanding fee should be split by the parties. (JWDR, pgs. 26-27).

Here, the Court will not rehash the issues discussed, in detail, with respect to Defendants' Motion for Sanctions. The bottom line for purposes of the instant application is that the Court found sanctions were unwarranted on each of the bases invoked by Defendants. As such, a straightforward application of Rule 26(b)(4)(E) is in order. *See* Fed. R. Civ. P. 26(b)(4)(E) ("Unless manifest injustice would result, the court *must* require that

the party seeking discovery…pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (D)) (Emphasis added). Put simply, the circumstances are not "extraordinary," such that the Wexford Defendants may meet the "high standard" for showing a manifest injustice under Rule 26(b)(4)(E). *See Crabtree v. Experian Information Solutions, Inc.*, 948 F.3d 872, 884 (7th Cir. 2020)). It is notable, too, that there is no claim that Dr. Shields's fee is unreasonable and no documentary evidence of an agreement to split the cost of that fee. The Court will not speculate as to any such agreement to deviate from the Rule. The Wexford Defendants' objection to the payment of Dr. Shields's outstanding fee, which purportedly totals $2,425.00, is **OVERRULED**.

### F. Defendants' Disclosures Under Federal Rule of Civil Procedure 26(a)(2)(C)

Plaintiff notes Defendants Wexford and Leven served the disclosures of 17 witnesses under Rule 26(a)(2)(C). (JWDR, pg. 27). Plaintiff states most of the disclosures by Defendants Wexford and Leven are "wholly inadequate and should be stricken." (JWDR, pg. 27). Plaintiff specifically requests that the disclosures of the following witnesses be stricken: Dr. Christian Gillespie; Dr. Neil Fisher; Mr. Nick Little; Defendant Siddiqui; Defendant Leven; Dr. Christina Floreani; Mr. Michael Moldenhauer; Ms. Mary Zimmer; Dr. Teynal Caldwell; and unidentified doctors and providers. (JWDR, pg. 27).

Dr. Gillespie purportedly testified as a Rule 30(b)(6) witness, but she was allegedly not an employee of Defendant Wexford, had no involvement with Decedent's care, and did not provide a written report of her opinions. (JWDR, pg. 27). Similarly, each of the named witnesses was allegedly disclosed by Defendant Wexford without an adequate summary of their testimony, as required by Rule 26(a)(2)(C). (JWDR, pgs. 28-29). The

opinion testimony of those witnesses, who Defendant Wexford has allegedly refused to present for depositions in relation to their Rule 26(a)(2) disclosures, will allegedly go "far beyond" their personal involvement in the case, requiring an expert report. (JWDR, pgs. 29-31). Certain witnesses will allegedly opine on liability and causation, the lack of merit in Plaintiff's allegations, and the opinions of Plaintiff's experts, but Plaintiff asserts Defendant Wexford's disclosures "shed barely any light" on what the witnesses will actually say on those topics. (JWDR, pg. 229). As for Mr. Little and Dr. Fisher, Plaintiff indicates the disclosures were "tantamount to no disclosure at all" because Defendant Wexford merely indicated "they may testify 'as to all relevant facts, topics, opinions, customs, and practices in this case." (JWDR, pg. 29) (Emphasis omitted). Finally, as to the unidentified doctors and providers, Plaintiff notes Defendant Wexford has offered no answer to the questions of who this disclosure refers to, what opinions they hold, and which medical records are implicated by the disclosures. (JWDR, pg. 31).

In response, Defendants Wexford and Leven claim Plaintiff misunderstands the purpose of unretained-expert disclosures and the role of corporate representatives. (JWDR, pgs. 32-33). They allege each of the witnesses at issue, in light of their medical expertise and treatment of Decedent, was identified as an unretained expert with opinions based on the medical records and their depositions. (JWDR, pg. 32). Further, Plaintiff allegedly feigns misunderstanding as to the witnesses' properly summarized testimony and withholds important context from the disclosures of Drs. Fisher, Siddiqui, and Leven. (JWDR, pgs. 32-34). Defendants Wexford and Leven emphasize that each of the challenged witnesses, other than Dr. Caldwell and the unidentified doctors and

providers, have been deposed. (JWDR, pg. 32). Therefore, Defendants Wexford and Leven argue striking their disclosures is unnecessary since Plaintiff, at a more appropriate time, can object to the testimony on the same grounds now asserted. (JWDR, pgs. 32-33).

Here, the only relief sought by Plaintiff is the striking of Defendants' Rule 26(a)(2)(C) disclosures. The Court agrees with Defendants that would be an extreme remedy. Under Rule 26(a)(2)(C), "unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, th[e] disclosure must state…the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and…a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Plaintiff may be correct that the disclosures are not perfectly detailed, but the Court is nevertheless of the opinion that they need not be stricken at this time. After all, Defendants Wexford and Leven invite Plaintiff to object to the testimony on the same grounds now asserted but at a more appropriate time. (JWDR, pgs. 32-33). Though it may not be today, it is ultimately Defendants Wexford and Leven who run the risk that the testimony will be barred due to inadequate disclosures. The Court finds, on this posture, it is unnecessary to strike the disclosures at this time and declines to do so.

## IV. Conclusion

The Motion is **DENIED** and the JWDR is **RESOLVED** in the manner described above.

**SO ORDERED.**

Dated: November 20, 2023.

s/ *David W. Dugan*

DAVID W. DUGAN
United States District Judge