**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| YOLANDA JACKSON, as Administrator of the Estate of Kevin Curtis, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-cv-0900-DWD |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., et al., | ) ) | |
| | ) | |
| Defendants. | ) | Hon. David W. Dugan |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff Yolanda Jackson, as administrator of the estate of Kevin Curtis, moves for partial summary judgment on Count I of her Complaint as to the liability of Defendant Nickolas  Mitchell. As discussed below, the undisputed facts show that Defendant Mitchell violated the Eighth Amendment by acting with deliberate indifference to the health and well-being of Kevin Curtis. Plaintiff is therefore entitled to partial summary judgment on Count I.

## INTRODUCTION

On September 5, 2018, Correctional Officer Nickolas Mitchell knowingly disregarded a substantial and obvious risk of harm to Kevin Curtis by abandoning his post as the sole crisis-watch officer on Gallery 5 of Menard Correctional Center's North 2 cellhouse. As Mitchell has admitted under oath, he knew that leaving Mr. Curtis alone in crisis watch put him at grave risk. Mitchell abandoned his post anyway, leaving Mr. Curtis unmonitored for more than an hour and a half. When Mitchell returned, he found Mr. Curtis unresponsive and in respiratory arrest. Mitchell then falsified Menard's crisis-watch logs to make it seem as if he had been checking on Mr. Curtis all the while.

Based on these undisputed facts, no reasonable jury could deny that Mitchell acted with deliberate indifference. Summary judgment is therefore appropriate as a matter of law.

## STATEMENT OF MATERIAL FACTS[1]

1.      On September 5, 2018, Kevin Curtis died in the custody of the Menard Correctional Center, a facility operated by the Illinois Department of Corrections (IDOC). Ex. 1 (Kevin Curtis's IDOC Medical Records) at IDOC000402.

2.      Mr. Curtis spent the last five days of his life in a segregation cell on 5 Gallery in Menard's North 2 cellhouse. Ex. 2 (Living Unit History) at IDOC000089.

3.      When he died, Mr. Curtis was on "crisis watch," a form of solitary confinement reserved for prisoners who require an elevated level of care and supervision because they present a danger to themselves or others, or else because they require diagnostic assessment and temporary, clinical intervention for stabilization or diagnostic purposes. Ex. 3 (Mental Health SOP Manual) at ESI 2 0155.

**A.      Kevin Curtis is Placed on Crisis Watch, Where He Deteriorates**

4.      On August 31, 2018, correctional officers drove Mr. Curtis to the emergency room at Chester Memorial Hospital in Chester, Illinois. Ex. 4 (Chester Memorial Hospital Records) at P000480–489; *see also* Ex. 1 at IDOC000151–155.

5.      Mr. Curtis presented with an inability "to verbalize," repetitive and jerky limb movements, and an elevated temperature and blood pressure. The nursing staff at Chester observed Mr. Curtis urinating on himself and his head and mouth writhing. His urine drug screen at Chester was negative. Ex. 1 at IDOC000151–155, IDOC000378.

---

[1] Plaintiff refers to these facts throughout her briefing as "UMF," followed by the appropriate paragraph number.

6.      On September 1, Mr. Curtis was discharged from Chester Memorial and sent back to Menard with a diagnosis of "altered mental status." Ex. 1 at IDOC000142–143.

7.      Upon Mr. Curtis's return to Menard, a physician "assessed" his condition as "[m]ental health," noting that he was "acting fearful" and "showing inappropriate behavior." The doctor prescribed Mr. Curtis a low dose of Tylenol PM and placed him on a "constant watch," which required Mr. Curtis to be continuously observed by a correctional officer. A second order, entered just fifteen minutes later, reduced that status to a 30-minute watch, which required correctional staff to perform visual and verbal checks on Mr. Curtis every half hour. Ex. 1 at IDOC000122; Ex. 3 at ESI 2 0176–0177.

8.      Over the next several days, Menard medical staff documented Mr. Curtis exhibiting an array of alarming behaviors: pacing naked, sucking his thumb, screaming, pulling his scrotum, and banging on his steel cell door. Mr. Curtis consistently presented as non-verbal and with poor hygiene. Ex. 1 at IDOC000122–131, IDOC000228–239.

