**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

YOLANDA JACKSON, as Administrator )
of the Estate of Kevin Curtis, )
           )
         Plaintiff, )
           )
         v. )        Case No. 20-cv-0900-DWD
           )
WEXFORD HEALTH SOURCES, INC., )
et al., )
           )
         Defendants. )       Hon. David W. Dugan

**<u>PLAINTIFF'S MOTION TO EXCLUDE MOEIN HEIDARI</u>**

Sarah Grady
Howard Kaplan
Nabihah Maqbool
David A. Schmutzer
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Suite 205
Chicago, IL 60614
(312) 852-2184
sarah@kaplangrady.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.     Heidari's criticisms of Dr. Herrington are factually and legally irrelevant. ..................... 4

     A.    Heidari's criticisms ignore Dr. Herrington's actual opinions and methods. ........... 6

     B.    Heidari's criticisms misrepresent the legal standard.............................................. 8

     C.    Heidari's criticisms of Dr. Herrington are full of medical opinions that Heidari admits he is not qualified to give. ..................................................................................11

II.    Heidari's criticisms of the Lippert Report are irrelevant—and if admitted, will open the door to a full discussion of that report for purposes of its truth. .................................... 15

III.   Heidari's criticisms of Dr. Cockerill are not helpful to the jury. .................................... 17

IV.   Alternatively, the Court should conduct a Daubert Hearing to decide Heidari's admissibility....................................................................................................................... 19

CONCLUSION ............................................................................................................ 20

Pursuant to Fed. R. Evid. 702, Plaintiff Yolanda Jackson, as Administrator of the Estate of Kevin Curtis, hereby moves to exclude the Wexford Defendants' statistical expert Moein Heidari. If for any reason the Court concludes that the Mr. Heidari's exclusion is not justified on the face of the briefs, Plaintiff further respectfully requests that this Court conduct a *Daubert* hearing pursuant to Federal Rules of Evidence 104(b) and 702 to determine whether Defendants can establish that Mr. Heidari is qualified to offer the opinions he has disclosed, and whether those opinions satisfy Rule 702.

## INTRODUCTION

Wexford has disclosed reports from four retained experts. Plaintiff has filed a consolidated *Daubert* motion seeking to bar certain opinions from three of Wexford's experts. But Plaintiff seeks total exclusion of just one of Wexford's retained experts: Moein Heidari, a quantitative methodologist from the United Kingdom who works with a consulting company. Heidari has authored two reports: (1) one purporting to critique Plaintiff's correctional medical expert, Dr. Ryan Herrington, and (2) one purporting to critique the 2014 *Lippert* Report that was created by multiple court-appointed experts in a class action challenging the constitutional adequacy of care provided by Wexford. Both Dr. Herrington's report and the 2014 *Lippert* Report represent a qualitative analysis of the quality of medical and mental health care provided to patients in IDOC custody by Wexford and its staff. Heidari did not review any of the underlying medical records on which both reports are based. And he admits he has **no medical expertise or training**, and **no expertise or experience in qualitative studies**.

This lack of relevant expertise is fatal to Wexford's ability to establish that Heidari's reports are admissible pursuant to Rule 702 and *Daubert*. Heidari purports to criticize both Dr. Herrington's report and the 2014 *Lippert* Report because they do not satisfy his quantitative

-1-

metrics—*i.e.*, because the data studied in these reports is not statistically significant. But those criticisms are inapposite to these reports, which do not purport to offer statistically significant results or even to offer quantitative findings at all. Heidari's criticisms are thus attempting to force a square peg into a round hole and wholly unhelpful to the jury in examining the issues.

Worse still, Heidari's methodology risks misleading the jury as to the applicable legal standard on Plaintiff's *Monell* claim. In his report, Dr. Herrington opines that the 12 cases he reviewed, as well as a wealth of other evidence in the record, led him to conclude that Wexford maintained a variety of dangerous and infirm widespread practices. This opinion is directly relevant to Plaintiff's 42 U.S.C. § 1983 claim against Wexford, which requires her to adduce evidence that satisfies *Monell*. *See, e.g., Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) (there are no "bright-line rules" regarding the quality, quantity, or frequency of conduct needed to prove a widespread practice, but typically evidence of more than three instances is required).

Heidari's criticism of Dr. Herrington's opinions is that they are not valid because the 12 cases do not represent a statistically significant sample and because they were not selected based on random sampling. In other words, Heidari intends to tell the jury that a widespread practice cannot be identified without a blind random sample of statistical significance to a certain p-value. But that opinion is directly contradicted by well-settled Seventh Circuit precedent, as well as the Seventh Circuit's pattern jury instructions. Accordingly, permitting Heidari to offer these opinions would risks misleading the jury on the legal standards required for Plaintiff to prove her claim against Wexford.

