# Exhibit 4

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

CASE NO. 3:20-CV-00900

HON. DAVID W. DUGAN

ORIGINAL

YOLANDA JACKSON, AS ADMINISTRATOR OF THE

ESTATE OF KEVIN CURTIS,

Plaintiff

v.

WEXFORD HEALTH SOURCES, INC., ET AL.,

Defendants

DEPONENT: MOEIN HEIDARI

DATE: SEPTEMBER 29, 2023

REPORTER: ESTHER HEATH

APPEARANCES

ON BEHALF OF THE PLAINTIFF, YOLANDA JACKSON, AS ADMINISTRATOR OF THE ESTATE OF KEVIN CURTIS:
Sarah Grady, Esquire
Kaplan & Grady LLC
1953 North Clybourn Avenue
Suite 274
Chicago, Illinois 60614
Telephone No.: (312) 852-2184
E-mail: sarah@kaplangrady.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANTS, DR. MOHAMMED SIDDIQUI, DR. EVA LEVEN, AND WEXFORD HEALTH SOURCES, INC.:
Jaclyn Kinkade, Esquire
Cassiday Schade LLP
222 West Adams Street
Suite 2900
Chicago, Illinois 60606
Telephone No.: (312) 641-3100
E-mail: jkinkade@cassiday.com
(Appeared via videoconference)



APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANTS, GAIL WALLS, CHARLIE FRERKING, JEREMY FRERICH, ANDREW BENNETT:
Robert Brandon Shultz, Esquire
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
Telephone No.: (312) 814-3000
E-mail: robert.shultz@ilag.gov
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, NICKOLAS MITCHELL:
Jeanine Armstrong, Esquire
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
Telephone No.: (312) 814-3000
E-mail: jeanine.armstrong@ilag.gov
(Appeared via videoconference)

Also Present: Allison Thompson, observing from Cassiday Schade LLP



INDEX


| | Page |
|---|---|
| PROCEEDINGS | 6 |
| DIRECT EXAMINATION BY MS. GRADY | 8 |
| CONFIDENTIAL PORTION I REDACTED | 76 |
| CONFIDENTIAL PORTION II REDACTED | 93 |
| CONFIDENTIAL PORTION III REDACTED | 93 |


EXHIBITS


| Exhibit | Page |
|---|---|
| 1 - Moein Heidari Curriculum Vitae | 18 |
| 2 - Moein Heidari Report - Confidential | 93 |
| 3 - Invoice from Precision Consulting - Confidential | 93 |
| 4 - Dr. Herrington Redacted Report - Confidential | 110 |




STIPULATION

The VIDEO deposition of MOEIN HEIDARI was taken at CHURCHILL REPORTING, 110 NORTH WACKER DRIVE, SUITE 2500, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on FRIDAY, the 29th day of SEPTEMBER 2023 at 7:37 a.m. (CT); said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that ESTHER HEATH, being a Notary Public and Digital Reporter for the State of ILLINOIS, may swear the witness.

PROCEEDINGS

THE REPORTER: My name is Esther Heath. I'm the online video technician and court reporter today, representing Churchill Reporting, located at 110 North Wacker Drive, Suite 2500, Chicago. Today is the 29th day of September 2023. The time is 7:37 a.m. We're convened by videoconference to take the deposition of Moein Heidari in the matter of Yolanda Jackson, as the Administrator of the Estate of Kevin Curtis v. Wexford Health Sources, Inc., pending in the United States District Court for the Southern District of Illinois, case number 20 -- 3:20-CV-00900. Will everyone but the witness please state your appearance, how you're attending, and your location starting with Plaintiff's counsel?

MS. GRADY: This is Sarah Grady. I'm attending remotely from Chicago, Illinois.

MR. SHULTZ: Assistant Attorney General Brandon Schultz, attending remotely from Madison County, Illinois, for Defendants Frerking, Frerich, Bennett, and Walls.

MS. ARMSTRONG: Assistant Attorney Janine Armstrong, attorney -- appearing remotely in St. Clair County, Illinois for Defendant Mitchell.



MS. KINKADE: Jaclyn Kinkade, appearing on behalf of Dr. Siddiqui, Dr. Leven, and Wexford and the retained expert, appearing remotely from St. Louis, Missouri.

THE REPORTER: Okay. And then Mr. Heidari, would you state your name for the record?

THE WITNESS: Yes. This is Moein Heidari, attending remotely from Iran.

THE REPORTER: Thank you. Do all parties agree that the witness is, in fact, Mr. Heidari or agree to continue?

MR. SHULTZ: Yes.

MS. GRADY: Yes. Yes, we agree.

THE REPORTER: Okay. Sir, would you raise your right hand? Do you solemnly swear or affirm that the testimony that you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE REPORTER: You may begin. Thank you.

MS. GRADY: Okay. Mr. Heidari, before we begin, I just want to put a few things on the record. I'll go first, and then I'll let Ms. Kinkade go as well. We have reached an agreement with Counsel, although Mr. Heidari is appearing from Iran, there has been a waiver of any objections to



the fact that the court reporter, who is recording this deposition stenographically and by video, is located in the States. And Jaclyn, if you wouldn't mind, just putting on the record what you said before the depo.

MS. KINKADE: Yeah. And I'll confirm that I've agreed to what you just said. In order to expedite things, we've agreed to stipulate that Mr. Heidari is not a medical professional, and he did not review medical records of the patients. That's it.

MS. GRADY: Okay. Thank you. And we obviously agree with that stipulation from the perspective of the plaintiff.

DIRECT EXAMINATION

BY MS. GRADY:

**Q. Okay. Mr. Heidari, can you please state your name and spell it for the record?**

A. This is Moein Heidari.

MS. ARMSTRONG: Before you go through all that, you want to --

MS. GRADY: Go ahead. Before you go -- sorry. Just a minute --

MS. ARMSTRONG: Let's put this -- let's put on the stipulation about the objections, too, that when one party makes an objection, it applies to all,



instead of everybody interrupting.

MS. GRADY: Sure.

BY MS. GRADY:

**Q. Okay. Sir, can you please state and spell your name for the record?**

A. This is Moein Heidari. It's -- it's spelled M-O-E-I-N H-E-I-D-A-R-I.

**Q. Okay. Thank you, sir. My name is Sarah Grady. I am an attorney for the plaintiff in this case. Her name is Yolanda Jackson, and she is the mother of and administrator of the estate of Kevin Curtis. Have you ever had a deposition taken before?**

A. No, this is my first time.

**Q. Okay. Your counsel has probably gone over some of these rules, but I'm going to go over them, and that will, I think, help us get through today and the continuation of your deposition as well. If you have any confusion about any of my questions or don't understand either my question or what it is I'm asking, please feel free to let me know. I'm happy to rephrase anything that I'm trying to ask you so that you can understand, okay?**

A. Okay.

**Q. On the flip side, if you don't tell me that you don't understand my question or otherwise express**

your confusion, I'm going to assume that you've understood my question and that your response is an answer to it, fair?
A. Fair. Okay.
Q. Okay. The second one is that I'd ask that you keep your answers audible and verbal. (Coughs). Excuse me. So please make sure to say yes or no instead of a nod or a shake of the head or an uh-huh or uh-uh. That way our court reporter can be sure to get your answer on the record. And please also keep your voice up. It's Zoom, so especially important that the Zoom is able to capture your answer, so please keep your voice up, okay?
A. Okay.
Q. The next is a rule for both of us. Please let me finish my question in its entirety before you begin your answer, even if you understand what it is I'm asking, and I'll do my best to let you finish your answer in its entirety before beginning my next question. Again, that's so that the court reporter can understand what's being asked and what's being answered, okay?
A. Okay.
Q. All right. Lastly, your attorney or some of the other attorneys who are participating today might raise an objection to one or more of my questions. They



might say things like, objection, form, foundation. Unless your attorney instructs you not to answer, even if someone raises an objection like that, you should still go ahead and answer my question. Those objections are for a judge, later on down the road, but for purposes of today, again, unless your attorney instructs you not to answer, you answer, even though an objection has been raised, okay?
A. Okay.
Q. All right. Can you tell me, is there any reason that you cannot provide truthful and accurate testimony here today?
A. Sorry. Can you clarify your question?
Q. Sure. Is there anything about your situation that prohibits you from providing truthful testimony at this deposition?
A. Well, I -- I only reviewed the sampling methodology and the analysis, you know, my input on -- on -- on those areas. I -- I just provide my input.
Q. Yeah. I appreciate that answer, Mr. Heidari, but what I'm asking is just a more fundamental question. Bot about what you reviewed, but just about
-- and let me ask it this way: Have you taken any medication that would prevent you from testifying



truthfully?
A. No, I haven't taken any medications.
Q. Okay. Have you consumed any alcohol today?
A. No.
Q. Okay. Is there any other reason that you might have trouble answering my questions truthfully?
A. No.
Q. Okay. Is there anything that might give you trouble with your memory? And let me know if you'd like me to explain that.
A. No. No problem.
Q. Okay. Can you tell me everything that you did to prepare for today's deposition?
A. Well, I reviewed the reports that I've provided for the 2014 Lippert report and Dr. Harrington's report, and the -- the other statistical analysis I did, you know, using probability theory for Kevin Curtis' case and the death of three individuals. And I briefly reviewed the other reports, you know, the -- the -- the actual reports that I -- I -- I -- I reviewed for -- for this case.
Q. Okay. So in advance of today's deposition, you looked back at the two reports you prepared, right?
A. Yes.
Q. And you also looked at -- did you also look at



the 2014 Lippert report itself?
A. Yes.
Q. And did you also review Dr. Harrington's report to prepare for today's deposition?
A. Well, I mostly reviewed my own report, but, you know, I -- I reviewed them very shortly.
Q. Okay. You glanced over them; is that a fair characterization?
A. Sorry?
Q. You -- okay. You reviewed them very briefly. Can you tell me, did you read every page, or did you just look through quickly?
A. Looked through them quickly.
Q. Okay. Any other documents that you reviewed to prepare for today's deposition, other than your reports, the Lippert report, and Dr. Harrington's report?
A. For today, no. I -- I haven't reviewed anything else.
Q. Okay. Who did you speak with about your deposition today?
A. Well, I -- I -- can you rephrase that? Sorry.
Q. Yes. Who did you discuss your deposition with?
A. Well, I -- I -- I've discussed it with no --

no one, you know, just, you know, this was -- I just did this project and sent it to the -- to the client, which was Attorney Kinkade.

**Q. Okay. Did you talk with Ms. Kinkade or anyone in her office in advance of today's deposition?**

MS. KINKADE: I'll remind you --

A. Just --

MS. KINKADE: I'll remind you, you can tell her that we talked, just not what we talked about, okay?

THE WITNESS: Yes.

A. Well, in addition to the, you know, the e-mails that -- about -- about the -- the files, you know, that we sent back and forth, we also briefly discussed about the deposition, what the deposition is, general, you know.

BY MS. GRADY:

**Q. Yeah. Again, sir, I just want to -- Ms. Kinkade is right. I don't get to know about what you talked about.**

A. Yes.

**Q. I'm just asking: Did you talk?**

A. Yes, we did.

**Q. Did you talk with anyone from Precision Consulting about your deposition?**

A. Well, they know about, you know, what I do in



Precision, yes. They -- they -- they know that I'm doing the deposition today.

**Q. Who did you talk with at Precision Consulting about your deposition?**

A. Well, the founder, Peter Chabot, and Ryan. I don't remember his last name.

**Q. What is his title?**

A. Mr.

**Q. What is his title with the company?**

A. Sorry. Do you mean Ryan or Peter Chabot? He is the Chief --

**Q. Yes, Ryan.**

A. -- Operating Officer. He is the Chief Operating Officer.

**Q. Is Peter the Chief Executive Officer?**

A. He is the founder.

**Q. Do you know his title?**

A. Well, he refers to himself as the founder.

**Q. Okay. What did you talk with Peter and Ryan about?**

A. Well, they don't get into the details of projects. They just, you know, coordinate stuff. They just schedule our meetings, you know. For -- for example, today's video call, they -- they schedule this stuff, but they don't get into the details of projects.



**Q. Okay. So can you tell me: Did you discuss anything beyond the scheduling of this deposition with Peter and Ryan?**

A. No, I -- I don't remember.

**Q. Okay. Is your answer that you did not discuss anything beyond the scheduling, or is your answer that you might have but you do not recall?**

A. Well, I just remember talking about, you know, the deposition, the importance of the deposition, and not about the -- you know, about the report itself.

**Q. What did you talk about regarding the importance of the deposition?**

A. It was, I guess, last month when -- when he -- they discussed with me that they -- they -- they might -- there might be deposition.

**Q. What did they tell you about the importance of a deposition?**

A. Well, just prepared me to be -- just told me to be professional, dress well, you know, the general things, not -- only being very professional, trying to be professional.

**Q. Did you talk about how to answer questions?**

A. No.

**Q. Did you talk about your report at all?**

A. No.



**Q. Okay. Anyone else that you spoke with at Precision Consulting Company about your deposition?**

A. No. It was just Peter and Ryan.

**Q. Have you spoken with any of the defendants, including Dr. Leven or Dr. Siddiqui, about your deposition?**

A. No.

**Q. Have you ever spoken with Dr. Siddiqui or Dr. Leven?**

A. No.

**Q. Have you ever spoken with anyone who works -- who is employed by Wexford Health Sources?**

A. No.

**Q. Do you have any documents in front of you, sir?**

A. Yes.

**Q. What documents do you have in front of you?**

A. It's my own report, the one I provided.

**Q. Do you have both reports or just one?**

A. Well, all of them are just in one PDF file.

**Q. And are they printed in front of you, or are you saying they're in front of you on your computer?**

A. No, they're on my computer.

**Q. I see. Okay. I am going to put something on the screen, and I want to first make sure that you can**

**see it.**
A. Yes.
**Q. Okay.**
A. Yes, I can see this.
**Q. Can you -- excellent. Okay.**
MS. GRADY: So let's mark this as Exhibit 1.
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
BY MS. GRADY:
**Q. And for the record, it is the two page CV that was produced to us along with your reports in this case. This -- I'll just look at both pages. This is your CV, correct?**
A. Correct. Yes.
**Q. Is this a current and accurate CV?**
A. Yes. I update -- updated it last month, yes.
**Q. Okay. This was provided to us on September 11, so this is the most current version of a CV that you have; is that true?**
A. True. Yes.
**Q. I want to look at your about me section. Here, you say that your background is in quantitative data analysis; do you see that?**
A. Yes.
**Q. What is the difference between quantitative data analysis and qualitative data analysis?**



A. Well, quantitative data analysis deals with numbers. It -- it deals with, you know, collecting numerical data, performing specific statistical tests, and then making conclusions. And -- which are -- if the -- the analysis is performed appropriately, the results are usually objective. But quantitative data analysis -- qualitative data analysis involves text data, like, you know, from interviews, from -- from articles, and then the -- the researcher who -- who does the study, you know, does textual analysis, like thematic analysis, different types of analysis, and then makes the conclusions.
**Q. Okay. And what is qualitative data analysis, if you know?**
A. Well, qualitative data analysis, I explained this earlier. This is -- it involves numerical data, data collected from different sources that are numeric, and you apply statistical tests on them to -- to, you know, address your research -- your research purpose, the -- the hypothesis you might have. It involves numeric data.
**Q. Okay, sir. I thought that that was what you were saying was quantitative data analysis. That's quantitative, right?**
A. Yes. The -- I first mentioned quantitative,



then went to qualitative.
**Q. Okay. So you're saying that both quantitative -- I'm not sure I understand the difference in your mind. Can you explain to me the difference between quantitative and qualitative analyses?**
A. Yes. Yes. Quantitative deals with numeric data, the data collected from surveys, from, you know, clinical trials, from different methods that are numeric, but qualitative data, there are no numeric data. There are texts, there are interviews, there are, you know, information obtained -- obtained from text. And this -- this is the -- the primary difference between the two.
**Q. And you agree that Dr. Harrington's report did not purport to be a quantitative data analysis, correct?**
MS. KINKADE: Form.
A. Well, it doesn't discuss whether it, you know, use a quantitative or qualitative data analysis.
BY MS. GRADY:
**Q. Okay. But you agree that the evaluation that Mr. Harrington was doing was an analysis that was qualitative in nature, correct?**
A. Well, since -- as I explained, since it -- it involved evaluating numbers, you know, and it could not be said, you know, it's -- it's qualitative in nature.



**Q. Okay. What numbers did Dr. Harrington's report involve?**
A. Well, I need to go back to the report to give you specific examples.
**Q. Can you give me any example?**
A. Okay. Sure.
**Q. And sir, are you pulling up Dr. Harrington's report?**
A. Yes. I -- I'm just going through the document.
**Q. Okay.**
A. Okay.
**Q. And again, what I'm looking for is where, to your testimony, Dr. Harrington addresses numbers.**
A. Yes. He addresses numbers. Yes.
**Q. Okay. Tell me where.**
A. I'm just looking. You know, this is a long document. Sorry. I need some time to go through the document; is that okay?
**Q. Well, we can come back to that question. But you're not able to -- without thoroughly reviewing every page of Mr. -- of Dr. Harrington's report, you're not able to tell me where he addresses numbers, right?**
A. Well, you know, this is a very long report. You know, I -- I saw examples of that, but, you know,

going through the document, it -- it -- it takes some time to, you know, to find those examples.

**Q. Right. And what I asked you was just to even give me one example where he is addressing numbers that, to your testimony, indicate a quantitative analysis, rather than a qualitative analysis. And just to be clear, sir, you're not able to do that without thoroughly reviewing every page of his report; is that true?**

A. Well, I'm not saying that he did a quantitative data analysis. I'm saying that it's not entirely qualitative.

**Q. Okay. So I do -- and we can -- there will be breaks. I'm happy to give you time to look, but I am interested --**

A. Yes.

**Q. -- in what, to your opinion, is a quantitative data analysis in Dr. Harrington's report, but we can move on --**

A. Yes, I will do that.

**Q. -- for now. Okay.**

A. Okay. Great.

**Q. Now, your background is quantitative data analysis and not qualitative data analysis, correct?**

A. My -- my background, yes, this is quantitative



data analysis.

**Q. Okay.**

A. But I also assist clients with qualitative data analysis, but it's mostly quantitative data analysis.

**Q. And you say that your background is also in providing methodological guidance to businesses and academic researchers, correct?**

A. Yes, that's correct.

**Q. What businesses have you provided methodological guidance to?**

MS. KINKADE: And I'll just -- I'll put on the record that there are some businesses that have non-disclosure agreements, so if there's any businesses that don't have non-disclosure agreements that you're comfortable with, go ahead and provide those answers.

MS. GRADY: All right. Well, I just need to put on for the record, there's been no invocation of privilege, and so, to our mind, there is no reason to omit from a response, sorry, any businesses. So are you instructing him not to provide a fulsome answer to that question?

MS. KINKADE: I'm instructing him not to violate any non-disclosure agreements that he has.



MS. GRADY: Okay. And what is the privilege basis for that?

MS. KINKADE: A contractual non-disclosure agreement.

MS. GRADY: Okay. Well, we -- I'm happy to mark this deposition as attorney's eyes only --

MS. KINKADE: I don't --

MS. GRADY: -- so that --

MS. KINKADE: That's not how non-disclosures work.

MS. GRADY: Okay. Well, I don't think that there's any basis in law for him to not answer my question. So I just want to be clear. You're instructing him not to fully answer my question; is that true?

MS. KINKADE: I'll say it again. I'm instructing him not to violate any non-disclosures. I don't think the witness has said whether there is any, but I know that the company has them, so I'm giving guidance.

BY MS. GRADY:

**Q. Okay. All right, sir. What businesses have you provided methodological guidance to?**

A. Well, I consulted my -- you know, the people at my company -- company, like Peter Chabot. They told



me not to, you know, mention the specific names of the businesses or clients since, you know, they -- since -- since they might be a non-disclosure disagree -- non-disclosure agreements between them and the clients. Yeah.

**Q. Okay.**

A. But I can give you general -- I can give you general information about the projects, yeah, without, you know, disclosing names.

**Q. Okay. And we'll move on to that, but I just want to first be clear that you're refusing to provide a single name of a single business that you have ever provided methodological guidance to; is that true?**

A. But there are -- as my last message, there are many businesses and -- and academic researchers that I provided methodological guidance to.

**Q. And I'm just asking you to name anyone.**

A. Well, they -- they told me not to, you know, disclose their names.

**Q. Okay. So you are refusing to provide a single name of a single business that you have ever provided methodological guidance to, true?**

A. No, not refusing. Because -- because of the agreements between -- between the clients and the businesses.

**Q. Right. So I'm asking --**
A. But I can -- I can give you information. Yeah.
**Q. And again --**
A. On the -- the -- the type of work.
**Q. And again, sir, we'll move on to that next, but I just want to make it --**
A. Okay.
**Q. -- I just want to make it clear, and I think it is clear for the record that you're refusing to provide a single name of a single business that you have ever in your career provided methodological guidance to, right?**
A. I don't know if the response is no. It's because of the -- our agreements between us and the clients.
**Q. Is it your testimony that every engagement that you have for any time you've provided methodological guidance, you have -- you have agreed not to disclose the name of the business?**
A. Well, when I first started working with Precision, they -- they -- you know, they told us that every project we do is -- you know, it's -- they are confidential. I can't just discuss the names of the clients, you know, to anyone, unless they let me to do so.



**Q. And no one has allowed you to speak about their -- no one is willing to allow you to say that you have provided them methodological guidance; is that right?**
A. Can -- can you clarify your question?
**Q. Has any business been willing to allow you to disclose their name as part of your work providing them methodological guidance?**
A. Well, I -- I don't work directly with the -- the businesses. There are project managers that -- you know, that speak with the clients. I don't -- I'm not directly, you know, working with them. I don't know if they want to disclose that.
**Q. Okay. Have you ever provided methodological guidance to Wexford Health Sources?**
A. No.
**Q. Have you ever provided methodological guidance to any other correctional healthcare company?**
A. No.
**Q. Have you ever provided methodological guidance to individuals tasked with determining whether a correctional setting was providing adequate care or inadequate care?**
A. No.
**Q. Have -- and let's go outside the correctional**



**setting. Have you ever provided methodological guidance to individuals tasked with determining whether a healthcare institution was providing adequate care or inadequate care?**
A. About adequate care, no.
**Q. Okay. Can you tell me what healthcare-related studies, if any, you've conducted?**
A. Healthcare. Well, there are -- they involve about the development of drugs, the development, you know, comparing the efficacies of different types of treatments, and designing experiments.
**Q. Okay. Any other healthcare-related studies you've conducted?**
A. Well, I -- you know, I've been involved in the -- those studies, either the -- the analysis or the -- the development of the methodology.
**Q. And those are the types --**
A. Of the entire study.
**Q. Okay. And those are the types that you've just described, development of drugs, efficacy of a particular treatment. And was there another category?**
A. Yeah, there are many other categories like --
**Q. I want to know what those are.**
A. Like survival analysis, like -- let me refresh my memory, please.



**Q. Sir, are you looking at a -- go ahead.**
A. No, no, no. I just -- I was just thinking. I was, you know, in how they, you know, collect their data, you know, the -- the -- the elements of the methodology, how to, you know, conduct -- conduct robust analysis.
**Q. Okay. But I'm asking, within the field of healthcare, what types of studies you've participated in, even if that participation is limited to advising on the methodology?**
A. Yes. It was mostly, as I discussed, drug development, comparing efficacies of drugs, and it -- yes, mostly this. It was this. I don't remember, you know, since I do study -- do projects in many different areas, you know, economic, social sciences, and many different areas, to help businesses and academic researchers.
**Q. Okay. But again, you've issued two separate reports, or maybe you consider them to be, you know, opinions within a single report, on critiquing a team and -- a team of medical doctors and a particular medical doctor, Dr. Herrington, and offered opinions that I expect your client will ask the jury to credit over these medical doctors. So what I'm asking you, sir, is what other types of healthcare related studies**

**you've participated in?**
MS. ARMSTRONG: Argumentative. Go ahead.
A. Yes. But as I mentioned, just the methodology and the analysis, but there are so many types of analysis that there might be other categories that just don't remember, you know. The field of drug development is so vast you know. Most of our projects deal with drug development and efficacy of different treatments, different drugs.
BY MS. GRADY:
**Q. Okay. So fair to say that your participation in the healthcare field as a methodologist, other than these reports, is limited to advising on methodology related to drug development?**
A. I'm saying there are other things that I've done, but just don't, you know, remember at the moment.
**Q. Okay. Well, that's an important part of our talk --**
A. Maybe -- maybe during the -- well, maybe during -- during the break, I can just briefly look my project -- look over my projects to see, you know, to give you more categories. And I'd --
**Q. I'd appreciate --**
A. Yeah.
**Q. I'm sorry, I cut you off. Go ahead, sir.**



**Mr. Heidari?**
MS. GRADY: Is he frozen for anybody else? Oh, there we are.
MS. ARMSTRONG: Yeah, Mr. Heidari?
THE WITNESS: Sorry. I can't even -- can you hear me?
MS. GRADY: Yes. But you're very dark.
A. Oh, sorry. The electricity just went off. I -- I'm using my mobile Wi-Fi. Sorry. Well, I -- I'll provide you with those examples. During the -- during the break, I'll look -- look into my projects and give you the examples.
MS. GRADY: Okay. Sir, it's difficult to see you. Is there, like, a light that you can turn on?
THE WITNESS: Well, to be honest, the electricity just went off. Can you see me better now?
MS. GRADY: Yes. A little bit.
MS. ARMSTRONG: I'm having trouble seeing him. Is -- I'm not having any trouble seeing him throughout this time.
THE WITNESS: Can you see me now?
THE REPORTER: Sorry. Is that Jeanine speaking?
MS. ARMSTRONG: That's Jeanine speaking.



THE REPORTER: Okay.
MS. GRADY: Okay.
THE WITNESS: I can -- can you see me?
MS. GRADY: I can see you. Yes. It was just a little dark, but it's fine. We can -- we can keep going.
THE WITNESS: Okay.
BY MS. GRADY:
**Q. All right. So now, you also say here that you're, "An expert in designing and implementing complex and efficient study designs, such as experimental, quasi experimental and correlational designs," right?**
A. Yes. That's right.
**Q. What is an experimental design?**
A. Well, an experimental design is a type of design that the researcher, you know, does an experiment by manipulating different, you know, like, categories of just -- an experimental design is a design that a researcher does by manipulating variables.
**Q. And it relies on statistical analysis to prove or disprove a hypothesis, correct?**
A. It's, you know, a first step after, you know, you -- you design a -- an experimental design, then you collect data, and then you run a -- you use a statistical analysis to decide if a hypothesis can be



rejected or not.
**Q. And it requires the establishment of a control group and an experimental group using random selection, true?**
A. It -- it involves, yes. But there are many types of designs. Yes.
**Q. But the experimental design requires that establishment of a control group and an experimental group using random selection, right?**
A. Well, there might not be just control and, you know, just two groups. There might be several other groups. You know, you might be simultaneously comparing several different groups versus a control group. Yeah.
**Q. Okay. And those groups have to be established through random selection, right?**
A. Well, probability sampling should be applied. Yes.
**Q. Okay. And then what is quasi experimental design?**
A. Quasi experimental designs is when the researcher manipulates one variable and does not manipulate another variable. You know, he -- he -- for example, he assigns participants to different groups, you know, control and experimental design, but he also uses another variable that he does not control.

**Q. Okay. But it also relies on statistical analysis to prove or disprove a hypothesis, correct?**
A. Yeah, this is -- as I said, this is a -- a first part. You know, then a statistical analysis is performed on the data to decide if a hypothesis can be rejected or not.
**Q. And unlike the experimental design, it does not require the control group to be randomly selected; is that right?**
A. No, that -- we do have that constraint.
**Q. Okay. So it too requires random selection for the various groups?**
A. Well, there are some designs that researchers do purposeful sampling, but we can say for sure that it, you know, should definitely involve random selection. But -- mostly, yes, random selection.
**Q. Okay. But it's not required for a quasi-experimental design; is that -- do I have that right?**
A. I'm not saying that it's -- it's required for various special studies. There might not be required when they're interested --
**Q. Okay. And then -- go ahead.**
A. When they're interested in, you know, exploring, when they're interested in, you know,



understanding a phenomenon, they do that, you know, don't use random sampling. Not when they want to generalize. When they want to generalize the results, they use random samples.
**Q. Okay. And what is correlational design?**
A. Correlational design is the type of design that the researchers -- researcher is interested in the relationship between several variables, you know, how they are associated with each other and how -- taking account other variables, how these variables might impact one another, about relationship between different variables.
**Q. Okay. And so, correlational design studies, unlike experimental or quasi experimental design studies, the researcher does not control the variables like the establishment of a control group, right?**
A. The researcher does not use control and treatment groups. You know, the researchers may control for some variables, some confounding variables, like, you know, gender, like many different variables. But not -- they don't -- they may not divide participants into different groups, but like -- you know, like experimental or quasi experimental designs.
**Q. And the end result of a correlational design study, it can only find a degree of correlation and not**



**causation, right?**
A. Causation is mostly a philosophical. You know, we can't say causation. We can't -- we -- we only say that there is evidence that two variables are related or are not related. There is no causation. Yes.
**Q. And you say causation is philosophical. Can you tell me what you mean by that?**
A. Well, what I mean is that simply observing that two variables correlate, we can't say that, you know, one variable causes the other. There might be other factors that influencing the other variable that we have not included in our study.
**Q. And --**
A. But --
**Q. -- is that because in the world of statistics, a finding of causation requires a study of statistical significance?**
A. Well, we don't do statistical significance to -- to determine causation. We -- we look for evidence for relationship between variables. It's -- but it's never -- to say that it's causation, it's -- it's -- it's not true, you know.
**Q. I'm not sure I understand your answer, Mr. Heidari. What is required in order for a statistician to make a determination about causality?**



A. Well, we don't do causality -- determination of causality. We just, you know, provide evidence of causality, but we don't say that for sure that it's causality. It -- it might suggest causality. There is a relationship. You know, there is an association, but it -- we don't say that it's causality.
**Q. Okay. So in the field of statistics, you as a mathematician, you never make a finding of causality; is that right?**
A. We don't say causality -- we don't conclude causality yet.
**Q. Okay. What does the term "statistical significance" mean?**
A. Well, statistical significance means that our findings, you know, what we observe is -- you know, does not happen by chance. You know, it's away from randomness. We are just speaking about certainty, you know. We are speaking about how something might happen and how much it -- it might be different from randomness.
**Q. And that's -- you're defining that term as you use it within the field of mathematics; is that right?**
A. Well, the field of mathematics does not, as far as I know, is not -- does not -- is not concerned with uncertainty, but statistics is always concerned

with uncertainty. There is always a level of uncertainty about our findings.

**Q. Right. But isn't statistics just a subfield within the field of mathematics?**

A. Well, it's -- you know, they say that the -- statistic -- all the methods that apply to statistics have a foundation in mathematics. You know, statistics uses mathematics to -- to develop tests to -- to test hypothesis. You know, statistics uses mathematics as a tool. But to say that --

**Q. Right. The field of statistic -- go ahead.**

A. To -- to say that is a subfield of mathematics may not be entirely true, yes.

**Q. Okay. So where do -- where do I locate the field of statistics?**

MS. ARMSTRONG: Form.

BY MS. GRADY:

**Q. Let me know if you'd like me to explain that question a little better.**

A. Well, field of statistics is very broad, you know. Can you clarify your question more? You know, can you clarify it?

**Q. Sure. So, like, I practice within the field of law, and there are various, you know, subspecialties within the field of law. Dr. Herrington practices in**



**the field of medicine, and there are various specialties within the field of medicine. I had always understood statistics to be a more specific thing within the realm of the field of mathematics. But it sounds like you're saying that's not correct. So I'm just trying to understand where one would locate the field of statistics.**

MS. ARMSTRONG: Form.

A. Well, again, as I said, statistics is a very broad field. It -- it's -- it -- it apply -- it -- you know, it provides a tool for -- to assist many different fields, like economic, healthcare, social sciences. I mean, it's involved in many other different fields. I can't just say that it's a part of -- you know, it's a field of mathematics.

BY MS. GRADY:

**Q. Okay. And does statistical significance require an alpha level of 0.05 or lower?**

A. It depends on the purpose of the study. The -- you know, the -- the study -- the researcher, there is -- we can't say for sure, you know, to use 0.05 or 0.01. It depends on many different factors.

**Q. Is there any minimum alpha level to render a result statistically significant?**

A. Again, it depends on the purpose of the study.



We can't say that for sure, you know, determine a universal alpha value.

**Q. So if my alpha level is 0.5, that would still allow me to find something of statistical significance; is that correct?**

MS. ARMSTRONG: Incomplete hypothetical. Go ahead.

A. Yeah. So if your alpha is 0.05, you know, and you -- your test result, your P-value is less than 0.05, you -- you -- you know, you -- you can say that -- basically, you can determine the extent to which it's far away from randomness.

BY MS. GRADY:

**Q. Right. But sir, I said 0.5 is my alpha level. Can I make a finding of statistical significance if I use an alpha level of 0.5?**

MS. ARMSTRONG: Asked and answered.

A. Well, again, it depends -- depends -- depends on the study itself. You know, some studies consider lower value. Some study may even consider 0.1. If you use a -- for example, if you use a large sample size, your alpha -- your P-value tends to be lower. You know, it -- it all depends on -- on your study.

BY MS. GRADY:

**Q. Okay. But sir, so just to be clear, I could**



**set an alpha level of 0.5 and still have a result that is statistically significant in your view; is that true?**

MS. ARMSTRONG: Incomplete hypothetical. Asked and answered.

A. Well, we can't say -- again, it depends on the purpose of the study, you know.

BY MS. GRADY:

**Q. Okay. So --**

A. We might want to look for more unique results, something that is more away from randomness than just 0.05.

**Q. But sir, again, please be clear. I'm not asking about an alpha level of 0.05. I'm asking of an alpha level of 0.5. You understand the difference between those two figures, correct?**

A. Oh -- oh yeah. 0.50 -- oh, yes. I thought you said 0.05. 0.5, well, it's -- no, it's -- we don't consider that significant.

**Q. Okay. So what is the minimum alpha level that is required to render results statistically significant?**

MS. ARMSTRONG: Asked and answered.

A. Well, the commonly used alpha value in -- are either 0.01 or 0.05, but there is no universal value. Some studies that --

BY MS. GRADY:

**Q. Okay. And --**
A. -- may require a 0.1 or 0.2 maybe, but there's no general value.
**Q. 0.1 or 0.2 could still render a study -- a result statistically significant; is that true?**
MS. ARMSTRONG: Incomplete hypothetical.
Go ahead.
**Q. But it's possible in some cases when the sample size is low or the purpose of the study, you know, may determine that 0.01 -- 0.1 is statistically significant.**
BY MS. GRADY:
**Q. Okay. But 0.5 would be outside of the realm of statistical significance; is that right?**
MS. ARMSTRONG: Incomplete hypothetical.
**Q. Well, I've never seen that point -- below 0.5, like, you know, 0.4 are statistically significant. Not in my experience.**
BY MS. GRADY:
**Q. Now, you said the commonly used ones are 0.05 or 0.01. When you say commonly used, commonly used where?**
A. Typically, you know, this is across mostly academic researchers. But as I said, there is no definite rule. You know, my -- some researchers may



need to use lower values.
**Q. Well, but I'm just trying to understand the phrases you used. Commonly used. That's -- when you're saying commonly used, you're referring to academic research?**
A. Both academic research and business is my -- want to see results that are statistically significant at 0.05.
**Q. Are you familiar with the term practical significance?**
A. Practical significance, yes. Like --
**Q. What is that term?**
A. Well, practical significance, before explaining that, I need to clarify that when you increase the size of the sample, you know, when -- when it's very large, you are more likely to get significant results. So in those cases, statistically significant may not be very meaningful to us. You know, to -- since we are -- we expect to get significant results. In these cases, we look at effect sizes. Since we use a statistic -- statistics to test hypotheses, we -- we look at how large our -- our statistic is. You know, there -- there are different measures to determine effect size. Like in regression analysis, we -- we use R-squared in different types of analysis. We have



different -- we define different measures as -- you know, to determine effect size to determine how practically significant our results are.
**Q. Okay. And I'm not sure that I got a definition there. Can you explain to me, as a layperson without any training in mathematics, what the term practical significance means?**
A. Well, practical significance means a statistical -- let me just say statistically -- statistically significant different -- statistically significant means that how our findings are different from randomness. But practical significance means that how substantial our findings are. You know, a finding might be statistically significant, but it might not be of practical interest to us. The -- the -- the size we have observed might not be big enough for us to consider it useful for our research purposes.
**Q. Can you give me an example of a study that would find something is statistically significant without having any practical significance?**
A. Yes. For example, we assess the relationship -- to give a -- a simple example, we assess the relationship between two variables and we find it to be statistically significant. But when we look at the size of the correlation between the values, we see that



the size is not large enough. It's -- it's not large enough for us to consider it to be interesting results. We have --
**Q. Okay. What I'm asking for, sir, just to -- just to kind of give you a direction. I'm asking for, like, a particular concrete example. If you could provide us, like, a particular concrete example of a result that is statistically significant, but not practically significant.**
MS. ARMSTRONG: Sarah, just let him complete his answers. He's been interrupted. I think he in the middle of an answer, so --
MS. GRADY: I'm trying desperately to get him -- to get him to finish his answer.
BY MS. GRADY:
**Q. So go ahead, sir.**
A. So for example, you calculate correlation to be 001, and you find that it's statistically significant. But it's -- it may not be practically significant. Practical significance for us may -- may be, you know, above point -- 0.1 or 0.5. It is just to give an example of a correlation analysis.
**Q. Okay. And I think that what you're answering still isn't giving me an example. So I'm just asking for, like, an actual example of something. Like, tell**

**me about a time when you have found statistical significance in a study you've designed that did not have practical significance?**

A. Well, I -- I -- I'm saying, you know -- well, for example, when you want to compare two groups, you know, to -- to the control and the treatment group, you find that the difference between the two groups is statistically significant on some outcome of interest. But the size of the difference is not -- may not be big enough for us to consider that, you know, to be interesting. So even though the finding is statistically significant, far away from randomness, we don't consider that practically significant. It -- it's -- it does not provide us the results, you know, we aim to achieve.

**Q. Can you have practical significance without statistical significance?**

A. Sorry. Can you rephrase?

**Q. Yes. Can practical significance be present, even when statistical significance is absent?**

A. Yes, that can happen.

**Q. Okay. Is it fair to say the practical significance refers to the usefulness of a finding?**

A. No. We still might want to see if our findings are, you know, from -- away from -- did not



happen by chance, you know. We always know -- we should also look at the significance to see if they did not happen by chance.

**Q. Okay. So in your view, no study is useful unless it has statistical significance?**

A. No, I'm not saying that.

**Q. Okay. Tell me how that's wrong.**

A. Well, again, it depends on the purpose of the research and what we try to achieve. You know, statistically significant, sometimes it just tells us that it's -- how far it's from randomness. And practical significance means how substantial our findings are. But it depends on the purpose of the study.

MS. GRADY: All right. I'm going to put Exhibit 1 back on the screen.

BY MS. GRADY:

**Q. Okay. We looked at where you say you're an expert. We talked about those fields.**

A. Yes.

**Q. Next, you say you're, "Proficient in utilizing stimulation studies to perform power analysis and sensitivity analysis and applying advanced statistical methods, such as Bayesian statistics, mixed effects models, structural equation modeling, time series, panel**



**data, various classification tools, et cetera, to address various research goals." You agree you're not holding yourself out as an expert on these topics, correct?**

MS. ARMSTRONG: Misstates evidence.

A. Sorry. Can you rephrase your questions?

BY MS. GRADY:

**Q. Yes. You listed a number of things that --**

A. Yes.

**Q. -- in your about me section, you note you are an expert in, true?**

A. Yes. I have a --

**Q. And then the next --**

A. -- lots -- lots of experience doing this analysis.

**Q. Okay. And the next sentence in your about me section lists a number of other fields that you note you are "proficient in," correct?**

A. Yes, I've -- my experience have made me -- experiences have made me proficient in utilizing these techniques.

**Q. Okay. You're not an expert on those topics, though, right?**

MS. ARMSTRONG: Misstates evidence.

A. Sorry. Can you tell me the difference between



proficient and expert?

BY MS. GRADY:

**Q. Well --**

A. What you mean.

**Q. -- I'm just looking at -- I'm looking at the wording that you have in about me. These are topics that you don't list as being an expert in, correct?**

A. Well, I'm not saying that. Just -- you know, just for the purpose of a writeup, I just use the word proficient. But what I mean is that I've done lots of work in all these areas, and I'm pretty much familiar with the techniques.

**Q. Okay. So it's your testimony, even though you list them as being proficient and not expert, you are an expert in all of these fields; is that right?**

MS. ARMSTRONG: Argumentative. Go ahead.

A. Can you tell me what you mean by expert? You know, how -- what you would -- you mean if someone is expert in these areas? What do you mean?

BY MS. GRADY:

**Q. Well, I'm just -- I'm just going on what you've used, the phrase as you've used it. You used the word expert here in about me, correct?**

A. I used the -- the -- the phrase expert, yes. And proficient, yeah.

**Q. Okay. Why did you use a different phrase in this sentence?**

A. Well, I used the word -- the word proficient, because I have done so many analyses and simulation studies since I -- and, you know, sensitivity analysis. And the other methods, because of my experience. And I -- I -- I -- I use the word expert because, you know, I -- I -- I have read many -- I have done so many studies about this. I -- I've -- again, I have so many experiences in those areas. But, you know, to say that you are expert in simulation studies, you can -- you can't say that because simulations are so vast. You can't just say that you are expert because there are so many simulation studies that nobody can master all those -- you know, all those simulation studies.

**Q. Okay. And that's why you said you're proficient and not an expert, right?**

A. Yes. And since I can utilize these methods pretty much easily and efficiently.

**Q. What is a power analysis?**

A. Well, power analysis is a type of analysis used to determine the required sample size for quantitative studies and taking into account different factors, such as significance level and -- and confidence level and many different -- depending on the



statistical test being used, you -- you -- you take -- you take into account many parameters and run power analysis to determine your sample size, a minimum required sample size.

**Q. Right. It's the minimum to give you a statistically significant result, right?**

A. That's -- that's not right. That's not what I said. It's -- it determines the minimum required -- or required value to obtain significant results, given that other parameters that you input in power analysis are true. Like, you know, for regression analysis, you have different parameters. Given that those parameters are true, this is the minimum required number to obtain significant results.

**Q. Significant in what way? Practical significance, statistical significance, or something else?**

A. Well, here we are speaking -- speaking about the statistically significant results.

**Q. Sensitivity analysis, that's an analysis used to perform financial analysis, correct?**

A. Not limited to financial analysis. We do that in many different areas.

**Q. Do you do that in the field of healthcare?**

A. Well, we can -- we do that. Yeah.



**Q. What -- tell me what it is, then?**

A. Well, sensitivity analysis -- well, imagine a situation that you have missing values on your variables, and then you impute those missing values. And you -- you -- you run sensitivity analysis by comparing how, you know, sensitive your analysis -- your findings are to the imputed values. This is just one example for imputation. But sensitivity analysis is usually performed when you change some values and see how your findings are sensitive to -- to those values, you know, to those changes in those values and how sensitive they are in -- in changes in your procedures and how -- you know, different methods you apply. We apply sensitivity analysis to see how robust your analyses are.

**Q. What is Bayesian statistics?**

A. Well, Bayesian statistics takes -- you know, classical statistics, like they don't take into account prior information about the parameters. In statistics, we always make -- you know, perform analysis taking into account many different types of parameters. Bayesian statistics, we use prior information about those parameters.

**Q. Bayesian statistics are about the probability of knowledge, right?**

A. Sorry. Can you rephrase -- rephrase the



question?

**Q. Do you not understand the question?**

A. No, I -- I didn't hear you well.

**Q. Bayesian statistics are about the probability of knowledge, correct?**

A. Probability of knowledge? Sorry. No. Bayesian statistics, we take into account prior information and then do our -- our analysis taking into account those information. It is how I would define this.

**Q. Okay. So you disagree that Bayesian statistics is a system for describing epistemological uncertainty using the mathematical language of probability?**

A. Well, your question is quite complex. Can you, you know, clarify it.

**Q. I'm just trying to understand what Bayesian statistics is, to your understanding. So when I did this research and based on my you know, prior understanding of Bayesian statistics, I understand it to be a system for describing epistemological uncertainty using the mathematical language of probability. Is that consistent with or different from your understanding of Bayesian statistics?**

A. Well, Bayesian statistics is applied in many

different fields, and we can use -- apply it to any -- to any field. As long as we can make assumptions about prior distribution and prior -- you know, make assumptions about prior knowledge of our parameters. There is evidence that -- there -- we have some information about our parameters, and we take that into -- into account and we may obtain more accurate results.

**Q. Okay. So I just -- I don't want to dwell on this, but I do just want an answer to my question. Do you disagree that Bayesian statistics is a system for describing epistemological uncertainty using the mathematical language of probability?**

A. This is not the definition of Bayesian statistics.

**Q. Okay. So you do disagree with that as a statement; is that true?**

A. But that might be one of the applications of Bayesian statistics that I haven't applied. Since --

**Q. Okay. I'm just -- sir, I'm just trying to get an answer to my question. Yes or no, is Bayesian statistics a system for describing epistemological uncertainty using the mathematical language or probability?**

MS. KINKADE: Asked and answered.



Argumentative. Go ahead.

A. Well, if you want just yes or no, my answer is no.

BY MS. GRADY:

**Q. Okay. All right. Next, you list a number of different things that you say different things that you're skilled in, okay?**

A. Yes.

**Q. I'm not going to go through each of these, but you agree you're not holding yourself out as an expert on these topics, correct?**

MS. KINKADE: Argumentative. Misstates the evidence. Go ahead.

A. Since there are many different skills listed here, you know, I might be more proficient in some of them and less proficient in some of them, you know, depending on my experience.

BY MS. GRADY:

**Q. Okay. Are there any in that statement that you see on Exhibit 1 that you do hold yourself out as an expert in?**

A. In -- in the methods I mentioned here, you mean these methods?

**Q. Yes. In the highlighted sentence that starts "skilled in," are there any of the methods that you've**



**listed in that sentence that you do hold hold yourself out as an expert in?**

A. Well, I can't say, for example, that I am an expert in optimization methods, for example, mark of -- MCMC method, since there -- these are also very vast areas. You know, I -- I just -- I -- I have utilized these methods many times before, but I know that they are -- they could be quite vast, you know, and to be applied to many different situations. I can't just say that I'm expert in that.

**Q. Okay. All right. You've listed as your contact here, an address in the UK. Is that a personal address, or is that an address affiliated with Precision Consulting?**

A. No, it's a personal address.

**Q. Okay. You're currently in Iran, correct?**

A. Yes. Correct.

**Q. And can you tell me when you intend to return to the UK?**

A. Well, I might return in -- in a month, I guess.

**Q. When you say you might return in a month, does that mean your plan -- your current plan is to return to the UK in a month?**

A. Well, I have not booked a return. You know, I



have not booked something to -- to return. I'm just -- I'm not sure. You know, I might return in -- in a month or might take 10 to 15 days later.

**Q. Okay. But sometime between one month and two months, your intention is to return to the UK; is that true?**

A. Yes. My intention is to return.

**Q. Do you intend to travel to the United States to testify at a trial in this case?**

A. Well, because of, you know, the -- the restrictions on the Iranians, I might not be able to travel to the United States. So I'm not -- no, I don't have any plans about that.

**Q. Okay. The -- your education lists here that you received a Bachelor of Science Science -- and will you just pronounce that university for me, so I don't mispronounce it, please?**

A. Yes, it's Isfahan University of Technology.

**Q. Okay. Thank you. Isfahan. And then you enrolled in the University of Tehran the following fall, correct?**

A. Yes. Correct.

**Q. And you list here under awards that you ranked fourth among 4,000 applicants in the MSC entrance exam for statistics in Iran, correct?**

A. Yes. In order to attend the University of Tehran, I -- I needed to take this entrance exam. Yes.
**Q. Is that similar to, like, the LSAT or the MCAT, the graduate students in law or medicine take to receive admission?**
A. Well, it's quite different, you know. You -- many people participate in this exam and they -- they get accepted into universities based on how -- based on, you know, where they rank. The rank only matters --
**Q. Okay. Are you familiar with the sorry, go ahead, sir.**
A. Yeah. The -- the -- the rank only matters when entering University in Iran for a master's degree or for bachelor's degrees.
**Q. Are you familiar with the LSAT?**
A. LSAT? Well, heard of it. Not sure. No.
**Q. Okay. So you don't know the difference or similarities between the LSAT and the MSC Entrance exam, true?**
A. True. Yeah.
**Q. Have you heard of the MCAT?**
A. Is this a test?
**Q. Yes.**
A. No, I haven't.



**Q. Okay. And you've never taken the MCAT, spelled M-C-A-T, correct?**
A. No, I haven't taken it.
**Q. Now, then you mentioned that this nationwide statistical competition conducted by the Statistical Center of Iran in 2012. How many participants were there in that competition?**
A. Well, this is not the like the entrance exam for the universities that all the students participate. For this exam, I remember there were about 15 students selected from top universities in Iran, and they competed for this -- you know, for this exam.
**Q. And what did the competition entail?**
A. Sorry. Can you rephrase? I didn't hear you well.
**Q. What did the competition entail?**
A. Well, it was about our courses we took in -- in under -- undergraduate courses we took -- we took for, like, probability theory, mostly mathematics, probability theory, and some -- they tested our software skills and other courses, like regression analysis and time series, the -- the main courses we had in the university.
**Q. Was there a test that you had to take?**
A. Yes, there were -- there were two tests.



One -- one test assessed our software skills, another our -- the other skills for mathematic probability and the -- the other stuff.
**Q. Okay. In 2016, you graduated from the University of Tehran with a Master of science in Mathematical Statistics, correct?**
A. Yes, that's correct.
**Q. Did you -- what other types of statistics can you specialize in, other than mathematical statistics?**
A. Sorry. Can you rephrase your question?
**Q. Yes. What other types of statistics can you specialize in when receiving a master of science, other than mathematical statistics?**
A. Well, there are biostatistics, there is a degree for insurance, and there is a degree for applied statistics.
**Q. Have you ever achieved a Master of Science in Biostatistics?**
A. No. This is the only degree I have achieved.
**Q. And do you have any training in epidemiology?**
A. No.
**Q. Now, on the second page of your CV, you list your work experience as being exclusively with the Precision Consulting Company, true?**
A. Yes. True.



**Q. Have you ever worked for anyone other than Precision Consulting Company?**
A. Well, I have some work experience that are very minor ones, you know, that were not substantial to be included in my resume. They were before 2016.
**Q. Okay. What were they?**
A. They were in Iran. Yeah.
**Q. Okay. What were they?**
A. They were in Tehran or in Kerman, but they were very -- I didn't spend much time on them. Then I just moved with Precision Consulting Company.
**Q. Okay. What were these other experiences that -- work experiences in Tehran or the other city you identified?**
A. Well, they were I started as consulting academic researchers with their statistical analysis. I worked for -- since there are companies in Iran doing this stuff, I -- I -- I worked for those companies for a short while and then I started working with Precision.
**Q. Okay. What were the other companies?**
A. Well, they were in Tehran mostly, and one of them was in Kerman.
**Q. Okay. Can you tell me the names of the companies, please?**
A. Name of the companies. One of them was Amar

Pajohesh. This is how it's spelled in Iran.
**Q. Okay. Can you spell it for us?**
A. Can I write it on -- A-M-A-R P-A-J-O-H-E-S-H.
**Q. Okay. Any other companies?**
A. Well, there was another company. Let me think of its -- its name. Just -- it was just for two weeks, you know. It wasn't substantial amount of time. It also had something to do with -- sorry. I don't recall its name. You know, it was very long ago.
**Q. Okay. And why were you only there for two weeks?**
A. Well, I -- I worked with this company just mentioned, you know, and the other company, but, you know, I -- I was at the same time sending resume to Precision. Then when I obtained this possession -- position in Precision, I just, you know, I -- I worked for Precision.
**Q. Your work with Precision Consulting is exclusively remote; is that true?**
A. I work remotely, yes.
**Q. And you don't work directly with any clients; is that right?**
A. Yes. I don't work directly.
**Q. And do you work both from Iran and the UK, or do you work in one of those places, but not the**



**other?**
A. Well, I -- I -- I work almost full time. It doesn't matter if I'm in UK or Iran.
**Q. Okay. I appreciate that. So you do work with Precision in both places, true?**
A. Yes.
**Q. Okay.**
A. I've been working with Precision since the last six years.
**Q. And are you an -- you're an employee of Precision, correct?**
A. Yes, that's correct.
**Q. So is your compensation through a salary, or are you compensated on a per project basis?**
A. It's a per project basis.
**Q. So you're a contractor, true?**
A. Sorry. I didn't hear you well.
**Q. You're a contractor, true?**
A. Yes. I -- I work on a project-based basis.
**Q. You say here that you designed and implemented -- excuse me. You "designed and implemented complex and efficient study designs, such as experimental, quasi experimental and correlational designs for -- in various fields, such as education, health and social sciences"; you see that?**



A. Yes. I -- I can see that.
**Q. Okay. There appears to be a typo in there, right?**
A. Yes. I -- I might have, you know, left that -- that out.
**Q. Okay. Who did you design these studies for?**
A. For businesses and academic researchers.
**Q. Okay. And again, if I were to ask you the names of those, you would not give me the names of any of those folks, true?**
A. Yes.
**Q. How many -- strike that. And what studies did you design in the field of health?**
A. Field of health? Well, I assisted them with designing their -- you know, developing analysis plans, the number of samples they require for the analysis, and deciding on the type of design for the studies.
**Q. What studies?**
A. As I mentioned for health, as I mentioned before -- before, you know, for comparing drugs for comparing different types of treatments. You know, when you design a study, different elements should work well together. The -- the -- the way you collect your data, the analysis and the -- the design, everything should match, should -- should be well integrated.



**Q. Okay. And so, the companies, the businesses that you're consulting with, these aren't, like, hospitals. These are like GlaxoSmithKline, right?**
A. They're not hospitals, no.
**Q. They're pharmaceutical corporations, correct?**
A. I remember yeah, they're mostly pharmaceutical properties.
**Q. All right. The next -- how many studies have you designed for pharmaceutical corporations?**
A. Pharmaceutical corporations? I remember there were -- for these businesses, I remember there were about eight to ten studies. Yeah.
**Q. And that's total in the course of your career, true?**
A. Not in the course of career, yeah.
**Q. Okay. In the course of your career, how many studies have you designed for pharmaceutical corporations?**
A. I mean, for -- while working for Precision, then this is the number. You know, I -- I meant for academic researchers. There were many studies I have assisted academic researchers.
**Q. Okay. Let's leave academic research to the side. For pharmaceutical corporations, the total number of studies you've been involved with is eight to ten;**

is that true?
A. Yes, that's true.
Q. Okay. And there aren't any other types of corporations that you consult with in terms of businesses in the field of healthcare, other than pharmaceutical corporations, true?
A. Not that I can remember.
Q. Now, the studies that you have been involved in the field of health, those were all quantitative studies, correct?
A. The -- the eight to ten studies I mentioned, yeah, they were quantitative. They're quantitative aspects of their projects.
Q. Okay. You've only -- in the field of health, you've only ever been involved in quantitative analysis, correct?
A. You mean quantitative or qualitative?
Q. Quantitative. In the field of health, the only participation you've had is in giving advice about quantitative studies, correct?
A. Yes. Correct.
Q. Okay. The next bullet point talks about advising and consulting businesses and academic researchers. And we've already discussed that work that you've done, correct?



A. We didn't discuss this, you know, in the about me section.
Q. Oh, we did not discuss this? Okay. Tell me -- this is -- this is focused on advice and consultation regarding quantitative research, correct?
A. Yes. This is for quantitative research.
Q. Any of that research involve a healthcare setting?
A. You mean academic researchers or only businesses?
Q. Either one.
A. Well, yes. They -- they -- it involves the healthcare. Yeah.
Q. Okay. How many of the studies that you've been involved with here under bullet point two involved a healthcare setting?
A. Well, for businesses, there were, as I mentioned, between eight to ten, but for academic combined, maybe 50 to 60. Around 60, I guess.
Q. All right. Then you talk about how you've applied advanced statistical and machine learning methods to address various research goals; you see that?
A. Yes.
Q. And one of the machine learning methods or statistical and machine learning methods that you



specifically list as part of your work as a methodologist is Bayesian statistics, right?
A. I didn't mention Bayesian statistics as a machine -- machine learning -- machine learning as a part of, you know, advanced statistical analysis. Not machine -- not Bayesian statistics, not as a machine learning tool. You know, I didn't list -- list it as that.
Q. Right. No. I took you to be listing Bayesian statistics as an example of advanced statistical methods, right?
A. Yes. For advanced statistical methods.
Q. Okay. My point is, is that you specifically highlight that some of your work as a methodologist since February of 2022 is using and applying that advanced statistical method of Bayesian statistics, true?
A. Sorry. Can you clarify?
Q. Do you need me to re-ask it or do you need me to ask it in a different way?
A. A quite different way. I just didn't understand it well.
Q. Okay. You highlight in your CV that one of the methods you have experience in applying is Bayesian statistics, right?



A. Yes. Yes.
Q. Okay. Any of that work in bullet point three involve a healthcare setting?
A. For -- yeah. Bayesian statistics was applied, I remember. And for classification tools, I also remember doing classifying observations. And yeah, mixed effect modeling also applied to healthcare. Yeah.
Q. Okay. So tell me about the time that you've applied Bayesian statistics in a -- to a study involving a healthcare setting.
A. Well, I remember there was a study that dealt with -- a very complex study dealt with missing values, and it involved using item response theory and mixed effect modelings, you know, to -- to model missing value patterns. When doing the analysis, we used the Bayesian statistics to update our parameters during the analysis. Yep.
Q. Okay. What was the study about?
A. Well, it was mostly about handling missing values, but a quite complex one.
Q. Okay.
A. But part of it --
Q. What was the study -- go ahead.
A. A part of it involved using Bayesian statistics in the -- to update the parameters.

**Q. Okay. What was the purpose of the study?**
A. The purpose of the study. It was -- the title of it. I remember it was about handling missing values for longitudinal studies using, I guess, a mixture of mixed effect modelings and item response theory. This is what I remember. Might not be very exactly true.
**Q. Okay. How is that at all connected to a healthcare setting?**
A. Well, the longitudinal studies collected data for patients over time. I remember there were 50 time points. They collected data and then wanted to handle missing values in their study.
**Q. Okay. So this was about an effectiveness of a drug?**
A. No, it wasn't about a drug.
**Q. Okay. What was that about?**
A. It was about just -- I did it about three to four months ago. I just -- I can look the -- and can I, you know, see my work, and just get back to -- can I do that?
**Q. Sure. You know what? Now's a -- good. Yes. Now's a good time for a break. There's a couple of things that you've asked to look back and see. So why don't you go ahead and do that over the break? Let's take ten minutes. Okay.**



THE REPORTER: Okay. We're going off the record.
MS. KINKADE: You're going to ask him to --
THE REPORTER: We're going off --
MS. KINKADE: That's fine. We can go off.
THE REPORTER: Going off the record at 9:11 a.m.
(OFF THE RECORD)
THE REPORTER: Back on the record for the deposition Moein Heidari had being conducted by videoconference. My name's Esther Heath. Today's date is September 29th. The time is 9:29 a.m.
BY MS. GRADY:
**Q. Okay, sir. Before the break, I was asking you about this longitudinal study that you participated in. And you said that you'd like to go back and look. So have you had a chance to go back and look at the purpose of that study?**
A. Well, I looked back. Just there are so many folders here. I just remember it was about comparing health outcomes, and just, you know, there are so many projects in my computer.
**Q. Okay. But when I asked you whether it was about the development of a drug, you said no. So what I'm trying to understand is: What was the**



**purpose of that study?**
A. Well, it was not about drug development, treatment development. It was about different -- I remember about different health outcomes. You know, how -- related to the health of adolescents and the observations were made over -- across -- for 50 time points. And it -- it just compared their health out -- I don't remember the -- the measures for their health outcomes. They just -- I remember it was about the -- the use of drug, the use of alcohol, different measures they included the -- in their study. And then compared their measures of a health outcome, I remember.
**Q. Is this for an academic research purpose?**
A. This last one, yeah. I -- I mentioned this is -- this is more for academic research. Yes.
**Q. And was it intended to be research that was published in a peer reviewed academic journal?**
A. Well, it was, I think, for both to be published and for a dissertation study. Yeah. I remember at a prestigious university.
**Q. Do you know if that study involved looking at the use of synthetic cannabinoids?**
A. No. I don't remember that, if it involved that. Yeah. I don't think so, no. Not. It didn't -- it didn't involve that.



**Q. Okay. We're going to go back to Exhibit 1. So when you first began working with Precision Consulting Company from June 2016 to February 2022, your role was as a statistical data analyst, correct?**
A. Correct. Yeah.
**Q. And what happened in February 2022 that your job title changed to become a methodologist?**
A. Well, before in 2022, I mostly just did statistical analysis for the clients. But after that, you know, I -- I needed to complete a project, then move to another one. But after that, I was in -- in charge of more projects. You know, they -- they send me more projects. I decide what they should be done and then how they should be done to the statistical data analysts. It -- I did -- you know, I get to do work on more projects.
**Q. Okay. So prior to February 2022 as a statistical data analyst, you were just taking data that had been generated by a study and using statistical methods to perform the analysis of the results, true?**
A. That was the most part of my job, but I also consulted the -- the clients with methodology. But it was mostly statistical data analysis, yes.
**Q. Okay. And so then, as a methodologist now, since February of 2022 you've been consulting with**

**businesses and academic researchers about how to design the study at the outset, true?**

A. Sorry. What happened?

**Q. Let me ask my question again: Since February of 2022, as a methodologist. you now consult with businesses and academic researchers about how to design their studies at the outset, true?**

MS. GRADY: I think he's frozen again.

A. Sorry. I lost connection.

BY MS. GRADY:

**Q. Okay. Let me ask my question again.**

A. Oh, sorry.

**Q. Since February --**

A. Sorry about that.

**Q. That's okay. No problem. Since February of 2022, as a methodologist, you've now been consulting with clients at the outset about how to design the study, correct?**

A. Not totally. I -- I -- this is what I mostly do, but I still do statistical data analysis. But the major part of my role is assisting with methodology.

**Q. Okay. Was the move from statistical data analyst to methodologist a promotion?**

A. Well, I can consider it as a promotion, yes.

**Q. Do you receive greater compensation on a per**



**project basis as a methodologist as compared to a statistical data analyst?**

A. Yes, that's true.

**Q. And what -- do you receive a flat compensation on a per project basis?**

A. Sorry. I -- I -- can you rephrase that, please?

**Q. Yes. Do you receive a set amount of compensation on a per project basis or does it differ based on the project itself?**

A. Well, I get to -- to work on bigger projects and more projects and spend less time. You know, I just, you know, kind of work on the methodology, determine the analysis plan, and do -- most of the stuff -- most of the stuff, you know, the boring stuff, I -- I send it to other people, you know. As they say, they -- they want to use my -- my experience to use me efficiently for these projects.

**Q. Okay. But what I'm asking about, sir, is compensation; do you understand that?**

A. Yes. My compensation is more now.

**Q. Okay. Do you receive the same compensation for each project, or does it differ based on the project?**

A. It's, I think still the same. But what



the -- the difference is -- is that I get to work on more projects and bigger projects. Either more projects or bigger projects, yeah.

**Q. Like, what is the per project compensation that you receive?**

A. Well, I'm not sure if I can -- I should disclose this information because they don't let me, you know, disclose this information about it, the -- the -- the company.

**Q. I'm not asking you about the company.**

MS. KINKADE: Moein -- well, I can help. This one I know is okay. We've disclosed the invoices, and we disclosed them subject to protective order, so it's still confidential. And we can mark this part of the record confidential, but they can know what your hourly, or project based, whichever one it is, what your rate is.

(CONFIDENTIAL PORTION I REDACTED)

BY MS. GRADY:

**Q. Okay. Now, you were retained by Wexford -- or strike that.**

A. Well --

**Q. Your -- Wexford retained Precision Consulting company on this project, correct?**

A. Well, I guess, yes, it was -- they retained



Precision Consulting company, and they assigned me on this project. The Precision Consulting company gave me the task to work on this project.

**Q. And have you ever worked on a project like this one before?**

A. Like how? Can you clarify, please?

**Q. Well, in any way. Is there any way in which this project is similar to any other work that you've done in your career?**

MS. KINKADE: Form.

A. Well, from which aspect of the project do you mean? You know, from qualitative, quantitative, the analysis, what aspect? You know, since there are some aspects that may -- we have done on other projects and some aspects like, you know, assessing a healthcare system is unique here. Some aspects I've done before, yeah.

BY MS. GRADY:

**Q. Okay. What aspects have you done before?**

A. Well, in this report I gave input on the sample size. But I have done so many analysis to determine -- so many power analysis to determine sample size before. And, you know, on sampling methodology, for example. And these are the areas that I have done work. And also, I have lots of experience on

generalizability of the results. But -- they're quite different, but, you know, the -- the framework is quite similar.

**Q. Okay. So work on sample size and work on generalizability. Any other aspects that you've done before in your work?**

MS. KINKADE: Form.

A. Sample selection, probability sampling, for example.

BY MS. GRADY:

**Q. Okay. Any others?**

A. Well, descriptive reports of the results, you know. You -- you make some observations and make some descriptive reports, you know, to -- you report, you know, the numbers, the frequencies.

**Q. Okay. Any others?**

A. Since -- well, I don't recall at the moment, no.

**Q. Well, I mean, sir, this is my only opportunity to talk to you before motions about your admissibility and also your potential testimony at trial, so I'd really like to know if there's anything about either of these reports that you've ever done before.**

MS. KINKADE: Just to clarify, this isn't your only opportunity. There's going to be a second



deposition, but go ahead.

MS. GRADY: That's true. I'm sorry. Thank you for that correction.

BY MS. GRADY:

**Q. This and next Friday are my only opportunities to talk to you, so I'd really like to know if there's anything else that you -- if there's any other aspects of what you did as part of these reports that you've done before.**

A. Well, actually what they have done is to, you know, make some observations and make conclusions. They don't use clear methodology, clear analysis, you know. Their work is quite unclear. I can't just say that what I have done is similar to them because, you know, their work is very unclear to me, how they source their data, how they analyze their data, how they interpret it. You know, they are just quite unclear to me. I can't say that, you know, this is similar to other work.

**Q. Okay. So --**

A. So the -- the other aspects are quite unclear to me.

**Q. Okay. So the aspects that you have done is you -- one of the things you mentioned is sample size. Have you ever offered a critique of another study's sample size in your work, other than these reports?**



A. Critique of -- you mean to critique the -- the size of the sample they used in their study, right?

**Q. Yes. So in this -- in these reports, you offer criticism about their sample size. What I'm asking is whether you've ever offered a criticism of sample -- of a sample size other than in these two reports?**

A. I have done so many sample size determinations before, but not -- but nothing critical of sample size, no. This is my first time.

**Q. Okay. Have -- you said that you've done some work assessing generalizability. Have you ever offered a criticism of a completed study's generalizability, other than these two reports?**

A. Well, in my studies, I have ensured that the results can be generalizable, but to -- to ensure that the different aspects of the study are well integrated, but not that, you know, to study if the results are generalizable.

**Q. Okay. You mentioned that you have experience conducting sample selection. Have you ever provided criticism at -- strike that. Have you ever provided criticism of a completed study's sample selection, other than these two reports?**

A. Not to specifically critique a report,



but -- well, there are many studies that I can critique, you know. The studies that they have already done the sample, the -- the data collection procedure, I can critique their -- their study, but not specifically to just critique their study.

**Q. Okay. So that's not --**

A. This is my --

**Q. -- something you've ever done before?**

A. No, this is my first type of -- task of critiquing, yeah.

**Q. Okay. And you talked about your -- that you've previously had experience with probability sampling. Have you ever critiqued the ability to -- strike that. Have you ever critiqued a completed study's probability sampling?**

A. No, not to critique the probability sample.

**Q. And then you mentioned descriptive reports. And by that, I mean -- by that, I took you to mean that you have previously in your work written things describing what you have found; is that right?**

A. Yeah. Just providing some summary, you know, describing the sample.

**Q. Okay. So --**

A. In terms --

**Q. -- when you say you've done --**

A. In terms of --
**Q. Go ahead.**
A. -- frequencies, you know, like frequencies of observations and other statistics that might be related to the project, yes. Just describing the sample.
**Q. Okay. So when you say you have previous experience with descriptive reports, you mean just summarizing things, true?**
A. It's not completely true. You know, descriptive, it's not just summarizing. Descriptive is just to -- to describe the situation, to -- to describe what you have, you know. Descriptive might even mean, you know, describe the relationship between the variables using simple statistics. Just simply describing the sample.
**Q. Okay.**
A. The data that we have.
**Q. And have you ever -- have you ever offered a report for a legal purpose, other than these two reports?**
A. For -- well, I'm not sure. But the -- I -- I used to receive some projects about an insurance company, I remember, to check the analysis they had done. I remember that, yeah.
**Q. Okay. You understand that your testimony here**



**is part of a civil lawsuit that was filed in Illinois in federal court, right?**
A. Right. Yes.
**Q. Okay. And have you ever been retained to provide expert testimony in any case other than this one?**
A. No. This is my first time.
**Q. Okay. And I believe you said you've never given testimony on any topic before; is that right?**
A. Yes. This is my first time.
**Q. Are you familiar with the American judicial system?**
A. Not very -- you know, don't have a very clear understanding. But very broad familiarity, yes.
**Q. Do you know whether or not the judicial system in the UK or Iran is an adversarial system?**
A. I don't know.
**Q. The -- are you aware that in the United States, and specifically in federal court, there -- we have an adversarial system?**
MS. KINKADE: Foundation.
A. I'm not aware of that.
BY MS. GRADY:
**Q. Do you know what I mean when I use that phrase, adversarial system?**



A. Can you clarify on that, please?
**Q. I'm happy to clarify, but I just want to understand first if you understand that phrase?**
A. Well, no. This is -- I'm not familiar with the phrase, actually.
**Q. Okay. An adversarial system is one in which parties who bring a lawsuit are represented by lawyers who are adversaries to one another. And I'm not going to do a good job of explaining it in its fullest terms, so I won't quiz you on that later. But are you familiar with the standards by which civil cases in the United States are decided?**
MS. KINKADE: Foundation.
A. No, I -- well --
BY MS. GRADY:
**Q. Okay. Go ahead.**
A. Well, I'm not sure because -- well, the answer would be no, I guess.
**Q. Okay. Are you familiar with the phrase, preponderance of the evidence?**
MS. KINKADE: Foundation.
A. No.
BY MS. GRADY:
**Q. Are you familiar with the phrase, more likely than not?**



A. Can you clarify the phrase as you said -- as you did before?
**Q. Sure. So -- but first I just want to -- I just want to understand. You do not know what I mean by the phrase, more likely than not, true?**
MS. KINKADE: Form.
A. Well, I'm not sure, actually. If you can clarify more on that, I would appreciate it.
BY MS. GRADY:
**Q. I know. And I just want to -- I'm sorry. I -- we are having difficulty talking over each other, but I promise you it is not intentional. But first, sir, I just want to understand. You don't -- you're not familiar with that phrase as it's used in the United States judicial system, correct?**
MS. KINKADE: Foundation.
A. Well, I'm not familiar with the phrase, yes.
BY MS. GRADY:
**Q. Are you familiar with the phrase, beyond a reasonable doubt?**
MS. KINKADE: Foundation.
A. Beyond a reasonable -- I have heard this phrase actually, but I'm not sure if it's -- can you clarify on this, please?
BY MS. GRADY:

**Q. Okay. What -- just tell me if you know anything about that phrase, what you understand about it?**

MS. KINKADE: Foundation.

A. I mean, I speculate -- I think that it's -- it means that we can't have doubts about it. You know, there is so much evidence that we can't doubt it, I -- I assume.

BY MS. GRADY:

**Q. Okay. I'm going to share with you a section of the Pattern Jury Instructions in the Seventh Circuit. And I think it's relevant because it bears on the likelihood that things need to be true. So just to make sure that we're using the correct definitions, preponderance of the evidence is used in the Seventh Circuit, which is the circuit we're in. Means that, when you have considered all of the evidence you must be persuaded that it is more probably true than not true, right?**

MS. KINKADE: Form. Foundation.

A. So this -- this is the definition of preponderance of evidence, right?

BY MS. GRADY:

**Q. Yes.**

A. Can I take a note, please.



**Q. Sure.**

A. Might be useful. Okay.

**Q. So that is not a standard that you used as a statistician, true?**

MS. KINKADE: Form. Foundation.

A. Sorry. A standard for what? To do what types of analysis?

BY MS. GRADY:

**Q. Any types of analysis. Are there any types of analysis where you utilized the preponderance of the evidence standard?**

MS. KINKADE: Same objection.

A. To say that it's -- to say that it's more likely than not?

BY MS. GRADY:

**Q. Correct.**

MS. KINKADE: Same objections.

A. Well -- well, as I said before, it may depend on the purpose of the project. You know, sometimes you can't find statistical significance or statistical practical results. But you know -- but when you describe your situation you might use it like this, you know, that it's more likely than not.

BY MS. GRADY:

**Q. Okay. Tell me any project where you've utilized the preponderance of the evidence standard.**

MS. KINKADE: Form. Foundation.

A. Well, I've not explicitly used this preponderance of -- of evidence. But in the interpretations of the results, we may sometimes, you know, say that -- I remember some projects, you know, when we couldn't -- we couldn't find the strong evidence, we just, you know, said that it's more likely -- this is more likely that the other one, you know.



BY MS. GRADY:

**Q. Okay. You didn't use the preponderance of the evidence standard in assessing the reports in this case, true?**

MS. KINKADE: Form. Foundation.

A. Well, let me just think a little bit. Well, I didn't use this phrase, but what I did was, you know, assess what they did, you know, in terms of sampling, analysis, and interpretation of the findings. I didn't say that this is more likely than the other. I just evaluated what they had done.

BY MS. GRADY:

**Q. Okay. You did not utilize the preponderance of the evidence standard in assessing what they did, right?**



MS. KINKADE: Asked and answered.

A. Well, this is quite a broad question, you know. I -- we can't say for sure I didn't use this, you know, since -- for example, I challenged their sampling, you know. I said that their sampling might not be enough. But, you know, even the -- they might have been true, but they didn't provide evidence, you know. Just, to me, it seems more likely that they what they did is wrong.

BY MS. GRADY:

**Q. Okay. So is it your testimony that you did employ the more likely than not standard in assessing these reports?**

A. Sorry. Can you clarify?

**Q. Is it your testimony that you did employ the more likely than not standard in assessing these reports?**

MS. KINKADE: Form. Foundation.

A. Sorry. I don't understand the question.

BY MS. GRADY:

**Q. What about my question don't you understand?**

A. I mean, when you say how it's related to preponderance of evidence, you know, my testimony, I -- I -- I -- I just can't get it.

**Q. Okay. Did you, in any way, use the more**

**likely than not or preponderance of the evidence standard in assessing these reports?**
MS. KINKADE: Form. Foundation.
A. Actually, what I did just was to review their -- what they had done, you know. I didn't use this explicitly. I just assessed whether what they had done was actually scientifically sound.
BY MS. GRADY:
**Q. Did you use it implicitly?**
MS. KINKADE: Same objections.
A. Well, I don't remember in my report using, you know, more likely than not, you know. I just said that it's not scientifically, you know, reliable. But not that it's more likely than not or not more like -- you know, this phrase.
BY MS. GRADY:
**Q. You agree that you did not put out any opinion about whether the findings of Dr. Herrington or the Lippert experts would satisfy the standard -- the preponderance of the evidence standard?**
MS. KINKADE: Form. Foundation.
MS. ARMSTRONG: Relevance, too.
A. Actually, this question is quite, you know, confusing to me. Can you please ask one question at a time?



BY MS. GRADY:
**Q. I am asking a single question at a time, sir. What -- what don't you understand about my question?**
A. Well, I just -- it's not clear to me what you mean, you know, how preponderance of evidence is related to these reports.
**Q. That's fine if it's not clear to you how it's related to those reports. It's clear to me. But my question is not about what the -- how preponderance of the evidence applies. My question is simply: You agree that you did not express any opinion about whether or not Dr. Herrington's reports satisfied the preponderance of evidence standard, true?**
MS. KINKADE: Form. Foundation --
A. I didn't express any --
MS. ARMSTRONG: And relevance.
BY MS. GRADY:
**Q. Go ahead, sir.**
A. Oh. I didn't, you know, use any phrases like that in the report, yeah.
**Q. Okay. Not just those words, but you agree that you didn't express any opinion to that effect, correct?**
MS. KINKADE: Form. Foundation. Argumentative. Asked and answered.



A. But I'm -- as I said, you know, I may have used it differently, you know, when I challenged their methods, their analysis. To -- to me, it seemed like that, you know, they were more likely to be wrong than right, you know.
BY MS. GRADY:
**Q. Okay. So it's your testimony that, in your report criticizing Dr. Herrington's report, you are expressing an opinion that it is more likely that he is incorrect than he is correct; is that your testimony?**
A. Well, my testimony is that what they did is not scientifically reliable, you know. They don't follow any scientific method. They don't refer to any standards or guidelines. That was what I did. But I'm not saying that -- I'm just assessing it in terms of, you know, how the -- the methodology they applied, how they analyzed their observations.
**Q. Okay. I still don't think I've got an answer to my question, Mr. Heidari. And I'm not trying to, you know, draw this out longer than it needs to be. But what I'm trying to understand is whether you believe you've expressed an opinion, specifically with regard to Dr. Herrington's report, that it fails to satisfy the preponderance of the evidence standard?**
MS. KINKADE: Form. Foundation. Argumentative.



Asked and answered.
A. Well, actually, I don't remember, you know. But it's -- the question is just, you know, quite broad, you know. It might -- you know, you might fit some -- some of them into this, you know, some of my conclusions. But it's -- in my mind, you know, I can't just think of the -- what I -- what I provided, you know, to fit -- fit them --
MS. GRADY: Okay. Let's mark -- let's mark this report as Exhibit 3 [sic].
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
(CONFIDENTIAL PORTION II REDACTED)
MS. GRADY: I'm going to put what we'll mark as Exhibit 3 on the screen.
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
(CONFIDENTIAL PORTION III REDACTED)
**Q. And there was a stipulation made at the outset of this deposition, and I just want to ask a few additional questions. You're not a physician, and you have no medical degree, true?**
A. I don't have a medical degree or position, true. Yes.
**Q. And have you ever had any medical training?**
A. No.
**Q. Okay. You agree that you are not an expert in**

**the field of medicine, correct?**
A. The field of medicine? You know, can you clarify more, you know, make this more specific to me, please.
**Q. I don't understand. Do you understand my question? Or are -- can you help me understand how --**
A. This is -- I only assist the field of medicine as an statistician, yeah. Yeah. I'm not expert in the -- you know, as a medical professional, yeah.
**Q. Okay. And you've never participated in a qualitative study, true?**
A. Qualitative studies, minor assistance. Not very -- you know, not very much assistance.
**Q. You're not an expert in the methods of qualitative studies, right?**
A. Qualitative studies, no. I focus mostly on quantitative studies, but I'm familiar with -- only familiar with qualitative studies.
**Q. Is it your testimony that you're an expert on the methodologies of qualitative studies?**
A. Sorry. Can you rephrase your questions?
**Q. Do you not understand it?**
A. You spoke a bit fast. You know, I -- I didn't get everything well.



**Q. Is it your testimony that you are an expert on the methodologies used in qualitative studies?**
A. Well, I'm not an expert in the methodology -- methodologies for qualitative studies. I'm familiar with them.
**Q. Okay. Let's go back to Exhibit 2, please. What, if any, experience do you have with offering opinions about making a determination about the cause of someone's death?**
A. You mean in general or for this case?
**Q. At all.**
A. Since I'm not a medical professional, well, I can't give opinions about causes of death.
**Q. On page 4 of your report, you list the records that you have reviewed, correct?**
A. Yes.
**Q. And one of the records you reviewed was the plaintiff's complaint. Do you recall reviewing that document?**
A. Well, I reviewed it about two months ago, two -- two -- two to three months ago. I don't remember the details.
**Q. You reviewed Dr. Herrington's report, correct?**
A. Yes. Correct.
**Q. And then you reviewed this document that**



**you've titled the IDOC Report of Deaths, Bates labeled; do you see that?**
A. Yes. Yes, I do.
**Q. And then down at number 9, you listed as an additional document, a -- IDOC Adult Institution Inmate Deaths, P5017 to P5089; do you see that?**
A. Yes, I can.
**Q. What is the additional document that you've set out at 0.3?**
A. It was the death spreadsheets for the death of patients over a -- a time period, I -- I think.
**Q. Well, that's what you're referring to in 0.9, right? That's the death spreadsheet.**
MS. KINKADE: I don't want to interrupt too much, but I think we may have -- might have had a native format that wasn't Bates.
MS. GRADY: Okay. I don't think that's been produced in this case.
THE WITNESS: Sorry. This is --
MS. KINKADE: It was either native or it just wasn't Bates.
MS. GRADY: Okay. Let's go off the record for a second.
MS. KINKADE: But there's no -- I can -- I can stipulate, there's no additional -- he did not



review any additional reports of death, other than the IDOC spreadsheet that was produced in this case by the IDOC, if that helps.
A. Yeah, I reviewed the IDOC spreadsheet.
MS. GRADY: Okay. Let's just go off the record for one second.
THE REPORTER: Going off the record. The time is 10:21 a.m.
(OFF THE RECORD)
THE REPORTER: Back on the record for the deposition of Moein Heidari, being conducted by videoconference. My name's Esther Heath. The date is September 29th. It's 10:22 a.m.
BY MS. GRADY:
**Q. On 0.5, you say that you reviewed a prison population dataset, correct?**
A. Yes. I checked the prison population dataset, yes.
**Q. Was that something that you went out and found or something that was provided to you?**
A. Well, I was provided the link, and I remember there were the datasets for different years. I just reviewed them. Yes.
**Q. Okay. The 0.8, you reviewed the National Vital Statistic reports, page 69, number 13?**

A. Yes. I remember I reviewed the Vital Statistics, yes.
**Q. Okay. And was that something that was provided to you or something you went out and found on your own?**
A. Well, I think this one, I found it on my own, I guess, but I'm not sure.
**Q. Why did you -- go ahead.**
A. But what -- you know, I -- I was provided the IDOC data, I remember, but -- and the link to the other data, I think -- well, I think it's, like -- I think they provided it to me, I guess.
**Q. Okay. We're going to go to the next page here. This is the introduction to your critique of Dr. Herrington's report, correct?**
A. Correct. Yes.
**Q. And this is the first time you've ever written such a critique, correct?**
A. A critique, yes. This is my first time. Yeah.
**Q. Okay. Now, you say throughout this report, we. That's the pronoun that you use, we. Just to be clear, you're just referring to yourself, as you're the only one who generated this report, correct?**
A. Just let me review it. Sorry. Well, it refers to myself. Yes.



**Q. Now, you say, "In his report, Dr. Herrington claimed that none of these patients received adequate care by any reasonable criteria"; you see where you say that?**
A. Yes.
**Q. And you are not qualified to assess whether he's right about those patients receiving inadequate care, correct?**
A. Well, what I mean by this sentence is that they did not provide -- you know, Dr. Herrington did not provide any standards to -- to -- to make this decision. You know, this is what I mean. I'm not assessing the criteria. I'm not assessing the -- the patients. That's not -- I'm just saying that he did not provide any standards for his claims.
**Q. Okay. But you agree that you're not qualified to assess whether Dr. Herrington is correct that none of the patients whose records he reviewed received adequate care?**
MS. KINKADE: Form.
A. Well, I -- I can -- you know, I can assess his analysis. I -- I think I can assess an analysis and see if he provides -- you know, he supports his claims. What I'm saying is that he didn't support his claims. You know, he -- he just made some observations and made



conclusions. I -- I'm saying that he did not provide any supports for his claims. And to me, it -- it seems like it's not scientifically done. You know, it's not a valid analysis, since he did not provide any reasons for his explanations.
BY MS. GRADY:
**Q. Okay. We'll get back to my question. I don't think it's been answered. But when you say it's not a valid, valid in what field?**
A. Sorry. What field what? Sorry. I can't -- can you clarify?
**Q. You said that it wasn't a valid analysis. I mean, valid in what field? What are you referencing?**
A. By valid, I mean, you know, how he makes conclusions in the -- you know, statistics is a broad field. It applies to many different fields. I just assess it from my perspective, from my, you know, scope of expertise.
**Q. Right. And your scope of expertise, is that as -- is as a statistician, correct?**
A. Sorry. Data what? I -- I didn't hear you well.
**Q. Your expertise is as a statistician, correct?**
A. As a statistician and a methodologist, yeah.
**Q. Okay. And when you're opining about the**



**reliability of his findings, that's not tethered to any particular field, right?**
MS. KINKADE: Form.
A. Well, reliability of the findings? Well, this is something that may apply to many different fields. You can't just say that these findings are not related to medicine, you know, excluded to -- only inclusive to medicine. You know, they might be applied to other fields as well. I can't determine --
BY MS. GRADY:
**Q. Okay.**
A. -- a certain field.
**Q. Okay. So your findings about reliability, not tethered to any particular field, right?**
A. Well, as related to methodology, you know, they are related to the methodology of the -- the study. How -- you know, how the study was conducted. The -- the strategies he used to -- the techniques and strategies he used to, you know, do the -- do his analysis his related to the methodology of the work.
**Q. Okay. I think we're talking past each other.**
**What I'm asking you, Mr. Heidari is: Do these findings, these opinions that you offer about there being an insufficient reliability, is that tied to any particular field?**

MS. KINKADE: Form.

A. Well, I can't say that, you know, this -- these are related to the methodology. I can't say that methodology is related to a specific field. It -- it's -- it's related to most of the fields.

BY MS. GRADY:

**Q. Okay. So this is, like, an abstract standard of reliability; is that right?**

MS. KINKADE: Form. Misstates the evidence.

A. There are many types of reliability. It's just not -- this is not, you know, just how reliability is. Reliability, you know, in -- in the findings, in the data collection, in the analysis, rely -- we assess reliability in all those areas.

BY MS. GRADY:

**Q. Okay. And I just want to give you one last opportunity, sir, because we are going to be filing motions about this report. So I just would like to hear you tell me about any particular field that your opinions about reliability are grounded in.**

MS. KINKADE: Form. Asked and answered.

A. Well, this is a quite broad question. You know, reliability doesn't apply to a specific field. It -- it -- it -- it applies to how a study is conducted. A study might be conducted in any fields.



You know, I can't just say one field.

BY MS. GRADY:

**Q. Okay. So it's your opinion that there is a uniform reliability standard that is applicable to every field; is that -- is that true?**

MS. KINKADE: Form.

A. No, there is no unique reliability standard.

BY MS. GRADY:

**Q. Okay. So what reliability standard are you applying in this case?**

MS. KINKADE: Form.

A. Well -- well, I'm not applying reliability standard. I'm just assessing how they perform their study.

BY MS. GRADY:

**Q. Right. But you opine that the study is not reliable, right?**

A. By reliable, I mean, they -- they don't provide sufficient information. You know, they -- they don't -- the -- the steps they took, they are not, you know, scientifically justifiable. And that's what I'm saying.

**Q. Okay. So what field, like what standard of reliability are you using?**

MS. KINKADE: Form. Asked and answered.



A. Just let me review the question, please. Well, by reliability, I mean -- you know, I mean, they're not scientifically reliable to -- you know, that may apply to any fields. I mean, I just -- there's no definite answer to your question.

BY MS. GRADY:

**Q. Right. Can't give me a particular field that you've drawn the reliability standard from, right?**

MS. KINKADE: Form. Asked and answered.

A. So can you clarify your question? I can answer it. You know, it's quite vague to me.

BY MS. GRADY:

**Q. Do you understand my question, or what don't you understand about my question?**

MS. KINKADE: Form.

A. Well, I didn't get it very well. You know, I just -- I'm confused about your question. Can't give a response until I'm sure about it. Just rephrase it.

BY MS. GRADY:

**Q. Can you -- can you give me any field from which you've drawn this reliability standard you offer an opinion about?**

MS. KINKADE: Sarah, can you ask it in a different way? He's asked quite a few times for you to do that. I honestly don't understand your



question either. Can you just ask it in a different way, instead of the same?

MS. GRADY: I mean, I've been asking it in several different ways. I'm just trying to get an answer to my question.

A. So --

BY MS. GRADY:

**Q. Do you understand about -- do you -- do you have any standards by which you adjudicate reliability?**

MS. KINKADE: Form, foundation.

MS. ARMSTRONG: By which what? I missed that.

BY MS. GRADY:

**Q. I asked whether he has any standards by which he adjudicates reliability.**

MS. KINKADE: Same objections.

A. There is no specific standard. You know, the -- the -- the way a study is conducted, it has many different elements. You -- you must ensure that each element is done correctly. And for every study, the elements might be different. So I can't just say that there is one standard, because it's how the different -- different elements of the study are integrated, you know, how they work with each other. There is no standard. And this -- there are many different types of -- you know, for each study, these

elements might be quite different.
BY MS. GRADY:
**Q. Okay. What standard did you use for this report?**
MS. KINKADE: Form.
A. Well, I didn't use a standard, since I didn't do this report. You know, the -- the -- the -- Dr. Herrington's report, I didn't do it. I just assessed how this was scientifically reliable. I -- that's what I did. If -- if they provide --
BY MS. GRADY:
**Q. How do you determine that?**
A. I mean, I assessed whether he -- his methodology, how he -- he did different. He -- he didn't -- he used different elements to make -- to arrive as -- at his final conclusion. That's what I did.
**Q. Okay. So in order to make a determination about the reliability, you look solely at the methodology; is that right?**
A. Well, the methodology is how the work is -- you know, determines the different -- the -- the strategies, the procedures used to conduct the study. Well, we need to see -- yeah, we need to check the methodology to -- to see how the study is conducted.



**Q. Okay. And what objective metrics did you apply to your assessment of the methodology in order to determine whether Dr. Herrington's report was reliable or not?**
A. Well, I -- I assessed whether -- how he selected his sample, how -- whether he applied probability sampling, whether he -- you know, he -- how he did his analysis, and how he arrived at -- at his conclusions. This is what I did.
**Q. Okay. So one of the metrics by which you adjudicated the reliability was to determine whether there was probability sampling; is that right?**
A. One of the metrics could be whether there was probability sampling, and the other metric is how he determined the size of the sample.
**Q. Okay. Any other metrics?**
A. And well, I can't just mention specific metric. I just assessed how he arrived at his conclusions. Well, one of them could be whether he provided support for his causality. You know, he -- he -- he determined causality, but I can't see support for that.
**Q. Okay. Any other metrics?**
A. Well, another metric is that, you know, I can -- how the different observations, like the



12 -- 12 patients, how they were correlated, you know, how the identified causes, they were correlated with each other to conclude that there was, you know, there was a general practice in Wexford.
**Q. Okay. Any other metrics?**
A. I don't remember other metrics. And one of the -- one of the things is that the standards he provided when he, you know, made conclusions, another one is that -- how -- whether he considered all the possible factors when, you know, determining causality, you know. You -- you can't just find one observation, one -- one problem and make causality. You need to take into account all the factors, and then arrive at the conclusion.
**Q. Any others?**
A. Well, others could be -- I don't remember any others for now.
**Q. Okay. And just to be clear, I'm not asking you about other theoretical metrics you could use. I'm asking you specifically about what metrics you used in order to reach an opinion that you believe was the product of reliable principles and methods. So you -- one of -- earlier on in the deposition, you had discussed that you believe some portions of Dr. Herrington's report involved quantitative analysis,**



**and I -- and we took that break. And I'm happy to give you another break to do it, if you'd like. But I'd like to know which portions of Dr. Herrington's report are, in your review, focused on quantitative data analysis.**
A. Yes. I remember he mentioned some numbers, you know, that -- that made conclusions based on the descriptive number. You know, he was doing some descriptive stuff -- just, this is a very long report. You know, during the break, I just couldn't find those examples.
**Q. Okay.**
A. But, you know, when -- when you -- when -- when you're describing a situation, you know, giving numbers and frequencies, this has to do with quantitative parts of the study, you know.
**Q. Okay. So Mr. Heidari, I'm happy to give you as much time as you'd need. We can take another break now. But I really do want to know, with reference to the page in his report, where you, to your review, observed Dr. Harrington engaging in a quantitative analysis?**
A. Yes. I should do it in another break or -- or now? You want me to do it now?
**Q. Sure. How much time do you think you'll need?**
A. I think 10 to 15 minutes, I guess.

MS. GRADY: All right. Let's take 15. So we'll come back at 10 -- at 10:53 Central Time.
THE REPORTER: Okay. We're going off the record. The time is 10:38.
(OFF THE RECORD)
THE REPORTER: Back on the record to the deposition of Moein Heidari being conducted by videoconference. My name's Esther Heath. This is September 29th, and the time is 10:56 a.m.
BY MS. GRADY:
**Q. Okay. Mr. Heidari, were you able to identify in Dr. Harrington's report any place where he provides something you believe is a quantitative data analysis?**
A. Yes. I -- I -- I was able to find you an example.
**Q. Okay. Please point me to the page, and I'll be happy to put it on the screen. Give me one minute.**
A. It's on page 48 of the report, the section, Findings.
**Q. Just one second. Okay. Let's mark this as -- are we on Exhibit 4, Esther?**
THE REPORTER: Yes. This will be 4.
MS. GRADY: Okay. Let's mark this as Exhibit 4. This is Dr. Harrington's redacted report marked AEO.



(EXHIBIT 4 MARKED FOR IDENTIFICATION)
BY MS. GRADY:
**Q. You said page 48, sir?**
A. Yes, 48. You know --
**Q. Okay.**
A. -- for the findings, the first paragraph.
**Q. Okay. So the first paragraph to your review is a quantitative data analysis; is that right?**
A. Well, I am -- it's not that -- it could be quantitative data analysis, you know. He did not perform, you know, a clear quantitative methodology, but to make such conclusions about -- about life expectancy, you know, you can't use qualitative data analysis.
**Q. Okay. Any other places where Dr. Harrington, to your review, performs quantitative data analysis?**
A. Well, you know, the next paragraph, you know, where it says, "Upon comparison, only three of the 12 deaths in the study were from a relatively common causes of death." You know, this -- I don't think -- it's more -- it can be more appropriately done within a quantitative study, you know, if that study is well designed to make conclusions.
**Q. I see. So your opinion -- so your review is not that this paragraph, the second paragraph under Findings on page 48, is a quantitative data analysis,**



**but it is susceptible to a quantitative data analysis; is that true?**
MS. KINKADE: Form.
A. What I mean is that he did not use a quantitative data analysis. I mean, he -- he used numbers to -- to make conclusions. It's not related to qualitative data analysis. He could have done a better job, you know, to make conclusions through a quantitative data analysis methodology.
BY MS. GRADY:
**Q. Okay. Any other places where you found, upon your review, that Dr. Harrington engaged in what you believe is quantitative data analysis?**
A. Well, I was only able to find these two places, but there are -- I'm sure that there -- there can be -- other examples can be find. But during the time limit, I couldn't find other examples.
**Q. Okay. So we've taken two breaks of 15 minutes each, and during that time, your review of Dr. Harrington's report has only elucidated two examples of quantitative data analysis; is that right?**
A. I mean, it -- it -- it deals with data, not quantitative data, but qualitative data analysis. This is what I mean. I'm not saying that he is performing quantitative data analysis. I'm saying that



this does not fit -- fit qualitative data analysis methodology.
**Q. I don't understand your last answer. Sorry. You're saying that Dr. Harrington's report doesn't fit qualitative data analysis?**
A. Quan -- qualitative, yeah. Qualitative data analysis.
**Q. Okay. I'm very confused. Doctor -- the majority of Dr. Harrington's report focuses on qualitative data analysis, correct?**
A. Well, that, I assume, is correct, yes, since he makes observations and makes conclusions.
**Q. All right. Let's go back to your report. You say, "From a statistical perspective, Dr. Harrington's conclusions were flawed and unsupported by evidence"; do you see that?**
A. Yes.
**Q. And you're not opining that, in the field of medicine, Dr. Harrington's conclusions were flawed, correct?**
A. Sorry. Well, he -- he made conclusions in the field regarding healthcare.
**Q. Okay. Are you -- are you holding yourself out as an expert in the field of healthcare?**
A. No, no. I'm not an expert in the field of

healthcare.

**Q. Okay. And so, you have offered no opinions about the soundness of Dr. Harrington's opinions as it relates to the field of medicine, correct?**

A. Correct. I'm not a medical professional. I can't put input on that.

**Q. Okay. Now, you said that one of the metrics you use to make determinations about reliability is whether or not there is probability sampling. Can you tell me, what is probability sampling?**

A. Probability sampling? Well, you want to -- you select a sample of your target population that represents the characteristics of the entire population, and the probability sample is selecting participants randomly, you know, in a way that everyone in that sample has an equal chance of being selected in the sample.

**Q. Is it your testimony that in order to be rendered reliably, a study of any type in any field must employ random sampling?**

MS. KINKADE: Form. Incomplete hypothetical.

A. Well, it depends on -- on -- on the purpose of the study. Some studies are just exploratory. They don't require random sampling. They -- they --

BY MS. GRADY:



**Q. Okay. So --**

A. -- they just want to explore a phenomenon.

**Q. Okay. So reliability does not depend on the presence or absence of random sampling, correct?**

MS. KINKADE: Form. Incomplete hypothetical.

A. It depends on the purpose of the study. But if the study wants to generalize to the entire population and random sampling is not applied, well, reliability of the study is not present.

BY MS. GRADY:

**Q. Okay. So it's your opinion, in the field of statistics, that in order to make a determination that results can be generalized to the entire population, random sampling must be employed; is that right?**

A. Well, a random sampling should be applied and other limit -- limitations should be noted there, you know, why they couldn't reach to the -- you know, they - - why they couldn't apply random sampling, you know. These -- these are -- this should also be noted as limitations of the study.

**Q. Okay. But sir, I'm not asking about whether it should be noted. So if it is noted about why random sampling cannot be done, then a study can be reliable, even if it generalizes to the whole population; is that right?**



MS. KINKADE: Form. Incomplete hypothetical.

A. Well, in -- in situations when -- where -- where we have evidence that the -- the sample is a biased one, we can say that the finding -- you know, the study is not reliably conducted, you know, as to if the -- the results can be generalized to the entire population.

BY MS. GRADY:

**Q. Okay. I just am asking a straightforward question, so let me just try and ask it in a different way so we can -- we can understand one another. If a study purports to generalize a finding to the entire population, is random sampling required?**

A. Yes, random sampling is required.

**Q. Okay. And that's within the field of statistics, correct?**

A. Well, it's related to the field of statistics, yes. The statisticians, you know, determine -- you know, those with knowledge of statistics determine whether this is done correctly.

**Q. Okay. One of the metrics that you testified you used to make a reliability determination is an assessment of the determination about the size of a sample. Can you tell me what that means?**

A. Well, it means that before a study, you need



to determine, you know, the size of the sample to ensure that you can obtain accurate estimates. You know, if -- if you study a very low number of samples, your -- your results may not be accurate. And if you study many samples, more than needed, you -- you waste time and -- and energy and money. So before a study conducted, to ensure the accuracy of the results, you need to perform a sample size determination.

**Q. Okay. And do you have any knowledge about whether or not that's possible in the adversarial system of a lawsuit?**

MS. KINKADE: Form. Foundation.

A. Well, I've not enough information to -- to determine sample size for this project, but for quantitative projects, qualitative projects, sample size usually is determined as long as no new information is added, you know. But they didn't do any informed decisions to determine the sample size.

BY MS. GRADY:

**Q. Okay. Do you have any information about limitations on being able to determine the size of the sample in advance in the context of a civil lawsuit?**

MS. KINKADE: Form. Foundation.

A. Again, it depends on -- on the design of this study. If it's quantitative or if it's qualitative, you

need the information about the size of the population or subpopulations. There are so many information need to be provided before determine -- deciding on -- on the size of the sample.

BY MS. GRADY:

**Q. Does the fact that there is an adversarial system and a judge that decides the size of the sample have any involvement in the determination as to whether the sample size is sufficient?**

MS. KINKADE: Form. Foundation. Misstates the law. Go ahead.

A. This is -- this depends on, you know, the problem you want to address in your -- in your research, and the -- the purpose, you know. As long as their decisions are related to -- to your problem, you know, to -- to your study and provide you information, you know, related to the determination of sample size, that may be useful, you know. Even determining sample size, you need to take into account factors. If they provide information on -- on those, well, we can use those information.

BY MS. GRADY:

**Q. Okay. So you agree limitations on the ability to choose the sample size would be highly relevant to whether or not the sample size is sufficient, correct?**



MS. KINKADE: Form. Incomplete hypothetical.

A. Can you rephrase your question, please? I --

BY MS. GRADY:

**Q. Are limitations on the author's ability to choose the sample size relevant to determining whether the sample size is sufficient?**

MS. KINKADE: Same objections.

A. Well, there always could be limitations, yes. You -- you need to have some prior knowledge before determining the sample size, so you might not have all those information, yes, that could -- you know, you -- you may -- you may not have those information.

BY MS. GRADY:

**Q. Did you have any information about what, if any, limitations were present to Dr. Harrington's ability to choose the sample size?**

A. Well, I just only reviewed his report, and in his report, he didn't discuss that.

**Q. Okay. So you have no information about what, if any, limitations are present that prevented Dr. Harrington from having more freedom of choice in the sample size?**

MS. KINKADE: Form.

A. I don't -- in his report, he didn't note any



limitations for choosing that sample size. That's -- that's the only material I reviewed.

BY MS. GRADY:

**Q. Did Counsel tell you anything about any limitations, one way or the other, on Dr. Harrington about choosing a sample size?**

MS. KINKADE: I'm going to object to asking about our communication. If you want to ask him if he relied on any facts, but you're just asking him generally about our communication, so I'm going to object to privilege and advise the witness not to answer.

MS. GRADY: Okay. That's well taken. Let me rephrase.

BY MS. GRADY:

**Q. Let me ask it this way: Did you -- did you rely on any facts given to you by Counsel in the course of any discussions you might have had?**

A. No. I just assessed whether they determine the sample size using a sound scientific method.

**Q. And when you say sound scientific method, a scientific method in what field?**

A. You know, an appropriate methodology, you know. Methodology isn't limited to any field.

**Q. Okay. So just abstractly, methodology that**



**you determined was sound; is that right?**

MS. KINKADE: Form. Misstates the testimony.

A. Well, for -- for every -- for each study, you might apply a different sample size calculation method. There is no -- you know, it -- it -- it -- it has to do with the choice of the researcher, the purpose of the study. You know, there's no definite answer to that.

BY MS. GRADY:

**Q. Okay. Well, tell me how you went about deciding one way or the other whether this sample size was sufficient.**

A. Well, I was not provided to determine if the samples -- you know, to determine the sample size for this study. What I -- what I'm saying is that he didn't justify the -- the size of the sample. He didn't provide any evidence, and, you know, there are no support that -- why this size -- this size -- the size of 12 was selected.

**Q. Okay. So the size of 12 might be sufficient. Your criticism meant that he didn't explain why it was that he chose 12; is that true?**

MS. KINKADE: Form.

A. I'm saying that he didn't explain why he selected this -- this -- this number of participants and justify his choice, you know. He -- he -- he didn't

provide any information.
BY MS. GRADY:
**Q. Okay. But you have no opinion as to whether or not, if explained, a sample size of 12 would be sufficient, right?**
MS. KINKADE: Form.
A. I -- I can't say that the sample size of 12 is sufficient or not. I'm saying that he did not justify it, you know. It's -- to be able to obtain robust findings, you need to, you know, justify it. When it's not --
BY MS. GRADY:
**Q. And that --**
A. -- justified, you may -- the -- the results may not be reliable.
**Q. Okay. May not be reliable. So is the critique that you have, that's because in the academic research that you've conducted, you provide explanations about the choice of sample size; is that right?**
MS. KINKADE: Form.
A. I consult -- I consult clients with the choice of sample size.
BY MS. GRADY:
**Q. Okay. So you don't actually do the writing about the justification of sample size; is that right?**



A. Well, I apply power analysis to -- you know, to calculate sample sizes that are scientifically supported, you know. I -- I provide support for, you know, why I decide on this size of sample.
**Q. Okay. In your work, do you actually conduct studies, or do you just advise about how the study should be set up?**
A. But for quantitative data analysis, sample size, you know, I -- I -- I -- I do these parts and -- but for -- you know, for the methodology, I -- I both advise, and I -- I -- I also conduct some parts of them.
**Q. Okay. Have you ever conducted a study from start to finish on your -- like, yourself doing it?**
A. No, I don't do that. I -- it was only my master's -- master's thesis, my own study.
**Q. Okay. And what was that -- what was that study?**
A. Well, it was about numerical methods in finance, you know, to calculating -- you know, to determine option pricing.
**Q. Is that a fair amount of the type of work you work on now, doing financing analyses?**
A. You mean -- sorry, can you rephrase your question? I didn't get it right.
**Q. Yeah. Do you do financing analysis as part of**



**your work with Precision Consulting?**
A. I do, but -- you know, for time series analysis, yes, sometimes of analysis, I do that, yes.
**Q. Did you say timeshare analysis?**
A. No. Times series panel -- panel -- panel data, you know, sometimes of analysis related to finance, yeah.
**Q. Okay. Is that a majority of your work with Precision Consulting?**
A. Sorry. I -- I couldn't hear you well.
**Q. Is that a majority of your work with Precision Consulting?**
A. No. Financing, no. It's -- it's a -- a very small amount of my work.
**Q. Okay. All right. So one of the other metrics you described -- well, strike that. You did not set out any opinion about the appropriate sample size as regards the study that Dr. Harrington did, correct?**
MS. KINKADE: -- evidence.
A. I didn't -- I didn't suggest how to determine the sample size. I only -- my opinion was that he did not provide any information, you know. He did not justify the choice of the sample. I did not give opinions on how to calculate the size of the sample.
**Q. And you didn't offer any opinion about what**



**the appropriate sample size would be, right?**
A. Well, when I don't have information about -- about this case, I can't, you know, give opinions about how to determine the sample size.
**Q. And what additional information would you need in order to give an opinion about the sufficient sample size?**
A. This information would be, you know, the purpose of this study, the population, the variability in the data, the confident -- confidence level we want to achieve, and other -- you know, even if we are going to study -- if we are going to perform statistical analysis, you know, for each analysis, we want to -- we -- we may perform a different sample size calculation method, and there could be many information to take into account.
**Q. Did you ask for any of that information to be provided to you?**
MS. KINKADE: Form.
A. I was not provided information to do this calculations.
BY MS. GRADY:
**Q. Did you ask for that information?**
A. No, I didn't.
**Q. One of the other metrics you said is that**

**you look for support for causality. As a statistician, you don't make causality determinations, correct?**

A. Correct. Yes.

**Q. And you don't have any expertise in how to go about making causality determinations, correct?**

A. Correct. I don't do causality analysis.

**Q. Okay. You also said one of the metrics you look at in determining reliability is how the samples were correlated. Do you recall talking about that?**

A. Well, in his report, Dr. Harrington, you know, made them -- conclusions about the -- about Wexford's -- Wexford's practices, but, you know, to -- to -- to make such conclusions, he did not explain -- you know, provide support how the different samples shared were correlated with each other, you know, how a pattern was present in -- in the 12 samples he reviewed. By correlation, I mean, how a trend was present in these samples.

**Q. Okay. What more would you look for to find that there was a discussion of correlation?**

MS. KINKADE: Form.

A. Well, he -- I mean, his report lacks sufficiency as to whether the samples were correlated, you know. No information was provided to do that. I can't determine --



BY MS. GRADY:

**Q. Okay. Well, tell me what's missing.**

A. What the --

MS. KINKADE: Could you repeat that question?

BY MS. GRADY:

**Q. I'm sorry.**

MS. KINKADE: Sorry.

BY MS. GRADY:

**Q. I said, okay -- yeah. I said, okay. Well, tell me what's missing.**

A. What would be appropriate would be to identify, you know, some similarities across these cases and, you know, establish causality, you know, how these -- these cause to the patient's deaths, and, you know, show that this was present across the cases, you know, how -- and at the same time, establish causality.

**Q. Right. But we're talking about correlation, not causality, right? Those are two different concepts, right?**

A. Well, by correlation, I mean, you know, a -- a trend that is present between the -- the -- the patients, you know. If similar causality is present between the patients, we can say that there -- you know, that there is some sort of correlation. You know, they -- they -- they -- they exhibit similar patterns.



By correlation -- by correlation, I mean that.

**Q. Okay. Let's go back to page -- to Exhibit 4. You see I'm on page -- let's go back up. You see on page 48, there's a section entitled, "Why did these deaths occur in the manner in which they occurred?"**

A. Yes, I can see that.

**Q. And this whole section is dedicated to discussing the correlation of the care of these patients?**

MS. KINKADE: Argumentative.

BY MS. GRADY:

**Q. Right?**

A. Well, what I said about causality, you know, the causality is missing, the missing element here, you know. He -- he didn't establish causality between the -- the -- the identified problems and patient's deaths. So these, you know, correlations, they may not be accurate, if causality is not established.

**Q. Okay. But we already established that you're not an expert in causality, so I want to -- I want to focus on the correlation piece. You agree that this section of the report, beginning on page 48, all the way through to page 55, is dedicated to a discussion of correlation between the patients, correct?**

MS. KINKADE: Asked and answered.



Argumentative.

A. Well, I reviewed patients -- you know, the reviews for -- for the patients. I did not review this in detail. I can't give you definite answers. You know, I may --

BY MS. GRADY:

**Q. Okay. You didn't review this report in detail before forming an opinion that it was unreliable?**

A. No. I mean, I didn't review it before --

MS. KINKADE: Misstates his testimony.

A. I didn't review this before this meeting, you know. I -- I need to refresh my memory before -- you know, before giving a definite answer to your question.

BY MS. GRADY:

**Q. Okay. I'd be happy to provide you that time. Let's -- would you like to start at page 40 -- at the bottom of page 48?**

A. Yes.

**Q. Let me know when you'd like me to scroll down.**

A. Can you scroll down a bit to the second page? Oh, yeah, yeah. This can be said to be some similarities between the cases, but there are two issues here. One is that we can't -- you know, I'm not the expert in causality, but he did not, you know, establish how these led to the patient's deaths. This is one

issue. The other issue is that -- yeah, but they might be -- he did not explain how these are practices, and -- you know, Wexford practices and how they can be related to Wexford, you know. They might be just practitioners errors, you know. This is one other thing to consider.

**Q. Okay. But you agree that this section is dedicated to discussing correlations between the patients, right?**

MS. KINKADE: Asked and answered.

A. Well, based on this information, I can see that these are some similarities between the cases, but this does not lead to the conclusion that, you know, it can be generalized to the entire population.

BY MS. GRADY:

**Q. Okay. My question was just a simple one, though: You agree that that section was dedicated to a discussion of correlations between the patients?**

MS. KINKADE: Asked and answered.

A. Based on the page you showed me, yes, this -- this seems to be correlations.

BY MS. GRADY:

**Q. Okay. The next metric you said that you used to determine the reliability of a study is setting out the standards that are being provided for conclusions;**



**is that right?**

A. Standards for conclusions in the sample? Sorry.

**Q. Yeah, I -- what I have written, when I was asking you earlier about the metrics you use to make reliability determinations, is that you mentioned standards he provided for his conclusions. Is that a metric that you use to make reliability determinations about a study?**

A. Well, to assess whether a study was reliably conducted, yeah, we need to see how the participants were included in this study. Yes.

**Q. Okay. So that's just about selecting the sample size and the selection of the individuals who are included within the sample; is that right?**

A. The size and how they were selected, yes.

**Q. Okay. Now, you've never done an assessment of the reliability of a completed study before this one, true?**

A. Well, I don't -- I haven't critiqued the reliability. You know, I haven't been given the task to critique the reliability of the study, but I -- I -- I -- I do methodology, you know, and help clients with different aspects of their study to ensure that they --



**Q. Okay --**

A. -- their study leads to reliable findings.

**Q. But you've never reviewed a completed study to form an opinion one way or the other about whether it's reliable, correct?**

A. Yeah, correct.

**Q. Okay. Now, can you tell me whether, when you came -- when you reviewed Dr. Herrington's report, you were coming to it with a goal to find it unreliable, as opposed to a goal to determine one way or the other, without a thumb on the scale, about whether it was reliable?**

A. Well, I -- I studied the report to, you know, based on -- I applied the -- my past experience to see, you know, how it fit with my, you know, with my knowledge, with my expertise. I tried to compare the study against my expertise and see if -- if it makes -- if it's a sound study. But, you know, after reviewing it, I found that there are many elements missing.

**Q. Wait, but my question was different, sir. It was whether you came to it, you know, with, I'm just -- I'm just looking one way or the other, I'm not pre-judging, or did you come to it looking for a way to find that it was unreliable?**



A. Well -- well, I -- I looked at it from, you know, how -- how should I put this? I was given the task to see if -- if -- if it's -- well, it was done reliably, you know, if I can --and make sure that if it's done reliable, you know. But this was my task, and -- and I reviewed it, and I can't -- I can't support this work because, you know, if -- if they -- they told me to -- to support me. If -- if it's done reliably, I -- I can't provide supports, you know. I -- I -- my task was just review it. I -- I -- I reviewed it objectively. You know, if -- if I didn't -- couldn't find any failures, I would simply tell them that this is done correctly. I can't criticize it.

**Q. Okay. Let's go back to your report of Dr. Herrington's work. You note here that the report uses the epidemiological triangle as a framework. You see where you've noted that in your report?**

A. Yes, I do.

**Q. Now, you don't have any familiarity with the epidemiological triangle, right?**

A. Yes. This is my first time, but I -- I assessed this model, see. I assessed how we fitted the -- the observations.

**Q. And you don't have any training in epidemiology, true?**

A. That's true. Yes.

**Q. Okay. You're not an expert on whether the epidemiological triangle is a well-accepted way to adjudicate various metrics within the field of epidemiology, correct?**

A. Yes. This is my first time applying it, assessing epidemiological triangle. Yes.

**Q. Okay. In the next paragraph, you say, "We are not assessing whether the medical opinions are sound"; do you see that?**

A. Yes.

**Q. And you don't have any basis to assess whether Dr. Herrington's opinions about the adequacy of medical care was sound, correct?**

THE REPORTER: Did someone object? I'm sorry.

A. I mean --

THE REPORTER: I couldn't quite hear that.

MS. KINKADE: I did. Asked and answered.

THE REPORTER: Thanks.

A. I'm not assessing if his medical opinions are correct, you know. That's what I'm saying.

BY MS. GRADY:

**Q. Okay. But I'm just confirming. You don't have the ability to determine whether his opinions about adequacy of care are correct or incorrect, right?**



A. Well, adequacy of care is his final conclusion, you know. This -- since this is a part of the study, I -- I can't give opinions as to whether appropriate methodology was applied, you know. That, I can't give opinion on.

**Q. All right. Well, let's go -- let's turn back to his report, then, just so we're clear. Let's go to the very first patient. This gives a discussion of the patient's records that Dr. Herrington reviewed. And just to confirm, you didn't review any of the records that Dr. Herrington reviewed, correct?**

A. I -- I reviewed this document.

**Q. Right. But you didn't review any of the records?**

A. No, I know -- the others, maybe the, you know, the -- I -- I -- I reviewed the -- the spreadsheets.

**Q. Okay. And you reviewed the portion of Dr. Herrington's report where he criticizes various actions and inactions taken by medical and mental health staff with regard to Mr. Curtis, correct?**

A. Yeah, I reviewed them.

**Q. Yeah. And you are not qualified to offer any opinions about whether that's 100 percent right on, or totally incorrect, right?**

A. Well, on the standards, the -- the practices



of medical care, I can't give opinions because not I'm not a professional -- medical professional.

**Q. Okay. And so, then continuing down on the -- beyond the discussion, Dr. Herrington notes that -- hold on. Strike that. Dr. Herrington, on page 19, notes things he identifies as inadequacies in treatment, correct?**

A. Just, you know, since I -- I haven't reviewed this for a while, I need to review it. I can't give opinions about NCCHC standards, you know. I -- I -- I'm not -- it -- it's beyond my scope of expertise.

**Q. Okay. You can neither -- you can't offer any opinions about any of these identified inadequacies in treatment, true?**

A. Just let me see a second.

**Q. Sure.**

A. Well, I can't give opinions on the medical aspect of this case.

**Q. Okay. So it's true that you cannot opine about the truthfulness of any of -- strike that. You cannot opine about the accuracy of any of the opinions that are laid out here on pages 19 to 20, under the section, Identified Inadequacies of Treatment, correct?**

MS. KINKADE: Misstates the evidence.

A. Well, the only opinion I can give is whether



he considered all the factors, you know, that led to the -- to the -- to the patient's deterioration or patient's death, you know. Whether he provide -- he -- he included the -- all -- he assessed all the factors, you know, all the explanations that led to the patient's death, not based on -- on -- on a single identified cause.

BY MS. GRADY:

**Q. Well, I'm not sure I understand that answer. Let me go through it with specificity. You see here that Dr. Herrington opines that Mr. Curtis' psychiatric medications expired and were not renewed in a manner that was not under a medical practitioner's supervision is inadequate care?**

A. Well, you know, when he says that it was not renewed in a manner that was not under a medical practitioner's supervision, you know, here, I would like to -- him to refer to a standard, you know, or -- or, you know, provide the support for this claim.

**Q. Okay. Sir, I'm just asking whether you see those words printed on the page that is on your screen. Do you see those words as I've just read them?**

A. Yes, I can see them.

**Q. What qualifications do you have to evaluate whether or not that statement is true or false?**

A. Well, I don't have any qualifications to say if they are correct or false. I -- I can't say -- I can determine whether support was provided, you know. I'm saying that they -- he did not support this. He did not refer to any documents. He did not refer to any resources.

**Q. You don't refer to any documents or any other resources in your report?**

MS. KINKADE: Argumentative.

BY MS. GRADY:

**Q. Right?**

A. Well, I -- I explained everything in detail, you know. I said that how they were not scientifically sound. I did not --

**Q. Okay. Dr. Herrington's -- go ahead.**

A. You know, I did not make any claims in my report in a way, you know, to -- to make -- I just assessed whether the different elements were present.

**Q. Is it your testimony that you don't express any opinions in your report?**

A. No, I'm not saying -- I'm not -- I -- I didn't provide opinions. You know, I -- I didn't provide opinions about medical care, you know. I -- I -- I provided -- what I'm saying is that he didn't refer to any standards. That's -- you know, in my report, I said



that he didn't provide any standards, any -- any criteria, and that's what I was saying in my report, you know. You wouldn't cite that -- you know, you need a standard to make your claims.

**Q. In what field? In what field do you need a standard for any claim you make?**

A. Well, he is clearly making conclusions. So in any field, you -- you -- you want to make -- you know, come from an observation to a -- a conclusion, you know. You -- you need -- you know, to make it, to support it, you know, you need to -- to use either some standards, some resources, you know, or you have to justify your claim. That's what I'm saying.

**Q. Okay. Let's go back to Exhibit 2. Can you point me anywhere in your report, where you come to several conclusions, that you reference a single standard?**

MS. KINKADE: Argumentative.

A. Well, just let me review my reports. You know, I am saying that he didn't provide, you know, he didn't discuss how and why sampling was provided. I -- I just am saying he didn't provide -- you know, he didn't discuss how probability sampling was performed, how he took into account many -- the factors that -- that led to the outcome. This is my criticism,



you know. I -- I did this in critique.

BY MS. GRADY:

**Q. Okay. That wasn't my question, sir. So let me ask it again: Can you point me to anywhere in your report where you reference a single standard in support of the conclusions that you have reached?**

MS. KINKADE: Argumentative. Asked and answered.

A. Well, there are no references in my report, but -- well, my -- my report was to, you know, assess some of the answers and to see how it fitted into a sound scientific study.

BY MS. GRADY:

**Q. Okay. So you agree with me that your report here reaches conclusions, correct?**

A. It -- it's not conclusions. You know, it -- it's just assessing how Dr. Herrington did his study.

**Q. And you concluded that Dr. Herrington's study was unreliable, right?**

A. I concluded that the different elements of this study were not valid. Yes.

**Q. Okay. So you just said that in order to be reliable, a study that makes conclusions has to provide standards for those conclusions. So where are your**



**standards to support your conclusions, sir?**

A. So since -- since I'm the -- you know, I have lots of experience doing this, you know, it -- it makes sense to me, you know. You know, there are many other sources, you know, about probability sampling, methodology, you know. It's -- these are common practices, you know, not something that I -- I can obtain from a single source, and these --

**Q. Okay.**

A. -- things that I provided are common practices.

**Q. Okay. So you relied on your knowledge and experience as a statistician to reach your conclusions in your report, correct?**

A. Well, not only my knowledge and experience, you know. In -- in the meantime, I did, also, some research. I relied also on my research. But for these elements of methodology, yes, these are common practices. I relied on my experience and knowledge.

**Q. What research did you rely on?**

A. Well, you know, in addition to my knowledge and experience, you mean that?

**Q. No. You just told me -- I asked you whether you relied on your knowledge and experience. And you said, I also conducted research that I relied on. So**

**what research did you conduct that you relied on?**
A. Well, you know, for -- for the -- for example, for the epidemiological triangle, you know, I did some research about this, how this model is applied, and for -- you know, for the causality issues, you know, I -- I did some research, whether they identified the -- identified problems that can be the only -- you know, there are no other alternatives to cause the patients' deaths. And there, I did some research too, you know, to -- to see if there are other alternatives for the identified problems.
**Q. Okay. Let me understand your testimony on the causation piece. Is it your testimony that you did original research into whether the problems Dr. Herrington testified -- set out in his report were explainable by alternative events?**
A. Yes. The conclusions he made, I just assessed whether they are -- they could be the only explanations, yes.
**Q. Okay. What did you -- where did you go to conduct this research? What did you reference?**
A. Well, I provided them as examples, you know, to explain that the causality, you know, to -- to -- to challenge causality. You know, since the causality was, you know, was not well-established, I -- I -- I did some



research to see if causality can really -- you know, if there could be other explanations. Well --
**Q. Okay.**
A. -- there are so many materials that I reviewed, but I maybe can show them, some of them, you know, in a later -- you know, in either a break or a next session, because there were so many materials I reviewed.
**Q. Okay. Well, sir, there --**
A. I just --
**Q. Go ahead.**
A. I just provided them. I -- I didn't provide them as a -- as a medical professional, you know. I just provided them to -- to -- as examples to show that the causality, you know, was not well-established. That was my point, you know, from causality.
**Q. Did you provide the --**
A. Yes.
**Q. Did you provide them to the client?**
A. No, I didn't.
**Q. Okay. Well, sir, I mean, I'm sure you're not aware of this, but the federal rules, which dictate cases here, require you to include a discussion of any research that you relied on. So the time to do that is -- was -- is -- has passed, but certainly is not any**



**longer. So if there is research that you conducted, that you relied on in coming to your findings, I'm entitled to know what it is.**
A. Well, since -- since there are so many documents, you know, it's -- it's really difficult to find them now, but it -- this research, it has to do with causality part, you know. There are many elements of the study that are missing. This -- the research I did was just, you know, to assess whether causality was well-established.
**Q. Okay. We will take whatever time we need. I want to know what research you conducted, that you relied on, in coming to your findings here. Should we go off the record to give you that time?**
MS. KINKADE: Sure.
A. Well, we can. Yes.
THE REPORTER: Okay. We're going off the record. The time is 11:47 p.m. -- a.m. Sorry.
(OFF THE RECORD)
THE REPORTER: Back on the record. The deposition of Moein Heidari, being conducted by videoconference. My name is Esther Heath. It's September 29th, and the time is 12:04 p.m.
BY MS. GRADY:
**Q. Okay. Mr. Heidari, have you had an**



**opportunity to locate the research that you relied on in reaching your conclusions in this case?**
A. Yes, I -- I -- I found some information.
**Q. Okay. Tell me what research you reviewed in reaching your conclusions in this case.**
A. Well, one of the most -- one of the documents I relied heavily on was Dr. Herrington's deposition itself, you know. I have referred to it throughout the document, you know. Since you were discussing causality, you know, I -- I -- I -- I referred to the deposition, how causality was not present and how he did not --
**Q. Okay.**
A. -- consider many factors into account in his deposition.
**Q. Okay. Let's look back at Exhibit 2. Now, we have your list of materials that you reviewed here. Do you see that on your screen, sir?**
A. Yes.
**Q. Okay. So are there any materials that are not included in this list that you reviewed as part of the research that you relied on in reaching your conclusions in this case?**
A. Well, these are the main ones. I mean, there might be some very minor ones that, you know, just gave

me idea, but I don't think they -- I've included them.
**Q. Okay. What are they?**
A. Well, you know, I just, you know, get better ideas about, for example, the epidemiological triangle model, for example, you know, about these models, about the diseases mentioned, you know. I just -- just get a better idea, not to, you know, discuss them, you know, but -- and provide the medical opinions on.
**Q. Okay. So the materials you reviewed on the epidemiological triangle, you did not rely on any of those in reaching any conclusions in your report; is that correct?**
A. Well, I only identify that the epidemiological triangle has different elements and I -- I looked for the element, you know. In -- in my conclusion, I -- I only stated that whether the elements were present in -- in the study. I only did that, you know. I did -- I did an assessment of this model.
**Q. Okay.**
A. I did not --
**Q. Did you rely on that -- go ahead.**
A. I only -- I only assessed whether the elements were present, you know, how whether they were -- they interacted with each other, and I didn't provide any further information in the report.



**Q. I know you did not provide any further information in the report. What I'm asking is whether you relied on any of those materials you reviewed on the epidemiological triangle to reach any conclusions in your report?**
A. No, just the -- the definition of the model, how it works. And I didn't rely on those information, no.
**Q. Okay. Any other research that you conducted or materials you referenced in preparing this report that are not listed on the section of your report marked, Records Reviewed?**
A. As I mentioned before, I had to review many different stuff, you know, to -- to familiar with myself about these -- you know, these claims that Dr. Herrington made. But I don't remember including anything specifically in -- in the report. Just --
**Q. I agree you did not include it in the report. I'm asking whether you referenced anything else.**
A. No, I haven't referenced anything else.
**Q. Okay. So when you said earlier, before our break, that you relied on research exploring other alternatives for the issues that Dr. Herrington relied on, that research was based on your review of these materials that we see under the section Records**



**Reviewed; is that right?**
A. Yeah. Mostly, Dr. Herrington's deposition transcript. Yes. But I -- I -- you know, about the -- the diseases, I -- I -- I needed to -- you know, to familiarize myself with them, you know, to -- to -- to be -- be able to better read the transcript of the deposition, you know. It -- it was just medical. It was -- I just reviewed them to get a better sense.
**Q. So you did conduct outside research into the various diseases that came at issue in these patients' care; is that right?**
A. Not that I include them in this. Or I just -- to -- to familiar with myself with the -- the diseases.
**Q. How did you go about researching the diseases?**
A. Well, you know, I -- I read -- for example, I -- I read -- I just make some -- general research, you know. It's about causality, only, you know. I did some general research to -- to just familiarize myself, you know, not that, you know, reference them to -- in this report or -- or -- or influence my opinion, just to, you know, familiarize myself, because given the complexity of this project, and there's so many diseases listed in this report. Since I --
**Q. Okay.**
A. That could be, you know --



**Q. Did you -- go ahead.**
A. Due to my -- my curiosity and -- and to be able to, you know, better read these, you know, statements made in the -- in the report.
**Q. And that general research was relevant to your preparation of the report, so you could become familiar with those diseases; is that right?**
A. Yes, and to -- could be to be familiar -- to familiarize myself. But they didn't have any impact on my opinion on the findings, you know. I just, you know, general research.
**Q. Did you -- do you use Google? So if I were to ask you whether you Googled them, would you know what I mean?**
A. I know what you mean, but, you know, I -- I -- just different sources, like, you know, World Health Organization, like different articles I had, just to familiarize myself, but they had no impact on my decisions regarding the analysis, the sampling, and causality analysis.
**Q. Did you keep any list of which articles you reviewed or which sections from the World Health Organization website you looked at?**
A. Well, I don't -- I mean, I just reviewed them to familiarize myself, not that -- you know, to

influence my opinions on this matter.
**Q. I'm asking you a different question, sir. I'm asking whether you kept any list of what you did look at?**
A. I did not, since it was just to familiarize myself.
**Q. Okay. Let's turn to the section of your report where you start talking about individual patients. So we looked at Dr. Herrington's report for Patient 1, and now we're looking at your report on -- starting on page 9, where you review Patient 1, correct?**
A. This is for Patient 1. Yes. Correct.
**Q. And you reviewed your report in preparation for this deposition, correct?**
A. Yes, I did.
**Q. Okay. So you are not offering any opinion about whether or not Dr. Herrington is correct in his opinions about the adequacy of care, correct?**
A. Yeah. Well, adequacy of care is his final conclusion, you know, and to arrive at that conclusion, you -- you need to follow the methodology, you know. I -- I can give input on that, as long as it concerns the -- the -- the different elements of methodology.
**Q. You've never before endeavored to devise a**



**study to assess adequacy of care, right?**
A. No, I have not.
**Q. And did you receive any training through your education, you know, your studies about how to design a study to assess adequacy of care?**
A. No.
**Q. Okay. So what basis do you have to offer any sort of an opinion about what to do in order to assess adequacy of care?**
MS. KINKADE: Asked and answered, argumentative. Go ahead.
A. Well, I assessed, you know, what was related to my expertise, you know. Since every study -- you know, in many different fields, I don't have experience in -- in those fields, but I -- I can offer -- I -- I assist them with their methodology, their analysis. You know, even though I'm not an expert, for example, in economic, but I -- I can, you know, assist with different elements of -- of their studies. You know. For social sciences, I can assist with different elements. The same is here. You know, I -- I did the sampling aspect, the methodology aspect of this -- evaluated these aspects of the project. I -- and how that was done, you know, not -- I did not give any input about quality of care here. I just -- it was about my



area of expertise.
BY MS. GRADY:
**Q. Okay. So you did not offer any opinions about Doctor -- strike that. You are not qualified to offer any opinions about whether Dr. Herrington's opinions that care provided to Patient 1 was inadequate, correct?**
MS. KINKADE: Misstates his testimony, argumentative, asked and answered.
A. Well, I -- I see the general picture, you know, if -- how he did his study.
BY MS. GRADY:
**Q. Okay. Well, he's -- strike that. Let me move on. You note that Dr. Herrington has offered an opinion that Wexford's failure to obtain prior mental health and psychiatric records from Chester Mental Health Center is inconsistent with NCCHC standards and constitutes inadequate care. You see where you note that in your report?**
A. Yes.
**Q. Now, that -- that's --**
A. Yeah. As I mentioned --
**Q. Do you see where -- Mr. Heidari, I just asked whether you see where you've noted that in your report. Do you see the words on the page?**
A. Yes, I can see that.



**Q. Okay. You agree with me that that quoted statement expressly references standards?**
A. Well, as you can see my statement, I said that he failed to -- you know, to provide support that this criticism is connected to the cause of death. You know, that's -- that's my input. That's what I said.
**Q. Okay. But that statement that -- as I just read, it did not say anything about the cause of death. It references an opinion about inadequate care due to failure to obtain prior mental health and psychiatric records and expressly references standards, true?**
MS. KINKADE: Asked and answered, and argumentative.
A. Well, let me review it briefly. Well -- well, I -- I assisted as is -- as how it was related to -- to the -- to the patient's death.
BY MS. GRADY:
**Q. Okay. So you did not offer and are not qualified to offer an opinion about whether that statement is correct, right?**
MS. KINKADE: Argumentative.
A. Well, I can provide insight as to whether it is consistent with the -- the standards, you know, whether it -- this is with the -- with this standard or not, NCCHC standard.

BY MS. GRADY:

**Q. What is the NCCHC?**

A. Well, I did not -- you know, I don't recall what it -- what it refers to. You know, this is a very long report. Since I'm not assessing whether this is related to a standard, you know, I -- I -- I'm assessing whether, you know, this is -- whether he -- he provides support that this is connected to the cause of death.

**Q. Okay. Sir, that wasn't my question. I asked you: What is NCCHC?**

MS. KINKADE: Asked and answered.

A. I don't recall, as this is, you know, a very long report. You know, I -- I remember reading about it, but I just -- I don't remember this right now.

BY MS. GRADY:

**Q. Was it with that outside research that you did?**

A. I might have -- I think I have -- you know, did some research about this too, but, you know, I just don't remember. This is, you know, a very long report.

**Q. So this is your report, sir.**

A. I don't -- no, I -- I cited -- you know, I specifically cited this from the -- from the -- the Herrington's report, but I -- I didn't discuss this standard. You know, I -- I -- I said -- I -- I



said -- I said he didn't provide support for causality.

**Q. You see Dr. Herrington repeatedly references NCCHC standards, correct?**

A. Correct. Yes.

**Q. Okay. And have you ever become familiar with what that acronym stands for?**

A. Well, I remember since I -- I did this in detail two to three months ago, but, you know, I don't remember what this stands for. You know, I'm not a medical professional. I am statistics -- a statistician who assesses the elements of the methodology and the analysis.

**Q. Right. But you've testified that one of the important things you consider in assessing the methodology is whether there's been a reference made to standards. So this is a reference to standards, correct?**

MS. KINKADE: Argumentative. Asked and answered.

A. So I did not reference this. You know, I -- I provided -- I -- I quoted -- just quoted this from the original report.

BY MS. GRADY:

**Q. I appreciate that, sir. But again, I just want -- let me just focus very, very specifically on**



**what I'm -- what I'm asking. Did you do outside research into what the NCCHC stands for?**

A. Yes, I did. And that was two to three months ago. I don't recall, you know, what it stands for.

**Q. Okay. I'll tell you it stands for the National Commission on Correctional Healthcare.**

A. Yes.

**Q. Did you review any standards from the NCCHC?**

A. The standards for healthcare -- well, correctional healthcare, there was a document, you know, but I -- I didn't need to -- to -- to review these standards. You know, this is not related to my scope of practice in this -- you know, in this case. I didn't need to do this. You know, I -- I just wanted to see if they -- they -- they use the appropriate sampling methodology. You know, I didn't need to get myself familiarized with this. But -- but I did so --

**Q. Okay.**

A. But I -- I don't remember it right now.

**Q. Wait, so you did look at standards?**

A. Well, back then, I was reviewing so many documents. You know, just this was -- you know, to have a good view about everything, you know, but just for now, for today's preparation, I reviewed my reports and

**Q. Okay. I'm asking whether, as part of your of**



**your preparation of your report, you reviewed any NCCHC standards?**

MS. KINKADE: Asked and answered.

A. Well, I don't remember, because I didn't need to, you know, review them in detail.

BY MS. GRADY:

**Q. Okay. Relying on standards is something that allows the study to be reliable, right?**

MS. KINKADE: Incomplete hypothetical.

A. Well, what I discussed in my report is that, you know, he didn't provide evidence that -- he didn't discuss whether he used any standards to make conclusions, you know. But I didn't, you know, assess the -- the standards to see whether he -- his claims are valid. The -- this is not -- this was not my role of -- role in this project. You know, I -- I had to inspect it from a different aspect.

BY MS. GRADY:

**Q. Okay. You agree with me that you are unqualified to offer any opinion as to whether or not it is true that Wexford's failure to obtain prior mental health and psychiatric records from Chester Mental Health Center is inconsistent with NCCHC standards and constitutes inadequate care?**

A. Just let me review. I can't give such

Page 158

opinions. I'm not an -- a medical expert, yeah.
**Q. Okay. You say here, "This statement does not take into account Dr. Herrington's own finding that the records were obtained, the history was noted, and treatment was provided prior to death"; do you see that?**
A. Yes.
**Q. And where did you find evidence that records were obtained, history was noted, and treatment was provided prior to death?**
A. Well, this -- this must be based on his previous statements.
**Q. Okay. So that's solely based on the statements in Dr. Herrington's report?**
A. Yeah, that's true. Let's see.
**Q. Okay. Now, you next state -- let's strike that. How does the fact that records were obtained play into a qualitative analysis as to whether adequate care was provided?**
A. Well, it -- this is through causality analysis. I -- I -- I mentioned that this is not related to -- you know, he -- he does not establish a -- a -- a causal link here. This is what I'm discussing.
**Q. Okay. And so, your reference to this sentence here is based on the fact that Dr. Herrington is noting**

Page 159

**and taking account of the fact that records were obtained, history was noted, and treatment was provided prior to death, correct?**
A. Well, it must be either based on the -- the test and the -- his proposition or either the -- the statements he made in the report. Yeah.
**Q. Okay. So this isn't -- is this an opinion you're expressing?**
A. Well, I -- I mean that he -- he -- he doesn't consider them, you know. They may be, you know --
**Q. How do you know?**
A. I'm just giving examples. You know, I'm giving that -- you know, how did he come to the conclusion when he doesn't mention any -- any -- any of the -- you know, the issue, any of these factors?
**Q. He does --**
A. He does not --
**Q. -- discuss those factors, as you identify in your report, when you say Dr. Herrington's own finding, right?**
A. Yeah. But for his --
MS. KINKADE: Hold on. Argumentative. Misstates his testimony. Vague and confusing. Go ahead.
A. I mean, he -- he discusses them in his report

Page 160

or -- or -- or -- or either in his deposition, but he -- when he makes a conclusion about it -- about -- about the patient's death, he doesn't -- he doesn't seem to take into account these factors.
BY MS. GRADY:
**Q. And what leads you to say that?**
A. What I'm saying is that he -- he does not mention how -- well, he makes conclusions that does not take into account this information that he provided.
**Q. What makes you say that?**
A. Well, what makes me say that -- say that is that when make a conclusion, how could you, you know, rule out some of the possibilities? You know, you just make an observation and make a conclusion. He -- he -- he -- based on -- he simply jumps to the conclusion based on an observation. He didn't take into account these factors.
**Q. Okay. But you agree he discusses these factors?**
MS. KINKADE: Vague. Argumentative.
A. Well, what I'm saying is that he at least did not rule out the possibility that this -- these factors did not contribute to -- to the outcome, you know, which is the -- the death.
BY MS. GRADY:

Page 161

**Q. Okay. Is it your -- is it your testimony that Dr. Herrington cannot reach any opinions about a cause of death unless he rules out any possible additional or alternative factors?**
A. No. I mean, he -- he is -- he just jumps to the conclusion. What I'm saying is that he jumps to the conclusion and does not discuss anything. You know, this -- what I'm saying here is just an example. You know, he could do that many different ways, but he does not provide any analysis. He does not follow any methodology. He just makes conclusions. That's my point here.
**Q. I really honestly don't understand what you're talking about when you say he doesn't provide any analysis. He -- on Patient 1, he provides -- he provides 10 pages of analysis about the course of the patient's treatment before he offers opinions about the inadequacies of the treatment that he's detailed.**
MS. KINKADE: Argumentative. That's not even a question. Are we talking about Patient 1 or the other patient?
MS. GRADY: We're talking about Patient 1.
BY MS. GRADY:
**Q. This is 10 pages, you agree with me, 10 pages of discussion about Patient 1's care?**

A. Well, there are many -- you know, these are observations that he made, but, you know, the link from the observations to the cause of -- to -- to death, what I'm saying is that it's not established well. This is what I'm saying.

**Q. Okay. And what additional -- what things need to be present for him to make that link?**

A. Well, I'm not a medical professional to give input on that, but I'm saying that his analysis seemed insufficient to me.

**Q. Okay. So you're not qualified to tell -- opine what would be sufficient; is that right?**

MS. KINKADE: Vague.

A. Well, I -- I found this to be, you know, unclear to me, you know. I found this to be jump to -- to -- to simply jump from an observation to the conclusion. And there -- there was nothing in the middle, no, you know -- to at least -- if I'm not qualified to do this, you know, there is no analysis present to show that. I -- what I mean is that he -- he -- he doesn't provide any analysis, you know.

BY MS. GRADY:

**Q. But are you qualified to opine on what would be required to make conclusions?**

A. There -- there at least needs to be some sort



of a well-established analysis, you know, such as root cause -- root cause analysis, how this analysis was performed to arrive at the conclusion. What I'm saying is that there is an absence of an analysis here and a well-established analysis. An example would be with cause analysis.

**Q. Okay. You agree there's 10 pages of discussion analyzing Mr. Curtis' care, correct?**

A. Well, these are some observations. And since it is 10 pages doesn't mean that this is a valid analysis, you know, leading to a valid conclusion.

**Q. Okay. What needs to be present in order for Dr. Herrington to make the conclusions from his observations?**

A. Well, I'm not a professional to put input on that. I'm saying that he does not provide anything -- you know, any valid analysis to make a conclusion here.

**Q. Okay. And you can't provide me any metrics by which you determine whether or not a patient -- strike that. You don't -- you don't have knowledge of any metrics by which you determine whether or not a medical doctor's observations are sufficient to allow them to make conclusions about adequacy of care, true?**

MS. KINKADE: Form. Foundation. Misstates his testimony.



A. Well, I mean, an example would be root cause analysis, you know, one analysis to arrive at this conclusion. And I -- and I don't see that here. I'm not qualified to, you know, do this analysis myself, but since I'm a statistician, I -- but there is no -- I'm saying that even though it's 10 pages, there are no clear analyses performed to arrive at the conclusion.

BY MS. GRADY:

**Q. Is it your testimony that a root cause analysis is required in order for Dr. Herrington to make conclusions about the -- to make the conclusions about the patient he has for Patient number 1?**

A. No. Root cause analysis is just one example. There might be other examples present in the field to establish causality.

**Q. What else?**

A. Well, since I'm not a medical professional or I don't have expertise in that field, but what I expect to see here is to some sort -- sort of analysis.

**Q. Okay. Are you and I equally qualified to assess the appropriate analysis from his observations to his conclusions?**

MS. KINKADE: Form. Foundation.

A. Well, actually, I don't know about your background. You may be more qualified. You know,



I'm not sure about that.

BY MS. GRADY:

**Q. Okay. Well, I'll be happy to rephrase it, not to reference my background, which I'd be happy to share with you, but is there anything that's particularly within your tent as a person holding themselves out as an expert that leads you to uniquely be able to assess the adequacy of Dr. Herrington's analysis for Patient 1?**

A. Well -- well, I'm as an -- you know, since -- as I mentioned before, to arrive at the final conclusion of, you know, adequacy of care, the different elements need to -- need -- need to be present. You know, since I -- I'm doing this study, I feel like, you know, I can, you know, see if -- you know, since I'm already familiar with the different elements, I'm looking for an analysis here. You know, some other reason might not be able to do this because he's not familiar with the other elements. And because of that, you know, I -- I can -- since I don't see any analysis, I -- well, that make -- that's what makes me different from another -- another reader, you know, since I'm familiar with the other parts -- parts of the, you know, methodology.

**Q. Okay. Because you're familiar with this**

**report, that's your qualification to offer the opinion on analysis?**
MS. KINKADE: Misstates his testimony. Argumentative.
A. I mean, that doesn't qualify me to -- to give inputs on medical -- on medical, you know, stuff. But, you know, as a -- I was just looking for an analysis. You know, the -- the -- my point is that I didn't see an analysis to come up at a conclusion. I was --
BY MS. GRADY:
**Q. Okay.**
A. -- just -- they should have, you know, showed me, you know, that this -- the -- the findings are valid. You know, I'm just seeing if they provide an an analysis.
BY MS. GRADY:
**Q. Okay. And all I'm asking, sir, is whether you have any, like, unique qualifications to make the determination of whether there's an analysis, as you use that phrase?**
A. Well, from this report, I can -- well, I can definitely see -- definitely see that there is no valid analysis, since -- since, you know, it doesn't mention any types of analysis. There is no -- there is -- you know, it doesn't mention any analysis and how the



different parts of the analysis -- you know, about the different parts of the analysis and how -- how he arrived at the final conclusion. You know, I -- I can't see anything in the report. That's my point. You know, someone else with -- you know, might, you know, notice that as well, you know, as long as they look for an analysis.
**Q. Okay. Sir, I really am asking you a different question and so I would, you know, appreciate it -- I know what your points are. You've listed them in your report, but this is the time for me to understand the questions that I need to get answered. So my question is focused on what -- whether you believe that you have a unique ability to determine whether there is an analysis for Patient 1, as compared to non-experts?**
MS. KINKADE: Form. Foundation. Improper opinion. Go ahead.
A. Well, you know, I -- I answered it several times, but I think the answer would be this is -- what -- what makes me more qualified is that at least I am aware of the different elements of this study. You know, someone else just jumped into these pages, they might not -- you know, since I'm -- the only thing that distinguishes me is I'm aware of the purpose, you know, the -- you know, I -- I've evaluated the different



aspects of this project. This is what qualifies me than a usual reader.
BY MS. GRADY:
**Q. You keep referencing different elements. What are the different elements?**
A. Well, how these cases were selected, sampling -- you know, sampling methodology and how the sample size of the sample was selected, you know, how the analysis were performed, how the results were interpreted. These are the different elements I'm referring to, how the data was sourced.
**Q. Isn't that --**
A. Yeah.
**Q. Go ahead.**
A. Yeah. Okay.
**Q. Isn't that just information that you came to learn through reading the report?**
A. Sorry. What information?
**Q. You just listed a number of different elements, how these cases were selected, what the goals of the project were. You only learned that information by reading the report, right?**
A. Well, actually, I didn't learn how the -- the same cases were selected, you know, but, you know, these were the elements that I evaluated.



**Q. Okay. So a person who has read the materials that you read would be equally situated to you to offer opinions about whether or not Dr. Herrington provided sufficient analysis to reach his conclusions with regard to Patient 1, correct?**
MS. KINKADE: Form. Foundation. Incomplete hypothetical. Misstates testimony. Go ahead.
A. Sorry. That was a long question. Can you please rephrase it? Sorry.
BY MS. GRADY:
**Q. Do you need me to repeat it, or do you need me to rephrase it?**
A. I mean, just repeat it. Yeah. Just -- that was long. I just didn't get it.
**Q. Okay. A person who has reviewed all the same materials that you have reviewed to write this report would be equally situated to you in terms of their ability to assess whether there was sufficient analysis from Dr. Herrington to reach his conclusions for Patient 1, correct?**
MS. KINKADE: Same objection.
A. Well, it depends on the patient's -- and on the person's background. You know, if he doesn't have any background on the different elements of his study, well, he might, you know, just -- he -- he -- he -- he

might have substantially different opinions. You know, what -- but a person with the same background as me would -- I'm -- I'm certain that he -- he will find -- he will identify similar -- similar insufficiencies.
BY MS. GRADY:
**Q. And you agree that -- strike that. You are unable to tell me what would constitute a sufficient analysis, if present, to reach Dr. Herrington's conclusions for Patient 1, correct?**
MS. KINKADE: Form.
A. Well, devising a sufficient analysis requires a substantial amount of time, you know, and information about the project and many other -- you know, about the population, and -- and since I don't have the information, I can't devise this, you know, because I don't -- I'm not provided with anything.
BY MS. GRADY:
**Q. Okay. You spent 100 hours or 90 hours, I believe, on this case, right?**
A. Yes. As I said so, yes.
**Q. Okay. Now, can you provide me what would be necessary for Dr. Herrington to reach the conclusions that he did for any of the individual patients?**
MS. KINKADE: Form.



A. A big issue is here that he -- he seems to have -- you know, he -- he only studied the -- a sample of cases. He didn't justify how he selected them, you know. He -- he needs to do everything from scratch, you know, describing how he would select the sample, how -- the size of the sample, adopt an appropriate methodology, and then note the limitations and then come at the conclusion, but all of these elements are missing here.
BY MS. GRADY:
**Q. Okay. But Mr. Heidari, I did not ask that question. I asked you whether you could tell me what additional analysis would render Dr. Herrington's conclusions appropriate for any of the individual patients.**
MS. KINKADE: Same objections, and asked and answered.
A. You mean -- you mean just for the patients or for Wexford -- you know, for Wexford practices, conclusions?
BY MS. GRADY:
**Q. Yes, I'll get to Wexford practices. I'm asking for the individual patients.**
A. Oh, individual.
**Q. Can you tell me any analysis --**



A. Yeah.
**Q. -- that would render Dr. Harrington's conclusions appropriate for any of the individual patients?**
A. Yeah. One analysis could be root cause analysis, yes.
**Q. Okay. And what other ones?**
A. Since I'm not -- this is outside my area of expertise, you know, I can't give input on that.
**Q. Okay. Are you an expert in root cause analysis?**
A. No.
**Q. Have you ever conducted a root cause analysis?**
A. No.
**Q. And do you know whether Wexford has ever conducted a root cause analysis for any of its patients?**
MS. KINKADE: Foundation.
A. No, I'm not aware of.
BY MS. GRADY:
**Q. You agree it would be inappropriate for them to make any conclusions about the quality of care without doing a root cause analysis?**
MS. KINKADE: Foundation.
A. Well, as I said before, root cause analysis is just an example. There could be other analysis



performed.
BY MS. GRADY:
**Q. Okay. But you can't give me any others, right?**
A. No. Since that's outside my -- my area of expertise, I can't.
**Q. Okay. So -- but just to be clear, I mean, you're criticizing Dr. Herrington for making conclusions about causes of death without a root cause analysis, but you're unable to tell me whether Wexford making the same conclusions without a root cause analysis would be inappropriate?**
MS. KINKADE: Argumentative. Form. Foundation.
A. Well, about -- to -- to extend them to Wexford, you know, we need to take into account not only root cause analysis, but -- you know, but sampling and different elements, as I mentioned before.
BY MS. GRADY:
**Q. No. What I'm saying is: Doesn't your criticism about the lack of root cause analysis apply equally to Wexford if they draw conclusions about causes of death without performing a root cause analysis?**
MS. KINKADE: Same objections.
A. Well, root cause analysis is just one. You know, Wexford could use other methods to -- to --

if -- if these analyses are not performed well, I still believe that their -- their study lacks, you know, scientific methodology. You know, it's not -- it's not -- the results are not reliable.
BY MS. GRADY:
**Q. Okay. So you agree that a different standard shouldn't apply to how Wexford evaluates deaths that applies to how Dr. Herrington evaluates deaths, right?**
MS. KINKADE: Form. Foundation.
A. I'm not saying that they should be different practices. I mean, as long as it's a valid method, it's just -- you know, they justify that, you know, the conclusions are reliable.
BY MS. GRADY:
**Q. Okay. Okay. So long as a person justifies their findings, their conclusions are reliable; is that your testimony?**
A. No, I didn't say justify their findings. I said justify every element of their study, every -- you know, then their findings are -- we could say that are reliable if -- if they know their limitations and there are no issues with the methodology.
**Q. And if they -- and if Wexford does not justify every element of its study of a death, then those results are similarly unreliable, correct?**



MS. KINKADE: Form. Foundation.
A. Well, the -- the results, when -- when -- when the elements are insufficient, well, the -- the -- the findings are -- you know, that you want to generalize into -- generalize to Wexford are also, you know, not reliable.
BY MS. GRADY:
**Q. No. I'm asking a different question. If Wexford does a study of a death and make -- makes conclusions about the adequacy of care provided, that study --**
A. They're separate.
**Q. Please let me finish. If Wexford conducts a study of a death and makes conclusions about the adequacy of care provided to that patient, that study would be unreliable if Wexford did not justify every element of that study; is that right?**
MS. KINKADE: Form. Foundation.
A. Well, if they don't justify them, you know, and -- well, the results are not reliable, you know, if they use -- they don't -- they don't -- yeah. They are -- they're not reliable.
BY MS. GRADY:
**Q. Okay. Now let's go back to your report.**
MS. KINKADE: I'm going to need a restroom



break at some point, whenever it's convenient for you.
MS. GRADY: Sure. Now is good enough.
THE REPORTER: Okay. Going off --
MS. GRADY: We can go off.
THE REPORTER: Going off the record. 12:48 p.m.
(OFF THE RECORD)
THE REPORTER: Back on record for the deposition of Moein Heidari being conducted by videoconference. I'm Esther Heath. It's September 29th, and the time is 1:04 p.m.
BY MS. GRADY:
**Q. Okay. Mr. Heidari, before the break, we were talking a little bit about analysis. I want to turn back to your report at Exhibit 2. All right. I'm going to turn your attention down to page 10. I -- it's the paragraph that goes on to page 10, so I'll give you an opportunity to see some of page 9 as well. You criticized Dr. Herrington's opinions that there was inadequate care because of a failure to provide -- or a failure to obtain appropriate medication history, right?**
A. Well, let me just review this. Well, again, I'm providing some examples that he may have needed to take into account, you know, I mean, just to show that



there is no sufficient analysis present, you know.
**Q. And you don't have any expertise in determining whether or not he should have taken these into account, right?**
A. Well, I just gave them as an example, you know, to -- to just challenge his analysis, you know, to -- but no expertise to -- to -- to say -- to -- you know, to mention -- to give opinions on this. Just the analysis is -- is insufficient.
**Q. Okay. He also didn't take into account what color shirt Mr. Curtis was wearing, right?**
A. Sorry. I mean, these are some of the observations, I said, he didn't take into account.
**Q. Right. But he also didn't take into account what color shirt Mr. Curtis was wearing at the time of the encounter on November 8, 2017, right?**
MS. KINKADE: Argumentative.
A. Well -- well, that's right. But, you know, the analysis is insufficient. You know, the color of the shirt, he, you know, should mention what to include in the analysis. And, you know, the analysis, you know, it lacks sufficiency, you know, should include what should be included and what should not.
BY MS. GRADY:
**Q. Did he include any observation about whether**

**the psychiatrist had his or her nails painted at the time of the encounter?**

MS. KINKADE: Argumentative.

A. Sorry. Can you rephrase and clarify your question?

BY MS. GRADY:

**Q. Yeah. You know what nail -- you know nail polish, like your fingernails being painted?**

A. Yes.

**Q. Okay. You didn't remark on the absence of any analysis by Dr. Herrington as to whether or not the psychiatrist had her nails painted, did you?**

MS. KINKADE: Argumentative.

A. Well, the analysis was -- I mean, these are the observations, you know, he made, I mean, and he cited in -- in his report, you know. He didn't cite about those observations. I mean --

BY MS. GRADY:

**Q. But why didn't you criticize him for not analyzing what color of nail polish, if any, the psychiatrist was wearing and what color shirt Mr. Curtis was wearing?**

A. Well --

MS. KINKADE: Argumentative.

A. -- a person who -- who wants to, you know, run



the analysis, you know, should consider what to include and, you know, what not to include. What I'm saying is -- here is that there is no sufficient analysis present.

BY MS. GRADY:

**Q. Okay.**

A. I mean, there's no --

**Q. You're giving -- go ahead.**

A. These specificities are just to give examples, you know, why this not -- why that was included, why this was not included, just -- you know, just clarify my point, you know?

**Q. Okay. You don't have any expertise to determine whether these should have been included, right?**

A. No. These are just -- just the examples. And, you know, I didn't say for sure this.

**Q. Okay. And you would agree with me that statements about whether the psychiatrist had her nails painted would be unlikely to have any relevant bearing on the adequacy of care, right?**

A. Well, I'm not a professional to determine that, you know. I -- I don't rule out anything here. But I am saying in here is that there is insufficiency about the analysis.



**Q. Okay. But you're not saying that it was insufficient because there was no description of the color of nail polish, right?**

MS. KINKADE: Argumentative.

A. Well, not to discuss -- I mean -- I mean, he didn't -- this is, you know, causality now. I mean, he didn't perform causality. You know, when you -- causality, you -- you list different factors, you know. And color of nail is just one factor that might not be important. But, I mean, he didn't consider all the -- you know, the factors. He -- he -- he had -- he -- how he narrowed it to -- down to -- you know, to root causes, you know, he -- to the main causes. I mean, this is --

BY MS. GRADY:

**Q. Can you agree that Dr. Herrington -- go ahead.**

A. I mean, these sorts of analysis are lacking here.

**Q. Can you agree that Dr. Herrington is more qualified than you are to determine what factors are appropriate to consider in making a determination about the adequacy of care?**

MS. KINKADE: Form. Foundation.

A. Well -- well, Dr. Herrington, well, he -- he did not did it -- you know, he did not do a sound and



valid study, you know. And -- and -- and I'm not saying that I want -- you know, I -- I -- I'm qualified to do this study. I'm just looking for the presence of an analysis. Well, he may be more qualified than I am, but what he -- he has done here is -- is not scientifically reliable. But he --

BY MS. GRADY:

**Q. Okay.**

A. -- he may be more qualified. I -- I -- I don't just rule that out.

**Q. Okay. But specifically on the topic of determining what factors are necessary to consider in reaching an opinion about the adequacy of care, he's more qualified than you are, true?**

MS. KINKADE: Asked and answered. Argumentative. Foundation.

A. Well, he may be more qualified, but his analysis does not -- is not reliable, you know. Even if he's qualified, he may, you know, start to obtain specific results. You know, we -- he may be more qualified, but his analysis is not scientifically valid.

BY MS. GRADY:

**Q. Wait, you just offered a hypothesis that he may have been -- have had some bias. Is that is -- did I get that right, or did I get that wrong?**

A. No. I mean, even if he's qualified, you know, I -- I'm not sure if, you know -- if he has some bias or not. I mean, even if a person is qualified, he may have some bias, you know. And the results he generates might -- might not be reliable, you know. Even if someone is more qualified, you can't -- they -- they are not definitely, you know, the results they produce is better than mine.

**Q. Yeah. So tell me any evidence that you reviewed in any of the materials you looked at that would give you any basis to suggest that Dr. Herrington is biased?**

A. Well, can we go to the summary of the -- the report for Dr. Herrington? No. The summary of my report, I mean.

**Q. Oh.**

MS. KINKADE: The introduction.

THE WITNESS: No, this -- this is the introduction.

BY MS. GRADY:

**Q. Is there another place you want me to -- where should I go? Point me to a page.**

MS. KINKADE: It's somewhere at the end.

A. The end. Yeah.

BY MS. GRADY:



**Q. Okay.**

A. Well, what makes me think that he may -- he may have been biased is, you know, where it mentions he only reviewed cases where a death occurred, you know. And this is one of the things that makes me think he may have been biased.

**Q. And why could that lead you to believe he has bias?**

A. Since he is assessing quality of care, simply assessing the patients who -- who were dead, you know, the -- this is not a representative sample. This does not reflect the entire population, you know. These are just dead individuals.

**Q. I still don't understand how that could possibly suggest that Dr. Herrington is biased.**

MS. KINKADE: Argumentative. Not a question.

A. Well, what I'm --

BY MS. GRADY:

**Q. Can you explain it to me?**

A. Well, what I'm saying here, that to -- to generalize these results to the entire population, you should select a sample that reflects the entire population, not a sample that -- of only dead individuals. This -- this doesn't apply to the entire population.



**Q. Is it your testimony -- are you expressing an opinion that Dr. Herrington is biased?**

A. Well, I'm not saying if he's biased or -- I'm -- I'm saying that his sample is biased.

**Q. Okay. And you've never conducted any studies -- well, strike that. Let's go back to page 10. You criticized Dr. Herrington for not considering the reason for the absence of involvement for the site medical director, his vacation, or the role of the physician that was on call in his absence; do you see that?**

A. Yes, I can see that.

**Q. How did you come to learn that there was a vacation involved in this case?**

A. Just let me review it. Well, I reviewed the deposition. It -- it's, you know, from his deposition.

**Q. Okay. And you state here one of your criticisms is that Dr. Herrington's report in this portion does not specify what level or frequency of involvement was expected or needed for the patient, right?**

A. Yes.

**Q. It's important for a report to set out the criteria that would satisfy what the expert criticizes, right?**



MS. KINKADE: Incomplete hypothetical.

A. So I mean, what I -- the reason I provided this is that he did not, you know -- sorry. I need to take my time. Sorry.

BY MS. GRADY:

**Q. Okay.**

A. You know, it -- it simply mentions the absence of involvement, you know. It doesn't -- what seemed problematic to me is, you know, it doesn't say anything of how much, you know, presence, you know, the frequency of involvement, you know, at least some -- some -- you know, some criteria or some standard. He doesn't mention anything.

**Q. That would be really important for a report to be reliable, right?**

MS. KINKADE: Incomplete hypothetical. Form.

A. Well, so you -- you are asking a broad question. Sorry. How -- you know, when he makes a claim, I -- and makes a conclusion, I mean, he should have provided some standards. That's what I'm saying, you know, at least some.

BY MS. GRADY:

**Q. Okay. On the bottom of page 10, you criticized Dr. Herrington for not acknowledging other support -- sources of support or assistance that were**

**available or utilized for him during this time period, such as other healthcare provider or correctional staff. Do you see that sentence in your report?**

A. Yes, I can see that.

**Q. And how do you have any idea that there was other healthcare provider or correctional staff available to Mr. Curtis?**

A. Well, I'm not saying that I was aware -- aware of those sources. I mean, I'm saying that he -- he did not take into account different -- you know, other sources that may have played a part here, you know. That's what I'm saying. He -- he makes a observation and then jumps to the conclusion. He neglects -- neglects the other factors that may have been -- that maybe should have been considered.

**Q. And you have no expertise in what those factors are, right?**

MS. KINKADE: Form.

A. Sorry?

BY MS. GRADY:

**Q. You have no expertise in what those factors are, correct?**

MS. KINKADE: Objection.

A. I just provided some examples and not, you know, these -- there could be many other factors. But,



you know, just gave an example that he -- his analysis is insufficient.

BY MS. GRADY:

**Q. Okay. But that's not my question, Mr. Heidari. My question is: Whether you have any expertise to elicit the list of factors that he should consider.**

MS. KINKADE: Form.

A. Well, I -- I -- I don't have the expertise to give opinions on -- on medical -- medical care, but I -- I just provided an example, you know, as to there is insufficient analysis.

BY MS. GRADY:

**Q. Okay. I just I need to get an answer to the question that I asked, not a different question. You do not have any expertise to determine what factors Dr. Herrington should consider in reaching his conclusions about adequacy of care, right?**

MS. KINKADE: Asked and answered. Form.

A. Well, I don't have the expertise to list the factors, but I may be able to provide, you know, some examples.

BY MS. GRADY:

**Q. You say that -- here on page 11, that you criticized Dr. Herrington for not providing support for**



**his cause of death based on an -- what you've termed an internally contradictory opinion. What expertise do you have to render an opinion that Dr. Herrington's cause of death determinations were internally contradictory?**

A. Let me review it, please. Sorry. Well, for similar observations, he made a different conclusion. I mean, why he didn't explain, you know, why he made this conclusion, this is what my concern.

**Q. Can a person who has elevated sodium die from different reasons?**

MS. KINKADE: Form. Foundation.

BY MS. GRADY:

**Q. Sir, do you understand my question?**

A. Yeah, I understand. I just

**Q. What are you -- are you looking at the report that's on the screen, or are you looking at something else?**

A. No, no. I'm -- I'm reviewing the paragraph. Well --

**Q. But I'm not asking you about the paragraph, sir. Just to be clear, I'm asking you about whether a person -- strike that. I'm asking you about whether two people who have the same elevated sodium level can die of different causes.**

A. Well --



MS. KINKADE: Same objections.

A. -- I'm not the -- the medical expert to -- you know, to give opinions on that.

BY MS. GRADY:

**Q. Okay. You can't -- you can't give me any opinions about the causes of death for patients with elevated sodium levels, right?**

A. Yes. I'm not -- no medical expert to give opinions on these matters.

**Q. You criticize -- I want to draw your attention to this paragraph because I'm not sure I understand it. You criticize Dr. Herrington because he does not identify a Wexford policy he believed caused or contributed to these criticisms. What do you mean by the word "policy?"**

MS. KINKADE: Can you point me to where you're at? Sorry.

MS. GRADY: Yep.

A. Well, the -- the reason I use the word "policy" here is that Dr. Herrington at the end concludes that -- you know, links this patient's death to -- to, you know, inadequate care at Wexford, you know. But I'm saying here that he did not mention any Wexford policies that, you know, contributed to these events --

BY MS. GRADY:

**Q. Okay.**

A. He makes a conclusion about this.

**Q. Are you -- when you use the word "policy," are you referring to a written document?**

A. Yes. Since -- since he challenges the Wexford policies, I'm referring to those policies, yes, to written documents.

**Q. Okay. And then you say, "He's failed to explain how any of the above criticism was caused by a Wexford practice." What is a sufficient -- what is necessary to be present in order for there to be a sufficient explanation linking criticism in a patient's individual case with Wexford practices?**

A. Well, I wasn't, you know, reviewing it to, you know -- to link patient's death to Wexford practices. I mean, is -- what I mean here is that there is not sufficient information to support that they could be linked to Wexford practices.

**Q. What is sufficient information?**

A. Well, it didn't -- I mean, an analysis that shows that this could be linked to Wexford practices.

**Q. But he does discuss how the criticisms he lists are linked to Wexford practices. We looked at those in detail earlier today, right?**



MS. KINKADE: Argumentative. Assumes facts not evidence.

A. Well, those are just observations, and they -- they were not -- it was not clear whether they were as a cause of a Wexford practice or a judgment of a clinician.

BY MS. GRADY:

**Q. Okay. So what needs to be present -- let's say I want to take your methodology that you have said you applied to this case and apply it to the next case. What would I look for to be present to say, yes, there is adequate explanation linking the criticism of an individual case to a Wexford practice?**

MS. KINKADE: Form.

A. Well, there is no single, definite answer. You know, one way would be to perform a causal analysis and show that, yeah, the -- the -- the -- a causal analysis, you know, identify that the root cause is a Wexford practice. That would, you know, be a good answer.

BY MS. GRADY:

**Q. Okay. Any others?**

A. Well, as I said, this is not my area expertise, but there could be other analyses that I -- I don't have, you know, any experience -- you know, I'm not familiar with.



**Q. Okay. But, I mean, again, the entirety of your report is focused on criticizing the adequacy of Dr. Herrington's analysis. So part of what I'm trying to understand is whether there's any methodology that you employed, that I could employ in the next case to determine whether a different person's analysis of the same or different data was sufficient, based on what you've done with regard to Dr. Herrington.**

A. Well, a sufficient methodology -- sufficient - - sufficient methodology would be to -- you know, to do the elements in a scientifically sound -- sound way, you know. The -- the sampling, the analysis, you know, identify a justifiable analysis, such as root cause analysis, to arrive from the observations to the conclusions. That way, your -- your findings would be justifiable and reliable.

**Q. I see. So in order to satisfy your conclusion, your, you know, headline assessment about reliability, there would need to be a statistically significant result that was obtained through random selection and a root cause analysis; is that right?**

A. I mean, I didn't mention statistically significant result or -- or -- or just root cause analysis, you know. There might be other analyses that I need, you know, information in detail about this



project, you know or -- to be able to determine an appropriate method. And there might be other methods that would suit this case.

**Q. Okay. But Mr. Heidari, I mean, I'm not trying to hide the ball here. Let me be clear. The rules that allow for experts to testify at trial require them to set out a methodology that can be reasonably applied to this case and to others. They have to -- in other words, they have to show their work. And you're familiar with that in the work that you do, right?**

A. I mean, show the methodology for -- for the work we have done; you mean that?

**Q. Yes. You have to -- in order to be able to pass muster as an expert, you have to show that you have employed reliable methodology in a way that was reliably applied to the facts of the case. So what I'm asking you is: What is the methodology that then I can use to apply to the next case? And that's random sampling and a root cause analysis, right? That's what's required to satisfy your standards?**

MS. KINKADE: Form. Argumentative. Asked and answered. Go ahead.

A. Well, I mean, root cause analysis is just one example. There could be other analyses, too. And there could be some elements of some quantitative analysis

performed, you know, and how they are performed, you know, a -- a -- a specific analysis plan and a analysis plan for qualitative study and justification for how the sample is selected and the number of samples, you know, these elements.

BY MS. GRADY:

**Q. Okay. But Mr. Heidari, I mean, you say that there can be other things other than root cause, but when I ask you, as I will again, what other things, you tell me that you're not an expert in that field, right?**

A. I'm not an expert to do causal analysis. Yes. I'm a statistician.

**Q. But you go to great lengths to criticize -- to hold yourself out as an expert sufficiently qualified to expert -- to criticize -- I'm sorry. I got caught up in my question. Let me try that again. You admit you're not an expert in causal analysis, but yet you repeatedly, through your report, criticized Dr. Herrington for having insufficient causal analysis, right?**

A. What I mean here is that there is no analysis present. This is my -- this is what I am repeating throughout my report, you know. There is no analysis. And -- and I'm just giving some examples, you know, the facts as well he didn't take into account and an absence



of an appropriate analysis. This is what I'm doing.

**Q. Okay. And I really just want to ask this one last time. Can you tell me, other than random sampling, what would satisfy you?**

A. To -- to what? To arrive at what conclusions?

**Q. To pass muster for reliability.**

A. I mean --

MS. KINKADE: Form.

A. I mean, you want to make conclusions about what? You know, can you be more specific about the -- since the purpose of the studies matters most?

BY MS. GRADY:

**Q. Well, no. I'm talking about this study. This is the study I'm talking about, Dr. Herrington.**

A. Oh, I understand.

**Q. What -- yes. What would be present that would satisfy you for purposes of your reliability conclusion?**

MS. KINKADE: Form. Asked and answered.

A. Well, actually, I -- I was only provided this report, you know, to give opinions on that. You know, I don't -- I'm not provided with enough information to give input on that.

BY MS. GRADY:

**Q. Okay. On the bottom of page 11, you say, "The agent of catatonic schizophrenia is not well understood,**



**and it is not clear if it is caused by a microbe, a genetic mutation, a chemical imbalance, or a combination of other factors." What qualifications do you have to opine about the understanding of the etiology of catatonic schizophrenia?**

A. Since, you know, when I -- when I say it's not caused by microbe, he -- he didn't mention, you know, how it was caused by microbe or -- or genetic mutation or -- you know, he -- he is not very clear about it.

**Q. Why does he need to be clear about the etiology of catatonic schizophrenia?**

A. Since the -- he -- he links them to -- to the cause of the patient's death, you know. And since these elements are missing, we can't just conclude that the death was, you know, caused by these agents.

**Q. Okay. So it's your testimony that in order for a physician to ascribe a cause of death for a patient, they have to have complete understanding of the etiology of the disease?**

A. I mean -- I mean, they should explain it, how the disease interacted with the host, you know, and how the environment facilitated the -- this interaction. And the -- the report does not explain this at all, you know. It just provides some observations and jumps to a conclusion, and there is no evidence of



this information.

**Q. Okay. That wasn't my question, Doctor. You just testified about the epidemiological triangle, right?**

A. Sorry. Can you repeat your question?

**Q. You were just testifying about the epidemiological triangle, right?**

A. Yeah, I was discussing the -- the use of epidemiological triangle here, yes.

**Q. Okay. So we've already established that you're not an expert in that. You're not going to be able to testify about that. I'm asking you about whether it's your opinion that the cause of death cannot be determined by a physician unless they have complete understanding of the etiology of the disease?**

MS. KINKADE: Argumentative. Misstates the law. Go ahead.

MS. GRADY: If you have a basis by which he can testify about a thing he testified he had to research, I'd welcome that. But anyway.

A. I mean, there's no --

MS. KINKADE: You can testify that -- hold on. You can testify --

MS. GRADY: Hold on, Mr. Heidari.

MS. KINKADE: You can testify that something

needs to exist without being an expert in conducting the study itself. So I do agree that there are limitations.

MS. GRADY: Okay.

BY MS. GRADY:

**Q. So I just -- again, I just want to put the question back up sort of center stage. I'm not asking you about the epidemiological triangle. I'm just asking you yes or no. Is it your opinion that a physician cannot ascribe the cause of death without a complete understanding of the etiology of the disease?**

A. Let me put it --

MS. KINKADE: Form. Incomplete hypothetical. Foundation.

A. Let me put this this way. You know, if and he had conducted the -- this analysis, you know, and then, you know, I -- I wouldn't be able to, you know, to assess whether he did it correctly. But what I'm seeing here is that there is no evidence of this analysis. If he had done this, you know, I would -- I could not give opinions on that. But there is no analysis at all, so I -- I can say for sure that this - - this model cannot be used to -- you know, is not reliably used to reach to the conclusion.

BY MS. GRADY:



**Q. Mr. Heidari, that is not my question, so let me ask my question again: Is it your opinion that a physician cannot ascribe a cause of death without a complete understanding of the etiology of the disease?**

MS. KINKADE: Same objections.

A. I'm not a medical professional to give opinions on that.

BY MS. GRADY:

**Q. Okay. What research have you done on the etiology of catatonic schizophrenia?**

A. Well, I'm -- you know, I just mentioned and discussed the model. I haven't done any research. I don't recall doing any research here. You know, I just -- assessing the model, how it was performed by Dr. Herrington.

BY MS. GRADY:

**Q. Okay. How do you have any idea whether the agent of catatonic schizophrenia is not well understood?**

A. Well, it -- it's from the statements of Dr. Herrington, in -- in his previous statements. You know, he -- he doesn't make -- he -- he doesn't clarify it, you know.

**Q. Is it your testimony that you relied on Dr. Herrington's testimony that the agent of catatonic schizophrenia is not well understood?**



A. Based on his previous statements, it's not -- it seems that it's not well understood by.

**Q. Okay. Because he doesn't say that. Any -- strike that. We'll come back to that. The -- you don't have any independent understanding of the medical or psychiatric community's understanding of the etiology of catatonic schizophrenia, correct?**

A. I don't have any expertise on that area.

**Q. Okay. Now you, in -- for Patient 2 you note that, "Dr. Herrington criticized nurses for not notifying medical practitioners of the patient's status and documenting that Mr. [redacted] would have no complications from swallowing a foreign body." Then you say, "It is unclear if Dr. Herrington confirmed that medical practitioners were not notified or if he is making an assumption based solely on documentation." Do you see where you've written that in your report?**

A. Yes, I can see that.

**Q. And do you have any expertise on what is appropriate for medical experts to rely on in forming opinions?**

MS. KINKADE: Form.

A. I'm just giving an example of, you know, some factors that Dr. Herrington didn't take into account. I -- I don't have expertise --



BY MS. GRADY:

**Q. All right. Mr. Heidari -- yeah?**

A. I don't have expertise on that area but these are the factors, you know. I'm saying that there is no analysis present, and this -- there are some factors that he didn't take into account.

**Q. Are you suggesting that Dr. Herrington should have called all the people involved in this patient's care to confirm that medical practitioners were not notified?**

MS. KINKADE: Argumentative. Form.

A. No, I'm not saying that they -- they should have been notified. You know, I -- I'm just giving an example that -- that applies for this case. You know, he had a condition, and he says that, you know -- you know, he says for not notifying practitioners. You know, he doesn't -- it doesn't take into account the other probabilities. And that's what I'm saying, you know. He -- he -- he -- he -- he -- sees the observation that they didn't notify medical practitioner -- practitioners and concludes that this is related to the -- to his death. But I'm saying that there could be other possibilities. That's all I'm saying. This is an example.

BY MS. GRADY:

**Q. Okay. Do you know the likelihood of the possibility that medical practitioners were notified, but no documentation was made of that fact?**
MS. KINKADE: Objection.
A. Well, I don't have any information on that.
BY MS. GRADY:
**Q. Okay. You still thought it was sufficiently large to mention it as a thing Dr. Herrington should have taken into account, true?**
A. Since -- you know, this is an example. There could be other examples, too, you know. This is what -- what -- what came to my mind, you know, how could, you know, this has caused the patient's death, you know.
**Q. Well, right. I mean, it's also possible that the practitioners were able to read the minds of the nurses, and so no communication was necessary, right?**
MS. KINKADE: Argumentative.
A. I don't -- well, I don't mean that. I mean he didn't take into account the possibility that the nurses could have, you know, taken care of the situation, you know.
BY MS. GRADY:
**Q. Oh, okay. And what what qualification do you have to make assessments about taking into account that**



**nurses are able to handle the situation in which someone ingests a foreign object that eventually rips their body organs apart?**
MS. KINKADE: Argumentative.
A. Well, I'm just giving an example. You know, I -- I'm not qualified to give input on medical science, you know.
BY MS. GRADY:
**Q. Okay. You do list some factors that you opine influenced the decision to notify -- that may influence the decision to notify a medical practitioner. That -- and you say they, "Include the shape, size and material of the foreign object." How does the shape, size and material of an ingested foreign object influence the decision by nursing staff to notify a medical practitioner?**
A. I mean, besides -- I mean, it might have not been, you know -- and these are also, you know, some other things that he should have taken into account, you know. It just -- in some situations, you know, might not be as emergent as others, you know. I mean, I -- I provided these examples to show that -- you know, to, you know, that they shouldn't -- they might be -- sorry. And -- and there -- there is insufficient information provided, you know.



**Q. Okay. But my question was not that. My question was: Just how the shape, size and material of a foreign object influences the decision to notify a medical practitioner.**
A. Well, I'm not a medical professional to give input on that. This is just an example, you know.
**Q. Okay. But to be clear, it's just an example that you're just, you know, throwing out there as a layperson?**
A. No, this is just an example of why the medical practitioners were not, you know, notified. I mean, there could be other reasons too, you know. I'm just -- I'm just providing this to show that this observation may not be directly linked -- you know, may not have caused the patient's death.
**Q. Right. But what expertise, Hr. Heidari, do you have to offer any opinion about how the shape, size, or material of the foreign object has any bearing on the decision to notify a medical practitioner?**
A. Well, I didn't --
MS. KINKADE: Argumentative.
A. -- give any -- any opinions whether this could be -- you know, this could influence the patient's care, you know, the -- the patient's situation. I just provided them, you know, as there might be some factors.



You know, there could be many other factors they didn't consider. These are the ones that came to my mind.
BY MS. GRADY:
**Q. Okay. And, like, you didn't -- you don't have any special expertise, as apart from a non-statistician, to come up with factors that might possibly influence a decision to notify a medical practitioner, right?**
A. No, I don't have any experience. I don't have any expertise to do that.
**Q. Now you state that, "Nurses are trained and licensed professionals who have the knowledge and skills to perform various assessments and interventions within their scope of practice"; you see that?**
A. Yes.
**Q. What is the scope of practice for a nurse?**
A. Well, I mentioned I'm not a nurse and --
**Q. I'm not asking why you mentioned it. I'm asking: What is the scope of practice for a nurse?**
A. Well, I don't know the scope of practice for a nurse. Yeah.
**Q. You say, "Nursing documentation is not a definitive or final diagnosis, but rather a record of observations and actions that can be revised or updated as new information becomes available." What training or**

**education have you received about the impact or use of nursing documentation?**

A. I'm just reviewing. I just also provided this, you know, to give an example. You know, I -- I must have reviewed some -- some documents to --

**Q. Okay. But that wasn't my question, sir. My question was: What training or education have you received in the purpose of the nursing documentation?**

A. Well, I don't have any -- any training on that.

**Q. Then you say, "The statement does not acknowledge the role and responsibility of nurses in providing holistic and patient-centered care, which may involve making clinical judgments and decisions within their scope of practice and in collaboration with other health professionals." Now, you've already told me about your knowledge on the scope of practice. Did you receive any training or education about the roles and responsibilities of nurses?**

A. No, I -- I haven't received that education.

**Q. Okay. You criticize Dr. Herrington's statement that, "Follow-up x-ray imaging should have been considered, and surgical consultation should have been considered." Okay. And then what I'm interested in is here, when you say, "This statement that assumes**



**follow-up x-ray imaging and surgical consultation are always necessary and beneficial for patients who swallow foreign objects"; do you see that statement?**

A. Yes.

**Q. What training and education have you received on how to address a person who has swallowed foreign objects?**

A. I have received none. I provided this to challenge causality on this.

**Q. What is comorbidities?**

A. Well, I obtained this from the -- the statements in the - the report.

**Q. Do you know what that word means?**

A. It was listed, I think, as one of the patient's conditions. I - I included it, you know, as it might have been a contributing factor.

**Q. It's your understanding that comorbidities is a reference to a medical condition?**

A. But this - from the document, I -- I assume that this may be a - a condition, so I listed it here as it might have contributed. Yeah.

**Q. Okay. Again, I don't - I'm not saying from the document. I'm just asking you if you actually know what that word means.**

A. I don't know what this means, but it's in the



document, yeah. It - it's a condition listed there.

**Q. Okay. But you think that Dr. Herrington should have considered that thing that you don't know what it means?**

MS. KINKADE: Argumentative.

A. Well, he listed it as a condition, you know, that, you know, I - at least factor, you know, that may have contributed to the - to the cause of the death.

BY MS. GRADY:

**Q. Even though you don't know what it is?**

MS. KINKADE: Argumentative.

A. Yeah, from the document, I -- I -- I assumed that, yeah.

BY MS. GRADY:

**Q. Okay. What are the potential benefits and harms of repeated radiation exposure?**

A. You know, again, you know, these are from the patient's conditions that I just listed here, you know. I just, you know, listed these factors as to mention that the -- a -- a causal analysis was not performed, you know. The -- I -- I listed these as some -- some -- some potential contributing factors.

**Q. Okay. Do you have any idea what radiation exposure is?**

A. Well, I'm not a medical professional to give



input on that. But I -- I -- I -- I reviewed the document, and these are -- you know, based on the document, they seem to be -- they may play a role.

**Q. Your -- based on your review of document?**

A. Sorry. Can you rephrase the question?

**Q. Yeah. What -- based on what document did you determine that the benefits and harms of repeated radiation exposure played a role?**

A. Well, I just -- and the -- the Dr. Herrington's report. I just listed this, you know, as some factors. You know, not -- not definite factors. They are just examples that may have contributed to the patient's death.

**Q. Do you -- do you know how radiation exposure is in any way related to x-ray imaging and surgical consultation?**

A. No, I'm not an expert in that area.

**Q. Okay. Do you know whether radiation exposure comes from surgical consultation?**

A. No, I don't. It is just some -- some information I obtained from the -- the report.

**Q. Okay. And I mean, I will represent to you that there is absolutely no discussion in the deposition or the report or the medical records that radiation exposure was something was a factor that was considered**

**or identified by anybody. So I'm really just -- I'm trying to understand, given your lack of understanding of this phrase, where it is that you even got this from?**

MS. KINKADE: Argumentative. Asked and answered.

A. Well, these are based on previous patient's conditions. You know, I just listed them, you know. Any of his conditions might have led to his -- you know, his death, based on the -- based on the -- the report, you know. And I -- I -- I assume that they might play a role, but these are just examples. I'm not a medical professional to -- to assert that these contributed to the -- the death. These are just examples to challenge causality.

BY MS. GRADY:

**Q. Okay. You keep - you keep saying that these are just examples, but I'm trying to even understand where it is that you even possibly came up with this as an example. Dr. Herrington doesn't talk about it. The medical records don't talk about it. Dr. Herrington's deposition testimony doesn't talk about it. Where did you even come up with the idea the potential benefits and harms of repeated radiation exposure is any sort of thing that might be relevant to this patient?**

A. Well, radiation exposure -- I need to see the



document, you know. With the -- I think it was listed in the document.

**Q. Listed in what document?**

A. In Dr. Herrington's report for -- for the second patient.

**Q. Okay. Here's Dr. Herrington's report. Now, I'm going to search for the word radiation. No match. Go to Patient 2.**

A. I just go to Patient 2.

**Q. Right. Oh, I'm sorry. I went too far. Here we are.**

A. Could you please scroll down to the next page?

**Q. Sure.**

A. You know where - where it mentions abdominal x-ray, you know. It could be one example.

**Q. You're right. It does reference x-ray. Where, at all, does it reference radiation exposure?**

A. Could you please scroll down a bit?

**Q. Okay.**

A. Could you please scroll down a bit? Sorry. You know, since I reviewed this report in detail three months ago, I - I think I was referring to x-ray, you know, x-ray imaging.

**Q. What does radiation exposure have to do with x-ray imaging?**



A. Well, x-ray imaging, I think, is a -- you know, I was just providing examples. You know, I -- I -- I thought -- interpreted the x-ray as radiation, I guess. Just, you know, provide some factors that may have played a role, I guess.

MS. KINKADE: Just for the record, his deposition does -- Dr. Herrington's deposition does discuss radiation exposure.

MS. GRADY: Right. But totally far afield from anything about this patient.

MS. KINKADE: Well, you just made a proffer on the record, so I'm just clarifying.

MS. GRADY: All right.

BY MS. GRADY:

**Q. Is there someone in the room with you, Mr. Heidari?**

A. Sorry?

**Q. Is there someone in the room with you? It sounded like you were speaking to somebody.**

A. (Inaudible).

**Q. Okay. Sorry. Has there been someone in the room with you for some time during this deposition?**

A. No, she just -- just came in and I -- I'm ask her to, you know, to -- to close the door.

**Q. Okay. Is she still in the room with you?**



A. No, no. She closed the door.

**Q. Okay. Was she -- this -- did you discuss the contents of your testimony with her at all?**

A. No, she doesn't understand English. No.

**Q. Okay. All right. All right. So for Patient number 3, we see here that you criticize Dr. Herrington for, "Not taking into account that there may be specific guidelines or policies that regulate when and how nursing staff should communicate with medical practitioners, especially in cases of after-hours care, emergency, or uncertainty"; you see that?**

A. Yes. I can see that.

**Q. Do you have any information that any such guidelines or policies existed?**

A. Well, again, I -- I just may have tried to, you know -- sorry. You know, the reason I provided this is to discuss why -- you know, again, to --

**Q. That's not my question, Hr. Heidari.**

A. Yeah. The -- the answer is no but --

**Q. I'm not asking you why you included it.**

A. Yeah, the answer is no --

**Q. Okay.**

A. -- but I -- I provided this to challenge causality.

**Q. Which you are not an expert in, correct?**

A. Yes, correct. But just some examples.
**Q. All right. You talk about Dr. Herrington's opinion about discontinuing a proton pump inhibitor. Do you see this section of your report on page 14, continuing to page 15?**
A. Yes, I can see that.
**Q. What is a proton pump inhibitor?**
A. Well, again, I -- I -- I just, you know, I don't need -- I don't know what this means, but, you know, I -- I just assess whether this -- you know, an analysis was present to -- to lead to a conclusion, you know. What I'm doing here is just assessing his analysis.
**Q. Okay. So you don't know what a proton pump inhibitor is, right?**
A. No, I'm not an expert in that area.
**Q. Okay. And you say that, "The statement applies that discontinuing a proton pump inhibitor is harmful and inappropriate for a patient with gastrointestinal bleeding, regardless of their mental health status or preferences." Do you see that sentence on your report?**
A. Yes.
**Q. Okay.**
A. Well --



**Q. Do you have any idea about the propriety of discontinuing a proton pump inhibitor?**
A. I don't have any idea about that, but, you know, since his -- his health status was discussed in the report, you know, I just included them, you know, as to challenge causality, you know, as causality was not present.
**Q. I mean, the statement also implies that death is an unwanted outcome, right?**
MS. KINKADE: I didn't hear your question. Can you repeat the question? I didn't hear it.
BY MS. GRADY:
**Q. I said the statements of Dr. Herrington for this patient also imply that death is an unwanted outcome, right?**
A. Sorry. Can you repeat the last part of your question? What are outcomes? Sorry.
**Q. You agree that Dr. Herrington's report implies that death is an unwanted outcome, right?**
A. Well, that's a broad question.
**Q. How is it a broad question?**
A. You know, death is an unwanted outcome. You know, for this patient or for all patients, do you mean?
**Q. I just asked you whether you agree that Dr. Herrington's report implies that death is an unwanted**



**outcome?**
MS. KINKADE: Form.
A. Based on the information in the report, well, I can't give an definite answer to this question.
BY MS. GRADY:
**Q. I mean, of course the report assumes that death is an unwanted outcome. If death was a desire -- if Dr. Herrington believed that Wexford desired to kill its patients, that would be something you'd expect to see as part of his analysis, right?**
MS. KINKADE: Form.
MS. GRADY: I'll withdraw the question.
A. But --
BY MS. GRADY:
**Q. Is it your testimony that any implication that an observation makes must be fully discussed?**
MS. KINKADE: Form.
A. Well, I don't say that it must be fully discussed. I mean there must be -- what I'm saying is that there must be an -- an analysis present, some sort of -- you know, a causality analysis. That's what I'm saying, for the entire report.
BY MS. GRADY:
**Q. Okay.**
MS. GRADY: Let's go off the record for a second.



THE REPORTER: Off the record. The time is 2:04 p.m.
(OFF THE RECORD)
THE REPORTER: We're back on record for the deposition of Moein Heidari being conducted by videoconference. My name's Esther Heath. It's September 29th, and the time is 2:13.
BY MS. GRADY:
**Q. All right. I want to switch topics and look at your critique of Dr. Cockerill's report. You have no training in mental health treatment, correct?**
A. Yes, that's correct.
**Q. Now, you say that Dr. Cockerill's calculation of the probability of dying as a result of synthetic cannabinoids is based on naive assumptions. What about Dr. Cockerill's assumptions as he set them out here, in your opinion, are naive?**
A. Well, he -- he -- he made three assumptions then calculated the -- a probability value. But I listed the -- how -- you know, how each of these assumptions -- how these assumptions were naive, you know. You know, you can see, you know, the -- the -- the three arguments I made here.
**Q. Right. But why are they naive assumptions?**

A. Well, let me go them -- go over one by one.

**Q. Okay. The assumption that --**

A. Well, the calculation --

**Q. Hold on. Let me ask my question: The assumption that there have been a total of 22 to 27 deaths that could be attributed to synthetic cannabinoids in the U.S. since they were developed. How is that an assumption that is naive?**

A. Well, as I explained later in this report, this can -- these values may not be valid, you know. The -- the actual value could be much larger than this, so since -- since the probability value depends on these values, you know, as you can see below, well -- this, the -- the calculated value then, is -- is not reliable.

**Q. Okay. So because Dr. Cockerill didn't take into account the theoretical possibility that additional deaths are attributed to synthetic cannabinoids without any information as such, he -- that assumption is nain your opinion?**

A. Well, I -- I have discussed, and can you please scroll down? You know, I've discussed how this assumption could be naive.

**Q. Please point me to the discussion where you discussed about how this assumption is naive?**

A. That -- and this is in this paragraph, you



know, the last paragraph on page 30, which continues on page 31.

**Q. Okay. I still have -- I still need you to point me to where you discussed specifically why the assumption is naive.**

A. Okay. I'm just reviewing the document. Well, you know, some of them -- these are only the reported deaths, you know. It -- it doesn't take you -- into account unreported deaths. So when unreported deaths are not included, well, these values are not reliable.

**Q. Okay. But you purport to make probability determinations about the likelihood that Mr. Curtis died from the substance that was detected on toxicology, right?**

MS. KINKADE: Misstates the testimony.

A. Can you clarify your question, please? Sorry.

BY MS. GRADY:

**Q. Did you make a calculation of the probability that Mr. Curtis died from the substance identified in his urine at autopsy?**

A. Actually, I cannot do that calculation because I don't know the true numbers of patients, you know. If these assumptions are flat, then I don't have the true values, so I can't calculate it myself.

**Q. Okay. Isn't it an assumption that there are**



**additional deaths that are from synthetic cannabinoids?**

A. Sorry. I didn't get your -- what you meant.

**Q. You criticized Dr. Cockerill for, in your view, assuming that the number is 22 to 27, because it's possible there are additional deaths that are unreported; isn't that an assumption?**

A. Well, he did not make that assumption. What I'm saying is that this is not taken into account that some of the deaths are unreported.

**Q. Do you have any information about a -- strike that. You don't know that any additional deaths have been from synthetic cannabinoids in the timeframe?**

A. Well, I don't have information on that, but just this is the reported value, you know. The -- not the -- since he is making conclusions about the general population of the United States, the -- the value needs to be accurate and not, you know -- you know, just reported values might not reflect the situation.

**Q. Okay. So what number should he use to take into account what you say could be additional deaths that go unreported?**

A. Well, I don't have any information on that, but -- you know, I can't give input on that, because I -- I don't know -- you know, I'm not a medical professional to give input on that.



**Q. Okay. So you don't have any expertise in determining whether and how to account for undiagnosed deaths from synthetic cannabinoids?**

A. Yes, I don't have expertise to -- just to give my opinions on that.

**Q. Okay. The second topic, the second assumption that you criticized Dr. Cockerill for having, in your view, is that Mr. Curtis's death was caused by a synthetic cannabinoid, which you say is inaccurate because the pathologist found Mr. Curtis's death was caused by an unknown substance, right?**

A. Yes, that's correct.

**Q. Okay. Are you aware that other experts retained by Wexford have opined that the substance was a synthetic cannabinoid?**

MS. KINKADE: Misstates the evidence.

A. Well, can you restate your question, please? Sorry.

BY MS. GRADY:

**Q. Are you aware that Wexford has produced other reports from other experts that opined that Mr. Curtis did die from a synthetic cannabinoid?**

MS. KINKADE: Misstates the evidence.

A. Well, I only reviewed the -- this part of the report, you know. I -- I didn't review anything else,

so I'm not aware of anything else.
BY MS. GRADY:
**Q. You agree that if one or more of Wexford's experts opined that Mr. Curtis did die of a synthetic cannabinoid, they would be subject to the same criticism that you've leveled against Dr. Cockerill here, correct?**
MS. KINKADE: Form. Foundation. Assumes facts not evidence.
A. Sorry. I'm confused. Can you clarify your question?
MS. GRADY: Can you read it back, Esther? Or play it back?
THE REPORTER: Yes. Just one moment.
(REPORTER READS BACK REQUESTED QUESTION)
MS. KINKADE: I think there's a question after that.
A. Well --
MS. GRADY: Here, I'll ask. It's okay, Esther, I got it.
BY MS. GRADY:
**Q. Let me re-ask my question, Mr. Heidari: If any such expert did offer that kind of an opinion, they would be subject to the same criticism from you as you've leveled against Dr. Cockerill here on page 31 of your report, correct?**



MS. KINKADE: Form. Foundation. Assumes facts not in evidence. Incomplete hypothetical.
A. Well, it mentions unknown substance, you know. Even it's -- you know, but it narrows in -- the problems down to -- to just one substance, you know. This is the issue I -- I identified. So if this is for another case as well, my opinion remains the same.
BY MS. GRADY:
**Q. Okay. So if someone who Wexford retained said it was a synthetic cannabinoid, you would have the same criticism, right?**
MS. KINKADE: Same objections.
A. Well, I can't give input on that because there might be some implications, you know -- you know, how they are related, you know. They might require another analysis to be performed. But what -- I just critiqued this analysis. But for that case, the situation might be completely different. I can't say yes answer.
BY MS. GRADY:
**Q. I see. So if Wexford's experts had opined that it's a synthetic cannabinoid, that might be okay, but if Dr. Cockerill provides any opinion to that effect, that's what's inappropriate; is that your testimony?**
MS. KINKADE: Misstates, the evidence.



Dr. Cockerill didn't have that as the cause of death, but --
MS. GRADY: I mean, I agree with you, but he has listed it here.
MS. KINKADE: If you'll stipulate that Dr. Cockerill has that as the cause of death, I'm good. But I'll renew my other objections as well.
MS. GRADY: We're obviously not stipulating to that.
BY MS. GRADY:
**Q. Go ahead, sir.**
A. You know, I'm confused about your question. You know, I just -- if you state it differently, you know, I would provide a more appropriate response.
**Q. You agree it would be appropriate to apply the same methodology in the same way to opinions in this case, whether the opinions are put out by someone retained by the plaintiff or someone retained by Wexford, right?**
A. The -- the analysis is flawed, yes. If I'm retained by anybody, you know, this is -- this is flawed, you know. This is -- yeah, I would identify these flaws, yes.
**Q. Okay. In your discussion about the**



**assumptions of death by synthetic cannabinoids, you don't do any discussion about the accounting for undiagnosed deaths from catatonia. Why not?**
MS. KINKADE: Form.
A. Well, why -- why should I include in those cases?
BY MS. GRADY:
**Q. Well, you remember that Dr. Cockerill performed this analysis as part of a determination as to the likelihood that Mr. Curtis died from synthetic cannabinoids, rather than dying from catatonia, correct?**
A. He compared the two probabilities, yes.
**Q. And so, wouldn't it be equally important for him to account for undiagnosed catatonia deaths as it is, per your report, to account for undiagnosed synthetic cannabinoid deaths?**
A. Based on the information provided, I assume -- I could only assess synthetic cannabinoids, I guess, you know. For the other one, I -- I think no detailed information was provided.
**Q. What detailed information was provided about the synthetic cannabinoids?**
A. Well, like, the numbers, you know, to -- the range from 22 to 27. Like, you know, the other assumptions he made, you know. But for the other one,

Page 226

no, I don't remember, you know, any -- any assumptions for the calculation of probability. I don't recollect anything.

**Q. Okay. You purport to perform an analysis of the likelihood that three people died in the same facility within 72 hours of each other with an unknown substance of the same molecular weight in their systems, yet they died of something other than that unknown substance. Do you see that on page 32 of your report?**

A. Yes, I can see that.

**Q. Okay. And then you did calculate that probability, correct?**

A. I -- I used Poisson distribution to calculate that probability, yes.

**Q. Poisson distribution is a calculation tool that's used for rare events, right?**

A. Well, it's not limited to rare events. It's -- it is used to calculate the rate of occurrence for -- for some -- you know, some events.

**Q. Okay. It's your testimony Poisson distribution is not a tool that is used to calculate the probability of rare events?**

MS. KINKADE: Misstates his testimony.

A. Well, we can't -- the -- we can't say that it cannot be applied to this situation. You know, the

Page 227

Poisson distribution is applied to calculate the occurrences of different, you know, events -- you know, different events. You know, it's a discrete distribution.

BY MS. GRADY:

**Q. Right. But it's utility is at its peak when it is used to make determinations about rare events, right?**

MS. KINKADE: Form.

A. Again, it's not limited to rare events, you know. It -- it can apply to any situation as long as, you know, it -- it seems appropriate.

BY MS. GRADY:

**Q. Is it primarily used for rare events?**

MS. KINKADE: Form.

A. Well, to calculate to use for rare events to -- for what purpose? I -- I don't understand.

BY MS. GRADY:

**Q. Well, what purpose do you use the Poisson distribution model for?**

A. Well, I -- I used it to calculate the probability that the three deaths occurred, you know, within a 72-hour -- within a 72-hour period.

**Q. Are you familiar with the Poisson limit theorem?**

Page 228

A. Poisson what? Sorry.

**Q. The Poisson limit theorem.**

A. Can you restate that? I didn't get it correctly.

**Q. The Poisson limit theorem. Are you familiar with that theorem?**

A. Poisson limit theorem? There is a central limit theorem. I -- I've never heard of -- of Poisson limit theorem.

**Q. Have you heard of the law of rare events?**

A. Yes, I have.

**Q. The law of rare events is also known as the Poisson limit theorem, right?**

A. Well, since I haven't heard of that, you know, I don't -- I'm not sure if they are the same, but

**Q. Okay. So --**

A. I have applied the -- the law of rare events, yeah.

**Q. So you conclude in your report that -- well, tell -- you tell me. What is the conclusion that you reached with regard to your hypothesis that three men died in the same facility within 72 hours of each other with an unknown substance of the same molecular weight in their systems, yet they died of something other than that unknown substance?**

Page 229

A. Well, I use historical data from 2013 to 2019, I guess, to calculate this probability value, you know. Based on this historical data, I determined the rate of occurrence of death, and then I -- I converted it to rate of occurrence of death within a 72-hour period. Then, you know -- and I calculated this -- this probability means that how -- this is like p-value, you know, how far our findings are from randomness. I mean, how -- how likely it is to -- to get a result as extreme as, you know, three deaths within a 72-hour period. Like four deaths, five deaths. This probability is the .0 over 1. This is -- which is extremely small, you know. So this -- this tells us that the -- the death of three individuals in 20 -- in 72 hours is a rare occurrence, extremely rare occurrence. So there might be another underlying factor explaining the death of these individuals.

**Q. Okay. So a few things. Your sample size is not randomly selected, correct?**

A. This is Poisson distribution. We are dealing with rates of occurrence.

**Q. Okay. Did you conduct any sampling?**

A. Well, sampling was not performed, but we are just dealing with the rate of occurrence of deaths within time periods. We have data.

**Q. Okay. Did you perform a root cause analysis?**
A. No. But let me go back to your previous question, you know. We -- this --
**Q. No, sir. Your counsel is going to have opportunity to ask you follow-up questions. I just want the answers to my questions, because my time is limited.**
A. Okay.
MS. KINKADE: Well, if he needs to complete an answer, you've got to let him --
MS. GRADY: No, he said, let me go back to your last question -- you requested sanctions against an expert who did exactly that thing, arguing that providing answers to a previous question was not only inappropriate, it was sanctionable. So this is my time --
MS. KINKADE: That is not why --
MS. GRADY: -- ask my questions and get --
MS. KINKADE: That was not why --
MS. GRADY: -- get my answers.
MS. KINKADE: That's not why I moved for sanctions, but I'll -- I mean, if you're not going to let him finish answering that question, then just put on the record that he wanted to provide additional answers at this time and wasn't allowed.
MS. GRADY: Well, that's totally incorrect. He



indicated that he answered my question, which called for a yes or no answer. He said no. And then he said, let me go back to your last question. You'll have all the opportunities, so you can feel free to ask him about that on your direct.
MS. KINKADE: And just --
MS. GRADY: So let me --
MS. KINKADE: Just to be clear, I won't have that today. I'll have that in a week's time.
MS. GRADY: Sure.
MS. KINKADE: I just want the witness to --
MS. GRADY: If you want to take additional time today, you're free to -- I mean, like, I'm happy to allow that, as long as then we're going to limit your questions next week to next week's questions from me.
MS. KINKADE: I don't -- you don't just get to make up new rules. I just put on the record that the witness should be able to fulsomely answer every question. And that's what I'm putting on the record.
MS. GRADY: Okay. And I -- just, again, counsel has moved for sanctions against a witness who did just that, so I would just like an answer to the questions that I asked.



MR. SHULTZ: I agree with Jaclyn, and I don't -- I don't think tit-for-tat is the correct reasoning here, and I completely agree with Jaclyn that the answer should be completed.
MS. GRADY: Okay. Fine.
BY MS. GRADY:
**Q. Mr. Heidari, was there something in addition that you needed to provide in order to answer the question whether or not you did a root cause analysis as part of this calculation here?**
A. Well, my answer was to your -- to your previous questions, yes, since I couldn't complete it. I didn't need to perform a root cause -- I didn't perform a root cause analysis here, but for the -- for the sample, you -- you -- you asked for the previous questions, our sample was data from 2013 to 2019. And we made the conclusions based -- based on the data for that time period. I mean, it concluded that based on this -- on this time periods, this is far away from randomness, you know, based on the -- during the timeframe, the patients that were reviewed, this is extremely from -- far away from randomness.
**Q. Did you conduct any random sampling, sir? Yes, or no?**
A. I did not. I -- I used historical data.



**Q. Okay. So then it -- it's your finding that it is unlikely that three men died at the same facility within 72 hours of each other with an unknown substance of the same molecular weight in their systems, yet they died of something other than that unknown substance; is that right?**
A. Well, I evaluated this, yes.
**Q. Okay. And so, you determined that that probability is .00010; is that true?**
A. This is the probability of the three individuals' deaths within 72 hours. This is the probability of that.
**Q. Okay. So yes, you calculated that probability, as you're -- as you're stating there, to be .00010, correct?**
A. Yes. 00 -- .0001, yes.
**Q. Okay. And you're assuming for purposes of this analysis that, in fact, the three men who died did in fact die with unknown substances of identical molecular weight in their systems, right?**
A. I'm not concluding that. I am concluding that this is a very unusual occurrence, and there is an underlying -- it -- it's -- and it -- it suggests that there is an underlying factor, you know, and that needs to be considered. You know, there might be some other

thing that we haven't considered.

**Q. I see. So you're -- so it's not true that the probability that the men died of something other than the unknown substance is .00010. Instead, it is only your conclusion that it is a probability of 0.00010 that the men died of unconnected causes; is that right?**

A. Well, it's just the probability that the -- the -- the three men died within three hours under the -- our new hypothesis.

**Q. Okay. So the only determination that you're making with respect to this figure of .0010 [sic] is that that is the probability that such an event would occur; is that right?**

A. The probability are as a result as extreme as three deaths, you know, three, four, five or more.

**Q. Okay. So you are not expressing any opinion as to the probability that they died from an unknown substance, true?**

A. Well, I am saying that there is an under -- you know, it's away from randomness. You know, it's very unusual. This suggests that there -- there is very likely that an underlying cause, you know, that -- I mean, it suggests that -- that the three deaths could be connected.

**Q. Yeah. And you're not expressing any opinion**



**as to what that cause is, right?**

A. Well, I'm a statistician. I don't do causal analysis. I just, you know, assess -- you know, do analysis and see if they are -- you know, I can't assume -- determine casualty.

**Q. Okay. So you don't have any opinion -- you don't have any ability to opine whether the connecting cause is that unknown substance, rather than the inadequate practices of Wexford, right?**

MS. KINKADE: Form. Foundation. Incomplete hypothetical.

A. Well, as I said before, I am not determining causality. I'm just saying that there's an underlying cause that may suggest that the -- the three deaths are connected. I'm not saying anything about -- about the quality of care or the -- the substance that caused these deaths. I'm just saying that there is an underlying cause.

BY MS. GRADY:

**Q. You're not even saying that the substances did cause the deaths, right?**

A. Well, I can't assume causality, no.

**Q. Okay. And why didn't you take into account the population? You're mentioning that this is the same facility. Why aren't you taking into account the**



**population of the facility?**

A. Sorry. Let me see. Can you show me on -- on the report, please, where -- where I mentioned that?

**Q. You mentioned that the relevant piece is that three people died within the same facility, right?**

A. Yes.

**Q. Okay. So it's actually much more likely that three people would die within 72 hours of each other if the facility at issue had a population of 360 million, true?**

A. Well, the size of the population -- you know, this -- you know, if the size of the population is smaller, you know, the rate is higher, you know. We expect to see more deaths. This is what I can say about this. You know, if the size of the small population was -- was smaller, you know, and the -- the number of deaths was the same, well, the rate of death would be larger, and the probability of death within 72 hours would be higher. That what I can say for sure.

**Q. Okay. You agree there's nowhere in here where you discuss the population of the facility and its impact on your probability calculation, correct?**

A. No. And these values are directly related to the sizes of -- the size of the population. When we calculate the -- calculate the -- the rate of



occurrence, we take into account the size of the population. The rate of occurrences calculated as the number of deaths divided by the size of the population.

**Q. Okay. Where do you discuss that?**

A. Well, could you please scroll down? I --

**Q. Okay.**

A. Well, I -- I provided, you know, the total number of deaths, which is 73 here.

**Q. Okay. You didn't provide any discussion about the size of the facility, right?**

A. I just calculated the average number of deaths per year and then calculated the -- the rate of -- no, I didn't discuss the size of the population, just average number of deaths per year for the facility.

**Q. Is it the result of your calculation statistically significant?**

A. Yes. It's -- it's a .0001, which is very far away from randomness.

**Q. Okay. And it's your testimony that basing that on a total of 73 deaths over the course of six years, that's a sufficient sample size to render results with a p-value of .00010?**

A. Well, this is not sample -- sample size. We didn't select the 73 patients and, you know, we are -- we are calculating rate of death, you know.

Rate of -- our sample here is the years from 2013 to 2019, not -- not this 73 participants, you know.

**Q. Okay. And you don't know the number of people who were at Menard during those timeframes, correct?**

A. Well, I remember I had -- I had the -- the data for the number of incarcerated population, I -- I -- I assume, yeah.

**Q. Did you put in your report any information about the number of people incarcerated at Menard during this timeframe?**

A. Well, actually, I didn't, you know. I just calculated the average number of deaths per year, you know, and then calculated the parameter of the Poisson distribution based on that.

MS. GRADY: Okay. I think this might be a good time to stop. Esther, are we around six?

THE REPORTER: Yes, we're at 559. It's a great time -- go off the record?

MS. GRADY: Yes.

THE REPORTER: Okay. Going off the record at 2:44.

(DEPOSITION CONCLUDED AT 2:44 P.M. CT)



CERTIFICATE OF DIGITAL REPORTER

STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to type written form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.



ESTHER HEATH,
DIGITAL REPORTER/NOTARY
MY COMMISSION EXPIRES ON: 01/09/2024
SUBMITTED ON: 11/21/2023