**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

YOLANDA JACKSON, as Administrator )
of the Estate of Kevin Curtis, )
          )
         Plaintiff, )
          )
-vs- )     Case No. 20-cv-900-DWD
          )
WEXFORD HEALTH SOURCES, INC, )
et al., )
          )
         Defendant. )

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, NICKOLAS MITCHELL, by and through his attorney, KWAME RAOUL, Attorney General of the State of Illinois, and for his Brief in Opposition to Plaintiff's Partial Motion for Summary Judgment (Doc. 228), in accordance with the Southern District Local Rule 56.1, states as follows:

### RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS[1]

1.     On September 5, 2018, Kevin Curtis died in the custody of the Menard Correctional Center, a facility operated by the Illinois Department of Corrections (IDOC). Ex. 1 (Kevin Curtis's IDOC Medical Records) at IDOC000402.

**RESPONSE: Defendant admits these facts are undisputed and supported by the record. Defendant denies fact shows that this Defendant had personal involvement or supports liability of Defendant.**

2.     Mr. Curtis spent the last five days of his life in a segregation cell on 5 Gallery in Menard's North 2 cellhouse. Ex. 2 (Living Unit History) at IDOC000089.

---

[1] Any admissions made are solely for the purpose of this response.

**RESPONSE: Defendant admits these facts are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal involvement, nor can they support liability of Defendant.**

3.      When he died, Mr. Curtis was on "crisis watch," a form of solitary confinement reserved for prisoners who require an elevated level of care and supervision because they present a danger to themselves or others, or else because they require diagnostic assessment and temporary, clinical intervention for stabilization or diagnostic purposes. Ex. 3 (Mental Health SOP Manual) at ESI 2 0155.

**RESPONSE: Defendant denies that the fact that "[w]hen he died, Mr. Curtis was on 'crisis watch'" is supported by the record citation. Defendant admits the remaining facts are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge of the Mental Health SOP Manual or personal involvement, nor can they support liability of Defendant.**

4.      On August 31, 2018, correctional officers drove Mr. Curtis to the emergency room at Chester Memorial Hospital in Chester, Illinois. Ex. 4 (Chester Memorial Hospital Records) at P000480–489; *see also* Ex. 1 at IDOC000151–155.

**RESPONSE: Defendant denies that the fact that "correctional officers drove Mr. Curtis to the emergency room at Chester Memorial Hospital" is supported by the record citation. Defendant admits the facts that on August 31, 2018, Mr. Curtis went to the emergency room at Chester Memorial Hospital in Chester, Illinois are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement,**

**nor can they support liability of Defendant.**

5.      Mr. Curtis presented with an inability "to verbalize," repetitive and jerky limb movements, and an elevated temperature and blood pressure. The nursing staff at Chester observed Mr. Curtis urinating on himself and his head and mouth writhing. His urine drug screen at Chester was negative. Ex. 1 at IDOC000151–155, IDOC000378.

**RESPONSE: Defendant denies the temperature and blood pressure noted on the records also include notations that either were elevated. Defendant denies the drug screen indicates it was done at Chester. Defendant admits the remaining facts are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant.**

6.      On September 1, Mr. Curtis was discharged from Chester Memorial and sent back to Menard with a diagnosis of "altered mental status." Ex. 1 at IDOC000142–143.

**RESPONSE: Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant.**

7.      Upon Mr. Curtis's return to Menard, a physician "assessed" his condition as "[m]ental health," noting that he was "acting fearful" and "showing inappropriate behavior." The doctor prescribed Mr. Curtis a low dose of Tylenol PM and placed him on a "constant watch," which required Mr. Curtis to be continuously observed by a correctional officer. A second order, entered just fifteen minutes later, reduced that status to a 30-minute watch, which required correctional staff to perform visual and verbal checks on Mr. Curtis every half hour. Ex. 1 at IDOC000122; Ex. 3 at ESI 2 0176–0177.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant.**

8.      Over the next several days, Menard medical staff documented Mr. Curtis exhibiting an array of alarming behaviors: pacing naked, sucking his thumb, screaming, pulling his scrotum, and banging on his steel cell door. Mr. Curtis consistently presented as non-verbal and with poor hygiene. Ex. 1 at IDOC000122–131, IDOC000228–239.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant. Additionally, the same records indicate that, at times, Mr. Curtis**

**was in zero distress and sitting on his bunk.**

9.      On September 4, Mr. Curtis saw Melissa Pappas, a licensed clinical professional counselor, in the North 2 infirmary. Ms. Pappas ordered that Mr. Curtis be placed on a "10-minute watch," citing his "lack of stability on crisis watch and lack of information obtained [from] the Offender during the session." Ex. 1 at IDOC000232–233.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant.**

10.      About thirty minutes after meeting with Ms. Pappas, Mr. Curtis saw Dr. Christina Floreani, a psychiatrist and a contract employee of Defendant Wexford Health Sources. Dr. Floreani noted that Mr. Curtis had "required assistance into the exam room with significant psychomotor retardation," that he was "largely unresponsive to verbal prompts," and that he had "virtually no reaction to stimuli." Dr. Floreani also observed that Mr. Curtis had an elevated heart

rate and had "not been taking in fluids." Based on these findings, Dr. Floreani diagnosed Mr. Curtis with catatonia. Ex. 1 at IDOC000234–239.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant denies an "elevated heart rate" is stated in the records, but affirmatively states the cited records provide that the vitals of Mr. Curtis were otherwise normal and that he refused to come**

out of his cell. *Id.* **Defendant admits the remaining facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant.**

11.     Sometime between 8:35 and 9:00 a.m. on September 5, Mr. Curtis was found unresponsive in his crisis-watch cell. Correctional officers brought him first to the cellhouse infirmary and then to the infirmary in Menard's healthcare unit, where medical staff drew blood and urine samples. Correctional staff brought him back to his crisis-watch cell by wheelchair. Ex. 2 at Mitchell000082; Ex. 1 at IDOC000128, 000333; Ex. 5 (L. Goldman Dep.) at 18.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant. Defendant did not begin his shift until approximately 2:50 p.m. on September 5, 2018. (Doc. 222, p. 3, ¶ 10; Doc 222-7 at p. 1 of 3).**

12.     Dr. Lisa Goldman, an IDOC psychologist administrator, saw Mr. Curtis as he was being transported back to 5 Gallery in a wheelchair. A short while later, in a 10:20 a.m. email sent to several Menard staff, Dr. Goldman warned that Mr. Curtis appeared "extremely dehydrated" and "catatonic (just as he had been diagnosed in the past)." Dr. Goldman further wrote that, in her "clinical opinion," Menard staff "need[ed] to intervene quickly for the dehydration with a combination of this heat could be lethal." Ex. 5 at 18; Ex. 6 (Goldman emails) at IDOC000630–633.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Defendant further objects based upon lack of adequate foundation. Defendant denies the clinical opinion of Dr. Goldman was within the scope of her practice. (Doc. 228-6, pg. 148, ¶¶ 3-6; *Id.* at p. 153 ¶¶ 7-11; *Id.* at p. 159-160). Subject to and without waiving those objections, Defendant admits the remaining facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant. Defendant was not a recipient of that email nor is there any evidence he was aware of the email.**

13.    At 12:25 p.m., Dr. Floreani emailed an "emergency" prescription order for Ativan. *Id.* The order directed staff to "Start Ativan 2 mg PO NOW and give 2 mg IM if [Mr. Curtis] refuses." Ex. 1 at IDOC000091.

**REPONSE: Defendant denies "emergency" is supported by the cited record. Defendant admits the remaining facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to show that this Defendant had personal knowledge or personal involvement, nor can they support liability of Defendant.**

14.    At 1:30 p.m., Mr. Curtis received that dose of Ativan intramuscularly. He received no further medical or psychiatric attention before his final lapse into unresponsiveness. Ex. 1 at IDOC000130–141.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant denies**

the facts contained in this paragraph are supported by the record citation.

15.    At all relevant times, Nickolas Mitchell was employed by IDOC as a Correctional Officer at Menard Correctional Center. Ex. 7 (N. Mitchell Dep.) at 222.

**RESPONSE: Defendant admits the facts in this paragraph are undisputed.**

16.    On September 5, 2018, Mitchell was the sole officer assigned to crisis-watch duty on 5 Gallery during the 3:00 p.m. to 11:00 p.m. shift. Ex. 8 (IA Report) at Mitchell000011.

**RESPONSE: Defendant denies the allegations in this paragraph. The cited record also indicates that on September 5, 2018, Charlie Frecking was also assigned to 30-minute crisis watch duty on 5 Gallery during the 3:00 p.m. to 11:00 p.m. shift. (Doc. 228-9, p. 8).**

17.    As a crisis-watch officer, Mitchell's principal duty was to monitor crisis-watch prisoners for signs of medical or emotional distress. Ex. 7 at 180.

**RESPONSE: Defendant denies the facts contained in this paragraph are supported by the record citation. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

18.    Mitchell knew the importance of a prisoner's crisis-watch status. Mitchell was trained as a crisis-watch officer through the IDOC's mandatory, systemwide mental-health cycle training. Based on this training, he knew that prisoners on crisis watch were at risk of suffering serious harm if left unmonitored. Ex. 7 at 181 ("Q: And you know that there is a risk for people on suicide watch[,] that they will be harmed by themselves if they are not watched at 10-minute intervals; right?  A: Yes.  Q: You were trained on that when you started working for the IDOC; right?  A: Yes."); *see also* Ex. 9 (Mitchell training records) at P004691.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather**

**than one discrete fact. Subject to and without waiving that objection, Defendant denies
the facts contained in this paragraph are supported by the record citation. Plaintiff filed
her deposition exhibits without page numbers. The referenced page fails to support her
allegations nor do the training records.**

19.    Mitchell was also trained on the IDOC's policies for responding to medical
emergencies, which required him to call a "Code 3"—a radio code denoting a medical
emergency—any time he believed a prisoner required emergency medical care. Mitchell knew that
calling a Code 3 would summon medical staff to his location, and he also knew that he did not
need approval from anyone else before calling a Code 3. Ex. 7 at 222–228.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather
than one discrete fact. Subject to and without waiving that objection, Defendant admits
the facts as to being trained on a Code 3 – which is a medical emergency – when a prisoner
required emergent care, and that he did not need approval before calling a Code 3 are
undisputed and supported by the record; however, Defendant denies that they are
material to any claims against him as they fail to show that this Defendant they support
liability of Defendant. Defendant denies the remaining facts contained in this paragraph
are not supported by the record citation. Plaintiff filed her deposition exhibits without
page numbers. The referenced page fails to support her allegations nor do the training
records.**

20.    Mitchell entered the crisis-watch gallery to begin his shift at "[a]pproximately 2:55"
p.m. on September 5, 2018. Three prisoners, including Mr. Curtis, were being held on crisis watch
at that time. Ex. 7 at 24; Ex. 8 at Mitchell000011.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather**

than one discrete fact. Subject to and without waiving that objection, Defendant denies the facts contained in this paragraph are supported by the record citation in Exhibit 7. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations nor do the training records. Defendant admits the three prisoners, including Mr. Curtis, were designated on crisis watch are undisputed and supported by the record in Exhibit 8 at Mitchell 000011.

21.     Mitchell "knew Kevin Curtis was on crisis watch and was to be monitored every 10 minutes with verbal and visual checks." Dkt. 44 (Def. Mitchell's Answer) ¶ 36.

RESPONSE: Defendant admits his answer states he now knows and admitted in his that Kevin Curtis was on crisis watch and was to be monitored every 10 minutes with verbal visual check; but the evidence shows that, at the time, Defendant thought it was only a 'skin' check. (Doc. 222-7, p. 1 of 3). Defendant denies that they are material to any claims against him as they fail to support liability of Defendant.

22.     After beginning his September 5 shift, Mitchell conducted "[a]pproximately 12" rounds of cell checks. Ex. 7 at 24–25.

RESPONSE: Defendant admits these facts, but denies Plaintiff provided the proper record citation.

23.     At 4:03 p.m., and again at 4:10 p.m., Mitchell wrote in the crisis-watch logbook that Mr. Curtis was alive and "lying on the floor." Ex. 2 at Mitchell000028. Mitchell specifically observed during these checks that Mr. Curtis's chest was moving, meaning that he was breathing. Ex. 7 at 239; *see also id.* at 82.

RESPONSE: Defendant admits these facts, but denies Plaintiff provided the proper record citation.

24.      Around 4:15 p.m., Mitchell was asked by Defendant Andrew Bennett, a
correctional sergeant, to help Bennett oversee prisoners as they went to and from "chow," or
mealtime. Ex. 7 at 36.

**RESPONSE: Defendant admits these facts, but denies Plaintiff provided the proper
record citation.**

25.      Mitchell knew that he was the only officer assigned to monitor the prisoners on
crisis watch. He also knew that, although he could briefly attend to other duties "between the ten-
minute interval crisis checks," it was his "responsibility to return and complete the mandatory ten-
minute tour" afterward. Ex. 8 at Mitchell000014; *see also* Ex. 7 at 36.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather
than one discrete fact. Subject to and without waiving that objection, Defendant denies
the facts contained in this paragraph are supported by the record citations. Any findings
in the investigational report or statements made by others who were interviewed do not
impute knowledge of those facts upon Defendant. Defendant also denies that he was the
only officer assigned to monitor the prisoners or that he had to return to his post every 10
minutes while assigned with the chow lines.**

26.      Mitchell did not advise Bennett that he needed to be at his post to continue running
checks. And Mitchell did not ask Bennett—or act himself—to ensure that another officer would
cover his post. Ex. 7 at 32–34.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather
than one discrete fact. Subject to and without waiving that objection, Defendant admits
the facts in this paragraph are undisputed and supported by the record; however,
Defendant denies that they are material to any claims against him as they fail to support**

**liability of Defendant.**

27.    Mitchell "check[ed] to see if [Mr. Curtis's] chest was moving before" leaving the crisis-watch gallery. He then stopped to retrieve a "magnum" canister of pepper spray "just in case a fight broke out or something would have happened." Ex. 7 at 29–31, 56, 239.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits he checked to see if Mr. Curtis's chest was moving before he left but denies this is material to any claims against him as they fail to support the liability of Defendant. Defendant denies the remaining facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

28.    Mitchell left the crisis-watch wing unmonitored for nearly an hour and a half. No one took his place. Ex. 7 at 36.

**RESPONSE: Defendant denies the facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

29.    Mitchell returned to 5 Gallery around 5:50 p.m. He reached Mr. Curtis's cell at 5:53 p.m.  Ex. 7 at 82; Ex. 10 (IA Report Attachments) at Mitchell000026.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits that Exhibit 10 indicates a check on Mr. Curtis at 5:53. Defendant denies the remaining facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her**

**allegations.**

30.    Mitchell immediately saw that Mr. Curtis was "[l]aying on his bunk" and "not breathing." Ex. 7 at 82.

**RESPONSE: Defendant denies the facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

31.    After making this observation, Mitchell continued to watch Mr. Curtis for another two minutes "to see if he was breathing." Ex. 7 at 85.

**RESPONSE: Defendant denies the facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

32.    Mitchell knew that he was required to call a Code 3 for any prisoner he believed to be experiencing a medical emergency, regardless of whether he was "sure that [the prisoner] wasn't breathing." However, Mitchell did not call a Code 3 or otherwise attempt to provide or summon medical assistance. Ex. 7 at 85–86, 224–225.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to support liability of Defendant.**

33.    Instead, Mitchell contacted another correctional officer, Defendant Jeremy Frerich, who came over to Mr. Curtis's cell "[i]mmediately." Ex. 7 at 82–83, 86.

**RESPONSE: Defendant admits he immediately contacted another correctional officer, Defendant Jeremy Frerich, who came over to Mr. Curtis's cell immediately. Defendant denies this is material to any claims against him as this fails to support any liability of Defendant.**

34.    Mitchell asked Frerich whether his "eyes were deceiving" him. Frerich told him to radio the "gallery officer." Ex. 7 at 82–83.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant denies the facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

35.    Neither Mitchell nor Frerich called a Code 3 or took any other action to provide or summon medical assistance. Ex. 7 at 88, 90–91.

**RESPONSE: Defendant denies the facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

36.    About two minutes later, Defendant Charlie Frerking—another correctional officer—arrived at Mr. Curtis's cell. Frerking looked through the cell door before leaving to find a superior officer, Defendant Andrew Bennett. Ex. 7 at 92–99.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one, discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to support**

**liability of Defendant.**

37.     While waiting for Frerking to retrieve Bennett, Mitchell continued to watch Mr. Curtis to "see if he was breathing at all." Mitchell made no effort to assist Mr. Curtis, nor did he call a Code 3 or take any other action to summon emergency medical assistance. Instead, he worried to himself about "[g]etting in trouble and Mr. Curtis being dead." Ex. 7 at 95–100.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to support liability of Defendant. To the contrary, this shows that Defendant's superiors were in charge of the situation.** *Id.*

38.     Several more minutes passed before Frerking returned with Bennett. Upon reaching Mr. Curtis's cell, Bennett remarked, "I do not think he's breathing." Ex. 7 at 103–104.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant denies Bennett's remark of "I do not think he's breathing" is supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations. Defendant admits the remaining facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to support liability of Defendant. To the contrary, this shows that Defendant's superiors were in charge of the situation.** *Id.*

39.    For the next "two or three minutes," Bennett knocked on and shouted into Mr. Curtis's cell window. Bennett then radioed his shift supervisor and left to retrieve him. Again, by this point, neither Mitchell nor anyone else had called a Code 3 or taken any other action to summon or provide medical assistance. Ex. 7 at 104–105.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant denies the facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

40.    While the other officers waited at Mr. Curtis's cell for Bennett to return, Mitchell resumed his crisis-watch duties. Ex. 7 at 101–112.

**RESPONSE: Defendant denies the facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

41.    After four or five minutes, Lieutenant Caleb Zang, the on-duty shift supervisor, arrived at Mr. Curtis's cell. Like Bennett, Zang tried to reach Mr. Curtis by knocking on his cell window. Zang then radioed another superior officer, Major Page, and left the gallery to retrieve him. Again, no one called a Code 3 or took any other action to summon or provide medical assistance. Ex. 7 at 114–118.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that they are material to any claims against him as they fail to support**

liability of Defendant. To the contrary, this shows that Defendant's superiors were in charge of the situation. *Id.*

42.     Zang returned with Major Page about seven minutes later. Page "looked in[to]" Mr. Curtis's cell, told "Zang to get the ERT [Emergency Response Team]," and "then left the 5 Gallery." Ex. 7 at 120, 126–127; *see also* Ex. 8 at Mitchell000014.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant. To the contrary, this shows that Defendant's superiors were in charge of the situation.** *Id.*

43.     An ERT is typically called for forcible cell extractions. The team comprises armed correctional staff that enter a prisoner's cell, apply mechanical restraints, and remove the prisoner from his cell. Summoning an ERT does not summon medical staff. Ex. 7 at 129–130.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant. To the contrary, this shows that Defendant's superiors were in charge of the situation.** *Id.*

44.    Another five to seven minutes passed before three ERT officers arrived at Mr. Curtis's cell. At no point during those five to seven minutes did Mitchell or any other officer present at Mr. Curtis's cell call a Code 3 or take any other action to provide or summon emergency medical assistance. Ex. 7 at 130–131.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits another five to seven minutes passed before three ERT officers arrived at Mr. Curtis's cell are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant. The remaining facts contained in this paragraph are not supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.**

45.    The ERT officers spent a "[m]inute and a half, two minutes, approximately" entering Mr. Curtis's cell, securing his unconscious body in handcuffs, and carrying him by his arms and legs out of the cell and to the cellhouse infirmary. Ex. 7 at 132–135.

**RESPONSE: Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant. To the contrary, this shows that Defendant's superiors were in charge of the situation. *Id.***

46.    After Mr. Curtis had been removed from his cell, Bennett instructed Mitchell to "stay on 5 Gallery for crime scene watch." Ex. 7 at 135–137.

**RESPONSE: Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him**

**as this fails to support liability of Defendant. To the contrary, this shows that Defendant's superiors were in charge of the situation.** *Id.*

47.      Medical staff were not summoned until another correctional officer went to the healthcare unit at Menard and told two correctional medical technicians that they were "needed on North 2 cellhouse for an unresponsive inmate." Ex. 1 at IDOC000133–134.

**RESPONSE: Defendant admits the cited record indicates a correctional officer went to the healthcare unit at Menard and told medical technicians that they were "needed on North 2 cellhouse for an unresponsive inmate." The remaining facts contained in this paragraph are not supported by the record citations.**

48.      The medical technicians met Mr. Curtis at the North 2 infirmary.  After failing to detect Mr. Curtis's pulse, the medical technicians initiated CPR.  Meanwhile, a Menard nurse called an offsite Wexford provider, who directed nursing staff to request an ambulance. Mr. Curtis then was transported to the healthcare unit to await the paramedics. Ex. 1 at IDOC000132–138.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant. To the contrary, this shows that others were in charge of the situation.** *Id.*

49.      At 6:37 p.m., shortly after the paramedics arrived at Menard, Mr. Curtis was pronounced dead. In total, at least twenty minutes had elapsed from the time Mitchell first noticed Mr. Curtis in distress and when he received any medical care. Ex. 1 at IDOC000132–140.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather**

**than one discrete fact. Subject to and without waiving that objection, Defendant admits**

**the facts in this paragraph are undisputed and supported by the record; however,**

**Defendant denies that this is material to any claims against him as this fail to support**

**liability of Defendant.**

50.      At no point before Mr. Curtis's death did Mitchell call a Code 3 or take any other

action to provide or summon medical assistance. Ex. 7 at 101–112, 194–195.

**RESPONSE: Defendant denies the facts contained in this paragraph are supported by the**

**record citations. Plaintiff filed her deposition exhibits without page numbers. The**

**referenced page fails to support her allegations.**

51.      Instead, after Mr. Curtis was found unresponsive, Mitchell spent several minutes

making false entries in the crisis watch log. These entries purported to show that Mitchell had been

conducting cell checks in the crisis-watch gallery during his 90-minute absence. Ex. 8 at

Mitchell000011–12 (IDOC investigative summary finding that Mitchell "falsified all Inmate Crisis

Watch Observation Logs as completed, every ten[]minutes, after CURTIS was found

unresponsive."); *see also* Ex. 7 at 141–144.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather**

**than one discrete fact. Subject to and without waiving that objection, Defendant admits**

**the allegation that he made false entries in the crisis watch log are undisputed and**

**supported by the record; however, Defendant denies that this is material to any claims**

**against him as this fail to support liability of Defendant. Defendant denies the remaining**

**facts contained in this paragraph are supported by the record citations. Plaintiff filed her**

**deposition exhibits without page numbers. The referenced page fails to support her**

**allegations.**

52.    Around 8:00 p.m., Bennett informed Mitchell that a "[s]tate investigator want[ed] to talk to" him. During that interview, Mitchell admitted to the investigator that he "did not make all [crisis-watch] watches as required," that he was instead "helping with chow lines," and that he "completed his watch list after [Mr. Curtis] was found unresponsive." *Id.* at 161–178; Ex. 8 at Mitchell000011–18; Ex. 10 at Mitchell000022–24.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant.**

53.    Nearly a year later, an IDOC internal investigation found that Mitchell had violated several provisions of IDOC's code of conduct by "falsifying the Crisis Watch Observation Log" and by "fail[ing] to complete his duty as Crisis Watch Officer by not conducting his ten-minute observations as required." Ex. 8 at Mitchell000011–18.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather than one discrete fact. Subject to and without waiving that objection, Defendant admits the facts in this paragraph are undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant.**

54.    Mitchell's case was referred to the Employee Review Board for disciplinary proceedings. Ex. 11 (Memo re Review Board Referral) at Mitchell000002–03. Mitchell received a sanction of five days of unpaid leave. Ex. 7 at 214.

**RESPONSE: Defendant objects to this paragraph as it consists of multiple facts, rather**

than one discrete fact. Subject to and without waiving that objection, Defendant admits the statement that his case was referred to the Employee Review Board for disciplinary proceedings is undisputed and supported by the record; however, Defendant denies that this is material to any claims against him as this fail to support liability of Defendant. Defendant denies the remaining facts contained in this paragraph are supported by the record citations. Plaintiff filed her deposition exhibits without page numbers. The referenced page fails to support her allegations.

## ADDITIONAL UNDISPUTED MATERIAL FACTS[2]

1.      Defendant is not a medical professional. (Doc. 228-8 at 257, 267-268 of 322).

2.      This was Defendant's first time on crisis watch. (Doc. 228-8 at 37:24 of 322).

3.      Defendant Mitchell does not recall being trained how to perform crisis watch check. (Doc. 228-8 at 237:1-13 of 322).

4.      Defendant had no interactions with Mr. Curtis prior to the date of death, and Curtis appeared to be sleeping prior to 4:15 p.m. (Doc. 222-11, at p. 13 of 17, Mitchell Interrogatory Resp. 10).

5.      Sergeant Bennett was Defendant Mitchell's commanding officer. (Doc. 228-8 at p. 32 of 322).

6.      Sergeant Bennett ordered Defendant Mitchell to help with the chow lines. (Doc. 228-8 at p. 31-32, 58 of 322).

7.      Contrary to Plaintiff's assertions, on September 5, 2018, Charlie Frecking was also assigned to 30-minute crisis watch duty on 5 Gallery during the 3:00 p.m. to 11:00 p.m. shift. (Doc. 228-9 at p. 8 of 15).

8.      When defendant saw Plaintiff was not moving/breathing, he called for help

---

[2] Defendant's Additional Undisputed Material Facts will by referenced as Def. AUMF.

to Officer Frerich. (Doc. 228-8 at p. 87-88 of 322).

9. Defendant Mitchell then called Officer Frerking. (Doc. 228-8 at p. 93-94 of 322).

10. Sergeant Bennett was then notified by Officer Frerking. (Doc. 228-8 at p. 99-100 of 322).

11. Sergeant Bennett notified Lieutenant Zang. (Doc. 228-8 at p. 103-104, 113 of 322).

12. Defendant Mitchell thought the situation was being taken care of by those notified, including his superiors Frerking, Bennett, and Zang. (Doc. 228-8 at p. 115-116 of 332).

13. The autopsy report indicates that Mr. Curtis's cause of death was caused by probable intoxication of an unknown substance. (Death Cert., Doc. 1; Doc. 228-9 at p. 14 of 15).

14. All pathologists in this case agree that intoxication with a synthetic cannabinoid or synthetic cannabinoid like substance is an appropriate cause of death for Mr. Curtis, as well as other prisoners who died contemporaneously at Menard Correctional Center. (Doc. 214-4 p. 43-45 of 112; Doc. 153:4-155:14; Doc. 214-5, p. 37, 40-42; Doc. 217, Co-Defendant Wexford's Ex. P; Doc. 217, Co-Defendant Wexford's Ex. Q).

15. There is no known antidote for a synthetic cannabinoid overdose. (Doc. 214-4 at p. 30 of 112 ¶3-15).

## ARGUMENT

Defendant adopts and incorporates his Motion for Summary Judgment. (Doc. 222).

**Improper citations are contained in Plaintiff's facts.**

Plaintiff fails to provide accurate citations to the record for the facts the asserted that are crucial to the analysis in this matter. Plaintiff's recitation of her "Undisputed Material Facts" include multiple facts and improper citations. These types of issues were addressed in *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015). Much of Plaintiff's facts refer to deposition testimony. But the asserted facts are not found in the designated page numbers. Plus, Plaintiff failed to provide citations on a fact-to-fact basis; rather, citations were at the end of the paragraphs and the paragraphs contained multiple facts. This Court's Local Rules specifically states that fact section is to "set[] forth each relevant, material fact in a separately numbered paragraph. **A material fact is one that bears directly on a legal issue raised in the motion.** Each paragraph must contain specific citation(s) to the record, including page number(s)." SDIL-LR 56.1(a) (emphasis in original). Many of the facts set forth in Plaintiff's motion for partial summary judgment violate the local rules as the paragraphs include multiple facts, the facts are not material to the legal issues concerning this Defendant, and contain incorrect citations to the record. As in *Friend*, the Court or Defendant should not be required to sift through pages of deposition transcripts to find what Plaintiff is attempting to cite. *Friend,* 789 at 711; *citing United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him."). Further, SDIL-LR 56.1(a) mandates that each paragraph "contain specific citation(s) to the record, including page number(s)."

**The facts do not show Plaintiff is entitled to summary judgment.**

Plaintiff fails to establish that Defendant Mitchell acted with deliberate indifference to Curtis's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 258 (7th Cir. 1996). There is no question that Mr. Curtis is deceased, and it is undisputed that his death is objectively serious. The official autopsy showed that he died by probable intoxication, likely from synthetic cannabinoids. (Doc. 1; Def. AUMF 14-15). Following discovery and based upon the evidence, her motion for partial summary judgment should be denied because Plaintiff did not establish that Defendant Mitchell knew of and disregarded a substantial risk of serious harm on September 5, 2018.

Plaintiff's material facts do not provide a basis for the granting of the motion. Moreover, as shown in Defendant's Motion for Summary Judgment, which is incorporated into this response, Defendant is entitled to judgment as a matter of law on Plaintiff's claims against him. (Doc. 222). Pages of Plaintiff's "Undisputed Material Facts" consist of recitations of medical records and what happened to Mr. Curtis leading up to his death. But the records cited by Plaintiff also include notations that the vitals of Mr. Curtis were otherwise normal and that he simply refused to come out of his cell. (Doc. 228-2, p. 146-151 of 316). In the pages of allegations concerning Mr. Curtis's medical records, there is no evidence in them or otherwise indicating Defendant had any knowledge of or access to the records. To the contrary, Defendant was not a medical professional so there was no reason for him to be able to access any medical records. (Def. AUMF. 2). Obviously, it would be improper under HIPAA for a correctional officer to access medical or mental health records of an individual. Additionally, this was Defendant's first time encountering Mr. Curtis. (Def. AUMF 5). Plaintiff's statements concerning any records to which Defendant was not privy and prior to Defendant's encounter with Plaintiff should not be used to impute any liability to this Defendant.

Any opinions expressed by Dr. Goldman, including those contained in her deposition, emails, and records should not be considered because Plaintiff failed to show this Defendant had any personal knowledge or personal involvement with Dr. Goldman, her emails and/or records. In the emails referenced in Plaintiff's Facts ¶12, Dr. Goldman was expressing clinical opinions outside the scope of her practice. (Doc. 228-6, p. 148, ¶¶ 3-6; *Id.* at p. 153 ¶¶ 7-11; *Id*. at p. 159-160). Because there is no evidence this Defendant was aware of Dr. Goldman's opinions and because her opinions were outside the scope of her practice, all of Dr. Goldman's opinions should not be relied upon or considered to support any liability of Defendant.

This was Defendant's first time working crisis watch. (Def. AUMF 3). He does not recall being trained in how to perform crisis watch checks. (Def. AUMF 4). Another officer was also assigned to the crisis watch. (Def. AUMF 8). During this time, Defendant was ordered by his superior officer to assist with chow lines. (Def. AUMF 6-7). Defendant simply followed orders of his commanding officer. Following his superior's orders does not give rise to a deliberate indifference claim. On the contrary, it gives rise to qualified immunity.

Upon Defendant's return to crisis watch and noticing Mr. Curtis not breathing, Defendant notified another officer and his superiors. (Def. AUMF 9-12.) Plaintiff, being the new person, thought his superiors were handling the situation. (Def. AUMF 3, 13). This action cannot give rise to an action for deliberate indifference.

Lacking from Plaintiff's motion is any indication that Defendant caused or could have prevented Mr. Curtis's death. To the contrary, the official cause of death of Mr. Curtis was probable intoxication of an unknown substance. Def. AUMF 14. In fact, all pathologists in this case agree that intoxication with a synthetic cannabinoid or synthetic cannabinoid like substance is an appropriate cause of death for Mr. Curtis. (Doc. 214-4 p. 43-45 of 112; Doc. 153:4-155:14; Doc. 214-5, p. 37, 40-42; Doc. 217, Co-Defendant Wexford's Ex. P; Doc. 217, Co-Defendant

Wexford's Ex. Q; Docs. 213, 214). There is no admissible evidence of where the cannabinoids came from nor when they were taken by Mr. Curtis. Thus, there is no evidence that can show whether Mr. Mitchell's presence on the gallery between 4:15 and 5:50 p.m. would have changed anything with respect to Mr. Curtis's death.

Much of Plaintiff's facts and arguments consist of what occurred outside Defendant Mitchell's knowledge and control. The remaining facts and arguments suggest nothing more than mere negligence – if that, not deliberate indifference, and gave rise to qualified immunity.

WHEREFORE, Defendant Mitchell respectfully requests this honorable Court deny Plaintiff's motion for partial summary judgment, and for all other relief this Court deems just and proper.

<div style="margin-left: 40%">

Respectfully submitted,

NICKOLAS MITCHELL,

    Defendant,

KWAME RAOUL, Attorney General,
State of Illinois,

    Attorney for Defendant,

</div>

Jeanine Armstrong #6271105
Assistant Attorney General
201 West Pointe Dr. Suite 7
Swansea, IL 62226
(618) 236-8784 Phone
(618) 236-8620 Fax
Email:Jeanine.Armstrong@ilag.gov
gls@ilag.gov

                                 BY:   __s/ Jeanine Armstrong__
                                           Jeanine Armstrong #6271105
                                         Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

YOLANDA JACKSON, as Administrator ) 
of the Estate of Kevin Curtis, )
           )
           Plaintiff, )
           )
-vs- )     Case No. 20-cv-900-DWD
           )
WEXFORD HEALTH SOURCES, INC, )
et al., )
           )
           Defendant. )

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on June 21, 2024, the foregoing document, **<u>DEFENDANTS' BRIEF IN OPPOSITION PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT,</u>** was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Adam J Smith | adam@kaplangrady.com |
| David A Schmutzer | david@kaplangrady.com |
| Howard Kaplan | howard@kaplangrady.com |
| Nabihah Maqbool | nabihah@kaplangrady.com |
| Sarah C Grady | Sarah@kaplangrady.com |
| Timothy P Dugan | tdugan@cassiday.com |
| Emma Wormington | ewormington@cassiday.com |
| Jaclyn A Kinkade | jkinkade@cassiday.com |
| Nicholas Childress | nchildress@cassiday.com |

                Respectfully Submitted,

                s/Jeanine Armstrong
                Jeanine Armstrong #6271105
                Assistant Attorney General
                201 West Pointe Dr. Suite 7
                Swansea, IL 62226
                Phone: (618) 236-8784
                Fax: (618) 236-8620
                E-Mail:  jeanine.armstrong@ilag.gov
                gls@ilag.gov