**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| YOLANDA JACKSON, as Administrator of the Estate of Kevin Curtis, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-0900-DWD |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | Hon. David W. Dugan |

**PLAINTIFF'S RESPONSE TO**
**<u>WEXFORD'S MOTION TO BAR DR. HERRINGTON</u>**

Sarah Grady
Howard Kaplan
David A. Schmutzer
Nabihah Maqbool
Terah Tollner
Annie Garau Kelly
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184
sarah@kaplangrady.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

ARGUMENT ............................................................................................................... 4

I.     Dr. Herrington offers his opinions to a reasonable degree of medical certainty. ............... 4

II.    There are no grounds to exclude Dr. Herrington's "systemwide" opinions. ..................... 6

    A.    Dr. Herrington's opinions are the product of specialized knowledge. .................. 7

    B.    Dr. Herrington's opinions are based on sufficient facts and data. ......................... 8

    C.    Dr. Herrington's opinions are the product of reliable principles and methods..... 12

        1.    Dr. Herrington followed an accepted methodology to reach reliable conclusions regarding root causes. .................................................... 12

        2.    Disputes about Dr. Herrington's conclusions do not warrant exclusion. 15

        3.    Wexford's remaining arguments fail. ................................................. 18

III.   There are no grounds to exclude Dr. Herrington's "patient-specific" opinions. ............. 19

    A.    Wexford's miscellaneous arguments fail. ........................................................ 19

        1.    Statistics and probability. ................................................................... 19

        2.    Psychiatric opinions. .......................................................................... 20

        3.    Cause of death. ................................................................................... 21

        4.    Toxicology. ........................................................................................ 22

    B.    Wexford's arguments about individual patients are not a basis for exclusion. .... 22

        1.    Kevin Curtis (Mot. 37-43) .................................................................. 24

        2.    D.P. (Mot. 43-44)............................................................................... 26

        3.    D.E. (Mot. 44-46)............................................................................... 27

        4.    C.G. (Mot. 46-47) .............................................................................. 28

        5.    G.H. (Mot. 47-49) .............................................................................. 28

        6.    L.K. (Mot. 49-51)............................................................................... 29

        7.    G.P. (Mot. 51-53)............................................................................... 30

        8.    M.J. (Mot. 53-55)............................................................................... 31

9.       H.C. (Mot. 56-58) ................................................................ 32

10.      John Doe (Mot. 59-61)......................................................... 33

11.      M.L. (Mot. 61-62) ............................................................... 34

12.      Y.A. (Mot. 62-63) ............................................................... 35

C.      Wexford's hearsay objections are premature and incorrect................................. 36

CONCLUSION ............................................................................................ 38

Plaintiff Yolanda Jackson, as Administrator for the Estate of Kevin Curtis, hereby responds

to the motion to bar Dr. Ryan Herrington submitted by Defendants Wexford Health Sources, Inc.,

Dr. Eva Leven, and Dr. Mohammed Siddiqui (collectively, "Wexford'), and states as follows:

## INTRODUCTION

This case concerns Kevin Curtis's death at Menard Correctional Center on September 5,

2018. Plaintiff retained Dr. Ryan Herrington to review medical records pertaining to Mr. Curtis

(Plaintiff's son). Plaintiff also retained Dr. Herrington to review medical records for eleven other

prisoners who died in the custody of the Illinois Department of Corrections. Based on his review,

Dr. Herrington concluded that there were substantial deficiencies in the care Wexford provided to

all 12 individuals. He produced an expert report and rebuttal report laying out his conclusions.

Without seriously challenging his qualifications, Wexford now moves to bar all of

Dr. Herrington's opinions, filing a 67-page motion that is nearly as long as Dr. Herrington's two

reports put together. In that motion, Wexford raises almost every imaginable ground for exclusion,

including several that have nothing to do with the relevant legal standard. Ultimately, however,

the length of the motion is deceiving. Wexford repeatedly recycles the same flawed arguments and

mischaracterizes the scope and substance of Dr. Herrington's opinions. It does not identify a

legitimate basis for excluding any—let alone all—of Dr. Herrington's testimony.

In addition to its substantive shortcomings, Wexford's motion repeatedly denigrates

Dr. Herrington himself. Wexford unnecessarily accuses Dr. Herrington of offering "self-serving,"

"shocking," "bought and paid," and "knowingly misleading" opinions. It further declares that his

report was "created from extreme incompetence" to "driv[e] up the costs of litigation to exorbitant

numbers." These personal attacks are uncalled for, and lack any support in law or fact. As shown

below, Dr. Herrington performed a careful review of medical records and other relevant materials,

reliably applied his considerable expertise to those materials, and drew reasonable conclusions that will help the jury decide important issues in this case. Wexford and its experts may disagree with those conclusions—even strenuously. But a jury will have to resolve those disagreements after hearing all the evidence and assessing the witnesses on the stand.

The Court should deny Wexford's motion to exclude Dr. Herrington in its entirety.

## BACKGROUND

Dr. Herrington is eminently qualified to offer opinions about Wexford's medical practices as they pertain to Kevin Curtis and others in IDOC custody. He has more than two decades of experience in primary care, urgent care, and general medicine, including unusually broad experience in the correctional healthcare setting. Dr. Herrington previously held senior medical positions for departments of corrections in four states: Washington, where he served as facility medical director and site medical director; Vermont, where he served as site medical director and regional medical director; Ohio, where he served as chief medical officer; and Maine, where he served as regional director. In each of these roles, he provided direct patient care to incarcerated individuals, supervised other medical providers, and managed referrals for outpatient care. Dr. Herrington has degrees in medicine and public health and is dual board certified by the American Board of Preventative Medicine in Public Health/Preventative Medicine and Addiction Medicine. And he has provided expert testimony in more than 50 matters for both the plaintiff and the defense. *See* Ex. 89 (Herrington CV); Ex. 90 (Herrington Testimony List).

Plaintiff retained Dr. Herrington to "review several sets of medical records for patients who died while incarcerated within the Illinois Department of Corrections and to perform an analysis of these and other records." Ex. 10 (Herrington Report) at 5. Dr. Herrington reviewed a substantial amount of material in addition to the medical records, such as administrative directives, audits,

quality improvement records, clinical guidelines, mortality reviews, relevant contracts, pleadings, and deposition testimony. *Id*. at 8-10. His review "focused on both the adequacy of the care provided to and received by each patient" (what Wexford calls Dr. Herrington's "patient-specific" opinions) and on "whether there existed any operational patterns of practice exhibited by Wexford that transcended patient care on an individual basis" (what Wexford calls "systemwide" opinions). *Id*. Following his review, Dr. Herrington produced a lengthy report laying out each of his conclusions. *Id*. at 11-21.

Dr. Herrington is sharply—and justifiably—critical of the medical care Wexford provided to Kevin Curtis. For example, he observed that the psychiatric care provided to Mr. Curtis between September 1 and September 4 was grossly inadequate, with Wexford's providers failing to prioritize Mr. Curtis's emergent condition, failing to follow up with medical practitioners despite serious warning signs, and failing to complete timely documentation. *Id*. at 20-21. Dr. Herrington also identified serious problems with the care provided to 11 other individuals who died in IDOC custody around the same time. *See id*. at 21-48. Finally, based on his review, he identified underlying drivers of these catastrophic patient outcomes, such as ineffective efforts at continuous quality improvement and mortality reviews and a significant lack of communication between correctional staff, medical providers, and mental health providers. *Id*. at 49-54.

After Wexford disclosed reports from three different experts criticizing Dr. Herrington's opinions, Dr. Herrington submitted a rebuttal report to defend his conclusions. Dr. Herrington first addressed criticisms from Moein Heidari, Wexford's statistician expert and "methodologist," who argued that Dr. Herrington's conclusions were unreliable because Dr. Herrington did not use statistical techniques as part of his analysis. In response, Dr. Herrington explained that he was not offering statistical opinions and that the statistical precision Mr. Heidari appeared to demand was

contrary to the prevailing standards in both correctional medicine and litigation. Ex. 57 (Herrington Rebuttal) at 2-8.

Separately, Dr. Herrington addressed criticisms offered by Wexford's medical experts, Dr. John Slish and Dr. Michael Pins, who critiqued Dr. Herrington's cause of death opinions. Both Dr. Slish and Dr. Pins asserted that Mr. Curtis died from ingesting an unknown synthetic drug, which aggravated a preexisting cardiac condition. Both also pointed to two other individuals (E.F. and T.M.) who died at Menard around the same time as Mr. Curtis. In response to these opinions, Dr. Herrington conducted his own review of E.F. and T.M.'s medical records, and concluded that his original opinions regarding Mr. Curtis remained valid. *Id.* at 9-15.

## ARGUMENT

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The applicable standard is described at length in Plaintiff's Opposition to Wexford's Motion to Bar Dr. Richard Cockerill, which is being filed contemporaneously.

In its motion to bar Dr. Herrington, Wexford attacks the admissibility of Dr. Herrington's testimony on nearly every imaginable ground, including several that are entirely ungrounded in the Rule 702 analysis. *See* Dkt. 215 ("Mot."). As shown below, Wexford fails to show that a single opinion, let alone Dr. Herrington's entire report, should be excluded.

## I.    Dr. Herrington offers his opinions to a reasonable degree of medical certainty.

Wexford first contends that Dr. Herrington's opinions are inadmissible because they do not reflect a "reasonable degree of medical certainty." Mot. 6-7. This is not a basis to exclude evidence. The "reasonable degree of medical certainty" standard is part of the *substantive* law for certain state law claims. Rule 702 governs the admissibility of expert testimony in federal court, and it

does not require a "reasonable degree of medical certainty." *See Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) ("the Federal Rules do not contain any threshold level of certainty requirement"); *Kirschner v. Broadhead*, 671 F.2d 1034, 1039 (7th Cir. 1982) ("The admissibility of an expert medical opinion . . . should not turn on whether the testifying physician characterizes a particular potential cause of an injury as 'conceivable,' 'possible,' or 'probable.'"); *Carney v. Millis Transfer, Inc.*, No. 08-cv-709, 2010 WL 11561360, at *2 (S.D. Ill. Aug. 25, 2010) ("The fact that Dr. Naughton would not state that she holds her opinions with a 'reasonable degree of medical certainty' does not make her testimony inadmissible.'").

Regardless, as Dr. Herrington stated multiple times in his reports, he ***does*** hold his opinions based on a reasonable degree of medical certainty. Ex. 10 at 5 ("The opinions formulated and documented herein are made to a reasonable degree of medical certainty . . ."); *id*. at 48 (same); Ex. 57 at 1 ("Like my prior report, I have reached all of the below opinions to a reasonable degree of medical certainty . . ."); *id*. at 4 (same). Wexford inexplicably ignores these clear statements, just as it has done in other similar cases. *See Jones v. Wexford Health Sources, Inc.*, No. 17-cv-8218, 2021 WL 323792, at *7 (N.D. Ill. Feb. 1, 2021) (expressing confusion where "[t]he defendants frequently claim that [an expert] 'does not offer a single opinion to a reasonable degree of medical certainty'" but the expert's report "concludes by stating that his opinions are offered with 'a reasonable degree of medical and orthopedic surgical certainty'").

Instead of addressing the plain statements in Dr. Herrington's reports, Wexford points to snippets from Dr. Herrington's deposition, where Dr. Herrington explained that he made certain determinations because he judged that they were more likely true than not. Mot. 6-7. But this is perfectly consistent with the reasonable degree of medical certainty standard. *See Wise v. St. Mary's Hospital*, 64 Ill. App. 3d 587, 590 (1978) ("While medical testimony is usually couched in

terms of art such as 'based upon a reasonable degree of medical certainty,' etc., it is not objectionable for the medical expert to testify in terms of percentages so long as it is clear that the opinion expressed is not the product of mere speculation or conjecture."); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018) (deeming evidence sufficient to meet the "reasonable degree of medical certainty" standard where a jury could find based on the testimony that the defendant's actions "more likely than not contributed" to the decedent's "ultimate death"); *Liss v. TMS Int'l, LLC*, No. 19-cv-810, 2022 WL 2192863, at *2 (S.D. Ill. June 17, 2022) (the "reasonable degree of medical certainty" standard is "not a difficult one" to meet and is satisfied "[e]ven when a medical witness testifies" that there is a "less than one percent possibility").

The "reasonable degree of medical certainty" standard is not a "magical incantation" that an expert must repeat verbatim throughout his deposition. *Galvin v. Olysav*, 212 Ill. App. 3d 399, 405 (1991) (declining to exclude evidence where a "doctor testified in terms of percentages" without repeating the words "reasonable degree of medical certainty"). And of course, "substantive disagreements" with the expert's opinions present, at most. "a factual question for trial." *Jones*, 2021 WL 323792, at *7; *see also Galvin*, 212 Ill. App. 3d at 405 (disputes over an expert's estimates "go[] to the weight to be given the medical testimony," not the "reasonable degree of medical certainty standard").

## II. There are no grounds to exclude Dr. Herrington's "systemwide" opinions.

Wexford next attacks Dr. Herrington's opinions about the underlying causes of the twelve deaths he reviewed—what Wexford calls Dr. Herrington's "systemwide opinions." The gist of Wexford's argument is that Dr. Herrington did not design a study to show that, as a statistical matter, failures he saw in Wexford's care of the twelve patients could be generalized to all of the care that Wexford provided throughout the IDOC. But the law does not require that kind of random

sampling or statistical rigor, and Dr. Herrington did not perform that kind of study. Wexford's arguments for exclusion are therefore misplaced.

### A.    Dr. Herrington's opinions are the product of specialized knowledge.

Federal Rule of Evidence 702(a) states that an expert's "scientific, technical, or other specialized knowledge" should "help the trier of fact to understand the evidence or to determine a fact in issue." Wexford argues that Dr. Herrington does not satisfy Rule 702(a) because he does not have expertise in developing a statistical methodology for "unbiased sampling in the IDOC population." Mot. 8-9. Dr. Herrington, however, was not asked to conduct a statistical analysis of the IDOC population and did not purport to do so. As Dr. Herrington explained at the outset of his opening report, his assignment was "to review several sets of medical records for patients who died while incarcerated within the Illinois Department of Corrections and to perform an analysis of these and other records." Ex. 10 at 5. He then offered his opinions about the fundamental drivers of these deaths. Whether he is qualified to conduct a *different* study than the one he undertook is irrelevant under Rule 702.

Along the same lines, Wexford argues that because counsel provided Dr. Herrington with the medical records to review, Dr. Herrington "does not have firsthand knowledge and cannot lay the foundation for how the sampling methodology was created, let alone that the sampling methodology meets the rigors of FRE 702." Mot. 8. Again, Dr. Herrington does not offer any opinions that depend on a "sampling methodology." His opinions are based on the records he reviewed, his medical training, and his extensive experience delivering healthcare in correctional settings like the IDOC. Moreover, whether those opinions, in conjunction with the rest of the evidence, are sufficient to satisfy the standards for *Monell* liability is a different and logically separate question from whether Dr. Herrington is qualified to offer those opinions in the first place.

That said, a plaintiff "need not present a full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to establish a widespread practice or custom." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006). And the Seventh Circuit has repeatedly declined to adopt a "bright-line rule regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021); *Thomas v. Cook Cnty. Sheriff 's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (stating that "[w]e do not adopt any bright-line rules defining a 'widespread custom or practice' and that, beyond some minimal threshold requirements, "the jury must make a factual determination as to whether the evidence demonstrates that the [defendant] had a widespread practice that [caused] the alleged constitutional harm"); *accord Ruiz v. Johnson*, 37 F. Supp. 2d 855, 891 (S.D. Tex. 1999) ("Defendants contend that, in the absence of statistical proof of violations in TDCJ–ID units, the plaintiffs have not and cannot show system-wide violations. This reliance by the defendants on statistics as the sole methodology for establishing system-wide violations . . . is misplaced."), *rev'd and remanded on other grounds sub nom. Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001). Thus, not only are Dr. Herrington's opinions highly relevant to the factual questions the jury will need to decide in this case, but Wexford's criticisms of those opinions as insufficiently rooted in statistical methodologies are themselves contrary to law.

> **B.** **Dr. Herrington's opinions are based on sufficient facts and data.**

Federal Rule of Evidence 702(b) states that expert testimony should be based on "sufficient facts or data." Wexford argues that Dr. Herrington's "systemwide review" is not based on sufficient facts or data because (1) Dr. Herrington did not use a large enough sample size and (2) the sample was (in a statistical sense) "biased." Again, these arguments miss the mark.

Wexford's explanation of these criticisms is unfortunately quite muddled, resting in large part on statements from its own expert Moein Heidari's report.[1] As to sample size, Wexford argues that it is an "important factor that affects the accuracy and precision of conclusions based on a study." Mot. 10-11. Wexford then faults Dr. Herrington for not reviewing a random sampling of IDOC deaths from 2000–2020 (which is not a sample *size* issue) and for not performing a "statistical power analysis" based on his sample. *Id*. Likewise, Wexford argues that Dr. Herrington's review was "biased" because it was not statistically representative of the entire IDOC population. Wexford then complains that certain individuals whose records Dr. Herrington reviewed were either referenced in the 2014 *Lippert* report or are the subject of litigation in other cases in which the undersigned's firm represents the plaintiff. *Id*. at 12-14.

As above, Wexford's arguments mischaracterize Dr. Herrington's opinions, attacking a "study" that Dr. Herrington did not perform and opinions that he did not give. Dr. Herrington did not need to calculate p-values or perform a power analysis because he was not performing a statistical study. He was performing a qualitative review of twelve cases. Moreover, even if Wexford's demand for statistical rigor was not foreclosed by precedent, Dr. Herrington's review of the twelve individuals' medical files revealed at least several instances of inadequate treatment *per patient*. *See* Ex. 10 at 11–48. Thus, it is more accurate to say that Dr. Herrington identified roughly fifty examples of the widespread practices she contends caused her son's death, not twelve.

---

[1] Heidari's report is a *Daubert* argument masquerading as expert opinion, and Wexford's use of the Heidari report in its motion to bar Dr. Herrington illustrates the point. Indeed, much later in its motion, Wexford states "[a]lthough not required for granting this Motion, the Court could also review the report of Moein Heidari . . . , a statistician who helps create and conduct medical research and testing." Mot. 64. This shows that, as Plaintiff has elsewhere explained, Wexford is inappropriately attempting to introduce an expert to opine on a legal issue—the admissibility of Dr. Herrington's testimony. S*ee* Dkt. 231.

When he was deposed by Wexford's counsel, Dr. Herrington squarely addressed Wexford's statistical criticisms and explained why the facts and data he considered were adequate to support his conclusions:

> I'm not part of any efforts to obtain, you know, an entire population. I can only tell you that I'd be happy to do that if I were able to. But what I have here is twelve cases. . . . [T]hese are cases where the adequacy is not . . . a hard decision to make. . . . I think if the difference was smaller and more subtle, then you would need the methodology that you're talking about. Large sample size, randomness. But here, the outcomes were so bad, and the decision making was so breathtakingly poor that these are still valid conclusions and opinions to make based on a number of twelve.

Ex. 91 (Herrington June 21, 2023 Tr.) at 412-13. Notably, Wexford does not cite any case suggesting that opinions about the fundamental problems with the delivery of medical care must satisfy arbitrary statistical standards to be based on "sufficient facts or data." Given the Seventh Circuit's rejection of a "bright-line" threshold and statistical evidence requirement for *Monell* liability, it would be entirely incongruous if that were the case.

Outside of *Monell*, too, "courts frequently permit expert testimony on causation based on evidence other than statistical significance." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40-41 (2011) (collecting cases); *see also United States v. Joseph*, 542 F.3d 13, 21 (2d Cir. 2008) (expert testimony "need not be based on statistical analysis in order to be probative"); *In re Diet Drugs Prod. Liab. Litig.*, 890 F. Supp. 2d 552, 561 (E.D. Pa. 2012) ("many courts have recognized that medical professionals often base their opinions on data other than statistical evidence from controlled clinical trials or epidemiological studies"). In short, Rule 702 does not require experts to apply statistical methodologies to reach opinions.

As for the selection of the sample, Wexford states that "[i]t does not take a statistician to understand the inherent bias in selecting a pool of patients with known complaints for a review of systems." Mot. 14. But the patients whose records Dr. Herrington reviewed were not patients with "known complaints." They were patients who died, often in shocking circumstances, while

ostensibly under Wexford's care. That is exactly where one would want to look to understand what broader policies, procedures, or customs might result in catastrophic outcomes for patients. Indeed, as Dr. Herrington explained, "the things that Mr. Heidari [and now Wexford] demands be present in my report, including formal sample size determination, random sampling strategies and the use of statistics are not mainstream correctional healthcare industry practice especially for mortality reviews, continuous quality improvement and patient safety." Ex. 57 at 4-5.[2]

According to Wexford, "Dr. Herrington, himself, understands the importance of sampling to determine a true representation of population without error." Mot. 14-15. But Dr. Herrington explained that statistical rigor was ***not*** required in a medical or litigation context. Ex. 57 at 8 ("Mr. Heidari's criticisms are misplaced—especially his mistaken understanding that mortality reviews must be conducted with the same robust statistical rigor required of peer reviewed academic literature which is simply not true nor practical in civil litigation."). His testimony at his deposition was fully consistent with this position.[3]

Finally, Wexford proclaims that "it is in the interest of the Court and the public that attorneys be prohibited from interjecting themselves into the foundation of their expert's review

---

[2] Wexford, of course, was free to retain an expert to conduct a study based on random sampling or some other statistical methodology if it believed that analysis would be exculpatory. *Cf. Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381-82 (7th Cir. 2017) (en banc) ("At trial, there is no reason why [private-medical contractor] Corizon would not be entitled to introduce evidence of its track record, if it believes that this evidence will vindicate its decision not to follow the INDOC guidelines"). Wexford chose not to do so.

[3] In one of the excerpts cited by Wexford, for example, Dr. Herrington was asked whether he "understood the importance of sampling a given population to ensure that the sample group is a true representation of the population without error." Ex. 91 at 403-404. He agreed with this vague assertion. Then, Dr. Herrington was asked whether "[t]o ensure reliable and valid inferences from a sample, probability sampling techniques should be used to obtain unbiased results," and he responded, "I do, except I think what you're getting at is random sampling. What this review is not a random sampling. This is a sentinel event review." *Id.* at 405-06; *see also* Ex. 10 at 49 ("Morbidity and mortality is a part of clinical practice and much can be learned and operationalized for the betterment of patient care when sentinel events like patient deaths, injury or even 'near misses' are analyzed").

to create a framework that can only lead to opinions in support of their claims/defenses." Mot. 15. Wexford's repeated attacks on counsel's and Dr. Herrington's integrity are unsupported and unnecessary. They are also not a basis for exclusion. *See infra* pp. 13-14.

**C.   Dr. Herrington's opinions are the product of reliable principles and methods.**

Federal Rule of Evidence 702(c) and (d) state that expert testimony should be the "product of reliable principles and methods" and "reflect a reliable application of the principles and methods to the facts of the case." Wexford contends that Dr. Herrington's "systemwide" opinions fail these criteria on grounds that are basically the same as those discussed above, and that fail for basically the same reasons.

**1.   Dr. Herrington followed an accepted methodology to reach reliable conclusions regarding root causes.**

Wexford claims that Dr. Herrington improperly "generalized" his findings by "select[ing] an untested methodology that he knew . . . would only come to one conclusion." Mot. 16-18. But Dr. Herrington's methodology was not "untested." Qualitative review of serious adverse outcomes is standard in the field. *See, e.g.*, Ex. 57 at 5 (discussing other similar third-party evaluations of state correctional systems and explaining that the National Commission on Correctional Health Care standards do not employ rigorous statistical methodologies); Ex. 92 (Herrington November 7, 2023 Tr.) at 42 ("[E]very system that I've been in has operated that way."); *id.* at 180-81 (explaining that the methodology applied is "accepted within the field of correctional healthcare"). Dr. Herrington's methods are also similar to those admitted in other civil rights cases. In *Dockery v. Fisher*, 253 F. Supp. 3d 832 (S.D. Miss. 2015), for example, a group of prisoners brought constitutional claims challenging their conditions of confinement. The defendants argued that "the experts' opinions, which are based on 'judgment sampling' and 'qualitative studies' of a few 'unrepresentative samples' of medical records and prisoner interviews, are invalid because such

samplings and studies cannot be used to derive inferences as to the EMCF prisoner population at large." *Id*. at 844. The court held that the defendants' arguments "go more to the credibility of the expert opinions as opposed to undermining the methodologies used by Plaintiffs' experts." *Id*.

Nor—despite Wexford's baseless invective—did Dr. Herrington reach a preordained conclusion. As he made clear, he was free to draw whatever conclusions he thought were appropriate as part of his review and he conducted his review objectively and with an open mind. *See* Ex. 92 at 182 ("Q: I just want to make this clear for the record. Did counsel for plaintiff, any member of counsel for plaintiff, ever ask or demand that you make assumptions as part of your report? A. No."); Ex. 93 (Herrington Jan 2024 Tr.) at 24 ("Q. Did you make any inferences about how these 11 patients [plus Mr. Curtis] were selected for your review? A. Inferences? Did I make any inferences? No, I just reviewed those 11 cases objectively.").

Arguments that counsel "selected" materials for an expert to review go to "the reliability and weight of the evidence" and are "not an issue for a motion under *Daubert*." *Orthofix Inc. v. Gordon*, No. 13-cv-1463, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 1, 2016); *see also Ameritox, Ltd. v. Millennium Health, LLC*, No. 13-cv-832, 2015 WL 1520821, at *13 (W.D. Wis. Apr. 3, 2015) ("Since there is nothing in plaintiffs' submissions supporting a finding of 'bad faith,' any notion that Dr. Wu's opinions must be excluded because Millennium selected materials for him to consider in forming his opinion is without merit."); *In re Titanium Dioxide Antitrust Litig.*, No. 10-cv-0318, 2013 WL 1855980, at *9 (D. Md. May 1, 2013) ("While the Defendants may draw attention to the thoroughness of Dr. Hamilton's review . . . and emphasize that Dr. Hamilton looked only to the portions of the record that Plaintiffs' counsel selected, these facts do not call into question the reliability of Dr. Hamilton's methodology."); *Coleman v. Wilson*, 912 F. Supp. 1282, 1303 (E.D. Cal. 1995) (rejecting an argument that an expert's conclusions are "unreliable insofar

as they are based on medical files 'pre-selected' by plaintiffs' counsel"). "[T]he extent to which the patterns identified are statistically significant or any given example is representative is a suitable subject to broach in vigorous cross-examination." *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, No. 19-cv-1324, 2024 WL 2106577, at *8 (D. Conn. Mar. 1, 2024).

Next, Wexford claims that "Dr. Herrington understands that a root cause analysis is 'a very good practice' when looking at causes and contributors to [a] sentinel event (unexpected death or serious injury" but did not conduct one here. Mot. 18-19. As Dr. Herrington explained, however, his methodology was "***consistent*** with . . . root cause analysis." Ex. 91 at 414-15 (emphasis added). He analyzed the medical records, discussed lapses in care, and then identified what in his judgment were the underlying causes of those lapses based on the records, deposition testimony, and his own correctional experience. There is no requirement that an expert conduct a formal root cause analysis to opine on issues relevant to the case. *See Morr v. Plains All American Pipeline, L.P.*, No. 17-cv-163, 2021 WL 4478660, at *3 (S.D. Ill. Sept. 30, 2021) (holding that an expert is qualified to opine on issues within his background and experience "regardless of whether he formally participated in a root cause analysis"); *In re MacBook Keyboard Litig.*, No. 18-cv-2813, 2022 WL 1604753, at *4 (N.D. Cal. Jan. 25, 2022) (similar).[4]

Wexford's brief is devoid of supporting authority on this point as well. It invokes *Williams v. IDOC*, No. 19-cv-739, 2023 WL 1472246, at *15 (S.D. Ill. Feb. 2, 2023), but that case is inapposite. In *Williams*, Magistrate Judge Beatty excluded testimony from the plaintiff's mental health care expert who looked at systemic deficiencies identified by the court in another litigation

---

[4] In his rebuttal report, Dr. Herrington also produced a fishbone diagram that illustrated how his conclusions could be easily mapped onto a root-cause approach. Ex. 57 at 6. Wexford declares that an expert should not use a fishbone diagram to "illustrate some pre-conceived conclusions." Mot. 9; *see also id*. at 27-28. But Dr. Herrington's conclusions were not pre-conceived. He developed them from his review of medical records and other evidence.

but failed to assess whether those deficiencies impacted the plaintiff. In contrast, here Dr. Herrington *began* by looking at the medical records of 12 individuals to determine whether there were deficiencies in their care, and then analyzed the underlying causes of those deficiencies. Thus, Dr. Herrington's report is perfectly consistent with the reasoning in *Williams*.

### 2. Disputes about Dr. Herrington's conclusions do not warrant exclusion.

Wexford next offers an 8-page, densely packed laundry list of factual disputes that it has with Dr. Herrington's so-called "systemwide" conclusions. *Compare* Ex. 10 at 48-54, *with* Mot. 20-27. Wexford does not—and cannot—connect these supposed "[p]roblems with [o]pinions [a]ccording to the [e]vidence" to the *Daubert* standard.

The *Daubert* inquiry is concerned primarily with "the validity of the methodology employed by an expert, not the quality of the data used . . . or the conclusions reached." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). Given the focus on methodology, criticism of an expert's conclusions or interpretation of evidence is *not* grounds for exclusion. Rather, as this Court has held, if a party contends that a medical expert "relied on faulty or incomplete information in forming his opinion, this argument should be developed through cross examination and is suited for the jury, who can decide the weight to give [the] opinions." *Armour v. Santos*, No. 19-cv-678, 2024 WL 82848, at *2 (S.D. Ill. Jan. 8, 2024) (Dugan, J.). A mountain of authority is to similar effect. *See, e.g.*, *Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, 2022 WL 17184469, at *10 (N.D. Ill. Nov. 23, 2022) ("disagreements with [an expert's] use of underlying facts and assumptions . . . do not warrant his exclusion"); *Robertson Transformer Co. v. Gen. Elec. Co.*, No. 12-cv-8094, 2015 WL 14074998, at *3 (N.D. Ill. Sept. 18, 2015) (arguments that an expert "relied on 'flawed assumptions[]' and 'cherry-picked evidence'" should be raised through "vigorous cross-examination, not exclusion"); *Chaudhry v. Provident Life Accident Ins. Co.*, No. 12-cv-5838, 2015 WL 1756832, at *3 (N.D. Ill. Apr. 15, 2015) (arguments relating to

accuracy of opinions or choices regarding underlying data "are inappropriate for a Daubert motion as they go to the weight of [the] testimony rather than its admissibility.").

In short, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. But here, the opinions Dr. Herrington offers are far from "shaky." Consider, for example, the three "problems" Wexford identifies with the conclusion that there was a lack of communication between medical and mental health teams in many of the cases Dr. Herrington reviewed. None of these criticisms withstands scrutiny.

First, Wexford argues that Dr. Herrington's opinion is "unsupported" because there are communications between the two teams regarding Mr. Curtis in the record. Mot. 22. That is a red herring. Dr. Herrington's opinion was not that there literally was no communication between medical and mental health teams. It was that, based on his review, there appeared to be insufficient communication such that "patient care was not coordinated." Ex. 10 at 51-52.

Second, Wexford criticizes Dr. Herrington for citing Dr. Neil Fisher's deposition testimony. According to Wexford, this is inappropriate because Dr. Fisher was not Wexford's designated corporate representative on mental health policies. Mot. 22. However, as Dr. Fisher agreed at his deposition, Wexford designated Dr. Fisher to provide testimony "regarding the practices related to continuity of care, including continuity of care between mental health staff and medical staff." Despite this designation, Dr. Fisher testified that he had no knowledge of policies regarding the referral of patients between the medical and mental health teams. Ex. 94 (Fisher Jan 31 2023 Tr.) 78-80. The purpose of Rule 30(b)(6) is to "enable the responding organization to identify the person who is best situated to answer questions about the matter." *DSM Desotech Inc. v. 3D Sys. Corp.*, 08-cv-1531, 2011 WL 117048, at *1 (N.D. Ill. Jan. 12, 2011). Rule 30(b)(6)

would mean little if an organization could designate a witness to provide binding testimony on its

behalf and then exclude the opposing party's expert for relying on that testimony because "no

analysis is provided for how Dr. Fisher's . . . memory of a policy is dispositive on whether one

exists." Mot. 22.

Third, Wexford takes issue with Dr. Herrington's reliance on testimony from IDOC's

Healthcare Unit Administrator Gail Walls, claiming he overlooks her limited experience with

mental health. Specifically, Wexford argues that Dr. Herrington "fails to identify how her

recollection" regarding mental health referrals is "dispositive that referrals did not occur." Mot.

22. But Dr. Herrington accurately cited Ms. Walls' testimony that, in her experience, an individual

needed to "write an order" to get a referral and her testimony that she did not believe ensuring

coordination was her responsibility. Ex. 66 (Walls Tr.) at 76, 81. Moreover, Dr. Herrington did

not need to show that Nurse Walls's testimony was "dispositive" of a problematic practice. Rather,

that testimony supported an opinion that Dr. Herrington had reached based on his review of the

twelve cases and the rest of the record.

At the conclusion of this section, Wexford argues that Dr. Herrington did not identify any

formal policies that were inadequate or any instance where Wexford denied a referral for care.

Mot. 29-30. However, Dr. Herrington's opinions—like *Monell* itself—are not limited to formal

policies. *Cf. Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)

(explaining that governmental liability under § 1983 may apply even where a "custom has not

received formal approval through the body's official decisionmaking channels"). Wexford also

nitpicks the fact that Dr. Herrington "could not articulate" from memory "how many times he

observed" the factors he identified in his opening report. Mot. 28. That is because counsel asked

these questions of Dr. Herrington at a deposition that was ostensibly supposed to address Dr.

Herrington's *rebuttal* report. *See* Ex. 92 at 185-186 ("I don't remember offhand. I didn't read my first report. I thought we were going to be talking about the rebuttal report today, so I feel at a little bit at a disadvantage.").

### 3. Wexford's remaining arguments fail.

Wexford argues that Dr. Herrington's findings about the average age and cause of death of the individuals he reviewed should be barred. Mot. 30-31. But in this section of the brief, Wexford largely seeks to exclude opinions that Dr. Herrington did not give.

As to average age, for instance, Dr. Herrington simply stated that "[a]ge at time of death for the incarcerated individuals in this analysis ranged from 21 to 82 years with an average age at time of death of 48 years." Ex. 10 at 48. Wexford does not claim that these numbers are incorrect and does not explain why Dr. Herrington should be unable to give them. It claims only that he did not calculate the average age of death for all prisoners who die in IDOC custody. Wexford can raise this on cross-examination.

As another example, Wexford states that "Dr. Herrington wrongly implies the death rate is higher in the IDOC than the general population." Mot. 31. But that opinion does not appear in Dr. Herrington's report, and Wexford's objection can be explored on cross if necessary.

Finally, Wexford argues that Dr. Herrington should not be allowed to opine that most of the deaths in his study were from causes not listed in the top 5 causes of death in Illinois. Wexford claims that Dr. Herrington "provides no explanation" for this conclusion. Mot. 30. His report clearly states how he reached it: comparing the likely cause of death for each individual to the 2016 mortality data published by the Illinois Department of Public Health. *See* Ex. 10 at 48. According to Wexford, Dr. Herrington's cause of death conclusions are "wrong," Mot. 30, but that is yet another point that it can present to the jury on cross.

**III.    There are no grounds to exclude Dr. Herrington's "patient-specific" opinions.**

After attacking Dr. Herrington's "systemwide" opinions, Wexford turns to what it calls the "patient-specific" opinions—*i.e.*, the analyses of the medical records of Mr. Curtis and 11 other prisoners who died while in the custody of the IDOC. Wexford presents a grab-bag of arguments attacking nearly every aspect of Dr. Herrington's patient-specific opinions, including several that are not "patient-specific" under Wexford's definition. In any event, these arguments fail.

**A.    Wexford's miscellaneous arguments fail.**

**1.    Statistics and probability.**

Wexford repeats that Dr. Herrington is not qualified to conduct a "systemwide review" and that, for the same reasons, he is not qualified to "come[] to opinions about statistical and mathematical probability." Mot. 31-32. Once more, Dr. Herrington is not giving statistical opinions, so this argument is moot. However, Wexford seems to believe that without formal statistical or mathematical training and methodology, Dr. Herrington cannot mention what he views as "probable," "likely," or "more likely than not." Yet, as discussed at the outset of this brief, such opinions from medical providers are consistent with the substantive legal standard. *E.g.*, *Wise*, 64 Ill. App. 3d at 590 ("it is not objectionable for the medical expert to testify in terms of percentages so long as it is clear that the opinion expressed is not the product of mere speculation or conjecture"); *Liss*, 2022 WL 2192863, at *2 (similar). These are straightforward concepts that experts—and jurors—use all the time in their daily lives.

The deposition testimony Wexford relies on in attempting to show why Dr. Herrington's opinions should be excluded proves the point. For instance, Wexford cites a deposition exchange where counsel asked Dr. Herrington to provide "calculations" supporting his determination that it was improbable that Mr. Curtis died from ingesting a synthetic cannabinoid. Dr. Herrington replied by explaining the basis for his medical judgment. Ex. 95 (Herrington Jun 20, 2023 Tr.) at 175-76.

This excerpt shows that Dr. Herrington was not offering statistical or mathematical opinions, but rather using terms like "improbable" and "probable" in their ordinary, commonsense way.

## 2. Psychiatric opinions.

Wexford seeks to bar Dr. Herrington's opinions on mental health care, catatonia, and psychiatric care. However, Wexford does not identify what specific opinions fall under this umbrella. *See* Mot. 32 (asking the Court to prohibit all "opinions related to mental health, catatonia, psychiatric medication, standard of care of mental health and psychiatry, etc."). Whatever the scope of Wexford's request for exclusion, the Seventh Circuit has repeatedly explained that "[t]he notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Thus, the fact that an expert "may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016); *see also Gayton v. McCoy,* 593 F.3d 610, 617 (7th Cir. 2010) ("courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats"); *Olivarius v. Tharaldson Prop. Mgmt.*, 2011 WL 13261842, at *2 (N.D. Ill. Apr. 29, 2011) ("[T]he fact that Dr. Simon is not a specialist in infectious disease does not prevent him from offering an opinion about how plaintiff developed cellulitis in her left leg.").

Dr. Herrington has extensive correctional experience, including correctional medical health experience, from his prior work in corrections departments. *See* Ex. 95 at 57-61 (describing Dr. Herrington's experience in the Vermont and Maine correctional systems). This gives him a sufficient basis to offer opinions on mental health and psychiatric issues in the correctional context. Further, Dr. Herrington was careful to tether his opinions to his experience supervising mental health in a correctional setting. *See* Ex. 95 at 195 ("I was careful with my criticisms, and my criticisms were sort of process-related, not so much like choice of psychiatric medicine because I

realize that I'm not a psychiatrist."). If Wexford believes that any specific opinions cross this line, it can raise that objection at trial, but Wexford has not presented any grounds for wholesale exclusion of all opinions on these topics.

### 3.     Cause of death.

Wexford argues that Dr. Herrington cannot offer opinions on "cause of death" or "preventability" because he "is not a pathologist and cannot perform autopsies." Mot. 33. As just explained, the law is to the contrary. A physician need not have pathology training to offer opinions on cause of death. *See, e.g., Gayton*, 593 F.3d at 618 (discussing generalist physician's cause of death opinions); *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994) ("*Daubert* does not support plaintiff's position that the subject of Carroll's cause of death falls within the exclusive confines of pathology"); *Bindl v. Evanston Hosp. Corp.*, No. 14-cv-52, 2015 WL 13333596, at *3 (D. Wyo. Oct. 15, 2015) ("Cause of death is not a subject limited only to pathologist."). Indeed, Dr. Herrington "routinely received communications and instructions to complete death certificates" in his professional career. *See* Ex. 92 at 29-30; Ex. 95 at 172-73.

Wexford also argues that Dr. Herrington is not qualified to address cause of death opinions from its own expert, Dr. John Slish, who opined that Mr. Curtis's death was related to cardiac issues. Mot. 33-34. Of course, Dr. Slish is also not a pathologist, so this simply demonstrates why it would be inappropriate to preclude Dr. Herrington from giving cause-of-death testimony. In any case, Wexford believes that Dr. Herrington's responses to Dr. Slish are "simply incorrect," Mot. 33-34, but that is fodder for cross-examination. So too with Wexford's claim that

Dr. Herrington did not consider a diagnosis of Wellens Syndrome and misread laboratory tests. Mot. 34-35. Those purported flaws in the opinion go to weight, not admissibility.[5]

### 4.    Toxicology.

Wexford argues that Dr. Herrington should not be allowed to opine on toxicology issues. Mot. 35-36. To be clear, Plaintiff agrees that the medical experts—including Wexford's clinical pathologist expert Dr. Pins and emergency medicine expert Dr. Slish—should not testify on toxicology matters. *See* Dkt. 233 at 9-11, 17-20.

That said, the portion of Dr. Herrington's opinions that Wexford seeks to exclude is simply rebuttal to improper toxicology testimony from Dr. Slish. As Dr. Herrington observed, Dr. Slish "repeatedly assumes throughout his report" that the *same* compound was found in post-mortem testing of Kevin Curtis, E.F., and T.M. when in fact the toxicology results did not say anything one way or the other about the compounds in the three men being identical. Ex. 57 at 10. If Plaintiff's motion to preclude Dr. Slish from giving this opinion is granted, then Dr. Herrington will not need to give his opinion in rebuttal. But if Plaintiff's motion is not granted, Dr. Herrington should be able to testify about toxicology matters to the same extent as Dr. Slish.

### B.    Wexford's arguments about individual patients are not a basis for exclusion.

Nearly forty pages into its motion, Wexford turns to the twelve patients that Dr. Herrington considered. But first, Wexford offers a host of general principles that guide the *Daubert* inquiry, none of which Plaintiff disputes, but which are inapplicable here. Mot. 36-38.

In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, No. 02-cv-4356, 2010 WL 2607241 (N.D. Ill. June 23, 2010), for example, the excluded expert formed his opinion only through web

---

[5] Additionally, Wexford misrepresents testimony by Plaintiff's pathology expert. Wexford contends that Dr. Diaz's "concessions" call Dr. Herrington's opinions into question. Mot. 33-34. Plaintiff's opposition to the motion to exclude Dr. Diaz, filed contemporaneously, explains what Dr. Diaz actually said.

searches, did not review most of the resources provided to him, and conceded that he did not follow his own methodology. Here, Dr. Herrington reviewed hundreds of pages for each patient, contracts, numerous depositions, medical guidelines, and more. Likewise, in *Sommerfield v. City of Chicago*, 254 F.R.D. 317 (N.D. Ill. 2008), the expert relied only on deposition summaries that had been drafted by plaintiff's counsel. Conversely, Dr. Herrington reviewed the records themselves. *See N. States Power Co. v. City of Ashland*, No. 12-cv-602, 2015 WL 1745880, at *10 (W.D. Wis. Apr. 16, 2015) (finding *Sommerfield* "easily distinguishable" where the expert reviewed the underlying documents, rather than summaries that "were less than 1% of the length of the depositions themselves").

Dr. Herrington applied a well-worn methodology, reviewing hundreds of pages of medical records, as well as other record evidence, and applying his medical judgment to reach conclusions about the care given to each individual. *See* Ex. 10 at 8-10 (list of materials considered). This is bread-and-butter testimony of the kind frequently admitted by courts. *See e.g.*, *Ortiz v. City of Chicago*, 656 F.3d 523, 537 (7th Cir. 2011) (holding that medical expert's opinion derived from examining autopsy report, medical records, and testimony of guards and other witnesses was reliable and exclusion of the expert's testimony was error); *Mack v. Johnson Cnty. Sheriff*, No. 12-cv-141, 2014 WL 309394, at *5 (S.D. Ind. Jan. 28, 2014) (holding that an expert's "experience as a physician and Allen County Jail doctor is sufficient to support his status of expertise in this field" and that a review of medical records, depositions, and other material was a "reliable method" that is "often relied upon by courts"). Wexford takes issue with some of the conclusions Dr. Herrington reached based on his review of each individual's records, but none of those arguments warrant wholesale exclusion.

### 1.    Kevin Curtis (Mot. 37-43)

Wexford argues that Dr. Herrington's opinions conflict with the opinions of Dr. Kamal Sabharwal, the forensic pathologist who conducted Mr. Curtis's autopsy. Wexford focuses particularly on Dr. Sabharwal's opinion that Mr. Curtis's death may have been related to the deaths of two other men, E.F. and T.M., who died at Menard around the same time. Mot. 37-38.

Wexford complains first that Dr. Herrington did not review the cases of E.F. or T.M., before issuing his own report. In his first deposition, however, Dr. Herrington explained that he was aware of allegations that E.F. and T.M. had died from ingesting synthetic cannabinoids and did not believe the "potential for two other deaths related to synthetic cannabinoids" would change his opinions. Ex. 95 at 75-78. Dr. Herrington repeatedly explained why, in his judgment, synthetic cannabinoids were not a realistic cause of death for Mr. Curtis. *See id*. at 83-86, 150-55, 170-73, 175-77, 210-11. Thus, even if Dr. Herrington had not submitted a rebuttal report, this would not be a basis for exclusion.

As Wexford acknowledges, moreover, Dr. Herrington did submit a rebuttal report, in which he appropriately reviewed E.F. and T.M.'s medical records and reiterated that he did not believe the synthetic cannabinoid theory could explain Mr. Curtis's death. *See* Ex. 57 at 9-15. Dr. Herrington did so because Wexford's experts both pointed to E.F. and T.M.'s deaths as support for their synthetic cannabinoid theory. That is precisely what rebuttal reports are for. Wexford additionally argues that Dr. Herrington "has not provided a reasonable explanation for the three men's deaths." Mot. 39. This goes to weight, not admissibility. *See Harris v. Wexford Health Sources, Inc.*, No. 15-cv-10936, 2021 WL 1192437, at *6 (N.D. Ill. Mar. 30, 2021) ("If Harris disagrees with how Dr. Tubbs has applied his medical knowledge to the facts of the case, she may address that on cross-examination.").

Wexford argues that Dr. Herrington did not consider an IDOC investigation into the distribution of synthetic cannabinoids in Menard in September 2018. Mot. 39. Again, that is at best a subject for cross. In fact, it is clear that a report stating that synthetic cannabinoids were circulating at Menard in September 2018 would not change Dr. Herrington's conclusions. The leader of that investigation testified at his deposition that he did not "find any connection between Kevin Curtis and synthetic cannabinoids." Ex. 96 (Reichert June 5, 2023 Tr.) at 91. Further, Dr. Herrington was asked whether his opinions would change if the evidence showed that Mr. Curtis had taken a synthetic cannabinoid and that two other individuals had died in the days thereafter. He answered that his opinions would remain the same. Ex. 95 at 175-77.

Wexford tries to undermine Dr. Herrington based on cardiac issues in Mr. Curtis's medical records. Mot. 39. But Dr. Herrington addressed this point at his deposition as well. *See* Ex. 92 at 138 ("Well, you asked me to answer that question, so I think I he still had an arrhythmia based on the dehydration and kidney failure. All of those causal factors in his death are still present. The only thing you've changed is the heart disease, which I don't think killed him anyway, so if he doesn't have the heart disease, I think he still dies."). Wexford also argues that Dr. Herrington's opinion that the cause of death was catatonia, rhabdomyolysis, and hypovolemia is inconsistent with the evidence and with the opinions of other experts. Mot. 39-40. Whether Dr. Herrington or Wexford is correct is a question for the jury.[6]

Finally, Wexford offers rapid-fire arguments that roughly parallel its arguments for summary judgment. Mot. 42. Wexford does not cite any relevant authority or other briefing in this

---

[6] Wexford highlights supposedly "jaw dropping" testimony from Dr. Herrington that the presence of venlafaxine and diphenhydramine in post-mortem testing may have stemmed from medication given in error. Mot. 40-41. Dr. Herrington was not opining that medical staff gave Mr. Curtis incorrect medications. He was simply explaining that a "potential explanation" for these findings was medication error—illustrated with the example of a nurse delivering medicine to a patient with a curt instruction to swallow the pills—and stated that "this isn't a formal opinion of mine." Ex. 92 at 174.

section, so these arguments should be treated as forfeited or waived for purposes of the motion to bar. Regardless, as discussed in Plaintiff's response to Wexford's summary judgment motion, these arguments are unavailing.

### 2.    D.P. (Mot. 43-44)

D.P. was a 24-year-old with a significant mental health history, including self-harm. He died in October 2017 at Dixon Correctional Center after swallowing two metal utensils or sporks. Dr. Herrington opined that there were numerous material inadequacies in D.P.'s care, including (1) failure to timely notify a medical practitioner that D.P. had swallowed a spork and out of scope clinical decision-making by a nurse, (2) failure to perform an adequate assessment, including a physical examination, imaging, and an upper endoscopy, (3) failure to notify a medical practitioner of complaints of abdominal pain later in June, and (4) failure to consider x-ray imaging or a surgical consultation in October 2017, and (5) failure to notify a medical practitioner of complaints of abdominal pain late in October. Ex. 10 at 8, 21-24.

Wexford states that Dr. Herrington's criticism is that "the practitioner did not create a new referral when D.P. swallowed another object," and contends that Dr. Herrington "saw no evidence the practitioner's decision was based on a Wexford practice." However, that is immaterial. Dr. Herrington was asked about both "policies" *and* "practices" as part of Wexford's questioning; he stated that he was not aware of any "written policies," but did see evidence of a problematic "practice" in D.P.'s case and other cases. Ex. 95 at 268-70 ("if you ask me about policies, I can't speak to a policy. But if you ask me about practice patterns, this patient not being sent timely to the hospital is a practice pattern that I think that this mortality review establishes"). Moreover, Dr. Herrington's criticisms are broader than just referral issues. He also criticizes out-of-scope decision-making and a failure to conduct an appropriate work-up. Accordingly, Wexford identifies no basis for exclusion of his opinions.

### 3.    D.E. (Mot. 44-46)

D.E. was a 59-year-old with a significant mental health history and several other serious complications. He died in January 2016 at Dixon Correctional Center after markedly abnormal lab tests that a Wexford physician attributed to dehydration.

Dr. Herrington opined that nursing staff did not appropriately contact medical practitioners, the medical team did not adequately ensure medication compliance or involve the mental health team, and D.E. should have been immediately referred to the hospital based on his abnormal test results. Ex. 10 at 24-26.

Wexford fails to show any grounds for exclusion of these opinions. First, Wexford argues that D.E. is to blame because he "refused medical care." But as Dr. Herrington explained, "patients refuse treatment in prison routinely," and that "does not give the healthcare practitioner carte blanche to not provide care." Ex. 91 at 301. Particularly for patients suffering from mental illness, "adequate care requires" involving "mental health colleagues to give th[e] patient every opportunity to take their medication." *Id.* at 304-05. Wexford argues that the medical records show staff attempts to ensure compliance in the weeks before D.E.'s death, but that does not excuse later failures and is, in any event, a matter for cross examination. Further, Wexford states that Dr. Herrington "admitted he did not mean to imply the providers did not engage with D.E" (Mot. 45), but Dr. Herrington made no such admission. *See* Ex. 91 at 304-05 ("I'm saying exactly what I wrote, which is the failure to refer a patient with known mental illness whose refusals of medicine might be related to their condition, the failure to refer that patient to mental health is, in my opinion, inadequate care.").

Wexford also conflates the treatment of D.E. and the treatment provided to Mr. Curtis, implying there is some inconsistency because D.E.'s laboratory results were misinterpreted as dehydration whereas Plaintiff asserts that Mr. Curtis died of dehydration. Dkt. 215 at 46. But there

is no inconsistency in Dr. Herrington's findings—each patient's case must be evaluated on an individualized basis.

### 4.    C.G. (Mot. 46-47)

C.G. was a 30-year-old who died at Menard Correctional Center from a chronic liver disease called primary sclerosing cholangitis (PSC) in 2018. Dr. Herrington opined that Wexford failed to obtain critical records, failed to follow up on his liver condition for years, and delayed inappropriately in attempting to obtain a liver transplant. Ex. 10 at 26-31.

Wexford notes that C.G.'s liver transplant was ultimately approved by the IDOC Chief of Medical Services in September 2019. But this elides the crucial fact that C.G. was left to languish due to inaction by Wexford's medical officials over the crucial months from May to October 2018.[7] As Dr. Herrington's report notes, simply monitoring C.G.'s liver values—without more—is insufficient medical care. Wexford also argues that its providers did make some attempts to obtain a liver transplant. But whether those efforts are sufficient to meet the standard of care, and whether they undermine Dr. Herrington's opinions, is a question for cross-examination. Wexford also takes issue with Dr. Herrington's observation that Wexford officials failed to timely obtain C.G.'s prior medical records. To defend that failure, Wexford chastises Dr. Herrington for failing to note efforts made by Wexford officials to obtain them. Of course, it is hard for Dr. Herrington to show what effort was made to obtain C.G.'s records if the medical records do not reflect that any attempt was made to obtain them. Again, this is at best a question for cross.

### 5.    G.H. (Mot. 47-49)

G.H. was a 48-year-old who died at Taylorville Correctional Center on August 28, 2018 after visiting the healthcare unit with reports of nausea, vomiting, feelings of fogginess, neck pain,

---

[7] Wexford incorrectly states that C.G.'s liver transplant evaluation was approved in September 2019. In fact, the transplant was approved in September *2018*. Dkt. 215 at 47. C.G. died on October 28, 2018.

and a sore throat. Despite G.H.'s history of methamphetamine use, which was documented in his medical records, healthcare staff failed to inquire further regarding his mental status, conduct any tests for drug use, or even (at the second visit) take G.H.'s vitals. Dr. Herrington opined that nursing staff failed to contact a medical practitioner, failed to follow up on complaints about feeling "foggy," and failed to take vital signs in violation of the standard of care. Ex. 10 at 31-32.

Wexford claims that Dr. Herrington's opinion is that Wexford provided G.H. with inadequate care by "not identifying methamphetamine G.H. had not yet ingested." Mot. 48–49. This mischaracterizes Dr. Herrington's report and testimony. Dr. Herrington does not suggest that healthcare providers should have been "clairvoyant," as Defendants claim. He simply opines that, under general standards of correctional care, G.H.'s medical providers should have followed up on their patient's "change in mentation," as evidenced by his reports of "fogginess," especially given the fact that this change had appeared in someone who: (1) had a known history of drug abuse, (2) was housed in a correctional setting where drug use is common, and (3) presented with other symptoms associated with drug use, including nausea and vomiting. Ex. 91 at 339.

### 6.    L.K. (Mot. 49-51)

L.K. was an 82-year-old who died at Dixon Correctional Center in August 2016 after developing a decubitus ulcer, resulting in visible bone. He was never referred for surgery to treat the ulcer and began demonstrating signs of decompensation. Dr. Herrington opined that L.K. should have received surgical consultation and debridement (removal of tissue) for his condition, which did not occur, as well as an immediate referral to a hospital when he presented with high temperature and confusion. Ex. 10 at 33-34.

Wexford complains that Dr. Herrington did not mention outside referrals and wound care made during L.K.'s incarceration prior to August 2016. But these were not the referrals that L.K needed in August 2016; the fact that providers gave *other* treatment before that date does not

mitigate this need. Wexford further suggests that L.K. was to blame for not reporting irritation around his coccyx until it was too late for doctors to prevent the ulcer. But when treating a disabled and wheelchair bound patient, there are basic measures healthcare staff should take to prevent such irritation from occurring in the first place.

### 7.    G.P. (Mot. 51-53)

G.P. was 43 years old when he presented in an IDOC infirmary with incontinence, bruising, blood in his urine, and unequal pupils. When G.P. was finally sent to the hospital, it was discovered that he had profound over-anticoagulation "meaning his blood was too thin to clot at all." Herrington Report at 36. He died from a large subdural hematoma. Dr. Herrington determined that G.P.'s anticoagulation "was irresponsibly managed by Wexford on an astounding number of levels." *Id.* at 37. He also concluded that medical providers failed to make proper referrals to outside specialists and improperly delayed sending G.P. to the hospital, among other issues.

Defendants again critique Dr. Herrington for failing to reference specific portions of G.P.'s substantial medical records. Dkt. No. 215 at 52. Yet Dr. Herrington explicitly acknowledged that G.P.'s "past medical history was complicated," and included a gunshot wound, "chronic seizures," and diagnoses of "stroke, hypothyroidism, and pseudoseizures." Ex. 10 at 34. Similarly, Defendants accuse Dr. Herrington of not realizing that G.P.'s pupils were *always* different sizes, but Dr. Herrington explained during his deposition that even if this was normal for G.P., it was "not a normal status generally," and warranted attention. Ex. 91 at 367-369. This is yet another example of why expert opinions are better tested on cross-examination than through the exclusion of testimony.

Defendants purport to be "shocked" by Dr. Herrington's opinion that G.P.'s "care evidences a failure to use community consultants." Dkt. 215 at 52. But Dr. Herrington suggests that G.P.'s providers failed to *properly* use community consultants—not that they failed to use

them altogether. *See* Herrington Report at 39 ("adequate care required involvement of a neurologist to assist with the *on-going* necessary management of his seizures") (emphasis added); *id.* (noting that rather than sending G.P. to the hospital, the facility physician ordered five to six hours of "purposeless" monitoring). Defendants point to Wexford's "appropriate Coumadin Management guidelines" as evidence that, contrary to Herrington's findings, G.P.'s care was adequate. But, as Dr. Herrington noted, those guidelines were not followed here. Herrington Report at 37-38; Ex. 92 at 82–83 (noting that G.P.'s Coumadin was overdosed even though there is "a Wexford protocol that deals with that").

### 8.    M.J. (Mot. 53-55)

M.J. was 21 years old when he died in IDOC custody. M.J., who was diagnosed with schizoaffective and generalized anxiety disorder, quickly began to decline when he went off of his psychiatric medications in 2019. He stopped eating and drinking and eventually died from severe dehydration. Like Mr. Curtis, M.J. was being closely monitored on crisis watch during his decline and death. In his report, Dr. Herrington determined that medical providers' failures to promptly process M.J.'s psychiatric medications, consider enforced medications before it was too late, monitor for dehydration when M.J. wasn't eating, rush order M.J.'s labs on the day of his death, and send M.J. to an outside hospital all denoted inadequate care. Herrington Report at 42.

Defendants' primary critique of Dr. Herrington's analysis is that he did not include a full chronology of each mental health appointment M.J. attended in 2019. Dkt. 215 at 54; *see also id.* at 55 ("Dr. Herrington further claims psychiatry should have been involved earlier but does not appear to know that psychiatry was involved."). But Dr. Herrington never suggested that M.J. didn't have enough appointments with mental health providers. Rather, he concluded that those providers—who, admittedly, saw M.J. frequently—should have been consulted much earlier regarding the possible need for enforced medications. Again, contrary to Rule 702, Defendants

attack Dr. Herrington's report using evidence unrelated to his findings. *See* Fed. R. Evid. 702(b) (expert's testimony must be "based on sufficient facts or data.").

Defendants' other criticisms are similarly baseless. They accuse Dr. Herrington of purporting that "on August 22, 2019, the only interaction M.J. had was with a physician; however, he was also seen by mental health." Dkt. No. 215 at 54. In fact, Dr. Herrington's report simply states that, on August 22, M.J. "was seen by a physician in reference to a staff assault with fluid exposure. Documentation reflects labs done to test for communicable diseases only." Herrington report at 41. Defendants also take issue with Dr. Herrington's finding that M.J.'s labs should have been ordered "stat," noting that the testing "was performed within 4 hours." Dkt. 215 at 55. Defendants omit the fact that that, within those four hours, M.J. died. Ex. 97 (M.J. ISP Response) at 4. Had providers received his labs earlier, they would have seen that M.J.'s sodium levels were "High Critical."

The crux of Defendants argument is that the care Wexford provided to M.J. wasn't that bad. They note that medical and correctional staff "repeated [*sic.*] offered M.J. food and water, along with other medical and mental health services," and insist that although Wexford did not initiate an emergency transfer for M.J., providers did not deny him one either. Dkt. 215 at 55. Citing nothing, Defendants assert that it is a "nearly universal experience" to have medication delays and. in any event, the delay wasn't significant. Dkt. 215 n.35. Of course, these arguments speak to Dr. Herrington's conclusions, rather than his methodology or qualifications, and should be reserved for cross-examination.

### 9. H.C. (Mot. 56-58)

H.C. was a 74-year-old with prostate cancer. Throughout 2016, while incarcerated at Menard, he was seen several times by offsite oncologists for follow-up oncology care. In November 2016, H.C. was taken to the emergency room with severe abdominal pain. A CT scan

of his abdomen revealed that H.C. had developed a large abdominal mass that indicated retroperitoneal cancer. The following month, Wexford authorized H.C. to travel offsite again for a biopsy and for follow-up treatment. In February 2017, after a rapid decline in his health that saw him suffer through an evidently untreated bout of hallucinations and delusions, H.C. died in a hospital ER. He did not undergo a biopsy or receive any oncological care at any point between his diagnosis in November and his death the following February.

Dr. Herrington opined that several inadequacies in H.C.'s care precipitated his death: namely, (1) the failure by Menard healthcare staff to ensure that his abdominal mass was biopsied and worked up, as ordered by his oncologists, and (2) the failure by Menard healthcare staff to timely identify the emergent nature of his altered mental state and inability to care for himself, or to adequately address either condition. Ex. 10 at 43–44.

Wexford contends that Dr. Herrington's analysis is flawed because the records he reviewed were incomplete. Mot. 57–58. That is not grounds for exclusion, and in any case, none of the prescriptions noted by Wexford bear on whether H.C. was receiving adequate or prompt diagnostic and oncological care. As for the delay in having the CT scans read by a radiologist, the records cited by Wexford indicate that its staff let the "urgent request for CT guided biopsy" go unaddressed for more than a month. *See* Defs.' Ex. SS at 504–505. Dr. Herrington testified that in his more than two decades of practice, he had "never seen a biopsy take more than a day or two." Ex. 91 at 383–84.

### 10.    John Doe (Mot. 59-61)

John Doe was a 45-year-old with hypertension, diabetes, obesity, and a history of sexually transmitted infections. On September 5, 2015, he was found on the floor of his cell at Menard in an altered mental state, having apparently urinated on himself. Between September 2015 and his death in October 2016, Mr. Doe had numerous encounters with Menard healthcare staff and

outside providers to address—among other things—apparent neurological changes, bladder infections, dehydration, and at least one urinary tract infection. On October 11, 2016, Mr. Doe was taken to the ER and the following day to Barnes Jewish Hospital, where infectious disease specialists promptly diagnosed him with HIV. Mr. Doe suffered from pneumonia and an episode of cardiac arrest before dying on October 20, 2016.

Dr. Herrington opined that several deficiencies in Mr. Doe's care directly caused his death—chief among them the complete failure to screen Mr. Doe for HIV at intake or after he presented with HIV-suggestive symptoms. Ex. 10 at 44–45. Wexford argues that Dr. Herrington's opinions are flawed because he "did not review [Mr. Doe's] IDOC intake to see if he was screened, does not know when John Doe contracted HIV, [and] did not recall if the IDOC directives required screening." Mot. 61. But when Wexford asked Dr. Herrington whether he had reviewed Mr. Doe's intake record, Dr. Herrington replied that he had "looked at everything that [he] had" but could not "specifically recall the intake document." Ex. 91 at 386–87. Dr. Herrington's admission at his deposition that he could not recall one document out of the thousands he reviewed is in no way an admission that he did "not review [Mr. Doe's] IDOC intake to see if he was screened." And that Dr. Herrington did not know when Mr. Doe contracted HIV is also beside the point. Wexford does not know when Mr. Doe contracted HIV either, because Wexford failed to test Mr. Doe for HIV.

### 11.    M.L. (Mot. 61-62)

M.L. was a 48-year-old with uncontrolled elevated blood pressure. He was sent to Southern Illinois University Hospital in February 2015 and discharged with clear instructions for follow-up visits with cardiology and nephrology. Wexford never referred M.L. for those appointments and he was found dead in his cell at Menard in November 2016. Mot. 61-62.

Dr. Herrington opined that there were numerous material inadequacies in M.L.'s care, including (1) failure to refer M.L. to cardiology, (2) failure to refer M.L. to nephrology, and (3)

failure to complete a full work up based on elevated labs. Ex. 10 at 9, 45-47. Wexford argues that Dr. Herrington's analysis is flawed because he did not mention in his report that M.L. received mental health care and had a history of refusing his hypertensive medications.

Neither M.L.'s history of mental health care nor his track record of medication compliance, however, is pertinent to Dr. Herrington's conclusion that Wexford should have done a work-up and sent M.L. to specialists, as indicated by his doctors at Southern Illinois University Hospital. Indeed, the hospital *noted* M.L.'s medical noncompliance and still recommended that M.L. see a cardiologist and nephrologist. Ex. 97 at P018531-18532. Further, as Dr. Herrington testified at his deposition, M.L.'s mental health treatment would not impact his opinion. Ex. 91 at 395-96. Thus, there was no reason for him to include it in his report.

### 12.    Y.A. (Mot. 62-63)

Y.A. was a 64-year-old who was violently assaulted by his cell mate and sustained head and neck trauma in 2013. He became unable to feed himself and began to display increasingly concerning symptoms, like dangerously low blood pressure, blood sugar, and oxygen saturation. Instead of sending Y.A. to the emergency room, medical staff decided to continue to observe him in the prison. Several hours later, Y.A. was found dead in his cell at Menard.

Dr. Herrington opined that Y.A. required prompt transfer to the hospital and that by failing to transfer Y.A., Wexford provided inadequate care. Ex. 10 at 9, 47-48. Wexford attempts to discredit Dr. Herrington by shifting focus away from his conclusion—which Wexford does *not* dispute—that Y.A. needed to be transferred to the hospital. Its arguments lack merit.

First, Wexford criticizes Dr. Herrington for failing to note Y.A.'s refusal of medical and mental health services. But whether Y.A. previously refused services is irrelevant to whether he should have been transferred to the emergency room on the day he died.

The same is true regarding Wexford's argument that Dr. Herrington should have analyzed whether being sent to the hospital two hours earlier would have resulted in a different outcome. As Dr. Herrington explained at his deposition, whether Y.A. would have survived at the hospital is irrelevant to whether Wexford provided adequate care. Ex. 91 at 401 ("Whether or not he would have survived at the hospital, adequate care is sending him because he was unstable and that would give him the best chance."). Wexford also contends that Dr. Herrington's analysis is unreliable because he lists Y.A.'s cause of death as cardiovascular disease, which differs from the cause of death reported in the IDOC's death spreadsheet. This is irrelevant to whether a person with Y.A.'s symptoms required emergency treatment at a hospital. At most, it is a subject for cross-examination.

Finally, Wexford argues that doctors must exercise "clinical judgment" in deciding when to send a patient to the ER versus treating the patient in the infirmary and that a doctor previously sent Y.A. to the hospital when he felt it was appropriate. Y.A.'s prior hospital stay has no bearing on Dr. Herrington's determination that Wexford should have sent Y.A. to the hospital the day he died. And even if the decision not to transfer Y.A. to the hospital was one of "clinical judgment," Dr. Herrington should be permitted to offer his opinion that the clinical judgment that Wexford's staff exercised in Y.A.'s case fell far short of professional standards.

### C.    Wexford's hearsay objections are premature and incorrect.

At the conclusion of its brief, Wexford seeks to exclude all non-party medical records and the *Lippert* reports as hearsay. Mot. 65-67. This has nothing to do with Dr. Herrington's opinions. The argument is also premature and wrong.

First, whether the underlying records are admissible is not a *Daubert* issue and should be addressed through motions *in limine* or at trial. The records may be admissible under exceptions such as Federal Rule of Evidence 803(4) and 803(6). Or they may be admissible to help the jury

understand Dr. Herrington's opinions under Rule 703. Regardless of the answer to these questions, however, an expert is expressly permitted to rely on hearsay records to formulate his or her opinions as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Wexford does not argue that it is inappropriate for a medical expert to rely on medical records to make decisions, and it could not credibly do so. *See, e.g.*, *Maremont v. Susan Fredman Design Grp., Ltd.*, No. 10-cv-7811, 2014 WL 13111295, at *4 (N.D. Ill. Sept. 19, 2014) ("Defendants' expert may base his opinion on medical records, even if hearsay, pursuant to Rule 703.").

Wexford claims that "[w]ell-settled law prohibits a plaintiff from introducing evidence of other incidents absent a clear demonstration of substantial similarity between plaintiff's claims and such claims or incidents." Mot. 65. That is incorrect. The only case Wexford cites in support of this "well-settled" principle is a products liability case, *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1185 (7th Cir. 1993), that has no application to section 1983 claims brought under *Monell*. And once again, whether the underlying records are admissible is a separate matter from the admissibility of Dr. Herrington's opinions.

Finally, Wexford argues that the *Lippert* reports are hearsay. That is irrelevant because, even if hearsay, Dr. Herrington was entitled to rely on the reports under Rule 703 to form his opinions. As to the reports themselves, Plaintiff has already explained that she does not intend to use them as substantive evidence at trial (unless Wexford's expert Moein Heidari opens the door by testifying about the substance of the *Lippert* reports himself). *See* Dkt. 231 at 15-17. Wexford briefly asserts that the *Lippert* reports cannot be used for non-hearsay purposes (*e.g.*, notice). *See* Mot. 66-67. But that is wrong and, more importantly, premature. Whether a plaintiff can use one or both *Lippert* reports for notice purposes is a matter for the district court's discretion, turning on

the facts of the case and other considerations. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021). It will require *in limine* briefing and may ultimately be decided in the context of the record at trial. For now, the key point is that none of the opinions that Dr. Herrington will offer at trial turn on whether the *Lippert* reports are admissible to prove notice.

## CONCLUSION

For the foregoing reasons, the Court should deny Wexford's motion in its entirety.


Dated: June 21, 2024                                          Respectfully submitted,

                                                             /s/ Sarah Grady
                                                             Sarah Grady
                                                             Attorney for Plaintiff


Sarah Grady
Howard Kaplan
David A. Schmutzer
Nabihah Maqbool
Terah Tollner
Annie Garau Kelly
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Suite 205
Chicago, IL 60614
(312) 852-2184
sarah@kaplangrady.com

**CERTIFICATE OF SERVICE**

I, Sarah Grady, an attorney, hereby certify on June 21, 2024, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.


/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff