**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

YOLANDA JACKSON, as Administrator )
of the Estate of Kevin Curtis, )
       )
            Plaintiff, )
       )
            v. )      Case No. 20-cv-0900-DWD
       )
WEXFORD HEALTH SOURCES, INC., )
et al., )
       )
            Defendants. )      Hon. David W. Dugan

**PLAINTIFF'S RESPONSE TO THE IDOC
<u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>**

Sarah Grady
Howard Kaplan
David A. Schmutzer
Nabihah Maqbool
Terah Tollner
Annie Garau Kelly
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184
adam@kaplangrady.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENTS OF MATERIAL FACT ....... 3

I.    PLAINTIFF'S RESPONSE TO MITCHELL'S STATEMENT OF MATERIAL FACTS3

II.   PLAINTIFF'S RESPONSE TO WALLS, BENNETT, FRERICH, AND FRERKING'S STATEMENTS OF FACT ........................................................................... 14

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ................................. 33

I.    Kevin Curtis is Placed on Crisis Watch, Where He Deteriorates ...................................... 34

II.   At the Direction of Defendant Bennett, Defendant Mitchell Leaves Mr. Curtis to Die ... 39

III.  Defendants Mitchell, Bennett, Frerich, and Frerking Deny Mr. Curtis Emergency Medical Care 43

IV.   While Mr. Curtis Dies, Mitchell Attempts to Evade Accountability ................................. 49

V.    Relevant IDOC Policies ................................................................................. 50

      A.    Responding to Medical Emergencies .................................................... 50

      B.    Crisis Watch ............................................................................... 51

      C.    Meal Lines ................................................................................ 52

ARGUMENT ................................................................................................. 53

I.    Plaintiff does not oppose Defendants' motion for summary judgment on Count II (civil conspiracy). ............................................................................................... 53

II.   Defendants are not entitled to summary judgment on Count I (deliberate indifference). 54

      A.    Defendant Nickolas Mitchell is liable for deliberate indifference. ...................... 55

      B.    A reasonable jury could find that Defendant Jeremy Frerich knew that Mr. Curtis needed emergency care and simply walked away. ........................................... 57

      C.    A reasonable jury could find that Defendant Charlie Frerking knew that Mr. Curtis needed emergency care yet refused to provide or summon aid. ........................... 58

      D.    A reasonable jury could find that Defendant Andrew Bennett knew that Mr. Curtis needed crisis and emergency care and deprived him of both. ............................... 60

E.    A reasonable jury could find that Defendant Gail Walls knew of and was
deliberately indifferent to Mr. Curtis's catatonia and dehydration. .................................. 64

F.    Defendants are not entitled to qualified immunity from Count I ............................. 68

III.    Defendants are not entitled to summary judgment on Count III (failure to intervene). ... 72

A.    A reasonable jury could find that each of the correctional-officer Defendants failed
to intervene in one another's denial of emergency care. .................................................. 72

B.    A reasonable jury could find that Walls knew that the Wexford Defendants were
denying Mr. Curtis adequate care and failed to intervene on his behalf. .......................... 74

IV.    Defendants are not entitled to summary judgment on Count IV (wrongful death) or Count
V (survival). ........................................................................................................................... 75

CONCLUSION ...................................................................................................................... 78

Plaintiff Yolanda Jackson, as Administrator for the Estate of Kevin Curtis, hereby responds to the motions for summary judgment by Defendants Nickolas Mitchell, Andrew Bennett, Jeremy Frerich, Charlie Frerking, and Gail Walls (collectively, "IDOC Defendants" or "Defendants") as follows:

## INTRODUCTION

Kevin Curtis was 30 years old when he entered the custody of the Illinois Department of Corrections ("IDOC"). He died fourteen months later at the Menard Correctional Center on a 93-degree day in an unairconditioned observation cell, the purported purpose of which was to allow Menard to closely monitor inmates who were at serious risk of harm. Menard's medical providers repeatedly documented Mr. Curtis's severe dehydration and never treated it. The facility's mental-health providers observed Mr. Curtis in a catatonic state but failed to review Mr. Curtis's medical history to understand it or prescribe antipsychotics to treat it until it was too late. The officer tasked with checking on Mr. Curtis's well-being every ten minutes abandoned his post for nearly an hour and a half before returning to find Mr. Curtis unconscious and in apparent respiratory arrest. And the correctional staff who reported to Mr. Curtis's observation cell spent nearly a half hour dithering rather than summoning or providing any sort of medical care. In short, the people tasked with caring for Mr. Curtis failed him at every turn.

Those Defendants now seek summary judgment. Their motions are largely unfounded, but they are not unexpected. IDOC defendants regularly move for summary judgment despite material facts that cut against them or remain in hot dispute. Here, however, the five IDOC employees charged with allowing Mr. Curtis to die through their deliberate indifference go even further. They move for summary judgment despite their inability to agree to a single set of facts among *themselves*. Bennett, Frerich, Frerking, and Walls say that all the blame rightly lies with Mitchell.

Mitchell disputes that Mr. Curtis's death had anything to do with him. Yet they all ask this Court to overlook heaps of adverse evidence, interpret whatever remains of the record in their favor, and conclude that none of them bears an ounce of responsibility.

As Plaintiff will explain, the record more than suffices to prove that these Defendants were deliberately indifferent to Mr. Curtis's emergent medical needs and failed to intervene in each other's deprivations of his constitutional rights. Indeed, in their own words, all these Defendants knew that Mr. Curtis needed some form of help. They all knew that help was just a call away. And not one of them did what the Eighth Amendment—or common decency—demanded. Their motions for summary judgment must be denied.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENTS OF MATERIAL FACT

Pursuant to Local Rule 56.1(b), Plaintiff hereby responds to the statements of fact provided by Defendants Mitchell, Dkt. 222, and Bennett, Frerich, Frerking, and Walls, Dkt. 226[1]:

## I.    PLAINTIFF'S RESPONSE TO MITCHELL'S STATEMENT OF MATERIAL FACTS

1.    Plaintiff's decedent, Kevin Curtis, was incarcerated in the custody of the Illinois Department of Corrections for a 40-year sentence based upon a conviction for murder.

**Response:** Admitted. However, Plaintiff disputes that the nature of Mr. Curtis's conviction is material or relevant to whether Mitchell treated him with deliberate indifference.

2.    On August 31, 2018, Curtis was sent to an outside hospital after reporting that he took Remeron and was unable to speak clearly or answer questions. (Ex. A, IDOC DOCS 226-227/Leven Ex. 3).

**Response:** Admitted in part and disputed in part. Plaintiff admits that on August 31, 2018, correctional officers drove Mr. Curtis to the emergency room at Chester Memorial Hospital in Chester, Illinois, and that Mr. Curtis "was unable to speak clearly or answer questions." Ex. 15 (Chester Memorial Hospital Records) at P000480–489; Ex. 1 (IDOC Medical Records) at IDOC000151–155. Plaintiff disputes that the record supports Mitchell's contention that Mr. Curtis "report[ed] that he took Remeron." On the contrary, as Menard Assistant Warden Frank Lawrence reported to IDOC leadership that afternoon, "[m]edical staff believed that Curtis had taken some type of medication although at this time [they were] uncertain what type of medication or the quantity ingested." Ex. 18 (Aug. 31, 2018 Reportable Incident) at 1.

3.    On September 1, 2018, at approximately 11:30 a.m., Curtis returned from the hospital and was placed on constant suicide watch. (Co-Defendant Wexford's Ex. M, 142-3); (Co-Defendant Wexford's Ex. O).

---

[1] This brief refers to Mitchell's Statement of Material Facts (and Plaintiff's responses thereto) as "Mitchell SOF __," the other IDOC Defendants' Statement of Material Facts (and Plaintiff's responses thereto) as "IDOC SOF __," and Plaintiff's Statement of Additional Material Facts as "PSOF __."

**Response:** Admitted.

4.      Subsequently, on September 1, he was seen and was not suicidal or homicidal and began speaking in complete sentences. The watch was changed from a continuous watch to a 30-minute watch. (Ex. B, 000122/Leven Ex. 4).

**Response:** Admitted in part and disputed in part. Plaintiff admits that someone in Menard's healthcare unit changed Mr. Curtis's watch level from a constant watch to a 30-minute watch. Plaintiff disputes that this change was the product of a "subsequent[]" evaluation. The relevant progress note, which was unsigned, purports to document an order from Dr. Lisa Goldman, Menard's Psychologist Administrator, downgrading Mr. Curtis's crisis-watch status to a 30-minute watch. Ex. 1 at IDOC000122.; *see also* Ex. 19 (Lisa Goldman Dep.) at 70. Dr. Goldman denied that she would have changed Mr. Curtis's watch level from a constant watch to a 30-minute watch by telephone. Ex. 19 at 161–63 ("I would not change a watch if I was not giving an eyeball on a patient."). According to Dr. Goldman, it was not uncommon for Menard staff to attribute an order to the wrong physician. *Id.* at 162. For example, on September 5, another nurse documented that she administered a medication to Mr. Curtis "per MD Goldman[,]" *see* Ex. 1 at IDOC000130, even though Dr. Goldman is not a medical doctor and could not prescribe or oversee the administration of the medication. Ex. 19 at 174-75 ("Absolutely not. I did not oversee an administration. I would never oversee an administration of an injection.").

5.      On September 4, 2018, Curtis's status was changed by a Qualified Mental Health Professional (QMHP) from 30-minute watch to 10-minute watch. His immediate risk to himself or others was determined to be moderate. (Ex. C, 000232/Leven Ex. 7).

**Response:** Admitted.

6.      Curtis was given limited access to property while on crisis watch and was only allowed a crisis smock, crisis blanket, crisis mattress, and finger foods only with no bones or utensils. (Ex. D, Pl 000273).

**Response:** Admitted.

-4-

7.    On September 5, 2018, Curtis was found unresponsive in his cell by Defendant Mitchell. (Ex. E, IA Report Mitchell Bates 000011-000018, at 000011-000012).

**Response:** Admitted.

8.    Defendant Mitchell began working for IDOC on January 18, 2018. (Ex. F, Mitchell Dep 223:13-15).

**Response:** Admitted. But Plaintiff disputes that Mitchell's start date—nearly nine months before Mr. Curtis's death—is at all material or relevant to whether he treated Mr. Curtis with deliberate indifference.

9.    Defendant Mitchell worked the 3:00 p.m. to 11:00 p.m. shift on September 5, 2018. (Ex. F, Mitchell Dep, 21:14-16).

**Response:** Admitted.

10.   Defendant Mitchell began his shift at approximately 2:50 p.m. on September 5, 2018. (Ex. G, Mitchell Bates 000023-000025, at 000023).

**Response:** Admitted.

11.   September 5, 2018, was Mitchell's first time working on crisis watch. (Ex. F, Mitchell Dep 36:12-37:1).

**Response:** Admitted. But Plaintiff disputes that Mitchell's crisis-watch experience is material or relevant to whether he treated Mr. Curtis with deliberate indifference.

12.   Defendant Mitchell does not recall being trained on how to perform crisis watch checks. (Ex. F, Mitchell Dep 235:1-13).

**Response:** Disputed. Mitchell was trained as a crisis-watch officer through the IDOC's mandatory, systemwide mental-health cycle training. *See* Ex. 61 (N. Mitchell training records) at P004691. Based on this training, as he later testified, Mitchell knew that prisoners on crisis watch were at risk of suffering serious harm if left unmonitored. Ex. 60 (N. Mitchell Dep.) at 181 ("Q: And you know that there is a risk for people on suicide watch[,] that they will be harmed by

-5-

themselves if they are not watched at 10-minute intervals; right? A: Yes. Q: You were trained on that when you started working for the IDOC; right? A: Yes.").

13.    Assignments were given on a day-by-day basis, and you would find out your assignment each day at roll call. (Ex. H, Frerich Dep 37:19-38:19).

    **Response:** Admitted, though it is unclear to whom "you" and "your" refer.

14.    Mitchell misunderstood that he was assigned to conduct a "skin" count every 10 minutes as to Curtis, who was on suicide watch, rather than a verbal and skin watch. (Ex. G, Bates 000023; Ex. I, Bates 000029/Mitchell Ex. 2).

    **Response:** Disputed. In his Answer, Mitchell admitted that he "knew Kevin Curtis was on crisis watch and was to be monitored every 10 minutes with verbal and visual checks." Dkt. 44 (Def. Mitchell's Answer) ¶ 36. A "party is bound by what it states in its pleadings," and "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Soo Line R. Co. v. St. Louis S.W. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997). Accordingly, because Mitchell has never withdrawn or amended that admission, he cannot now repudiate it. *E.g.*, *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).

15.    There are four different ranges of watches for inmates on crisis watch: continuous, 10-minute, 15-minute, and 30-minute. (Ex. F, Mitchell Dep. 21:10-14).

    **Response:** Admitted.

16.    Mitchell recalls that there were no inmates on continuous watch on September 5, 2018. (Ex. F, Mitchell Dep. 21:13-16).

    **Response:** Admitted.

17.    Another correctional officer (Frerking) was assigned to the entire gallery and conducted watch every 30 minutes. (Ex. G, Bates 000023).

**Response:** Admitted. However, to the extent this statement is intended to imply that Defendant Frerking shared Mitchell's crisis-watch duties or assumed them in Mitchell's unexplained absence, Plaintiff would dispute such an implication. *See* IDOC SOF 59.

18.    Normally, there is only one officer per gallery; however, an additional officer may be assigned to crisis watch if there are prisoners who required checks more frequently than 30-minute tours. (Ex. J, Bennett Dep, 119:1-16 & 121:22-123:1).

    **Response:** Admitted.

19.    Defendant had no interactions with Mr. Curtis prior to the date of death, and Curtis appeared to be sleeping prior to 4:15 p.m. Mitchell made approximately 12 checks before he was pulled off to handle the chow lines (Ex. K, Mitchell Interrogatory Resp. 10; Ex. I, Mitchell Bates 000029; Ex. F, Mitchell Dep 24:15-25:3).

    **Response:** Admitted.

20.    Defendant Mitchell was directed by his supervising officer, Sergeant Bennett, to assist with chow lines. (Ex. F, Mitchell Dep 24:15-25:3).

    **Response:** Admitted.

21.    Chow began at approximately 4:15 p.m. on September 5, 2018. (Mitchell dep. 37:17-19).

    **Response:** Admitted.

22.    Mitchell assisted with the line movements, which took approximately 20 minutes per gallery. (Ex. F, Mitchell dep 80:8-14).

    **Response:** Admitted.

23.    All told, Mitchell was not on his post from approximately 4:15 to 5:50 p.m. (Ex. F, Mitchell Dep 183:20-22).

    **Response:** Admitted.

24.    While Mitchell was absent, Defendant Frerking conducted his required gallery tour every 30 minutes. (Ex. L, Pl Bates 000259).

    **Response:** Admitted. However, to the extent this statement is intended to imply that Frerking shared Mitchell's crisis-watch duties or assumed them in Mitchell's unexplained absence, Plaintiff would dispute such an implication. *See* IDOC SOF 59.

25.   After assisting with the line movement, Mitchell returned the pepper spray Magnum and returned to his post on 5 gallery. (Ex. F, Mitchell Dep. 80:15-18; 82:20-23; 83:12-15).

**Response:** Admitted.

26.   Soon after he returned to 5 gallery, Mitchell "pencil whipped" the checks he missed, meaning that he went back to fill in times that were missing from checks he did not complete. (Ex. F, Mitchell Dep. 144:1-23).

**Response:** Admitted in part and disputed in part. Plaintiff admits that the cited testimony, other relevant deposition testimony, and the documentary evidence in the record establish that Mitchell spent several minutes making false entries in the crisis-watch log after returning to 5 Gallery. Plaintiff disputes that this evidence makes clear *when* Mitchell did so. Based on the cited testimony, a reasonable jury could find that Mitchell falsified the logs immediately upon his return to 5 Gallery and before discovering Mr. Curtis in medical distress. But other evidence suggests that Mitchell falsified the logs after discovering Mr. Curtis in medical distress and, therefore, in lieu of providing or summoning medical assistance. During an interview with an IDOC investigator on the evening of Mr. Curtis's death, Mitchell admitted that he "did not make all [crisis-watch] watches as required," that he was instead "helping with chow lines," and that he "completed his watch list *after* [Mr. Curtis] was found unresponsive." Ex. 62 (IA Report Attachments) at Mitchell000022–24 (emphasis added); *see also* Ex. 63 (IA Report) at Mitchell000011–12 (IDOC investigative summary finding that Mitchell "falsified all Inmate Crisis Watch Observation Logs as completed, every ten[]minutes, after CURTIS was found unresponsive.").

27.   When Mitchell had finished chow lines and resumed his watch, at approximately 5:53 p.m., he noticed that Curtis was not moving and appeared unresponsive. (Ex. G, Bates 000024-25; Ex. F, Mitchell dep 83:16-19).

**Response:** Admitted.

28.   Mitchell called officer Frerich to double-check whether Curtis appeared to be breathing. (Ex. F, Mitchell dep 83:23-84:2).

**Response:** Admitted.

29.    Mitchell then called Frerking in order to notify the chain of command. (Ex. G, Bates 000024; Ex. F, Mitchell Dep 83:23-84:2).

**Response:** Admitted in part and disputed in part. Plaintiff admits that Mitchell "then called Frerking." Plaintiff disputes that the cited material supports Mitchell's contention that he did so "*in order to* notify the chain of command." Mitchell never testified to his intentions or his state of mind; he testified only that he "called Frerking, and then Frerking went and notified the chain of command." Ex. 60 at 83.

30.    Subsequently, then-Sergeant Bennett was called to Curtis's cell. (Ex. F, Mitchell Dep 96-97).

**Response:** Admitted.

31.    Bennett attempted to get a Response from Mr. Curtis, before calling for the Emergency Response Team. (Ex. L, Pl Bates 000259).

**Response:** Admitted in part and disputed in part. Plaintiff admits that Defendant Bennett "attempted to get a Response from Mr. Curtis." Plaintiff disputes Mitchell's contention that Bennett ever "call[ed] for the Emergency Response Team." On the contrary, Mitchell testified that after Bennett failed to "get a Response from Mr. Curtis" went unanswered, Bennett then retrieved Lieutenant Caleb Zang, who then retrieved Major Page, who then instructed Zang to "get the ERT." Ex. 60 at 103–127.

32.    The Emergency Response Team entered the cell and found Curtis unresponsive, lying on his bunk with only a suicide blanket and smock. (Ex. E, IA Report at 000012).

**Response:** Admitted.

33.    Mitchell did not discuss Mr. Curtis with Bennett, Frerking, or Frerich. (Ex. F, Mitchell Dep. 99:10-12, 112:16-113:17, 123:19-124:3, 140:11-22, 144:16-23).

**Response:** Disputed. The cited testimony establishes that Mitchell spoke with all three men about Mr. Curtis after Mitchell discovered him unresponsive and in apparent respiratory arrest.

34.   Defendant Mitchell was not told what to write in the incident report. (Ex. F, Mitchell Dep. 187-188, 196-197).

**Response:** Admitted.

35.   Bennett disagrees that he would have ordered Mitchell to assist with meal lines if Mitchell were assigned to crisis watch; however, he does not recall not telling Mitchell to assist. (Ex. J, Bennett Dep. 160:3-9 & 162:25-163:6).

**Response:** Admitted in part and disputed in part. Plaintiff admits that this statement accurately reflects the cited deposition testimony. Plaintiff disputes that Bennett would not "have ordered Mitchell to assist with meal lines if Mitchell were assigned to crisis watch." Bennett's post-hoc rewrite is directly contradicted by his own admissions to IDOC investigators in the immediate wake of Mr. Curtis's death. IDOC's investigation report quotes Bennett as "admitt[ing] he instructed MITCHELL to assist with monitoring the meal lines on the other side of the cell house." Ex. 63 at Mitchell000012.

36.   Regardless, Bennett believes that Mitchell would have been able to assist with meal lines and accomplish his crisis watch observations. (Ex. J, Bennett Dep 169:17-170-15 & 178:19-179:2).

**Response:** Admitted in part and disputed in part. Plaintiff admits that this statement accurately reflects the cited deposition testimony. Plaintiff disputes any implication that Bennett's order or Mitchell's resulting absence from his crisis-watch post were reasonable responses to a known risk of serious harm to Mr. Curtis's health.

37.   Curtis's death was determined to be "Probable Intoxication with an Unknown Substance." Death Cert., Doc. 1.

**Response:** Admitted in part and disputed in part. Plaintiff admits that this statement accurately reflects the cause of death listed on Mr. Curtis's death certificate. Ex. 2 (Death Certificate). But Plaintiff disputes that Mr. Curtis's death was caused by intoxication. *See* Ex. 51 (Dr. Diaz Report) at 7 (opining that Mr. Curtis's cause of death was dehydration).

-10-

38.     Mitchell did not give Curtis any drugs or illicit substances. (Ex. F, Mitchell Dep 181:16-18).

        **Response:** Admitted.

39.     Mitchell did not observe or see in video anyone giving drugs or other items to Curtis. (Ex. F, Mitchell Dep 181:19-182:5).

        **Response:** Admitted.

40.     Mitchell was subsequently disciplined with five days off unpaid for falsifying state documents. (Ex. F, Mitchell Dep 203:24-215:17).

        **Response:** Admitted.

41.     All pathologists in this case agree that intoxication with a synthetic cannabinoid or synthetic cannabinoid like substance is an appropriate cause of death for Mr. Curtis, as well as other prisoners who died contemporaneously at Menard Correctional Center, E.F., and T.M. (Co-Defendant Wexford's Ex. B); (Co-Defendant Wexford's Ex. C, 153:4-155:14); (Co-Defendant Wexford's Exhibit D, Report of Dr. Pins); (Co-Defendant Wexford's Ex. P); (Co-Defendant Wexford's Ex. Q).

        **Response:** Disputed. Dr. Francisco Diaz, Plaintiff's retained forensic pathologist, has opined to a reasonable degree of medical certainty that Mr. Curtis's cause of death was dehydration, not intoxication, and he specifically criticized reaching an opinion of death by intoxication "when there is no result to match a substance that when circulating in the blood can produce death."[2] Ex. 51 at 6-7. Although Dr. Sabharwal believes that Mr. Curtis died from intoxication, he testified that he "do[es] not know" what the intoxicant is. Ex. K. (Sabharwal Dep.) at 80. Accordingly, only Dr. Pins, the Wexford Defendants' retained expert, has opined that Mr. Curtis died of a synthetic cannabinoid-like substance, Ex. 77 (Dr. Pins Report) at 6, and *no* expert

---

[2] The Wexford Defendants have moved to exclude Dr. Diaz from testifying in this case. *See generally* Dkt. 219. Contemporaneously with this response, Plaintiff is submitting a separate response to that motion, setting forth her arguments in support of Dr. Diaz's qualifications and opinions in this matter. Accordingly, Plaintiff does not detail Dr. Diaz's extensive qualifications and foundation for his opinions in her Statement of Additional Facts, and instead refers the Court to her response to the Wexford Defendants' Motion to Bar Dr. Diaz.

has opined that intoxication with a synthetic cannabinoid is an appropriate cause of death for Mr. Curtis.

As for E.F. and T.M., Dr. Diaz does not disclose an express opinion as to their causes of death but a reasonable jury could conclude that he would take the same position as to their deaths as he did for Mr. Curtis: that it is inappropriate "to ascribe a death to a probability of intoxication with an unknown substance when there is no result to match a substance that when circulating in the blood can produce death." Ex. 51 at 6-7. Dr. Sabharwal concluded that E.F. and T.M. died from probable intoxication of an *unknown* substance, and he did not conclude that the substance was a synthetic cannabinoid or synthetic cannabinoid-like substance. *See* Defs.' Ex. P at Autopsies 19; Defs.' Ex. Q at Autopsies 49. Accordingly, only the Defendants' retained expert Dr. Pins has opined that E.F. and T.M. died of a synthetic cannabinoid-like substance, Ex. 77 at 6, and no expert has opined that intoxication with a synthetic cannabinoid is an appropriate cause of death for E.F. and T.M.

42.   Synthetic cannabinoids have no antidote or known reversing agent. (Co-Defendant Wexford's Ex. C, 140:3-15).

**Response:** Disputed and unsupported. The only evidence Defendants cite in support of this statement is Wexford's own citation to testimony from Dr. Diaz, who states that he is not aware of a substance that "reverses the effects" of synthetic cannabinoids. Ex. 81 (Dr. Diaz Nov. 11, 2023 Dep.) at 140. There is no record evidence affirmatively establishing that any such agent does or does not exist. In addition, the question posed by counsel is vague and does not specify the "effects" in question. Finally, even if synthetic cannabinoids have no "antidote," that does not mean that there is no treatment for adverse effects, such as monitoring and treatment of symptoms. Additionally, as Dr. Diaz testified, there are many synthetic cannabinoids, but very few that have been associated with adverse effects like irregular rhythms of the heart. *Id.* at 45-47.

43.    Synthetic cannabinoids were being distributed at Menard in September 2018. (Co-Defendant Wexford's Ex. E); (Co-Defendant Wexford's Ex. F).

**Response:** Disputed and unsupported. In support, Defendants cite generally to transcripts of two individuals who pled guilty to *possessing* synthetic cannabinoids—not distributing them. *See* Dkt. 214-6 at 12-13; Dkt. 214-7 at 6-7. And they also cite generally to an internal affairs investigation that concludes only that two individuals (the same individuals who later pled guilty) "violated Departmental Rules and Illinois Statutes regarding Contraband in a Penal Institution." Defs.' Ex. E at P7371. This statement is additionally irrelevant because even if synthetic cannabinoids were being distributed by these two individuals at Menard, the investigator who conducted the drug investigation testified that he did not identify any connection between Mr. Curtis and synthetic cannabinoids, Ex. 74 (Kevin Reichert Dep. Excerpt) at 91, and the investigator who conducted the investigation into Mr. Curtis's death similarly noted in his report that he reviewed video surveillance of Mr. Curtis's gallery at Menard (which showed the hallway and the front of Mr. Curtis's cell), and determined that the footage "did not show any illegal activity which could have contributed to Curtis's death." Ex. 63 at 16. Accordingly, although Defendants' statement is disputed, even if true, it would not establish any issues in dispute regarding Mr. Curtis any more or less likely and it is therefore irrelevant.

## II.    PLAINTIFF'S RESPONSE TO WALLS, BENNETT, FRERICH, AND FRERKING'S STATEMENTS OF FACT

1.    At all relevant times, Mr. Curtis was in custody of the IDOC at Menard. (Doc. 48, IDOC Answer to Complaint, p. 9).

   **Response:** Admitted.

2.    Mr. Curtis was diagnosed with schizophrenia and was designated as seriously mentally ill by IDOC. (Doc. 48, p. 10).

   **Response:** Admitted.

3.    On September 1, 2018, Mr. Curtis returned to Menard after a 23-hour hospitalization at Chester Memorial Hospital for a concern of possible ingestion of an unknown substance thought perhaps to be Remeron. *See* Deposition of Shane Reister, attached hereto as Exhibit H-2. The stay was for an evaluation due to his unusual and evasive behavior accompanied by what appeared to be extrapyramidal symptoms. Ex. H-3, p 14. Mr. Curtis was placed on a 30-minute crisis watch by the mental health team upon return from the hospital. Ex. H-2, pp. 1-2.

   **Response:** Admitted in part and disputed in part. Plaintiff disputes the use of the term "evasive," which is not used anywhere in Mr. Curtis's hospital records. Those records instead describe Mr. Curtis's behavior as "peculiar" and note that he was "unable to purposefully answer questions." *See* Ex. 1 at IDOC000151, 000155. (Plaintiff further clarifies that the deposition of Shane Reister was appended as Defendants' Exhibit H, not Exhibit H-2, while Exhibit H-2 is a September 1, 2018 Offender Outpatient Progress Note.) Although Menard staff informed Chester medical providers that they had sent Mr. Curtis to Chester "due to a concern of possible ingestion of an unknown substance," Mr. Curtis's urine drug screen at Chester was negative. *See* Ex. 1 at IDOC000151–000155. Plaintiff further disputes that Mr. Curtis was placed on a 30-minute crisis watch by mental-health staff upon his return from the hospital. Mr. Curtis was placed on a continuous watch at the time of his return, which was then changed to a 30-minute watch, and then changed again to a 10-minute watch. *See* PSOF 13–14. This statement is otherwise admitted.

4.    On September 2, 2018, through September 4, 2018, Mr. Curtis refused to speak with mental health staff and he was removed from his cell for a mental health evaluation. Ex. H-6; Ex.

H-8; Ex. H-10. Mental health staff noted "eye contact intense and attention not properly focused. Poor hygiene and strong smell of urine noted. No agitation. Change 30 min watch to 10 min watch." Ex. H-10.

**Response:** Admitted in part and disputed in part. Plaintiff disputes the use of the term "refused." Mr. Curtis was unable to speak with mental health staff due to his medical condition. *See* PSOF 12, 15. This statement is otherwise admitted.

5.      On September 5, 2018, Mr. Curtis was found unresponsive in his cell at approximately 8:55 a.m. Doc. 48, p. 11.

    **Response:** Admitted.

6.      On September 5, 2018, at approximately 9:00 a.m., Dr. Goldman, a psychologist with IDOC, received a phone call from Mr. Curtis's mother stating that she was concerned for the wellbeing of her son. *See* Deposition of Dr. Goldman, attached hereto as Exhibit A, p. 1; Ex. A-1. Mr. Curtis's mother shared that her son had been treated for the same thing a few years ago at Chester Mental Health. Ex. A-1.

    **Response:** Admitted. Plaintiff clarifies, however, that the "same thing" referred to by Mr. Curtis's mother for which Mr. Curtis had received treatment at Chester Mental Health was psychosis and catatonia. *See* PSOF 20, 31.

7.      Dr. Goldman then told Dr. Leven, a psychologist with Wexford, about the call with Mr. Curtis's mother and that she thought something needed to be done regarding his health. Ex. A, p. 26. Dr. Leven responded to Dr. Goldman that they were going to test him for syphilis. Ex. A, p. 26. Dr. Leven further stated that she thought this behavior was on purpose and not a mental health issue. Ex. A, p. 26-27.

    **Response:** Admitted.

8.      Dr. Goldman then left the training and mental health building to go to the healthcare unit to look at Mr. Curtis's medical chart. Ex. A, p. 17-18. During the walk to the healthcare unit, Dr. Goldman saw Mr. Curtis being pushed back to North 2 cellhouse in a wheelchair. Ex. A-1. Dr. Goldman noted that Mr. Curtis appeared "flat affect. His eyes were not scanning the environment. He appeared to be catatonic. His body wasn't moving that much." Ex. A, p. 22; Ex. A-1. Dr. Goldman further noted that it was an excessively hot day and she was concerned about his inability to walk." Ex. A, p. 23.

    **Response:** Admitted.

9.      Once Dr. Goldman arrived in the healthcare unit, she walked into the first aid room where the nurse had Mr. Curtis's medical chart as well as a urine sample that was dark in color.

Ex. A, p. 19. The nurse told Dr. Goldman that they were testing the urine for syphilis; however, Dr. Goldman found a negative result for syphilis in Mr. Curtis's chart, misfiled in the wrong section. Ex. A, p. 19. Dr. Goldman then asked the medical records department to contact Chester Mental Health Hospital and get Mr. Curtis's records as soon as they could. Ex. A, p. 19.

**Response:** Admitted.

10.     The requested records were received at approximately 10:04 a.m. and upon review of the Chester Mental Health records, Dr. Goldman confirmed Mr. Curtis was previously diagnosed and treated for psychosis NOS with catatonic features. Dr. Goldman then informed Dr. Leven via email at 10:20 a.m. that "if he is not eating and drinking we need to get him treated. In addition, he needs to be evaluated for emergency medication to see if he responds to antipsychotics. . . In my clinical opinion we need to intervene quickly for the dehydration with a combination of this heat could be lethal." Ex. A-1; Ex. A-2, p. 4. In addition, Dr. Goldman contacted Dr. Floreani, who was the psychiatrist in North 2, requesting an MD psychiatrist look into how Mr. Curtis was doing. Ex. A, p. 26.

**Response:** Admitted.

11.     At 11:01 a.m., Assistant Superintendent Alex Jones responded stating that "the dehydration part of this should be a medical issue if I am not mistaken. I have added Dr. Siddiqui, and Gail Walls (HCUA) to this email for their input on what has been done for that. Regarding the emergency enforced medication; I understand he was seen by a Psychiatrist yesterday and it was determined not to put him on emergency meds at this time. I also copied Dr. Floreani since I believe she was the individual that dealt with Curtis yesterday for input." Ex. A, p. 42; Ex. A-2, pp. 3-4.

**Response:** Admitted.

12.     At 11:32 a.m., Gail Walls responded and stated "We will have the results tomorrow. If he is on watch we should be able to tell if he is eating and taking fluids as well. The nurses say he acknowledges them when they talk to him but doesn't verbally respond to questions." Ex. A, p. 44-45; Ex. A-2, p. 3.

**Response:** Admitted.

13.     At 11:33 a.m., Dr. Goldman responded and stated "I contacted SGT Jones and he stated that his food trays are empty and he was drinking. I asked how he knew he was drinking. He said that it was written down that he was drinking." Ex. A, p. 44-45.

**Response:** Admitted. Plaintiff clarifies, however, that although this is an accurate excerpt from Dr. Goldman's email, evidence in the record suggests Mr. Curtis was in fact *not* eating and drinking at this time. *See, e.g.*, PSOF 12, 17.

14.     At 11:47 a.m., Dr. Floreani responded and said that the "patient presented with altered mental status yesterday, oriented to his own person but not capable of communicating in any significant manner to obtain further information. . . His current presentation and history per the chart suggests the etiology of his current condition is not psychiatric. It would be a mistake to treat it as such." Ex. A, pp. 45-46; Ex. A-2, p. 3.

    **Response:** Admitted.

15.     At 11:48 a.m. and again at 11:49 a.m., Dr. Goldman emailed Dr. Floreani asking whether she read the records from Chester Mental Health and stating "I just forward them to you. Please review. His DX in Chest MH was psychosis with Catatonia Features." Ex. A-2, p. 2.

    **Response:** Admitted.

16.     At 12:01 p.m., Dr. Floreani responded and stated "I just reviewed these. . . Based on these, he most likely has Catatonia. This would best be treated with benzodiazepines, usually a high dose is required in the immediate and for maintenance. These medications are restricted per psychiatry. Not sure how we should proceed." Ex. A, p. 52-53; Ex. A-2, p. 2.

    **Response:** Admitted.

17.     At 12:04 p.m., Dr. Goldman responded that "in acute situations they can be prescribed up to a month, not longer than 4 weeks, Per Dr. DeLong." Ex. A, p. 55; Ex. A-2, pp. 1-2.

    **Response:** Admitted.

18.     At 12:23 p.m., Dr. Floreani responded "Here is his emergency rx. Please let me know if there is anything else you need." Ex. A, p. 56; Ex. A-2, p. 1.

    **Response:** Admitted.

19.     At 1:07 p.m., Gail Walls responded and stated "Dr. Floreani, could you please also send us a progress note to address the reason why the script was written. We are processing the order now and he will receive the med soon." Ex. A, p. 56; Ex. A-2, p. 1.

    **Response:** Admitted.

20.     At 2:41 p.m., Dr. Floreani responded by providing the required progress note and stated "please let me know if he refuses his now dos of PO Ativan and requires an injection. Also, how often can vitals be taken?" Ex. A-2, p. 1.

    **Response:** Admitted. Plaintiff clarifies that, from the record, it appears that Walls never responded to this email. *See* PSOF 37.

21.    The progress note was signed by Dr. Floreani on September 5, 2018, for a visit on
September 4, 2018, at 1:13 p.m. Ex. A-4. The progress note stated that Mr. Curtis had
catatonia, unstable vitals, and poor PO intake. "Given the urgent nature of his condition
with poor po intake and tachycardia will immediately initiate Ativan rx and continue to
evaluate pt Response. Labs and treatment of dehydration per medicine, will continue pt on
crisis watch." Ex. A-4.

**Response:** Admitted.

22.    Dr. Goldman had told Dr. Leven that Mr. Curtis needed to be sent out to the hospital for
dehydration and catatonia. Ex. A, p. 64-65. Dr. Goldman also told Dr. Leven that she didn't
think they could wait until the lab results were finalized the next day. Ex. A, p. 56.

**Response:** Admitted.

**Defendant Nickolas Mitchell**

23.    On September 5, 2018, CO Mitchell started his shift from 3 p.m. to 11 p.m. and was
assigned to crisis watch, went to his assignment, and did his periodic checks when he was
supposed to. *See* Deposition of CO Mitchell, attached hereto as Exhibit B, p. 18-19.

**Response:** Admitted in part and disputed in part. Plaintiff admits that Mitchell "started his

shift from 3 p.m. to 11 p.m.[,] was assigned to crisis watch, [and] went to his assignment." Plaintiff

disputes that Mitchell "did his periodic checks when he was supposed to." It is undisputed that

Mitchell left the crisis-watch wing unmonitored for nearly an hour and a half, and that during this

period Mitchell did *not* conduct "his periodic checks when he was supposed to." Ex. 60 at 36.

24.    On September 5, 2018, chow was at approximately 4:15 p.m. Ex. B, p. 36.

**Response:** Admitted.

25.    Defendant Bennett stated to CO Mitchell "I need your help running chow lines. We are
short-staffed." Ex. B, p. 31; Ex. C, p. 176; Ex. D-1, p. 2. CO Mitchell said "Okay" then
grabbed a can of OC pepper spray ("OC spray") from Defendant Frerich and sat on the
other side of the gate while individuals came out for chow." Ex. B, p. 31. No other words
between Defendant Bennett and CO Mitchell were exchanged. Ex. B, p. 31.

**Response:** Admitted.

26.    CO Mitchell did not tell Defendant Bennett that he needed to continue running checks nor
ask Defendant Bennett whether someone else had been assigned to perform the checks
while he ran chow. Ex. B, p. 32.

**Response:** Admitted.

-18-

27. When Defendant Mitchell left the area to get the OC spray and then went to the other side of the cell house to help with chow lines, he knew, or should have known, there would be no one else present to conduct suicide checks or checks of any other sort. Ex. B, p. 36.

   **Response:** Admitted.

28. While offenders are out of their cells and mass line movement is performed, no one is permitted to be on the gallery for security reasons. Ex. B, p. 34, 36. CO Mitchell took the OC spray from Defendant Frerich and they had no other conversation about the OC spray, why he needed the OC spray, or whether or not CO Mitchell would be continuing his assigned checks. Ex. B, p. 47-48.

   **Response:** Admitted in part and disputed in part. Plaintiff disputes that the record supports

Defendants' contention that "[w]hile offenders are out of their cells and mass line movement is

performed, no one is permitted to be on the gallery for security reasons." Trevor Rowland, IDOC's

30(b)(6) designee, testified that sergeants typically are "on the back of the gallery" during

mealtime movements. Ex. 64 (T. Rowland Dep.) at 36-37. This statement is otherwise admitted.

29. While the offenders were having chow, CO Mitchell testified that he watched out the window while waiting for them to come back. He did not speak with anyone on the radio; however, he carried a radio with him. Ex. B, p. 61.

   **Response:** Admitted.

30. After running chow lines, but before continuing his crisis watch checks, CO Mitchell "pencil whipped" the checks that he missed between 4:20 p.m. through 5:50 p.m., while running chow lines. Ex. B, p. 143, 182.

   **Response:** Admitted in part and disputed in part. Plaintiff admits that the cited testimony,

other relevant deposition testimony, and the documentary evidence in the record establish that

"Mitchell 'pencil whipped' the checks that he missed between 4:20 p.m. through 5:50 p.m., while

running chow lines." Plaintiff disputes that this evidence makes clear *when* Mitchell did so. Based

on the cited testimony, a reasonable jury could find that Mitchell falsified the logs immediately

upon his return to 5 Gallery and before discovering Mr. Curtis in medical distress. But other

evidence suggests that Mitchell falsified the logs after discovering Mr. Curtis in medical distress

and, therefore, in lieu of providing or summoning medical assistance. During an interview with an

IDOC investigator on the evening of Mr. Curtis's death, Mitchell admitted that he "did not make all [crisis-watch] watches as required," that he was instead "helping with chow lines," and that he "completed his watch list *after* [Mr. Curtis] was found unresponsive." Ex. 62 at Mitchell000022–24 (emphasis added); *see also* Ex. 63 at Mitchell000011–12 (IDOC investigative summary finding that Mitchell "falsified all Inmate Crisis Watch Observation Logs as completed, every ten[]minutes, after CURTIS was found unresponsive.").

31.    "Pencil whipping the checks" refers to when CO Mitchell filled in the checks that were missed without actually having performed those checks. Ex. B, p. 143.

      **Response:** Admitted.

32.    Video surveillance on September 5, 2018, for 5 Gallery of the North 2 Cell House was captured and revealed that CO Mitchell failed to complete numerous ten-minute watches as required. Ex. D-1, p. 7. In addition, CO Mitchell admitted to falsifying the Crisis Watch Observation Log. Ex. D-1, p. 7.

      **Response:** Admitted. Plaintiff notes, however, that although IDOC policy required investigators to retain and preserve all relevant surveillance footage from "before, during, and after" incidents such as a prisoner's death, and despite IDOC investigators' statements indicating that they had reviewed video footage that showed Mitchell abandoning his post on 5 Gallery on September 5, 2018, the IDOC did not preserve any video footage from the evening of Mr. Curtis's death. Ex. 74 (K. Reichert Mar. 28 Dep.) at 75–77.

33.    On September 5, 2018, at 5:53 p.m., CO Mitchell did a tour check and noticed that Mr. Curtis was lying on his bunk, was not breathing, and observed that his chest was not moving. Doc. 48, p. 18; Ex. B, p. 82-83.

      **Response:** Admitted.

34.    CO Mitchell tried to get Mr. Curtis's attention by knocking on the window and asking him if everything was ok. Ex. B, p. 88.

      **Response:** Admitted.

35.    CO Mitchell saw Defendant Frerich and verbally called him over. Defendant Frerich stated
       he didn't think Mr. Curtis was breathing and that CO Mitchell should call the gallery
       officer. Ex. B, pp. 86-88.

       **Response:** Admitted.

36.    CO Mitchell then radioed Defendant Frerking. Ex. A, p. 82-83. Defendant Frerking assisted
       CO Mitchell with attempting to get Mr. Curtis to respond to verbal commands. When Mr.
       Curtis failed to reply, Defendant Frerking notified Defendant Bennett. Ex. D-1, p. 2.

       **Response:** Admitted.

37.    Defendant Bennett came to the cell and visually checked on Mr. Curtis and knocked on the
       window, after getting no Response from Mr. Curtis, Defendant Bennett radioed Lieutenant
       Zang. Ex. d; 111; Ex. D-1, p. 2.

       **Response:** Admitted.

38.    Lieutenant Zang came to Mr. Curtis's cell and then radioed Shift Commander Page, who
       also appeared at the cell. Shift Commander Page instructed Lieutenant Zang to call the
       Emergency Response Team ("ERT") to go into Mr. Curtis's cell. Ex. B, p.126-128.

       **Response:** Admitted.

39.    Mr. Curtis was removed from his cell by the ERT and taken to the infirmary in North 2
       cellhouse. Ex. B, p. 132, 135; Ex. D-1, p. 2.

       **Response:** Admitted.

40.    Attempts were made to resuscitate Mr. Curtis after he was found unresponsive, and he was
       pronounced dead at approximately 6:37 p.m. on September 5, 2018. Doc. 48, p. 18.

       **Response:** Admitted.

41.    While Mr. Curtis was in the infirmary, CO Mitchell stayed on 5 gallery per orders from
       Lieutenant Zang or Defendant Bennett for crime scene watch and to continue his crisis
       watch checks for the other inmates on the gallery. Ex. B, p. 135, 139.

       **Response:** Admitted.

42.    CO Mitchell did not call a code three because he wasn't sure if Mr. Curtis was breathing
       or not. Ex. B, p. 85.

       **Response:** Admitted. Plaintiff notes, however, that the IDOC's policies make no

"uncertainty" exception to their requirement that correctional officers and staff who witness a

medical emergency promptly provide or summon medical assistance. Ex. 64 at 92-94. Angela

Crain, IDOC's 30(b)(6) designee, disclaimed any knowledge of such an exception. Ex. 53 (A. Crain Dep.) at 160–61. That likely is because the relevant policy is unequivocal: "Notification to the Health Care Unit shall be made immediately by anyone observing a medical emergency situation and upon such notification Health Care staff member(s) shall respond to the scene immediately." Ex. 65 (Menard ID 04.03.108) at 7.

43.     The autopsy report for Mr. Curtis was obtained and reflected that Mr. Curtis's cause of death was probable intoxication with an Unknown Substance. Ex. D-1, p. 7. The St. Louis University toxicology report was inconclusive from synthetic cannabinoids although several molecular weights matched to synthetic cannabinoids and synthetic cannabinoid metabolites were made. Ex. D-1, p. 7.

**Response:** Admitted in part and disputed in part. Plaintiff admits that this statement accurately reflects the cause of death listed on Mr. Curtis's death certificate. Ex. 2. But Plaintiff disputes that Mr. Curtis's death was caused by intoxication. *See* Ex. 51 at 7 (opining that Mr. Curtis's cause of death was dehydration). Dr. Francisco Diaz, Plaintiff's retained forensic pathologist, has opined to a reasonable degree of medical certainty that Mr. Curtis's cause of death was dehydration, not intoxication, and he specifically criticized reaching an opinion of death by intoxication "when there is no result to match a substance that when circulating in the blood can produce death." Ex. 51 at 6-7. Although Dr. Sabharwal believes that Mr. Curtis died from intoxication, he testified that he "do[es] not know" what the intoxicant is. Ex. 44 at 80. Accordingly, only Dr. Pins, the Wexford Defendants' retained expert, has opined that Mr. Curtis died of a synthetic cannabinoid-like substance, Ex. 77 at 6, and *no* expert has opined that intoxication with a synthetic cannabinoid is an appropriate cause of death for Mr. Curtis.

**Defendant Andrew Bennett**

44.     At all relevant times to the events at issue in this case, Defendant Andrew Bennett was employed by IDOC at Menard as a Correctional Sergeant. Doc. 48, p. 9.

        **Response:** Admitted.

45.    On September 5, 2018, Defendant Bennett was the sergeant of the North 2 cell house at Menard. *See* Deposition of Andrew Bennett, attached hereto as Exhibit C, p. 19.

   **Response:** Admitted.

46.    The shift commander assigns the correctional officers to their assignment at the start of each shift. Ex. C, p. 39. During his shift, Defendant Bennett as sergeant was responsible for supervising all correctional officers in his assigned cellhouse. Ex. C, p. 39.

   **Response:** Admitted.

47.    Offenders get placed on a crisis watch when a mental health professional deems that they need to be watched. Ex. C, pp. 44-45.

   **Response:** Admitted.

48.    Correctional officers assigned to crisis watch would observe the offender in their cell and write down what they were doing in their cell on a log during the time requirement. Ex. C, p. 44. The sergeant on duty would review the crisis watch logs, once a day, to ensure that the correctional officer assigned to crisis watch was doing all the required checks. Ex. C, p. 50-51. The crisis watch logs were kept at a desk in front of the crisis watch cells. Ex. C, p. 51-52.

   **Response:** Admitted.

49.    In 2018 as part of his duties, Defendant Bennett would run evening chow lines. Ex. C, pp. 131-132.

   **Response:** Admitted.

50.    When there's any movement of prisoners from the gallery to outside, there will be additional correctional officers recruited to help. Ex. C, p. 136. All correctional officers are expected to help with the chow lines, except officers assigned to run showers and crisis watch officers assigned to a continuous watch would stay with the crisis watch. Ex. C, pp. 137, 138.

   **Response:** Admitted in part and disputed in part. According to Bennett's deposition testimony, crisis-watch officers were never expected to help with the chow lines, regardless of whether they were assigned to a continuous watch. *See* PSOF 48. This statement is otherwise admitted.

51.    A correctional sergeant can use a crisis watch officer between the 10-minute interval crisis checks. However, it is the crisis watch officer's responsibility to return and complete the mandatory 10-minute tour. Ex. C, p. 170-171.

-23-

**Response:** Disputed. Other relevant deposition testimony and the documentary evidence in the record suggests that it is against policy for a sergeant to use a crisis watch officer to help with other tasks. Trevor Rowland, whom IDOC designated to testify to the Department's crisis-watch policies, testified that a crisis-watch officer and his or her supervisor share responsibility for ensuring that the crisis-watch officer completes his or her mandatory 10-minute tours. *See* PSOF 109 (citing Ex. 64 at 58 ("A good supervisor knows who is on crisis watch . . . [and] he may pull one do that. But he's going to be . . . smart enough to know, 'Hey, you've got to get back and do your watch,' because the crisis watch sheets are very important and we have to keep up on them.")). The IDOC Defendants themselves contend that it "would be important for the sergeant to communicate to the crisis watch officer if ten minutes or more had gone by before the officer was freed up to go back to the area to check on the individuals." *See* IDOC SOF 81. This statement is inherently incompatible with Bennett's contention that it is entirely the responsibility of the crisis watch officer to return and complete the mandatory 10-minute tour.

52.  On the day of Mr. Curtis's death, Defendant Bennett believed CO Mitchell had performed his crisis watch checks as required and that all policies had been followed. Ex. C, p. 197.

   **Response:** Disputed. Other relevant deposition testimony and the documentary evidence shows that Bennett instructed Mitchell to leave his crisis-watch post to assist with chow lines. A reasonable jury could infer that Bennett knew that Mitchell was not performing his crisis-watch checks as required during the period that he was assisting with chow lines. *See* PSOF 48–51.

53.  Defendant Bennett was not aware that CO Mitchell falsified his entries on the crisis watch observation log. Ex. C, p. 127, 203. Defendant Bennett only found out that CO Mitchell falsified the crisis watch observation log after the internal affairs investigation. Ex. C, p. 127, 175.

   **Response:** Admitted.

54.  CO Mitchell had enough time to make his checks and at no time did Defendant Bennett tell him not to continue his 10 and 15-minute crisis watch checks. Ex. C, p. 177.

**Response:** Disputed. Other relevant deposition testimony and the documentary evidence suggests that assisting with chow lines can take significantly longer than ten minutes; it further shows that Bennett instructed Mitchell to assist with chow lines despite knowing that Mitchell was assigned to crisis watch at that time. A reasonable juror could interpret this order as one not to continue Mitchell's crisis-watch checks. *See* PSOF 48–51.

55.    If a correctional officer does not complete a required 10-minute check, this would be a violation of prison policy. Correctional Officer Mitchell should have known that he was required to complete his 10-minute checks. Ex. C, p. 180.

**Response:** Admitted. Plaintiff clarifies, however, that Bennett also knew or should have known that Mitchell was required to complete his checks, that he was not completing those checks, and that not completing the checks was a violation of prison policy. *See* PSOF 48–51.

56.    Defendant Bennett never spoke with or had any contact with Mr. Curtis prior to September 5, 2018. Ex. C, p. 19.

**Response:** Admitted in part and disputed in part. Plaintiff admits that this statement accurately reflects the cited material. Plaintiff disputes that the cited material definitively resolves the question of Bennett's familiarity with Mr. Curtis. Mr. Curtis was housed in North 2 before September 5, and Bennett served as a sergeant in the North 2 cellhouse for the entirety of Mr. Curtis's incarceration at Menard. Thus, it is plausible—if not probable—that Bennett had interacted with Mr. Curtis before the date of his death. *See* PSOF 45.

**Defendant Charlie Frerking**

57.    At all relevant times to the events at issue in this case, Defendant Charlie Frerking was employed by IDOC at Menard as a Correctional Officer. Doc. 48, p. 8.

**Response:** Admitted.

58.    On September 5, 2018, Defendant Frerking was assigned to the North 2 cell house as a 5-gallery officer and supervised prisoners leaving the cell house for mealtime. Doc. 48, p. 15; Ex. D, p. 17.

**Response:** Admitted.

59.  As the 5-gallery officer, Defendant Frerking would not have been responsible for conducting any crisis watch checks. *See* Deposition of Charlie Frerking, attached hereto as Exhibit D, p. 129.

**Response:** Admitted.

60.  If an offender experienced a medical emergency, the CO would call a code 3 on the radio for a medical emergency and the healthcare staff would come to the cell house. Ex. D, p. 38.

**Response:** Admitted.

61.  On September 5, 2018, Defendant Frerking was interviewed regarding Mr. Curtis's death. Ex. D-1, pp. 20- 21. During his interview, Defendant Frerking stated that he was assigned as the gallery CO and walked the gallery every 30 minutes. Defendant Frerking did his checks and Defendant Frerking contacted Defendant Bennett when Mr. Curtis was found unresponsive and the emergency Response team got Mr. Curtis out for the med techs and helped him to the infirmary. Ex. D, pp. 166-167; Ex. D-1, p. 21.

**Response:** Admitted in part and disputed in part. Plaintiff admits that this statement accurately reflects the cited materials. Plaintiff disputes any implication that Bennett immediately alerted the emergency Response team. The record reflects that Bennett contacted his supervisor, Lieutenant Caleb Zang, who eventually radioed yet another superior officer, Major Page, who eventually instructed Zang to contact the Emergency Response Team. Per IDOC policy, each of these individuals should have called a Code 3 upon finding Mr. Curtis in medical distress and attempted to provide Mr. Curtis with CPR or other lifesaving measures while they waited for medical professionals to respond. *See* PSOF 61, 97–101.

62.  On September 5, 2018, at 5:55 p.m., Defendant Frerking completed an incident report that stated "On the above date and approximate time this R/O was assigned to N2 5gallery. This R/O was passing out mail on 5-gallery when c/o Mitchell (8781) that was assigned to N2 5 gallery crisis watch asked this R/O to check on I/M Curtis, Kevin (Y22898) in cell 5-08. Upon observing I/M Curtis, this R/O notified Sgt. Bennett that I/M Curtis was unresponsive. Proper chain of command was notified, I/M was ID by offender 360 and State ID." Ex. D, p. 168; Ex. D-1, p. 22.

**Response:** Admitted in part and disputed in part. Plaintiff admits that this statement accurately reflects the contents of Frerking's incident report. Plaintiff disputes, however, that the

-26-

"proper chain of command was notified" after Mr. Curtis was found unresponsive. The "proper" response, per IDOC policy, would have been to call a Code 3 for a medical emergency and to begin CPR or other lifesaving measures while waiting for medical professionals to respond. *See* PSOF 61, 97–101.

**Defendant Jeremy Frerich**

63.     At all relevant times to the events at issue in this case, Defendant Jeremy Frerich was employed by IDOC at Menard as a Correctional Officer. Doc. 48, p. 8.

    **Response:** Admitted.

64.     The first time Defendant Frerich saw Mr. Curtis was the day of the incident and Mr. Curtis never spoke to Defendant Frerich. *See* Deposition of Jeremy Frerich, attached hereto as Exhibit E, p. 15.

    **Response:** Admitted.

65.     In September 2018, Defendant Frerich was assigned as the north two crank officer. Ex. E, p. 35. The crank officer would go to the back of the gallery and run an actual crank that unlocks the doors so the offenders can open their doors. Ex. E, p. 35. Then when the offenders go back to their cells, offenders will close the doors and the crank officer operates the crank to lock the doors. Ex. E, p. 35.

    **Response:** Admitted.

66.     On September 5, 2018, Defendant Frerich recalls that CO Mitchell requested OC spray for feed lines but does not recall what time that occurred. Ex. E, p. 97. Defendant Frerich did not know that CO Mitchell was assigned to crisis watch at that time. Ex. E, p. 99.

    **Response:** Admitted.

67.     However, sometime later, CO Mitchell said to Defendant Frerich "Hey, can you come here real quick? . . . I can't get this guy to respond." Ex. E, p. 95. Defendant Frerich went over to CO Mitchell and tried to get a Response from the individual, which he could not do. Ex. E, p. 95. Defendant Frerich then informed Sergeant Bennett that there was an individual not responding to verbal commands. Ex. E, p. 95-96.

    **Response:** Admitted in part and disputed in part. Plaintiff admits that the cited testimony,

other relevant deposition testimony, and the documentary evidence in the record would support

Defendants' account of Mitchell's initial conversation with Frerich and of Frerich's attempt to

elicit a Response from Mr. Curtis. Plaintiff disputes that the record similarly supports Defendants'

contention that Frerich "then informed Sergeant Bennett that there was an individual not responding to verbal commands." First, Bennett's incident report—ostensibly prepared in the hours after Mr. Curtis's death—does not list Frerich as one of the "offenders/staff involved" in the events of Mr. Curtis's death. Ex. 62 at Mitchell000039. What's more, Bennett wrote that he was "advised by C/O Frerking . . . to respond to cell North 2 5-08." *Id.* And Mitchell recalled only that Frerich had told him that "he should call the gallery officer" before Frerich walked away. IDOC SOF 35; *see also* PSOF 69–71.

68.    After informing Defendant Bennett, Defendant Frerich left the cell house to continue his assigned shift and was no longer in that cell house. Ex. E, p. 96. At the time, Defendant Frerich did not know who the individual was who was unresponsive in his cell. Ex. E, p. 96.

   **Response:** Admitted in part and disputed in part. Plaintiff admits that the cited testimony, other relevant deposition testimony, and the documentary evidence in the record would support the contention that Frerich "left the cell house to continue his assigned shift" and that he "did not know" of Mr. Curtis's identity at the time of Mr. Curtis's death. As explained above, however, Plaintiff disputes that the record supports the contention that Frerich left the cell house "[a]fter informing Defendant Bennett." *See also* PSOF 69–71.

**Defendant Gail Walls**

69.    At all relevant times to the events at issue in this case, Defendant Gail Walls was employed by IDOC at Menard as the Healthcare Unit Administrator ("HCUA"). Doc. 48, p. 7.

   **Response:** Admitted.

70.    Defendant Walls is a registered nurse. *See* Deposition of Gail Walls, attached hereto as Exhibit F, p. 15.

   **Response:** Admitted.

71.    Defendant Walls, in her position as HCUA, did not have any responsibilities regarding mental health care for offenders at Menard. Ex. F, p. 78.

**Response:** Disputed. Walls testified that if she was aware of a situation where there was "some sort of issue" between medical and mental health staff at Menard, such as insufficient communication between medical and mental health staff, it would be her responsibility to ensure that the issue was resolved. Ex. 66 (Walls Dep.) at 81; IDOC SOF 74, *infra*.

72.    Defendant Walls, as HCUA, did not provide any direct medical care to offenders. Ex. F, p. 80. Likewise, Defendant Walls did not have any role as to what care doctors or providers provided to the offenders. Ex. F, p. 80.

**Response:** Admitted in part and disputed in part. Plaintiff agrees that as HCUA, Walls did not provide any direct medical care to prisoners. The evidence shows, however, that Walls played a role in determining and coordinating the care *doctors or providers* gave to prisoners. Walls testified that it was her responsibility to ensure that "emergencies were being taken care of" and responded to. Ex. 66 at 80. Email communications in which Walls was relied on to fulfill Mr. Curtis's prescription, update providers regarding Mr. Curtis's care, and provide input on how to proceed to ensure that Mr. Curtis was treated for dehydration further support the conclusion that she had a critical role in ensuring the delivery of care. *See* PSOF 20–37. Moreover, Walls herself avers that it was her "responsibility to follow up on a patient and to make sure the patient received what he needed." *See* IDOC SOF 74, *infra.* This statement is inherently incompatible with Walls's contention that she had no role as to what care was provided to prisoners.

73.    Defendant Walls did not have any responsibility to ensure any communication amongst or between medical and mental health staff at Menard. Ex. F, p. 81.

**Response:** Disputed. Walls testified that if she was aware of a situation where there was "some sort of issue" between medical and mental health staff at Menard, such as insufficient communication between medical and mental health staff, it would be her responsibility to ensure that the issue was resolved. Ex. 66 at 81; *see also* IDOC SOF 74, *infra*.

74.    It was Defendant Walls's responsibility to follow up on a patient and to make sure the patient received what he needed. Ex. F, p. 102.

**Response:** Admitted.

**IDOC Policy**

75. The crisis watch officer is responsible for observing the individuals on crisis watch. Whether it be a thirty (30) minute crisis watch, fifteen (15) minute, ten (10) minute, or continuous watch, they're required to document all and any activity that the individual has on their crisis sheets. Any actions of self-harm – they immediately notify their chain of command, which would be the sergeant. *See* Deposition of Trevor Rowland, attached hereto as Exhibit G, p. 66.

   **Response:** Admitted in part and disputed in part. Plaintiff disputes the contention that "actions of self-harm" warrant a call to a sergeant rather than medical staff. By policy, if any prisoner—regardless of status—commits an act of self-harm that results in a medical emergency, any observing officer would be obligated to call a Code 3 and administer emergency care while awaiting medical personnel. *See* PSOF 61, 97–101. This statement is otherwise admitted.

76. During the watch, the crisis watch officer needs to lay eyes on the individual, but they do not need to elicit a verbal Response from the individual on crisis watch. Ex. G, pp. 70-71. The only time a verbal Response is required is at the 9:00 a.m. count. Ex. G, pp. 71-72.

   **Response:** Admitted. Plaintiff clarifies, however, that although an officer need not elicit a verbal response from an individual on crisis watch, he or she is required to conduct both "verbal and visual monitoring" every ten minutes when an individual is on suicide watch. Ex. 72 (IDOC Investigation Report) at P000273.

77. When there is a line being run for mealtime, the crisis watch officer, assigned to a continuous watch, is not available to be assigned to run mealtime lines. Ex. G, p. 55.

   **Response:** Admitted.

78. If the crisis watch officer is assigned to 10-minute or 15-minute watch, they can leave to assist with mealtime lines as long as they're able to get back in time to do their required checks. Ex. G, p. 57.

   **Response:** Disputed. Substantial record evidence, including testimony from IDOC's 30(b)(6) designee, indicates that it is never appropriate for a crisis-watch officer with 10-minute or 15-minute watches to leave his post to assist with mealtime lines. *See* Ex. 64 at 55 (noting that

when a line is being run for mealtime, crisis watch officers are not available to be assigned to run

those lines: "[T]he crisis watch officer is there to watch the crisis watch individuals. You know, if

it's 15 minutes or less, that's where they're at."); *see also* PSOF 48, 108.

79.    Running a mealtime line out of the cellhouse typically does not take more than 10 minutes.
       Ex. G, p. 58.

       **Response:** Admitted. Plaintiff clarifies, however, that each cellhouse contains multiple

galleries, so the process of running all of the mealtime lines out of a cellhouse ordinarily takes at

least thirty minutes, if not longer. *See* Ex. 64 at 61; *see also* PSOF 47.

80.    A good supervisor knows who is on crisis watch, who his staff is, and if he's short on staff,
       he may have to pull an officer to help with mealtime. Ex. G, p. 58.

       **Response:** Admitted. Plaintiff notes, however, that it is disputed whether it is proper

procedure for a supervisor to pull a crisis-watch officer to help with mealtime. *See* PSOF 48, 107–

111.

81.    It would be important for the sergeant to communicate to the crisis watch officer if ten
       minutes or more had gone by before the officer was freed up to go back to the area to check
       on the individuals. Ex. G, p. 59. IDOC policy requires this. Ex. G, pp. 58-59.

       **Response:** Admitted. Plaintiff again notes that it is disputed whether it is proper procedure

for a supervisor to pull a crisis-watch officer to help with mealtime. *See* PSOF 48, 107–111.

82.    IDOC policy also requires a crisis watch officer to take action to ensure that he is able to
       perform the checks as required based on the frequency that's been ordered. Ex. G, p. 60.

       **Response:** Admitted. Plaintiff again notes that it is disputed whether it is proper procedure

for a supervisor to pull a crisis-watch officer to help with mealtime. *See* PSOF 48, 107–111.

83.    The crisis watch officer is also required to communicate with the sergeant if his
       responsibilities regarding running lines for mealtimes exceeds the time when he is due to
       be back to perform one of those checks. Ex. G, p. 60.

       **Response:** Admitted. Plaintiff again notes that it is disputed whether it is proper procedure

for a supervisor to pull a crisis-watch officer to help with mealtime. *See* PSOF 48, 107–111.

84.    When an officer suspects that a prisoner is experiencing a medical emergency, they can push the emergency alert button on their radio and call a code 3, which is a medical emergency. Ex. G, p. 92. Alternatively, the officer could call the sergeant and allow the sergeant to make the determination as to whether the emergency Response team is necessary to enter the cell and get the individual out so they can get medical treatment. Ex. G, p. 96. The lieutenant then activates the emergency Response team. Ex. G, p. 107.

**Response:** Admitted in part and disputed in part. Plaintiff disputes that Menard's policies allow correctional officers and staff who witness a medical emergency to summon their supervisor rather than promptly provide or summon medical assistance. Ex. 64 at 92-94. Indeed, the relevant policy is unequivocal: "Notification to the Health Care Unit *shall be made immediately* by anyone observing a medical emergency situation and upon such notification Health Care staff member(s) shall respond to the scene immediately." Ex. 65 (Menard ID 04.03.108) at 7 (emphasis added).

85.    All staff have the ability to call a code 3. Ex. G, p. 94.

**Response:** Admitted.

86.    When the emergency Response team is activated, assigned security staff gets protective equipment on, the cell door is opened, the individual is restrained and they are taken to receive medical treatment. Ex. G, p. 103, 105. The individual is restrained even if it is obvious that the person is not breathing. Ex. G, p. 105.

**Response:** Admitted.

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1(c), Plaintiff offers the following additional material facts:

1.      Kevin Curtis entered IDOC custody on July 7, 2017. Ex. 1 at IDOC000090. He died in IDOC custody, at Menard Correctional Center, on September 5, 2018. Ex. 2. He was 31 years old. *Id.*

2.      Mr. Curtis spent the last five days of his life in a segregation cell on 5 Gallery, one of the eight galleries in Menard's North 2 cellhouse. Ex. 67 (Living Unit History) at IDOC000089; Ex. 64 at 22.

3.      When he died, Mr. Curtis was on "crisis watch," a form of solitary confinement reserved for prisoners who require an elevated level of care and supervision because they present a danger to themselves or others, or else because they require diagnostic assessment and temporary, clinical intervention for stabilization or diagnostic purposes. *Id.*; *see also* Ex. 9 (Mental Health SOP Manual) at ESI 2 0155.

4.      At all relevant times, Defendant Nickolas Mitchell was employed by IDOC as a Correctional Officer at Menard Correctional Center. Ex. 60 at 222.

5.      At all relevant times, Defendant Andrew Bennett was employed by IDOC as a Correctional Sergeant at Menard Correctional Center. Ex. 68 (A. Bennett Dep.) at 31.

6.      At all relevant times, Defendant Jeremy Frerich was employed by IDOC as a Correctional Officer at Menard Correctional Center. Ex. 69 (J. Frerich Dep.) at 26.

7.      At all relevant times, Defendant Charlie Frerking was employed by IDOC as a Correctional Officer at Menard Correctional Center. Ex. 70 (C. Frerking Dep.) at 44.

8.      At all relevant times, Defendant Gail Walls was employed by IDOC as a Healthcare Unit Administrator at Menard Correctional Center. Ex. 66 at 12.

### I.  Kevin Curtis is Placed on Crisis Watch, Where He Deteriorates

9.      On August 31, 2018, Mr. Curtis was discovered in his cell "unable to speak in complete sentences" and "acting very odd[.]" Ex. 14 (Aug. 31, 2018 Incident Reports) at P006795. Mr. Curtis was transported and admitted to the emergency room at Chester Memorial Hospital in Chester, Illinois. Ex. 15 at P000480–489; *see also* Ex. 1 at IDOC000151–155.

10.     At the hospital, Mr. Curtis presented with an inability "to verbalize," repetitive and jerky limb movements, and an elevated temperature and blood pressure. The nursing staff observed Mr. Curtis urinating on himself and having "mouth writhing and head movement episodes." Other healthcare providers at Chester also noted that Mr. Curtis was "alert but aphasic and unable to purposefully answer questions." Ex. 1 at IDOC 000155.

11.     A progress note completed by a physician at Chester indicates that the officers who accompanied Mr. Curtis reported that he "took someone's medications, possibly Remeron." Ex. 15 at P000481. That statement is hearsay, but even if admissible, a reasonable jury could find that to be untrue for several reasons, including that Remeron is not known to be associated with the behavioral signs and symptoms that Mr. Curtis displayed while at the hospital (or in the days that followed). Ex. 5 at 17.

12.     On September 1, Mr. Curtis was discharged from Chester Memorial and sent back to Menard with a diagnosis of "altered mental status." Ex. 1 at IDOC000142–143. At the time of his discharge, he remained nonverbal and "unable to purposefully answer questions." Ex. 15 at P000477-78. Although he was noted to be able to drink water, id., medical staff had charted just a few hours earlier that he had refused all offers of fluids to drink. *Id*. at P000487.

13.     Upon Mr. Curtis's return to Menard, a physician "assessed" his condition as "[m]ental health," noting that he was "acting fearful" and "showing inappropriate behavior." The doctor prescribed Mr. Curtis a low dose of Tylenol PM and placed him on a "constant watch,"

which required Mr. Curtis to be continuously observed by a correctional officer. This designation is reserved for individuals who are "acutely mentally or emotionally distressed, at imminent risk for self-harm or who have made a recent suicide attempt" and requires continuous monitoring by officers or staff. Ex. 71 (ID 04.04.102) at P004442-004443.

14.    A second order, entered just fifteen minutes later, reduced that status to a 30-minute watch, which required correctional staff to perform visual and verbal checks on Mr. Curtis every half hour. This order was unsigned. Ex. 1 at IDOC000122; Ex. 9 at ESI 2 0176–0177.

15.    Over the next several days, Mr. Curtis exhibited an array of alarming behaviors, as documented by Menard correctional staff: pacing naked, sucking his thumb, screaming, pulling his scrotum, and banging on his steel cell door. Mr. Curtis consistently presented as non-verbal and with poor hygiene. Ex. 1 at IDOC000122–131, IDOC000228–239. Mr. Curtis was further observed to be "unable to answer any questions appropriately," *Id.* He instead appeared fearful, "suck[ing] his thumb [and stating] I'm sorry." *Id.* On the evening of September 3, nursing staff noted that Mr. Curtis was sitting on the floor of his cell, banging on the door and yelling "NO" without being able to answer any questions appropriately. *Id.* at IDOC000126.

16.    On September 4, Mr. Curtis saw Melissa Pappas, a licensed clinical professional counselor, in the North 2 infirmary. Ms. Pappas ordered that Mr. Curtis be placed on a "10-minute watch," citing his "lack of stability on crisis watch and lack of information obtained [from] the Offender during the session." Ex. 1 at IDOC000232–233. This designation, known as "suicide watch status," requires "verbal and visual monitoring and documentation at staggered intervals, a minimum of once every ten minutes" and is reserved for individuals who are deemed "acutely suicidal or at risk for immediate self-harm." Ex. 71 at P004442-P004443.

17.     About thirty minutes after meeting with Ms. Pappas, Mr. Curtis saw Dr. Christina Floreani, a psychiatrist and a contract employee of Defendant Wexford Health Sources. Dr. Floreani noted that Mr. Curtis had "required assistance into the exam room with significant psychomotor retardation," that he was "largely unresponsive to verbal prompts," and that he had "virtually no reaction to stimuli." Dr. Floreani also observed that Mr. Curtis's pulse was 126 bpm and he had "not been taking in fluids." Ex. 1 at IDOC000234–239.

18.     Sometime between 8:35 and 9:00 a.m. on September 5, Mr. Curtis was found unresponsive in his crisis-watch cell. Correctional officers brought him first to the cellhouse infirmary and then to the infirmary in Menard's healthcare unit, where medical staff drew blood and urine samples. Ex. 67 at Mitchell000082; Ex. 1 at IDOC000128, 000333; Ex. 19 at 18.

19.     While in the infirmary, mental health staff observed Mr. Curtis to be "alert, but verbally non-responsive." They noted that Mr. Curtis's hygiene was poor "as evidenced by his body odor." Ex. 1 at IDOC000333.

20.     Dr. Lisa Goldman, an IDOC psychologist administrator, saw Mr. Curtis as he was being transported back to 5 Gallery in a wheelchair. A short while later, in a 10:20 a.m. email sent to several Menard staff, Dr. Goldman circulated Mr. Curtis's records from Chester Mental Health, which she noted she had requested that morning. She warned that when a nurse had catheterized Mr. Curtis earlier in the day to test for syphilis, he had been "extremely dehydrated" and that if Mr. Curtis was "not eating or drinking we need to get him treated." Dr. Goldman further opined that Mr. Curtis needed to be "evaluated for emergency enforced medication to see if he responds to antipsychotics." Finally, Dr. Goldman warned: "When I passed the offender on his way back from the HCU he was in a wheelchair and catatonic (just as he had been diagnosed in the past). In

my clinical opinion we need to intervene quickly for the dehydration with a combination of this heat could be lethal." Ex. 19 at 18; Ex. 38 (September 5, 2018 Email Chain) at 4.

21.    According to the official records of the National Oceanic & Atmospheric Administration, temperatures in the Menard area reached as high as 93º F on September 5. Ex. 23 (Local Climatological Data Daily Summary September 2018).[3]

22.    At 11:01 a.m., Assistant Superintendent Alex Jones, responded to Dr. Goldman's email and copied Defendant Gail Walls, Menard's Healthcare Unit Administrator. He wrote: "The dehydration part of this should be a medical issue if I am not mistaken. I have added Dr. Siddiqui, and Gail Walls (HCUA) to the email for their input on what has been done for that." Ex. 38 at 4.

23.    Walls responded at 11:32 a.m.: "It is my understanding he was showered yesterday. Today they straight cath him for a urine sample and drew blood on him for a wide variety of things. We will have the results tomorrow. If he is on watch we should be able to tell if he is eating and taking fluids as well. The nurses say he acknowledges them when they talk to him but doesn't verbally respond to questions." Ex. 38 at 3.

24.    Walls knew that Defendant Mohammed Siddiqui, Menard's medical director and an employee of Defendant Wexford, did not have a functioning email account. Ex. 56 (M. Siddiqui Dep.) at 84–85. Walls did not inform Jones or anyone else on the thread of that fact. Ex. 38 at 3.

25.    Although Walls had the ability to request that Mr. Curtis's blood work be sent "stat" to a local hospital for quicker results, she did not do so. Ex. 66 at 126.

---

[3] This Court may take judicial notice of the Government's proprietary climatological records. Fed. R. Evid. 201(b); *Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n. 2 (S.D. Ill. 2006) (Murphy, C.J.) (courts may judicially notice public records available on government websites); *see also, e.g.*, *Mitchell v. Dennison*, No. 16-cv-1189, 2017 WL 119343, at *2 (S.D. Ill. Jan. 12, 2017) (Reagan, C.J.) (taking judicial notice of "the historical weather data for Vienna, Illinois in September and October 2016").

26.    Additionally, crisis-watch tracking logs from September 4, 2018, reflect that Mr. Curtis did not take a shower. Ex. 41 at P006829; Ex. 1 at IDOC000333.

27.    At 11:41 a.m., Dr. Goldman replied: "Gail did they address his hydration?" Ex. 41 at 1.

28.    There is no evidence in the record to suggest that Walls ever responded to this email or took any action to determine whether medical staff addressed Mr. Curtis's hydration, and Walls testified that she does not remember taking any action in response to this email. Ex. 66 at 111.

29.    At 11:47 a.m., Dr. Floreani replied to the group, noting that Mr. Curtis's "current presentation and history per the chart suggests the etiology of his current condition is not psychiatric" and that "[i]t would be a mistake to treat it as such." Ex. 38 at 3.

30.    Dr. Goldman responded less than a minute later, asking Dr. Floreani if she had read the records from Chester Mental Health. Dr. Floreani confirmed that she had not. Ex. 38 at 2-3.

31.    After reviewing the records, Dr. Floreani emailed again at 12:01 p.m., noting that based on the records, it was most likely that Mr. Curtis had catatonia. "This would best be treated with benzodiazepines, usually a high dose is required in the immediate and for mainenance [*sic.*]," she wrote. "These medications are restricted per psychiatry. Not sure how we should proceed." Ex. 38 at 2.

32.    Around 12:00 p.m., Nurse Tripp informed LCPC Jacob Weatherford that Mr. Curtis was dehydrated. Weatherford then informed Dr. Floreani. A follow-up mental health evaluation was scheduled for twenty-four hours later. Ex. 1 at IDOC000333.

33.    At 12:25 p.m., Dr. Floreani emailed an "emergency" prescription order for Ativan. *Id.* The order directed staff to "Start Ativan 2 mg PO NOW and give 2 mg IM if [Mr. Curtis] refuses." Ex. 1 at IDOC000091.

-38-

34.     Walls responded in the email thread at 1:07 p.m., asking Dr. Floreani to send her a progress note to address the reason why the prescription was written. "We are processing the order now and he will receive the med soon," Walls wrote. Ex. 38 at 1.

35.     At 1:30 p.m., Mr. Curtis received that dose of Ativan intramuscularly. He received no further medical or psychiatric attention before his final lapse into unresponsiveness. Ex. 1 at IDOC000130–141.

36.     At 2:39 p.m., Dr. Floreani responded with the requested progress note and asked Walls to let her know if Mr. Curtis had refused his dose of Ativan and required an injection. She also asked Walls how often Mr. Curtis's vitals could be taken. Ex. 38 at 1.

37.     There is no evidence in the record that Walls ever responded to this email or took any action to determine whether Mr. Curtis required an injection or whether and how often Mr. Curtis's vitals were being taken, and Walls does not remember taking any action in response to this email. Ex. 66 at 152.

## II.    At the Direction of Defendant Bennett, Defendant Mitchell Leaves Mr. Curtis to Die

38.     On September 5, 2018, Mitchell was the sole officer assigned to crisis-watch duty on 5 Gallery during the 3:00 p.m. to 11:00 p.m. shift. Ex. 63 at Mitchell000011.

39.     As a crisis-watch officer, Mitchell's principal duty was to monitor crisis-watch prisoners for signs of medical or emotional distress. Ex. 60 at 180.

40.     Mitchell knew the importance of a prisoner's crisis-watch status. Mitchell was trained as a crisis-watch officer through the IDOC's mandatory, systemwide mental-health cycle training, and based on this training, he knew that prisoners on crisis watch were at risk of suffering serious harm if left unmonitored. Ex. 63 at 181 ("Q: And you know that there is a risk for people on suicide watch[,] that they will be harmed by themselves if they are not watched at 10-minute

intervals; right? A: Yes. Q: You were trained on that when you started working for the IDOC; right? A: Yes."); *see also* Ex. 61 at P004691.

41.    Mitchell entered the crisis-watch gallery to begin his shift at "[a]pproximately 2:55" p.m. on September 5, 2018. Three prisoners, including Mr. Curtis, were being held on crisis watch at that time. Ex. 60 at 24; Ex. 63 at Mitchell000011.

42.    Mitchell "knew Kevin Curtis was on crisis watch and was to be monitored every 10 minutes with verbal and visual checks." Dkt. 44 (Def. Mitchell's Answer) 36.

43.    After beginning his September 5 shift, Mitchell conducted "[a]pproximately 12" rounds of cell checks. Ex. 60 at 24–25.

44.    At 4:03 p.m., and again at 4:10 p.m., Mitchell wrote in the crisis-watch logbook that Mr. Curtis was alive and "lying on the floor." Ex. 67 at Mitchell000028. Mitchell specifically observed during these checks that Mr. Curtis's chest was moving, meaning that he was breathing. Ex. 60 at 239; *see also id.* at 82.

45.    On September 5, 2018, Defendant Andrew Bennett was serving as sergeant of the North 2 cellhouse. Ex. 68 at 19. Bennett served as the sergeant of the North 2 cellhouse for his entire two-year tenure as a sergeant at Menard. Ex. II2 at 41. In this supervisory role, he was responsible for ensuring that the correctional officers in the North 2 cellhouse were properly completing their gallery tours and required paperwork. Ex. 68 at 34, 39.

46.    "Chow lines" or "meal lines" refer to the process of moving inmates from their cellhouse to the dining hall for mealtimes. Ex. 64 at 16–17. Individuals housed in Menard's North II cellhouse would be taken to a separate building for meals. *Id.* at 21.

47.    When it was time for a meal, correctional officers would release one gallery at a time and escort them to the dining hall. The process of running a line out of the North II building

would generally take approximately ten minutes. Ex. 64 at 58. During a typical mealtime movement, "four or five correctional officers would escort [the inmates] to the dining hall, and whenever the last person would sit down . . . they would get approximately ten minutes to consume [their meal]. And then once everybody was done, they would all stand up and would be reverse-ordered back to the cellhouse and secured in their cells." In total, the process of serving one gallery a meal would take approximately 30 to 45 minutes. Ex. 64 at 18, 44–45.

48.    During his deposition, Bennett testified that there is no circumstance in which a crisis watch officer would be expected to help with chow lines and that "[t]he only time the crisis watch officer is moved during a chow line is if it's on, [for example] 5 gallery. If that gallery was going to chow, that correctional officer will be moved off the gallery for his safety and then returned to continue his checks afterwards." Ex. 68 at 138-39; *see also id.* at 140 ("[I]f they're assigned to crisis watch, they will not leave that gallery, except for movement when they're moved for a short time."); *id.* at 157 ("I would not have told [Mitchell] that he was to assist with chow lines."); *id.* at 161 ("I never had a crisis watch officer assist with meal lines.").

49.    Like Mitchell, Bennett knew the importance of a prisoner's crisis-watch status. Bennett was trained as a crisis-watch officer through the IDOC's mandatory, systemwide mental-health cycle training, and based on this training, he knew that prisoners on crisis watch were at risk of suffering serious harm if left unmonitored. Ex. 68 at 174; *id.* at 180 ("Q: And [completing crisis watch checks] is the prison's policy because not conducting the checks . . . required on crisis watch can endanger the lives of the prisoners on crisis watch, correct? A: Yes.").

50.    Both Bennett and Mitchell knew that Mitchell was the only officer assigned to monitor the prisoners on crisis watch. Ex. 60 at 36 ("Q: . . . [W]hen you left the area to get the OC spray and then to go to the other side of the cell house, you knew there would be no one else

present to conduct suicide checks or checks of any other sort; correct? A: Yes."); Ex. 68 at 39

(testifying that as sergeant, Bennett was responsible for supervising all of the correctional officers

assigned to North 2 cellhouse, including any crisis watch officers).

51.    Even so, around 4:15 p.m., Bennett ordered Mitchell to obtain a can of oleoresin

capsicum spray ("O.C. spray") and help oversee prisoners as they went to and from "chow," or

mealtime. Ex. 72 at P000284–85 (Bennett "told Mitchell to assist with chow lines on the other side

of the cell house even side. . . . [Mitchell's] duty on the chow line was to watch movement and use

his O.C. if needed."); Ex. 60 at 36; *see also* Ex. 72 at P000258-259.

52.    O.C. spray is used by officers monitoring chow lines to "subdue" prisoners "if they

get into an argument, discussion, you know, a fight, anything like that." Ex. 68 at 159. According

to Bennett, crisis watch officers who only leave the gallery for a few minutes during chow lines

would not require O.C. spray. *Id.* at 159–60 ("Q: . . . Are you saying you wouldn't have told

[Mitchell] to get pepper spray? A: I would not have told him to get pepper spray.").

53.    After receiving these instructions from Bennett, Mitchell "check[ed] to see if [Mr.

Curtis's] chest was moving before" leaving the crisis-watch gallery. He then stopped to retrieve a

"magnum" canister of O.C. spray "just in case a fight broke out or something would have

happened." Ex. 68 at 29–31, 56, 239.

54.    Mitchell then left the crisis-watch wing unmonitored for nearly an hour and a half.

No one took his place. Ex. 60 at 36.

55.    Mitchell knew that although he could briefly attend to other duties "between the

ten-minute interval crisis checks," it was his "responsibility to return and complete the mandatory

ten-minute tour" afterward. Ex. 72 at P000260; *see also* Ex. 60 at 36.

56.     Bennett similarly knew that, if he was aware that one of the officers under his supervision was not completing their required crisis-watch checks, it was his responsibility to take some sort of action to correct that failure. Ex. 38 at 129 ("Q: So you agree that if you were aware that someone was not doing their crisis watch checks, it would be your responsibility to take some kind of action? A: Yes, I agree.").

57.     Mitchell did not advise Bennett that he needed to be at his post to continue running checks. And Mitchell did not ask Bennett—or act himself—to ensure that another officer would cover his post. Ex. 60 at 32–34.

58.     Bennett does not recall telling Mitchell to make sure that he was able to get back for his ten-minute suicide checks or instructing Mitchell to make sure that someone else covered his crisis-watch checks while he was assisting with chow lines. Ex. 68 at 179.

## III.    Defendants Mitchell, Bennett, Frerich, and Frerking Deny Mr. Curtis Emergency Medical Care

59.     IDOC's Administrative Directives and Menard's Institutional Directives require all correctional staff who have regular contact with prisoners to receive regular emergency response and CPR training. Ex. 73 (AD 04.03.108) at P004587.

60.     In the event of a medical emergency, correctional staff are trained to contact the facility's medical personnel immediately and to "initiate life-saving first-aid procedures for the techniques in which training has been completed" in the interim. *Id.* at P004589.

61.     Mitchell, Bennett, Frerich, and Frerking were all trained on these policies for responding to medical emergencies, which require officers to call a "Code 3"—a radio code denoting a medical emergency—any time they believe a prisoner required emergency medical care. Each of these officers knew that calling a Code 3 would summon medical staff to the officer's location. They also knew that they did not need approval from anyone else before calling a Code

3. Ex. 60 at 222–228; Ex. 68 at 72–74 ("If it's a serious medical issue, you would use a Code 3."); Ex. 69 at 45-46 ("Q: . . . [I]f there was a medical issue with a prisoner, you saw someone exhibiting medical symptoms. What would you do? A: I would've got on my radio and called for a code three, which is a medical emergency."); Ex. 70 at 38–39 ("Q: . . . In the event of a medical emergency, what would you do as a correctional officer? A: You'd call a code 3 and then healthcare staff would come to the cell house.").

62.     On September 5, 2018, Mitchell returned to 5 Gallery around 5:50 p.m. He reached Mr. Curtis's cell at 5:53 p.m.[4] Ex. 60 at 82; Ex. IH at Mitchell000026.

63.     Mitchell immediately saw that Mr. Curtis was "[l]aying on his bunk" and "not breathing." Ex. 60 at 82.

64.     After observing that Mr. Curtis did not appear to be breathing, Mitchell continued to watch him for another two minutes "to see if he was breathing." Ex. 60 at 85.

---

[4] Mr. Curtis indisputably was pronounced dead at 6:37 p.m. Otherwise, Plaintiff's timeline has been pieced together through deposition testimony from each officer concerning his involvement and personal recollections because, taken together, the evidence strongly suggests that the time estimates recorded in incident reports from the evening of Mr. Curtis's death are inaccurate. Indeed, although IDOC policy required investigators to retain and preserve all relevant surveillance footage from "before, during, and after" incidents such as a prisoner's death, and despite IDOC investigators' statements indicating that they had reviewed video footage that showed Mitchell abandoning his post on 5 Gallery on September 5, 2018, the IDOC did not preserve any video footage from the evening of Mr. Curtis's death. Ex. 74 (K. Reichert Mar. 28 Dep.) at 75–77. Thus, the timeline of events relevant to Plaintiff's claims presents a material issue for a factfinder to resolve. *Jackson v. Sheriff of Winnebago Cnty., Illinois*, 74 F.4th 496, 499-503 (7th Cir. 2023) (reversing grant of summary judgment to correctional officer who allegedly failed to promptly summon medical assistance because record contained, among other material factual discrepancies, "competing factual accounts" regarding extent of officer's delay); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 534 (7th Cir. 2011) (explaining that "we do not weigh the proof, make credibility determinations, or resolve narrative disputes" at summary judgment); *Goelzer v. Sheboygan Cnty*, 604 F.3d 987, 995 (7th Cir. 2010) (holding that "summary judgment is not appropriate" when faced "with two competing accounts, either of which a jury could believe").

65.    Mitchell knew that he was required to call a Code 3 for any prisoner he believed to be experiencing a medical emergency, regardless of whether he was "sure that [the prisoner] wasn't breathing." However, Mitchell did not call a Code 3 or otherwise attempt to provide or summon medical assistance. Ex. 60 at 85–86, 224–225.

66.    Instead, Mitchell contacted another correctional officer, Defendant Jeremy Frerich, who came over to Mr. Curtis's cell "[i]mmediately" around 5:55 p.m. Ex. 60 at 82–83, 86.

67.    On September 5, 2018, Frerich was serving as the crank officer on 5 Gallery in North 2 Cell House. Ex. 72 at P000259.

68.    Mitchell asked Frerich whether his "eyes were deceiving" him and whether Curtis's chest was moving. Frerich responded that he did not think Curtis's chest was moving. Ex. 60 at 82–83, 86.

69.    Frerich, like Mitchell, attempted to prompt a response from Mr. Curtis from outside of the cell. Ex. 69 at 95. When he could not, he told Mitchell to "call the gallery officer." Ex. 60 at 82–83, 87–89.

70.    Neither Mitchell nor Frerich called a Code 3 or took any other action to provide or summon medical assistance. Ex. 60 at 88, 90–91.

71.    Frerich later testified to leaving Mitchell alone with Mr. Curtis to call a superior officer, Defendant Andrew Bennett. Ex. 69 at 95–96 ("I myself even tried to get a response from the individual, which I could not do, at which time I informed the Sergeant Bennett that we have an individual on the front five who is not responding to verbal commands."). Neither Bennett nor any other witness shared Frerich's recollection. Ex. 72 at P000259; Ex. 60 at 19. In any event, Frerich left the North 2 cellhouse promptly after unsuccessfully attempting to elicit a response from Mr. Curtis. He did not return that evening. *Id.* at 96; Ex. 60 at 93.

72.     Around 6:00 p.m., Defendant Charlie Frerking—another correctional officer—arrived at Mr. Curtis's cell in response to Mitchell's call. Ex. 72 at P000259.

73.     On September 5, 2018, Frerking was serving as the gallery officer for 5 Gallery, which entailed conducting gallery tours every 30 minutes. Ex. 72 at P000259.

74.     Frerking knew that if an inmate was unresponsive, it was his responsibility to call a Code 3. Ex. 70 at 81.

75.     Frerking observed Mr. Curtis in a state of unresponsiveness through the cell door before leaving to find Bennett. Ex. 60 at 92–99; Ex. 72 at Mitchell000039.

76.     Frerking did not call a Code 3 or attempt to provide Mr. Curtis with medical care. Ex. 70 at 161.

77.     While waiting for Frerking to retrieve Bennett, Mitchell continued to watch Mr. Curtis to "see if he was breathing at all." Like Frerking and Frerich, Mitchell made no effort to assist Mr. Curtis, nor did he call a Code 3 or take any other action to summon emergency medical assistance. Instead, he worried to himself about "[g]etting in trouble and Mr. Curtis being dead." Ex. 60 at 95–100.

78.     At approximately 6:02 p.m. Frerking returned with Bennett. Upon reaching Mr. Curtis's cell, Bennett remarked, "I do not think he's breathing." Ex. 60 at 103–104.

79.     For the next "two or three minutes," Bennett knocked on and shouted into Mr. Curtis's cell window. Bennett did not call a Code 3 or attempt to provide Mr. Curtis with any medical care; instead, at approximately 6:05 p.m., Bennett radioed his shift supervisor and left to retrieve him. Ex. 60 at 106; Ex. 68 at 145 ("I attempted to make verbal contact, and I was unsuccessful.").

80.     After four or five minutes, at around 6:10 p.m., Bennett and Lieutenant Caleb Zang, the on-duty shift supervisor, arrived at Mr. Curtis's cell. Like Bennett, Zang spent several minutes trying to reach Mr. Curtis by knocking on his cell window. Zang then radioed yet another superior officer, Major Page, and left the gallery to retrieve him. Once again, no one called a Code 3 or took any other action to summon or provide medical assistance. Ex. 60 at 114–118.

81.     Seven minutes later, at approximately 6:19 p.m., Zang returned with Major Page. Page "looked in[to]" Mr. Curtis's cell, told "Zang to get the ERT [Emergency Response Team]," and "then left the 5 Gallery." Ex. 60 at 120, 126–127; *see also* Ex. 63 at Mitchell000014.

82.     An ERT is typically called for forcible cell extractions. The team comprises armed correctional staff that enter a prisoner's cell, apply mechanical restraints, and remove the prisoner from his cell. Ex. 60 at 129–130.

83.     Summoning an ERT does not summon medical staff. Ex. 60 at 129–130.

84.     At approximately 6:26 p.m., ERT officers arrived at Mr. Curtis's cell. At no point during the five to seven minutes that officers awaited the ERT's arrival did any officer present at Mr. Curtis's cell call a Code 3 or take any other action to provide or summon emergency medical assistance. Ex. 60 at 130–131.

85.     When the ERT officers arrived, they entered Curtis's cell, secured his unconscious body in handcuffs, and carried him by his arms and legs out of his cell. This process took a "[m]inute and a half, two minutes, approximately." The ERT then transported Mr. Curtis to the infirmary. Ex. 60 at 132–135.

86.     After Mr. Curtis had been removed from his cell, Bennett instructed Mitchell to "stay on 5 Gallery for crime scene watch." Ex. 60 at 135–137.

87.    At some point in the evening, a correctional officer went to the healthcare unit at Menard and informed two correctional medical technicians that they were "needed on North 2 cellhouse for an unresponsive inmate." Ex. 1 at IDOC000132–134. This was the first time that any correctional officer summoned medical staff to treat Mr. Curtis since Mr. Curtis was found unconscious in his cell at approximately 5:53 p.m.

88.    The medical technicians met Mr. Curtis at the North 2 infirmary. Mr. Curtis remained unresponsive during his medical assessment. Ex. 72 at P000260. After failing to detect Mr. Curtis's pulse, the medical technicians initiated CPR. Meanwhile, a Menard nurse called an offsite Wexford provider, who directed nursing staff to request an ambulance. Mr. Curtis then was transported to the healthcare unit to await the paramedics. Ex. 1 at IDOC000132–138.

89.    At 6:37 p.m., shortly after the paramedics arrived at Menard, Mr. Curtis was pronounced dead. In total, at least thirty minutes had elapsed from the time Mitchell first noticed Mr. Curtis in distress and when he received any medical care. Ex. 1 at IDOC000132–140.

90.    It is undisputed that at no point before Mr. Curtis's death did Mitchell, Bennett, Frerich, or Frerking call a Code 3 or take any other action to provide or summon medical assistance. Ex. 60 at 101–112, 194–195.

91.    On September 6, IDOC Agency Medical Coordinator Kimberly Hugo wrote to Walls (with IDOC's Deputy Director and Medical Director and Menard's leadership carbon-copied) to demand an accounting of and explanation for Mr. Curtis's death:

> Gail,
>
> Please copy me on all documentation you send to the Randolph County Coroner. I want to see records of [Mr. Curtis's] assessment (including ALL vital signs) from his September 4, 2018, mental health evaluation where it was noted that he was catatonic, dehydrated, and tachycardic. I want to know why an offender who didn't come out of his cell for three days,

required assistance into an exam room with significant psychomotor retardation, was largely unresponsive to verbal prompts, demonstrated echolalia in the short amount of verbal output he produced, maintained a mundane posture throughout an evaluation with virtually no reaction to stimuli, with fixed gaze and motiveless response to instructions, dehydrated, and tachycardic was put in a crisis cell instead of the infirmary. I want these records sent to me by COB today.

Also, this offender's medical chart is to be copied and ready by Monday for Mary Klein to pick up when she will be at your facility for the 12 hour shift meeting.

Ex. 85 (Sept. 6, 2018 Email Thread) at 2.

92.    In a separate email thread, IDOC Medical Director Steven Meeks similarly noted the role played by "issue[s] with management," including their failure to send Mr. Curtis's blood work out "stat" or to monitor his vital signs alongside his mental state. Ex. 72 at P000264.

## IV.    While Mr. Curtis Dies, Mitchell Attempts to Evade Accountability

93.    Sometime before or after finding Mr. Curtis unresponsive and in respiratory arrest, Mitchell spent several minutes making false entries in the crisis-watch log. These entries purported to show that Mitchell had been conducting cell checks in the crisis-watch gallery during his 90-minute absence. Ex. 63 at Mitchell000011–12 (IDOC investigative summary finding that Mitchell "falsified all Inmate Crisis Watch Observation Logs as completed, every ten[]minutes, after CURTIS was found unresponsive."); *see also* Ex. 60 at 141–144.

94.    A little less than two hours after Mr. Curtis's death, Bennett informed Mitchell that a "[s]tate investigator want[ed] to talk" to him. During that interview, Mitchell admitted to the investigator that he "did not make all [crisis-watch] watches as required," that he was instead "helping with chow lines," and that he "completed his watch list *after* [Mr. Curtis] was found unresponsive." Ex. 60 at 161–178; Ex. 63 at Mitchell000011–18; Ex. 62 at Mitchell000022–24 (emphasis added).

95.     Nearly a year later, an IDOC internal investigation found that Mitchell had violated several provisions of IDOC's code of conduct by "falsifying the Crisis Watch Observation Log" and by "fail[ing] to complete his duty as Crisis Watch Officer by not conducting his ten-minute observations as required." Ex. 63 at Mitchell000011–18.

96.     Mitchell's case was referred to IDOC's Employee Review Board for disciplinary proceedings. Ex. 99 (Mem. re Review Bd. Referral) at Mitchell000002–03. Mitchell received a sanction of five days' unpaid leave. Ex. 60 at 214.

## V.     Relevant IDOC Policies

### A.     Responding to Medical Emergencies

97.     All Menard staff are required to be trained biennially in CPR and emergency aid. Ex. 65 at 6.

98.     According to Menard's emergency-response policies, "[n]otification to the Health Care Unit shall be made immediately by anyone observing a medical emergency situation and upon such notification Health Care staff member(s) shall respond to the scene immediately." Ex. 65 at 7.

99.     Correctional officers are trained to notify the healthcare unit by calling a "Code 3," which denotes a medical emergency. Officers are trained to provide all appropriate care until medical staff arrive to take over. For example, upon finding a prisoner in respiratory arrest, officers are trained to "immediately administer CPR until medical staff arrive." Ex. 64 at 92.

100.    All correctional officers and staff have the power to call a Code 3 without any approval from a supervisor. Ex. 64 at 94.

101.    It would be contrary to IDOC policy for an officer to suspect that a prisoner was having a medical emergency and do anything other than calling a Code 3. Ex. 64 at 93–94 ("Q: Fair to say it would be contrary to IDOC policy for an officer to suspect or know that a prisoner is

having a medical emergency and not call a Code 3? A: Correct. Q: Would it be contrary to policy

to delay calling a Code 3 until you first called a gallery officer, and then another officer and then

a Sergeant, and then a Lieutenant and then a shift commander? Would that be consistent with or

contrary to IDOC's policy with regard to a Code 3? A: It would be against the policy."); Ex. IR at

160–61 ("Q: . . . IDOC trains its staff that if they believe there's a medical emergency they should

call the code 3, right? A: Yes. Q: In other words, to err on the side of calling a code 3 rather than

err on the side of not calling a code 3, right? A: Yes.").

**B.     Crisis Watch**

102.    All Menard staff that have regular interactions with prisoners are required to receive

at least one hour of "Suicide Prevention and Intervention and Emergency Services" training every

year, which includes training on "procedural response and follow-up procedures including crisis

treatment supervision levels," "housing observation," and "documentation requirements." Ex. 71

at P004446–4447.

103.    Crisis-watch officers are under the direct supervision of their cellhouse sergeant.

Ex. 64 at 58, 63.

104.    The primary responsibility of officers assigned to crisis watch is to perform

required crisis-watch checks at the intervals determined by a mental-health provider, who can

prescribe either a continuous, 10-minute, 15-minute, or 30-minute watch. Ex. IW (N2 – 5 Gallery

Crisis Watch Officer Post Description) at P004225.

105.    These checks are intended to ensure that inmates on crisis watch are safe and secure.

Ex. 64 at 68.

106.    Crisis-watch officers are also required to maintain an accurate accounting (in a

"crisis-watch log") of the checks that they have performed and any developments or conditions of

note. Ex. 64 at 68–69.

### C.    Meal Lines

107.    It is the cellhouse sergeant's responsibility to monitor the officers assigned to chow line movements and to know whether they are supposed to be somewhere else. Ex. 64 at 63.

108.    It is contrary to IDOC policy for a sergeant to assign a crisis watch officer to assist with chow lines. Ex. 64 at 55 ("Q: . . . When there is a line being run for mealtime, is the crisis watch officer available to be assigned to run those lines? A: No. Q: That's contrary to the IDOC's policy, right? A: No, the crisis watch officer is there to watch the crisis watch individuals. You know, if it's 15 minutes or less, that's where they're at.").

109.    Trevor Rowland, IDOC's 30(b)(6) designee, testified that, per IDOC policy, if a sergeant assigns a crisis watch officer to leave an area, a "good supervisor" would know to instruct his subordinate to go back to do his crisis check. Ex. 64 at 58 ("A good supervisor knows who is on crisis watch . . . [and] he may pull one do that. But he's going to be . . . smart enough to know, 'Hey, you've got to get back and do your watch,' because the crisis watch sheets are very important and we have to keep up on them.").

110.    Rowland also confirmed that it would be important for the sergeant to communicate to the crisis watch officer that he was "freed up" to go back to the crisis watch area to perform his checks. Ex. 64 at 59.

111.    IDOC policy also requires a crisis watch officer to ensure of his own accord that he can perform the required crisis-watch checks, and to communicate with his sergeant if he has been assigned to a task that would require him to miss a crisis check. Ex. 64 at 60.

## ARGUMENT

Summary judgment "is appropriate only when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law." *Smallwood v. Williams*, 59 F.4th 306, 315 (7th Cir. 2023). At summary judgment, this Court views the record in the light most favorable to—and draws all reasonable inferences in favor of—the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). Similarly, on cross-motions for summary judgment, this Court views "all facts and inferences in the light most favorable to the nonmoving party on each motion." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015). Defendants contend that summary judgment should be entered in their favor on each of Plaintiff's claims. As explained below, nearly every issue in this case requires a jury's consideration.

### I.  Plaintiff does not oppose Defendants' motion for summary judgment on Count II (civil conspiracy).

Plaintiff turns first to Count II, which alleges that Mr. Curtis's death was the product of an unlawful conspiracy. A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, "the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). An express agreement between the conspirators is unnecessary; the participants simply must share the same general conspiratorial objective. *Id.* Since conspiracies are by their nature secretive endeavors, direct proof of such an agreement is rarely available. *See Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015). To survive summary judgment, Plaintiff must identify facts from which a reasonable jury could find "(1) an express or implied agreement among defendants to deprive plaintiff of . . . her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988).

The record is filled with evidence of an endemic, reflexive disregard by Menard's staff for the lives and dignity of prisoners like Mr. Curtis. For the last five or so days of his life, Mr. Curtis's obvious needs for medical and psychological care went virtually unaddressed. (That culture—a well-documented one—is the subject of Plaintiff's *Monell* claim against Defendant Wexford Health Sources.) Nevertheless, Plaintiff does not believe the record contains evidence of an unlawful agreement *between* Defendants. Plaintiff thus does not oppose the entry of summary judgment in Defendants' favor on Count II.

## II. Defendants are not entitled to summary judgment on Count I (deliberate indifference).

The same cannot be said for the rest of Defendants' arguments. Start with Count I, Plaintiff's deliberate-indifference claim. All Defendants are sued in their individual capacities, as employees of the IDOC at Menard, for their deliberate indifference to Mr. Curtis's dire medical needs. The record contains considerable evidence that each of the IDOC Defendants knew that Mr. Curtis was in danger of serious harm and recklessly disregarded those risks. And because neither the law nor Defendants' skeletal arguments warrants summary judgment on grounds of qualified immunity, their motions for summary judgment on Count I must be denied.

"Because depriving a prisoner of medical care serves no valid penological purpose," the Eighth Amendment prohibits deliberate indifference to a prisoner's medical needs. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022). When assessing a claim of deliberate indifference to a prisoner's medical needs, courts perform a two-step analysis, "first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*).

In their briefing, Defendants concede that Mr. Curtis's mental illnesses were objectively serious medical conditions and they do not contest that his catatonia and dehydration also constitute serious medical conditions. This leaves only the subjective prong of the deliberate-indifference inquiry. "Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015); *see generally Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (officials must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference"). A plaintiff need not show the defendant "literally ignored" his medical needs; it suffices if the defendant was aware of them and either knowingly or recklessly disregarded them. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Satisfying this scienter requirement demands "more than mere or gross negligence, but less than purposeful infliction of harm." *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).

### A.    Defendant Nickolas Mitchell is liable for deliberate indifference.

Mitchell was the sole crisis-watch officer on 5 Gallery of Menard's North 2 cellhouse on the last day of Kevin Curtis's life. Despite knowing of the enormous risks associated with leaving Mr. Curtis and the other prisoners on crisis watch unmonitored, Mitchell admittedly did so for more than an hour and a half. Mitchell SOF 23; PSOF 40, 54. He admittedly failed to take *any* steps to ensure that another officer would monitor Mr. Curtis or otherwise cover Mitchell's crisis-watch post in his stead. PSOF 54–57. After Mitchell returned to find Mr. Curtis in clear medical distress, Mitchell admittedly (1) declined to seek or provide emergent care and (2) instead falsified the crisis-watch observation logs to make it seem as if he had completed his checks as required. Mitchell SOF 23; PSOF 65. In short, Mitchell knew of the risk of serious harm posed by his absence and failed to take reasonable measures—or any measures at all—to abate it. Mitchell's

admissions warrant summary judgment *against* him. *See generally* Pl.'s Mot. Partial Summ. J., Dkt. 228. But at a minimum, he is not entitled to summary judgment in his favor. *See id.*

Faced with this mountain of adverse evidence, Mitchell's chief contention appears to be that he merely "made mistakes." Dkt. 222 at 9. In his telling, "[l]eaving his post for 1.5 hours to assist with chow lines and later falsifying records to reflect that he conducted the watches that he missed do not point to liability for deliberate indifference." *Id.* at 10. That line of argument is illogical and foreclosed. *Bradich ex rel. Est. of Bradich v. City of Chicago*, 413 F.3d 688, 691 (7th Cir. 2005) (Easterbrook, J.) ("Protecting one's employment interests while an inmate chokes to death would *exemplify* deliberate indifference to serious medical needs.") (emphasis added). His argument on the merits of Count I otherwise turns largely (if not solely) on *Collins v. Seeman*, 462 F.3d 757 (7th Cir. 2006), which concerned the death by suicide of a prisoner shortly after he reported "feeling suicidal." Dkt. 222 at 8–9 (citing *Collins*, 462 F.3d at 759–61). Mr. Curtis, of course, did not die by suicide. Nor was he capable of saying much at all while in the throes of a catatonic episode. And unlike in *Collins*, where the Seventh Circuit found no evidence of foreknowledge by any of the defendant-officers of a risk of harm to the prisoner, the record here contains ample evidence of Mitchell's knowledge.

Mitchell's other attempts to evade liability fare no better. For instance, Mitchell suggests that "although [he] was disciplined for failing to monitor the crisis watch prisoners for a period of time, violating Departmental policies does not mean that a constitutional violation occurred . . . even though the crisis watch monitoring policies were in place for the protection of Curtis and other inmates." Dkt. 222 at 9 (citations omitted). Plaintiff has never argued that Mitchell's violation of IDOC policies alone warrants Eighth Amendment liability, since such a line obviously would run contrary to longstanding Circuit and Supreme Court law. But evidence that an officer

violated policies "in place for the protection" of an injured prisoner often is, as the Seventh Circuit

has held time and again, highly *probative* of a resulting Eighth Amendment claim. *E.g.*, *Bracey v.*

*Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013) ("[I]nternal prison policies have relevance in nearly

every prison lawsuit alleging the excessive use of force."); *Mays v. Springborn*, 575 F.3d 643, 650

(7th Cir. 2009) ("[A]lthough violation of the prison's rule against public searches was not, by

itself, a violation of the constitution, . . . it was relevant evidence on which the jury could have

relied to conclude that the searches were done with an intent to harass."); *see also Jimenez v. City*

*of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (noting that expert testimony and other evidence

"regarding sound professional standards governing a defendant's actions can be relevant and

helpful" to a constitutional claim). In acknowledging that the crisis-watch policies that he

disregarded were "in place for the protection of Curtis and other inmates," Mitchell simply

demonstrates why his motion for summary judgment on Count I must be denied.

**B.    A reasonable jury could find that Defendant Jeremy Frerich knew that
Mr. Curtis needed emergency care and simply walked away.**

Frerich was the crank officer assigned to 5 Gallery on September 5. IDOC SOF 66. It is

undisputed that Mitchell contacted Frerich soon after encountering Mr. Curtis in an apparent state

of unconsciousness and respiratory arrest. IDOC SOF 68. It is undisputed as well that Frerich tried

to elicit a response from Mr. Curtis. *Id.* And by all accounts, when that effort failed, Frerich

declined to call for healthcare staff or attend to Mr. Curtis's medical needs himself. That decision

alone precludes summary judgment on Count I. *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015)

("If [a plaintiff] has put forth sufficient evidence to permit a reasonable jury to conclude that [a

defendant's] 'inaction substantially and unreasonably delayed necessary treatment,' then he has

done enough to withstand summary judgment.") (citation omitted).

What's more, Frerich's actions afterward remain in dispute. In his telling, Frerich left Mr. Curtis's cell-front to radio Bennett, North 2's on-duty sergeant and Frerich and Mitchell's superior, before leaving North 2 altogether. It is true that a correctional officer who, lacking the requisite first-aid training, responds to a medical emergency by "immediately notif[ying] his superior" may not act with the subjective mental state required to sustain a claim of deliberate indifference. *Mathison v. Moats*, 812 F.3d 594, 597–98 (7th Cir. 2016). But Frerich's mental state remains in dispute. Frerich, like all Menard correctional staff, was trained in first aid and required to administer it upon finding anyone in medical distress, and Frerich admittedly failed to provide any. PSOF 61, 70. Moreover, the rest of the evidence regarding Frerich's involvement, including the contemporaneous recollections of Mitchell and Bennett, indicates that Frerich simply left North 2 without saying anything to anyone. *See* IDOC SOF 35; *see also* PSOF 71. Bennett's incident report—ostensibly prepared in the hours after Mr. Curtis died—does not list Frerich as one of the "offenders/staff involved" in the events of Mr. Curtis's death. Ex. 72 at P000286). In fact, Bennett wrote that he was "advised by C/O Frerking"—not Frerich—to "respond to cell North 2 5-08." *Id.* And Mitchell recalled only that Frerich had told him that "he should call the gallery officer" before Frerich walked away. IDOC SOF 35.

Whether Frerich chose only to call Bennett or to do nothing, a reasonable jury could find that Frerich responded to Mr. Curtis's obvious medical emergency with deliberate indifference. His motion for summary judgment on Count I must be denied.

### C.   A reasonable jury could find that Defendant Charlie Frerking knew that Mr. Curtis needed emergency care yet refused to provide or summon aid.

Frerking was the gallery officer on 5 Gallery throughout the afternoon and evening of September 5. *See* PSOF 73. It is undisputed that after Frerich left 5 Gallery, Mitchell sought out Frerking's confirmation that Mitchell's "eyes did not deceive [him]." As all parties agree, after

seeing Mr. Curtis in an obviously emergent state, Frerking radioed Bennett and left 5 Gallery to

go retrieve him. PSOF 75. And as with Mitchell and Frerich, at no point did Frerking call a Code

3 or attempt to render emergency aid. PSOF 76.

Like Frerich, Frerking submits that Plaintiff "has failed to produce any credible evidence

that [he was] personally aware of and consciously ignored a serious medical condition of Mr.

Curtis." Dkt. 226 at 24. That argument runs afoul of the undisputed fact that Frerking saw Mr.

Curtis in clear distress. Instead, Frerking's only fact-supported contention is that his choice to

contact and retrieve Bennett is itself dispositive of Plaintiff's claim of deliberative indifference

against him. *See* Dkt. 226 at 24 ("[A]s soon as [Frerking and Frerich] became aware that Mr. Curtis

was unresponsive, they took immediate action to check on Mr. Curtis and notify the chain of

command."). Again, a correctional officer who, lacking the requisite first-aid training, responds to

a medical emergency by "immediately notif[ying] his superior . . . as protocol required" may not

have the requisite mental state to be liable for deliberate indifference. *Mathison*, 812 F.3d at 597–

98. But for this Court to conclude at summary judgment that Frerking's call to Bennett strips him

of liability, the Court would have to disregard Frerking's own admission that "[i]f an offender

experienced a medical emergency," the reporting officer would be required to "call a code 3 on

the radio for a medical emergency and the healthcare staff would come to the cell house." IDOC

SOF 61.

Instead, construing all the evidence and drawing all inferences in Plaintiff's favor, a

reasonable jury could find that Frerking acted with deliberate indifference by calling Bennett rather

than summoning or providing medical assistance, as he was trained to do. For one thing, it is

undisputed that Frerking—like Mitchell, Frerich, and Bennett—*did* have the requisite training to

provide Mr. Curtis emergency aid. PSOF ¶ 61. And to repeat, Frerking himself admitted that the

reasonable response to witnessing a prisoner experiencing a medical emergency (and the one that indisputably was required by IDOC and Menard policy) was to call for *medical* assistance. IDOC SOF 60. Frerking's undisputed decision not to provide or summon aid thus precludes summary judgment. *See, e.g.*, *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016) ("On the other hand, 'where evidence exists that the defendant . . . knew better than to make the medical decision . . . that [he] did,' then summary judgment is improper and the claim should be submitted to a jury.") (citation omitted); *Conley*, 796 F.3d at 747. A jury must decide whether it was the product of his deliberate indifference.

> ### D.    A reasonable jury could find that Defendant Andrew Bennett knew that Mr. Curtis needed crisis and emergency care and deprived him of both.

Bennett was the North 2 cellhouse sergeant on the afternoon and evening of Mr. Curtis's death. *See* PSOF 45. A jury could reasonably find that Bennett showed a reckless disregard for Mr. Curtis's safety in two ways. First, Bennett instructed Mitchell to leave his post on crisis watch to assist with chow lines. In doing so, Bennett knowingly left Mr. Curtis unattended, despite understanding the life-and-death risks of officers failing to conduct crisis checks. Bennett then compounded his first act of deliberate indifference by failing to call for or provide medical care when he saw Mr. Curtis unconscious and in respiratory arrest.

Again, summary judgment is appropriate only when there is no dispute of material fact. Here, Bennett's own deposition testimony—which directly contradicts both his Statements of Fact here and his statement to the Illinois State Police after Mr. Curtis's death—creates substantial issues of credibility that only a factfinder can resolve. Three disputes are especially material to the question whether Bennett was deliberately indifferent to Mr. Curtis's medical needs.

First, it is unclear from the record whether it was proper for Bennett, as a sergeant, to order Mitchell to assist with chow lines despite knowing that Mitchell was on crisis watch at the time.

*Compare* IDOC SOF 51 ("A correctional sergeant can use a crisis watch officer between the 10-minute interval crisis checks"), Ex. 72 at P000259 ("[T]he correctional sergeant can use a crisis watch officer between the ten-minute interval crisis checks."), *with* Ex. 68 at 138-40 (confirming there is no circumstance in which a crisis watch officer would be expected to help with chow lines), *id.* at 161 ("I never had a crisis watch officer assist with meal lines."), and Ex. 64 at 55 (noting that when a line is being run for mealtime, crisis watch officers are not available to be assigned to run those lines: "[T]he crisis watch officer is there to watch the crisis watch individuals. You know, if it's 15 minutes or less, that's where they're at.").

There is also an unresolved fact question as to whether it was Bennett's responsibility to ensure that Mitchell's crisis watch checks were completed after ordering Mitchell to run chow lines. *Compare* IDOC SOF 51 ("[I]t is the crisis watch officer's responsibility to return and complete the mandatory 10-minute tour."), *with* IDOC SOF 81 (It "would be important for the sergeant to communicate to the crisis watch officer if ten minutes or more had gone by before the officer was freed up to go back to the area to check on the individuals."); Ex. 68 at 129 (confirming that if he was aware that one of the correctional officers under his supervision was not doing their required crisis watch checks, it would be his responsibility as sergeant to take some sort of action); Ex. 64 at 58-59 (testifying that, per IDOC policy, if a sergeant assigns a crisis watch officer to leave an area, a "good supervisor" would know to instruct his subordinate to go back to do his crisis check).

Finally, there remains a question as to how long it would have taken Mitchell to assist with chow lines. *Compare* Ex. 72 at P000285 ("It only takes 3 minutes for a line to go out."), *with* Ex. 68 at 131-32, 141–42 (testifying that officers assigned to help with chow lines stay for entire process, which takes at least 20 minutes per line); Ex. 60 at 80 (testifying that Bennett instructed

-61-

him to assist with line movements, which took approximately 20 minutes per gallery); Ex. 64 at 61 (confirming that the process of running all of the lines out of a cellhouse takes 30 minutes to an hour). If it would have taken longer than ten minutes, which the record would support, then a reasonable jury could find that Bennett knowingly instructed Mitchell to skip one or more crisis watch checks. Each of these disputes precludes summary judgment on Plaintiff's deliberate indifference claim against Bennett.

There are additional undisputed facts in the record that themselves would support a reasonable jury holding Bennett liable for deliberate indifference. For one, Bennett was responsible for supervising all correctional officers in his assigned cellhouse. Dkt. 226 at 20. Bennett also knew that Mr. Curtis was on crisis watch on September 5, 2018, Ex. 68 at 130, that the purpose of crisis watch is to protect prisoners from harm, Ex. 68 at 112, and that not conducting the required crisis watch checks can endanger the lives of the prisoners on crisis watch, Ex. 68 at 180. Bennett argues that he cannot be held accountable because "[p]rison administrators are allowed to delegate tasks to subordinates." Dkt. 226. But it is precisely this ability to delegate that would make Bennett liable here: He ordered a subordinate to do something that he shouldn't have. Accordingly, this case stands in sharp contrast to the one relied on by Bennett, where the Seventh Circuit found that a prison official in a supervisory role could not be found to have been deliberately indifferent to a prisoner's medical needs when she directed medical personnel to take action and they failed to do so. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Here, the problem is precisely the opposite: Bennett gave Mitchell an order and Mitchell *complied*.[5]

_____

[5] Bennett also cites *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015), to support his assertion that "[p]rison administrators are allowed to delegate tasks to subordinates, and they cannot be held liable purely on the basis that they have a general duty to oversee the prison facility." But in *Perez*, the Seventh Circuit *reversed* a district court's grant of a prison

Considering all of the evidence—disputed and otherwise—a jury could reasonably conclude that Bennett (1) knew that he should not order Mitchell to assist with chow lines while Mitchell was serving as crisis watch officer, (2) knew that there was a serious risk of harm to Mr. Curtis or prisoners in Mr. Curtis's position should Mitchell leave his post to assist with chow lines, and (3) recklessly disregarded that risk by asking Mitchell to assist with chow lines anyway and failing to take any action to ensure that Mitchell's crisis checks were performed.

If that were not enough, Bennett's actions after finding Mr. Curtis unresponsive in his cell are virtually undisputed and give rise to similarly damning inferences. Nevertheless, Bennett argues in a conclusory fashion that he behaved reasonably after Mr. Curtis was found unresponsive in his cell. Dkt. 226 at 21. But IDOC policy when an officer suspects that a prisoner is experiencing a medical emergency is to (1) call a Code 3 and (2) administer CPR until medical staff arrive to take over. Ex. 64 at 93; *see* also Ex. IR at 129; Ex. 68 at 74. Bennett did neither of these things. Instead, he observed that Mr. Curtis was not breathing, spent "two or three minutes" knocking on and shouting into Mr. Curtis's cell window, and then left to retrieve his supervisor. This course of action went against IDOC policy. *See* Ex. 64 at 94. Bennett's response to Mr. Curtis's emergent state provides a second path to liability, as a jury could easily find that by failing to call for or provide any sort of medical care for Mr. Curtis, Bennett recklessly disregarded a substantial risk to Mr. Curtis's life. *See, e.g., Bradich*, 413 F.3d at 691 (reversing summary judgment to correctional officers on deliberate-indifference claim) ("Why did two officers who lacked CPR training think that they should shout at a hanging prisoner rather than call for help?"); *Dobbey v.*

administrator's motion to dismiss on that ground, reaffirming that even if an administrator is not "directly responsible" for a constitutional deprivation, "deliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or 'turn[s] a blind eye' to it." *Id.*

*Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) (officials who do "nothing to help a suffering prisoner obtain treatment . . . exhibit deliberate indifference"). His motion for summary judgment must be denied.

> **E.    A reasonable jury could find that Defendant Gail Walls knew of and was deliberately indifferent to Mr. Curtis's catatonia and dehydration.**

Walls was Menard's Healthcare Unit Administrator. In this role, it was Walls's responsibility to ensure that "emergencies were being taken care of," Ex. 66 at 102, and "to follow up on a patient and to make sure the patient received what he needed," IDOC SOF 74. Walls does not contest that any of Mr. Curtis's conditions were objectively serious. Instead, she argues that, as Menard's Healthcare Unit Administrator, she "did not provide direct medical care to offenders" and "cannot be held liable for relying upon the advice of Mr. Curtis's treating providers when she served in an administrative position." Dkt. 226 at 17. Lastly, Walls insists that to the extent that she was responsible for responding to Mr. Curtis's condition, she responded reasonably. Each of Walls's arguments is directly contradicted by the law and the evidence in the record.

First, the record shows that despite her administrative role, Walls was intimately involved in Mr. Curtis's medical treatment. On the day that Mr. Curtis died, Walls was added to an email chain regarding Mr. Curtis's dehydration for the express purpose of providing "input on what has to be done for that." Ex. 38 at 4. She responded that she would have the results for Mr. Curtis's labs the next day and that if Mr. Curtis was on crisis watch, "we should be able to tell if he is eating and taking fluids as well." *Id.* at 3. Later, Walls informed the medical providers that "We are processing the [prescription] order now and he will receive the med soon." *Id.* at 1.

As the day went on, Mr. Curtis's own medical providers relied on *Walls* to assess and provide updates on Mr. Curtis's treatment. At 11:41 a.m., Dr. Goldman emailed Walls: "Gail did they address his hydration?" Ex. 41 at 1. Walls never responded. She does not remember whether

she took any action to ensure that Mr. Curtis's hydration was addressed and there is no evidence of such action in the record. At 1:07 p.m., Dr. Floreani asked Walls to let her know if Mr. Curtis refused the medications prescribed and required an injection. Ex. ZH at 1. She also asked Walls how often Mr. Curtis's vitals could be taken. *Id.* Again, Walls never responded. Walls does not remember whether she acted to determine whether Mr. Curtis required an injection or to ensure that his vitals were taken, and there is no evidence of such action in the record. Ex. 66 at 152.

Walls herself notes that it was her responsibility to ensure that "emergencies were being taken care of," *id.* at 102, and "to follow up on a patient and to make sure the patient received what he needed." A jury could reasonably conclude from the evidence above that she failed in both respects by failing to take any action to ensure that Mr. Curtis received the medical care that Walls knew he needed. Ultimately, the "decision of a medical professional to do nothing, even though she knows that a patient has a serious medical condition requiring prompt treatment that the professional is capable of and responsible for providing, amounts to deliberate indifference." *Dobbey*, 806 F.3d at 940; *see also Horne v. Brown*, 2020 WL 2526940, at *4-5 (S.D. Ill. May 18, 2020) (rejecting healthcare unit administrator's summary judgment argument that, as administrator "she was not responsible for providing [plaintiff] with medical care," noting that "[w]hile Brown provided no direct medical treatment, her role as Healthcare Unit Administrator includes directing and coordinating healthcare operations, which seemingly includes ensuring access to necessary healthcare for prisoners").

Second, even if Walls had not made "medical" decisions regarding Curtis's treatment, substantial evidence supports Plaintiff's Eighth Amendment claim against her. In the Seventh Circuit, it is well-established that non-medical prison officials may be held liable under the Eighth Amendment if, as is alleged here, the official knows of the lack of adequate care and "facilitates,

-65-

approves, condones, or 'turn[s] a blind eye.'" *Perez*, 792 F.3d at 781-82 (prisoner could proceed with deliberate indifference claim against non-medical defendants who knew of plaintiff's serious medical condition and inadequate medical care but failed to intervene); *see also Reed v. McBride*, 178 F.3d 849, 854-56 (7th Cir. 1999) (warden was required to act when prison officials repeatedly denied an inmate life-sustaining medication and food).

It is true that lay prison officials can rely on medical staff's expertise "as long as [they do] not ignore [the prisoner] or his mistreatment." *Diggs v. Ghosh*, 850 F.3d 905, 911 (7th Cir. 2017). But where a non-medical prison official (which Walls is not, as she was both a registered nurse and the administrator of Menard's entire healthcare unit at the time) who has the ability to take action is made aware that a prisoner is not receiving adequate care from medical staff, that official has the responsibility to do *something*. *Id.* (denying summary judgment to warden because in response to prisoner's complaints about his serious medical needs, warden "took no action"); *see also Willis v. Wexford*, 2018 WL 2018559, at *4 ("[Gail] Walls' alleged failure to take action on Plaintiff's behalf, after Plaintiff brought these complaints to her attention, sufficiently suggests deliberate indifference at the pleading stage."). Thus, when considering deliberate indifference claims against non-medical prison officials, the operative question is "whether the non-medical defendants had any duty to do more than they did, in light of their knowledge of the situation." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008).

Here, Walls suggests that that she "understood that Mr. Curtis was being treated by Drs. Floreani and Goldman" and, therefore, "cannot be held liable for relying upon the advice of Mr. Curtis's treating providers." Dkt. 226 at 18. But it is clear from the communications directed to Walls that the various medical professionals involved in Mr. Curtis's care *could not agree* as to what treatment was needed or who should be providing it. While Dr. Floreani believed that Mr.

Curtis's condition was "not psychiatric," Ex. 38 at 3, Nurse Practitioner Mary Zimmer believed that Mr. Curtis's condition was a "psych problem," Ex. 1 at IDOC000127. And while Dr. Goldman was under the impression that Mr. Curtis was drinking fluids, Ex. 38 at 4, Dr. Floreani was under the impression that he was not, Ex. 1 at IDOC000234. Walls cannot now reasonably claim to have understood that Mr. Curtis was being adequately treated by Menard's medical providers when both mental health and medical staff were disclaiming responsibility for his treatment. *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (although non-medical officials are entitled to defer to the judgment of medical officials, that protection vanishes if the official has "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner").

Finally, Walls argues that because she "responded to emails and assisted the providers, where possible, with coordinating Mr. Curtis's care," she "pursued every avenue to respond to Mr. Curtis's medical emergency that was available." Dkt. 226 at 19. But, as explained above, the evidence actually suggests that Walls *failed* to respond to providers' emails or to take the basic steps they asked of her to ensure that Mr. Curtis received the care he needed. A jury could certainly find that by failing to take any action whatsoever to resolve disputes between the medical providers regarding the nature of Mr. Curtis's condition, address Mr. Curtis's dehydration, inquire about Mr. Curtis's need for medication treatment, or ensure that Mr. Curtis's vitals were being checked, Walls evinced a reckless indifference to Mr. Curtis's serious medical needs. *See, e.g., Allen v. Jeffreys*, 2024 WL 308522 at *12 (S.D. Ill. Jan. 26, 2024) (denying motion to dismiss where plaintiff alleged that prison healthcare unit administrator failed to carry out a specialist's orders regarding plaintiff's care, as these allegations suggested "sufficient personal involvement by [HCUA Angela] Crain both through the receipt, investigation and responses to grievances, as well

as through her role as the healthcare unit administrator"). Accordingly, Walls's motion for summary judgment on Count I must be denied.

### F.    Defendants are not entitled to qualified immunity from Count I.

Defendants also seek summary judgment on grounds of qualified immunity. Not one of them is entitled to it.

Qualified immunity insulates public employees from liability for money damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S 223, 231 (2009)). A clearly established right is one that "is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). In evaluating a qualified-immunity defense, this Court asks two questions: whether "the facts that a plaintiff has alleged make out a violation of a constitutional right," and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *See id.* (cleaned up). And at summary judgment, this Court must "approach the qualified-immunity inquiry by treating as true the evidence-supported facts and inferences favoring" Plaintiff. *Balsewicz v. Pawlyk*, 963 F.3d 650, 657 (7th Cir. 2020) (citing *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 421–22 (7th Cir. 2017)).

### 1.    Defendants have waived their qualified immunity defense with conclusory and tautological arguments.

Defendants' qualified-immunity arguments lack substance. Mitchell's qualified-immunity argument comprises three paragraphs. Dkt. 222 at 10–11. His colleagues' consists of four. Dkt. 226 at 29–30. Both dedicate just one paragraph to anything resembling a discussion of Plaintiff's

claims. And nowhere do Defendants identify precisely *how* any of Plaintiff's three federal claims are susceptible of a qualified-immunity defense. In other words, Defendants say that they are entitled to qualified immunity because they are entitled to qualified immunity. Tautologies are not enough to escape liability. *Cf. Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010) ("[S]tating blankly what one's argument *is* and actually *arguing* a position are different things.").

Defendants make no meaningful attempt "to demonstrate that Plaintiff's allegations do not amount to a violation of a clearly established constitutional right nor any attempt to apply Plaintiff's allegations to the rules of law they set forth." *Wiley v. Perez*, No. 13-cv-3637, 2013 WL 5890631, at *3 (N.D. Ill. Nov. 1, 2013) (St. Eve, J.). Nor do they do "more than gesture in the general direction of the record and make conclusory assertions about what the record shows, which does not suffice to establish a qualified immunity defense." *Jackson v. Vasquez*, No. 20-cv-6004, 2023 WL 319530, at *4 (N.D. Ill. Jan. 18, 2023) (cleaned up). Under well-settled precedent, Defendants thus have waived the defense. *E.g.*, *Lanahan v. Cnty. of Cook*, No. 16-cv-11723, 2018 WL 1784139, at *11 (N.D. Ill. Apr. 13, 2018) (defendants' cursory arguments failed to "properly put the defense of qualified immunity before the Court"); *Hood v. Smith*, No. 15-cv-7945, 2017 WL 2404974, at *3 (N.D. Ill. June 1, 2017) ("Beyond citing the qualified immunity standard, Smith barely addresses qualified immunity for Hood's failure to protect claim, which is insufficient to put the defense at issue."). This Court need not proceed any further.

### 2. Defendants violated clearly established law.

"It is not [this Court's] job to do the legal research that [Defendants] have omitted." *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir. 2005). But even if this Court moves on to the merits, Defendants are not entitled to qualified immunity.

Take Mitchell and his decision to abandon a catatonic, dehydrated Mr. Curtis for an hour and a half. "Correctional officials have long been warned that they cannot ignore an inmate's known serious medical condition." *Orlowski*, 872 F.3d at 422 (citing *Board v. Farnham*, 394 F.3d 469, 485 (7th Cir. 2005) ("[T]he right to receive adequate treatment for serious medical needs is a clearly established constitutional right.")). Just as "[a]ny reasonable officer would know that" Mr. Curtis's crisis-watch status "indicated a serious medical condition," any reasonable officer would have known that to ignore Mr. Curtis's medical providers' orders and leave him completely unmonitored was to expose him to an acute risk of serious harm. *See id.; cf. Hall v. Ryan*, 957 F.2d 402, 404–05 (7th Cir. 1992) ("It was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk."); *Viero v. Bufano*, 901 F. Supp. 1387, 1394–95 (N.D. Ill. 1995) (allegations that prison officials knowingly disregarded juvenile's "serious medical needs and substantial suicide risk . . . [were] enough to strip [them] of any putative qualified immunity") (citation omitted).

Mitchell's indifference to Mr. Curtis's medical needs continued after he returned from his 90-minute sojourn to 5 Gallery, where he found Mr. Curtis unresponsive and in apparent respiratory arrest. Mitchell responded to this obvious emergency by consulting a series of fellow correctional officers and by falsifying Mr. Curtis's crisis-watch logs to cover up his unauthorized absence. Officers who fail even "to consult or alert a medical professional where an inmate is unconscious and barely breathing" do so in violation of longstanding, clearly established Eighth Amendment law. *See, e.g.*, *Orlowski*, 872 F.3d at 422. And "no reasonable officer could think that the Constitution allowed him to cover up his own misconduct at the expense of a prisoner's life." *Bradich*, 413 F.3d at 692.

So too for Frerich, Frerking, and Bennett. Like Mitchell, all three men admitted to making the conscious decision *not* to provide or otherwise summon emergency assistance after finding Mr. Curtis in an obviously emergent state of medical distress. *See* PSOF 90. Again, any reasonable officer would have known that upon finding a prisoner unresponsive and not breathing, "the law required [him] to seek medical attention" or to provide it himself. *Orlowski*, 872 F.3d at 422; *see also Mathison*, 812 F.3d at 597–98; *Bradich*, 413 F.3d at 691 ("Why did two officers who lacked CPR training think that they should shout at a hanging prisoner rather than call for help?"); *cf. Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (officers who have "a realistic opportunity to step forward and prevent" harm to a prisoner but demure are liable for deliberate indifference). None of these Defendants can receive qualified immunity from Count I.

The same must go for Walls. A "prison official's decision to ignore a request for medical assistance" has long been prohibited by the Eighth Amendment. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016); *see also Diggs v. Ghosh*, 850 F.3d 905, 910 (7th Cir. 2017) (holding that jury could infer that a physician knowingly disregarded the risks associated with a prisoner's ACL tear "by not recommending *any* treatment for him"). As explained above, a reasonable jury could conclude that Walls, the highest-ranking healthcare official on site at Menard on September 5, knew that Mr. Curtis was catatonic and dehydrated. The same jury could conclude that despite several emails imploring Walls to address Mr. Curtis's dehydration, Walls did nothing of the sort. *See Dobbey*, 806 F.3d at 940 (officials who do "nothing to help a suffering prisoner obtain treatment . . . exhibit deliberate indifference"). Walls's admitted and abject failure to provide Mr. Curtis with the barest of palliative measures—water or a saline drip—is functionally no different than ignoring a request for help. *See Board*, 394 F.3d at 485 ("[T]he right to receive adequate treatment for serious medical needs is a clearly established constitutional right."); *see also, e.g.*,

*Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (noting that "[a]llegations of refusal to provide an inmate with prescribed medication or to follow the advice of a specialist can also state an Eighth Amendment claim"); *Johnson v. Doughty*, 433 F.3d 1002, 1013 (7th Cir. 2006) (observing that "medical personnel cannot simply resort to an easier course of treatment that they know is ineffective"). At the very least, a jury could find that Walls's decision not to provide a dehydrated prisoner with hydration was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate" blackletter deliberate indifference. *Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). She cannot receive qualified immunity either way.

## III.    Defendants are not entitled to summary judgment on Count III (failure to intervene).

To prevail on Count III, her claim for failure to intervene, Plaintiff must demonstrate that the IDOC defendants "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). The record provides ample grounds on which a jury could find that every Defendant knew of another's unconstitutional treatment of Mr. Curtis and did nothing to stop or remedy it. At the very least, the law makes Defendants' ability to intervene a quintessential jury question: "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, *a reasonable jury could not possibly conclude otherwise.*" *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997) (emphasis added); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (characterizing *Lanigan* as imposing a "stringent standard").

### A.    A reasonable jury could find that each of the correctional-officer Defendants failed to intervene in one another's denial of emergency care.

Defendants Bennett, Frerich, Frerking, and Mitchell argue that they cannot be held liable for failure to intervene where "the evidence shows that they did not know that CO Mitchell did not

complete his required crisis watch checks" and where "they took immediate action to notify the chain of command" as soon as they became aware that Mr. Curtis was unresponsive. Dkt. 226 at 26. This argument rests on Defendants' construction of disputed material facts in their favor.

First, as explained above, a reasonable jury could conclude that Bennett did, in fact, know that Mitchell was not completing his required crisis watch checks. Bennett told Mitchell to assist with chow lines, despite later testifying that this is something a supervisor should never do. Bennett also testified that, as a sergeant, it was his responsibility to take some sort of action if he was aware that one of his subordinates was not doing their crisis watch checks—as Trevor Rowland, IDOC's 30(b)(6) designee, affirmed on IDOC's behalf. PSOF 107, 109. Thus, a jury could find that Bennett knew that Mitchell was engaging in conduct that put Curtis at serious risk, had an opportunity to correct the situation by instructing Mitchell or another officer to complete his checks, and failed to take that opportunity. *Williams v. Doyle*, 494 F.Supp.2d 1019, 1028 (W.D. Wis. 2007) ("The court of appeals has long recognized that supervisory officials may be held liable under § 1983 if they are aware of constitutional violations committed by their subordinates and fail to intervene.") (collecting cases); *see also Giles v. Godinez*, 914 F.3d 1040, 1054 (7th Cir. 2019) ("A prison official may be held liable if he or she was "aware of facts from which a reasonable inference could be drawn that [a prisoner] was subjected to a substantial risk of serious harm, drew such an inference, and yet did not intervene.").

Bennett, Frerich, Frerking, and Mitchell could also all be found to have failed to intervene after Mr. Curtis was found unresponsive in his cell. As set forth in Section §§ II.A–C, *supra*, there is substantial evidence to support a finding that each of these officers were deliberately indifferent to Mr. Curtis's serious medical needs when they observed him unresponsive and not breathing in his cell and, contrary to IDOC policy, failed to either call for or provide any sort of medical

-73-

assistance. Should a jury find that any of these officers violated Mr. Curtis's constitutional rights, it is likely the jury would also conclude that each of the officers who observed this violation and did nothing are also liable for failing to intervene. *Cf. Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) ("[O]ne who is given a badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge."); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) ("This responsibility to intervene applies equally to supervisory and nonsupervisory officers."). Because there is a genuine issue of material fact regarding whether the underlying violation of deliberate indifference to medical needs occurred, Defendants Bennett, Frerich, Frerking, and Mitchell—all of whom unquestionably witnessed the alleged constitutional violation—are not entitled to summary judgment on Plaintiff's failure to intervene claims. *See, e.g., Fleriage v. Village of Oswego*, 2017 WL 5903819, at *9 (N.D. Ill. Nov. 30, 2017) ("A failure to intervene claim generally presents questions of fact appropriate for the jury; a court should not decide it at summary judgment if the underlying [constitutional] claim remains unresolved.").

### B.    A reasonable jury could find that Walls knew that the Wexford Defendants were denying Mr. Curtis adequate care and failed to intervene on his behalf.

In a similarly conclusory manner, Walls argues that she cannot be held liable for failing to intervene where there was no underlying constitutional violation. Dkt. 226 at 26 ("[T]he evidence shows that Mr. Curtis was receiving extensive medical treatment from his mental health and medical providers. Furthermore, the evidence shows that Defendant Walls attempted to assist in ensuring Mr. Curtis received the appropriate medical treatment from his providers."). There is extensive evidence to support a finding that the Wexford Defendants did not provide Mr. Curtis adequate medical care, as set forth in Plaintiff's response to the Wexford Defendants' motion for summary judgment. And there is substantial evidence that Walls knew. *See supra* § II.D. Again,

summary judgment on a claim of failure to intervene is not appropriate where a material issue of fact exists regarding the underlying constitutional violation. *See Davis v. Abdeljaber*, 2021 WL 1172597, at *5 (N.D. Ill. March 29, 2021) (denying summary judgment on failure to intervene claims given fact questions on underlying constitutional violation); *Horan v. City of Chicago*, 2010 W: 2836729, at *7 (N.D. Ill. July 16, 2010) (same).

Given her authority as Healthcare Unit Administrator, her knowledge of the inadequate care, and her personal involvement in Curits's case, a reasonable jury could find that Walls had a realistic opportunity to intervene in Curtis's treatment—or lack thereof—to ensure that he was treated for dehydration and provided proper medications. *See, e.g.*, *Taylor v. Wexford Health Sources, Inc.*, 2017 WL 4155366, at *6 (S.D. Ill. Sept. 18, 2017) (denying summary judgment on a failure-to-intervene claim regarding medical care where defendant failed to act despite his awareness of the prisoner's complaints and of the lack of response from medical staff). Walls's motion for summary judgment on this claim should be denied.

## IV.    Defendants are not entitled to summary judgment on Count IV (wrongful death) or Count V (survival).

Finally, Defendants seek summary judgment on each of Plaintiff's state-law claims. Count IV alleges that Defendants are liable under the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, because Mr. Curtis's death was the proximate result of their willful and wanton misconduct. *See generally* Compl. ¶¶ 74–80, Dkt. 1. Count V asserts an analogous claim under the Illinois Survival Act, 755 ILCS 5/27-6, and seeks to recover damages for Mr. Curtis's "great conscious pain and suffering prior to his death." *See generally id.* 81–87. Neither the substantial record evidence of Defendants' liability on Plaintiff's federal claims nor any statutory immunities warrant summary judgment in Defendants' favor.

Defendants first argue that the record cannot support a finding that any of them engaged in willful and wanton misconduct. Dkt. 226 at 27–28. That finding, as Defendants correctly note, turns on whether they are liable for deliberate indifference, because Defendants' liability on Counts IV and V rises and falls with their liability on Plaintiff's Eighth Amendment claims. *See id.* at 28 (citing *Williams v. Rodriguez*, 509 F.3d 392, 404–05 (7th Cir. 2007) (reaffirming that liability for willful and wanton misconduct is derivative of federal liability for deliberate indifference)); *cf. Johnson v. Myers*, 109 F. App'x 792, 798–99 (7th Cir. 2004) ("Without adequate evidence of deliberate indifference by the jailers, Johnson's state willful-and-wanton claim necessarily fails as well[.]"). So if this Court agrees that a reasonable jury could find against Defendants on either of Counts I and III, the same result necessarily follows for Counts IV and V. Rather than spill more ink recounting the considerable evidence of Defendants' deliberate indifference, Plaintiff will rest on and incorporate her arguments regarding Counts I and III here.

Defendants next argue that they are entitled to state-law sovereign immunity. Dkt. 226 at 27–29. Defendants are incorrect. The State Lawsuit Immunity Act, 745 ILCS 5 *et seq.*, protects Illinois and its employees from being "made a defendant or party in any court except as provided in the Court of Claims Act." *See* 745 ILCS 5/1. This protection, of course, "cannot be evaded by making an action nominally one against the servants or agents of the State." *Sass v. Kramer*, 381 N.E.2d 975, 977 (Ill. 1978). As the Illinois Supreme Court has reasoned:

> [W]hen there are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State, then the cause of action is only nominally against the employee.

*Healy v. Vaupel*, 140 Ill.Dec. 368, 549 N.E.2d 1240, 1247 (Ill. 1990).

-76-

But an exception applies "whenever 'agents of the State have acted in violation of statutory or constitutional law.'" *Murphy v. Smith*, 844 F.3d 653, 659 (7th Cir. 2016), *aff'd on other grounds*, 583 U.S. 220 (2018) (quoting *Leetaru v. Bd. of Trustees of Univ. of Ill.*, 32 N.E.3d 583, 597 (Ill. 2015)). Such claims "are not against the State at all and do not threaten the State's sovereign immunity." *Leetaru*, 32 N.E.3d at 598. "This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not." *Id.* at 596; *see also Murphy*, 844 F.3d at 661–62 (Manion, J., concurring) (concluding that the Illinois Supreme Court "would hold that" officers liable for deliberate indifference "acted outside their authority and therefore that immunity does not apply").

The illegal-acts exception applies here. Plaintiff alleges that Defendants "acted in violation of statutory or constitutional law." *Murphy*, 844 F.3d at 660 (cleaned up). That claim, if substantiated, removes Defendants' acts and omissions from the protected scope of their authority. *Id.* at 661–62 (Manion, J., concurring). Sovereign immunity thus "does not bar [Plaintiff's] state-law claims." *Id.* Defendants' motion for summary judgment should be denied.

## CONCLUSION

Plaintiff does not oppose the entry of summary judgment on Count II in Defendants' favor.

Defendants' motions for summary judgment otherwise should be denied.


Dated:  June 21, 2024                                      Respectfully submitted,

                                                           /s/ Adam J. Smith
                                                           Adam J. Smith
                                                           Attorney for Plaintiff


Sarah Grady
Howard Kaplan
David A. Schmutzer
Nabihah Maqbool
Terah Tollner
Annie Garau Kelly
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Suite 205
Chicago, IL 60614
(312) 852-2184
adam@kaplangrady.com

## <u>CERTIFICATE OF SERVICE</u>

     I, Adam J. Smith, an attorney, hereby certify on June 21, 2024, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.


<div style="margin-left:50%">

/s/ Adam J. Smith         
Adam J. Smith
Attorney for Plaintiff

</div>