# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

YOLANDA JACKSON, as Administrator )
of the Estate of Kevin Curtis, )
                                           )
                Plaintiff, )
                                             )
        v. )        Case No. 20-cv-0900-DWD
                                             )
WEXFORD HEALTH SOURCES, INC., )
et al., )
                                             )
       Defendants. )       Hon. David W. Dugan

## PLAINTIFF'S RESPONSE TO
## <u>WEXFORD'S MOTION FOR SUMMARY JUDGMENT</u>

Sarah Grady
Howard Kaplan
David Schmutzer
Nabihah Maqbool
Annie Garau Kelly
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184
sarah@kaplangrady.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................... 1

RESPONSE TO WEXFORD'S STATEMENT OF MATERIAL FACTS .................................. 3

RESPONSE TO WEXFORD'S FACTUAL SUMMARY ............................................. 9

STATEMENT OF ADDITIONAL MATERIAL FACTS ........................................... 11

ARGUMENT ...................................................................................................... 78

I.      The Jury Must Decide Whether Dr. Leven and Dr. Siddiqui Violated The Eighth Amendment. ..................................................................................................... 79

        A.      A reasonable jury could find that Dr. Leven was deliberately indifferent. ......... 79

                1.      There is evidence that Dr. Leven knew of the need for emergency care. .. 80

                2.      There is evidence that Dr. Leven was deliberately indifferent. ................... 82

                3.      There is evidence that this indifference caused Mr. Curtis's death. ........... 85

        B.      A reasonable jury could find that Dr. Siddiqui was deliberately indifferent. ..... 87

II.     The Jury Must Decide Whether Wexford is Liable Under *Monell* ................................. 89

        A.      A reasonable jury could find Wexford liable regardless of Dr. Leven's or Dr. Siddiqui's liability. ................................................................................. 89

        B.      A reasonable jury could find that Wexford's practices and customs were grossly inadequate. ...................................................................................... 90

        C.      A reasonable jury could find that Wexford's practices or customs were the moving force in Mr. Curtis's death. ............................................................... 94

III.    The Jury Must Decide Whether Dr. Leven Failed To Intervene. ..................................... 97

IV.     The Jury Must Decide Whether Defendants Are Liable Under State Law ...................... 99

        A.      Plaintiff has materially satisfied Section 2-622. ................................................. 100

        B.      Dr. Leven, Dr. Siddiqui, and Wexford owed a duty to Mr. Curtis. .................... 103

        C.      A reasonable jury could find causation. ............................................................ 105

V.      Wexford's Pleading Arguments Are Meritless. ............................................................. 107

        A.      Plaintiff's position at summary judgment is fully consistent with the pleadings. ........................................................................................................ 107

B.       Plaintiff's claims are timely. .............................................................. 112

C.       Plaintiff can discuss individuals who are not named defendants. .................... 114

CONCLUSION...................................................................................................... 115

Plaintiff Yolanda Jackson, as Administrator for the Estate of Kevin Curtis, hereby responds to the motion for summary judgment by Defendants Wexford Health Sources, Inc., Dr. Eva Leven, and Dr. Mohammed Siddiqui (collectively, "Wexford") as follows:

## INTRODUCTION

This case concerns the death of a young man, Kevin Curtis, while in the care and custody of Wexford and the IDOC. Mr. Curtis entered IDOC custody in 2017 with an extensive psychiatric history, including a diagnosis of acute catatonia. Upon transfer to Menard Correctional Center, however, Wexford failed to ensure appropriate follow-up and coordination of Mr. Curtis's care, and he began to show extremely worrying signs of decline. Mr. Curtis eventually became so ill that he was sent to Chester Memorial Hospital, but on discharge Wexford continued to fail to provide critical treatment. Because of these endemic failures, many of basic communication and coordination, Mr. Curtis's decline accelerated after he returned to Menard, even though he was on round-the-clock supervision in the prison's crisis watch unit. A mountain of evidence shows that Wexford's Mental Health Services Director and Medical Director, as well as other Wexford personnel not named as defendants, contributed to these egregious failures, which resulted in Mr. Curtis's death from severe dehydration on September 5, 2018, at just 31 years of age. And that same evidence similarly shows that widespread practices at Wexford also caused Mr. Curtis's preventable death. Indeed, a death review by IDOC medical staff concluded that Wexford had failed to respond to "red flags" and follow clinical guidelines and standards of care, and attributed "system issues" as the "major problem" in Mr. Curtis's case.

In its memorandum in support of summary judgment, Dkt. 214 ("Mem."), Wexford disputes many of these facts and offers a completely different version of events. In Wexford's telling, Mr. Curtis died after somehow ingesting an unknown synthetic drug that supposedly killed

him and two other prisoners at Menard, unrelated to his extensive psychiatric history. Wexford is free to ask a jury to credit its version and reject the wealth of evidence supporting Plaintiff's claims, but for present purposes, it suffices to say that these competing versions of events cannot be resolved before trial. Wexford's motion ignores, and asks the Court to ignore, these glaring factual disputes. For obvious reasons, ignoring factual disputes is not grounds for summary judgment.

Wexford offers only a handful of material facts, all of which are disputed or materially incomplete. Further, Wexford relegates almost all of its version of the facts to an improper "factual summary," violating the Local Rules and implicitly admitting that genuine disputes of fact exist. Wexford then seeks to exclude Plaintiff's cause of death evidence (as well as substantial other evidence in the record) on entirely spurious grounds. It is in no way improper to use discovery to uncover evidence that supports the claims alleged. Nor can Wexford seriously claim surprise. Wexford has repeatedly sought discovery extensions and additional depositions, served interrogatories, and used other discovery tools to ascertain the basis for Plaintiff's claims. And Wexford's own motion shows that Wexford is well aware of the facts and theories supporting Plaintiff's claims.

For these reasons, and as explained in detail below, Plaintiff is entitled to a trial on her claims against Dr. Eva Leven and Dr. Mohammed Siddiqui, as well as against Wexford itself, which is liable to Plaintiff on account of its systematically flawed practices and customs pertaining to IDOC prisoners like Mr. Curtis. Accordingly, aside from certain ancillary claims for which Plaintiff agrees that summary judgment is appropriate, Wexford's motion should be denied.

**RESPONSE TO WEXFORD'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1(b), Plaintiff responds to Wexford's Statement of Material Facts[1] as follows:

1.   Mr. Curtis' death certificate lists his cause of death as "Probable Intoxication with an Unknown Substance."

**RESPONSE:** Admit that this is the cause of death listed on Mr. Curtis's death certificate. Ex. 2. But Plaintiff disputes that Mr. Curtis's death was caused by intoxication, as she explains in detail in her Statement of Additional Facts. *See* PSOF 108-120; *see also* Ex. 51 at 7 (opining that Mr. Curtis's cause of death was dehydration).

2.   All pathologists in this case agree that intoxication with a synthetic cannabinoid or synthetic cannabinoid-like substance is an appropriate cause of death for Mr. Curtis, E.F., and T.M.

**RESPONSE:** Disputed. Dr. Francisco Diaz, Plaintiff's retained forensic pathologist, has opined to a reasonable degree of medical certainty that Mr. Curtis's cause of death was dehydration, not intoxication, and specifically criticized reaching an opinion of death by intoxication "when there is no result to match a substance that when circulating in the blood can produce death." Ex. 51 at 6-7. Although Dr. Sabharwal believes that Mr. Curtis died from intoxication, he testified that he "do[es] not know" what the intoxicant is. Ex. 44 (K. Sabharwal Dep. Transcript) at 80. Accordingly, only Dr. Pins, the Defendants' retained expert, has opined that Mr. Curtis died of a synthetic cannabinoid-like substance, Ex. 77 (Dr. Pins Report) at 6, and *no* expert has opined that intoxication with a synthetic cannabinoid is an appropriate cause of death for Mr. Curtis.

---

[1] This brief cites Wexford's Statements of Material Fact (and Plaintiff's responses thereto) as "Resp. to Wexford SOF __" and Plaintiff's Statements of Additional Material Facts as "PSOF __."

As for E.F. and T.M., Dr. Diaz does not disclose an express opinion as to their causes of death but a reasonable jury could conclude that he would take the same position as to their deaths as he did for Mr. Curtis: that it is inappropriate "to ascribe a death to a probability of intoxication with an unknown substance when there is no result to match a substance that when circulating in the blood can produce death." Ex. 51 at 6-7. Dr. Sabharwal concluded that E.F. and T.M. died from probable intoxication of an *unknown* substance, and did not conclude that the substance was a synthetic cannabinoid or synthetic cannabinoid-like substance. *See* Defs.' Ex. P at Autopsies 19; Defs.' Ex. Q at Autopsies 49. Accordingly, only the Defendants' retained expert Dr. Pins has opined that E.F. and T.M. died of a synthetic cannabinoid-like substance, Ex. 77 at 6, and no expert has opined that intoxication with a synthetic cannabinoid is an appropriate cause of death for E.F. and T.M.

3.     Synthetic cannabinoids have no known antidote or reversing agent.

**RESPONSE:** Disputed and unsupported. The only evidence Wexford cites in support of this statement is testimony from Dr. Diaz, who states that he is not aware of a substance that "reverses the effects" of synthetic cannabinoids. Ex. 81 (Dr. Diaz Nov. 11, 2023 Dep. Transcript) at 140. There is no record evidence affirmatively establishing that any such agent does or does not exist. In addition, the question posed by counsel is vague and does not specify the "effects" in question. Finally, even if synthetic cannabinoids have no "antidote," that does not mean that there is no treatment for adverse effects, such as monitoring and treatment of symptoms. Additionally, as Dr. Diaz testified, there are many synthetic cannabinoids, but very few that have been associated with adverse effects like irregular rhythms of the heart. *Id.* at 45-47.

4.     Synthetic cannabinoids were being distributed at Menard in September 2018.

**RESPONSE:** Disputed and unsupported. In support, Defendants cite generally to transcripts of two individuals who pled guilty to *possessing* synthetic cannabinoids—not

distributing them. *See* Dkt. 214-6 at 12-13; Dkt. 214-7 at 6-7. And they also cite generally to an internal affairs investigation that concludes only that two individuals (the same individuals who later pled guilty) "violated Departmental Rules and Illinois Statutes regarding Contraband in a Penal Institution." Defs.' Ex. E at P7371. This statement is additionally irrelevant because even if synthetic cannabinoids were being distributed by these two individuals at Menard, the investigator who conducted the drug investigation testified that he did not identify any connection between Mr. Curtis and synthetic cannabinoids, Ex. 74 (Kevin Reichert Dep.) at 91, and the investigator who conducted the investigation into Mr. Curtis's death similarly noted in his report that he reviewed video surveillance of Mr. Curtis's gallery at Menard (which showed the hallway and the front of Mr. Curtis's cell), and determined that the footage "did not show any illegal activity which could have contributed to Curtis's death." Ex. 63 at 16. Accordingly, although Defendants' statement is disputed, even if true, it would not establish any issues in dispute regarding Mr. Curtis any more or less likely and it is therefore irrelevant.

5.      Dr. Siddiqui was on vacation from August 31, 2018 through September 5, 2018 and was not present at Menard.

        **RESPONSE:** Admit.

6.      Dr. Leven began working for Wexford in March 2018.

        **RESPONSE:** Admit.

7.      Dr. Leven is a psychologist who, under her licensure and Illinois law, could not prescribe medical or mental health medication or assess, diagnose, or treat medical conditions.

        **RESPONSE:** Admit that Dr. Leven could not prescribe medication but otherwise disputed. The parties agree that Dr. Leven is a licensed clinical psychologist and not a medical doctor, but as Dr. Shields explained: "It is not a fact that Dr. Goldman, or any psychologist, cannot comment on one's medical needs, especially when they have information from medical staff." Ex. 16 at 24.

Indeed, "[o]ne of the most basic concepts taught to first year graduate students in psychology is how and when to recognize what might not be psychological, and therefore require a referral to a medical provider." *Id.* Additionally, psychologists are specifically trained "how to recognize changes in mental status that could suggest an underlying medical condition that needs medical intervention." *Id.* Dr. Leven herself admitted that she had responsibility to take action when she observed a medical issue like dehydration, testifying at first that diagnosing dehydration is "outside my scope of practice" but then admitted that she "might relay that information" because she "would certainly want that information to be part of the bigger picture . . . ." Ex. 25 at 18. Dr. Leven's ability to recognize and communicate physical issues that may require medical attention is particularly important given that she had primary responsibility for coordinating interdisciplinary care for patients with mental health needs and singular responsibility to watch patients on crisis watch. Ex. 19 at 181; Ex. 21 at 1; Ex. 16 at 18-19.

Notably, Dr. Goldman holds the same licensure as Dr. Leven, but did take action to try to advocate for Mr. Curtis, including raising his dehydration and expressing her concern for his safety. *See generally* Ex. 38. Many of these actions are particularly the type of conduct that Plaintiff and her experts contend Dr. Leven should have taken. Regarding her licensure, Dr. Goldman testified that although it was outside of her scope to prescribe a medication, "it [was] not outside of [her] scope to request a consultation to assess emergency medication." Ex. 19 at 171. And when it came to raising concerns about a patient's medical condition with medical staff, Dr. Goldman testified that a licensed clinical psychologist "would be negligent if we did not consult and, for lack of better words, demand some other modality come in to assess the situation, especially in a life-threatening situation." *Id.* at 181-182.

8.    Dr. Leven did not work at Menard from September 1st-3rd, 2018.

**RESPONSE:** Admit that Dr. Leven was not physically on site at the prison between September 1 and September 3 but Dr. Leven was working on those days. Indeed, Dr. Leven admitted that she spoke with mental health staff by telephone about Mr. Curtis specifically on at least September 2 and September 3. Ex. 20 at 211-212, 219-220; *see also* Ex. 27 at 1. As Mr. Curtis's assigned crisis team leader, a reasonable jury could conclude that Dr. Leven was also notified when Mr. Curtis arrived back at Menard on September 1, even though Dr. Leven could not remember one way or the other. Ex. 20 at 206; Ex. 1 at IDOC226.

9.      On September 4, 2018, Dr. Leven consulted with Melissa Pappas (non-party), a Licensed Clinical Professional Counselor and Qualified Mental Health Professional, on a session with Mr. Curtis.

        **RESPONSE:** Admit.

10.     Due to his presentation with Ms. Pappas and Dr. Leven on September 4, 2018, Mr. Curtis was referred to the psychiatrist, Dr. Floreani, who assessed Mr. Curtis approximately 20 minutes later.

        **RESPONSE:** Admit that Mr. Curtis saw Dr. Floreani on September 4, 2018, but deny that Dr. Floreani engaged in any type of meaningful assessment of Mr. Curtis on September 4, as Plaintiff explained in detail in her Statement of Additional Facts. *See* PSOF 54-59; *see also* Ex. 5 at 17-18, 23 ("[I]n this case, Dr. Floreani knew what appropriate care demanded yet chose not to provide it."). Plaintiff further denies that Mr. Curtis was assessed 20 minutes after Ms. Pappas and Dr. Leven observed him, as the September 4 Mental Health Meeting Minutes make clear that Ms. Pappas and Dr. Leven went to Mr. Curtis's cell front several hours before he saw Dr. Floreani, observed his presentation, and nevertheless threatened him. Ex. 28 at IDOC1991; *see also* PSOF 51-54.

11.     Approximately 30 minutes after the appointment with Dr. Floreani on September 4, 2018, Mr. Curtis was taken to the healthcare unit and assessed by nurse practitioner Zimmer (non-party).

**RESPONSE:** Admit that Mr. Curtis was brought to the healthcare unit approximately 30 minutes after he saw Dr. Floreani, but deny that Ms. Zimmer engaged in any type of meaningful assessment of Mr. Curtis on September 4. *See* PSOF 62-70. To the contrary, Ms. Zimmer's encounter with Mr. Curtis reflected inadequate care, as she did not conduct a meaningful review of Mr. Curtis's medical records despite know that he had been hospitalized just a few days before, did not document (and so "did not appreciate") Mr. Curtis's vital signs, including his elevated heart rate, and assessed only the obvious but superficial and non-life-threatening head wound. Ex. 10 at 21. Plaintiff further denies that Mr. Curtis's trip to healthcare was the result of any efforts or requests by Ms. Pappas, Dr. Leven, or Dr. Floreani. Instead, a reasonable jury could find that Mr. Curtis was brought to the healthcare unit only after correctional staff observed that he and another man were nonresponsive and had a head wound, and the nurse in the North 2 infirmary was unreasonable. Ex. 32 at P5431-5433.

12.     Mr. Curtis was seen by medical and mental health professionals on September 5, 2018, his care was discussed amongst the medical, mental health, and security staff, and enforced medication was administered based on Dr. Floreani's order.

**RESPONSE:** Admit that Plaintiff briefly saw two nurses, one of whom called a Code 3 – Medical Emergency without any provider responding and had momentary encounters with a Wexford mental health staff member and Dr. Goldman, an IDOC administrator, before he was found unresponsive and not breathing. Ex. 1 at IDOC128-130, IDOC333; Ex. 22 at P6788. Admit that after encountering Mr. Curtis and obtaining additional information about him, she sent an email that eventually included a member of the medical staff, some additional mental health staff, and some administrative staff, attempting to raise the alarm about Mr. Curtis's emergent condition. *See generally* Ex. 38. Deny that enforced medication was administered based on Dr. Floreani's order. Dr. Floreani ordered lorazepam to be administered orally and to be injected only intramuscularly if Mr. Curtis refused the medicine, but there is no documentation that reflects any

attempt to offer Mr. Curtis an oral dose of the medication or a refusal from Mr. Curtis. Ex. 1 at IDOC91.

## RESPONSE TO WEXFORD'S FACTUAL SUMMARY

At summary judgment, the Local Rules require the movant to set forth all facts "bear[ing] directly on a legal issue raised in the motion" in separately numbered paragraphs. S.D. Ill. L.R. 56.1(a). Wexford's motion for summary judgment includes a short Local Rule 56.1(a) statement. Mem. 10-11. In addition to its Local Rule 56.1(a) statement, however, Wexford's motion includes a lengthy "factual summary." This section of the brief is in narrative form, is not numbered, and is roughly five times as long as the Local Rule 56.1(a) statement. *See id*. at 1-5.

Wexford represents that its factual summary is "*not . . .* material" to the motion for summary judgment, but may be "greatly helpful, if not necessary, for the Court to meaningfully consider this Motion." *Id*. at 1 n.1 (emphasis added). It is not clear what this means. If the facts in the factual summary are "greatly helpful" to "meaningfully consider" the motion, as Wexford contends, then those facts should have been laid out in the Local Rule 56.1(a) statement so that the Court can cleanly evaluate the evidence and Plaintiff's responses to it. The clear purpose of Local Rule 56.1 is "to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). That purpose is defeated if a litigant includes two sets of facts, including obviously disputed facts, for consideration.

By including a barebones Local Rule 56.1(a) statement and a "factual summary" that is five times as long in unnumbered form, Wexford has violated both the letter and spirit of the Local Rules. It has also prejudiced Plaintiff. There is no mechanism in the Local Rules for Plaintiff to respond to "helpful" facts set out separately from a Local Rule 56.1(a) statement. Accordingly, the

Court would be within its rights to strike Wexford's motion entirely. *See* S.D. Ill. L.R. 56.1(h) ("The Court may strike any motion or response that does not comply with this Local Rule.").

At a minimum, however, the Court should disregard all facts asserted in the factual summary, as courts have done in analogous circumstances. *See, e.g.*, *Suleiman v. Wexford Health Source, Inc.*, 2021 WL 1121119, at *1 (N.D. Ill. Mar. 24, 2021) ("The Court disregards the plaintiff's attempts to assert additional facts within his brief because they are not in a LR 56.1(b)(3)(C) statement, which denied the defendants the ability to controvert them under LR 56.1(a)."); *Hall v. Vill. of Flossmoor Police Dep't*, 2012 WL 6021659, at *8 (N.D. Ill. Dec. 4, 2012) (disregarding facts offered by the non-movant in such a way that "the movant is unfairly deprived of a vehicle under Local Rule 56.1 to dispute those facts because the rule permits movants to reply only to a Local Rule 56.1(b)(3)(C) statement, not a Local Rule 56.1(b)(3)(B) response"), *aff'd*, 520 F. App'x 468 (7th Cir. 2013). Disregarding these facts is appropriate because of "the important function that local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). In fact, the Seventh Circuit has "consistently upheld the district court's discretion to require strict compliance with those rules." *Id.*

If the Court decides to consider any portion of the factual summary in deciding the motion for summary judgment, then Plaintiff respectfully submits that the Court should give notice of the portion or portions of the factual statement it intends to rely on, and permit Plaintiff to respond to those specific facts before any ruling. The Court should also view the facts in the "factual summary" in the context of Plaintiff's additional facts, which appear in the next section of this brief. And finally, the Court should construe any disputes or discrepancies in the factual summary

in the light most favorable to Plaintiff. Plaintiff is confident that, even if the Court were to consider the factual summary, there are numerous genuine factual issues requiring trial.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1(c), Plaintiff offers the following additional material facts.

1.     Kevin Curtis entered IDOC custody on July 7, 2017. Ex. 1 (IDOC Medical Records) at IDOC90. He died in IDOC custody, at Menard Correctional Center, on September 5, 2018. Ex. 2 (Death Certificate). He was 31 years old. *Id.*

2.     Mr. Curtis was transferred to the IDOC from Lake County Jail, where he had been detained since 2013 as a pretrial detainee. Ex. 1 at IDOC90; Ex. 3 (Chester Mental Health Records) at P435.

### While in Jail, Mr. Curtis Suffers Acute Catatonia and Is Found Incompetent to Stand Trial

3.     As of December 2014, while at the Jail, Mr. Curtis had been prescribed olanzapine, an antipsychotic medication. Ex. 4 (Lake County Jail Medical Records) at P604-606; *see also* Ex. 5 (Dr. Richard Cockerill Report) at 2. In March 2015, medical staff switched his prescription to mirtazapine, an antidepressant. Ex. 4 at P610-612; Ex. 5 at 2. Mr. Curtis was compliant with both medications. *E.g.*, Ex. 4 at P605-606, P608, P610-611, P700-753. In July 2015, Mr. Curtis's antidepressant prescription was discontinued. *Id.* at P624.

4.     On October 13, 2015—approximately seven months after Mr. Curtis stopped taking an antipsychotic and three months after he stopped taking any psychotropic medication—staff observed that Mr. Curtis presented "with anxiety" and "jerking movements, changes in voice." *Id.* at P526. Over the course of the next several days, Mr. Curtis was observed pacing in his cell naked, hitting or knocking on the glass, making grunting and unintelligible noises, throwing his food, staring blankly, standing in one place in his cell for a prolonged time, and urinating and defecating

on himself or the cell floor. *Id.* at P528-539. Staff observed that his food and liquid intake had substantially decreased. *Id.* at P537, P542. On October 17, 2015, Mr. Curtis's Jail psychiatrist diagnosed him with "schizophrenia with catatonia." *Id.* at P535.

5. The psychiatrist referred him to a nearby hospital, Vista Medical Center East, on two occasions. Ex. 6 (Vista Medical Center Records) at P3572, P3633. On the second occasion, Mr. Curtis was hospitalized for catatonia and dehydration. *Id.* at P3733. During his hospitalization, Mr. Curtis was prescribed and given continuous IV fluids, six doses of lorazepam (a sedative), as well as medications to treat his hypertension. *Id.* at P3678, P3747-3753. Shortly after his admission, Mr. Curtis had a fever, which an infectious disease doctor thought was reactive to hyperthermia from muscle rigidity as a result of Mr. Curtis's catatonic state. *Id.* at P3699-3700. He also had substantially elevated creatine kinase (CK) levels in the first few days of his hospitalization—1161 unit/L on October 20, and 1567 unit/L on October 21. *Id.* at P3740-3741. CK levels elevated to the degree observed in Mr. Curtis at Vista Medical Center are common in patients with acute catatonia. Ex. 5 at 4.

6. Mr. Curtis also was observed to have a low heart rate (referred to as "bradycardia") as well as an elevated heart rate (referred to as "tachycardia") at various points during his hospitalization. Ex. 6 at P3678-3679, P3691, P3864-3866. Mr. Curtis's treating psychiatrist at Vista Medical Center told Jail medical staff that his bradycardia was a side effect from the sedative (lorazepam) he had been prescribed, which was then discontinued on October 22. Ex. 4 at P1073; Ex. 6 at P3801; *see also* Ex. 5 at 4. On October 23, 2015, a cardiologist was consulted, who observed that Mr. Curtis's episodes of bradycardia occurred while Mr. Curtis was sleeping. Ex. 6 at P3693-3695. The cardiologist recommended conservative management, and that pacemaker placement only be considered if "he ha[d] symptomatic bradycardia while he is awake which is

very unlikely." *Id.* There is no indication in Mr. Curtis's medical records from Vista Medical Center that any physician ever determined that Mr. Curtis should receive a pacemaker, and no indication that Mr. Curtis or any member of his family refused any such procedure. *See id.* at P3637 ("the pauses abated and EP did not feel it appropriate to intervene"). To the contrary, the cardiologist was consulted again before Mr. Curtis was discharged from Vista Medical Center on the night of October 23 and agreed to the discharge plan. *Id.* at P3636; Ex. 4 at P1073.

7.      At the time of his discharge, a nurse observed that Mr. Curtis was "[s]till in catatonic state[,]" Ex. 6 at P3732, although his attending physician noted that he was "more interactive" and reportedly had begun eating and drinking again, *id*. at P3636. Jail records confirm that at the time of his arrival, Mr. Curtis remained in a catatonic state. Ex. 4 at P1073.

8.      Plaintiff, Mr. Curtis's mother, visited Mr. Curtis around this time with Plaintiff's daughter. Ex. 7 (Yolanda Jackson Dep.) at 32-33. Plaintiff testified that Mr. Curtis looked like "he just – he wasn't there." *Id.* at 33. Mr. Curtis did not recognize Plaintiff or his sister, was making weird sounds, and looked like he hadn't showered. *Id.* at 33-34. On November 4, 2015, Mr. Curtis was evaluated for his fitness to stand trial. Ex. 3 at P435. He was diagnosed with unspecified catatonia, found unfit to stand trial, and eventually transferred from the Jail to Chester Mental Health Center. *Id.* Upon admission, Mr. Curtis presented with a flat affect, mild shakes of his hand, and jerking movements of his neck. *Id.* He was not talking. *Id.* Mr. Curtis was diagnosed with unspecified psychosis. *Id.*

9.      Mr. Curtis stayed at Chester Mental Health Center for more than three months— from January 19, 2016 to April 26, 2016. *Id.* While at the Center, Mr. Curtis was prescribed lorazepam (for anxiety), risperidone (an antipsychotic), paroxetine (an SSRI), and diphenhydramine (an antihistamine). Ex. 3 at P475; Ex. 5 at 3, 5. He was also treated with

individual counseling, recreational therapy, and other therapeutic interventions. Ex. 3 at P475. By the time of his discharge on April 29, 2016, staff at the Center assessed that Mr. Curtis's progress was excellent and he was fit to stand trial. *Id.*

10. Mr. Curtis was transferred back to the Jail, where he remained for more than a year. Ex. 4 at P496, P517-518. Mr. Curtis was kept on the psychotropic medication regimen prescribed to him at Chester Mental Health Center with only minimal changes. *Compare* Ex. 3 at P475, *with* Ex. 4 at P517; Ex. 5 at 5-6. He remained stable and compliant with his psychotropic medications. Ex. 4 at P561-598, P795-987; Ex. 5 at 6. Plaintiff visited him at the Jail after his return and testified that he was back to normal, laughing and talking again. Ex. 7 at 39.

### Mr. Curtis Is Transferred to Stateville NRC Where He Is Noted to Have Mental Health Needs

11. On July 7, 2017, Mr. Curtis was transferred to Stateville Northern Reception Center (Stateville NRC). Medical and mental health care at Stateville NRC, like every other IDOC facility in the State of Illinois, was (and still is) run by Wexford Health Sources, Inc., a private, for-profit corporation. Ex. 8 (2011 Contract) at P4710.

12. The Jail sent Mr. Curtis with a "Patient – Transfer Summary" Worksheet, showing that he had hypertension and "unspecified psychotic disorder r/o [rule out] schizophrenia." Ex. 1 at IDOC174. It also showed that, at the time of his transfer, Mr. Curtis was currently prescribed the following medications: risperidone (brand name Risperdal, an antipsychotic) at 1.5 mg daily, mirtazapine (brand name Remeron, an antidepressant) at 15 mg daily, paroxetine (brand name Paxil, an SSRI) at 20 mg daily, lorazepam (brand name Ativan, a benzodiazepine and sedative) at 1.5 mg daily, and benzatropine (brand name Cogentin, an anti-tremor medication) at 1 mg twice daily, as well as medications to control Mr. Curtis's hypertension. *Id.*; Ex. 5 at 6.

-14-

13.     At Stateville NRC, Mr. Curtis received an initial medical screening. Ex. 1 at IDOC97. The nurse who conducted Mr. Curtis's medical screening noted the Jail Worksheet, as well as Mr. Curtis's diagnosis of schizophrenia. *Id.* That same day, Mr. Curtis's "problem list" was created, documenting a history of schizophrenia, along with Mr. Curtis's sulfa allergy and history of hypertension. *Id.* at IDOC95. A "bridged medication" order was also placed for Mr. Curtis, ordering a 30-day supply of the psychotropic medications listed in the Jail Worksheet (with a substitution of "formulary" clonazepam (Klonopin) for lorazepam (Ativan)). *Id.* at IDOC100, IDOC251, IDOC266. There is no indication that Mr. Curtis was evaluated by a psychiatrist as part of the "bridged medication" order. *See id.* at IDOC 97-100.

14.     Mr. Curtis also received an initial mental health screening at Stateville NRC the day he arrived. *Id.* at IDOC170-176. During that screening, Mr. Curtis reported that he had previously been hospitalized at Chester Mental Health Center in 2016. *Id.* at IDOC170. No efforts were made, however, to request Mr. Curtis's records from Chester Mental Health Center. *See generally id.* Mr. Curtis also reported that he was currently taking psychotropic medications and consented to being assessed for psychotropic medications. *Id.* at IDOC173. The Wexford employee conducting the mental health screening referred Mr. Curtis to a psychiatrist. *Id.*

### Mr. Curtis Is Transferred to Menard
### Where Wexford Denies Him Continuity of Care

15.     On July 19, 2017, Mr. Curtis was transferred from Stateville NRC to Menard. *Id.* at IDOC101. Staff at Stateville NRC noted Mr. Curtis's diagnoses of schizophrenia and unspecified psychotic disorder on his medical transfer form, as well as his current psychotropic and non-psychotropic medications, and the prior psychiatry referral. *Id.*

16.     A nurse at Menard similarly noted Mr. Curtis's psychiatric history with medications on the medical transfer form and referred him to psychiatry. *Id.* That same day, a nurse noted an

order to continue Mr. Curtis's medications, *id.* at IDOC103, and a 30-day order was entered for the medications. *See id.* at IDOC253, IDOC266. There is no indication that Mr. Curtis was evaluated as part of this medication renewal. *See id.*

17.     On August 8, 2017, a Wexford clinical professional counselor, Monet Williams, conducted a 30-minute mental health "evaluation" of Mr. Curtis. *Id.* at IDOC181-196, IDOC203. Although Ms. Williams indicated that she reviewed Mr. Curtis's medical record as part of her evaluation, *id.* at IDOC181, a reasonable jury could conclude she did not review any pertinent records, including the records reflecting Mr. Curtis's current psychotropic medication regimen or the records reflecting Mr. Curtis's prior diagnoses. *Id.* at IDOC181, IDOC190; Ex. 5 at 6. Among other reasons, Ms. Williams failed to note that Mr. Curtis's medical records reflected prior diagnoses of schizophrenia and psychosis, Ex. 1 at IDOC181, failed to note any prior mental health hospitalizations (despite the fact that Mr. Curtis's intake mental health screening indicates a 2016 hospitalization at Chester Mental Health Center), *id.* at IDOC170, IDOC182, and for the current psychotropic medications, noted only "Remeron; Attivan [sic]; Can't remember other ones" (despite the fact that Mr. Curtis's medical records reflected exactly what psychotropic medications Mr. Curtis was currently taking), *id.* at IDOC190, IDOC254.

18.     IDOC mental health policies in place at Menard at the time required Ms. Williams to review Mr. Curtis's medical and mental health records. Ex. 9 (IDOC SOP Manual for Mental Health) at 12. Indeed, the policy notes that the very purpose of the mental health evaluation "is to gather information from a variety of sources including a clinical interview, a review of available records, and any collateral sources so that an accurate diagnostic determination can be formulated." *Id.*

-16-

19.     Having not considered Mr. Curtis's history of psychosis and schizophrenia, records from Chester Mental Health Center or the Jail documenting his catatonia, or Mr. Curtis's current psychotropic medication regimen (which included an antipsychotic), Ms. Williams "diagnosed" Mr. Curtis with PDD—persistent depressive disorder. Ex. 1 at IDOC196; Ex. 5 at 6. Ms. Williams completed a mental health treatment plan for Mr. Curtis the same day. Ex. 1 at IDOC197-202. The plan acknowledged and endorsed some, but not all, of Mr. Curtis's psychotropic medications. Specifically, the plan acknowledged and endorsed Remeron/mirtazapine and Cogentin/benztropine, but did not acknowledge Mr. Curtis's then-current prescriptions for Risperdal/risperidone or Paxil/paroxetine. *Id.* at IDOC202. And the plan purported to acknowledge and endorse a prescription for Ativan/lorazepam, without any discussion of the fact that upon admission, Mr. Curtis's prescription had been changed to Klonopin/clonazepam. *Id.* The only other component of Mr. Curtis's mental health "treatment plan" was monthly 15- to 20-minute encounters with a mental health professional and group sessions "as available." *Id.* at IDOC198. The treatment plan was cosigned by a psychiatrist, Dr. Sudarashan Suneja, despite the fact that no psychiatrist had examined Mr. Curtis. *Id.* at IDOC202.

20.     Ms. Williams also did not designate Mr. Curtis as "SMI," meaning seriously mentally ill. *Id.* at IDOC197. It is likely that had Ms. Williams reviewed Mr. Curtis's medical records as she was required to do, she would have noted the repeated references to Mr. Curtis's diagnoses of various schizophrenia spectrum disorders—diagnoses that, pursuant to IDOC policy, constituted serious mental illnesses that required a prisoner to be designated SMI. Ex. 9 at 64. The effect of being designated SMI within the IDOC is an meaningful one, as according to IDOC's policy, it means that a prisoner should be seen "at least once every 30 days or more often as is clinically appropriate." *Id.* at 65.

21.     Mr. Curtis's prescriptions for his psychotropic medications expired on August 19, 2017. Ex. 1 at IDOC254. No psychiatrist was contacted regarding the expiration of the medication. *See generally id.* Mr. Curtis had been compliant with his medications until they were allowed to lapse. *Id.* at IDOC251-254. Plaintiff's correctional medical expert, Dr. Ryan Herrington, has opined that allowing medication to expire and not be reviewed under a medical provider's supervision is inadequate care. Ex. 10 (Dr. Herrington Expert Report) at 20.[2]

22.     Mr. Curtis did not see a psychiatrist until September 19, 2017, more than two months after he entered IDOC custody. Ex. 1 at IDOC207-217. Notably, IDOC mental health policies require prisoners like Mr. Curtis, who arrive in IDOC custody on verifiable, prescribed psychotropic medications, to be seen by a psychiatrist within 30 days of arrival. Ex. 9 at 13.

23.     On September 19, Mr. Curtis met with Dr. Suneja for 20 minutes for a psychiatric diagnostic evaluation. Ex. 1 at IDOC207-217. Like Ms. Williams, Dr. Suneja did not consult any of Mr. Curtis's medical or mental health records as part of this evaluation. *Id.* at IDOC207. Dr. Suneja did note, however, that Mr. Curtis reported having heard voices in the past, as well as his prior psychiatric hospitalization at Chester Mental Health Center. *Id.* at IDOC207 ("Said he heard voices . . ."), IDOC208. Again, no effort was made to obtain Mr. Curtis's records from the Center. *Id.* at IDOC207-217.

24.     As for his "diagnosis," Dr. Suneja noted a diagnosis of schizoaffective disorder, depressive type, "in remission," as well as marijuana use disorder and high blood pressure. *Id.* at IDOC216; Ex. 5 at 7. Dr. Richard Cockerill, Plaintiff's retained psychiatry expert, opined in his

---

[2] The Wexford Defendants have moved to exclude Dr. Herrington from testifying in this case. *See generally* Dkt. 215. Contemporaneously with this response, Plaintiff is submitting a separate response to that motion, setting forth her arguments in support of Dr. Herrington's qualifications and opinions in this matter. Accordingly, Plaintiff does not detail Dr. Herrington's extensive qualifications and foundation for his opinions in her Statement of Additional Facts, and instead refers the Court to her response to the Wexford Defendants' Motion to Bar Dr. Herrington.

report that schizoaffective disorder is a chronic condition that is characterized "by the presence of persistent psychotic symptoms and intermittent mood symptoms, like depression or mania."[3] Ex. 5 at 7. Spontaneous remissions of schizoaffective disorder are unusual and the disorder typically requires long-term medication therapy. *Id.* Regarding medications, Dr. Suneja noted that Mr. Curtis was not currently taking any psychotropic medications but that he had previously taken Remeron, Paxil, Ativan, risperidone, and Cogentin for mood, psychosis, and anxiety. Ex. 1 at IDOC207-208. Dr. Suneja did not, however, acknowledge the reason why Mr. Curtis's psychotropic medication prescriptions had lapsed or document any consideration as to whether or not the medications should be restarted. *Id.* Instead, Dr. Suneja noted without explanation: "no psych meds needed at this time." *Id.* at IDOC216. Dr. Suneja set a next appointment date for four weeks later. *Id.* at IDOC217.

25.     Dr. Cockerill opined that it was clear Dr. Suneja did not review any of Mr. Curtis's prior medical or mental health records—including records of his prior episode of catatonia while in the Lake County Jail—and had not spoken to any collateral sources of information about his condition. Ex. 5 at 19. Dr. Cockerill opined that such sources provide "critical components of any initial psychiatric evaluation, especially for patients with complex histories" like Mr. Curtis. *Id.* And Dr. Herrington has opined that the repeated failure to obtain Mr. Curtis's records from Chester Mental Health constituted inadequate care and was contrary to well-known standards of correctional healthcare promulgated by the National Commission on Correctional Healthcare. Ex. 10 at 19-20.

---

[3] The Wexford Defendants have moved to exclude Dr. Cockerill from testifying in this case. *See generally* Dkt. 216. Contemporaneously with this response, Plaintiff is submitting a separate response to that motion, setting forth her arguments in support of Dr. Cockerill's qualifications and opinions in this matter. Accordingly, Plaintiff does not detail Dr. Cockerill's extensive qualifications and foundation for his opinions in her Statement of Additional Facts, and instead refers the Court to her response to the Wexford Defendants' Motion to Bar Dr. Cockerill.

26.     On October 24, 2017, Mr. Curtis saw a licensed social worker, who documented his diagnosis as persistent depressive disorder (despite Dr. Suneja's contrary diagnosis just a month earlier). Ex. 1 at IDOC218. The social worker changed his treatment plan from 30-day encounters with a mental health professional to 60-day encounters with a mental health professional. *Id.* No meaningful explanation was given for this change. *Id.*

27.     On November 8, 2017, more than seven weeks after his previous psychiatry encounter, Mr. Curtis saw Dr. Kanwal Mahmood, a psychiatrist. *Id.* at IDOC219-224. Dr. Mahmood, like the prior mental health professionals who saw Mr. Curtis, did not review any medical records as part of her encounter. *Id.* at IDOC219. Dr. Mahmood documented that Mr. Curtis had not taken any psychotropic medication for the past two months but did not acknowledge the reason why Mr. Curtis's prescriptions had lapsed. *Id.* Dr. Mahmood documented that she advised Mr. Curtis of the risks and benefits of not taking medication, and that Mr. Curtis nevertheless refused to take medication, *id.* at IDOC223-224, but a reasonable jury could conclude that there was no such meaningful discussion about the risks and benefits of not taking the medications that Mr. Curtis was previously prescribed, as Dr. Mahmood's progress note—i.e., the record of her encounter with Mr. Curtis—does not even acknowledge many of the medications, including risperidone (the antipsychotic). *Id.* at IDOC219 (mentioning only Remeron and "Ativan in the past"). Indeed, although Dr. Mahmood purports to document that Mr. Curtis is refusing medication, there is no documentation whatsoever about *what* psychotropic medications Dr. Mahmood advised he should be prescribed. *See generally id.* at IDOC219-224.

28.     Dr. Mahmood diagnosed Mr. Curtis with unspecified anxiety disorder. *Id.* at IDOC223. There is no discussion as to why Dr. Mahmood believed Mr. Curtis suffered from unspecified anxiety disorder, rather than schizoaffective disorder (as Dr. Suneja documented),

persistent depressive disorder (as Ms. Williams documented), or schizophrenia or unspecified psychosis (as documented by staff at Stateville NRC). *Id.* at IDOC219-224. Despite purporting to document that Mr. Curtis would be remaining unmedicated against medical advice, Dr. Mahmood did not schedule any follow-up appointment with a psychiatrist. *Id.* at IDOC224. To the contrary, Dr. Mahmood discharged Mr. Curtis from psychiatric care altogether. *Id.* at IDOC224-225; *see also* Ex. 5 at 8.

29.     On December 4, 2017, Mr. Curtis saw Licensed Clinical Professional Counselor Melissa Pappas. Ex. 1 at IDOC225. Ms. Pappas documented Mr. Curtis's diagnosis as persistent depressive disorder (despite the fact that Dr. Mahmood had made a contrary diagnosis less than a month earlier). *Id.* Ms. Pappas discharged Mr. Curtis from the mental health case load altogether. *Id.*

30.     An undated spreadsheet produced by Wexford listing all prisoners at Menard who are currently taking antipsychotic medications notes that Mr. Curtis had been prescribed 3 mg of risperidone by Defendant Dr. Mohammed Siddiqui. Ex. 11 (Menard Prisoners on Antipsychotics) at 9. Notably, a 3 mg dose of risperidone is double the prescription prescribed to him at the Jail (and prescribed to him at the IDOC by way of bridge medication orders). Ex. 1 at IDOC100, IDOC174, IDOC251-254. There is no evidence in the record that Dr. Siddiqui evaluated Mr. Curtis prior to prescribing him a doubled dose of his psychotropic medication. *See generally id.*

31.     On July 29, 2018, Mr. Curtis saw Dr. Reynal Caldwell. *Id.* at IDOC116. According to Dr. Caldwell's progress note, Mr. Curtis voiced a desire to stop taking his hypertensive medications. *Id.* Dr. Caldwell ordered that his medication be decreased by half and further ordered weekly blood pressure checks, with a follow-up appointment in two months. *Id.* Mr. Curtis only

had three blood pressure checks conducted prior to a follow-up appointment, one of which registered an elevated blood pressure. *Id.* at IDOC119-121.

32.    Mr. Curtis saw Nurse Practitioner Michael Moldenhauer on August 28, 2018. Ex. 1 at IDOC121. Mr. Moldenhauer noted that Mr. Curtis's blood pressure had been elevated. *Id.* Despite that fact, Mr. Moldenhauer discontinued Mr. Curtis's hypertensive medications. Ex. 1 at IDOC121. No explanation is given for this decision, other than a note scrawled on the left of Mr. Moldenhauer's progress note: "preparing to DC." *Id.* Notably, a blood pressure taken two days later, on August 30, 2018, shows that Mr. Curtis had a reading of 140/70, which qualifies as stage 2 hypertension. *Id.*; *see also* Ex. 12 (Michael Moldenhauer Dep.) at 57.

### Mr. Curtis Suffers a Recurrence of Catatonia

33.    On August 30, 2018, correctional staff reported to mental health staff that Mr. Curtis was "acting strange" and "wouldn't talk much." Ex. 13 (Aug. 30, 2018 Mental Health Meeting Minutes). According to notes from the mental health staff meeting, which was led by Defendant Dr. Eva Leven, Wexford's Director of Mental Health Services at Menard, Mr. Curtis was seen for a "wellness check," although it is not clear who saw him (and whether it was a member of mental health staff or security staff), and there is no record of any encounter between Mr. Curtis and any member of mental health staff on that day. *Id.*; *see generally* Ex. 1. The notes indicate that Mr. Curtis would be "scheduled with a MHP next week." Ex. 13.

34.    The very next day, on August 31, 2018, Mr. Curtis was found in his cell, "unable to speak in complete sentences" and was "acting very odd[.]" Ex. 14 (Aug. 31, 2018 Incident Reports) at P6795. Mr. Curtis was apparently taken to the healthcare unit and subsequently sent to Chester Memorial Hospital. *Id.* at P5429. Although one of the incident reports indicates that he was evaluated at the healthcare unit at Menard before he was sent to Chester Memorial Hospital,

there is no record whatsoever of any such evaluation in Mr. Curtis's medical records. *See generally* Ex. 1.

35.     Records from the Hospital indicate that when Mr. Curtis arrived, there was no report from any medical personnel at the prison about the reason for the referral. Ex. 15 (Chester Memorial Hospital Records) at P489. Hospital staff called Menard to request a call from a provider with a report, as well as information about the patient's normal mentation. *Id.* The only provider who returned the call did not have any relevant information and told hospital staff she did not know the patient's normal mentation. *Id.*

36.     Upon arrival to the Hospital, Mr. Curtis was aphasic and "unable to verbalize" despite attempts to speak, with jerky repetitive motor behaviors involving his head, mouth, and neck. *Id.* at P480-481. Mr. Curtis had an elevated temperature (99.5 degrees Fahrenheit), respirate rate (34 breaths per minute), and blood pressure (150/69). Ex. 1 at IDOC165.

37.     Mr. Curtis was given Benadryl (diphenhydramine) and normal saline solution via IV, and labs were ordered. Ex. 15 at P481-482. The labs showed an elevated CK level—826 unit/L, nearly triple the upper limits of the normal range. *Id.* at P491-492. Despite the Benadryl and saline solution, Mr. Curtis's elevated temperature persisted throughout his admission at the Hospital, as did his blood pressure. Ex. 1 at IDOC161-164. At discharge, for example, Mr. Curtis's temperature was 100.76 degrees Fahrenheit and his blood pressure was 146/81. *Id.* at IDOC161.

38.     Mr. Curtis remained at the Hospital until the morning of September 1, 2018. Ex. 15 at P477. Throughout the course of his admission, staff noted that Mr. Curtis remained nonverbal, repeatedly urinated on himself, displayed "mouth writhing and head movement episodes[,]" displayed "anxiety when staff approach[ed] him[,]" and had "tacky" mucus membranes with "crusty lips." *Id.* at P477, P487-488. Like at the Jail, staff at the Hospital noted that he looked at

an item (at the Hospital, an ink pen) "like he didn't know what it was used for." *Id.* at P487; *see also* Ex. 4 at P539 ("Simple tasks such as holding a cup of water seem foreign to him."). At the time of his discharge, Mr. Curtis was "[s]table slight improved[,]" but he remained nonverbal and "unable to purposefully answer questions." Ex. 15 at P477-478. Although at the time of his discharge, Mr. Curtis was noted to be able to drink water, *id.*, medical staff charted just a few hours earlier that he had refused all offers of fluids to drink, *id.* at P487. His diagnosis at discharge was altered mental status. *Id.* at P479.

39.     Dr. Cockerill opined in his written report that Mr. Curtis likely began suffering from catatonia prior to his visit to the Hospital. Ex. 5 at 16. And Plaintiff's retained psychology expert, Dr. John Shields, has explained that catatonia is a "disorder that disrupts a person's awareness of the world around them" and leads the person to "react very little or not at all to their surroundings, or might behave in ways that are unusual, unexpected or unsafe to themselves or others."[4] Ex. 16 (Dr. Shields Expert Report) at 3.

40.     A progress note completed by one of the physicians at the Hospital indicates that the officers who accompanied Mr. Curtis to the Hospital reported that he "took someone's medications, possibly Remeron." Ex. 15 at P481. That statement is hearsay, but even if admissible, a reasonable jury could find it to be untrue for several reasons. First, none of the incident reports completed on August 31, 2018 (including the report by the officer who found Mr. Curtis in his cell) make any mention of a report by Mr. Curtis or anyone else that Mr. Curtis had taken someone else's medication. Ex. 14 at P6794-6795; *see also* Ex. 17 (Aug. 31, 2018 Email) at 1 (indicating

---

[4] The Wexford Defendants have moved to exclude Dr. Shields from testifying in this case. *See generally* Dkt. 218. Contemporaneously with this response, Plaintiff is submitting a separate response to that motion, setting forth her arguments in support of Dr. Shield's qualifications and opinions in this matter. Accordingly, Plaintiff does not detail Dr. Shield's extensive qualifications and foundation for his opinions in her Statement of Additional Facts, and instead refers the Court to her response to the Wexford Defendants' Motion to Bar Dr. Shields.

that the officers who accompanied Mr. Curtis to the hospital were different from the officer who found him in his cell). Second, an email reporting Mr. Curtis's referral to the Hospital indicates that unidentified "[m]edical staff believed that Curtis had taken some type of medication[,]" but there is no record in Mr. Curtis's medical records (or the email) that gives any basis for any such belief or identifies the individual who purportedly held this belief. Ex. 18 (Aug. 31, 2018 Reportable Incident Email) at 1. Third, Mr. Curtis's urine drug screen was negative. Ex. 15 at P493-494. And although Remeron was not specifically tested, Dr. Cockerill has explained that Remeron is not known to be associated with the behavioral signs and symptoms that Mr. Curtis displayed while at the Hospital (or in the days that followed). Ex. 5 at 17.

### Mr. Curtis's Catatonia Persists but His Concerning Symptoms Are Ignored by Wexford Staff at Menard Including Dr. Leven

41.     Upon return to Menard on the morning of September 1, 2018, Mr. Curtis saw Dr. Caldwell, who noted that Mr. Curtis was not displaying normal behavior, and was "acting fearful and not talking." Ex. 1 at IDOC122. Notably, no vital signs were taken as part of this encounter, even though Dr. Caldwell noted that Hospital records showed that Mr. Curtis's temperature was elevated. *Id.* Dr. Caldwell's "assessment" of Mr. Curtis was simply "mental health." *Id.*  He prescribed Mr. Curtis Tylenol PM and put Mr. Curtis on constant watch. *Id.*

42.     Moments later, a nurse changed Mr. Curtis's watch level to a 30-minute watch, "seg placement." *Id.* The note is unsigned and purports to have entered the order for a 30-minute watch after a telephone conversation with Dr. Lisa Goldman, the IDOC Psychologist Administrator at Menard. *Id.*; *see also* Ex. 19 (Lisa Goldman Dep.) at 70. For her part, Dr. Goldman denied that she would have changed Mr. Curtis's monitoring level from constant watch to a 30-minute watch. Ex. 19 at 161-163 ("I would not change a watch if I was not giving an eyeball of a patient."). According to Dr. Goldman, it was not uncommon for staff at Menard to put the wrong name in as the source

for an order. *Id.* at 162. For example, on September 5, 2018, another nurse documented that she administered a medication to Mr. Curtis "per MD Goldman[,]" Ex. 1 at IDOC130, even though Dr. Goldman is not a medical doctor and neither prescribed nor oversaw the administration of this medication. *See* Ex. 19 at 174-175 ("Absolutely not. I did not oversee an administration. I would never oversee an administration of an injection."). Dr. Leven testified that she did not recall whether it was Dr. Leven or Dr. Goldman who was notified on September 1, 2018 (a Saturday). Ex. 20 (Eva Leven Dep. Pt. I) at 206. But Dr. Leven's curriculum vitae indicates that she was the 24-hour on-call crisis care facility leader. Ex. 21 (Eva Leven CV) at 1.

43.    A "Crisis Care Record" for Mr. Curtis, created on August 31, 2018 (around the time that he was sent to the Hospital), also lists Dr. Leven as Mr. Curtis's crisis team leader. Ex. 1 at IDOC226. Accordingly, regardless of who changed the watch from a constant watch to a 30-minute watch, it was Dr. Leven's responsibility to appreciate this change and take action to understand the reason for it. Ex. 16 at 4. There is no evidence that Dr. Leven ever took any such actions. *Id.*; *see also generally* Ex. 1.

44.    Mr. Curtis was placed on the crisis watch unit at Menard, which was located in North 2 cellhouse. Ex. 19 at 81. The crisis watch unit was not air conditioned, although other areas of the prison, like the health care unit, were air conditioned. *Id.* at 39, 67. Early September 2018 was unseasonably hot at Menard. Ex. 23 (NOAA Climatological Data Sept. 2018). Records from the National Oceanic & Atmospheric Administration show that at the nearby Carbondale Southern Illinois Airport, temperatures reached into the high 80s on September 1-2 and reached 90 degrees on September 3-4. *Id.* The average temperature between September 1 and September 5 was between 78 and 80 degrees. *Id.*

45.    Dr. Leven was the individual at Menard with singular "responsibility to watch our patients" on "suicide watch." Ex. 19 at 181; *see also* Ex. 21 at 1 ("24-hour on-call crisis care facility leader"); Ex. 20 at 158. Dr. Leven admitted that she knew it was important that she had "particular eyes on the day-to-day care that was being provided for patients on crisis watch" because she knew those patients had the potential to experience a "particularly higher and more acute risk[.]" Ex. 20 at 158-159. She was also the representative for mental health services at Menard and the "liaison" between mental health and "other health care providers" to "coordinate[] patient care with other departments." Ex. 24 (Wexford Mental Health Services Director Job Description) at 3; *see also* Ex. 25 (Eva Leven Dep. Pt. II) at 19; Ex. 21 at 1 ("lead in patient care coordination, representation & liaison work between Mental Health services & other health care providers").

46.    On the evening of September 1, a nurse noted that Mr. Curtis was naked and screaming, while pulling on his scrotum and urinating on his suicide smock. Ex. 1 at IDOC123. According to the nurse, Mr. Curtis appeared fearful, sucking his thumb and saying, "I'm sorry." *Id.* He was unable to answer questions appropriately. *Id.* The nurse's plan was to continue to monitor Mr. Curtis. *Id.* Although IDOC mental health policies require nursing staff to take vitals within 24 hours (or to document a refusal), no vitals were taken. Ex. 9 at 26; *see also* Ex. 1 at IDOC123.

47.    The next morning, on September 2, 2018 (a Sunday), Mr. Curtis was seen by a social worker, Tori Homan. *Id.* at IDOC228. Ms. Homan noted that Mr. Curtis had a flat affect, and did not speak or answer questions. *Id.* She also noted that he had poor hygiene and grooming. *Id.* An email sent by Ms. Homan that afternoon indicated that Mr. Curtis, along with other individuals on crisis watch, "were staffed with Dr. Leven." Ex. 26 (Sept. 2, 2018 Email from T.

-27-

Homan) at 1. At her deposition, Dr. Leven explained this meant that Ms. Homan would have called her to notify her of Mr. Curtis's condition. Ex. 20 at 211-12. Dr. Leven further testified that she did not create any documentation regarding that conversation, despite it being a "clinical discussion" about Mr. Curtis and other patients. *Id.* at 212.

48.     The next morning (September 3), Mr. Curtis was seen by Samantha Stellhorn. Ex. 1 at IDOC230; *see also* Ex. 20 at 218. Like Ms. Homan, Ms. Stellhorn noted that Mr. Curtis did not speak. Ex. 1 at IDOC230. As part of her "plan," Ms. Stellhorn indicated that she "consulted with Dr. Leven to keep on same watch." *Id.*; Ex. 20 at 219-20. A subsequent email from Ms. Stellhorn confirmed a phone call with Dr. Leven. Ex. 27 (Sept. 3, 2018 Email from S. Stellhorn) at 1.

49.     Dr. Cockerill opined that a clinical psychologist like Dr. Leven would know that a patient presenting the behaviors Mr. Curtis displayed was at risk for catatonia or, at minimum, suffering from an actively psychotic process, and that an urgent referral to psychiatry was necessary. Ex. 5 at 20. Yet Dr. Leven took no action to refer Mr. Curtis to psychiatry at any point between September 1 and September 3. *Id.*; *see also* Ex. 1 at IDOC226-230.

50.     On the evening of September 3, a nurse noted that Mr. Curtis was sitting on the floor of his cell, banging on the door and yelling "no!" Ex. 1 at IDOC126. The nurse noted that Mr. Curtis was unable to answer questions appropriately. *Id.* Again, no vitals were taken, and the plan was simply to continue Mr. Curtis's watch. *Id.*

### Dr. Leven Observes Mr. Curtis's Obviously Emergent State But Takes No Meaningful Action to Provide Him Care

51.     On the morning of September 4, Dr. Leven and Melissa Pappas went to Mr. Curtis's cell after Mr. Curtis did not respond to requests to come out of his cell for a mental health meeting. Ex. 28 (Sept. 4, 2018 Mental Health Meeting Minutes) at IDOC1991. Dr. Leven and Ms. Pappas

-28-

threatened Mr. Curtis that they would call the tactical team to extract Mr. Curtis if he did not come out of his cell. Ex. 28 at IDOC1991.

52.     Sometime that morning, Plaintiff, Mr. Curtis's mother, called the prison and spoke with Dr. Leven. Ex. 7 at 51-52. Plaintiff testified that she made this call after she was informed that Mr. Curtis's prior cellmate had called a member of Mr. Curtis's family to report that he had not returned to his cell after being taken to the Hospital and that the family needed to check on him. *Id.* at 48. Plaintiff expressed concern for her son, asking, "I just want to know is he okay. Can you just tell me that, is he okay?" *Id.* at 51-52. Despite Plaintiff's concern for her son's well-being, Dr. Leven "was not very nice and just [said], 'No. No. I can't do that because he has to sign a release.'" *Id.* at 51-52.

53.     At approximately 12:45 p.m., Mr. Curtis was brought to the mental health office in the infirmary in North 2 cellhouse. Ex. 1 at IDOC232-233. Dr. Leven and Ms. Pappas met with Mr. Curtis, and Ms. Pappas documented that at the time of their encounter, Mr. Curtis's affect was blunt and inexpressive, and that he was neither alert nor oriented to time, place, or person. *Id.* Ms. Pappas also documented that Mr. Curtis had a "very strong body odor and urine odor during the session." *Id.* Dr. Leven asked Mr. Curtis some questions, and other than stating his first name, Mr. Curtis did not provide a verbal response. *Id.* at IDOC232-233; Ex. 20 at 74-76. Ms. Pappas noted that Mr. Curtis's immediate risk to himself was "moderate." Ex. 1 at IDOC232-233. Ms. Pappas also documented that Mr. Curtis's level of care was "assessed and determined appropriate at this time[,]" although later in the note, Ms. Pappas documented that Mr. Curtis's watch should be changed from a 30-minute watch to a 10-minute watch "due to [Mr. Curtis's] lack of stability on crisis watch and lack of information obtained by [Mr. Curtis] during the session." *Id.*

54.     At 1:13 p.m. on September 4, Mr. Curtis was taken to a room with a computer for a telepsychiatry encounter with Dr. Christina Floreani, a staff psychiatrist. *Id.* at IDOC232-239. Ms. Pappas was present with Mr. Curtis during his encounter with Dr. Floreani. Ex. 20 at 79. Dr. Herrington noted that Mr. Curtis was not seen by Dr. Floreani until *after* she saw patients who were previously on her schedule, and opined that this was inappropriate, constituted inadequate care, and was contrary to NCCHC standards. Ex. 10 at 20.

55.     Dr. Floreani noted that Mr. Curtis required assistance into the room. Ex. 1 at IDOC234; *see also* Ex. 29 (Christina Floreani Dep.) at 132-33 (Dr. Floreani would simultaneously document her interactions with a patient as she talked to the patient in the "history of present illness" section of the progress note). Dr. Floreani further noted that Mr. Curtis had "significant psychomotor retardation"—i.e., slow movements—and "extensive delay to speech onset"—i.e., extensive silence before answering—"with less than 20 words in a five minute time frame." Ex. 1 at IDOC234; Ex. 29 at 200-201. Dr. Floreani noted that Mr. Curtis was "largely unresponsive to verbal prompts" and "demonstrated echolalia"—i.e., a patient repeating words that have been said to him—"in the short of verbal output he produced, stating 'help you' when he was asked, 'How can I help you?'" Ex. 1 at IDOC234; Ex. 29 at 201. Dr. Floreani also noted that Mr. Curtis maintained an immobile posture throughout the evaluation and had "virtually no reaction to stimuli, with fix gaze and motiveless response to instructions." Ex. 1 at IDOC234; Ex. 29 at 201-202. Dr. Floreani noted that Mr. Curtis was not oriented (except to himself), had a blunt/inexpressive affect, an atypical, mundane posture and "near mutism" with slowed speech, and was disheveled and malodorous. Ex. 1 at IDOC235. Despite being immobile during their session, Mr. Curtis was tachycardic, with a resting heart rate of 126, which is quite high. Ex. 1 at IDOC234; Ex. 29 at 202-203; Ex. 12 (Michael Moldenhauer Dep.) at 123. Notably, vital signs

were not taken during telepsych encounters as a matter of course, but would only be taken if "there was something about the patient that required" vital signs. *Id.* Either Dr. Leven or Ms. Pappas also reported to Dr. Floreani that Mr. Curtis had not been taking in fluids. Ex. 1 at IDOC234; Ex. 29 at 203-204.

56.   Dr. Leven denied being in the room during the virtual encounter between Mr. Curtis and Dr. Floreani, Ex. 20 at 80, although Dr. Leven created absolutely no documentation reflecting any actions she did or did not take regarding Mr. Curtis in September 2018. *See generally* Ex. 1; Ex. 20 at 233. But given that she had encountered Mr. Curtis just moments before and spoken with Ms. Pappas about Mr. Curtis's presentation, a reasonable jury could determine that Dr. Leven was aware of the information reflected in "History of Present Illness" portion of Dr. Floreani's progress note. Ex. 1 at IDOC232-234. Indeed, after the encounter between Mr. Curtis and Dr. Floreani, there was a conversation between Dr. Leven, Dr. Floreani, and Ms. Pappas, during which Mr. Curtis's presentation was discussed. Ex. 20 at 92-93. Notably, Dr. Leven was Dr. Floreani's supervisor at Wexford. Ex. 29 at 86.

57.   Dr. Leven testified that during that conversation, there was "some question as to whether Mr. Curtis being non-responsive verbally was volitional or not." *Id.* at 79. But Dr. Leven did not conduct any assessment for malingering or factitious disorder—two diagnoses within the DSM-V that relate to the fabrication or exaggeration of medical symptoms—despite the fact that she had both the ability and responsibility, as a clinical psychologist, to conduct such an assessment and determine whether Mr. Curtis met the criteria for malingering or factitious disorder. Ex. 30 (Excerpt of DSM-V (2013 Ed.)) at 45-47; Ex. 20 at 187-189; Ex. 19 at 124 (explaining that malingering a mental health diagnosis that licensed clinical psychologists are qualified to make).

Dr. Goldman explained that malingering requires a specific assessment and the diagnosis cannot be reached without supporting documentation. Ex. 19 at 124.

58.     Dr. Cockerill has opined that there is "no evidence" that Mr. Curtis satisfied the criteria for malingering or factitious disorder, Ex. 5 at 24, and Dr. Floreani does not dispute that assessment. Ex. 29 at 222. But even if Dr. Leven had reason to believe that Mr. Curtis's presentation was volitional, she admitted that it would have been inappropriate to withhold care for Mr. Curtis on that basis. *Id.* at 100-101. Dr. Goldman agreed that it is important not to withhold treatment based on an assumption that a patient is malingering, and in fact, even if a malingering diagnosis is made, such a diagnosis "does not rule out that there's something that the patient could be in danger of." Ex. 19 at 124. Dr. Leven admitted that if Mr. Curtis's symptoms were not volitional, his condition "had the potential to be something serious[.]" Ex. 20 at 100.

59.     Dr. Cockerill opined that Mr. Curtis's symptoms, as documented by Dr. Floreani, were "textbook symptoms of catatonia" that a psychiatrist with the training and experience of Dr. Floreani would have recognized during the exam, even without a proper review of prior patient records. Ex. 5 at 17-18. Additionally, Dr. Cockerill opined that a psychiatrist like Dr. Floreani "would be aware that a patient presenting with the signs and symptoms" that Mr. Curtis displayed on September 4 "would face a substantial risk of serious harm" if his catatonia was left untreated. *Id.* at 18.

60.     Dr. Cockerill also opined that Dr. Leven would similarly know that Mr. Curtis's presentation reflected catatonia, or at minimum, an active psychotic process. *Id.* at 20. Indeed, catatonia (including catatonia associated with another mental disorder, catatonic disorder due to another medical condition, and unspecified catatonia) is within the DSM, so as a licensed clinical psychologist, Dr. Leven had both the ability and responsibility to assess it, as she admitted. Ex.

30; Ex. 20 at 189-190. Notably, Ms. Pappas's note—which Dr. Leven testified she reviewed for accuracy—makes no reference to dehydration or that Mr. Curtis had not been taking in fluids, even though, as Dr. Shields opined, mental health professionals like Dr. Leven and Ms. Pappas "must be mindful to look for [these symptoms] with a catatonic patient." Ex. 16 at 5; *see also* Ex. 1 at IDOC232-233; Ex. 20 at 200-201. And the "impression" portion of Ms. Pappas's note reflecting "Persistent Depressive Disorder," is handwritten, unlike the remainder of the note, which, as Dr. Shields stated in his report, "may indicate that neither Ms. Pappas nor Dr. Leven attempted to diagnose Mr. Curtis and instead just copied over his diagnosis from 2017." Ex. 16 at 5.

61.     Dr. Leven admitted that catatonia is a serious medical condition that can be fatal. Ex. 20 at 191. Yet despite her awareness that Mr. Curtis faced a risk of serious harm, Dr. Leven did not take any action in response to his textbook symptoms of catatonia. *See generally* Ex. 1; Ex. 28 at 1. Dr. Floreani testified that she told Dr. Leven and Ms. Pappas that Mr. Curtis needed to be evaluated by medical staff and that she relied on them to communicate with medical staff. She agreed that this communication was important to ensure that Mr. Curtis did not face a substantial risk of serious harm. *Id.* at 230-234, 256, 262.

62.     Although Mr. Curtis was eventually taken to the healthcare unit where he saw Nurse Practitioner Mary Zimmer, the evidence suggests that this visit was not by any efforts from Dr. Leven, Ms. Pappas, or Dr. Floreani. Ex. 1 at IDOC127; Ex. 31 (Mary Zimmer Dep.) at 30-31. Instead, *correctional* staff discovered that Mr. Curtis was unresponsive and/or had a possible head injury, and brought him to the healthcare unit when the nurse in the North 2 infirmary was unreachable. *See* Ex. 32 (Sept. 4 Incident Reports) at P5431-5433.

63.     This is contrary to policy. As the Mental Health Services Director at Menard, Dr. Leven was responsible for communicating with Ms. Zimmer to coordinate Mr. Curtis's care. Ex.

24 at 3; *see also* Ex. 20 at 239 ("[I]f I felt that somebody needed a level of care outside of my scope, part of my job would be to make sure that they had those resources available to them and to communicate to the providers who were qualified to make their assessments within that scope."). And Ms. Zimmer testified that if a member of the mental health staff like Dr. Leven believed that a patient needed to be evaluated or treated by a medical provider, that staff member had a responsibility to communicate *why* they believed there needed to be a referral. Ex. 31 at 55; *see also id.* at 52. Here, Dr. Leven did not communicate with Ms. Zimmer. Ex. 31 at 53. And neither she nor any other mental health staff informed Ms. Zimmer about the concerns that mental health staff had about Mr. Curtis, including that he was not taking in fluids, that he was tachycardic, or that they suspected the etiology of Mr. Curtis's condition was medical (rather than psychiatric). *Id.* at 53-55, 77, 80-81.

64.     Had she been told that Mr. Curtis was not taking in fluids, Ms. Zimmer would have understood that Mr. Curtis was at risk of dehydration, which Ms. Zimmer admitted can pose a serious risk to health and should be treated. *Id.* at 76-77. And if Dr. Leven had communicated with Ms. Zimmer to coordinate Mr. Curtis's care, as she was responsible for doing, Ms. Zimmer would have assessed and addressed Mr. Curtis's dehydration. *Id.* at 80. Intravenous (IV) fluids—the primary treatment for dehydration—were available in the healthcare unit at Menard, and could have easily been administered with an order from Ms. Zimmer (or another medical provider). *Id.*

65.     But Ms. Zimmer was not made aware of a need to evaluate or treat Mr. Curtis for dehydration. *Id.* at 80-81. And she did not assess or treat Mr. Curtis's dehydration. *Id.* at 79-81. Instead, nursing staff told Ms. Zimmer only that Mr. Curtis was being brought to first aid because of a small laceration on the top of his head. *Id.* at 34, 64-65. Ms. Zimmer noted that Mr. Curtis had a small laceration on the top of his head that was not actively bleeding, which she determined did

not require sutures. Ex. 1 at IDOC127. No vital signs were recorded as part of Mr. Curtis's encounter. *Id*. And although Ms. Zimmer testified she believed that they would have been taken, she has no recollection of this encounter and a reasonable jury could accordingly conclude that they were not taken. Ex. 31 at 38, 58.

66.     Ms. Zimmer noted that Mr. Curtis was not speaking, and although she looked through his chart and saw that he had been non-verbal as of August 31, she took no action to assess the etiology of this symptom. *Id*.; Ex. 31 at 39-41. She also saw that Mr. Curtis had recently been hospitalized and had an elevated temperature and blood pressure at discharge, although she took no steps to determine whether his current state was related to his recent hospitalization. Ex. 1 at IDOC127; Ex. 31 at 41-43. Ms. Zimmer's "assessment" was that Mr. Curtis had a "psych problem." Ex. 1 at IDOC127. Ms. Zimmer's plan was simply, "MH referral." *Id*.

67.     Dr. Herrington opined that Ms. Zimmer's encounter with Mr. Curtis reflected inadequate care. Ex. 10 at 21. Among other things, she did not conduct a meaningful review of Mr. Curtis's medical records despite knowing that he had been hospitalized just days before, did not document (and so "did not appreciate") Mr. Curtis's vital signs, including his elevated heart rate, and assessed only the obvious but superficial and non-life-threatening head wound. *Id*.

68.     Dr. Leven testified that she was "looped in" on the fact that Mr. Curtis had returned from the healthcare unit. Ex. 20 at 82-83; *see also id.* at 213 (testifying that she "was aware and involved" in Mr. Curtis's medical and mental health condition on a daily basis). As the person primarily responsible for overseeing care for prisoners on crisis watch and for serving as the liaison between mental health and other department, Dr. Leven had a responsibility to communicate with Ms. Zimmer or others in the healthcare unit to coordinate Mr. Curtis's care. Ex. 24 at 3; Ex. 21 at 1. But she did no such thing, even though Dr. Leven admitted she was "involved and informed

about [Mr. Curtis's] care." Ex. 20 at 100, 213; *see also* Ex. 33 (Eva Leven Investigational Interview) at 69. Indeed, there is no evidence that Ms. Zimmer spoke with any member of the mental health staff about Mr. Curtis after she saw him. *See generally* Ex. 1.

69.     Dr. Leven testified that she "would have been in contact" with Ms. Zimmer or someone within the medical department "to get a sense of what had happened, what had occurred." Ex. 20 at 235-236. But as Dr. Shields noted in his report, Dr. Leven also testified that she would have documented any efforts, including conversations, to coordinate Mr. Curtis's care, and yet "there was no such documentation" which "can only be understood to mean that there was an absence of such coordination of care." Ex. 16 at 14. And even if a jury credits Dr. Leven's testimony that she spoke with Ms. Zimmer, that means that Dr. Leven was expressly aware that Ms. Zimmer did not evaluate or treat Mr. Curtis for dehydration, catatonia, or any related issue, and still took no action to ensure that Mr. Curtis received appropriate attention from medical staff. Ex. 20 at 235-237; *see also* Ex. 19 at 181-182 (testifying that it would be inappropriate for a licensed clinical psychologist "not [to] consult and, for lack of better words, demand some other modality come in to assess the situation, especially in a life-threatening situation.").

70.     After his encounter with Ms. Zimmer, Mr. Curtis was brought back to his cell in North 2 cellhouse. Apart from a nurse observing that Mr. Curtis was sitting on his bed naked at 10:30 p.m. on September 4, Mr. Curtis received no further attention from medical or mental health staff that day. Ex. 1 at IDOC127-128. At a 2 p.m. mental health meeting attended by Dr. Leven and Ms. Pappas, along with other mental health providers (but not Dr. Floreani), staff noted simply that Dr. Floreani did not put Mr. Curtis on meds. Ex. 28 at IDOC1991. There is no indication that any further plan for Mr. Curtis's care (or coordination of care) was formed. And Dr. Leven testified

that, other than discussing Mr. Curtis during the daily crisis meetings, she does not recall taking *any* action regarding Mr. Curtis after he returned to his cell. Ex. 20 at 109-111.

71.      At 3 a.m. on September 5, a nurse noted that Mr. Curtis remained sitting on his bed. Ex. 1 at IDOC128. Approximately 30 minutes later, the correctional officer assigned to crisis watch began passing out food trays to prisoners. Ex. 34 (Sept. 5, 2018 3:36 a.m. Video Clip) at 03:36:19.[5] The officer went to Mr. Curtis's cell, Cell No. 8 (the seventh cell from the right visible on the camera), and offered him a food tray and a juice, but Mr. Curtis did not respond and the officer returned to the officer's station with the tray and juice still in hand. *Id.* at 03:37:23-03:03:37:53; *see also* Ex. 35 (Sept. 5, 2018 Mental Health Daily Report) at 1 (showing Mr. Curtis's cell assignment).

### Staff and Plaintiff's Attempts to Summon Help for Mr. Curtis, Who Is Obviously Suffering a Medical Emergency, Are Ignored

72.      At approximately 8:45 a.m. on September 5, a different crisis watch officer observed that Mr. Curtis appeared to be unresponsive and was lying at the back of his cell. Ex. 22 (Sept. 5, 2018 A.M. Incident Reports) at P6793. Supervisory correctional staff were called to Mr. Curtis's cell, including Sergeant Anthony Jones, who was working as the North 2 infirmary sergeant at the time. Ex. 36 (Anthony Jones Dep.) at 13-14. Sergeant Jones testified that Mr. Curtis appeared to be breathing but was not talking, moving, or responding to officers' attempts to communicate with him. *Id.* at 16-17. Sergeant Jones testified that he was concerned for Mr. Curtis's well-being. *Id.* at 17.

---

[5] All of the video clips included as exhibits can be accessed using the MiniPlayer application, which is being submitted to the Court along with the copy of the clips themselves. (This is the format in which IDOC produced to the video footage to Plaintiff, who produced it in the same format to the parties.) Plaintiff's pincites refer to the timestamp at the lower left corner of the MiniPlayer application.

73.     An emergency response team was summoned. *Id.* at P5427-5428. Video footage shows that at approximately 8:44 a.m., the team carried Mr. Curtis out of his cell. Ex. 37 (Sept. 5, 2018 8:42 a.m. Video Clip) at 08:44:25-08:44:38. Mr. Curtis was naked and not walking under his own power. *Id.* Mr. Curtis was put in a stair chair—a type of wheelchair used by staff at Menard to transport prisoners up and down stairs—and taken to the infirmary in North 2 cellhouse, where he saw Nurse Brandy Tripp. Ex. 36 at 19-21. Nurse Tripp began taking Mr. Curtis's vitals when Mr. Curtis started gasping for air. *Id.* at 21-22. Nurse Tripp called a Code 3—the code for a medical emergency—and Mr. Curtis was taken to the healthcare unit in the stair chair. *Id.*

74.     Around this time, Plaintiff called the prison and spoke with Dr. Goldman. Ex. 19 at 10-11. Plaintiff told Dr. Goldman that she was trying to get in touch with someone to help her son. *Id.* at 11. Dr. Goldman told her that she could not give her any details about her son, but Dr. Goldman "could listen to any details" Plaintiff wanted to share. *Id.* at 11-12. Plaintiff told Dr. Goldman that Mr. Curtis "had been at Chester Mental Health prior, and that he was on suicide watch, and that he had difficulties, and [Plaintiff] thought he was in the same situation." *Id.* at 12. Dr. Goldman noted the urgency in Plaintiff's voice. *Id.* at 17. Plaintiff also told Dr. Goldman that she had tried contacting Dr. Leven on multiple prior occasions, but Dr. Leven was "cold and uncaring." *Id.* at 12-13; *see also* Ex. 22 (Sept. 5, 2018 A.M. Incident Reports) at P6788.

75.     Dr. Goldman left her office and went to see Dr. Leven. Ex. 19 at 26. Dr. Goldman told Dr. Leven about the call from Plaintiff and that she thought, "we needed to do something about where [Mr. Curtis's] health was." *Id.* Dr. Leven told Dr. Goldman Mr. Curtis was being tested for syphilis and that she thought his issues were behavioral—i.e., a volitional withholding of a response. *Id.* at 26-27. Dr. Goldman explained that assuming a patient's presentation is

volitional, rather than symptomatic of a serious mental health condition, puts the patient at serious risk of harm, and is wholly inappropriate for a psychologist like Dr. Leven to do. *Id.* at 27-28.

76.     Dr. Goldman then left the building where her and Dr. Leven's offices were located, and walked toward the healthcare unit to determine whether Mr. Curtis's medical files included records from Chester Mental Health Center. *Id.* at 17-18. On the way to the building, Dr. Goldman saw Mr. Curtis being escorted via wheelchair from the healthcare unit back to North 2 cellhouse. *Id.* at 18. Dr. Goldman observed that Mr. Curtis had a flat affect and appeared to be catatonic. *Id.* at 21-22; Ex. 22 at P6788. Dr. Goldman also testified Mr. Curtis appeared to be a "relatively young, healthy, strong individual," so she was especially concerned about his inability to walk, particularly on an excessively hot day like September 5. Ex. 19 at 23; Ex. 23. Notably, Dr. Goldman testified that her observation of Mr. Curtis was inconsistent with Dr. Leven's claim that Mr. Curtis was faking or not responding volitionally. Ex. 19 at 208-209. In fact, Mr. Curtis's condition was so obviously emergent that if Mr. Curtis had been "somebody at Walgreen's" or "a perfect stranger," Dr. Goldman would have engaged with him "due to the way he was presenting." *Id.* at 201, 213. Dr. Goldman was worried that Mr. Curtis might not survive. *Id.* at 39-40.

77.     Dr. Goldman then continued to the healthcare unit, where she encountered a nurse who had Mr. Curtis's medical chart. Dr. Goldman saw a urine sample cup that was filled with dark urine, which gave her further concerns for Mr. Curtis's health. *Id.* at 19, 24-25. Dr. Goldman testified that dark urine is known to be a sign of dehydration, infection, or traces of blood in the urine, and given Mr. Curtis's presentation, Dr. Goldman believed the dark urine indicated dehydration in this case. *Id.* at 24, 37-38. When she asked the nurse what the urine was being collected for, the nurse told her that they were testing for syphilis. *Id.* at 19. But when Dr. Goldman reviewed Mr. Curtis's chart, she found that Mr. Curtis had already been tested for syphilis (the

result was negative). After determining that Mr. Curtis's chart did not contain records from Chester Mental Health Center, Dr. Goldman continued onto the medical records office in the healthcare unit to ask the medical records department to contact Chester Mental Health Center and get Mr. Curtis's records "as quickly as they could." *Id.* at 19; Ex. 22 at P6788.

78.     Despite the fact that Dr. Leven was responsible for communicating with medical staff about Mr. Curtis's condition and needs, the medical records make clear that when Mr. Curtis arrived in the healthcare unit, staff had received no information about Mr. Curtis's current condition or even his prior visit to the healthcare unit. Ex. 1 at IDOC128-130. A nursing note reflects that Mr. Curtis was purportedly taken to the healthcare unit for "labs and UA [urinalysis]" without explanation. *Id.* at IDOC128; Ex. 12 at 104. Notably, no vital signs were obtained despite the fact that a Code 3 emergency had just been called due to Mr. Curtis gasping for air. Ex. 1 at IDOC128; Ex. 36 at 21-22.

79.     The healthcare unit nurse called Nurse Practitioner Michael Moldenhauer, who was offsite at the minimum-security unit at Menard. Ex. 1 at IDOC130; Ex. 12 at 107-108, 184. Neither Dr. Leven nor anyone else told Mr. Moldenhauer about Mr. Curtis's dehydration or gave him any information whatsoever about Mr. Curtis's condition or history, except that Mr. Curtis had a history of "poor speech communication." Ex. 1 at IDOC130; Ex. 12 at 116-117, 146-147. Mr. Moldenhauer did not assess or treat Mr. Curtis's known dehydration or catatonia. Ex. 12 at 136. Instead, he simply ordered a general set of lab tests that "would cover most conditions or a good workup." *Id.* at 108-111, 116-117. Although some of the lab tests would indicate dehydration, others—like the STD tests—had no bearing on Mr. Curtis's hydration. Ex. 31 at 84-85; *see also* Ex. 12 at 110. Additionally, the labs were not ordered "stat," which would have made the results available within a few hours or less, rather than the next day. *Id.* at 142. Indeed, once the University

of Illinois Medical Center, which conducted the lab tests, received Mr. Curtis's blood and urine samples, it took less than 90 minutes for them to run the tests and call and fax staff at Menard with the critical results. Ex. 1 at IDOC308-313; Ex. 12 at 142-143.

80.    Had Mr. Moldenhauer been told Mr. Curtis was dehydrated, Mr. Moldenhauer testified that he would have assessed Mr. Curtis's skin turgor and looked at his lips to see whether they were dry. Ex. 12 at 42-43. He also would have ordered labs to assess for dehydration and would have been able to order that IV fluids be administered. *Id.* But even without being told about Mr. Curtis's condition unprompted, Dr. Herrington opined that Mr. Moldenhauer's conduct on September 5 still reflected inadequate care, as he did not inquire as to *why* Mr. Curtis needed lab work, which would have uncovered his catatonic state and obviously required Mr. Moldenhauer to "immediately assess Mr. Curtis in person." Ex. 10 at 21.

81.    Dr. Goldman received Mr. Curtis's records from Chester Mental Health Center via email at 10 a.m., approximately one hour after her trip to the healthcare unit. Ex. 19 at 29; Ex. 38 (Sept. 5, 2018 Email Chain) at 4. Despite the fact that Mr. Curtis had reported his prior admission at the Center to Wexford staff on multiple occasions, this was the first time since his incarceration that his records had been requested from the Center. *See, e.g.,* Ex. 1 at IDOC170, IDOC207, IDOC283-295; Ex. 22 at P6788.

82.    Dr. Goldman reviewed the records and saw that Mr. Curtis's diagnosis while at the Center was "psychosis, NOS, catatonic type." Ex. 19 at 25-26. Dr. Goldman emailed Dr. Leven, attaching Mr. Curtis's records from the Center, and expressly noting the prior diagnosis. Ex. 38 at 3. Dr. Goldman expressed her concern that Mr. Curtis "was extremely dehydrated" and that when she had seen him coming back from the healthcare unit, "he was in a wheel chair and catatonic (just as he had been diagnosed in the past)." *Id.* Dr. Goldman expressed a need to get him treated

and be evaluated for emergency enforced medication. *Id.* She concluded: "In my clinical opinion we need to intervene quickly for the dehydration with a combination of this heat could be lethal. Please let me know how you are going to proceed with this [inmate]." *Id.*; Ex. 22 at P6788. Dr. Goldman knew that catatonia is a medical emergency and can be lethal if left untreated. Ex. 19 at 35-36, 47. She further testified that such information is commonly known amongst clinical psychologists like herself and Dr. Leven. Ex. 19 at 35.

83.     Dr. Goldman also told Dr. Leven Mr. Curtis needed to be checked into a hospital. *Id.* at 64; Ex. 39 (Lisa Goldman Investigational Interview) at 65. Dr. Leven responded that she wanted to wait on the results for the syphilis testing, but Dr. Goldman replied that Mr. Curtis "couldn't wait." Ex. 39 at 65; *see also* Ex. 19 at 64-65. Dr. Goldman believed that, if nothing else, Mr. Curtis should have at least been admitted to the healthcare unit, which was air conditioned and under more frequent observation by nursing staff. Ex. 19 at 67-68; Ex. 39 at 66.

84.     Dr. Goldman explained that she directed these questions to Dr. Leven because Dr. Goldman's role was that of an administrator, not a clinician. Ex. 19 at 179-180 ("Clinicians can grieve, if I were to do any type of therapeutic intervention, because I'm an administrator, not a clinician."). It was Dr. Leven, and not Dr. Goldman, who "was given the responsibility" to watch the patients on suicide watch. *Id.* at 181. Additionally, at this time, Dr. Goldman was not permitted to enter North 2 cellhouse and had instead been told that "Dr. Leven would now be in charge." *Id.* at 79-80, 189.

85.     Dr. Shields explained that Dr. Goldman was well within her rights to raise these concerns, even though as a psychologist, she could not prescribe medication. Ex. 16 at 22, 24. Dr. Shields explained that licensed clinical psychologists, like Dr. Goldman and Dr. Leven, have both the ability and the responsibility to "recognize changes in mental status that could suggest an

underlying medical condition that needs medication intervention." Ex. 16 at 24. Indeed, as Dr.

Shields pointed out, Dr. Goldman was right: Mr. Curtis did have dehydration and it did turn out to

be lethal. Ex. 16 at 24; *see also* Ex. 38 at 3.

86.     Dr. Goldman also spoke directly with Assistant Warden Alex Jones to try to get

him to encourage Dr. Mohammed Siddiqui, Menard's Medical Director, to treat Mr. Curtis. Ex.

19 at 43-44. Warden Jones responded to Dr. Goldman's email, including Dr. Siddiqui, Dr.

Floreani, and Defendant Gail Walls, the Healthcare Unit Administrator at Menard, in the email

chain. Ex. 38 at 3.

87.     Ms. Walls responded to Warden Jones's email, noting that nursing staff reported

that Mr. Curtis "acknowledges them when they talk to him but doesn't verbally respond to

questions." *Id.* Ms. Walls indicated that Mr. Curtis's lab results would be available the following

day (September 6), and that it was Ms. Walls's "understanding" that Mr. Curtis received a shower

the day before. *Id.* In fact, Mr. Curtis had not received a shower the day before, according to both

the North 2 shower logs and a Wexford staff member's note from that morning, noting his strong

body odor. Ex. 40 (Sept. 4, 2018 North 2 Shower Log); Ex. 1 at IDOC333 (noting that at

approximately 9 a.m., Mr. Curtis's hygiene was poor "as evidenced by his body odor"). With all

individuals still on the email chain, Dr. Goldman asked whether anyone had addressed Mr. Curtis's

hydration. Ex. 40 (Sept. 5, 2018 Partial Email Chain) at 1. Ms. Walls never responded. *Id.*; *see*

*also* Ex. 38.

88.     Dr. Floreani emailed the group at 11:47 a.m., opining that "[h]is current

presentation and history per the chart suggests that the etiology of his current condition is not

psychiatric. It would be a mistake to treat it as such." Ex. 38 at 3. Dr. Goldman asked Dr. Floreani

whether she had read the records from Chester Mental Health Center, and when Dr. Floreani

reported that she had not, promptly forwarded them for her review. *Id.* at 2-3. Dr. Goldman also spoke with Dr. Floreani directly, relaying her concerns for Mr. Curtis's health and asking her to give a medical opinion about his current state. Ex. 19 at 53.

89. After Dr. Floreani finally reviewed the records, she responded to the group diagnosing Mr. Curtis with catatonia and noting that catatonia should be treated with benzodiazepines: "usually a high dose is required in the immediate and for main[t]enance." *Id.* at 2. Dr. Floreani further indicated that benzodiazepines are "restricted per psychiatry." *Id.* at 2. Dr. Goldman advised that Dr. Floreani was permitted to prescribe them in an acute situation for up to four weeks. *Id.*

90. At 12:25 p.m., Dr. Floreani emailed an "emergency" prescription for Mr. Curtis for "Ativan 2 mg PO [by mouth] NOW and give 2 mg IM [intramuscularly] if he refuses" and well as "Ativan 2 mg PO TID [three times a day] x 1 month." Ex. 1 at IDOC91; Ex. 38 at 1.

91. Ms. Walls asked Dr. Floreani to send a progress note "to address the reason why the script was written?" Ex. 38 at 1. She indicated that Mr. Curtis would receive the medication "soon." *Id.* More than an hour later, at 2:41 p.m., Dr. Floreani emailed with a progress note for Mr. Curtis diagnosing him with catatonia and stating: "Here is his PN. Please let me know if he refuses his now dose of PO Ativan and requires an injection. Also, how often can vitals be taken?" *Id.* No one responded. *Id.*

92. Dr. Cockerill explained that catatonia is a "serious, potentially life-threatening condition which always requires prompt, assertive treatment." Ex. 5 at 15. Dr. Cockerill further explained that when there is a case of severe or malignant catatonia, electroconvulsive therapy (ECT) should be considered. *Id.* If, instead, lorazepam (Ativan) is used, a clinician should "be available to observe the patient within hours of administration." *Id.* Additionally, in some cases,

-44-

high doses of lorazepam—of 30 mg daily or more—may be required. *Id*. Regardless of the treatment choice, Dr. Cockerill opined that "treatment for catatonia is intensive and requires very close monitoring" in a "high acuity medical or psychiatric hospital" and if malignant catatonia is suspected or if the catatonia is accompanied by medical complications (like dehydration), "the patient should be transferred to an intensive care unit." *Id*. Dr. Cockerill explained that "[w]ithout prompt, appropriate treatment, the risk of death is very high, approaching 20[ percent] in the case of malignant catatonia." *Id*. at 19.

93.     Dr. Leven testified that she received Dr. Goldman's email on September 5. Ex. 20 at 111-112. And she believes that she would also have been made aware that Mr. Curtis was found unresponsive that morning. *Id*. at 113-114. Dr. Leven admitted that Mr. Curtis was not stable, and needed "close attention" and an assessment. *Id*. at 48, 117, 267-268. Yet Dr. Leven does not recall taking *any* action whatsoever after receiving the email raising an alarm about Mr. Curtis's dehydration and the express concern that his issues may be fatal. *Id*. at 266. Dr. Shields opined that this was grossly inappropriate, particularly as Dr. Leven was "primarily responsible for coordinating interdisciplinary care" and was made aware on multiple occasions of a situation that she knew constituted a medical emergency. Ex. 16 at 18-19.

94.     In fact, Dr. Leven created absolutely no documentation of her conduct regarding Mr. Curtis at any point, even though she admitted that documentation is an important part of continuity of care. Ex. 20 at 102-103; Ex. 25 at 23. Dr. Shields testified that this failure is "shocking and reflects complete disregard of some of the fundamental principles of clinical psychology." Ex. 16 at 28.

95.     Dr. Leven is not the only Wexford staff member whose notes regarding Mr. Curtis were inadequate. The progress note submitted by Dr. Floreani did not differentiate between events

that occurred during her encounter with Mr. Curtis on September 4, and events that occurred on September 5. Ex. 1 at IDOC234-239; Ex. 29 at 178 (admitting that she "decided rather than to create a new record to just edit the record that [she] had started the day before"); *see also* Ex. 29 at 182. Dr. Floreani testified that this was part of her practice: "if [she] didn't have orders on someone, they wouldn't need [her] progress note." Ex. 29 at 167. Dr. Floreani further testified that her supervisor, Dr. Leven, never told her that she needed to create documentation regarding all clinical interactions with patients. *Id.*

96.      Dr. Floreani testified pursuant to her typical practice, she would have completed the portions of the note for Mr. Curtis's history of present illness and mental status exam simultaneously with her encounter with Mr. Curtis. *Id.* at 182-183. But other portions of her note, including the narrative summary and DSM psychiatric diagnosis and plan, would be completed afterward. Ex. 29 at 132-139, 182-187. Dr. Goldman testified that such a practice is inappropriate and obstructive to continuity of care. Ex. 19 at 118-120.

97.      Dr. Floreani agreed that her progress note contained several errors regarding her encounter with (or subsequent conversations about) Mr. Curtis, including: (1) that she wrongly noted that Mr. Curtis had not been on crisis watch since his last encounter with psychiatry, Ex. 29 at 188; (2) that she wrongly marked that "recent laboratory results" had been reviewed, *id.* at 204-207; Ex. 1 at IDOC234; (3) that the "chief complaint" noted simply "f/u [follow up]," Ex. 29 at 189-190; Ex. 1 at IDOC234; (4) that she wrongly indicated that Mr. Curtis's psychiatric condition was "considered chronic and [he] has been psychiatrically stable on the same psychotropic medications at the same dose and has not been on crisis watch for the past 60 days[,]" Ex. 29 at 220; Ex. 1 at IDOC239; and (5) that, despite her note to the contrary, she did not review any medication changes with Mr. Curtis, Ex. 1 at IDOC239; Ex. 29 at 221. And Dr. Floreani's note

-46-

indicates absolutely no justification for her decision not to put Mr. Curtis on any medications on September 4. Ex. 1 at IDOC234-239; Ex. 28 at 1.

98.    At approximately 1:30 p.m. on September 5, Nurse Tripp (the nurse in the North 2 infirmary) noted that Mr. Curtis had been given "PRN Ativan injection per MD Goldman." Ex. 1 at IDOC130; *see also id.* at IDOC333 (noting that the nurse was staffed in the North 2 infirmary). There is no indication in the medical note, or anywhere else in the record, as to whether Mr. Curtis was offered an oral dose of Ativan and what, if any, response he had. *See* Ex. 1 at IDOC130. There is also no indication of Mr. Curtis's current appearance or presentation. *Id.* To the contrary, the only mentions of Mr. Curtis's condition is a reference to the "episode of 'unresponsiveness'" that had occurred several hours earlier. *Id.* And although Nurse Tripp's progress note includes an incomplete set of vital signs, a reasonable jury could determine that those vitals were taken earlier that morning, when Sergeant Jones saw her taking vital signs (before calling a Code 3), because those vital signs are not reflected anywhere else in Mr. Curtis's medical records. *See generally* Ex. 1; Ex. 36 at 21. Such an inference is especially appropriate given that Nurse Tripp's single progress note appears to cover both of her encounters with Mr. Curtis. Ex. 1 at IDOC130.

99.    Regardless of the time that Nurse Tripp took Mr. Curtis's vital signs, they do not include a temperature reading for Mr. Curtis. *Id.* In fact, there is no record of any staff member at Menard assessing Mr. Curtis's temperature at any point after he returned from the Hospital on the morning of September 1. *See* Ex. 1 at IDOC122-130. This is despite the fact that Mr. Curtis's records from the Hospital indicate that his temperature was elevated throughout his admission, including at discharge, *id.* at IDOC161-165, and even though Dr. Floreani testified that a patient's temperature is an important indicator of malignant catatonia, which she admitted is an emergent medical condition that requires very close monitoring. Ex. 29 at 115-117, 225.

100.    Dr. Cockerill explained that malignant catatonia, formerly known as "lethal catatonia" is the most serious type of catatonia, which involves abnormal vital signs, including heart rate, blood pressure, and temperature. Ex. 5 at 14. Mr. Curtis was observed to have all three types of abnormal vital signs in the days before his death. *See, e.g.,* AA at IDOC161 (elevated temperature and blood pressure), IDOC234 (elevated pulse). Dr. Cockerill opined that, if left untreated, malignant catatonia "progresses rapidly and may result in death within days." Ex. 5 at 14.

101.    At a 2 p.m. mental health meeting led by Dr. Leven, staff acknowledged that Mr. Curtis was "really dehydrated[.]" Ex. 42 (Sept. 5, 2018 Mental Health Meeting Minutes) at IDOC1994. There is no indication, however, that Dr. Leven or anyone else made any plan to address the severe dehydration. *Id.*

102.    Following the Ativan injection around 1:30 p.m., Mr. Curtis received no further evaluations or treatment from medical or mental health staff. *See generally* Ex. 1. Sometime after 6 p.m., nursing staff were summoned for Mr. Curtis, who was not breathing.[6] *Id.* at IDOC134-135. Mr. Curtis was brought to the North 2 infirmary, where he was determined to have no pulse. *Id.* An ambulance was eventually called and the paramedic who arrived declared Mr. Curtis's time of death at 6:37 p.m. *Id.* at IDOC137.

103.    At no point prior to his death was Mr. Curtis ever evaluated or treated for dehydration, even though the primary treatment—administration of intravenous fluids—presents a very low risk of complications. *See generally* Ex. 1; Ex. 12 at 136-137; Ex. 31 at 80-85.

---

[6] There are additional events that occurred after the Ativan injection but before Mr. Curtis's death that are relevant to the IDOC Defendants' summary judgment motions. But because they are not relevant to the Wexford Defendants' motion, Plaintiff does not include them as part of this response.

104.    Mr. Curtis's blood and urine samples were not delivered to the lab for testing until approximately 8 a.m. on the morning after his death. Ex. 1 at IDOC308-313. The results revealed that Mr. Curtis had a critically high level of sodium. *Id.* at IDOC310. An elevated sodium level—and particularly, a critically elevated level of sodium—is definitionally indicative of dehydration, as it shows that a patient's fluid level is abnormally low compared to the amount of sodium within their blood. Ex. 51 at 6 (noting that a certain sodium level "is considered dehydration"); Ex. 29 at 251. When lab results are "critical," lab staff will call a provider at Menard immediately to notify them of the result. Ex. 12 at 144-145. Unfortunately for Mr. Curtis, because the labs were not ordered "stat," the call came too late—he had already died. Ex. 1 at IDOC310; Ex. 2.

105.    Mr. Curtis also had elevated levels of blood urea nitrogen (BUN), chloride, creatinine, and protein, all of which are associated or consistent with severe dehydration. Ex. 29 at 251-252; Ex. 12 at 48. Indeed, Mr. Moldenhauer testified that an elevated creatinine and BUN level in a patient indicates that dehydration has "been going on for a while[.]" Ex. 12 at 48.

106.    Mr. Moldenhauer admitted that had he been notified of Mr. Curtis's lab results before Mr. Curtis died, he would have sent Mr. Curtis to the emergency room for treatment. Ex. 12 at 147-148. He also admitted that Mr. Curtis "needed to be watched" and "need[ed] to have some fluids." *Id.* at 147.

107.    Dr. Goldman testified that she left Menard shortly after Mr. Curtis's death because, among other reasons, the events that had occurred were "highly concerning" and "heavily impacted" her. She believed that she was taking action on September 5 to save Mr. Curtis's life, and her efforts were ignored. Ex. 19 at 15-16, 60-61, 210. Dr. Goldman did not believe that she could continue working at the prison in good conscience. *Id.* at 60-61.

**Mr. Curtis's Autopsy and Post-Mortem Testing**
**Indicates Death from Severe Dehydration**

108.    Mr. Curtis's autopsy was conducted on September 7, 2018. Ex. 43 (Autopsy) at

P239. Dr. Kamal Sabharwal, the forensic pathologist who conducted Mr. Curtis's autopsy, testified

that as part of the autopsy, he observed that Mr. Curtis had arteriosclerotic cardiovascular

disease—a chronic condition that reflects a buildup of plaque on the walls of the arteries. Ex. 44

(Kamal Sabharwal Dep.) at 22-26; Ex. 43 at P244. Dr. Sabharwal specified that Mr. Curtis had

two arteries with significant plaque buildup: the right coronary artery and the left anterior

descending coronary artery, both of which had 75 percent blockage. Ex. 44 at 22-26; Ex. 43 at

P240-241. Dr. Sabharwal also collected blood, urine, and vitreous fluid samples from Mr. Curtis's

body, among others. Ex. 44 at 28-30; Ex. 43 at P242. He then sent those samples to St. Louis

University for toxicological testing, which is something Dr. Sabharwal does in every case. Ex. 44

at 45-47; Ex. 43 at P242.

109.    The St. Louis University Forensic Toxicology Laboratory tested Mr. Curtis's blood

and urine samples for a wide range of pharmaceuticals and illicit drugs. Ex. 43 at P246-251. The

blood samples were negative for all tested compounds, except for lorazepam (Ativan), which was

present at 19 nanograms/mL, a concentration that is "quite low." *Id.* at P246; Ex. 45 (Sarah Riley

Dep. Pt. I) at 33, 45. The lab also tested Mr. Curtis's urine sample and detected some additional

compounds, including acetaminophen, diphenhydramine, pseudoephedrine, tramadol,

venlafaxine, and O-desmethylvenlafaxine (a metabolite of venlafaxine). Ex. 43 at P246; Ex. 45 at

35. There was no particular concentration of those compounds reported from the urine sample

because, as Dr. Sarah Riley—a forensic toxicologist and director of the SLU lab who certified Mr.

Curtis's toxicological report—testified, her lab "does not report concentrations in urine, because

the concentrations in urine are more or less useless." Ex. 45 at 33-34. Specifically, the fact that

these drugs were detected in Mr. Curtis's urine sample provides no information about when the drugs were introduced into the body or at what quantity, and whether the individual ever experienced any effect from the drug (referred to by Dr. Riley as "impairment"). *Id.* at 34; *see also id.* at 14. The lab also tested Mr. Curtis's blood samples for these same drugs, all of which were negative. *Id.* at 34-35. Dr. Riley testified that she could accordingly conclude from the toxicological testing that there was no acute toxicity of any of these drugs at the time of Mr. Curtis's death—i.e., he was not experiencing any adverse effect from them. *Id.* at 34-35.

110.    Mr. Curtis's vitreous sample was sent to MedTox Laboratories for electrolyte testing. Ex. 43 at P252; Ex. 45 at 49. The results indicated elevated levels of sodium, potassium, chloride, urea nitrogen, and creatinine. Ex. 43 at P252; Ex. 44 at 37-38. Dr. Sabharwal testified that the levels of sodium, chloride, and urea nitrogen were severely elevated, indicating potential dehydration and even severe dehydration. Ex. 44 at 38-41. Notably, these results were consistent with the lab results from Mr. Curtis's September 5 lab test, which also revealed elevated levels of sodium, chloride, urea nitrogen, and creatinine (among other abnormal results not tested in the post-mortem vitreous testing). Ex. 1 at IDOC313.

111.    A blood and urine sample for Mr. Curtis was also sent to the University of California at San Francisco Clinical Laboratory at the Zuckerberg San Francisco General Hospital for untargeted toxicological analysis. Ex. 43 at P247; *see also* Ex. 45 at 37 (explaining that the samples were sent to the UCSF lab because that labs performs untargeted analysis). Dr. Kara Lynch, an analytical toxicologist and the director of the UCSF lab, testified that untargeted toxicological analysis is a type of toxicological testing that is not limited to particular compounds (like the testing done at SLU) but instead identifies all small molecules within a specimen that fall within a certain atomic mass, whether or not those molecules are identified or not. Ex. 46 at 15-

16; *see also* Ex. 45 at 37-38. That range of atomic masses will "cover plasticizers and drugs and illicit drugs, pharmaceutical drugs, small molecules from plants, small molecules from our food, all of that." Ex. 46 at 81.

112.    Although the testing was untargeted, the analysis performed by Dr. Lynch and others in her lab to identify the resulting compounds was suspect analysis—i.e., looking only to see whether a particular category of compounds were present among the total compounds returned following the testing. Ex. 46 at 41-42. In this case, the suspect analysis was for synthetic cannabinoids. *Id.* Dr. Lynch testified that this was per Dr. Riley's request. *Id.* at 42.

113.    Dr. Riley testified that she sent the samples to the UCSF lab and asked Dr. Lynch to look for synthetic cannabinoids because of a request by her client, Carlos Barbour, the Randolph County Coroner, who had specifically asked about whether toxicological testing could detect synthetic cannabinoids. Ex. 45 at 32, 36. A reasonable jury could conclude that Mr. Barbour posed that question to Dr. Riley based on a request from Wexford, which was communicated to Mr. Barbour by Dr. Roderick Matticks, a Regional Medical Director for Wexford. Ex. 47 (Sept. 2018 Emails Re Tox Screens) at 2. Specifically, an email exchange between Dr. Matticks and Dr. Neil Fisher, a Corporate Medical Director for Wexford, indicates that Dr. Fisher first raised the possibility of synthetics on September 10, 2018. *Id.* In a response sent that same day, Dr. Matticks stated that he "spoke either [*sic*] the Randolph Count[y] coroner," who he reported "will pay special attention to our concerns and were appreciative of our concerns." *Id.* Dr. Fisher responded, thanking Dr. Matticks for his "follow-thru with the Coroner." *Id.* at 1.

114.    The suspect analysis conducted by Dr. Lynch and her staff was inconclusive for synthetic cannabinoids in Mr. Curtis's urine—the preferred specimen for identification of synthetic cannabinoids. Ex. 43 at P247. Dr. Lynch explained that to identify a particular molecule

as a particular known compound, the molecule should: (1) have the same molecular formula as the known compound, (2) have the same retention time as the known compound, and (3) have the same fragmentation pattern—i.e., spectra—as the known compound. Ex. 46 at 19-20; *see also* Ex. 45 at 19-20 (explaining that the spectra refers to a particular molecule's pattern of fragmentation). The match of spectra, or a spectral match, is by far the most accurate way to identify a compound, and at the UCSF lab, accounts for 70 percent of the score needed to determine whether a compound can be identified. Ex. 46 at 20-23. Dr. Lynch explained that it is not reliable to identify a compound without a spectral match. *Id.* at 19-23; *see also* Ex. 45 at 22.

115.    There were no spectral matches made between Mr. Curtis's urine specimen and any synthetic cannabinoids. Ex. 43 at P247. And although there were several molecular weight matches made to synthetic cannabinoids and synthetic cannabinoid metabolites, both Drs. Lynch and Riley testified that this is a non-specific finding. Ex. 45 at 23; Ex. 46 at 32-33. Dr. Lynch explained that molecular weights, or molecular formulas, can be shared by 400-700 different compounds. Ex. 46 at 37-39, 70-71, 90-91; *see also id.* at 46 ("typically, those formulas have at least multiple compounds that have been identified as having that formula, either in metabolite form or in parent molecule form"). The spectra, by contrast, is "usually very distinct to the compound" and is "like a fingerprint" for a compound. Ex. 46 at 32-33, 129. Dr. Lynch testified that a result like Mr. Curtis's is "just not – not uncommon when you search a big list of masses against like a specimen that's been run" because "when we do suspect analysis, there's always hits" for mass matches. *Id.* at 90-92; *see also id.* at 96-97 (testifying that she tends to just look at the spectral matches currently because "[i]f you take a list of 100 formulas" and you "search them against specimens, you're going to get mass matches. So I would say, in general, this is not an uncommon finding if I were to do this analysis on 100 specimens.").

116.    The fact that the untargeted analysis of Mr. Curtis's urine sample yielded multiple compounds that could not be identified is also not surprising. Ex. 46 at 37. To the contrary, Dr. Lynch testified that it was common for an average blood or urine sample to have a combination of identifiable compounds and unidentifiable compounds. *Id.* at 37, 48-49. Dr. Lynch could not even determine whether or not the compounds identified in Mr. Curtis's urine sample were endogenous (originating from within Mr. Curtis's body) or exogenous (originating from outside of Mr. Curtis's body). *Id.* at 18, 75-78, 124-125. And she could not rule out the possibility that the compounds were from some environmental cause, such that all prisoners in the environment would have the same compounds in their urine. *Id.* at 127-129. Notably, Dr. Riley testified that one of the "hallmarks" of synthetic cannabinoid intoxication is low potassium, Ex. 45 at 55-56, which is inconsistent with Mr. Curtis's post-mortem electrolyte levels, which showed an elevated potassium level. Ex. 43 at 252; Ex. 44 at 37-38.

117.    In the fall of 2023, Dr. Lynch reanalyzed the results of Mr. Curtis's urine sample, comparing it against an expanded library of synthetic cannabinoids at the UCSF lab, which contains approximately 100-150 synthetic cannabinoids. Ex. 46 at 60, 69-70; Ex. 48 (Sept. 22, 2023 Email from Dr. Lynch). She did not identify any synthetic cannabinoids. Ex. 46 at 59-60. And in January 2023, Dr. Riley retested Mr. Curtis's blood and urine samples and compared the results with all of the synthetic cannabinoids in the library at the SLU lab. Ex. 49 (Sarah Riley Dep. Pt. II) at 31-32. Dr. Riley also sent the test results to the Center for Forensic Science, Research and Education, which has a more robust library of synthetic cannabinoids. *Id.* at 28-29. Neither the SLU lab nor the Center for Forensic Science, Research and Education found a match to any synthetic cannabinoid. *Id.* at 31-32.

118.    Dr. Sabharwal testified that he did not observe anything at autopsy that indicated a death from intoxication. Ex. 44 at 35, 70. Nevertheless, Dr. Sabharwal listed "Probable Intoxication with Unknown Substance" as Mr. Curtis's primary cause of death. Ex. 43 at P244. He testified that he did this because of Dr. Riley's toxicology report, which was inconclusive as to whether or not Mr. Curtis's blood and urine specimens had synthetic cannabinoids, or even intoxicants of any sort (sufficiently present to cause acute toxicity). *Id.* at P247; Ex. 44 at 95-96; Ex. 46 at 18, 75-78, 124-129. Dr. Sabharwal admitted that it was unusual for him to include the word "probable" in a cause of death determination. Ex. 44 at 149. He also admitted that he did not have any idea as to the substance that he believed caused Mr. Curtis's purported "probable intoxication." *Id.* at 80.

119.    Dr. Sabharwal did include Mr. Curtis's abnormal vitreous results among his pathologic findings. Ex. 43 at P244. But he testified that he would not conclude that Mr. Curtis died from dehydration unless he could rule out every other potential cause of death. Ex. 44 at 41-42. He admitted, however, that the arteriosclerotic cardiovascular disease and dehydration could have independently caused Mr. Curtis's death. *Id.* at 43. And he could not say, one way or the other, whether Mr. Curtis would have survived if he had been provided treatment for his dehydration or catatonia. *Id.* at 96. Mr. Barbour testified that he completed Mr. Curtis's death certificate, listing "Probable Intoxication with Unknown Substance" as the cause of death based solely on Dr. Sabharwal's autopsy report. Ex. 50 (Carlos Barbour Dep.) at 30-31.

120.    Dr. Francisco Diaz, Plaintiff's retained forensic pathologist, after a thorough review of several relevant medical records, deposition transcripts, and other evidence in the case, opined to a reasonable degree of medical certainty that Mr. Curtis's cause of death was dehydration. Ex.

51 (Dr. Diaz Expert Report) at 7.[7] Dr. Diaz explained that the level of sodium in Mr. Curtis's vitreous sample was above 155 mEq/L—it was 161 mEq/L—which is considered dehydration. *Id.* at 6. Dr. Diaz noted that electrolyte levels like sodium decrease up to 2 mEq/L per day, and so given that Mr. Curtis's vitreous sample was analyzed nine days after his death, it was "safe to surmise that the levels of sodium in [Mr. Curtis's] vitreous [sample] were significantly higher at the time of death[.]" *Id.* at 6-7; *see also* Ex. 43 at P252. Dr. Diaz further opined that it was "erroneous" for Dr. Sabharwal to ascribe a death to a probability of intoxication with an unknown substance "when there is no result to match a substance that when circulating in the blood can produce death." Ex. 51 at 6. Dr. Diaz also criticized Dr. Sabharwal's testimony that a death should be ascribed to dehydration only if every other possible cause is ruled out because "its diagnosis can be demonstrated beyond a doubt with laboratory studies" that "left no room for speculation." *Id.* at 7. Death from an "unknown substance" on the other hand "is truly a diagnosis of exclusion." *Id.* As for synthetic cannabinoids, Dr. Diaz explained that "there are thousands of synthetic cannabinoids and only a handful have been associated with irregular rhythms of the heart." *Id.*

### A Death Review of Mr. Curtis's Death, Conducted by IDOC Medical Staff, Concluded that Mr. Curtis's Care Was Inadequate

121.    In October 2018, an IDOC Mortality Review Committee—which included the IDOC's current Agency Medical Director, Dr. Steve Meeks, the IDOC's Deputy Agency Medical Director, Dr. Steven Bowman, and other members of the IDOC's Office of Health Services— conducted a review of Mr. Curtis's care. Ex. 52 (Mortality Review Comm. Meeting Minutes) at

---

[7] The Wexford Defendants have moved to exclude Dr. Diaz from testifying in this case. *See generally* Dkt. 219. Contemporaneously with this response, Plaintiff is submitting a separate response to that motion, setting forth her arguments in support of Dr. Diaz's qualifications and opinions in this matter. Accordingly, Plaintiff does not detail Dr. Diaz's extensive qualifications and foundation for his opinions in her Statement of Additional Facts, and instead refers the Court to her response to the Wexford Defendants' Motion to Bar Dr. Diaz.

P5014-5015; *see also* Ex. 53 (Angela Crain Dep.) at 29, 188. Prior to the meeting, one of the members of the committee—likely Mary Klein, who was the Southern Regional Coordinator for OHS—completed a "Taxonomy for Mortality Reviews" for Mr. Curtis. Ex. 54 (Taxonomy Worksheet) at P15416; *see also* Ex. 52 at P5015; Ex. 53 at 188. In the worksheet, Ms. Klein flagged in the section for "failure to recognize, evaluate, and manage important symptoms and signs – so called 'red flags'" that Mr. Curtis had labs drawn on September 5 that were not sent stat, resulting in results that were not reported until after Mr. Curtis's death. Ex. 54 at P15416. In the section for "failure to follow clinical guidelines or standards of care," Ms. Klein noted that no vital signs were ever taken after he returned to Menard "although it is noted at times that his mental status was altered." *Id.* And in the section for "delay in access to the appropriate level of care, including off-sit[e] consultation access[,]" Ms. Klein noted that Mr. Curtis "with altered mental status was not sent for eval nor were labs sent to local hospital." *Id.* The Taxonomy Worksheet form notes that it is "intended for review of the Agency Medical Director who will make the determination of appropriateness of care." *Id.*

122.    During the Mortality Review Committee meeting, Dr. Meeks noted that "the system issues were the major problem of the case." Ex. 52 at P5015. After a taxonomy review, the minutes reflect a conclusion that "[m]ental illness is often seen as a deception by an inmate. In Curtis' case something was clearly wrong." *Id.*; *see also* Ex. 85 (Sept. 6, 2018 Email from Agency Medical Coordinator Kim Hugo) at 1 ("I want to know why an offender who didn't come out of his cell for three days, required assistance into an exam room with significant psychomotor retardation, was largely unresponsive to verbal prompts, demonstrated echolalia . . . maintained a mundane posture . . . with fixed gaze and motiveless response to instructions, dehydrated, and tachycardic was put in a crisis cell instead of the infirmary."). In his report, Dr. Cockerill agreed, opining that "labelling

Mr. Curtis's behavior as 'volitional' led providers to view him as a 'difficult patient' rather than a severely ill one in need of emergency care." Ex. 5 at 24. Dr. Cockerill concluded that this likely contributed to the inadequate treatment he received in the days before his death. *Id.*

### Dr. Siddiqui Oversaw a Widespread Practice at Menard Whereby Medical and Mental Health Staff Were Siloed and Did Not Communicate

123.     Although Dr. Siddiqui was not onsite at Menard during Mr. Curtis's crisis and eventual death, he testified that he was still on call and could be reached by members of the medical staff so long as he was in the country. Ex. 56 at 54-55. And regardless of Dr. Siddiqui's availability on any particular day, he oversaw and was responsible for a widespread practice whereby medical and mental health staff did not communicate with each other, even when such communication was obviously necessary to ensure minimally adequate patient care. Ex. 10 at 52. Pursuant to the contract between Wexford and the IDOC, Dr. Siddiqui, the Medical Director at Menard, was the "medical authority" who had responsibility to "operate the medical and mental health program" at Menard, "in accordance with accepted standards of medical practice." Ex. 8 at P4725 (Section 2.4.1.12). Dr. Siddiqui was further required to "plan, implement, direct and control all clinical aspects of the medical and mental health program." *Id.*

124.     Dr. Goldman testified that Dr. Siddiqui was resistant to collaboration between medical and mental health staff, and that he "would often say that the medical and mental health have nothing to do with each other" and that patients were instead "just trying to be manipulative and get into healthcare." Ex. 19 at 136. His resistance to a collaborative approach was so extreme that Dr. Goldman testified she eventually "stopped trying to interact with him because [she] knew the response [she] would get wouldn't be a collaborative approach." *Id.* at 136-137.

125.     Dr. Siddiqui himself admitted to this siloed practice at Menard, testifying that the "established system" in place at Menard regarding communication between medical and mental

health staff was simply: "If you are a medical doctor, you look after medical issues, and if you are [a] psychiatrist or mental health [provider,] you look after mental health issues." Ex. 56 at 25-26; *see also id.* at 39 ("Q. Is it fair to say that you were siloed off from . . . the mental health professionals at Menard, right? A. Mental health was their own – it was their own department, their own directors."). Dr. Siddiqui admitted that he did not communicate with mental health staff, did not attend any daily mental health meetings, and did not even know that mental health staff held daily meetings. *Id.* at 29-32.

126. Dr. Goldman testified about why it is important for medical and mental health staff to work collaboratively: "Multiple medical and mental health symptoms will overlap. And I am trained to observe medical symptoms that could be related to a mental health issue because they overlap." Ex. 19 at 143. As Dr. Goldman explained, "mental health issues are medical issues." *Id.* And when it comes to conditions like catatonia—which can have both a medical and mental health etiology—the importance of medical and mental health staff to communicate and collaborate is "critical." *Id.* at 206. Dr. Siddiqui similarly admitted that coordination between medical and mental health staff is important, and a lack of communication between medical and mental health staff "is potentially dangerous[.]" Ex. 56 at 35, 38.

127. Yet staff at Menard repeatedly testified that the functions were siloed, including Mr. Moldenhauer, who testified that as a medical provider, he did not "have much to do with crisis watch" and had never even been to the crisis watch unit. Ex. 12 at 36, 174. Dr. Siddiqui testified that crisis watch "was meant for psychiatrists" and it was "not often" that a member of the mental health staff would ask a member of the medical staff to visit someone on crisis watch. Ex. 56 at 40-41. And although Dr. Floreani was assigned as the psychiatrist—a medical doctor—for patients on crisis watch, she could not recall attending any interdisciplinary meetings with any members of

the non-mental health medical staff. Ex. 29 at 101, 108; *see also* Ex. 58 (Menard Telepsych Q&A Email) at 2-3. Instead, Dr. Floreani described the medical and mental health systems at Menard as "very separated" and said they "rarely communicated about a patient[.]" Ex. 29 at 257.

128.    Indeed, Dr. Floreani testified that, although outside the correctional setting, she was able to prescribe any type of medication she deemed necessary, psychiatrists had "a very strict role" and "certain medicines that [they] did not have access to at Wexford." Ex. 29 at 90-91; *see also id.* at 286 ("I could not order a medicine that was medical for medical problems, to manage medical problems."). Dr. Floreani explained that as a staff psychiatrist, she was only permitted to prescribe the medications that appeared on a list provided to her by Wexford. *Id.* at 91-92. Among other medications, Dr. Floreani was "95 percent certain" that IV fluids were not a class of medications Wexford permitted her to prescribe. *Id.* at 92. A document titled, "IDOC Formulary June 2018," indicates that there are 26 medications listed under the section titled, "Mental Health." Ex. 59 (2018 Formularies) at Jackson-Formularies 8-9. But neither the IDOC Formulary nor the IDOC mental health policies in place at Menard note any restriction on a Wexford psychiatrist's ability to prescribe formulary medication for medications listed in other sections of the formulary. *See id.* at Jackson-Formularies 1-30; *see also generally* Ex. 9. A reasonable jury could accordingly infer that the policy prohibiting psychiatrists like Dr. Floreani from prescribing non-mental health formulary medication was Wexford's policy, and not the IDOC's policy. Notably, IV fluids are not within the 26 medications listed under the "Mental Health" section of the formulary. Ex. 59 at Jackson-Formularies 8-9.

129.    Dr. Siddiqui testified that Wexford did not provide him any sort of formal or informal training on communications between medical and mental health staff, and he knew of no policy that governed such communications. Ex. 56 at 21, 24.

**Dr. Siddiqui Encouraged and Actively Participated in a**
**Widespread Practice of Inadequate Documentation at Menard**

130.    Dr. Herrington opined that Mr. Curtis's IDOC medical records reflected "grossly inadequate and incomplete documentation" by both medical and mental health staff, "which impacts continuity of care." Ex. 10 at 20. Again, as Medical Director at Menard, Dr. Siddiqui was responsible for controlling "all clinical aspects"—including documentation—"of the medical and mental health program." Ex. 8 at P4725.

131.    A reasonable jury could infer that Dr. Siddiqui actively participated in and encouraged a culture of inadequate documentation at Menard, as Dr. Siddiqui admitted that it was both his practice and a widespread practice at Menard to sign things without reviewing them— what Dr. Siddiqui called "trust[ing] each other." Ex. 56 at 65-66. For example, when Dr. Siddiqui was shown a copy of an investigational interview that the IDOC investigator investigating Mr. Curtis's death prepared regarding a statement from Dr. Siddiqui, Dr. Siddiqui testified that he signed the document without reviewing it because "it is a trust. Whoever prepared, I trust it and I signed it." Ex. 56 at 64; *see also* Ex. 55 (Dr. Siddiqui Investigational Interview) at P317-318.

132.    Those who worked under or alongside Dr. Siddiqui recalled a system in which medical records could not be trusted to contain timely, truthful, or even legible information. For instance, Dr. Leven testified that nursing notes were not "always available the same day they were written." Ex. 20 at 125. Gail Walls testified that the illegibility of Menard's handwritten medical records required continuous corrective action. Ex. 66 at 65. And—as Mr. Curtis's case illustrates, *see generally* Ex. 38—much of the critical communication between Wexford providers (or between Wexford and IDOC staff) regarding a patient's treatment occurred in email threads that were inaccessible or otherwise absent from a patient's records.

133.    Dr. Shane Reister, IDOC's Rule 30(b)(6) designee for policies and practices related to patients with serious mental illness, testified that issues regarding documentation of mental health notes "occurs on a regular basis," and that inadequacies include when the documentation is not sufficiently "informative." Ex. 101 (Dr. Shane Reister Dep. Pt. I) at 26.

134.    Moreover, as Dr. Floreani admitted during her deposition, practitioners at Menard regularly altered or supplemented records post hoc. Ex. 29 at 178 (admitting that she "decided rather than to create a new record to just edit the record that [she] had started the day before"); *see also id.* at 182. Dr. Floreani testified that this was part of her practice: "if [she] didn't have orders on someone, they wouldn't need [her] progress note." *Id.* at 167. Dr. Floreani further testified that her supervisor, Dr. Leven, never told her that she needed to create documentation in such circumstances. *Id.*

135.    According to Dr. Cockerill, Dr. Floreani's deposition "revealed that poor documentation was routine practice at Menard." Ex. 5 at 26. All physician-patient encounters, he opined, "should be fully documented in a progress note." *Id.* at 26. Yet Dr. Floreani testified that this was not her practice. Ex. 29 at 72. This is particularly problematic when, as was the case at Menard, the only means of communicating between practitioners in different specialties is the consult notes themselves.

136.    Dr. Cockerill identified a "pattern of incomplete, inaccurate, and untimely documentation" at Menard. Ex. 5 at 25. For example, nursing notes in Mr. Curtis's Menard medical record *typically* lacked "discrete, specific subjective and objective data and a clear assessment and plan." *Id.* According to Dr. Cockerill, such barebones records are improper because providers reading such notes would lack basic background information about the patient in question, "limiting their ability to provide adequate care." *Id.*

**Wexford Intentionally Chose Not to Implement an Adequate Continuous
Quality Improvement Program Within the IDOC**

137.    The contract between the IDOC and Wexford required Wexford to "have a Quality Improvement Program" which included, at a minimum, "audit and medical chart review procedures" as well as a quality improvement committee, and "[a] monthly Medical and Mental Health Staff meeting[,]" among others. Ex. 8 at P4783 (Section 7.1.1). The contract further required Wexford to have a "management information system capable of providing statistical data necessary for [Wexford's] self-evaluation and monitoring of health and mental health services." *Id.* at P4784 (Section 7.1.6). As Wexford's Rule 30(b)(6) designee, Nick Little, admitted, when the contract was renewed in 2016, it was amended to additionally include an express requirement that Wexford institute its own continuous quality improvement system. Ex. 111 (2016 Contract Amendment) at P1181-1182; Ex. 115 (Nick Little Dep.) at 54.

138.    Notably, Wexford maintained a "global" written policy for quality improvement, which it admitted it did not put into place within the IDOC. *See generally* Ex. 114 (Wexford Quality Management Program); *see also* Ex. 112 (Defs.' 7th Supp. Resp. to Pl.'s 1st Req. for Prod.) at 3. In that policy, Wexford expressly recognizes that the policy is designed to ensure that "Wexford Health's clinical leadership, from the site level through corporate," meets "the challenges of quality, performance, safety, and timeliness of services provided at its contracted facilities." Ex. 114 at 3. The policy provides that quality improvement efforts would be led by a regional office, which communicates both to the corporate office and to the site level, *id.* at 5-8, and provides for robust practices to assess care at the site level qualitatively, *id.* at 9-14, as well as the effectiveness of the quality management program itself, *id.* at 15. The policy also recognized the importance of "corrective action plans," which, the policy directed, should be overseen by the

regional office, should engage in root-cause analysis, and should be individualized to address each problem or concern. *Id.* at 13.

139.    But as mentioned above, despite expressly recognizing its importance to ensuring quality care, and despite there being no barrier to its implementation, Wexford chose not to implement the policy within the State of Illinois or at any IDOC facilities. *See* Ex. 114 at 3; Ex. 112 at 3. Indeed, IDOC's Rule 30(b)(6) designee, Angela Crain, admitted that the only quality improvement efforts that occurred at Menard were conducted by IDOC, and not Wexford, staff. Ex. 53 at 133-136; *see also id.* at 49 (admitting, as IDOC's Rule 30(b)(6) designee, that Wexford was required to do its own "quality analysis into the care that its staff is producing under the contract"). And Dr. Herrington opined that Wexford's "mere participation in another entity's quality improvement efforts" was "unlikely to be effective" in identifying or improving deficiencies in its delivery of care. Ex. 10 at 49-50.

140.    Wexford did appear to conduct "scorecard audits" at Menard on an inconsistent basis, and Wexford's "global" policy did provide for a procedure called "Scorecard Review." Ex. 114 at 12. Under that policy, Wexford is required to use checklists—"scorecards"—based on national standards, that target "high risk, high volume, and problem-prone areas" across various areas of healthcare delivery. *Id.* A percentage is computed to reflect compliance in those various areas. *Id.* According to the policy, if the computed percentages fall below a 90% compliance threshold, corrective action is required to be taken, and if the percentage falls below an 85% compliance threshold, a member of the "Corporate Quality Management Team" must be contacted for assistance. *Id.*

141.    The scorecard audits that Wexford completed at Menard routinely fell below the 90% compliance, including at least one instance where the audit fell below an 85% compliance

threshold. *See e.g.,* Ex. 103 (Apr. 8, 2014 Scorecard Audit) at 4 (89.58%); Ex. 104 (July-Sept. 2015 Scorecard Audit) at 4 (84.00%); Ex. 105 (Jan.-Mar. 2016 Scorecard Audit) at 4 (88.24%). But because Wexford never put its quality-improvement program into action in Illinois, it never took corrective action, Ex. 114 at 3; Ex. 112 at 3, despite the clear evidence on the scorecards— via Wexford's own monitoring system—that corrective action was needed. See Ex. 114 at 12 (stating when corrective action is needed); Ex. 103 at 4; Ex. 104 at 4; Ex. 105 at 4.

142.    This failure to engage in meaningful efforts toward continuous improvement extended to Wexford's treatment of custodial deaths. According to Dr. Herrington, morbidity and mortality reviews typically provide "a picture of causal events and linkages where gaps in quality or access occurred and where interventions can be planned and implemented." Ex. 10 at 49. Yet Wexford's mortality and morbidity reviews, as Dr. Herrington concluded, bore none of those qualities.

143.    Per Wexford policy, Dr. Siddiqui was responsible for preparing death summaries for each death at Menard. Ex. 113 (Death Review Policy) at 41-42. Yet despite his central role in reviewing deaths at Menard, Dr. Siddiqui was not aware of a single step Wexford had taken at any point following a death at Menard during his tenure to rectify any mistakes that may have occurred. Ex. 56 at 109. In fact, Dr. Siddiqui testified that he played "no part" in mortality reviews or in postmortem policy revisions. *Id.*

144.    Similarly, Angela Crain testified that she could not recall any instance in which Wexford altered its practices in response to a patient's death. Ex. 53 at 138–39 ("Q: And we talked earlier about Wexford['s] responsibility to conduct [death] evaluations. Did you ever see Wexford make any changes to any of its practices at Menard in response to the death of an incarcerated individual? A: Not that I'm aware of."). Nor could Crain recall any instance in which Wexford

altered its practices in response even to ongoing litigation, including *Lippert* and *Rasho*. *Id.* at 134–37, 146–47.

145.    Dr. Herrington ultimately opined that Wexford's mortality-review processes—exemplified by Dr. Siddiqui's total ignorance and remove—simply were "not good enough" to prevent future deaths. Ex. 10 at 50.

### Other Problematic Practices at Menard That<br>Deprived Patients Like Mr. Curtis of Adequate Care

146.    Dr. Goldman testified that the mental health caseload at Menard was "very high" and included approximately 200 patients per mental health staff member. Ex. 19 at 91-92. By contrast, at Alton Mental Health Center—an inpatient mental health facility for individuals adjudicated unfit to stand trial or not guilty by reason of insanity—where Dr. Goldman worked at the time of her deposition, mental health staff had no more than 15-16 patients on their caseload. *Id.* at 92.

147.    Dr. Goldman testified that Wexford had no process in place by which patients could be referred offsite for a higher level of care for their mental health needs. Ex. 19 at 100. And the IDOC's Rule 30(b)(6) designee, Dr. Shane Reister, confirmed that only the "medical team" could decide to transfer a patient offsite, even in an emergency. Ex. 101 at 116; Ex. 102 (Dr. Shane Reister Dep. Pt. II) at 33, 37.

### Dr. Herrington's Review of Other Patients Who Died in<br>IDOC Custody Reflects a Widespread Practice of Inadequate Care<br>and an Abject Lack of Continuity of Care

148.    Dr. Herrington reviewed multiple years of medical records for 11 other patients who, in addition to Mr. Curtis, died in IDOC custody while purportedly under Wexford's care. Ex. 10 at 21-48. In each case, Dr. Herrington found that Wexford provided inadequate care. *Id.*

149.    **D.P.** D.P. died in Dixon Correctional Center at 24 years old in 2017 from an upper gastrointestinal bleed caused by ingestion of two sporks. *Id.* at 21. In July 2017, D.P. was seen swallowing a spork. *Id.* at 22. Rather than immediately communicate with a provider about the obvious medical emergency that D.P. was facing, nursing staff simply noted that D.P. would "have no complications from swallowing a foreign object" and made no attempts to inform a provider until the following day. *Id.* D.P. was on a continuous watch; three days after ingesting the spork, D.P. declared a hunger strike because "no one cares about the spork I swallowed." *Id.* D.P. complained to nurses of abdominal pain nine days later, but no provider was noted and staff did not even conduct an abdominal examination. *Id.* In early October, D.P. reported to a provider that he had swallowed sporks "a long time ago." *Id.* Yet there was no plan of care. On October 20, D.P. was seen by nursing staff for abdominal pain that was made worse by eating and pain upon palpation of the abdomen. *Id.* Although nursing staff documented the prior ingestion of sporks, there was no communication with a provider about D.P.'s obviously emergent symptoms. *Id.* Instead, he was simply told to return to sick call if his symptoms persist or worsen. *Id.* He died the next morning. *Id.*

150.    Notably, D.P.'s medical records indicate that he had been prescribed risperidone, among other psychotropic medications, but toxicological testing showed that he had no antipsychotic medication in his system at the time of his death. *Id.* at 22-23. Dr. Herrington explained in detail how D.P.'s care was inadequate and reflected a failure to communicate and provide continuity of care. *Id.* at 22-24.

151.    **D.E.** D.E. died in 2016 at the age of 59 from an upper gastrointestinal bleed, mostly likely resulting in sepsis while he was incarcerated in Dixon Correctional Center,. Ex. 10 at 24-25. D.E. had a history of several mental illness. Ex. 10. at 26. Despite abnormal laboratory results

indicating an elevated white blood cell count, and unstable vital signs exhibited by D.E. at 7 a.m. on the morning of his death, D.E. was not sent to a hospital, and no other medical intervention was initiated for hours. Ex. 10 at 25. After vomiting blood, a nurse called a supervisor to receive permission to call a doctor regarding D.E. It was only then that D.E. was sent by ambulance to a hospital; he thereafter was transferred to another hospital, where he died. *Id.*

152.    Dr. Herrington notes several inadequacies in D.E.'s treatment, including the fact he did not continue to receive an essential medication because he was not present in the line during medication pass at Dixon, indicating that Wexford did not coordinate D.E.'s care with his mental-health providers. Ex. 10. at 25. Dr. Herrington also that Wexford did not coordinate D.E.'s specialty care, that nursing staff had to receive authorization simply to contact a physician about D.E. mere hours before his death, and that even after a physician was made aware of D.E.'s unstable vital signs, no immediate interventions were made and D.E. was not immediately sent to a hospital. Ex. 10 at 25-26.

153.    **C.G.** C.G. died at Menard at the age of 30 from primary sclerosing cholangitis, a chronic and progressive liver disease. Ex. 10. at 26-31. Despite his persistent elevated liver enzymes indicated by repeated tests, no further investigation was conducted as to the cause. *Id.* at 27. C.G. did not receive a gastroenterology consult until six years later, in 2018, at which point a liver transplant evaluation was requested for the first time. *Id.* at 27-29. C.G. was deemed eligible for a transplant in September 2018 but died the next month from the cirrhosis that had been caused by his progressive chronic liver disease. *Id.* at 30.

154.    Wexford had records indicating the severity of C.G.'s liver condition since 2012, but failed to diagnose it through the medical-intake process and then failed to manage it on an ongoing basis. Ex. D. at 26, 31. Although C.G.'s illness was monitored as it progressed, Dr.

Herrington opined that merely tracking his condition reflected inadequate care. Dr. Herrington further stated that Wexford was not relieved of its obligation to facilitate timely care (specifically, a liver transplant evaluation) simply because C.G. was incarcerated. Ex. 10. at 30-31.

155.   **G.H.** G.H. died at Taylorville Correctional Center at the age of 48, likely from a cardiac arrest due to the ingestion of methamphetamines. Ex. 10. at 31-32. Days before his death, G.H. was seen by nursing after reportedly feeling "foggy," but he was not seen by a medical practitioner until four days later for his nausea and vomiting, at which time blood labs were ordered, though no vitals were taken. *Id*. G.H. was found unresponsive at Taylorville the next day, and G.H.'s toxicology results were positive for methamphetamines *Id*. at 32.

156.   Dr. Herrington opined that the failure to contact a medical practitioner immediately for G.H. in response to his mental status, and the failure of any medical practitioner to follow up on G.H.'s complaint or take his vitals, all fell short of the standard of care.  Ex. 10 at 32.

157.   **L.K.** L.K. died at the age of 82 at Dixon Correctional Center after experiencing a pressure ulcer in his skin that was so deep that, as documented in his medical records, bone was visible. Ex. 10. 32-34. At no point did L.K. receive a referral for the ulcer, nor did L.K. receive a referral to the hospital for his fever and confusion that was likely caused by the decubital ulcer. *Id*. L.K. was not referred to gastroenterology for management of his underlying ulcerative colitis. *Id*. L.K. was placed in the infirmary after a fall, received intravenous fluids and intramuscular antibiotics, and was transferred to a hospital the week before his death, likely from sepsis. *Id*.

158.   Dr. Herrington critiqued Wexford's care for L.H. for allowing the ulcer to become a stage IV pressure ulcer (one so severe that bone could be seen) and failing to provide him with a surgical consultation or debridement of the ulcer. Ex. 10 at 32. Dr. Herrington further noted that

the care L.H. received from an infirmary would offer "little if any chance of" recovery, and that instead L.H. should have been timely sent to a hospital. *Id.* at 34.

159.   **G.P.** G.P. died at the age of 43 from a subdural hematoma that caused his brain to herniate as a result of overtreatment with anti-coagulants. Ex. 10. 34-36. Prior to his death, G.P. was housed at Menard and Hill Correctional Centers. G.P. was placed on an anticoagulant therapy despite having an inferior vena cava filter that would render anticoagulant therapy medically unnecessary. *Id.* at 34. G.P. also had a central venous catheter that remained in his clavicle without any medical necessity, elevating his risk of infection or hemorrhage. *Id* at 39. G.P. had a clinical history significant for stroke and pseudo-seizures. *Id.* In the month before his death, G.P. had urinary incontinence, bloody urine, and bruising while he was in the Hill Correctional infirmary.

160.   G.P. blood labs revealed that he had been provided excessive anti-coagulation, in contravention of Wexford's own policies, causing G.P. to not adequately clot blood, which Dr. Herrington found to be directly related to G.P.'s death. Ex. 10. at 36-37. Dr. Herrington also noted that Wexford failed to use community consultants to coordinate M.P.'s care and provide ongoing management for G.P.'s anticoagulation and seizures. *Id.* at 39.

161.   **M.P.** M.P. was a 21-year-old who died at Danville Correctional Center from dehydration in September 2019. Ex. 10. at 40-42. Prior to his incarceration, M.P. had a mental health history with diagnoses of schizoaffective disorder bipolar type, and generalized anxiety disorder, and prior treatment for schizophrenia, paranoia, and auditory hallucinations. *Id.* at 40. Wexford providers did not review this prior mental health history, and discontinued Remeron in April 2019. In June, M.P. began to refuse his other psychotropic medications, Lithium and Zyprexa, and by July, M.P.'s psychiatric care was listed ordered "as needed" despite his status as seriously mentally ill. *Id.* at 41. From August through September 4, M.P. refused meals and his

medication, he was placed in crisis watch, responded to "internal stimuli," had chest pains, was found with a wrist laceration and then an open wound on his scrotum. *Id.* 41-42. On September 5, M.P. was placed in the infirmary, a physician was notified of M.P.'s status but gave no orders, and M.P. passed away on September 6. *Id.*

162.    Dr. Herrington conclude that M.P.'s treatment was inadequate for multiple reasons, notably the failure to involve psychiatry care earlier in the course of his illness, and to enforce medications despite M.P.'s refusal. Ex. 10. at 42. Dr. Herrington also critiqued Wexford's for failing to monitor M.P.'s for dehydration during his hunger strike and to immediately refer M.P. to an outside hospital on or before September 5. *Id.* at 42.

163.    **H.C.** H.C. died at the age of 74 at Menard, mostly likely from sepsis secondary to an untreated cancer. Ex. 10 42-44. H.C. was receiving hormone injections at an outside hospital in 2015 to treat his prostate cancer, but his condition worsened throughout the year, during which time he demonstrated weakness, dizziness, high blood pressure, and edema. *Id.* Wexford staff prescribed H.C. Benadryl for these symptoms, and suggested he take a multivitamin. *Id.* In March 2016, H.C. began to experience stabbing and burning abdominal pain, and in November 2016, imaging taken of H.C. revealed an abdominal mass indicating cancer. *Id.* at 42. H.C. did not receive the follow-up care ordered by the outside physician: a biopsy of the mass and referral to another physician for further oncological care. *Id.* at 43. In 2017, H.C. exhibited incontinence, confusion, and hallucinations, for which he was transferred to a hospital. During the transfer H.C. exhibited labored breathing. *Id.*  He died five days later. *Id.*

164.    Dr. Herrington concluded that H.C.'s care was deficient because, Wexford failed to ensure that H.C. received follow-up with the specialty care he required. Ex. 10. at 44. And despite his altered mental status and observations made by medical staff that he was not conducting

appropriate "self-care," he was not hospitalized. *Id.* By the time he was transferred to a hospital, it was too late in the course of his illness to meaningfully address his medical condition. *Id.*

165.    **John Doe**. John Doe died of HIV at Menard. Ex. 10 at 44. For a year prior to his death, he had been found incontinent and on the floor of his cell, exhibiting an altered mental state. He was admitted to the infirmary in 2015, monitored, and diagnosed with a urinary tract infection and possible dehydration. *Id.* In 2016 he made inquiries and complaints to medical staff such as wanting to "know what's wrong with me," and "no one believes me." *Id.* As his mental state continued to deteriorate, John Doe was described as "very delusional," and did not know the date or time, and eventually he was unable to sit up without assistance. *Id.* John Doe was transferred to a hospital intensive care unit in a state of septic shock and died of HIV, with subsequent imaging consistent with HIV encephalitis. *Id.* at 45.

166.    Dr. Herrington noted a number of failures in the care of John Doe, including the failure to test John Doe for HIV. Ex. 10. at 45. Without an HIV diagnosis, John Doe did not receive the available and highly effective antiretrovirals that would manage his disease. *Id.* Instead John Doe received the immunosuppressant medication methotrexate, in error as John Doe never received a formal diagnosis of lupus, and despite John Doe's actual state of immunocompromise. *Id.*

167.    **M.L.** M.L. was 45-year-old man who died at Menard from heart disease and was found unresponsive in his cell. Ex. 10 at 45-46. M.L. had an elevated and uncontrolled blood pressure. *Id* at 46. Following a hospital visit for shortness of breath, instructions were issued for M.L. to be referred to cardiology and nephrology, though no follow-ups for these referrals were ever facilitated. *Id.* M.L. possibly had hypertension secondary to an underlying condition, as his blood lab results indicated a potential adrenal gland tumor. *Id.* at 46.

168.   Dr. Herrington concluded that M.L.'s care was inadequate because Wexford did not ensure that there was follow up with the referrals, and because Wexford did not complete an investigation for the underlying cause of his hypertension. Ex. 10 at 47.

169.   **Y.A.** Y.A. died at Menard at the age of 64 from cardiovascular disease. On the day of his death, Y.A.'s blood pressure was both low and unstable, he appeared lethargic, and had an abnormally low glucose level; for this, Y.A. was given intravenous fluids and a glucose tab. *Id.* at 47. As Y.A.'s blood oxygen levels dropped, he was provided oxygen, and released to his cell, where less than an hour later, he was found dead.

170.   Despite the clearly unstable condition on the day of his death, Y.A was managed at the infirmary, rather than promptly transferred to a hospital. Ex. 10 at 48. Dr. Herrington concluded that adequate care would require Wexford to have initiated a prompt transfer, which it did not do.

### The 2014 *Lippert* Report Gave Wexford Ample Notice of Constitutionally Inadequate Healthcare Across IDOC

171.   In *Lippert v. Godinez*, No. 13-cv-1434 (N.D. Ill.), a team of experts was formed to assist the court in determining whether Illinois's correctional-medical system was "providing health care service to the offenders in its custody that [met] the minimum constitutional standards of adequacy." Ex. 84 (2014 *Lippert* Report) at 3.

172.   To conduct its evaluation, the team visited numerous IDOC facilities, including Menard. *Id.* at 327.

173.   In December 2014, the team of experts released a report of its findings (the "Report"). *Id.* at 1. The Report chronicled numerous issues that gave Wexford notice about the constitutionally inadequate healthcare within the Illinois Department of Corrections. *See generally id.*

174.    The Report concluded that leadership was a "problem at virtually all of the facilities [the monitors] visited" and that the "question" of problematic leadership "varied only with regard to degree." *Id.* at 5.

175.    The monitors explained that leadership in the correctional health setting sets the tone at a facility on "both structure and professional performance," which ultimately impedes the process of identifying, addressing, and eliminating problems that arise in delivering adequate healthcare. *Id.* at 5.

176.    The *Lippert* Report also concluded that clinician quality was "highly variable across institutions." *Id.* at 6. In its discussion about poor clinician quality, the Report highlighted a Menard patient whose medical condition was not properly managed, resulting in amputation. *Id.* at 7.

177.    In another instance, the Report called out an inability to treat chronic medical conditions, highlighting a patient presented with poorly controlled diabetes; a doctor substantially increased the patient's medication doses, which led to "repeated episodes of low blood sugar." *Id.*

178.    The report also highlighted a significant lack of clinical oversight and peer review system wide. *Id.*

179.    Additionally, the Report highlighted severe staffing deficiencies. *Id.* The report recommended implementing a plan to address staffing shortages. *Id.* at 10.

180.    The Report also highlighted shortcomings in recordkeeping, as its recommendation explained that clinicians should have access to "electronic medical references at the point of care." *Id.* at 9-10. The Report highlighted that "[p]roblem lists" were not frequently updated and often cluttered with redundant and irrelevant information. *Id.* at 15.

-74-

181.    Furthermore, Medication Administration Records were frequently left blank, omitting important information—this was a practice "at virtually every facility." *Id.* at 15.

182.    The Report explained that disorganized medical record maintenance increases the "likelihood of a less well[-]informed clinician who will therefore be less able to make the appropriate clinical decisions," which in turn increase the chance that care will be delayed or not provided. *Id.* at 16.

183.    The Report also described a lack of clinical oversight—locally and centrally—of chronic diseases. *Id.* at 19.

184.    In addition, the Report described problems with sending patients for offsite care, as well as shortcomings in managing care when a patient returns from an offsite stint. *Id.* at 25. The Report highlighted that when someone returns from offsite, "the patient should be returned through the medical area with the paperwork so that a nurse can review any recommendations and contact a physician if an order is needed." *Id.* Some patients, the Report explained, were not "appropriately followed up by a primary care clinician." *Id.*

185.    On the other side of the coin, the Report also found "breakdowns" by nurses and clinicians alike "in identifying patient instability" and getting a patient sent offsite. *Id.*

186.    To support these findings about offsite care—including failures in care when the patient returned from the hospital—the Report explicitly noted three instances (all involving patients returning to Menard). *See id*. at 27.

187.    The Report provided recommendations to improve care for individuals being sent offsite, as well as for individuals returning to a facility. *Id.* at 28.

188.    Relatedly, the Report highlighted lapses in identifying the need for offsite medical services in the first instance, including delays in the approval process, delays in obtaining

appointments for necessary care, and delays in following up with patients who have abnormal medical issues. *See id.* at 29-31.

189.    The Report also emphasized the failure to conduct meaningful mortality reviews—inhibiting the ability to learn from patient deaths across IDOC facilities. *Id.* at 43.

190.    The Report described the process of conducting mortality reviews as "seriously flawed." *Id.*

191.    Similarly, the Report criticized the healthcare system's continuous quality improvement (CQI) problem, explaining that CQI is the way by which healthcare systems "identify the quality, process and professional performance with regard to many types of parameters" pertaining to the delivery of healthcare. *Id.* at 43-45.

192.    The Report made several recommendations regarding CQI, including assigning a trained CQI coordinator to each facility, creating a schedule to ensure various aspects of the healthcare-delivery system are functioning well, and implementing appropriate quality-performance metrics. *Id.* at 45.

193.    The Report concluded that the correctional-medical system in Illinois had been "unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." *Id.*

### The 2014 *Lippert* Report Gave Wexford Ample Notice of Constitutionally Inadequate Healthcare at Menard in Particular

194.    The notice provided by the Report was not simply system wide—the Report gave specific notice about constitutionally inadequate care at Menard. *Id.* at 327-71.

195.    The Report described significant staffing shortages at Menard, noting that at the time there were several important vacancies. *See id.* at 10, 332-33.

-76-

196.    The Report also gave notice about shortcomings in medical recordkeeping, noting that pertinent medical information was often missing from records. *See id.* at 335-36. The Report highlighted the failure to adequately document patient presentation during patient assessments. *Id.* at 370.

197.    The Report noted that Menard seldom "receive[d] vital medical records from outside sources such as emergency room reports and discharge summaries." *Id.* at 336.

198.    The Report described that individuals sent out for emergencies would return and obtain "inadequate follow up" care, which included "inadequate monitoring of patients" returning to Menard. *Id.* at 349.

199.    Regarding mortality reviews, the Report noted that 12 deaths had occurred from January 1, 2013 until the monitors' visit in June 2013. *Id.* at 364.

200.    The Report concluded that three of those deaths involved "serious lapses in care" that "likely contributed to the timing of the patients' demise." *Id.* at 364.

201.    The Report also emphasized Menard's lack of CQI. *Id.* at 367. This included failures in CQI related to patients who return from receiving offsite care. *Id.* at 368.

202.    The Report recommended that Menard fill its vacant positions and hire qualified physicians. *Id.* at 369.

203.    The Report also recommended retraining for nurses encountering patients sent offsite who have returned to Menard, as well as a clinically trained individual to ensure offsite-service reports are expeditiously obtained when a patient returns to the prison. *Id.* at 370.

204.    The Report recommended an overhaul of the CQI system to "facilitate quality improvement effectively occurring at each institution" and that this endeavor required "lengthy discussion" to be accomplished. *Id.* at 371.

## ARGUMENT

At summary judgment, the moving party must establish that the case presents no genuine issues of material fact which require a trial to resolve. *Ponsett v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). When deciding whether a genuine dispute of fact exists, the Court must view the facts in the light most favorable to Plaintiff, resolving all evidentiary conflicts and credibility issues in her favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *see also Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding which inference to draw from [a] conversation is the task of a fact finder."). Circumstantial evidence is entitled to equal weight. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*).

Ignoring these principles, Wexford offers five basic reasons why it is entitled to summary judgment. But before diving into the details of Wexford's many arguments, it is worth summarizing those grounds and why, at a high level, they fail.

First, Wexford contends that Plaintiff cannot pursue claims or theories outside the bounds of the complaint. Mem. 12-21. Wexford's argument is contrary to Seventh Circuit law and black-letter procedure. This argument also ignores the fact that Wexford has been on notice of the facts and theories that it now claims should be off-limits for years and has had ample time to conduct discovery and prepare its defenses. Because it is patently clear that the Court cannot simply ignore the record evidence to grant summary judgment, Plaintiff brackets this issue and returns to it at the end of this brief.

Second, Wexford contends that there is no evidence that the individual Wexford Defendants—Dr. Leven and Dr. Siddiqui—violated the Eighth Amendment. *Id*. at 21-29. Wexford ignores extensive evidence from which a jury could find that either or both of these individuals

acted with deliberate indifference. Wexford also misstates the law on the degree and nature of personal involvement required for Eighth Amendment liability. The claims against Dr. Leven and Dr. Siddiqui should proceed. *See* Part I *infra*.

Third, Wexford contends that there is no evidence that Wexford itself violated the Eighth Amendment. *Id*. at 30-42. This argument again ignores extensive record evidence. Wexford also seeks to impose a rigid statistical standard that the Seventh Circuit has rejected time and again in this context. Plaintiff has adduced sufficient evidence to raise a triable issue on its *Monell* claim.

Fourth, Wexford contends that there is no evidence to support Plaintiff's ancillary federal claims brought in addition to the deliberate indifference claims under the Eighth Amendment. *Id*. at 42-44. Plaintiff agrees that summary judgment is appropriate on certain of these claims, but the failure to intervene claim against Dr. Leven should proceed.

Finally, Wexford seeks summary judgment on the state law claims. *Id*. at 44-52. These arguments largely track the arguments under federal law, with a few state-specific particulars that do not change the outcome, and are addressed at the end of the brief.

## I.      The Jury Must Decide Whether Dr. Leven and Dr. Siddiqui Violated The Eighth Amendment.

In Count I of the Complaint, Plaintiff alleges that Defendants were deliberately indifferent in violation of the Eighth Amendment to the Constitution. Dkt. 1 ¶¶ 47-61. Dr. Leven and Dr. Siddiqui move for summary judgment on this claim. None of their arguments has merit.

### A.      A reasonable jury could find that Dr. Leven was deliberately indifferent.

Wexford offers three reasons why Dr. Leven is entitled to summary judgment on Count I: (1) she was unaware of Mr. Curtis's critical condition; (2) she was not deliberately indifferent to that condition; and (3) she did not cause Mr. Curtis's death. These arguments are based on

Wexford's disputed version of events, which is contradicted by extensive evidence and which a reasonable jury would not need to credit. The claim against Dr. Leven should proceed to trial.

### 1. There is evidence that Dr. Leven knew of the need for emergency care.

Wexford's first argument rests on a fundamental factual dispute about Mr. Curtis's death. Wexford asserts that "Mr. Curtis died from discreetly ingesting a synthetic cannabinoid-like substance" and that "Dr. Leven had no actual knowledge that Mr. Curtis ingested such a substance." Mem. 24. Thus, Wexford concludes, it follows that Dr. Leven "could not have been deliberately indifferent to a condition she had no actual knowledge of." *Id.* at 24-25. This is not a basis for summary judgment because Plaintiff and her experts vehemently dispute that synthetic cannabinoids played a role in Mr. Curtis's death. *See* PSOF 108-120. Even though Wexford believes that Mr. Curtis ingested a synthetic cannabinoid and died as a result, a reasonable jury would not have to credit either of those assertions. Resp. to Wexford SOF 1-2.

Wexford does not cite any specific facts to support its assertion that Mr. Curtis ingested a synthetic cannabinoid. In its statement of material facts, Wexford asserts that "all pathologists in this case agree" that synthetic cannabinoids are an "appropriate cause of death." Resp. to Wexford SOF 2. But that is patently false. Plaintiff's pathology expert, Dr. Francisco Diaz, does not believe that Mr. Curtis died from synthetic cannabinoids. PSOF 120. Wexford's experts may believe that, but resolving these disputes requires trial. *See, e.g.*, *Godinez v. City of Chicago*, 2019 WL 5597190, at *2 (N.D. Ill. Oct. 30, 2019) ("It is not for this Court to make credibility determinations on the expert opinions [regarding cause of death] on summary judgment.").

Also in its statement of material facts, Wexford asserts that synthetic cannabinoids "were being distributed at Menard in September 2018." Resp. to Wexford SOF 4. This assertion is disputed and not supported by the record, which indicates an actual determination only that two individuals *possessed* synthetic cannabinoids while they were incarcerated at Menard. *Id.*

Regardless, a jury could easily conclude that reports showing that synthetic cannabinoids may have been distributed at Menard in general do not show that Mr. Curtis had access to, much less ingested, took synthetic drugs at Menard in particular. Indeed, the IDOC employee who led the investigation into the distribution activities admitted that he did not "find any connection between Kevin Curtis and synthetic cannabinoids," Ex. 74 at 91, and the investigator who investigated Mr. Curtis's death reviewed video surveillance and concluded that it "did not show any illegal activity which could have contributed to Mr. Curtis's death." Ex. 63 at 16.

Even if a jury concluded that Mr. Curtis ingested a synthetic cannabinoid, there would still be genuine disputes of fact requiring trial. A defendant does not need to have actual knowledge of the specific substance that caused a prisoner to need care to be liable for deliberate indifference. What the law requires, as Wexford admits, is simply "actual knowledge of impending harm easily preventable." Mem. 21 (quoting *Thomas v. Walton*, 461 F. Supp. 2d 786, 793 (S.D. Ill. 2006)). Whatever the reason for his condition, Mr. Curtis, who was on crisis watch and was displaying extremely concerning signs of physical and psychological distress, faced a clear risk of impending harm. Dr. Lisa Goldman, for example, stated after observing Mr. Curtis he was in clear need of emergency care and that "we need to intervene quickly for the dehydration with a combination of this heat could be lethal." PSOF 77, 82. A reasonable jury could conclude that Dr. Leven knew of or strongly suspected that Mr. Curtis needed immediate care as well, even if she did not know the specific cause of his condition. PSOF 51-71.

Finally, Wexford asserts that Dr. Leven "consulted with medical and mental health staff to provide Mr. Curtis the services he needed." Mem. 24-25. Wexford again does not cite any record evidence or a material fact to support this contention. Regardless, Plaintiff need not show that Mr. Curtis "was 'literally ignored'" to prevail on her Eighth Amendment claim. *Id.* (quoting *Greeno v.*

*Daley*, 414 F.3d 645, 653 (7th Cir. 2005)); *see also Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (en banc) ("[W]e have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment[.]"). There is substantial record evidence that Dr. Leven was aware of Mr. Curtis's emergent state but did not take meaningful action—action for which she was primarily responsible as the individual chiefly responsible for care for patients on crisis and primarily responsible for coordinating care for mental health patients—to ensure that he was assessed and provided the care he desperately needed. PSOF 72-95, 101-103. At a minimum, this evidence raises factual disputes for trial.

### 2.    There is evidence that Dr. Leven was deliberately indifferent.

Wexford next argues that a jury could not find Dr. Leven deliberately indifferent because she "was not Mr. Curtis' treating clinician" and "is not responsible for the treatment decision of all departments, including those outside her scope of practice." Mem. 25-27. Wexford's arguments are irrelevant because Plaintiff does not contend that Dr. Leven is liable because she failed to practice medicine. Rather, a reasonable jury could find that Dr. Leven is liable because she was responsible for coordinating patient care between various providers, including medical staff and psychiatrists, PSOF 45-52, yet she took no meaningful action to ensure that Mr. Curtis's medical and mental health needs were addressed. This included after she received an email raising the alarm about Mr. Curtis's dehydration—a failure that Plaintiff's expert Dr. Shields opined was grossly inappropriate. PSOF 92-93.

That Dr. Leven may not have personally had a license to provide some of the medical assistance that Mr. Curtis desperately needed is not a defense. The Seventh Circuit has rejected the argument that a health care worker "cannot, as a matter of law, be held liable for Eighth Amendment violations where they allegedly lacked authority to provide particular forms of medical care" to prisoners. *Perez v. Fenoglio*, 792 F.3d 768, 779-80 (citing *Berry v. Peterman*,

604 F.3d 434, 443 (7th Cir. 2010)). Nor can a member of the health care team blindly defer to a physician where there is a clear risk to the prisoner's safety or health. *See Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) ("[A] nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health."). In fact, as Plaintiff's expert Dr. Cockerill explained, "given that Dr. Leven could not prescribe medication or similar treatments for mental illness, an urgent referral to a psychiatrist for appropriate assessment, diagnosis, and treatment was critical, and there was no legitimate reason to delay." Ex. 5 (Dr. Cockerill Report) at 20. Wexford may contend that Dr. Leven had legitimate reasons for not taking additional action, but those are matters for trial, not summary judgment.

Wexford's reliance on the decision in *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012), is unavailing. *See* Mem. 27. In that case, the Seventh Circuit stated that a correctional officer may be "entitled to defer to the judgment of jail health professionals" so long as the officer does not "ignore" the prisoner." *Id.* at 1018. But Dr. Leven was a health professional, not a correctional officer, and in this case had independent ability and responsibility to (1) diagnose Mr. Curtis's clear catatonia, and (2) take action, as the person designated to coordinate care between departments, to ensure that both medical and mental health staff were assessing his condition and communicating with one another. *See* PSOF 45-52. Thus, as *King* recognizes, a jury could infer that she was deliberately indifferent if her conduct represented such a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King*, 680 F.3d at 1018-19 (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)). Additionally, even non-medical personnel can be liable for deliberate indifference if they "have a reason to believe (or

actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett v. Webster*, 658 F. 3d 742, 755 (7th Cir. 2011).

In any event, there is a clear dispute as to whether Dr. Leven departed substantially from the standards of accepted professional judgment in this case. In addition to the facts recounted above, Plaintiff's experts Dr. John Shields and Dr. Cockerill offer extensive opinions on the applicable standards of professional conduct for clinical psychologists and Dr. Leven's failure to meet them. *See generally* Ex. 5; Ex. 16; *see also* PSOF 58-60. For instance, both Dr. Cockerill and Dr. Shields note that Dr. Leven surmised, without any basis, that Mr. Curtis was malingering and that his symptoms were not attributable to a mental health condition, and that she may well have prevented Mr. Curtis from receiving adequate care by communicating these unfounded suppositions to Dr. Floreani. *See* Ex. 5 at 20-21; Ex. 16 at 10-13; PSOF 73. That is directly analogous to *King*, where the Seventh Circuit affirmed denial of a motion for summary judgment where a jury could have concluded that a health care worker "had already decided that [a prisoner] was faking seizures even before she saw him" and failed to treat obvious signs of distress. *King*, 680 F.3d at 1019.

Implicitly recognizing that there are factual disputes precluding summary judgment, Wexford asks the Court to "disregard" Dr. Shields and Dr. Cockerill's opinions. Mem. 28-29. This portion of the brief incorporates Wexford's arguments in its Rule 702 motions. Plaintiff explains in her separate oppositions to those motions why those arguments are meritless; simply put, the *Daubert* inquiry does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek,* Inc., 689 F.3d 802, 805 (7th Cir. 2012). Alternatively, Wexford asserts that Dr. Shields and Dr. Cockerill's opinions cannot create a genuine issue of fact because they supposedly "do not relate to Dr. Leven's personal involvement." Mem. 28. But the experts discuss

Dr. Leven's personal involvement at length based on their review of documents and deposition testimony. *E.g.*, Ex. 16 at 4-6, 15-16. And as Plaintiff's statement of additional facts reflects, there is ample evidence of Dr. Leven's personal involvement elsewhere in the record as well. *See* PSOF 51-71.

Last, to the extent the record does not reflect the full scope of Dr. Leven's personal involvement, that is because Dr. Leven failed to document her encounters in accordance with professional standards, and then professed to remember few specifics about her interactions with Mr. Curtis when she was deposed. *See* Ex. 16 at 28 (noting the "shocking" lack of documentation, reflecting "complete disregard of some of the fundamental principles of clinical psychology"); *see also, e.g.*, PSOF 47, 56, 94. This makes it even more clear that Dr. Leven is not entitled to summary judgment on this claim. *Cf. Hoskins v. Mezo*, 2018 WL 3869633, at *3 (S.D. Ill. Aug. 15, 2018) (improper to award summary judgment on conditions-of-confinement claim where defendants claimed to have "no memory" of the plaintiff's complaints and relied instead on generalized evidence or evidence post-dating the incident to defeat summary judgment).

### 3.    There is evidence that this indifference caused Mr. Curtis's death.

Besides disputing knowledge and indifference, Wexford disputes causation. It argues that there is no evidence that Dr. Leven's failures "contributed to Mr. Curtis's death." Mem. 29. In a section 1983 case, however, causation is almost always "a question to be decided by a jury." *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010). It is only in the "rare instance" that a plaintiff "can proffer no evidence that a delay in medical treatment exacerbated an injury" that summary judgment should be granted "on the issue of causation." *Id*. This is not one of those instances. Indeed, both Dr. Shields and Dr. Cockerill directly opine that Dr. Leven's lack of care contributed to Mr. Curtis's death. *See* Ex. 16 at 40-41; Ex. 5 at 27-28.

In addition to expert opinion, there is ample evidence in the record from which a jury could conclude that Dr. Leven's indifference to Mr. Curtis's need for medical treatment was one of the causes of Mr. Curtis's death. For example, on September 4, 2018, one day before Mr. Curtis's death, Dr. Leven failed to communicate to Nurse Practitioner Mary Zimmer the substantial risks Mr. Curtis faced, including that he was not taking fluids or that mental health staff believed his condition had a medical (rather than psychiatric) basis. Had she done so, it is likely that Ms. Zimmer would have administered IV fluids or taken other action to treat Mr. Curtis's dehydration. PSOF 63-65; *see also* PSOF 79-80 (similar for Nurse Practitioner Moldenhauer).

Wexford asserts that no reasonable jury could find causation because "[t]here is no known antidote or reversing agent for synthetic cannabinoid intoxication." Mem. 29. As already discussed, there are substantial factual disputes about whether Mr. Curtis took synthetic cannabinoids at all. *See* PSOF 108-120.

On top that of that, the factual assertion that there are no antidotes or reversing agents is unsupported and disputed. *See* Resp. to Wexford SOF 3. Even if there were no "antidote," that would not mean that Wexford could not have provided monitoring and stabilization to prevent a catastrophic outcome like the one that occurred on September 5, 2018. Wexford also points to its expert's opinion that Mr. Curtis suffered from "advanced heart disease" that made him particularly susceptible to fatal complications from synthetic cannabinoids. Mem. 29. But again, this does not automatically defeat causation. The fact that Mr. Curtis supposedly had a pre-existing condition would simply underscore why it was critical for Wexford and Dr. Leven to ensure that Mr. Curtis had appropriate monitoring and care. *See Cobige v. City of Chicago*, 651 F.3d 780, 782 (7th Cir. 2011) (holding that it was appropriate to hold police officers liable for ignoring a prisoner's need

for medical attention where the officers' indifference "combined with a pre-existing heart condition" to "cause[]" the prisoner's death).[8]

### B.    A reasonable jury could find that Dr. Siddiqui was deliberately indifferent.

Wexford argues that Dr. Siddiqui, the Medical Director at Menard, is entitled to summary judgment on Count I because he was not "personally involved" in Mr. Curtis's care. Mem. 22-23. There is conflicting evidence on the details of Dr. Siddiqui's involvement with Mr. Curtis, due in part to Dr. Siddiqui himself. IDOC investigators interviewed Dr. Siddiqui after Mr. Curtis's death and he signed an interview report reflecting his supposed statement that Mr. Curtis "was being monitored daily via medical and was being treated appropriately." Ex. 72 at P000318. IDOC investigators also interviewed Dr. Leven, and she signed a report reflecting her apparent statement that she (Dr. Leven) assessed had Mr. Curtis "per her department" and that Dr. Siddiqui "evaluated [Mr. Curtis] within his department." *Id.* at P000316.

In discovery in this case, both Dr. Siddiqui and Dr. Leven wavered on Dr. Siddiqui's involvement. Dr. Siddiqui claimed that the interview report did not reflect "firsthand information," that he did not remember making the statement to the investigator, and that he signed the document without reading it based on "trust." PSOF 137. Dr. Leven stated that she could not recall whether she told investigators that Dr. Siddiqui had evaluated Mr. Curtis. Ex. 20 at 256-57. Wexford also produced timesheets showing that Dr. Siddiqui was on vacation from August 31, 2018 to September 5, 2018. *See* Resp. to Wexford SOF 5.

---

[8] For this reason, Wexford's assertion (at Mem. 29) that Plaintiff's forensic pathology expert "admitted" that "if Mr. Curtis had a pacemaker placement it probably would have saved his life" is irrelevant. Mem. 29. But in fact, Dr. Diaz admitted no such thing. In the cited testimony, Dr. Francisco Diaz first says the question by Wexford's counsel is "better posed to a treating cardiologist." Ex. 81 at 125. Wexford's counsel asked whether it was *possible* that a pacemaker would have affected the outcome, and Dr. Diaz stated, "probably yes." *Id.*; *see also* Pls. Resp. to Wexford Mot. to Bar Dr. Diaz (filed contemporaneously).

Even if Dr. Siddiqui was not physically present at Menard while Mr. Curtis deteriorated and died on crisis watch, however, a reasonable jury could still find him liable for deliberate indifference. To be liable for deliberate indifference under section 1983, a defendant must have personal involvement, but that does not mean the defendant must have been physically present and providing care. Rather, as one of the cases Wexford cites in its brief expressly recognizes, it is enough if the defendant "create[d] the peril facing" the plaintiff," "increased the peril," or "made it harder for . . . anyone else[] to solve the problem." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009); *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("an official satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent") (cleaned up). "Direct participation" is not necessary, only a showing that the defendant "acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003).

Although Dr. Siddiqui was not on site during Mr. Curtis's final days, he oversaw and was responsible for the medical and mental health program at Menard and was responsible for operating those programs in accordance with accepted standards of practice. As Dr. Lisa Goldman testified, however, Dr. Siddiqui was extremely resistant to coordination between medical and mental health—and Dr. Siddiqui himself admitted that he did not communicate with mental health staff, did not attend any daily mental health meetings, and did not even know that mental health staff held daily meetings. PSOF 124-127, 130. As a result of these siloed functions, the medical and mental health systems at Menard were "very separated" and "rarely communicated" about patients, inhibiting care. PSOF 128-129. It was that very separation that lay at the root of many of the problems plaguing Mr. Curtis's health in the last few days of his life. Based on the evidence in

the record, a jury could conclude that Dr. Siddiqui knew of and increased the peril facing Mr. Curtis or, at a minimum, made it harder for those treating him to solve the problem.

## II.     The Jury Must Decide Whether Wexford is Liable Under *Monell*.

In addition to bringing deliberate indifference claims against Dr. Leven and Dr. Siddiqui, Plaintiff brings Eighth Amendment claims against Wexford directly. Under current precedent, private corporations like Wexford are subject to the standard for section 1983 liability articulated in *Monell v. Department. of Social. Services*, 436 U.S. 658 (1978). *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). Plaintiff has introduced more than enough evidence for a jury to conclude that Mr. Curtis's death was caused by Wexford's policies and practices of providing inadequate medical care, siloing healthcare staff in a way that prevented any meaningful continuity of care, and refusing to implement known and available quality assurance efforts despite being on notice of both its dangerous practices and the ineffectual nature of the quality assurance efforts implemented by the IDOC. This claim, too, must proceed to trial.

### A.     A reasonable jury could find Wexford liable regardless of Dr. Leven's or Dr. Siddiqui's liability.

Wexford argues that it cannot be liable under *Monell* because Plaintiff has "failed to establish Mr. Curtis was deprived [of] a constitutional right." Mem. 30-31. As just explained, however, a reasonable jury could find that both Dr. Leven and Dr. Siddiqui were deliberately indifferent. Accordingly, Wexford cannot obtain summary judgment on this ground.[9]

---

[9] Even if Dr. Siddiqui and Dr. Leven were not deliberately indifferent, moreover, a reasonable jury could conclude that other Wexford personnel violated Mr. Curtis's constitutional rights by failing to provide him with desperately needed care in the days before his death. For instance, in the early afternoon of September 4, Mr. Curtis was seen by Dr. Christina Floreani, a staff psychiatrist. Based on what Mr. Curtis's presentation and the information available to her, Dr. Floreani would have observed "textbook symptoms of catatonia" requiring immediate attention and known the need to act. PSOF 57-61; *see also, e.g.*, PSOF 66-67 (Nurse Practitioner Mary Zimmer).

Wexford's argument also fails for a more fundamental reason. It is possible that Wexford could be found liable under *Monell* even if no Wexford employee is individually liable for an Eighth Amendment violation. The Seventh Circuit explained why *Monell* organizational liability does not rise and fall with individual liability in *Glisson v. Indiana Department of Corrections*:

> [T]his case well illustrates why an organization might be liable even if its individual agents are not. Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional polices are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.

849 F.3d 372, 378 (7th Cir. 2017) (*en banc*). Accordingly, it is only where "the plaintiff's theory of *Monell* liability rests entirely on individual liability"—such as when a plaintiff alleges that the defendant is a final policymaker and offers no other *Monell* theory—that "negating individual liability will automatically preclude a finding of *Monell* liability." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). That is not the case here.

In sum, there are triable issues as to Dr. Leven and Dr. Siddiqui. But even a jury ultimately concludes that Dr. Leven and Dr. Siddiqui acted reasonably given the facts known to them at the time, that jury could still reasonably conclude that Wexford's dangerous practices and customs still created constitutional liability. *See*, *e.g.*, *Wiley v. Young*, 2023 WL 5207310, at *4 (S.D. Ill. Aug. 14, 2023) ("Wexford may be liable under *Monell*, even where the Individual Defendants are not.") (Dugan, J.); *Arsberry v. Wexford Health Sources, Inc.*, 2021 WL 4942039, at *2 (N.D. Ill. Oct. 22, 2021) (noting that "individual liability is not a prerequisite to corporate liability"). Either way, summary judgment on this ground is inappropriate.

### B. A reasonable jury could find that Wexford's practices and customs were grossly inadequate.

Wexford argues that Plaintiff has not adduced evidence of a policy, custom, or practice sufficient to satisfy *Monell*. But a reasonable jury could find several Wexford practices or customs

that contributed to Mr. Curtis's death in September 2018. Chief among these is Wexford's custom or practice of habitually poor communication amongst and between medical and mental healthcare teams and systematic siloing of medical and mental health providers from each other. At Menard, much of the responsibility for that siloing lay with Dr. Siddiqui, as already discussed. PSOF 123-129. But there is evidence of several other constitutionally infirm practices and customs, including a culture of inadequate documentation and failure to create medical records affecting continuity of care, PSOF 130-136, crushing mental health caseloads, PSOF 146-147, and a failure to implement a "quality improvement program" as required by the Wexford-IDOC contract, PSOF 137-145. And despite being contractually required to implement a quality assurance system—a system designed to detect and address the very issues discussed in the sentence above—Wexford affirmatively chose not to implement an available quality assurance policy it had available to it, instead leaving only the *IDOC*'s quality review system in place (a system it knew to be ineffective). PSOF 137-140. The systematic flaws led directly to catastrophic outcomes like Mr. Curtis's death. Indeed, in a death review of Mr. Curtis's case that the IDOC conducted in October 2018, the IDOC concluded that Wexford had failed to evaluate and manage "red flags" and that "system issues were the major problem of the case." PSOF 121-122.

In moving for summary judgment, Wexford contends that Dr. Siddiqui and Dr. Leven are not final policymakers and that Plaintiff has not identified any "express policies" responsible for Mr. Curtis's death. Mem. 32-33. That is immaterial because Plaintiff is not pursuing either a final policymaker theory or an express policy theory at summary judgment. Plaintiff does not need to prove either theory for a viable *Monell* claim. *See, e.g.*, *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) ("An unconstitutional policy can include both implicit policies as well as a gap in

expressed policies."); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (entity's "actual practice," as opposed to its "written policy," was inadequate).

Second, Wexford argues that *Monell* claims based on a widespread practice require proof of "a series of violations." Mem. 33-34. That is exactly what Plaintiff has done, introducing 11 other medical records that reflect multiple instances of inadequate care based on the same dangerous widespread practices that were at play in Mr. Curtis's case, as well as a report from a correctional medical expert who reviewed those records in details and explains in exhaustive fashion why each of those records reflects multiple instances of inadequate care. PSOF 148-170. It is well-established that there is no "bright-line rule" as to the "quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021); *see also Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[W]e do not adopt any bright-line rules defining a 'widespread custom or practice[.]'"); *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) (similar). The only "threshold requirements" for *Monell* liability are that conduct not be isolated (*i.e.*, that a plaintiff show more than 1-3 instances) and that the plaintiff demonstrate that the conduct is not the product of a "random event." *Thomas*, 604 F.3d at 303. Beyond these thresholds, the jury "must make a factual determination" about whether the evidence "demonstrates that the defendant had a widespread practice that [caused] the alleged constitutional harm." *Id.*

Plaintiff has satisfied the threshold requirements through the evidence in the record, PSOF 121-147, as well as the opinions of her correctional healthcare expert, Dr. Ryan Herrington. Dr. Herrington conducted a review of Mr. Curtis's case and 11 other patients and concluded that, similar to Mr. Curtis, Wexford had repeatedly failed to provide adequate care because of lack of communication, poor infrastructure design and documentation, and ineffective continuous quality

improvement. PSOF 148-170. Further, although Wexford attacks Dr. Herrington's review for not following arbitrary statistical standards, *see*Mem. 38-39, statistical evidence is ***not*** required for a *Monell* claim to proceed to trial. To "survive summary judgment," the Seventh Circuit has stressed, a plaintiff "need not present a full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to establish a widespread practice or custom." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006). Instead, "it is enough that a plaintiff present competent evidence tending to show a general pattern of repeated behavior." *Id*. That is what Plaintiff has done here.

Relying on these principles, district courts in this Circuit have denied summary judgment in cases like this one, where Plaintiff has provided evidence of other incidents where patients received constitutionally inadequate medical care. In *Awalt v. Marketti*, 74 F. Supp. 3d 909, 939 (N.D. Ill. 2014), the district court denied summary judgment to HPL, a private medical care company, after the plaintiff provided evidence of six other detainees were provided inadequate medical care. Similarly, in *Piercy v. Warkins*, 2017 WL 1477959, at *12-13 (N.D. Ill. Apr. 25, 2017), the district court denied summary judgment to ACH, another private medical care company, after the plaintiff provided evidence that seven other detainees were denied adequate medical care. These cases, and many others, establish that a plaintiff survives summary judgment with other examples of deficient care—even when those allegations concern medical conditions not identical to the one at issue in the case. *See also Abreu v. City of Chicago*, 2022 WL 1487583, at *17 (N.D. Ill. May 10, 2022) (explaining that the Seventh Circuit has "warned against overstating Plaintiff's burden" and concluding that four complaints were sufficient to create a genuine issue in light of the record as a whole); *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 917 (N.D. Ill. 2016) (reiterating that there are no "bright-line rules" at summary judgment and explaining that a defendant's demand for statistical evidence of a widespread custom or practice "fails to

persuade"); *Warfield v. City of Chicago*, 2009 WL 10739474, at *1 (N.D. Ill. Feb. 18, 2009) (holding that evidence of "up to nine witnesses who were allegedly mistreated" was sufficient to warrant trial and explaining that defendant's arguments that those incidents did not occur or were "isolated" and "outside of [their] control" are "not arguments amenable to summary judgment").

Accordingly, even if the Court were to count each patient as a single additional piece of evidence in support of Plaintiff's *Monell* claim, summary judgment would be inappropriate. But as Dr. Herrington explains in detail in his report, each patient's medical record reflects *several* instances of inadequate medical care and *several* examples of the widespread practices that caused Mr. Curtis's death. PSOF 148-170; *see also* Ex. 10 at 11-48. Counting just the instances noted by Dr. Herrington in his "identified inadequacies in treatment" for each patient (which does not come close to encompassing the total number of instances in which he identified inadequate care), Plaintiff has offered 50 separate instances of the widespread practices she contends caused her son's death. There can be no meaningful dispute that 50 examples of a widespread practice is enough.

### C. A reasonable jury could find that Wexford's practices or customs were the moving force in Mr. Curtis's death.

In addition to disputing that a custom or practice exists, Wexford claims that there is no evidence that the customs or practices Plaintiff has identified were the "moving force" in Mr. Curtis's death. Mem. 36-37. This is another question that the Court cannot resolve at summary judgment. "[C]ausation is not a mechanical exercise like working a math problem and getting an answer, but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and then reach reasonable conclusions about the effects of particular action and inaction" *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 384–85 (7th Cir. 2020) (en banc). Moreover,

"there is no rule demanding that every case have only one proximate cause." *Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012).

Courts have recognized that "a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind" a plaintiff's injury in circumstances very similar to those here. *Dixon v. County of Cook*, 819 F.3d 343, 349 (7th Cir. 2016); *see also, e.g.*, *Daniel*, 833 F.3d at 740-42 (denying defendant's summary judgment motion where testimony from jail medical staff describing inadequate record-keeping practices and scheduling difficulties, "viewed in the light most favorable to Daniel, raise[d] a genuine issue of material fact as to whether his injury resulted from systemic, gross deficiencies in the Jail's medical care"); *Piercy*, 2017 WL 1477959, at *14 ("If a jail has a widespread practice of providing inadequate care, it is a highly predictable consequence that, faced with a possibly serious medical condition, medical personnel would fail to inquire further, provide necessary medications, or seek the assistance of a specialist."); *Roland v. Dart*, 2016 WL 4245524, at *7 (N.D. Ill. Aug. 11, 2016) (denying defendants' motion for summary judgment on prisoner's *Monell* claim and noting that even where the "causation chain is a long one, and it may be difficult for a jury to conclude that Defendants were a but-for cause of Plaintiff's injury . . . a jury, not the court, should make the determination whether Defendants' policies or practices—whether understaffing or generally allowing delayed processing of HSR forms—were the cause and 'moving force' behind Plaintiff's injury").

Likewise, with respect to Wexford's failure to implement a meaningful quality program as required by its contract, a reasonable jury could find that the absence of such a policy made it likely and foreseeable that prisoners with complex medical and psychological conditions, like Mr. Curtis, would face grave risk of harm. *See Glisson*, 849 F.3d at 382 ("A jury could further conclude

that Corizon had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless 'adopt[ed] a policy of inaction'"). As the Seventh Circuit has said, there is "no magic number of injuries" that must occur before a "failure to act can be considered deliberately indifferent." *Id*.

Wexford's principal argument regarding causation is that "Plaintiff is seeking to proceed on unpled allegations against non-defendants." Mem. 34-35. But that is a non sequitur. Plaintiff is seeking to proceed on claims against Wexford, which is a named defendant. To the extent Wexford means that Plaintiff cannot reference actions and individuals not specifically described or named in the complaint, moreover, Wexford is flatly wrong, as explained at the end of this brief.

Wexford also argues that the practices Dr. Herrington identified in his reports are not moving forces behind Mr. Curtis's death. Mem. 35-39. But these arguments raise, at best, factual disputes for the jury, and simply recapitulate the failed arguments Wexford offers in its motion to bar Dr. Herrington from testifying entirely. With this motion, Plaintiff is submitting a lengthy opposition to the motion to bar Dr. Herrington, and will not repeat all those arguments here. But as an example, Wexford cites *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1185 (7th Cir. 1993), for the proposition that patients whose care is "not substantially similar to Mr. Curtis' care" are "inadmissible." Mem. 39. *Ross* is a products liability case addressing when evidence of other accidents involving the product and post-dating the injury to the plaintiff can be admitted to show notice, existence, or cause. It has nothing to do with *Monell* liability (or, for that matter, Rule 702).

Also inapposite, Wexford highlights the decision in *Armbruster v. Shah*, 2019 WL 5874335 (S.D. Ill. July 23, 2019), where Magistrate Judge Beatty granted summary judgment to Wexford on *Monell* claims—but not on "moving force" grounds. Nevertheless, even with respect to its

policy, practice, or custom analysis, *Armbruster* is plainly distinguishable. Wexford asserts that *Armbruster* is "helpful" in illustrating that "a review of 11 cases over nine months is insufficient to establish a widespread practice at one facility." Mem. 39-40. In fact, *Armbruster* turned on the lack of expert evidence from which a factfinder could infer a pattern or custom, and it thus highlights why Plaintiff's different claim and evidentiary record may proceed.

In *Armbruster*, the plaintiff suffered significant injury from a spinal cord compression in prison but did not receive proper care from Wexford providers. The court found genuine issues of fact as to the treating physician and the nurse, but granted summary judgment on the *Monell* claims because the plaintiff's evidence was not enough for a reasonable jury to find a widespread custom or practice. *Id*. at *15-17. In reaching this determination, the court contrasted the evidence in *Armbruster*—grievance records from ten other prisoners complaining that they had received inadequate medical care from the same physician—with the *Awalt* and *Piercy* cases discussed above, where the plaintiffs (as here) had hired physicians as expert witnesses to review medical files and records. The court explained that the plaintiff in *Armbruster* had "not offered any competent evidence regarding the quality of the medical care these ten other inmates received." *Id*. Plaintiff has offered just such evidence from Dr. Herrington.

## III.   The Jury Must Decide Whether Dr. Leven Failed To Intervene.

In Counts II and III of the complaint, Plaintiff brings claims for conspiracy under section 1983 and for failure to intervene against Dr. Leven and Dr. Siddiqui. Dkt. 1 ¶¶ 62-73. These claims are ancillary to the Eighth Amendment claims, and Plaintiff does not intend to pursue Count II at trial. Plaintiff also does not intend to pursue Count III against Dr. Siddiqui, but the failure to intervene claim against Dr. Leven should proceed.

Section 1983 imposes liability for civil conspiracy when "two or more persons act[] in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Beaman v.*

*Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Because conspiracies "are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy." *Id*. at 511. Wexford calls the conspiracy allegations "preposterous" and "lack[ing] any good faith basis." Mem. 42-43. That is overheated rhetoric with no basis in fact. Citing *Nosair v. Federal Bureau of Prisons*, 2013 WL 5835733, at *4 (S.D. Ill. Oct. 30, 2013), Wexford argues that a conspiracy "cannot exist solely between members of the same entity." Mem. 42-43. But *Nosair* involved a conspiracy claim under 42 U.S.C. § 1985 and does not apply to section 1983 claims.[10] Plaintiff articulated the factual allegations on which the conspiracy claim was based, and the Court held that they stated a claim under longstanding Seventh Circuit law. Dkt. 61 at 4-5. The conspiracy claim was brought in good faith and Wexford shows no basis for concluding otherwise. That said, because discovery has shown that Dr. Siddiqui was not present in the health care unit when Mr. Curtis returned from Chester Memorial Hospital, and since both Dr. Siddiqui and Dr. Leven professed to have little memory of Mr. Curtis's death, Plaintiff does not intend to pursue a conspiracy claim against these two defendants at trial. Accordingly, Plaintiff consents to the entry of summary judgment on those claims.

The elements of a failure to intervene claim are that (1) a constitutional violation has been committed by a state actor; and (2) the defendant had a realistic opportunity to intervene to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). "A failure to intervene claim generally presents questions of fact appropriate for the jury; a court

---

[10] The Seventh Circuit has repeatedly affirmed conspiracy claims under Section 1983 involving only police officers from the same department, and district courts in the Circuit have "overwhelmingly declined to dismiss conspiracy claims" based on arguments that entities from the same entity cannot conspire. *Liggins v. City of Chicago*, 2021 WL 2895147, at *5 (N.D. Ill. July 9, 2021) (collecting cases); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 750 (7th Cir. 2012) (reversing dismissal of section 1983 conspiracy claim brought against eight police officers, all of whom were employed by the City of Chicago and worked in the same unit); *Harris v. Kuba*, 2003 WL 27383917, at *3 (S.D. Ill. Dec. 17, 2003) (intracorporate conspiracy doctrine inapplicable to section 1983 conspiracy).

should not decide it at summary judgment if the underlying [constitutional] claim remains unresolved." *Fleriage v. Village of Oswego*, 2017 WL 5903819, at *9 (N.D. Ill. Nov. 30, 2017).

Wexford seeks summary judgment on the failure-to-intervene claim on three grounds. First, Wexford argues that "no constitutional violation was committed." Mem. 44. That is wrong as discussed above. Second, Wexford argues that Dr. Siddiqui did not have had a realistic opportunity to intervene because he was on vacation when Mr. Curtis died. Plaintiff agrees that a reasonable jury could not find that Dr. Siddiqui was in a position to prevent the harm to Mr. Curtis between September 1 and September 5, since he was not present during Mr. Curtis's final demise. That said, Dr. Siddiqui can still be found liable under a deliberate indifference theory for creating or increasing the risk of harm to Mr. Curtis, as discussed above.

Finally, Wexford argues that Dr. Leven "lacked any knowledge of a constitutional violation." Mem. 44. But this is genuinely disputed. There is ample evidence that Dr. Leven failed to take action or provide the necessary information to enable effective life-saving treatment despite knowing of the serious risk of harm facing Mr. Curtis and the fact that that risk was not being adequately addressed. *See* Part I.A *supra*; PSOF 72-95, 101-103. Even if this failure to act were not deliberately indifferent, a reasonable jury could find that it amounted to an unlawful failure to intervene. *See Winchester v. Marketti*, 2012 WL 2076375, at *6 (N.D. Ill. June 8, 2012) (nurse was liable for failing to intervene when she knew doctor's response was inadequate to prevent patient harm and failed to confront or report him). Summary judgment on this claim against Dr. Leven is therefore unwarranted.

## IV.  The Jury Must Decide Whether Defendants Are Liable Under State Law.

In Counts IV and V of the Complaint, Plaintiff brings wrongful death and survival claims against Defendants under the Illinois Wrongful Death Survival Acts. Dkt. 1 ¶¶ 74-87; *see* Dkt. 61 at 9. Because a reasonable jury could find that Dr. Leven, Dr. Siddiqui, and Wexford violated Mr.

Curtis's Eighth Amendment rights, a jury necessarily could find that these Defendants were willful and wanton under the Wrongful Death Act and Survival Act as well. *See Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (stating that the "willful and wanton [standard] is 'remarkably similar' to the deliberate indifference standard"); *Bragado v. City of Zion/Police Dep't*, 839 F. Supp. 551, 554 (N.D. Ill. 1993) ("The definition of 'willful and wanton' [under Illinois law] is essentially the same as the definition of 'deliberate indifference' under the federal constitutional law."). Wexford's attempts to resist this conclusion fail.

### A.  Plaintiff has materially satisfied Section 2-622.

Wexford argues that the state law claims fail to satisfy 735 ILCS 5/2-622, which states that the plaintiff in a medical-malpractice suit[11] should "file an affidavit stating that 'there is a reasonable and meritorious cause' for litigation" and a report from a physician that shows that the physician has "reviewed the plaintiff's medical records and . . . justif[ies] the conclusion that 'a reasonable and meritorious cause' exists." *Young v. United States*, 942 F.3d 349, 350 (7th Cir. 2019). Although section 2-622 speaks to what should be filed with the complaint, when a case is proceeding in federal court, the Federal Rules of Civil Procedure control, so the defendant should instead "submit a motion with its answer and ask the court to grant summary judgment because the plaintiff has not supplied the required affidavit and report." *Id*. at 351-52.

Even though the purpose of section 2-622 is to makes sure that "insubstantial medical-malpractice suits [are] resolved swiftly" and Rule 56 allows a summary-judgment motion to be filed at "at any time" (*Young*, 942 F.3d at 351), Wexford did not submit a motion asking the Court

---

[11] To determine whether a claim is one for malpractice requiring a Section 2-622 filing, a court considers (1) whether the applicable standard of care involved procedures not within the grasp of the ordinary lay juror; (2) whether the activity alleged was inherently one involving medical judgment; and (3) the type of evidence necessary to establish plaintiff's claim. *Jackson v. Chi. Classic Janitorial & Cleaning Serv., Inc.*, 355 Ill. App. 3d 906, 909 (1st Dist. 2005).

to dismiss the state law claims with its answer. Instead, Wexford waited until the close of fact and expert discovery, making section 2-622 superfluous. As the evidence in this case demonstrates, the claims against Wexford are very substantial indeed, and to the extent they are "insubstantial," Wexford has already moved for summary judgment on the merits.

Regardless, as Wexford recognizes, the expert reports of Dr. John Shields, Dr. Richard Cockerill, and Dr. Ryan Herrington—all of which are accompanied by sworn declarations—can serve the same function as the affidavit and report requirement of Section 2-622 at summary judgment. *See* Mem. 46 ("Plaintiff may seek to substitute her retained witness reports in support"). That is consistent with the principle that section 2-622 is intended to reduce the number of frivolous medical malpractice lawsuits filed, but *not* to abridge injured parties' substantive rights. *E.g.*, *Apa v. Rotman*, 288 Ill. App. 3d 585, 589 (1997) ("The technical requirements of the statute should not interfere with the spirit or purpose of the statute, and the absence of strict technical compliance is one of form only and not one of substance."). Plaintiff's expert reports amply demonstrate that there are substantial disputes over the propriety of the medical and mental health care provided to Mr. Curtis.

Wexford responds that the expert reports do not "meet 735 ILCS 5/2-622 standards" for the reasons "outlined in the Motions to Bar." Mem. 46. However, only one of Wexford's motions—the one to bar Dr. Shields—even mentions section 2-622, and its argument on this point is unavailing. Wexford argues that Dr. Shields's report does not satisfy section 2-622 because Dr. Shields has not "actively practiced" clinical psychology within the last six years. *See* Dkt. 218 at 6-7. But that is incorrect—Dr. Shields testified that although he does not currently have a caseload of patients, he regularly practices clinical psychology by conducting psychological evaluations of individuals for courts and attorneys, "primarily in criminal matters." Ex. 83 at 10-

11. Wexford has not cited any case to support an argument that psychological evaluations do not constitute the "practice" of psychology for purposes of section 622 and an ordinary construction of that word makes clear that it does suffice. Accordingly, Wexford's argument that Dr. Shields's report does not satisfy section 622 fails on the facts.

The argument also fails on the law. Even if this Court were to find that psychological evaluations do not constitute the "practice" of psychology as that word is used in section 622, Dr. Shields's report would nevertheless be sufficient under Illinois law. Illinois courts do not "mechanically apply" the "technical requirements of the statute" where doing so would "deprive the plaintiff of her substantive rights." *Comfort v. Wheaton Family Practice,* 229 Ill. App. 3d 828, 832, (2d Dist. 1992). Rather, Illinois courts "liberally construe" a certificate of merit "in favor of the malpractice plaintiff." *Hull v. S. Illinois Hosp. Servs.*, 356 Ill. App. 3d 300, 305 (1st Dist. 2005). This means that a provider's specific qualifications are "not a concern" where it is clear the provider has "decades" of experience on relevant issues. *Brooks v. HSHS Med. Grp., Inc.*, 2019 WL 2139993, at *2 (S.D. Ill. May 16, 2019).

Dr. Shields is licensed as a psychologist in six states, and he has decades of psychology experience, including in the correctional setting, and his report provides detailed bases for his conclusions. That is sufficient to satisfy the qualification requirements of the Illinois statute. *See Brooks*, 2019 WL 2139993, at *2. In fact, one of the cases Wexford cites supports this conclusion. Consistent with a liberal interpretation of section 2-622, it indicates that a report is acceptable where it shows the provider "had experience" with the relevant issues and gives "detailed reasons" for the determination that the defendant's conduct "fell below the standard of care." *Cutler v. Northwest Suburban Comm. Hosp., Inc.*, 405 Ill. App. 3d 1052, 1065 (2d Dist. 2010).[12]

---

[12] The other case Wexford cites, *Cuthbertson v. Axelrod*, 282 Ill. App. 3d 1027 (1st Dist. 1996), is inapposite. As *Cutler* explains, "[p]athology was at issue in *Cuthbertson* and the report did not state that

Even if Wexford had not waived its qualifications argument as to the three other experts, their extensive experience and backgrounds, detailed in their expert reports, amply satisfy the purpose of section 2-622. And their detailed reports, which set out their review of records and conclusions about various mental health and medical deficiencies, are similarly sufficient to sustain Plaintiff's state law claims.

**B.     Dr. Leven, Dr. Siddiqui, and Wexford owed a duty to Mr. Curtis.**

Wexford argues that neither Dr. Leven nor Dr. Siddiqui owed a duty to Mr. Curtis under Illinois law because they were not treating clinicians. Mem. 47-48. But under Illinois law, a "special relationship" giving rise to a duty of care "may exist even in the absence of any meeting between the physician and the patient where the physician performs specific services for the benefit of the patient." *Mackey v. Sarroca*, 2015 IL App (3d) 130219, ¶ 20. Specifically, a physician-patient relationship is established once "the physician takes some affirmative action to participate in the care, evaluation, diagnosis or treatment of a specific patient," such as when "one physician is asked by another physician to provide a service to the patient, conduct laboratory tests, or review test results." *Id.* ¶¶ 19-20; *see also Lenahan v. University of Chicago*, 348 Ill. App. 3d 155, 164 (1st Dist. 2004) (finding duty of care where defendant physician never personally examined the decedent but had responsibility for making referral decisions). Dr. Leven was the 24-hour on-call crisis care facility leader, encountered Mr. Curtis during his final days, and consulted with and supervised her colleagues concerning his care. *E.g.*, PSOF 41-44, 50, 63. Likewise, Dr. Siddiqui was the facility medical director with responsibility for both the medical and mental health teams. PSOF 123. He also prescribed Mr. Curtis a double dose of psychotropic medication without any

---

the reviewing physician was qualified by experience or demonstrated competence in pathology." 405 Ill. App. at 1065. Here, by contrast, Dr. Shields has extensive experience in the relevant discipline.

indication that he had evaluated him to determine that this was appropriate and was aware that Dr. Goldman was trying to get Mr. Curtis additional treatment. PSOF 30, 86. Accordingly, both providers were involved with Mr. Curtis's care such that they owed a duty under Illinois law.[13]

Wexford concedes that Illinois permits institutional liability for medical negligence but claims that there is no evidence of the applicable standard of care. Mem. 48. Dr. Herrington and Dr. Cockerill both offer extensive testimony on the standards for adequate care in the correctional context and the ways in which Wexford's care of Mr. Curtis fell short. As the *Longnecker* case cited by Wexford states, the standard of care "may be shown by a wide variety of evidence, including, but not limited to, expert testimony, hospital bylaws, statutes, accreditation standards, custom and community practice" and can "also be determined without expert testimony in some cases." *Longnecker v. Loyola Univ. Med. Ctr.*, 383 Ill. App. 874, 885 (Ill. 2008). And even if Plaintiff cannot proceed directly on an institutional negligence theory, Wexford remains liable for medical negligence by its agents and employees under the theory of *respondeat superior*.

Wexford's only argument on this score is that "Dr. Siddiqui and Dr. Leven were not deliberately indifferent and did not commit malpractice." Mem. 48. Wexford also argues that Plaintiff should not be permitted to proceed on claims due to acts of non-defendants. But Illinois permits a plaintiff to maintain *respondeat superior* claims against an employer even if the responsible employees are not named in the action. For instance, in a suit under state law where the plaintiff named an unknown Chicago police officer but failed to identify the defendant before discovery closed in the case, the Seventh Circuit held that the City of Chicago could not escape vicarious liability for the now-dismissed unknown officer's conduct. *Williams v. Rodriguez*, 509

---

[13] Wexford relies on *Reynolds v. Decatur Memorial Hospital,* 277 Ill. App. 3d 80 (4th Dist. 1996), to show that no duty exists, but that case is inapposite. There, the defendant, a neurosurgeon, "did not have any specific on-call relationship with the hospital" and merely "accepted calls from local physicians seeking informal advice" without compensation. *Mackey*, 2015 IL App (3d) 130219, ¶ 24 (distinguishing *Reynolds*).

F.3d 392, 405 (7th Cir. 2007). As the court explained, a "determination that the unnamed defendant is not himself a properly named defendant" does not negate the employer's "potential liability for his conduct." *Id.*; *see also McCottrell v. City of Chicago*, 135 Ill. App. 3d 517, 519 (1st Dist. 1985) (courts have "long recognized that in an action by a third party based on injuries caused by the negligence of the servant, the servant is not a necessary party in an action against the master"); *Prate v. Village of Downers Grove*, 2011 WL 5374100, at *5 (N.D. Ill. Nov. 7, 2011) (collecting cases). This principle applies to wrongful death cases against jails and prisons as well. *Hunt v. Dart*, 2010 WL 300397, at *5 (N.D. Ill. Jan. 22, 2010).

### C. A reasonable jury could find causation.

The proximate cause standard on the state law claims requires the plaintiff to show, through expert testimony offered to a "reasonable degree of medical certainty," that the defendant's failure to comply with the standard of care proximately caused an injury. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018). Wexford argues that there is no evidence that its agents or employees' conduct caused Mr. Curtis's death. However, "[q]uestions concerning proximate cause are factual matters for the jury to decide." *Espinoza v. Elgin, Joliet & Eastern Ry. Co.,* 165 Ill.2d 107, 114 (Ill. 1995). There is ample evidence here that would permit a jury to find for Plaintiff.

In attempting to show otherwise, Wexford argues that "Plaintiff's retained [expert] testimony lacks foundation and/or does not genuinely dispute Mr. Curtis' certified cause of death within a reasonable degree of medical certainty." Mem. 49. But these arguments just re-tread the arguments for exclusion in Wexford's motions to bar the opinions of Dr. Cockerill, Dr. Shields, and Dr. Herrington. *Id.* at 49-50. As explained in Plaintiff's oppositions to those motions, all three experts are qualified to offer cause of death opinions and opinions on proximate cause. Plaintiff will not repeat every basis for that conclusion here. An example will illustrate the point.

Wexford asserts that Dr. Herrington's testimony is infirm because he applies a "more likely than not" standard rather than a "reasonable degree of medical certainty" standard. But this is puzzling, because Dr. Herrington stated multiple times in his reports that he ***does*** hold his opinions based on a reasonable degree of medical certainty. Ex. 10 at 5 ("The opinions formulated and documented herein are made to a reasonable degree of medical certainty . . ."); Ex. 57 at 1 ("Like my prior report, I have reached all of the below opinions to a reasonable degree of medical certainty . . ."). That Dr. Herrington mentioned that he reached some of his conclusions on a "more likely than not" basis is fully consistent with that legal standard. *See Wise v. St. Mary's Hospital*, 64 Ill. App. 3d 587, 590 (1978) ("While medical testimony is usually couched in terms of art such as 'based upon a reasonable degree of medical certainty,' etc., it is not objectionable for the medical expert to testify in terms of percentages so long as it is clear that the opinion expressed is not the product of mere speculation or conjecture."); *Galvin v. Olysav*, 212 Ill. App. 3d 399, 405 (1991) (declining to exclude evidence where a "doctor testified in terms of percentages" without repeating the words "reasonable degree of medical certainty"). Wexford's substantive disagreement with Dr. Herrington's conclusions presents at most "a factual question for trial." *Jones v. Wexford Health Sources, Inc.*, 2021 WL 323792, at *7 (N.D. Ill. Feb. 1, 2021) (denying motion for summary judgment on causation grounds where "[t]he defendants frequently claim that [an expert] 'does not offer a single opinion to a reasonable degree of medical certainty'" but the expert's report "concludes by stating that his opinions are offered with 'a reasonable degree of medical and orthopedic surgical certainty'").

In sum, a reasonable jury could conclude that Wexford's misconduct amount to the proximate cause of Mr. Curtis's death. *See, e.g.*, *Miranda*, 900 F.3d at 348 (expert opinion that "the medical defendants' inaction contributed" to the defendant's death was not "impermissibly

conclusory" and was sufficient to find causation). Of course, Wexford is free "to cross-examine the experts about what led them to draw their conclusions." *Id*. (citing *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981)). But this is not an issue for summary judgment.

## V.    Wexford's Pleading Arguments Are Meritless.

One final set of issues remains. Likely because the record contains so many disputed and material facts, Wexford attempts to sidestep the evidence with hypertechnical pleading arguments. Wexford offers three reasons for casting out large portions of the record. All are off-base.

### A.    Plaintiff's position at summary judgment is fully consistent with the pleadings.

Wexford's most audacious argument seeks to prevent Plaintiff from controverting the cause of death on Mr. Curtis's autopsy report—*i.e.*, seeks to bind Plaintiff, irrevocably, to a cause of death of "Probable Intoxication of Unknown Substances." *Id*. But Plaintiff has never conceded that Mr. Curtis died from unknown substances, or even that the determination of a "probable intoxication" (which leaves room for other causes on its face) was correct. Rather, Plaintiff alleged in her complaint that the "forensic pathologist who conducted Kevin's autopsy on September 7, 2018 determined that Kevin died as a result of a probable intoxication from an unknown substance." Dkt. 1 ¶ 46. That fact is true, but it says nothing about whether the forensic pathologist's determination is ultimately correct.

Nevertheless, because Plaintiff has moved to not amend the complaint—or the autopsy and death certificate—Wexford says that Plaintiff should "be barred from proceeding on a theory of liability not pled and a cause of death contradictory to her pleadings." Mem. 13. But it should be abundantly clear that there is nothing remotely "contradictory" between alleging that a forensic pathologist made one determination after Mr. Curtis's death and contending at summary judgment that Mr. Curtis's death was caused by severe dehydration. All that means is that the cause of death listed on the autopsy report was *wrong*.

None of this can come as a surprise to Wexford given the fiercely litigated history of this case. Indeed, just looking at the Court's docket, there are countless indications that Plaintiff intended to challenge the cause of death on the autopsy report, all acknowledged both by the Court and by Wexford's counsel itself. On October 7, 2022, for example, the parties filed a joint motion for extension of time indicating that both sides anticipated exchanging multiple expert reports. Plaintiff specifically indicated that she planned to submit a report by a forensic pathologist. Dkt. 97 ¶ 6. As another example, on December 16, 2022, Plaintiff filed a reply stating that the cause of death would be a "hotly disputed" subject in expert discovery. Dkt. 114 at 2 n.1 ("Wexford asserts that Plaintiff died of intoxication with an unknown substance. But that cause of death is hotly disputed in this case and will be an important focus of expert discovery.").

As yet another example, Wexford *itself* acknowledged that Plaintiff would challenge cause of death, noting on January 11, 2023 that Plaintiff's forthcoming expert disclosures "will contradict the cause of death for Mr. Curtis, found by Dr. Sabharwal, the forensic pathologist that performed the autopsy." Dkt. 120 ¶ 6. Wexford filed that paper more than a year before it moved for summary judgment. Thus, as the Court recognized when it granted a motion to compel in November 2023, the fact that Plaintiff intended to challenge the original cause-of-death determination "should come as no surprise to Defendants Wexford and Leven, in light of Plaintiff's claims under *Monell* and the circumstances surrounding Decedent's death." Dkt. 177 at 20-21 (requiring Wexford to produce documents regarding deaths in custody from dehydration from 2010–2020).

To make matters worse, Wexford is now seeking to bar critical evidence on the untenable grounds that it was deprived of fair notice even though Wexford successfully sought an extension of time to be able to address this very issue. On May 26, 2023, Wexford asked the Court to extend the fact discovery schedule in light of "Plaintiff's expert disclosures, which Plaintiff represented

would contradict the cause of death for Mr. Curtis, found on autopsy." Dkt. 153 ¶ 4. Wexford claimed that it needed this extension to ensure "sufficient time to discover and defend this novel finding." *Id*. The Court ***granted*** that motion, thus giving Wexford the "additional time" it requested to "properly defend those expert disclosures." Dkt. 156.

Having successfully obtained an extension of discovery based on its representations that it needed the time to "defend" against Plaintiff's cause of death opinions, Wexford should be judicially estopped from claiming that it lacked sufficient notice of Plaintiff's position and seeking to bar Plaintiff from offering any evidence in support of this position in the first place. *See New Hampshire v. Maine*, 532 U.S. 742, 750-71 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."). But estoppel and basic fairness aside, Wexford's position is not remotely defensible. In federal practice, a plaintiff "need not plead detailed factual allegations" to support a claim at the start of a case. Dkt. 61 at 2-3 (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Federal Rules require only a "short and plain statement of the claim" (Fed. R. Civ. P. 8(a)) because a "full description of the facts that will prove the plaintiff's claim comes later, at the summary-judgment stage or in the pretrial order." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017); *see also Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (a complaint merely "limns the claim" and "details of both fact and law come later, in other documents"). Contrary to Wexford's current position, "elaborating on the complaint is exactly what plaintiffs are supposed to do in discovery." *Prayitno v. Nextep Funding LLC*, 2020 WL 3414955, at *5 (N.D. Ill. June 22, 2020).

-109-

Wexford cites *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529 (7th Cir. 2018), and *Chessie Logistics Co. v. Krinos Holdings Inc.*, 867 F.3d 852 (7th Cir. 2017), to argue that Plaintiff is barred from trying to change facts alleged in the complaint at summary judgment. Mem. 13-15. But those cases address a separate issue, when the plaintiff brings one kind of legal claim in the complaint and then switches to another kind of claim that is factually inconsistent with the first. *See Chessie*, 867 F.3d at 541 ("The facts needed to support his new legal theory were inconsistent with his original factual allegations."). Plaintiff is bringing the same claim today that she brought in her original complaint: claims against Dr. Leven, Dr. Siddiqui, and Wexford for deliberate indifference causing Mr. Curtis's death. As explained above, Plaintiff's position at summary judgment does not "alter the factual basis of [her] complaint." *BRC*, 900 F.3d at 540; *see also, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 937 (N.D. Ill. 2023) ("In relying on evidence obtained in discovery to flesh out the contours of Defendants' alleged conspiracy . . . , Plaintiffs have not altered the 'fundamental factual allegation' in their complaints."); *Holt v. Lewsader*, 2020 WL 10976625, at *23 (C.D. Ill. Sept. 30, 2020) ("the court is not persuaded that Plaintiff is making the sort of 'new argument' that is impermissible at summary judgment, because Plaintiff's position is firmly rooted in the Amended Complaint and in Plaintiff's and Lewsader's deposition testimony, so even if it reflects a change of tack, Defendants had fair warning of it, and the change is not the sort of fundamental alteration of the factual basis for the claim that puts the argument out of bounds"); *Greene v. Karpeles*, 2020 WL 3250715, at *4 (N.D. Ill. June 16, 2020) ("[T]he complaint articulated the gist of the fraud claim, and in opposing summary judgment Greene merely added detail with the aid of discovery. That does not violate the rule against altering the factual basis of a claim on summary judgment.").

What is more, the Seventh Circuit has recently addressed the authority cited by Wexford and clarified that the reading Wexford gives those decisions is untenable. In *Schmees v. HC1.COM, Inc*., 77 F.4th 483 (7th Cir. 2023), the court held that the somewhat "muddled" decisions in *Chessie Logistics* and *BRC Rubber* do not preclude courts from considering new factual theories even where the theories are advanced for the first time in an opposition to summary judgment. *Id*. at 488-90. Rather, "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend." *Id*.

Here, of course, Plaintiff is not pursuing her factual theory for the first time in opposition to Wexford's motion. *See supra* p. 41-42. But even if Plaintiff were, the Court should simply allow constructive amendment, as there is no conceivable prejudice to proceeding on a dehydration cause of death when Defendants have been able to conduct extensive fact and expert discovery on this issue. *See Schmees*, 77 F.4th at 490 (stating that, in deciding whether to allow constructive amendment at summary judgment, a court "should apply the familiar standards governing when leave to amend should be granted, paying particular attention to the potential for prejudice to other parties"); *Dealer Management Systems*, 680 F. Supp. 3d at 938 (even assuming the plaintiff was asserting a new factual basis, amendment would be permitted on the grounds of no prejudice where defendants' experts "had an opportunity to rebut" them, plaintiff's experts "were deposed extensively" and "subject to *Daubert* challenges," and defendants "have not identified any specific material that could have been revealed, had they explored those topics, and have not asked the court to reopen discovery on these topics"). Wexford effectively concedes that there is no prejudice on this point, arguing only that prejudice is not relevant to "the 'firm' standard for attempts to

change the fundamental *facts* alleged." Mem. 14 (citing *BRC Rubber*). Yet the Seventh Circuit overruled that portion of *BRC Rubber* in *Schmees*. *See* 77 F.4th at 488 n.*.[14]

In the alternative to blanket exclusion of Plaintiff's cause-of-death evidence, Wexford contends that there is no genuine dispute over the cause of death. Mem. 15-19. But as the Court by now can doubtlessly surmise, that is plainly incorrect. Cause of death is vigorously disputed. *See* PSOF 108-120. This section of the brief is simply another excuse for Wexford to summarize its baseless arguments for excluding the cause-of-death opinions offered by Dr. Herrington and Dr. Diaz. Plaintiff incorporates her responses to those motions by reference.

### B.    Plaintiff's claims are timely.

Wexford argues that the statute of limitations bars Plaintiff from pursuing "any claims based on actions or inactions of any person prior to September 5, 2018." Mem. 19. Elsewhere, Wexford seems to be under the impression that reference to anything that happened before September 5, 2018 is barred by statute limitations. *See, e.g.*, *id*. at 28 (stating that "any allegations before September 5, 2018 . . . would be barred by the statute of limitations"). Wexford is incorrect.

To start, Wexford expressly waived the statute-of-limitations affirmative defense for both Defendants Wexford and Leven in the Parties' First Joint Written Discovery Report, which was submitted to the Court on February 3, 2023. Ex. 110 (Parties' Joint Written Disco. Rept.) at 9, 35. At no point in the 16 months that followed did Wexford or Leven ever inform Plaintiff that it intended to re-assert the affirmative defense—an action Plaintiff relied on in not seeking discovery

---

[14] Wexford also argues that Plaintiff is seeking to proceed on "unpled allegations" with respect to the *Monell* claims. Mot. 35. That is meritless for the same reasons. Wexford has long known the bases for Plaintiff's claims and had ample time to respond. On May 26, 2021, Plaintiff served interrogatories responses outlining her *Monell* theories. Ex. 108 (Pl.'s Resp. to Wexford's Interrog.) at 8-11. On March 14, 2023, she served a supplemental response discussing Dr. Leven, Dr. Siddiqui, and Wexford generally, and incorporating by reference her forthcoming expert reports. Ex. 109 (Pl.'s Supp. Resp. to Wexford's Interrog.) at 1-10. On May 12, 2023, Plaintiff served her expert reports. As discussed in the text, Wexford sought and obtained an extension to respond to these reports as well. Dkt. 156.

on the defense. This Court should accordingly reject Wexford's statute-of-limitations arguments at the outset because they were expressly and knowingly waived. *See United States v. Gaona*, 697 F.3d 638, 641 (7th Cir. 2012) (waiver occurs when a defendant "intentionally relinquishes or abandons a known right").

Even if this Court does not enforce Wexford's waiver—which it should—the arguments nevertheless fail. There does not appear to be any dispute all of Plaintiff's claims accrued on September 5, 2018, the date of Mr. Curtis's death. Nor does there appear to be any dispute that the complaint, filed on September 4, 2020, was timely filed. Dkt. 1. Although the claims accrued on September 5, 2018, however, that actions and inactions giving rise to those claims began much earlier—as early as 2017, when Mr. Curtis was transferred to IDOC's custody in Stateville Northern Reception Center and first encountered Wexford, which failed to request pertinent records or ensure continuity of care. PSOF 11-30.

Contrary to Wexford's apparent position, all of this conduct is directly pertinent to Plaintiff's claims and properly the subject of this litigation. Under well-settled precedent, a "violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct." *Heard v. Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001). As in *Heard*, Mr. Curtis's death was "the consequence of a numerous and continuous series of events," and thus the entire series of events can therefore be the subject of suit. *Id.*; *see also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517 (7th Cir. 2019); *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). The same is true of *Monell* claim. So long as the claim is filed timely, the plaintiff can and often does reach back before the start of the accrual date to prove an unconstitutional policy, practice, or

custom. *See Golodner v. City of New London*, 2016 WL 1048746, at *6 (D. Conn. Mar. 11, 2016) ("[A]ny claim arising out of the 2006 and 2008 incidents is barred by the statute of limitations. But the 2006 and 2008 incidents can still be considered in deciding whether there was a policy of deliberate indifference that caused the 2011 incidents").

Indeed, it is "well established" as a general principle that conduct outside the limitations period can always be admitted if it is relevant "as background evidence in support of a timely claim." *Hum. Rts. Def. Ctr. v. Jeffreys*, 2022 WL 4386666, at *5 (N.D. Ill. Sept. 22, 2022); *Beard v. Don McCue Chevrolet, Inc.*, 2012 WL 2930121, at *3 (N.D. Ill. July 18, 2012) (although some alleged misconduct is not actionable under Title VII and § 1981 statutes of limitations, allegations are still relevant because time-barred prior acts can serve as background evidence); *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (explaining that a statute of limitations does not preclude the introduction of evidence from before the commencement of the statute of limitations that is relevant to events during that period). Accordingly, Wexford's repeated complaints about the statute of limitations are insubstantial. All the evidence in the record is appropriately considered in deciding Plaintiff's claims.

### C.     Plaintiff can discuss individuals who are not named defendants.

Wexford also argues that Plaintiff cannot rely on "the actions or inactions of non-defendants not pled in the Complaint" (*i.e.*, other Wexford employees like Dr. Floreani) at summary judgment. Mem. 19-20. It makes a similar point about *Monell* liability later in its brief. Mem. 31. This is also head-scratching. The Seventh Circuit has held that there is no rule that "requires individual officer liability" to hold a municipality or private corporation "liable for damages" under *Monell*. *Thomas*, 604 F.3d at 305. Similarly, the argument that "there is no underlying Constitutional violation because the statute of limitations has run as to the alleged individual offenders" is "foreclosed by case law holding that 'a municipality can be held liable

under Monell, even when its officers are not.'" *Callaway v. City of Austin*, 2015 WL 4323174, at *9 n.8 (W.D. Tex. July 14, 2015) (citing *Thomas*, 604 F.3d at 305). And Wexford's claim that it will be "prejudiced" if these facts are considered or denied a "right to a fair trial" does not hold water. Mem. 20-21. The relevant individuals have been the subject of extensive discovery, depositions, expert reports, and interrogatory responses. Wexford has had ample opportunity to construct a defense.

In short, the fact that Dr. Floreani and other Wexford employees are not named as defendants means only that those persons, individually, do not face liability for any violations of Mr. Curtis's rights. The Court can still consider evidence relating to those employees in support of Plaintiff's *Monell* claims and other claims.

## CONCLUSION

Plaintiff does not object to the entry of summary judgment on her conspiracy claim and failure to intervene claim against Dr. Siddiqui or on her conspiracy claim against Dr. Levin. With those exceptions, however, the Court should deny Wexford's motion for summary judgment.

Dated: June 21, 2024

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff


Sarah Grady
Howard Kaplan
David Schmutzer
Nabihah Maqbool
Annie Garau Kelly
Adam J. Smith
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184
sarah@kaplangrady.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Sarah Grady, an attorney, hereby certify on June 21, 2024, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.

<u>/s/ Sarah Grady</u>
Sarah Grady
Attorney for Plaintiff