9.      On September 4, Mr. Curtis saw Melissa Pappas, a licensed clinical professional counselor, in the North 2 infirmary. Ms. Pappas ordered that Mr. Curtis be placed on a "10-minute watch," citing his "lack of stability on crisis watch and lack of information obtained [from] the Offender during the session." Ex. 1 at IDOC000232–233.

10.     About thirty minutes after meeting with Ms. Pappas, Mr. Curtis saw Dr. Christina Floreani, a psychiatrist and a contract employee of Defendant Wexford Health Sources. Dr. Floreani noted that Mr. Curtis had "required assistance into the exam room with significant psychomotor retardation," that he was "largely unresponsive to verbal prompts," and that he had "virtually no reaction to stimuli." Dr. Floreani also observed that Mr. Curtis had an elevated heart

rate and had "not been taking in fluids." Based on these findings, Dr. Floreani diagnosed Mr. Curtis with catatonia. Ex. 1 at IDOC000234–239.

11.     Sometime between 8:35 and 9:00 a.m. on September 5, Mr. Curtis was found unresponsive in his crisis-watch cell. Correctional officers brought him first to the cellhouse infirmary and then to the infirmary in Menard's healthcare unit, where medical staff drew blood and urine samples. Correctional staff brought him back to his crisis-watch cell by wheelchair. Ex. 2 at Mitchell000082; Ex. 1 at IDOC000128, 000333; Ex. 5 (L. Goldman Dep.) at 18.

12.     Dr. Lisa Goldman, an IDOC psychologist administrator, saw Mr. Curtis as he was being transported back to 5 Gallery in a wheelchair. A short while later, in a 10:20 a.m. email sent to several Menard staff, Dr. Goldman warned that Mr. Curtis appeared "extremely dehydrated" and "catatonic (just as he had been diagnosed in the past)." Dr. Goldman further wrote that, in her "clinical opinion," Menard staff "need[ed] to intervene quickly for the dehydration with a combination of this heat could be lethal." Ex. 5 at 18; Ex. 6 (Goldman emails) at IDOC000630–633.

13.     At 12:25 p.m., Dr. Floreani emailed an "emergency" prescription order for Ativan. *Id.* The order directed staff to "Start Ativan 2 mg PO NOW and give 2 mg IM if [Mr. Curtis] refuses." Ex. 1 at IDOC000091.

14.     At 1:30 p.m., Mr. Curtis received that dose of Ativan intramuscularly. He received no further medical or psychiatric attention before his final lapse into unresponsiveness. Ex. 1 at IDOC000130–141.

## B.     Defendant Mitchell Leaves Mr. Curtis to Die

15.     At all relevant times, Nickolas Mitchell was employed by IDOC as a Correctional Officer at Menard Correctional Center. Ex. 7 (N. Mitchell Dep.) at 222.

16.     On September 5, 2018, Mitchell was the sole officer assigned to crisis-watch duty on 5 Gallery during the 3:00 p.m. to 11:00 p.m. shift. Ex. 8 (IA Report) at Mitchell000011.

17.     As a crisis-watch officer, Mitchell's principal duty was to monitor crisis-watch prisoners for signs of medical or emotional distress. Ex. 7 at 180.

18.     Mitchell knew the importance of a prisoner's crisis-watch status. Mitchell was trained as a crisis-watch officer through the IDOC's mandatory, systemwide mental-health cycle training. Based on this training, he knew that prisoners on crisis watch were at risk of suffering serious harm if left unmonitored. Ex. 7 at 181 ("Q: And you know that there is a risk for people on suicide watch[,] that they will be harmed by themselves if they are not watched at 10-minute intervals; right?  A: Yes.  Q: You were trained on that when you started working for the IDOC; right?  A: Yes."); *see also* Ex. 9 (Mitchell training records) at P004691.

19.     Mitchell was also trained on the IDOC's policies for responding to medical emergencies, which required him to call a "Code 3"—a radio code denoting a medical emergency—any time he believed a prisoner required emergency medical care. Mitchell knew that calling a Code 3 would summon medical staff to his location, and he also knew that he did not need approval from anyone else before calling a Code 3. Ex. 7 at 222–228.

20.     Mitchell entered the crisis-watch gallery to begin his shift at "[a]pproximately 2:55" p.m. on September 5, 2018. Three prisoners, including Mr. Curtis, were being held on crisis watch at that time. Ex. 7 at 24; Ex. 8 at Mitchell000011.

21.     Mitchell "knew Kevin Curtis was on crisis watch and was to be monitored every 10 minutes with verbal and visual checks." Dkt. 44 (Def. Mitchell's Answer) ¶ 36.

22.     After beginning his September 5 shift, Mitchell conducted "[a]pproximately 12" rounds of cell checks. Ex. 7 at 24–25.

23.     At 4:03 p.m., and again at 4:10 p.m., Mitchell wrote in the crisis-watch logbook that Mr. Curtis was alive and "lying on the floor." Ex. 2 at Mitchell000028. Mitchell specifically observed during these checks that Mr. Curtis's chest was moving, meaning that he was breathing. Ex. 7 at 239; *see also id.* at 82.

24.     Around 4:15 p.m., Mitchell was asked by Defendant Andrew Bennett, a correctional sergeant, to help Bennett oversee prisoners as they went to and from "chow," or mealtime. Ex. 7 at 36.

25.     Mitchell knew that he was the only officer assigned to monitor the prisoners on crisis watch. He also knew that, although he could briefly attend to other duties "between the ten-minute interval crisis checks," it was his "responsibility to return and complete the mandatory ten-minute tour" afterward. Ex. 8 at Mitchell000014; *see also* Ex. 7 at 36.

26.     Mitchell did not advise Bennett that he needed to be at his post to continue running checks. And Mitchell did not ask Bennett—or act himself—to ensure that another officer would cover his post. Ex. 7 at 32–34.

27.     Mitchell "check[ed] to see if [Mr. Curtis's] chest was moving before" leaving the crisis-watch gallery. He then stopped to retrieve a "magnum" canister of pepper spray "just in case a fight broke out or something would have happened." Ex. 7 at 29–31, 56, 239.

28.     Mitchell left the crisis-watch wing unmonitored for nearly an hour and a half. No one took his place. Ex. 7 at 36.

**C.     Defendant Mitchell Denies Mr. Curtis Emergency Medical Care Upon His Return**

29.     Mitchell returned to 5 Gallery around 5:50 p.m. He reached Mr. Curtis's cell at 5:53 p.m. Ex. 7 at 82; Ex. 10 (IA Report Attachments) at Mitchell000026.

30.     Mitchell immediately saw that Mr. Curtis was "[l]aying on his bunk" and "not breathing." Ex. 7 at 82.

31.     After making this observation, Mitchell continued to watch Mr. Curtis for another two minutes "to see if he was breathing." Ex. 7 at 85.

32.     Mitchell knew that he was required to call a Code 3 for any prisoner he believed to be experiencing a medical emergency, regardless of whether he was "sure that [the prisoner] wasn't breathing." However, Mitchell did not call a Code 3 or otherwise attempt to provide or summon medical assistance. Ex. 7 at 85–86, 224–225.

33.     Instead, Mitchell contacted another correctional officer, Defendant Jeremy Frerich, who came over to Mr. Curtis's cell "[i]mmediately." Ex. 7 at 82–83, 86.

34.     Mitchell asked Frerich whether his "eyes were deceiving" him. Frerich told him to radio the "gallery officer." Ex. 7 at 82–83.

35.     Neither Mitchell nor Frerich called a Code 3 or took any other action to provide or summon medical assistance. Ex. 7 at 88, 90–91.

36.     About two minutes later, Defendant Charlie Frerking—another correctional officer—arrived at Mr. Curtis's cell. Frerking looked through the cell door before leaving to find a superior officer, Defendant Andrew Bennett. Ex. 7 at 92–99.

37.     While waiting for Frerking to retrieve Bennett, Mitchell continued to watch Mr. Curtis to "see if he was breathing at all." Mitchell made no effort to assist Mr. Curtis, nor did he call a Code 3 or take any other action to summon emergency medical assistance. Instead, he worried to himself about "[g]etting in trouble and Mr. Curtis being dead." Ex. 7 at 95–100.

38.     Several more minutes passed before Frerking returned with Bennett. Upon reaching Mr. Curtis's cell, Bennett remarked, "I do not think he's breathing." Ex. 7 at 103–104.

39.     For the next "two or three minutes," Bennett knocked on and shouted into Mr. Curtis's cell window. Bennett then radioed his shift supervisor and left to retrieve him. Again, by this point, neither Mitchell nor anyone else had called a Code 3 or taken any other action to summon or provide medical assistance. Ex. 7 at 104–105.

40.     While the other officers waited at Mr. Curtis's cell for Bennett to return, Mitchell resumed his crisis-watch duties. Ex. 7 at 101–112.

41.     After four or five minutes, Lieutenant Caleb Zang, the on-duty shift supervisor, arrived at Mr. Curtis's cell. Like Bennett, Zang tried to reach Mr. Curtis by knocking on his cell window. Zang then radioed another superior officer, Major Page, and left the gallery to retrieve him. Again, no one called a Code 3 or took any action to summon or provide medical assistance. Ex. 7 at 114–118.

42.     Zang returned with Major Page about seven minutes later. Page "looked in[to]" Mr. Curtis's cell, told "Zang to get the ERT [Emergency Response Team]," and "then left the 5 Gallery." Ex. 7 at 120, 126–127; *see also* Ex. 8 at Mitchell000014.

43.     An ERT is typically called for forcible cell extractions. The team comprises armed correctional staff that enter a prisoner's cell, apply mechanical restraints, and remove the prisoner from his cell. Summoning an ERT does not summon medical staff. Ex. 7 at 129–130.

44.     Another five to seven minutes passed before three ERT officers arrived at Mr. Curtis's cell. At no point during those five to seven minutes did Mitchell or any other officer present at Mr. Curtis's cell call a Code 3 or take any other action to provide or summon emergency medical assistance. Ex. 7 at 130–131.

45.     The ERT officers spent a "[m]inute and a half, two minutes, approximately" entering Mr. Curtis's cell, securing his unconscious body in handcuffs, and carrying him by his arms and legs out of the cell and to the cellhouse infirmary. Ex. 7 at 132–135.

46.     After Mr. Curtis had been removed from his cell, Bennett instructed Mitchell to "stay on 5 Gallery for crime scene watch." Ex. 7 at 135–137.

47.     Medical staff were not summoned until another correctional officer went to the healthcare unit at Menard and told two correctional medical technicians that they were "needed on North 2 cellhouse for an unresponsive inmate." Ex. 1 at IDOC000133–134.

48.     The medical technicians met Mr. Curtis at the North 2 infirmary.  After failing to detect Mr. Curtis's pulse, the medical technicians initiated CPR.  Meanwhile, a Menard nurse called an offsite Wexford provider, who directed nursing staff to request an ambulance. Mr. Curtis then was transported to the healthcare unit to await the paramedics. Ex. 1 at IDOC000132–138.

49.     At 6:37 p.m., shortly after the paramedics arrived at Menard, Mr. Curtis was pronounced dead. In total, at least twenty minutes had elapsed from the time Mitchell first noticed Mr. Curtis in distress and when he received any medical care. Ex. 1 at IDOC000132–140.

50.     At no point before Mr. Curtis's death did Mitchell call a Code 3 or take any other action to provide or summon medical assistance. Ex. 7 at 101–112, 194–195.

51.     Instead, after Mr. Curtis was found unresponsive, Mitchell spent several minutes making false entries in the crisis watch log. These entries purported to show that Mitchell had been conducting cell checks in the crisis-watch gallery during his 90-minute absence. Ex. 8 at Mitchell000011–12 (IDOC investigative summary finding that Mitchell "falsified all Inmate Crisis Watch Observation Logs as completed, every ten[]minutes, after CURTIS was found unresponsive."); *see also* Ex. 7 at 141–144.

52.     Around 8:00 p.m., Bennett informed Mitchell that a "[s]tate investigator want[ed] to talk to" him. During that interview, Mitchell admitted to the investigator that he "did not make all [crisis-watch] watches as required," that he was instead "helping with chow lines," and that he "completed his watch list after [Mr. Curtis] was found unresponsive." *Id.* at 161–178; Ex. 8 at Mitchell000011–18; Ex. 10 at Mitchell000022–24.

53.     Nearly a year later, an IDOC internal investigation found that Mitchell had violated several provisions of IDOC's code of conduct by "falsifying the Crisis Watch Observation Log" and by "fail[ing] to complete his duty as Crisis Watch Officer by not conducting his ten-minute observations as required." Ex. 8 at Mitchell000011–18.

54.     Mitchell's case was referred to the Employee Review Board for disciplinary proceedings. Ex. 11 (Memo re Review Board Referral) at Mitchell000002–03. Mitchell received a sanction of five days of unpaid leave. Ex. 7 at 214.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Rule 56 authorizes summary judgment on a "part of each claim or defense." Fed. R. Civ. P. 56(a). Here, Plaintiff moves for partial summary judgment as to Defendant Mitchell's liability on Count I. Dkt. 1 (Compl.) ¶¶ 47–53.

## ARGUMENT

### I.      There Is No Genuine Dispute That Mr. Curtis's Condition Was Objectively Serious.

"To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, the plaintiff must show two elements: one objective and one subjective." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). The objective element requires Plaintiff to first show that Mr. Curtis "suffered from an objectively serious medical condition." *Id.* (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (cleaned up)). Based on the undisputed facts in the record, Mr. Curtis's medical condition on September 5, 2018, was objectively serious.

A medical condition is objectively serious if it "has been diagnosed by a physician" or is "so obvious that even a lay person would perceive the need for a doctor's attention." *Orlowski v. Milwaukee County*, 872 F.3d 417, 423 (7th Cir. 2017) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). Mr. Curtis was placed on crisis watch following his visit to the emergency room, and while on crisis watch displayed a series of disturbing behavioral and physical symptoms that ultimately led to an order for a 10-minute watch. *See* UMF ¶¶ 3–14. The Seventh Circuit has repeatedly recognized that these kinds of symptoms are objectively serious for purposes of an Eighth Amendment claim. *See, e.g.*, *Townsend v. Cooper*, 759 F.3d 678, 689 (7th Cir. 2014) (reaffirming that "severe mental illness" is an objectively serious condition); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) ("Treatment of the mental disorders of mentally disturbed inmates is a serious medical need.") (cleaned up).

Although Mr. Curtis already had an objectively serious medical condition when Mitchell began his shift on the crisis-watch gallery on September 5, it is undisputed as well that Mr. Curtis lost consciousness and stopped breathing during Mitchell's 90-minute absence. UMF ¶¶ 27–38. His medical needs thus became even *more* objectively serious. *Orlowski*, 872 F.3d at 423 ("Failure

to breathe and failure to regain consciousness are undoubtedly life-threatening medical conditions that are obvious to a layperson."). Accordingly, there can be no dispute that throughout Mitchell's involvement in this case, Mr. Curtis suffered from an objectively serious medical condition.

## II.     There Is No Genuine Dispute That Mitchell Was Deliberately Indifferent to Mr. Curtis's Serious Medical Needs.

A plaintiff asserting an Eighth Amendment claim for deliberate indifference must also show that the defendant "was deliberately, that is subjectively, indifferent." *Giles*, 914 F.3d at 1049. There can be no genuine dispute over this element, either. The undisputed record shows that Mitchell abandoned his post in the crisis-watch gallery despite knowing the risks that his absence posed to Mr. Curtis and the two other prisoners on crisis watch. When Mitchell returned, he found Mr. Curtis unresponsive and in respiratory arrest. Mitchell then falsified the crisis-watch logbook to cover his tracks. And despite knowing that Mr. Curtis was not breathing, Mitchell never made a radio call for emergency assistance—the action he knew he was required to take in response to seeing a prisoner in an obviously emergent state—or otherwise sought to summon medical assistance. All of this was textbook deliberate indifference. Plaintiff's motion for summary judgment on Mitchell's liability should be granted.

### A.     There is no dispute that Mitchell was deliberately indifferent when he abandoned his post.

A defendant acts with deliberate indifference if he knows that a prisoner faces "a substantial risk of serious harm" and "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A correctional officer does "not have to know the specifics of the danger to be culpable." *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005). It is sufficient if the officer "was aware of a serious risk of harm in some form." *Id.*

Here, Mitchell was responsible for ensuring that the inherently vulnerable prisoners on crisis watch were observed with sufficient regularity that they did not succumb to the substantial risks of harm they faced. It is undisputed that Mitchell abandoned his crisis-watch post for more than 90 minutes to monitor movement out of the cellhouse during mealtime. UMF ¶¶ 24, 27, 28. As Mitchell's *own* deposition testimony confirms, he was aware of and disregarded the deadly serious risks of his actions.

Mitchell admitted, under oath, that he knew that Mr. Curtis was on a ten-minute watch, which obligated Mitchell to check on Mr. Curtis every ten minutes and ensure that he was alive and well. UMF ¶ 21. Mitchell further admitted that he understood ten-minute watches to be reserved for those in especially serious medical and mental-health crises and that there would be "a risk for people on suicide watch[,] that they will be harmed by themselves if they are not watched at 10-minute intervals." UMF ¶¶ 18, 25. He knew that his overriding obligation as a crisis-watch officer was to ensure that the prisoners under his care did "not harm themselves," and that he had no discretion to ignore that obligation. UMF ¶¶ 17, 18, 25. And he knew that "there would be no one else present to conduct [these] checks" if he left. UMF ¶¶ 26, 28.

Despite knowing of the enormous and obvious risks associated with leaving Mr. Curtis and the other prisoners on crisis watch unmonitored, Mitchell left Mr. Curtis alone for more than an hour and a half. He admittedly failed to take *any* steps to ensure that another officer would monitor Mr. Curtis or otherwise cover his crisis-watch post in his stead. UMF ¶¶ 25–28. In short, by his own admissions, Mitchell knew of the risk of serious harm posed by his absence and failed to take reasonable measures—or any measures at all—to abate it. That is deliberate indifference, full stop.

Mitchell's falsification of crisis-watch logbook entries makes it even clearer that his misconduct was deliberate. In the immediate aftermath of Mr. Curtis's death, Mitchell confessed

to IDOC investigators that he falsified the crisis-watch observation logs to make it seem as if he had completed his checks every ten minutes. UMF ¶¶ 50–54. A factfinder does not need "specialized medical knowledge or assistance from a medical expert to know that recklessly or intentionally falsifying records" bespeaks a culpable mind. *White v. United States*, 2021 WL 2476772, at *6 (S.D. Ill. June 17, 2021); *cf. Bradich ex rel. Est. of Bradich v. City of Chicago*, 413 F.3d 688, 691 (7th Cir. 2005) ("Protecting one's employment interests while an inmate chokes to death would exemplify deliberate indifference to serious medical needs.") (citation omitted); *Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1098 (N.D. Ill. 2007) (declining to dismiss *Monell* claim against alleging "a widespread practice" among Cook County Jail staff "of falsifying the daily tier logs to cover up missed security checks, which in turn failed to ensure that serious medical needs of [plaintiff] and other detainees were treated in a reasonable time frame.") No reasonable jury could conclude otherwise.

To be sure, the issue of deliberate indifference "ordinarily cannot be concluded on summary judgment," because the inquiry necessarily turns on the defendant's state of mind. *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (cleaned up). But this is not the ordinary case. When, as here, a defendant admits under oath to the subjective element of a deliberate indifference claim, courts have not hesitated to award summary judgment. *E.g.*, *Clark v. Quiros*, 2023 WL 6050160, at *21–22 (D. Conn. Sept. 15, 2023) (awarding summary judgment where treating physician testified to awareness of extent and cause of prisoner's injuries and refused to provide treatment); *Tardiff v. Knox Cnty.*, 573 F. Supp. 2d. 301, 308–09 (D. Me. 2008) (granting detainee's motion for partial summary judgment on liability where jail officer's deposition testimony, standing alone, established liability for unconstitutional search).

*Nagle v. Gusman*, 61 F. Supp. 3d 609 (E.D. La. 2014), is particularly instructive. The decedent in *Nagle* died by suicide after the only officer assigned to watch him abandoned his post for more than two hours. *Id.* at 628–29. Like Mitchell, the suicide-watch officer in *Nagle* admitted that he knew that the prisoner was at a serious risk of harm if not constantly monitored. *Id.* Also like Mitchell, the officer admitted that he left the detainee unmonitored to run chow anyway. *Id.* at 627, 629. These admissions and the rest of the record left "no question" that during the times when the officer left his post "he took *no* measures to protect" the detainee "from harm." *Id.* The *Nagle* court therefore concluded that the officer was deliberately indifferent as a matter of law and entered partial summary judgment on the question of liability for the plaintiff. *Id.* at 629–31.[2]

Given Mitchell's clear admissions at his deposition, the ample record evidence to corroborate those admissions, and the absence of any evidence to undermine them, no factfinder could reach a different conclusion here. Mitchell's decision to abandon his post—without taking any steps to ensure Mr. Curtis's safety—was deliberately indifferent as a matter of law.

### B.      There is no dispute that Mitchell was deliberately indifferent after returning to his post.

Standing alone, Mitchell's decision to abandon his post entitles Plaintiff to partial summary judgment. His conduct *after* finding Mr. Curtis unresponsive and in respiratory arrest, however, only bolsters the conclusion that no reasonable jury could find Mitchell acted with anything less than deliberate indifference.

---

[2] *Nagle* involved a pretrial detainee, not a prisoner, so the plaintiff's claim arose under the Fourteenth Amendment. That technical difference is immaterial, however, because the *Nagle* court (following Fifth Circuit precedent) made clear that deliberate-indifference standard articulated in *Farmer v. Brennan*, 511 U.S. 835 (1994), applied equally to both Eighth Amendment and Fourteenth Amendment deliberate-indifference claims. *See Nagle*, 61 F. Supp. 3d at 628 (citing *Hare v. City of Corinth*, 74 F.3d 633, 648–49 (5th Cir. 1996) (*en banc*)).

"Prison guards have a responsibility for prisoners' welfare." *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015). Accordingly, "[i]f a prisoner is writhing in agony, the guard cannot ignore him on the ground of not being a doctor; he has to make an effort to find a doctor . . . [or] *some* medical professional." *Id.* Yet Mitchell did not call for emergency medical help after finding Mr. Curtis in desperate need of it. UMF ¶¶ 30–35, 37, 39, 41, 44, 50. He could not offer a single excuse for failing to do so. UMF ¶ 32. Nor could he point to any training or policies that barred or even discouraged him from summoning emergency assistance. *Id.* The Seventh Circuit has found that failing "to consult or alert a medical professional where an inmate is unconscious and barely breathing" is a paradigmatic example of deliberate indifference. *Orlowski*, 872 F.3d at 425 (citing *Gayton*, 593 F.3d at 624). Mitchell's actions fit that bill.

In lieu of calling medical personnel, a correctional officer who—lacking the requisite training—responds to a medical emergency by "immediately notif[ying] his superior" may lack the subjective mental state required for deliberate indifference. *Mathison v. Moats*, 812 F.3d 594, 597–98 (7th Cir. 2016). But Mitchell did not immediately alert any of his supervisors to Mr. Curtis's plight, either. Instead, he turned to two fellow correctional officers—supposedly to confirm whether his "eyes were deceiving [him]." UMF ¶¶ 33–37. Even if the jury were to credit that excuse once (let alone twice), Mitchell's conduct still would be deliberately indifferent. As the Seventh Circuit has stated, it is "inconsistent with *Farmer* to 'reward guards who put their heads in the sand.'" *Robinson v. Moran*, 2008 WL 628708, at *16 (C.D. Ill. Mar. 5, 2008) (quoting *Velez*, 395 F.3d at 736). A guard who, like Mitchell, "does nothing to help a suffering prisoner obtain treatment . . . exhibit[s] deliberate indifference." *Dobbey*, 806 F.3d at 940.

In sum, the record shows that Defendant Mitchell was deliberately indifferent on at least two occasions—when he abandoned his crisis-watch post for more than 90 minutes, and then when

he returned to find Mr. Curtis in desperate need and did nothing to help him. Either of these instances of deliberate indifference warrants partial summary judgment on its own. In tandem, they confirm that the only question left for a jury is that of damages.

## CONCLUSION

For these reasons, this Court should enter summary judgment for Plaintiff on the question of Defendant Nickolas Mitchell's liability on Count I.

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Sarah Grady
Howard Kaplan
Nabihah Maqbool
David A. Schmutzer
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Suite 205
Chicago, IL 60614
(312) 852-2184
sarah@kaplangrady.com

## <u>CERTIFICATE OF SERVICE</u>

  I, Sarah Grady, an attorney, certify that on May 1, 2024, I caused the foregoing Motion for Partial Summary Judgment to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

          /s/ Sarah Grady
          Sarah Grady
          Attorney for Plaintiff