Heidari's criticisms of the 2014 *Lippert* Report fail for the same reasons, and for an important additional one. The *Lippert* Report is admissible in this case only for purposes of the notice it provided to Wexford about the danger of their practices, not for the truth of the matter

asserted within it. On the topic of notice, Heidari's report is wholly irrelevant. It was never made available to Wexford at any point before Mr. Curtis's death and as such, it has no bearing on why Wexford was or was not justified in ignoring the clear notice set out in the *Lippert* Report. Instead, Heidari's expert report was authored nine years after Wexford received the *Lippert* Report and is directed entirely to disputing the *contents* of the Report. Accordingly, permitting Heidari to testify as to why the *Lippert* Report should be disbelieved as to its *contents* would at worst run afoul of Seventh Circuit precedents prohibiting the *Lippert* Report's admission for any purpose other than notice, and at best open the door to permit Plaintiff to argue that its contents should instead be credited by the jury for the truth of the matter asserted within it.

Lastly, Heidari offers brief criticism of an opinion set out by Plaintiff's psychiatry expert, Dr. Richard Cockerill, regarding the likelihood that Mr. Curtis died of catatonia rather than intoxication from synthetic cannabinoids. But Heidari's response amounts to nothing more than vague truisms about irrelevant theoretical possibilities Dr. Cockerill supposedly did not consider. Heidari's comments on Dr. Cockerill's opinion in this regard are unfounded, unhelpful, and should be excluded.

For all of these reasons, Wexford cannot establish that any of Heidari's opinions satisfy Rule 702 or *Daubert*. This Court should accordingly exclude his testimony from trial.

## ARGUMENT

The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mutual Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). Because experts "famously possess an aura of special reliability surrounding their testimony," *United States v. Christian*, 673 F.3d 702, 712–13 (7th Cir. 2012), the standard for admission is a meaningfully stringent one.

To satisfy the standard for expert testimony, the proponent of the witness must demonstrate that it is more likely than not that (a) the expert's technical or specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. Rule 702 requires the district court to act as an "evidentiary gatekeeper," *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017), evaluating not only a proffered expert's qualifications, but also the reliability of the expert's methodology and the relevance of the expert's testimony to the case. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778-79 (7th Cir. 2017).

## I.    Heidari's criticisms of Dr. Herrington are factually and legally irrelevant.

Dr. Herrington has more than 20 years' experience managing correctional healthcare systems. As part of his work in this case, Dr. Herrington analyzed medical records from 12 prisoners who died in IDOC custody, as well as deposition testimony, quality assurance records, administrative materials, clinical guidelines, mortality review files, and national correctional health care standards. Based on this review and his extensive experience, Dr. Herrington identified numerous inadequacies with the care that Wexford was providing to prisoners, including Mr. Curtis. Dr. Herrington's analysis was qualitative in nature; he did not purport to draw any statistical conclusions about the healthcare provided to every prisoner in IDOC custody. *See generally* Ex. 1 (Dr. Ryan Herrington Report); Ex. 2 (Dr. Ryan Herrington Rebuttal Report) at 4.

Heidari's "critique" of Dr. Herrington's report asserts that Dr. Herrington's did not follow a methodology like the one Heidari would use if he were designing a quantitative study for one of his business or pharmaceutical clients. Heidari summarizes his conclusions as follows:

This report is a critique of the conclusion made by Dr. Herrington in his review of several sets of medical records for patients who died while incarcerated within the Illinois Department of Corrections. In his report, Dr. Herrington claimed that none of these patients received adequate care by any reasonable criteria, which identified patterns of practice by Wexford Health Sources that reflected the presence of a disease amenable environment in need of substantial improvement.

However, *from a statistical perspective*, Dr. Herrington's conclusions were flawed and unsupported by evidence. First, he failed to *perform unbiased sampling* or any methodology in determining which cases he reviewed or how many cases he reviewed, which is required to ensure the reliability and generalization of his findings. Second, he *failed to establish clear and valid causal links* between the alleged Wexford practices and the alleged inadequate care that resulted in the patients' deaths. Moreover, this report uses the epidemiological triangle as a framework to challenge Dr. Herrington's claims regarding inadequacies in treatment for each patient.

*We are not assessing whether the medical opinions are sound, but instead are assessing whether scientific methodology was utilized to ensure the study was performed reliability* [sic] and whether the opinions can be reliably generalized into the entire IDOC population. Furthermore, *we are assessing whether the opinions were data-driven through industry accepted mathematical or scientific analysis* to ensure the review was accurate and reliable, instead of being driven by speculation or perspective.

We are testing the following null and alternative hypotheses:

H0: Patterns of practice by Wexford were significantly associated with the patient's death.

Ha: Patterns of practice by Wexford were not significantly associated with the patient's death.

Under the null hypothesis, we assume that a combination of the inadequacies in treatment identified by Dr. Herrington were significantly associated with the patient's death and the patterns of practice by Wexford significantly led to the patient's death. This means that we assume Dr. Herrington's findings are correct and that they explain why the patients died. If, however, by evaluating the sampling methods, data sources, analysis, and interpretations of the findings, there are flaws in the analysis, in the connection of the deaths, and/or the generalizability of the results, the null hypothesis is unsupported, and it provides support in favor of the alternative hypothesis. This means that if there are errors or inconsistencies in Dr. Herringto's findings, the evidence for the null hypothesis is unsupported and the evidence for the alternative hypothesis is strengthened. For example, if some of the patients had other medical conditions or complications that contributed to their death, or Dr. Herrington's assertions regarding inadequacies in treatment were flawed, or if his findings and observations did not fit the epidemiological triangle, then his opinions concerning Wexford's practices are unsupported.

Ex. 3 (Moein Heidari Report re Dr. Herrington) at 5-6 (emphasis added). In short, Heidari claims that, "from a statistical perspective," he does not believe Dr. Herrington's analysis is "scientific" or necessarily representative of the entire IDOC population. *Id.*

**A.    Heidari's criticisms ignore Dr. Herrington's actual opinions and methods.**

Heidari's framing of his report is extraordinarily confusing because it has nothing to do with the opinions Dr. Herrington actually offers. Dr. Herrington is not a statistician, did not perform a statistical study, and did not offer any opinions on the statistical significance of his results. Accordingly, Dr. Herrington does not purport to offer opinions to any degree of statistical significance. Instead, he performed a qualitative analysis of more than a dozen prisoners who died in IDOC custody to determine whether, based on his experience, he could identify common threads in the Wexford policies and practices that led to the prisoners' deaths. Heidari's attempt to "critique" Dr. Herrington's study by using a quantitative perspective Dr. Herrington did not apply is therefore forcing a square peg into a round hole. *Cf. United States v. Shamsud-Din*, 2012 WL 280702, at *6 (N.D. Ill. Jan. 31, 2012) (an expert need not "rely primarily on the hard sciences in support of her expert opinion," as "expert testimony need not be based on statistical analysis in order to be probative").

Heidari tied himself in knots at his deposition to suggest otherwise, continually asserting that Dr. Herrington offered opinions that, in fact, he did not. For instance, Heidari said that he "remember[ed]" that Dr. Herrington "mentioned some numbers, you know, that—that made conclusions based on the descriptive number." Ex. 4 (Moein Heidari Dep. Vol. I) at 108-09. Heidari was initially unable to point to examples of quantitative analysis despite taking multiple breaks to look for them. *Id.* ("You know, he was doing some descriptive stuff—just, this is a very long report. You know, during the break, I just couldn't find those examples.").

Following a second break, Heidari identified one paragraph of the report that mentioned life expectancy and stated, "I am – it's not that – it could be quantitative data analysis, you know. He did not perform, you know, a clear quantitative methodology, but to make such conclusions about – about life expectancy, you know, you can't use qualitative data analysis." *Id*. at 110-11. But the fact that Dr. Herrington mentioned "life expectancy" in his report obviously does not mean that he was conducting a quantitative analysis subject to quantitative statistical standards. Dr. Herrington was simply explaining that the subjects he examined had died decades earlier than the average life expectancy for a person in Illinois. Ex. 1 at 48.

Heidari's attempt to force Dr. Herrington's qualitative opinions into a quantitative mold is also extraordinarily confusing. Take, for instance, his use of the "null hypothesis" and "alternative hypothesis" concepts to critique Dr. Herrington's report. Ex. 3 at 5-6. Null and alternative hypotheses are terms of art in statistics. A null hypothesis posits that there is no difference between the groups. An alternative hypothesis posits that a difference does exist. To test the alternative hypothesis, a scientist draws samples from each of the two groups and then applies various statistical measures to determine how likely it is that, assuming the null hypothesis is true, one would see the observed differences in the sampled data. If it is very unlikely that the differences in the sample would arise by chance—*i.e.*, if the differences are "statistically significant"—it is statistically appropriate to infer that the null hypothesis is false. Federal Judicial Center, *Reference Manual on Scientific Evidence* 283, 291 (3d ed. 2011), https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf. But these concepts are inapposite in the *qualitative* context because qualitative studies are not designed to test a null hypothesis o r satisfy statistical significance tests.

Pressed on the subject, Heidari finally conceded that Dr. Herrington was offering qualitative opinions: "I mean, it – it – it deals with data, not quantitative data, but qualitative data analysis. This is what I mean. I'm not saying that he is performing quantitative data analysis. I'm saying that this does not fit – fit qualitative data analysis methodology." *Id.* at 112-13. But this makes Heidari's opinions even more confusing and unhelpful. Heidari has no experience with qualitative studies and flat-out admitted that he is not an expert in qualitative study methodologies. *See* Ex. 4 at 94-95 ("I'm not an expert in the methodology – methodologies of qualitative studies"); *see also id.* at 66 (agreeing that he has had no experience with qualitative studies in the field of health). His insistence on applying quantitative standards to a qualitative report is nonsensical and will be tremendously confusing and distracting for the jury. If Wexford believed that a quantitative study would have been useful or more "appropriate" in this case, it could have hired an expert to perform such a study. Heidari himself does not offer any such opinions, so his declaration that a quantitative study would be a "more appropriate" way to draw conclusions about Wexford's care than Dr. Herrington's qualitative study is worthless.

In short, Heidari's criticisms of Dr. Herrington's report will neither help the jury "understand the evidence" nor "determine a fact in issue," Fed. R. 702(a), because they apply standards to Dr. Herrington's report that simply do not fit Dr. Herrington's opinions or methodology. For this reason alone, Heidari's opinions should be excluded.

### B.    Heidari's criticisms misrepresent the legal standard.

To make matters worse, the quantitative standards Heidari is applying are contrary to law as well as fact. The Seventh Circuit has repeatedly declined to adopt a "bright-line rule regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021); *see also*

*Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (stating that "[w]e do not adopt any bright-line rules defining a 'widespread custom or practice' and that, beyond some minimal threshold requirements, "the jury must make a factual determination as to whether the evidence demonstrates that the [defendant] had a widespread practice that the alleged constitutional harm"); *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) (explaining that there is "no clear consensus among the courts as to what level of frequency of the challenged conduct evidences a custom" and that a plaintiff "need[]s only to show, by a preponderance of the evidence, that the [defendant] had a custom" resulting in constitutional injury). Heidari's opinion that evidence of repeated instances of constitutional violations—evidence which, in combination with a wealth of other evidence, led a correctional medical expert to conclude that they stem from dangerous widespread practices—should be disregarded because it does not satisfy a non-applicable statistical standard is directly contrary to law, and would inevitably mislead the jury into believing that Plaintiff must prove her *Monell* claim to a certain level of statistical certainty, despite the Court's instruction otherwise. Indeed, if Heidari were permitted to testify, the Court would be required to repeatedly instruct the jury throughout Heidari's testimony that his opinion of Herrington's review does not reflect the law that governs Plaintiff's *Monell* claim, and that any testimony suggesting otherwise must be disregarded. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1063 (N.D. Ill. 2022) ("Expert opinions that are contrary to law are inadmissible.").

Typically, the Seventh Circuit has required no more than three instances of a particular constitutional violation as a threshold showing to establish the existence of a widespread practice pursuant to *Monell*. *E.g.*, *Howell*, 987 F.3d at 655-56. The Seventh Circuit has *never* stated that statistical sampling is necessary to prove a practice or custom. Nor has any other circuit. To the

contrary, in situations where there is an obvious risk created by a gap in prison healthcare policies, even one instance may be enough. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc) ("There is no magic number of injuries that must occur before [a] failure to act can be considered deliberately indifferent."); *Woodward v. Correctional Medical Services*, 368 F.3d 917, 929 (7th Cir. 2004) (similar).

Wexford could, of course, have introduced evidence on its "track record" of care for prisoners similar to Kevin Curtis, if it believed that any such evidence would have been favorable, and not damning, to the company. *See Glisson*, 849 F.3d at 381-82 ("At trial, there is no reason why [private-medical contractor] Corizon would not be entitled to introduce evidence of its track record, if it believes that this evidence will vindicate its decision not to follow the INDOC guidelines," but "[i]f it does so, it presumably would also have to face less flattering news about its records."). But as discussed above, that is not what Heidari does. Heidari did not review any evidence at all about Wexford's "track record," and he offered no affirmative opinions about it. Ex. 3 at 4, 5-34. Instead, Heidari simply criticizes Dr. Herrington for not using a "scientific" sampling methodology that is wholly inapplicable to his report and that the law does not require. For this reason, too, Heidari's testimony should be excluded. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d at 1063; *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. Sept. 8, 2005) ("Expert opinions that are contrary to law are inadmissible" and "cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact."); *In re Diet Drugs Products Liability Litigation*, 2001 WL 454586, at *18 (E.D. Pa. 2001) (excluding opinion that "is not an 'expert' opinion, but rather a personal opinion about [what standard the expert] believes should apply" in this case).

### C.   Heidari's criticisms of Dr. Herrington are full of medical opinions that Heidari admits he is not qualified to give.

In addition to criticizing Dr. Herrington for opinions he never rendered, Heidari offers almost 20 pages of opinions that purport to criticize Dr. Herrington's "analysis" of the data from a methodological perspective. *See* Ex. 3 at 9-28. These opinions are wildly inappropriate. They show that—despite Heidari's claim that he is not "assessing whether the medical opinions are sound" but simply whether "scientific methodology was utilized[,]" *id*. at 5—Heidari is in fact offering countless medical opinions without medical expertise.

For instance, Dr. Herrington opines that Wexford provided inadequate medical care by failing to ensure that Mr. Curtis's psychiatric medications were renewed. Heidari opines that Dr. Herrington's opinion is invalid because he "does not take into account the reason the psychiatric medications expired, whether it was beyond his provider's control or knowledge, that renewing his medications was not indicated or appropriate for his condition, or that Mr. Curtis consented to the medications." Ex. 3 at 9-10. Yet the type of information that must be considered by a physician in determining the adequacy of care provided to a patient is something that only *medical* experts can determine. *See Williams v. Prison Health Sys.*, No. 05-cv-154RM, 2007 WL 2915627, at *3 (N.D. Ind. Oct. 2, 2007) (explaining that unqualified individuals may not "render an expert opinion as to [the plaintiff's] need for surgery"). Heidari does not have a medical degree and has never had any medical training. *See* DD at 93-94 ("I don't have a medical degree or position, true. Yes. . . . I'm not expert in the – you know, as a medical professional, yes.").[1] He has no expertise upon which to criticize Dr. Herrington for not "tak[ing] into account" factors that, per Heidari's *ipse dixit*, should have been considered. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

---

[1] *See also* Ex. 4 at 114 ("I'm not a medical professional. I can't put input on that."), 136 ("I can't give opinions on the medical aspect of this case.").

("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

At his deposition, Heidari struggled to justify his critique, admitting that he was not qualified to evaluate Dr. Herrington's opinion one way or the other:

> Q: You see here that Dr. Herrington opines that Mr. Curtis' psychiatric medications expired and were not renewed in a manner that was not under a medical practitioner's supervision is inadequate care?
>
> A. Well, you know, when he says that it was not renewed in a manner that was not under a medical practitioner's supervision, you know, here, ***I would like to – him to refer to a standard, you know, or – or, you know, provide the support for this claim***.
>
> Q. Okay. Sir, I'm just asking whether you see those words printed on the page that is on your screen. Do you see those words as I've just read them?
>
> A. Yes, I can see them.
>
> Q. ***What qualifications do you have to evaluate whether or not that statement is true or false***?
>
> A. ***Well, I don't have any qualifications to say if they are correct or false***. I – I can't say – I can determine whether support was provided, you know. I'm saying that they – he did not support this.

*Id.* at 137-38 (emphasis added).

This example is just the tip of the iceberg. Heidari offers dozens of criticisms of medical opinions offered by Dr. Herrington without any relevant expertise. Regarding a prisoner who died after swallowing a utensil, for example, Heidari states that "some factors that may influence the decision to notify a medical practitioner include the shape, size, and material of the foreign object, the presence or absence of symptoms, and the level of observation already in place with the practitioner." Ex. 3 at 12. These factors are not based in any relevant medical or correctional experience. They are entirely made up. *But see Johnson v. Dart*, 2020 WL 8255194, at *8 (N.D. Ill. Dec. 18, 2020) ("The whole point of *Daubert* is that experts can't speculate.").

Regarding another prisoner, Heidari states that Dr. Herrington did not consider that "there may be specific guidelines or policies that regulate when and how nursing staff should communicate with medical practitioners, especially in cases of afterhours care, emergency, or uncertainty." Ex. 3 at 14. Again, this is rank speculation. What guidelines is Heidari referencing? Do they exist? What do they say? How should a medical expert like Dr. Herrington take them into account? Since Heidari does not know the answers to these questions, he cannot help the jury consider them either. And he applies no expertise in simply pointing out theoretical possibilities that there may be additional information out there that could have been, but was not, discussed by Dr. Herrington in his report.

Regarding still another prisoner, Heidari states that Dr. Herrington "does not account for other factors that could have contributed to the patient's cause of death, including his prior head injury rather than his anticoagulation therapy." Ex. 3 at 21. But Heidari agreed that he had no ability to opine on cause-of-death issues either. *See* Ex. 4 at 95 ("Q. What, if any, experience do you have with offering opinions about making a determination about the cause of someone's death? A. You mean in general or for this case? Q. At all. A. Since I'm not a medical professional, well, I can't give opinions about causes of death."). Since Heidari is not a medical professional, he can offer nothing to the jury other than his lay observation that Dr. Herrington did not seem to "account" for factors that Heidari seems to pluck from the sky at random. Indeed, Heidari has no greater qualifications on these subjects than an average juror—or Wexford's counsel, who can pose these questions to Dr. Herrington on cross-examination at trial. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) ("The possibility of Mr. Cooper's CPS being attributable to a factor other than the fall is a subject quite susceptible to exploration on cross-examination by opposing counsel."). While Wexford may cross-examine Dr. Herrington on his cause-of-death

opinions, it would be wholly inappropriate to allow Heidari to take the stand to repeat Wexford's arguments under the guise of his "expertise" in "scientific methodology."

Courts in this Circuit have routinely excluded these types of opinions. In *Deere & Co. v. Ohio Gear*, for example, the court excluded an expert's opinion that certain conclusions were "unsupported" according to that witness's vague personal standards, noting the rule that "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." 2009 WL 6366762, at *6-7 (C.D. Ill. Oct. 7, 2009) (quoting *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004)). Likewise, in *Marmol v. Kalonymus Development Partners, LLC*, the court granted a motion to exclude an expert where "much of [the expert's] disagreements with [another expert's] conclusions are more appropriately addressed through cross examination or presented as legal argument, not through expert testimony." 2023 WL 6534410, at *2 (S.D. Fla. Sept. 5, 2023).

Simply put, even if a witness is an expert in *some* field, the witness's opinion "is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate [his] opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). Accordingly, unless the witness's expertise "adds something" based on his special skills, the expert "at best is offering a gratuitous opinion," and "at worst is exerting undue influence on the jury that would be subject to control under Rule 403." *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). Heidari's criticisms of Dr. Herrington should be excluded in full.

## II.    Heidari's criticisms of the Lippert Report are irrelevant—and if admitted, will open the door to a full discussion of that report for purposes of its truth.

Heidari's second submission is a "critique" of a 2014 report in *Lippert v. Ghosh*, a case challenging the medical care offered in IDOC prisons. *See generally* Ex. 5 (Moein Heidari Report re 2014 *Lippert* Report). The 2014 *Lippert* Report, authored by the party-nominated and court-appointed expert as well as three additional doctors approved by the parties, followed a months-long investigation, including eight site visits and an exhaustive review of institutional documents and medical records. In December 2014, the monitors submitted a 400-page report that assessed the adequacy of multiple aspects of the healthcare system in place within the IDOC. They concluded that it did not meet minimal constitutional standards. *See generally* Ex. 6 (2014 *Lippert* Report).

Structurally, Heidari's critique is identical to his critique of Dr. Herrington, down to the same conclusory statement that "[w]e are not assessing whether the medical opinions are sound, but instead are assessing whether scientific methodology was utilized to ensure the study was performed reliability and whether the opinions can be reliably generalized into the entire IDOC population." *Compare* Ex. 5 at 5-6, *with* Ex. 3 at 5. Heidari's critique of the *Lippert* report thus should be excluded for the same reasons as his critique of Dr. Herrington. But it should also be excluded for an additional, independent reason.

First, as with Dr. Herrington, Heidari criticizes the authors of the 2014 *Lippert* Report for not using a sufficient sample size or a "scientific" methodology. Ex. 5 at 8. As was the case with Dr. Herrington, the authors of the *Lippert* report were not conducting a quantitative study. Again, Heidari admitted that he has no expertise designing a sampling protocol for a qualitative study, let alone a qualitative study in the correctional healthcare context. Ex. 4 at 66, 94-95; Ex. 7 (Moein Heidari Dep. Vol. II) at 27-28; *see also id.* at 67 ("Q. Okay. What analyses are used in qualitative

-15-

studies?" A. "Well, since I'm not an expert in that area, I can't give you an example because I – I might not be able to provide details on that since I'm not an expert there."). Indeed, despite criticizing the *Lippert* experts' methodology, Heidari conceded that he lacked the information needed to propose an alternative, much less to assess what that alternative methodology would have revealed in this case. Ex. 7 at 99-102.

As yet another example, Heidari repeatedly criticizes both the *Lippert* experts and Dr. Herrington for not conducting a "root cause analysis" to determine the cause of various issues that the experts identified in their reports. Ex. 3 at 29; Ex. 5 at 15, 17, 27. But Heidari admits that he is not an expert in root-cause analysis and has never conducted a root-cause analysis himself. Ex. 4 at 172; Ex. 7 at 70-73. Indeed, at his deposition, Heidari could not even explain what a root-cause analysis *was*. Ex. 7 at 70-71. Perhaps that is because—as Heidari admitted—as a statistician, he never makes determinations regarding causality. Ex. 4 at 36-37. Simply put, Heidari has no relevant expertise or experience whatsoever to offer these criticisms against Dr. Herrington and the authors of the 2014 *Lippert* Report.

Heidari's critique of the 2014 *Lippert* Report is separately inadmissible because of the limited purposes for which that evidence will be used. The Seventh Circuit has clearly held that the *Lippert* Report is hearsay if offered for the truth of the matter. *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019). Plaintiff accordingly does not intend to introduce the 2014 *Lippert* Report for its truth.

Rather, Plaintiff intends to submit the 2014 *Lippert* Report as evidence that, long before Mr. Curtis's death, Wexford was on notice of the dangers its widespread practices posed to prisoners like Mr. Curtis. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 237-39 (7th Cir. 2021) (analyzing the 2014 *Lippert* Report for purposes of notice); *Daniel v. Cook County*, 833 F.3d

728, 743 (7th Cir. 2016) (recognizing that such reports may be admissible to establish notice for purposes of a *Monell* claim). Heidari's report is entirely irrelevant to the question of notice. Heidari did not discuss the 2014 *Lippert* Report with anyone at Wexford at any point, let alone at any point in the years between the 2014 *Lippert* Report's publication and Mr. Curtis's death—the time period that is relevant to Wexford's notice. And Heidari does not offer any opinions regarding *why* it was proper for Wexford to have conducted itself in the way it did in the years after the 2014 *Lippert* Report was published. Indeed, Heidari makes absolutely no mention about what, if any action, Wexford took in the wake of the Report's publication, including any action to assess the legitimacy of the findings themselves. There is no evidence that Heidari even *knows* what the relevant decisionmakers at Wexford took from the *Lippert* report or what analyses Wexford did or did not perform regarding the report's conclusions.

Instead, Heidari's report is dedicated exclusively to the *substance* of the 2014 *Lippert* Report. Permitting such testimony by Heidari would run afoul of the Seventh Circuit's ruling in *Wilson*. But if Wexford is permitted to present an expert to critique the methodology and conclusions reached by the *Lippert* monitors at trial, then fairness demands that Plaintiff have the opportunity to defend that methodology and conclusions before the jury. Wexford cannot have it both ways. If the Court denies exclusion of the opinions in Heidari's critique of the 2014 *Lippert* Report, therefore, the Court should make clear that Heidari's testimony will open the door to hearsay uses of the 2014 *Lippert* Report by Plaintiff at trial.

## III.    Heidari's criticisms of Dr. Cockerill are not helpful to the jury.

A final, limited set of opinions Heidari's report concerns Plaintiff's psychiatric expert, Dr. Richard Cockerill. Dr. Cockerill is a board-certified forensic and clinical psychiatrist and a professor of psychiatry at the University of Chicago. After explaining the standards for assessing and treating catatonia, and detailing the treatment (or lack thereof) of Mr. Curtis's catatonia, Dr.

Cockerill opines in his report that Mr. Curtis's care was inadequate and his death was most likely caused by catatonia. Heidari addresses only a single paragraph of Dr. Cockerill's report, in which Dr. Cockerill opines that it is more likely that Mr. Curtis died from acute catatonia than from ingesting synthetic cannabinoids.[2] *See* Ex. 3 at 30-34.

Once again, Heidari's criticisms are entirely unhelpful to the trier of fact. First, Heidari states that that Dr. Cockerill did not consider (1) whether there may be unreported or unrecognized deaths from synthetic cannabinoids, (2) whether Mr. Curtis died from a *different* unknown substance, or (3) whether Mr. Curtis was particularly likely to die from synthetic cannabinoids for some reason. *Id.* at 30-31. These are all unhelpful truisms. Of course, it is possible that any study may exclude unreported or unrecognized deaths or that a person may be exceptionally likely to suffer an adverse impact from a particular chemical. But Heidari—who is not an expert in toxicology, epidemiology, or any other relevant discipline—does not have any particular *expert* insight that would help the jury assess these questions. As before, Wexford's lawyers can ask Dr. Cockerill whether he considered these possibilities. Letting Heidari take the stand to offer rank speculation that Mr. Curtis may have been more likely to die from taking synthetic cannabinoids because he was "administered Ativan prior to his death" offers nothing useful to the jury. It would be "gratuitous" at best, and hugely prejudicial at worst. *Hall*, 93 F.3d at 1343.

In addition to speculating about causes far outside his experience and expertise, Heidari proposes a statistical model to test whether Mr. Curtis's death and the deaths of two other men at

___

[2] The relevant opinion reads: "While the data set is limited, overdose deaths attributable to synthetic cannabinoids are very rare. A 2016 study estimated there had been a total of 22-27 deaths which could be attributed to synthetic cannabinoids in the US since they were developed.12 Given that approximately 1% of the population uses synthetic cannabinoids, the risk of death from overdose could be estimated to be <0.001%. On the other hand, catatonia is known to be fatal in up to 20% of cases without treatment. Thus, even if Mr. Curtis used synthetic cannabinoids, his acute catatonia would be orders of magnitude more likely to have contributed to his death." Ex. 8 (Dr. Richard Cockerill Report) at 22.

Menard around the same period were independent of each other. Ex. 3 at 32-33. Heidari does not identify any studies or methodologies that have used his approach to model fatalities in prisons, and he does not claim to have any experience using such a model for this purpose. Regardless, Heidari makes no effort to connect his model to the facts of the case. According to Heidari's model, if the background likelihood of a given prisoner dying is assumed to be random and independent, then it is rare that three men would die in a 72-hour period. But so what? Neither Plaintiff nor Wexford contends that Mr. Curtis's death was random.

Put another way, the jury must decide whether Mr. Curtis's death was caused by a Wexford policy, practice, or custom. Heidari does not and cannot offer the jury any tools to answer that fundamental question. In Heidari's words, his model shows only that "there might be another underlying factor explaining the death of these individuals." Ex. 4 at 229. It does not "say anything" about what that cause might be. *Id*. at 235. Heidari's opinions on this topic should accordingly be excluded.

## IV.    Alternatively, the Court should conduct a Daubert Hearing to decide Heidari's admissibility.

For the reasons explained above, Heidari's opinions are so drastically unmoored from the analysis provided by Dr. Herrington (and by Dr. Cockerill) that they could not possibly add any value to the jury's determination of the issues in this case. Yet if the Court has any doubts about the admissibility of Heidari's opinions—whether based on his qualifications or his experience—Plaintiff requests a *Daubert* hearing. "Whether a *Daubert* hearing is necessary before trial lies within the district court's discretion." *United States v. Godinez*, 7 F.4th 628, 637 (7th Cir. 2021). *Daubert* hearings "are limited in scope." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013). As a supplement to the parties' briefing on the admissibility of expert testimony, a *Daubert* hearing "enable[s] the [Court] to decide whether the expert's proposed evidence is

sufficiently reliable to be considered by the jury." *Apple, Inc. v. Motorola, Inc.*, No. 1:11-cv-08540, 2012 WL 1959560, at *1 (N.D. Ill. May 22, 2012) (Posner, J.), *rev'd on other grounds*, 757 F.3d 1286 (Fed. Cir. 2014); *see also Cage*, 979 F. Supp. 2d at 798 (noting that *Daubert* hearings assist the district court in "evaluat[ing] the proposed testimonies" of expert witnesses).

Conducting a *Daubert* hearing would permit the parties and the Court to probe the question of Heidari's admissibility to the Court's own satisfaction. *See Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) (explaining that a *Daubert* hearing gives the district court the chance "to probe [a proffered expert] about the basis for his opinions, the methodology he employed to formulate his theories, and the potential rate of error of his approach—all proper considerations under Rule 702 and *Daubert*."). Indeed, conducting such a hearing would lay to rest any question as to whether Heidari should be qualified as an expert witness in this case. *See Apple*, 2012 WL 1959560, at *1 ("The focus thus is not on results but on methodology. The expert must use a 'proper methodology,' an 'acceptable methodology.'" (quoting *Walker v. Soo Line R.R.*, 208 F.3d 581, 587 (7th Cir. 2000))). As explained throughout this motion, Heidari's methodology and his conclusions bear little connection to the pertinent legal issues in this case. In short, if the Court is not inclined to outright exclude Heidari as an expert, it should conduct a *Daubert* hearing to help it resolve the issue.

## CONCLUSION

The Court should exclude Moein Heidari's testimony in its entirety. Alternatively, the Court should conduct a *Daubert* hearing before ruling on the issue.

Dated: May 1, 2024

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Sarah Grady
Howard Kaplan
Nabihah Maqbool
David A. Schmutzer
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Suite 205
Chicago, IL 60614
(312) 852-2184
sarah@kaplangrady.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Sarah Grady, an attorney, hereby certify on May 1, 2024, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.


/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff