## IN THE UNITED STATES DISTRICT COURT
## FOR SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| YOLANDA JACKSON, Administrator of the Estate of Kevin Curtis, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| WEXFORD HEALTH SOURCES, INC., EVA LEVEN, MOHAMMED SIDDIQUI, GAIL WALLS, NICKOLAS MITCHELL, CHARLIE FRERKING, JEREMY FRERICH, and ANDREW BENNETT, | ) ) ) ) ) ) ) ) ) | Case No. 3:20-cv-900-DWD |
| Defendants. | ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court are the parties' four separate Motions for Summary Judgment, which are fully briefed with Responses and Replies. (Docs. 213, 214, 222, 226, 228, 235, 255, 263, 264, 288, 290, 291, 295; Sealed Doc. 217).[1] Also before the Court are the parties' various Motions to Exclude Expert Opinions together with their respective Responses and Replies. (Docs. 215, 216, 218, 219, 231, 233, 246, 247, 256, 258, 259, 262, 275, 278, 283, 284, 285, 287; Sealed Docs. 220, 232, 234).[2] In addition, Defendants filed various other miscellaneous motions. (Docs. 221, 313, 320). All pending matters are resolved below.[3]

---

[1] A hearing was held on the parties' Motions for Summary Judgment on March 13, 2025. (Doc. 303).

[2] Defendant Mitchell joined the Wexford Defendants' Motions to Exclude Expert Opinions and Replies in Support. (Docs. 225, 236, 289, 294).

[3] The Court notes, to facilitate the extensive briefing of the matters now at issue, it allowed the parties to operate outside of the page limitations and the default deadlines prescribed by the Local Rules.

# I. BACKGROUND

Decedent, Kevin Curtis, died while incarcerated at Menard Correctional Center. (Doc. 1, pgs. 1-2, 6). Before his death, Decedent was placed on the crisis watch unit due to his mental health. (Doc. 1, pgs. 1-2, 6). On the morning of September 5, 2018, a correctional officer, conducting a crisis watch check, found Decedent unresponsive in his cell. (Doc. 1, pgs. 2, 7). He was taken to the healthcare unit, where Defendants Siddiqui, Leven, and Walls allegedly failed to properly treat his condition. (Doc. 1, pgs. 2, 7-8). Defendant Leven was the mental health services director, Defendant Siddiqui was the medical director, and Defendant Walls was the healthcare unit administrator at the prison. (Doc. 1, pg. 4). Defendants Leven and Siddiqui were employees of Defendant Wexford, and Defendant Walls was an employee of the IDOC. Thereafter, Decedent was allegedly abandoned in his cell by Defendants Mitchell, Bennett, Frerich, and Frerking, who were correctional officers for the IDOC. (Doc. 1, pgs. 2, 4-5, 8-10). Decedent died after several missed crisis watch checks. (Doc. 1, pgs. 2, 10). An autopsy later revealed the probable cause of death was intoxication by unknown substances. (Doc. 1, pgs. 2, 10).[4]

---

[4]The Wexford Defendants argue Plaintiff's unpled factual allegations must be disregarded on summary judgment. (Doc. 214, pg. 12). As to Decedent's cause of death, the Wexford Defendants remind the Court that Plaintiff alleges, and an autopsy confirmed, Decedent's probable cause of death was intoxication by unknown substances. (Docs. 1, pgs. 2, 10; 214, pg. 13). Decedent was seen by medical and mental health staff, but they did not know he "obtained and ingested a synthetic cannabinoid-like substance." (Doc. 214, pg. 13). As a result, the Wexford Defendants suggest they are not liable for that cause of death and Plaintiff, who never amended her Complaint, cannot defeat summary judgment by relying on unpled and disputed facts. (Doc. 214, pgs. 13-18, 19-20). In response, Plaintiff argues the Wexford Defendants were on notice of the facts and theories of the case for years, so they had "ample time" to conduct discovery and prepare defenses. (Doc. 264, pgs. 81, 110-11, 118). As to the cause of death in the autopsy report, *i.e.*, death by probable intoxication from unknown substances, Plaintiff argues she "never conceded" that was the cause of death. (Doc. 264, pg. 110). In fact, Plaintiff and her experts "vehement[ly] dispute" the record reflects a synthetic cannabinoid caused Decedent's death. (Doc. 264, pgs. 83-84).

Plaintiff, as Decedent's mother and the administrator of his estate, filed a 6-count Complaint against Defendants. (Doc. 1). Plaintiff alleges deliberate indifference by each Defendant under the Eighth Amendment and 28 U.S.C. § 1983 (Count I), a conspiracy by each individual Defendant under § 1983 (Count II), a failure to intervene by each individual Defendant under the Eighth Amendment and § 1983 (Count III), a wrongful death action against each Defendant under 740 ILCS 180/1 (Count IV), and a survival action against each Defendant under 755 ILCS 5/27-6 (Count V). (Doc. 1, pgs. 10-18).[5] [6]

## II. ANALYSIS

### A. The Parties' Motions for Summary Judgment

The Court will grant summary judgment if the movant shows there is no genuine dispute as to any material fact, such that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015); citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Assertions that a fact cannot be or is genuinely disputed must be supported by citations to the materials of record. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, the assertions must be supported by a showing that the

---

Plaintiff argues a reasonable jury could also reject that conclusion, as the autopsy leaves room for other possible causes of death. (Doc. 264, pgs. 83-84, 110, 115). Thus, Plaintiff argues there is nothing surprising or contradictory about the autopsy, the Complaint, or a death by dehydration. (Doc. 264, pgs. 110-15).

[5]Count VI, invoking Defendant Wexford's *respondeat superior* liability, was dismissed. (Doc. 61).

[6]Plaintiff now concedes summary judgment is appropriate on certain of her claims. (Docs. 263, pgs. 56-57; 264, pgs. 82, 100-02, 118). Specifically, she indicates summary judgment is appropriate on Count II. (Docs. 263, pgs. 56-57; 264, pgs. 82, 100-02, 118). In addition, Plaintiff only intends to pursue Count III against Defendants Leven, Mitchell, Walls, Bennett, Frerich, and Frerking. (Docs. 263, pgs. 75-78; 264, pgs. 82, 100-02, 118). For these reasons, there is no need for further discussion of Count II in this Memorandum & Order. Likewise, the Court will only discuss Count III as to the previously named Defendants.

materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

If the movant presents evidence to show the absence of a genuine dispute of material fact, then the burden shifts to the nonmovant to provide evidence of specific facts that create a genuine dispute of material fact. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Hudson Ins. Co. v. City of Chicago Heights*, 48 F.3d 234, 237 (7th Cir. 1995)). A genuine dispute of material fact exists if there is sufficient evidence for the nonmovant to receive a verdict. *Driveline Sys.*, 936 F.3d at 579 (quoting *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018), *reh'g denied* (Oct. 30, 2018)). Speculation, unsupported by the evidence, cannot defeat summary judgment. *Moje v. Fed. Hockey League, LLC*, 377 F. Supp. 3d 907, 920 (N.D. Ill. 2019) (citing *Sbika v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018); *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994)).

When considering a motion for summary judgment, the Court will not determine credibility, weigh the evidence, or decide which inferences to draw from the facts, as those tasks are reserved for the finder of fact. *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (quoting *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018)). Instead, based on the evidence, the Court will decide whether a genuine dispute of material fact requires a trial. *Id.* (quoting *Johnson*, 892 F.3d at 893). When doing so, the Court construes the evidence in a light most favorable to the nonmovant while avoiding the temptation of deciding one party's version of the facts is more likely true than the other party's version of the facts. *Id.* (quoting *Johnson*, 892 F.3d at 893).

### 1. Count I: Deliberate Indifference by All Defendants under the Eighth Amendment and § 1983

Prison officials, *i.e.*, prison medical professionals and correctional officers, violate the Eighth Amendment's prohibition on cruel and unusual punishment when their conduct shows a deliberate indifference to serious medical needs. *Jones v. Mathews*, 2 F.4th 607, 612 (7th Cir. 2021) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997)); *Lewis v. McLean*, 864 F.3d 556, 562 (7th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff must prove (1) an objectively serious medical condition and (2) that the prison officials were deliberately indifferent to the prisoner's health or safety. *Jones*, 2 F.4th at 612 (citing *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 423 (7th Cir. 2017)); *accord Eagan v. Dempsey*, 987 F.3d 667, 694-95 (7th Cir. 2021); *Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019); *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019). When reviewing the claim, the Court considers all of the inmate's care. *Lisle*, 933 F.3d at 716.

Notably, there is an objective and a subjective component to the claim. *Jones*, 2 F.4th at 612 (quoting *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002)); *accord Lewis*, 864 F.3d at 562. To satisfy the objective component, a plaintiff may show a doctor diagnosed the medical condition as requiring treatment, a layperson would find the need for treatment to be obvious, or the failure to treat resulted in a more serious injury or the unnecessary and wanton infliction of pain. *Jones*, 2 F.4th at 612 (quoting *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019)); *Eagan*, 987 F.3d at 695 (quoting *Gutierrez*, 111 F.3d at 1373); *Orlowski*, 872 F.3d at 423 (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A condition may be obvious to a layperson even if he or she

cannot diagnose or identify its cause. *Jones*, 2 F.4th at 612 (quoting *Orlowski*, 872 F.3d at 423). Also, the medical condition need not be life-threatening. *Orlowski*, 872 F.3d at 423.

To satisfy the subjective component to the claim, a plaintiff must prove the prison officials were aware of facts from which to infer a substantial risk of serious harm, drew such an inference, and responded with a reckless or intentional disregard for the serious medical condition through inaction or woefully inadequate action. *Jones*, 2 F.4th at 612; *Eagan*, 987 F.3d at 695; *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Put another way, a plaintiff must prove the prison officials "acted with a sufficiently culpable state of mind," *i.e.*, that they were "aware of a substantial risk of serious harm[] and effectively condone[d] th[at] harm by allowing it to happen.' " *Jones*, 2 F.4th at 612-13 (quoting *Estate of Simpson v. Gorbett*, 863 F.3d 740, 747 (7th Cir. 2017); *Eagan*, 987 F.3d at 693) (cleaned up).

The Court stresses that deliberate indifference describes a state of mind more blameworthy than even gross negligence. *Jones*, 2 F.4th at 612-13 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *McGowan*, 612 F.3d at 640; *see also Eagan*, 987 F.3d at 688 ("A physician's negligence in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment.") (cleaned up). Indeed, "an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind." *Eagan*, 987 F.3d at 688 (quoting *Estelle*, 429 U.S. at 105-06) (cleaned up). Likewise, a mistake in professional judgment is not deliberate indifference. *Id.* (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). Therefore, treatment decisions are entitled to deference unless no minimally competent professional would respond in the same way. *Campbell*,

936 F.3d at 545 (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)); *accord Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *see also Orlowski*, 872 F.3d at 424 ("Even if a defendant recognizes the substantial risk, he is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted.") (cleaned up). The course of treatment must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Campbell*, 936 F.3d at 545 (quoting *Sain*, 512 F.3d at 895) (cleaned up); *see also Roe*, 631 F.3d at 857 ("The burden is high on a plaintiff making such a claim: Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts. However, a successful plaintiff need not show that he was literally ignored in his demands for medical treatment, and a defendant's showing that a plaintiff received some treatment does not resolve the issue conclusively if the treatment was blatantly inappropriate.") (cleaned up).

Relevantly, dehydration is serious enough to require "prompt action," and the failure to breath or to regain consciousness "are undoubtedly life-threatening medical conditions that are obvious to a layperson," under the objective component. *Orlowski*, 872 F.3d at 423; *Hoban v. Godinez*, 502 Fed. App'x 574, 578 (7th Cir. 2012). Moreover, the failure to treat or the improper delay in treating a serious medical condition can show deliberate indifference for the subjective component. *See Campbell*, 936 F.3d at 549 ("[R]egardless of the disease or injury at issue, utterly failing to treat a serious medical condition constitutes deliberate indifference…. Deciding whether to provide additional medical interventions…is not the same as deciding to provide no treatment at all."); *Orlowski*, 872

7

F.3d at 425 ("Failing to consult or alert a medical professional where an inmate is unconscious and barely breathing 'surpasse[s] mere negligence and enter[s] the realm of deliberate indifference.' "). Whether a delay is tolerable depends upon the seriousness of the condition, the official's awareness of the condition, and the ease of treatment. *Jones*, 2 F.4th at 615 (quoting *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015)); *Hoban*, 502 Fed. App'x at 577 (citing *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012)); *see also Lewis*, 864 F.3d at 563 ("A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain, and even brief, unexplained delays in treatment may constitute deliberate indifference.") (cleaned up).

### i. Defendant Siddiqui

As to Defendant Siddiqui, the Wexford Defendants argue § 1983 requires personal liability that is predicated upon fault and, here, a medical director, overseeing medical staff without personal involvement in patient care, cannot be the subject of a deliberate indifference claim. (Doc. 214, pg. 22). They note there are no allegations against Defendant Siddiqui before August 31, 2018, and timesheets show he was on vacation between August 31 and September 5, 2018. (Doc. 214, pg. 23). In discovery responses, Defendant Siddiqui stated: "Based on my review of the medical records, I do not believe I had any interaction with [Decedent]" or was "involved in the incidents alleged in the Complaint." (Docs. 214, pg. 23; 214-8, pgs. 2, 4, 6, 8). Thus, the Wexford Defendants argue no reasonable jury could find Defendant Siddiqui liable on Count I. (Doc. 214, pg. 23).

Plaintiff argues there is conflicting evidence as to Defendant Siddiqui's personal involvement in Decedent's treatment. (Doc. 264, pg. 90). He purportedly signed an

8

interview report that indicated Decedent "was being monitored daily via medical and was being treated appropriately." (Doc. 264, pg. 90). Defendant Leven purportedly signed an interview report that indicated Defendant Siddiqui "evaluated [Decedent] within his department." (Doc. 264, pg. 90). During discovery, the Wexford Defendants allegedly "wavered" on these issues. (Doc. 264, pg. 90). For example, Defendant Siddiqui claimed the interview report did not reflect "firsthand information," he did not remember his interview statements, the interview report was signed without being read, and Defendant Leven did not recall indicating Defendant Siddiqui evaluated Decedent. (Doc. 264, pg. 90). Even if Defendant Siddiqui was on vacation, Plaintiff argues a reasonable jury could still find deliberate indifference because he "oversaw and was responsible for the medical and mental health program…and [he] was responsible for operating those programs in accordance with accepted standards of practice." (Doc. 264, pg. 91).

Here, it is undisputed that Defendant Siddiqui was on vacation between August 31 and September 5, 2018. (Docs. 214, pg. 10; 264, pg. 8; Sealed Doc. 217, pgs. 8-12). As a result, it is also undisputed that Defendant Siddiqui was not present at Menard Correctional Center on the day of, or during the five days leading up to, Decedent's death. This also means Defendant Siddiqui did not meet with or treat Decedent during that time.

It is true, though, Defendant Siddiqui, so long as he was in the country, was on call during his vacation. (Docs. 264, pg. 61; 268-64, pgs. 15-18; 290, pgs. 72-73). However, Plaintiff has identified no evidence that Defendant Siddiqui was called by medical staff at Menard Correctional Center during that time. (Doc. 290, pgs. 58, 72-73). And, notably,

9

Defendant Siddiqui stated in his testimony, while he "was available…all the time," he was not contacted by phone about events involving Decedent. (Doc. 268-64, pgs. 24-25).

It is also true Defendant Siddiqui was eventually copied onto an email chain, originating from Dr. Lisa Goldman, a nonparty who was employed as the IDOC psychologist administrator, relating to Decedent's condition on the morning of September 5, 2018. (Docs. 264, pgs. 28-29; 44-48; 268-46; 290, pgs. 41, 58). Defendant Siddiqui, who was included "for…input on what ha[d] been done" about Decedent's dehydration, did not respond to any emails on which he was copied. (Doc. 268-46). Again, though, Defendant Siddiqui was on vacation between August 31 and September 5, 2018. (Docs. 214, pg. 10; 264, pg. 8; Sealed Doc. 217, pgs. 8-12). While Defendant Siddiqui testified that he could be contacted for offsite consultations in "any way," including by email, his IDOC email address, which was the email address copied onto the email chain, "was broke and they were…never able to fix it." (Doc. 268-64, pgs. 11-12, 14-15, 24). For "a number of years," Defendant Siddiqui testified that he "went without a working [IDOC] e-mail." (Doc. 268-64, pgs. 11-12, 14-15, 24). As such, Defendant Siddiqui "didn't see the e-mail" chain; otherwise, he would have responded to it. (Doc. 268-64, pgs. 24-26).

On this record, the Court finds there is no genuine dispute of material fact that prevents summary judgment for Defendant Siddiqui on Count I. The Court agrees with the Wexford Defendants that there is no evidence he was personally involved in the constitutional violation alleged by Plaintiff on September 5, 2018, *i.e.*, the "fail[ure] to provide [Decedent] with proper medical/mental health care or access to medical care" despite knowing his catatonic and unresponsive "condition caused…a substantial risk of

10

serious harm without appropriate action." *See Gonzalez v. McHenry County, Illinois*, 40 F.4th 824, 828 (7th Cir. 2022) (noting for personal involvement in a constitutional deprivation, which is required against an individual, "the plaintiff must show that the relevant official 'caused the constitutional deprivation at issue' or acquiesced in some demonstrable way in the alleged constitutional violation.' "); (Doc. 1, pgs. 6-8, 10-11).

The Court stresses the record is devoid of evidence that Defendant Siddiqui was deliberately indifferent to Decedent's medical needs, *i.e.*, that he knew of facts from which to infer Decedent was at a substantial risk of serious harm, drew that inference, and responded with reckless or intentional disregard for his condition. *See Jones*, 2 F.4th at 612-13; *Eagan*, 987 F.3d at 688, 693, 695; *Lisle*, 933 F.3d at 716; *McGowan*, 612 F.3d at 640; *Roe*, 631 F.3d at 857. In short, there is no evidence Defendant Siddiqui knew of Decedent's condition, which was admittedly assessed by other medical and mental health personnel both inside and outside of Menard Correctional Center between August 31 and September 5, 2018, so he could not have been deliberately indifferent to it. Indeed, even when construing the facts related to the September 5, 2018, email chain, the "conflicting evidence" from the IDOC investigation and discovery, and the broader responsibilities of a medical director maximally for Plaintiff, the Court cannot find those facts reflect a sufficiently culpable state of mind for the constitutional deprivation alleged by Plaintiff in Count I. *See Jones*, 2 F.4th at 612-13; *Eagan*, 987 F.3d at 688, 693, 695; *McGowan*, 612 F.3d at 640; *Roe*, 631 F.3d at 857; (Docs. 264, pgs. 90-91; 268-64, pgs. 11-12, 14-15, 24-26). Accordingly, summary judgment is **GRANTED** for Defendant Siddiqui on Count I.

### ii. Defendant Leven

Before resolving the arguments relating to Defendant Leven, the Court must discuss the factual circumstances surrounding Decedent's death on September 5, 2018. Defendant Leven, a licensed clinical psychologist, was a mental health services director, which has the following position summary: "Provides guidance, direction, training and clinical supervision to all Mental Health Professionals (MHPs), except for psychiatrists, within the facility of responsibility. Ensures that said Staff are compliant with all applicable agency, facility and Wexford Health Sources (WHS) policies and procedures, corporate protocols and ethical and professional standards." (Docs. 214, pg. 11; 264, pg. 8; 268-34, pg. 2). That position has 47 "duties/responsibilities." (Doc. 268-34, pgs. 2-4). The 37th duty/responsibility is "[s]erv[ing] as representative for, and/or liaison between, Mental Health services and other health care providers, as well as IDOC Administration, and coordinat[ing] patient care with other departments." (Doc. 268-34, pg. 4).

On August 31, 2018, Decedent "reported taking Remeron," which belonged to his cellmate. (Docs. 214-18, pg. 1; 268-1, pg. 138; 268-25, pgs. 2, 4). Decedent was "not able to speak clearly" and he "could not answer questions." (Docs. 214-18, pg. 1; 268-1, pg. 138). Decedent was "sent to an outside hospital." (Doc. 268-1, pg. 138). Defendant Leven, who was the crisis team leader and the person who authorized crisis care status, was notified of these circumstances. (Doc. 268-1, pg. 138). At the hospital, Decedent received "IV fluid hydration," was "stable," had a normal EKG and lab work, and, "[i]n general, [was] in no apparent distress." (Doc. 268-25, pgs. 2, 4, 9-10). He was "alert and following commands but [had] no verbal answers to questions aside from stating 'can I use the

bathroom.' " (Doc. 268-25, pg. 2). Decedent was discharged, "in stable condition" without "active home medications," on the morning of September 1, 2018. (Doc. 268-25, pgs. 2, 4).

Defendant Leven was not present and working at the prison from September 1 to 3, 2018, so she did not encounter Decedent on those dates. (Docs. 214, pg. 11; 264, pgs. 9-10). During that time, however, Decedent was on crisis watch and seen by other medical and mental health staff members. (Docs. 264, pgs. 26-28, 30-31; 290, pgs. 40-41, 43-44).

Upon returning to work on September 4, 2018, which was the day before Decedent's death, Defendant Leven consulted with Melissa Pappas, a nonparty clinical professional counselor and qualified mental health processional, on a session with Decedent at 12:45 p.m. (Docs. 214, pg. 11; 264, pgs. 10, 32; 268-1, pgs. 144-45; 290, pgs. 44-45). Decedent was uncooperative, blunt and inexpressive, poor in hygiene, and he was not alert to time, place, or person. (Doc. 268-1, pg. 144). MHP Pappas' narrative states:

> Met with Offender in the confidential environment of NII infirmary mental health office. Offender initially refused to attend his daily crisis watch assessment in the AM. Offender agreed to attend his session when security staff approached his cell this afternoon. Offender would not verbally respond to this MHP['s] questions and would only stare at this MHP intensely. This MHP staffed the Offender with Dr. Leven - Wexford Psych Admin who joined this MHP for the session. The Offender responded to Dr. Leven by stating his first name to her. The Offender would nod yes to some of the questions asked about the Offender's family. Due to the Offender's lack of cooperation during the session [t]his MHP staffed Offender further with Dr. Floreani - NII Psychiatrist who agreed to assess the Offender further. Please see psychiatrist note for further information. Offender [level of care, crisis placement,] was assessed and determined appropriate at this time.
>
> Offender was alert and oriented x0 throughout the session. Offender's eye contact was intense and attention was not appropriately focused. Offender's hygiene was poor as there was a noted presence of very strong body odor and urine odor during the session. There was no presence of

distress or agitation noted in the session. Offender's affect was blunted.
Based on the lack of information obtained from the Offender during the
session, the offender's immediate risk for himself or others at this time is
moderate.

(Doc. 268-1, pg. 144).

MHP Pappas indicated Decedent was suffering from persistent depressive

disorder. (Doc. 268-1, pg. 145). Decedent's level of care, crisis placement, "was assessed

and determined appropriate at th[e] time," but MHP Pappas discontinued the 30-minute

crisis watch in favor of a 10-minute crisis watch "due to [his] lack of stability on crisis

watch and lack of information obtained by the Offender." (Doc. 268-1, pgs. 144-45).

Due to Decedent's presentation, he was referred to Dr. Christina Floreani, a

nonparty psychiatrist, for a telepsychiatry visit at around 1:13 p.m. (Docs. 214, pg. 11; 264,

pgs. 10, 33-34; 268-1, pg. 146; 290, pgs. 44-45). MHP Pappas, but not Defendant Leven,

attended the telepsychiatry visit. (Docs. 264, pg. 33; 290, pg. 45). Dr. Floreani observed:

Pt is brought into exam per CO's [*sic*]. He had refused to come out of cell
for third day and as per protocol was retrieved by CO's [*sic*]. He required
assistance into the exam room with significant psychomotor retardation. He
was largely unresponsive to verbal prompts. He was able to respond
appropriately to his name after multiple prompts and extensive delay to
speech onset, with less than 20 words in a five minute time frame. He
demonstrated echolalia in the short amount of verbal output he produced,
stating "help you" when he was asked, "How can I help you?" He
maintained a mundane posture throughout the evaluation with virtually
no reaction to stimuli, with fixed gaze and motiveless response to
instructions. His pulse was 126. Vitals were otherwise normal. Per staff he
has not been taking in fluids.

(Doc. 268-1, pg. 146).

Dr. Floreani indicated she reviewed Decedent's recent labs. (Doc. 268-1, pg. 146).

Decedent had atypical posture/gait, psychomotor retardation, a disheveled appearance,

and poor and malodorous hygiene. (Doc. 268-1, pg. 147). He was oriented to person, but not to time, place, or reality, and he was uncooperative. (Doc. 268-1, pg. 147). He had slowed speech and a blunt, inexpressive, and inappropriate affect. (Doc. 268-1, pg. 147).

Approximately 30 minutes after that appointment with Dr. Floreani, Decedent was taken to the healthcare unit, where he was assessed by a nonparty nurse practitioner, Mary Zimmer. (Docs. 214, pg. 11; 264, pgs. 10-11, 36; 290, pg. 48). Zimmer testified she would have had Decedent's chart to review. (Doc. 268-41, pg. 12). Zimmer documented:

> [I]nmate brought to first aid. Has small laceration on top of head, no active bleeding, refuses to speak, alert. O is alert, refusing to speak, inmate on Psych Watch already. No medical issues noted. No sutures needed for small head wound, unknown as to how attained. Recent increased alcohol level, assessment, psych problem, plan is mental health referral.

(Docs. 268-1, pg. 39; 268-41, pg. 11).

Around this same time, *i.e.*, at approximately 2 p.m., there was a mental health meeting attended by Defendant Leven, MHP Pappas, and 16 other mental health staff members. (Docs. 264, pgs. 40-41; 290, pg. 51). Dr. Floreani did not attend the mental health meeting. (Docs. 264, pgs. 40-41; 290, pg. 51). The meeting minutes reflect the following:

> Curtis, Kevin Y22898 is on a 10 min watch, refused to come out at first, Dr. Leven and Pappas then went to see him at cell front and told him if he didn't come out they were going to have TAC team get him out, he then came out, saw Dr. Floreani she didn't put him on meds.

(Doc. 268-38, pg. 2).

Defendant Leven clocked out at 4:02 p.m. on September 4, 2018. (Sealed Doc. 217, pg. 10). She clocked in at 8:12 a.m. on September 5, 2018. (Sealed Doc. 217, pg. 10). Shortly thereafter, an emergency response team was summoned to Decedent's cell, where he

appeared to be unresponsive. (Docs. 264, pgs. 40-41; 268-32, pg. 7; 290, pg. 52). Decedent was put in a wheelchair and taken to the infirmary, where he was seen by a nonparty nurse. (Docs. 264, pgs. 40-41; 268-32, pg. 7; 290, pg. 52). The nurse called a "code 3," *i.e.*, a medical emergency, because Decedent began "gasping" while she was taking his vitals. (Docs. 264, pg. 41; 268-45, pg. 8; 290, pg. 52). Decedent was then taken to the healthcare unit in a wheelchair. (Docs. 264, pg. 41; 268-45, pg. 8; 290, pg. 52). A note indicates: Decedent "brought to HCU for labs and [urinalysis]. Both obtained." (Doc. 268-1, pg. 40).

A nurse in the healthcare unit also called an offsite nonparty nurse practitioner, Michael Moldenhauer, for a "jacket review." (Docs. 264, pg. 43-44; 268-1, pg. 42; 268-22, pg. 30; 290, pgs. 54-55). This means Moldenhauer was "doing some work for [Decedent] but [was] not seeing [him] in person." (Doc. 268-22, pg. 30). Moldenhauer testified that "the nurse called and asked about labs[,] and I probably didn't know what labs possibly, so I just ordered what I would consider would cover most conditions or a good workup." (Docs. 268-1, pg. 42; 268-22, pg. 30). A progress note confirms that a nurse called to ask Moldenhauer about labs that he ultimately ordered. (Doc. 268-1, pg. 42). The progress note also indicates Decedent had "poor speech communication." (Doc. 268-1, pg. 42).

That morning, Dr. Goldman, the IDOC psychologist administrator, received a call from Plaintiff. (Docs. 264, pgs. 28-29, 41; 290, pgs. 41-42, 52). She described it as follows:

> I received a phone call from a woman who stated that she was I/M Kevin Curtis mother, Yolanda Jackson…. She stated that she knew that her son was getting Mental Health Treatment at our facility and that she had spoke to Dr. Leven 3 times and she was not helpful and kept transfering [*sic*] her to counselor in our clinical services…. She asked if I could have her son sign a release of information while on watch so information regarding her son's care could be shared with her. I told her that I would work on that but it

might take me a few days. I assured her that all offender's [*sic*] with MH needs are cared for well. At this time I could not share information without a release of information and at this time I did not have one. I told her she could share information with me that might help her son. She stated that he was treated at Chester Mental Health a few years ago for the same thing.

(Doc. 268-32, pg. 2).

With this information, Dr. Goldman went to see Defendant Leven, who was told about the call. (Docs. 264, pg. 41; 290, pgs. 52-53). Dr. Goldman testified that she told Defendant Leven something needed to be done about Decedent's health, including that Decedent "needed to be sent out to the hospital." (Docs. 264, pg. 41; 268-29, pg. 8; 268-47, pg. 3; 290, pgs. 52-53). Defendant Leven allegedly responded that Decedent was being tested for syphilis and that he was exhibiting "on-purpose behavior." (Docs. 264, pgs. 41-42; 268-29, pgs. 8, 17; 290, pgs. 52-53). Dr. Goldman testified that she told Defendant Leven they "couldn't wait" for the test results. (Docs. 268-29, pgs. 17-18; 268-47, pg. 3).

Dr. Goldman testified that she left Defendant Leven's office and walked toward the medical records office and healthcare unit to review Decedent's chart. (Docs. 264, pg. 42; 268-29, pgs. 6-8; 290, pg. 54). On her way, Dr. Goldman "saw [Decedent] in a wheelchair, being wheeled back to the N-2 building, North Two." (Doc. 268-29, pg. 6). Dr. Goldman observed: "He appeared flat [in] affect. His eyes were not scanning the environment. He appeared to be catatonic. His body wasn't moving that much." (Docs. 264, pg. 42; 268-29, pg. 7; 290, pg. 53). Dr. Goldman was "concerned about his inability to walk." (Docs. 264, pg. 42; 268-29, pg. 7; 290, pg. 53). Dr. Goldman was subsequently told by a nonparty nurse that Decedent's urine was collected to test for syphilis. (Docs. 264, pgs. 52-53; 268-29, pgs. 6-7; 290, pg. 53). This was despite Dr. Goldman finding a negative

syphilis test "misfiled…in the wrong section" of his records. (Docs. 264, pgs. 52-53; 268-29, pgs. 6-7; 290, pg. 53). Dr. Goldman asked the medical records office to contact Chester Mental Health Center for Decedent's records. (Docs. 264, pgs. 52-53; 268-29, pgs. 6, 8; 290, pg. 53). She reviewed the records about an hour later, stating: "I saw his psychological diagnosis was psychosis, NOS, catatonic type. I contacted Dr. Leven via an e-mail and Dr. Floreani, who is the psychiatrist in N-2, requesting an M.D. psychiatrist look into how he was doing." (Docs. 264, pg. 44; 268-29, pgs. 8-9; 268-46, pg. 5; 290, pgs. 55-56).

Dr. Goldman's email, which was sent to Defendant Leven and various other nonparties at 10:20 a.m. on September 5, 2018, stated as follows:

Dr. Leven:

Please find the attached records from Chester Mental Health that I requested this morning for Kevin Curtis, Y22898. In 2016 he was diagnosed with Psychotic NOS; Catatonic Type Symptoms. After reading his chart, they tested him for syphilis and it came back negative. When the nurse catheterized him today to test for syphilis he was extremely dehydrated. If he is not eating or drinking we need to get him treated. In addition, he needs to be evaluated for emergency enforced medication to see if he responds to antipsychotics. When I passed the offender on his way back from the HCU he was in a wheel chair and catatonic (just as he had been diagnosed in the past).

In my clinical opinion we need to intervene quickly for the dehydration with a combination of this heat could be lethal. Please let me know how you are going to proceed with this I/M.

(Doc. 268-46, pg. 5).

Assistant Warden Alex Jones was the first to respond. At 11:01 a.m., he stated:

The dehydration part of this should be a medical issue if I am not mistaken. I have added Dr. Siddiqui, and Gail Walls (HCUA) to the email for their input on what has been done for that. Regarding the emergency enforced medication; I understand he was seen by a Psychiatrist yesterday, and it

was determined not to put him on emergency meds at that time. I also copied Dr. Floreani since I believe she was the individual that dealt with Curtis yesterday for input.

(Doc. 268-46, pgs. 4-5).

At 11:32 a.m., IDOC Defendant Walls responded:

It is my understanding he was showered yesterday. Today they straight cath him for a urine sample and drew blood on him for a wide variety of things. We will have the results tomorrow. If he is on watch we should be able to tell if he is eating and taking fluids as well. The nurses say he acknowledges them when they talk to him but doesn't verbally respond to questions.

(Doc. 268-46, pg. 4).

Dr. Goldman then asked the following at 11:41 a.m.: "Gail did they address his hydration?" (Doc. 268-49, pg. 2). Dr. Floreani, who assessed Decedent in a telepsychiatry visit at around 1:13 p.m. the previous day, responded at 11:47 a.m. She stated:

The patient presented with altered mental status yesterday, oriented to his own person but not capable of communicating in any significant manner to obtain further information. He was tachycardic to 126. He has not taken psychotropic medications since September of 2017 without decompensation, last seen by psychiatry in November of 2017 not on medicines for months without issue, coping with his diagnosis of anxiety with behavioral interventions, namely exercising.

His current presentation and history per the chart suggests the etiology of his current condition is not psychiatric. It would be a mistake to treat it as such.

Please let me know if you have any questions or concerns.

(Doc. 268-46, pg. 4).

After Dr. Goldman asked Dr. Floreani whether she "read the records from Chester Mental Health," to which Dr. Floreani responded "No," Dr. Goldman, in part, stated: "I

19

just forwarded them to you. Please review. His DX in Chester MH was Psychosis with Catatonia Features." (Doc. 268-46, pgs. 3-4). At 12:01 p.m., Dr. Floreani stated as follows:

> I just reviewed these. Thank you for forwarding them, Dr. Goldman.
>
> Based on these, he most likely has Catatonia. This would best be treated with benzodiazepines, usually a high dose is required in the immediate and for mainenance [*sic*]. These medications are restricted per psychiatry. Not sure how we should proceed.

(Doc. 268-46, pg. 3).

Three minutes later, at 12:04 p.m., Dr. Goldman stated: "In acute situation[s] they can be prescribed up to a month, not longer than 4 weeks, Per Dr. DeLong." (Doc. 268-46, pgs. 2-3). In response to that email, at 12:25 p.m., Dr. Floreani stated: "Here is his emergency rx. Please let me know if there is anything else you need." (Doc. 268-46, pg. 2). At 1:07 p.m., Defendant Walls responded: "Dr. Floreani could you please also send us a progress note to address the reason why the script was written? We are processing the order now and he will receive the med soon." (Doc. 268-46, pg. 2). At 1:29 p.m., Dr. Goldman stated: "Thank you very much. Great team work today." (Doc. 214-17, pg. 4).

The progress note of a nonparty nurse, at 1:30 p.m., states: "I/m had an episode of 'unresponsiveness.' I/m pulled out, labs ordered and obtained. PRN Ativan injection per MD Goldman. Tolerated well. [No] other s/s of acute distress." (Doc. 268-1, pg. 42). Decedent was altered in thought processes. (Doc. 268-1, pg. 42). The plan was to "cont. to monitor" and to "cont. [crisis] watch as ordered." (Doc. 268-1, pg. 42). The minutes from a mental health meeting, held at 2:00 p.m., and attended by Defendant Leven and 19 nonparty members of the mental health staff, state: "Curtis, Kevin Y22898 is on a 10 min

watch, refused to come out at first, extracted because he appeared to be unresponsive, took to healthcare for labs, really dehydrated, started on Ativan." (Doc. 268-50, pg. 3).

At 2:41 p.m., Dr. Floreani sent the following email with a new progress note: "Here is his PN. Please let me know if he refuses his now dose of PO Ativan and requires an injection. Also, how often can vitals be taken?" (Doc. 268-46, pg. 2). The note stated:

> Pt with a PPH Catatonia per Chester Mental Health records obtained 9/5/18, who presented on 9/4/18 with near mutism, mundane posturing, fixed gaze, motiveless response to instructions, with unstable vitals, and staff report of poor po intake. He was sent to medicine for medical work up which indicated dehydration. In the interim, mental health records of Catatonia history have been obtained and pt presentation along with his history and lack of any other medical etiology together indicate current Catatonia. Given the urgent nature of his condition with poor po intake and tachycardia, will immediately initiate ativan rx, and continue to evaluate pt response. Medicine is aware of pt condition. Labs and treatment of dehydration per medicine. Will continue pt on crisis watch.

(Docs. 268-1, pgs. 3, 150-51).

Defendant Leven testified that policy would have prompted staff to alert her, as well as Dr. Goldman, that Decedent was unresponsive on the morning of September 5, 2018. (Doc. 214-9, pgs. 114-15). She "recall[ed] going over to the healthcare unit" at some point, "having a discussion about the current status" of Decedent, and having "some brief discussion about labs or blood work that had been ordered." (Doc. 214-9, pg. 115). Defendant Leven also testified that she had a "vague[]" recollection of receiving Dr. Goldman's email on September 5, 2018. (Doc. 214-9, pg. 112). She testified as follows:

> I don't remember the time of day that I received it and actually read it and I was not the only person on the e-mail chain. I vaguely recall there had been some responses by the time I had…seen it initially, but I don't remember how many. But there were multiple people in addition to myself on that e-mail and several of those people had responded.

21

(Doc. 214-9, pg. 113).

Defendant Leven did not "recall one way or the other" if she took "any action in response to" Dr. Goldman's September 5, 2018, email. (Doc. 214-11, pg. 21). She indicated: "I'm sure that there was a response in terms of wanting to continue to try and meet this inmate's needs, but I don't recall a specific reaction." (Doc. 214-11, pg. 21). Defendant Leven clocked out on September 5, 2018, at 4:32 p.m. (Sealed Doc. 217, pgs. 7, 10).

At around 6:00 p.m., Decedent was found unresponsive and without a pulse in his cell. (Docs. 264, pg. 51; 268-1, pgs. 46-47; 290, pg. 64). He was eventually transported to the healthcare unit to wait for an ambulance. (Docs. 264, pg. 51; 268-1, pgs. 46-47; 290, pg. 64). Despite the administration of life-saving measures, Decedent was pronounced dead in the healthcare unit at 6:37 p.m. (Docs. 264, pg. 51; 268-1, pgs. 46-47; 290, pg. 64).

Under these circumstances, the Wexford Defendants argue, while Defendant Leven consulted with medical and mental health staff about Decedent's care before his death, it was unbeknownst to anyone that he "procured and then ingested a synthetic cannabinoid-like substance." (Doc. 214, pg. 24). As a result, the Wexford Defendants suggest Defendant Leven could not be deliberately indifferent to a condition about which she was unaware. (Doc. 214, pg. 25). They also argue a psychologist's scope of practice extends to the diagnosis and treatment of mental, emotional, and behavioral disorders but not to the treatment of physical conditions or to prescribing medicine. (Doc. 214, pgs.

25, 28-29) (citing 225 ILCS 15/2(5), 4(b); 225 ILCS 60/50).[7] Therefore, even though Dr. Goldman raised concerns about Decedent in her September 5, 2018, email, the Wexford Defendants argue Decedent was already on crisis watch at that time and Defendant Leven, as a psychologist, could not assess and treat dehydration or order enforced medication. (Doc. 214, pgs. 26, 28-29). They also argue no reasonable jury could find Defendant Leven was deliberately indifferent when Decedent was being assessed and treated by the other medical and mental health providers at the time. (Doc. 214, pgs. 25-29). Finally, the Wexford Defendants argue Plaintiff presented no evidence that Defendant Leven's actions, or the actions of any other Defendant, caused Decedent's death in any way, let alone by intoxication from unknown substances. (Doc. 214, pg. 29).

---

[7]Illinois' Clinical Psychologist Licensing Act defines "clinical psychology" as follows:

"Clinical psychology" means the independent evaluation, classification, diagnosis, and treatment of mental, emotional, behavioral or nervous disorders or conditions, developmental disabilities, alcoholism and substance abuse, disorders of habit or conduct, and the psychological aspects of physical illness. The practice of clinical psychology includes psychoeducational evaluation, therapy, remediation and consultation, the use of psychological and neuropsychological testing, assessment, psychotherapy, psychoanalysis, hypnosis, biofeedback, and behavioral modification when any of these are used for the purpose of preventing or eliminating psychopathology, or for the amelioration of psychological disorders of individuals or groups. "Clinical psychology" does not include the use of hypnosis by unlicensed persons pursuant to Section 3.

225 ILCS 15/2(5).

Further, § 4(b) of that Act provides:

Nothing in this Act shall be construed as permitting persons licensed as clinical psychologists to engage in any manner in the practice of medicine as defined in the laws of this State. Persons licensed as clinical psychologists who render services to persons in need of mental treatment or who are mentally ill shall as appropriate initiate genuine collaboration with a physician licensed in Illinois to practice medicine in all its branches.

*Id.* at § 4(b).

In response, Plaintiff argues the law requires knowledge of impending harm that is preventable, but not knowledge of a specific substance causing the need for care. (Doc. 264, pg. 84). In light of the evidence, including Dr. Goldman's concerns about Decedent's dehydration, Plaintiff argues a reasonable jury could find Defendant Leven knew Decedent needed immediate emergency care yet failed to take "meaningful action." (Doc. 264, pgs. 83-85). Plaintiff argues this is true even though Defendant Leven was a non-treating psychologist who was not responsible for the decisions of other providers, as she was responsible for coordinating care between the medical and mental health staff. (Doc. 264, pgs. 85-86). Plaintiff also states it is inconsequential that Defendant Leven consulted with other medical and mental health staff, as Plaintiff need not establish Decedent was "literally ignored." (Doc. 264, pgs. 84-85). Finally, Plaintiff argues a reasonable jury could find Defendant Leven's deliberate indifference caused Decedent's death. (Doc. 264, pgs. 88-89). On September 4, 2018, she allegedly "failed to communicate to [nonparty] Nurse Practitioner Mary Zimmer the substantial risks [Decedent] faced, including that he was not taking fluids or that mental health staff believed his condition had a medical (rather than psychiatric) basis." (Doc. 264, pg. 89). Absent that failure, Plaintiff suggests Decedent would have avoided death by receiving treatment for dehydration. (Doc. 264, pg. 89-90).

Here, it appears to be uncontested by the parties that Decedent suffered from an objectively serious medical condition. The Court agrees. Nevertheless, on the above-discussed record, the Court finds there is no genuine dispute of material fact that prevents summary judgment for Defendant Leven on Count I, as the events preceding

24

Decedent's death are not indicative of sufficient personal involvement in the alleged constitutional deprivation or deliberate indifference. *See Gonzalez*, 40 F.4th at 828.

As an initial matter, the Court tends to agree with Plaintiff that being a non-treating clinical psychologist, without the ability to assess, diagnose, or treat medical conditions or to prescribe medicine, does not by itself protect Defendant Leven from liability for deliberate indifference under Count I. However, in the days preceding Decedent's death, the above record makes clear that he was being treated within the scopes of practice of other medical and mental health professionals, including a nonparty psychiatrist, Dr. Floreani, to whom Defendant Leven could not "[p]rovide guidance, direction, training [or] clinical supervision." (Doc. 268-34, pg. 2). As such, the Court concludes there is no genuine dispute of material fact about whether the perceived failure of Defendant Leven to take "meaningful action" to ensure Decedent received the necessary care for his serious medical condition—*i.e.*, by better coordinating care between medical and mental health staff—proves sufficient personal involvement in the alleged constitutional deprivation or rises to the level of deliberate indifference. It does not.

In reaching this conclusion, the Court again stresses that even gross negligence and medical malpractice do not equate to deliberate indifference. *See Jones*, 2 F.4th at 612-13; *McGowan*, 612 F.3d at 640; *Eagan*, 987 F.3d at 688; *Roe*, 631 F.3d at 857. Defendant Leven must have known of facts from which to infer a substantial risk of serious harm to Decedent, drawn that inference, and responded with a reckless or intentional disregard for the serious medical condition through inaction or woefully inadequate action. *See Jones*, 2 F.4th at 612-13; *Eagan*, 987 F.3d at 695; *McGowan*, 612 F.3d at 640. Between

September 1 and 3, 2018, when Decedent was discharged from the outside hospital "in stable condition," and Defendant Leven was not working, Decedent was monitored through the crisis watch and other medical and mental health professionals. (Docs. 264, pgs. 26-28, 30-31; 268-25, pgs. 2, 4; 290, pgs. 40-41, 43-44). When she returned to work on September 4, 2018, Defendant Leven consulted with MHP Pappas on an in-person session with Decedent, at which time "[t]here was no presence of distress or agitation." (Docs. 214, pg. 11; 264, pgs. 10, 32; 268-1, pgs. 144-45; 290, pgs. 44-45). Decedent's crisis watch placement "was assessed and determined appropriate at th[e] time," except the timing of the crisis watch checks was actually reduced from every 30 minutes to every 10 minutes to more closely monitor Decedent. (Doc. 268-1, pgs. 144-45). The encounter then resulted in a referral to a nonparty psychiatrist, Dr. Floreani, whom, again, Defendant Leven was not responsible for "[p]rovid[ing] guidance, direction, training [or] clinical supervision." (Docs. 268-1, pg. 144; 268-34, pg. 2). The telepsychiatry visit, which was attended by MHP Pappas but not Defendant Leven, began less than 30 minutes after the start of that in-person session with Defendant Leven and MHP Pappas. (Docs. 268-1, pgs. 144-46). The Court realizes Plaintiff disagrees with the actions of Dr. Floreani, a nonparty, during and after the telepsychiatry visit; however, the broader circumstances of the case do not allow the Court to shift the entirety of the blame stemming from that disagreement onto Defendant Leven. (Docs. 264, pgs. 10-12, 33-36, 48-50; 268-1, pgs. 146-47; 268-38, pg. 2).

Similarly, it is undisputed that Decedent was assessed by nonparty NP Zimmer in the healthcare unit around 30 minutes after the telepsychiatry visit with Dr. Floreani and at approximately the same time as the 2 p.m. mental health meeting. (Docs. 268-1, pg. 39;

26

268-38, pg. 2). Although Plaintiff disputes the manner in which Decedent arrived in the healthcare unit, as well as the reasoning for the visit, Zimmer testified that she would have had Decedent's chart at that time. (Docs. 264, pg. 36; 268-1, pg. 12). She also observed, *inter alia*, Decedent was "on Psych Watch already," had "[n]o medical issues noted," and was assessed as a "psych problem." (Docs. 268-1, pg. 39; 268-41, pg. 11).

Defendant Leven left the prison at 4:02 p.m. on September 4, 2018, and she did not return until 8:12 a.m. on September 5, 2018. (Sealed Doc. 217, pg. 10). To be sure, an emergency response team was summoned to Decedent's cell at around that time on September 5, 2018. (Docs. 268-32, pg. 7). But, as was true the prior day, Decedent received care from nonparty medical professionals at the prison. Specifically, Decedent was taken to the infirmary, where a nonparty nurse eventually called a medical emergency. (Docs. 268-32, pg. 7; 268-45, pg. 8). Decedent was then taken to the healthcare unit "for labs and [urinalysis]. Both obtained." (268-1, pg. 40). The nurse in the healthcare unit requested the "jacket review" by NP Moldenhauer, which resulted in an "order[] [for] what [he] consider[ed] would cover most conditions or a good workup." (Docs. 268-1, pg. 42; 268-22, pg. 30). Again, the Court observes Plaintiff can disagree with the actions taken by nonparty nurses and NPs, who were operating within their scopes of practice, but it would be improper to shift the entirety of the blame stemming from the disagreement onto non-treating clinical psychologist, Defendant Leven. (Doc. 264, pgs. 11, 38-39, 43-44).

Finally, for similar reasons as already discussed, the Court concludes the circumstances involving Dr. Goldman are insufficient to create a genuine dispute of material fact as to Defendant Leven's alleged personal involvement in the constitutional

deprivation and deliberate indifference. The circumstances reveal, while Dr. Goldman's concerns were sincerely raised after she received a call from Plaintiff, Decedent was already being treated by medical professionals at the prison. The day before, Decedent was referred to and seen by a nonparty psychiatrist, Dr. Floreani, who did not prescribe medication, which was something Dr. Goldman and Defendant Leven could not do. (Docs. 268-1, pgs. 146-47; 268-38, pg. 2). Defendant Leven also "recall[ed] going over to the healthcare unit," discussing "the current status" of Decedent, and briefly discussing "labs or blood work that had been ordered." (Docs. 214-9, pgs. 114-15; 268-29, pgs. 8, 17).

Based in part on the records obtained from Chester Mental Health Center, Dr. Goldman again flagged her concerns about Decedent's health in an email to Defendant Leven and other prison personnel on September 5, 2018, at 10:20 a.m. (Doc. 268-46, pg. 5). But the email chain, like other portions of the record, reveals that Dr. Goldman's concerns were discussed and addressed by medical and mental health professionals who, unlike Defendant Leven, could operate within their scopes of practice. (Doc. 268-46, pgs. 2-5). This included Dr. Floreani, a nonparty psychiatrist, who actually saw Decedent the previous day, and IDOC Defendant Walls, the healthcare unit administrator, who is discussed further below. (Docs. 264, pg. 46; 268-46, pgs. 2-5). Defendant Walls advised: "Today they straight cath him for a urine sample and drew blood on him for a wide variety of things. We will have the results tomorrow. If he is on watch we should be able to tell if he is eating and taking fluids as well." (Doc. 268-46, pg. 4). Dr. Floreani, to whom Defendant Leven could not "[p]rovid[e] guidance, direction, training [or] clinical supervision," reiterated her findings from the prior day, then added: "His current

28

presentation and history per the chart suggests the etiology of his current condition is not psychiatric. It would be a mistake to treat it as such." (Docs. 268-34, pg. 2; 268-46, pg. 4).

Ultimately, after being presented with the Chester Mental Health Center records, Dr. Floreani changed her diagnosis to "likely…Catatonia," worked with medical personnel to update her progress note, and wrote an "emergency rx." (Doc. 268-46, pgs. 2-3). Importantly, the updated progress note that was sent on the email chain indicated: "Medicine is aware of pt condition. Labs and treatment of dehydration per medicine. Will continue pt on crisis watch." (Doc. 268-1, pgs. 3, 150-51). The "emergency rx" was received by medical staff at 12:25 p.m. and administered by a nonparty nurse at around 1:30 p.m., which the Court notes was around 4 to 5 hours after the emergency response team went to Decedent's cell, 2 to 3 hours after Dr. Goldman sent her email, 3 to 4 hours before Defendant Leven clocked out for the day, and 4.5 to 5.5 hours before Decedent's death after missed crisis watch checks that are not attributable to Defendant Leven. (Docs. 268-1, pgs. 42, 46-47; 268-46, pg. 2; Sealed Doc. 217, pgs. 7, 10). Finally, the Court stresses the nurse noted "labs ordered and obtained," the "emergency rx" was "[t]olerated well" by Decedent, and Decedent had "[no] other s/s of acute distress." (Doc. 268-1, pg. 42).

Under these circumstances, which are considered in the context of a deliberate indifference claim, the Court cannot conclude Defendant Leven, a non-treating clinical psychologist, could or should have done more in order to avoid liability on Count I. Accordingly, summary judgment is **GRANTED** for Defendant Leven on Count I.

### iii. Defendant Wexford

Initially, the Court must address the additional legal principles that apply to Defendant Wexford under Count I. Notably, Defendant Wexford contracted with the State of Illinois to provide healthcare within the IDOC; as such, Plaintiff alleges Defendant Wexford was responsible for implementing, overseeing, and supervising healthcare policies and practices at Menard Correctional Center. (Doc. 1, pgs. 3, 11-12).

Under *Monell v. Department of Social Services*, a private corporation like Defendant Wexford, acting under the color of state law, may be liable for constitutional torts arising from its policies or customs. *See* 436 U.S. 658, 690 (1978); *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 616-17 (7th Cir. 2022) (citing *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789-96 (7th Cir. 2014)). Notably, though, a private corporation is only liable for its own violations of the Constitution and laws; it is not liable for the constitutional torts of its employees or agents. *Stockton*, 44 F.4th at 617 (citing *Monell*, 436 U.S. at 691-94; *First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021)); *but see Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("The County appears to push for a rule that requires individual officer liability before a municipality can ever be held liable for damages under *Monell.* The actual rule is much narrower: a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an inconsistent verdict. So, to determine whether the County's liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses.") (cleaned up). *Monell* liability is rare and difficult to establish. *Stockton*, 44 F.4th at 617 (citing *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022)).

First, a plaintiff must trace the deprivation of a federal right to the action or inaction of the private corporation. *Id.* (citing *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021); *LaPorta*, 988 F.3d at 986). The plaintiff must show the express policy, widespread practice or custom, or action or inaction by a final policymaker gave rise to liability under § 1983. *Id.* (citing *Dean*, 18 F.4th at 235; *Thomas*, 604 F.3d at 303).

Second, for purposes of the claim alleged in Count I, a plaintiff must clear the "high hurdle" of proving the private corporation was deliberately indifferent, such that it was aware of risks but failed to take appropriate steps to protect the prisoner. *Id.* (citing *Dean*, 18 F.4th at 235); *Thomas*, 604 F.3d at 303. When asserting liability based on a widespread practice or custom, as Plaintiff does in this case, the showing of deliberate indifference requires proof that other inmates were injured by the practice or custom. *Stockton*, 44 F.4th at 617 (citing *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)); (Doc. 264, pgs. 94-95). Absent multiple injuries to other inmates, a plaintiff "cannot supply adequate evidence from which a jury could reasonably find [the defendants] would conclude that the plainly obvious consequences of the practice [or custom] would result in the deprivation of a federally protected right, as is required to establish deliberate indifference." *Id.* (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)) (cleaned up). That said, there is no "magic number" of injuries that will equate to deliberate indifference. *Thomas v. Chmell*, 569 F. Supp. 3d 732, 739 (N.D. Ill. 2021) (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017)); *see also Howell*, 987 F.3d at 654 ("In our extensive case law on prison healthcare, we have not adopted bright-line

rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*. [W]hat is needed is evidence that there is a true municipal [or corporate] policy at issue, not a random event.") (cleaned up).

Third and finally, a plaintiff must prove the private corporation's action "was the moving force behind the constitutional injury," which is "a rigorous causation standard demanding a direct causal link between the challenged municipal action and the violation of constitutional rights." *Stockton*, 44 F.4th at 617 (quoting *Dean*, 18 F.4th at 235; citing *Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016)) (cleaned up).

The Wexford Defendants argue Plaintiff failed to establish, as a threshold matter, that Decedent was deprived of a constitutional right. (Doc. 214, pg. 30). In other words, since Plaintiff failed to show Defendants Siddiqui and Leven, in view of their personal involvement and scopes of practice, provided constitutionally inadequate care to Decedent, the Wexford Defendants argue her *Monell* claim against Defendant Wexford must fail. (Doc. 214, pgs. 30-31). The Wexford Defendants again note that Defendant Siddiqui was on vacation between August 31 and September 5, 2018, Defendant Leven is a psychologist who could not assess or treat Decedent's condition, other medical professionals assessed and treated that condition, and no one knew he ingested a synthetic cannabinoid-like substance. (Docs. 214, pgs. 10, 13, 31; 264, pg. 8).

Alternatively, as to Defendant Wexford's widespread policies and practices, on which Plaintiff bases her *Monell* claim, Plaintiff purportedly alleges a failure to adequately examine or diagnose patients, create sensible treatment plans, perform differential diagnoses, and provide for treatment at outside facilities. (Docs. 1, pgs. 12-13;

214, pg. 34; 264, pgs. 94-95). The Wexford Defendants argue those allegations amount to claims that employees use poor judgment, which cannot support a *Monell* claim. (Doc. 214, pgs. 34-35). And, as discussed regarding Defendant Siddiqui's vacation and Defendant Leven's scope of practice as a psychologist, the Wexford Defendants argue there is no evidence that the moving force of any action was Defendant Wexford's policies or practices. (Doc. 214, pg. 35). Plaintiff allegedly seeks, via a "shotgun approach," "to proceed on unpled allegations against non-defendants," leaving unclear the policy or practice that was the moving force in Decedent's care. (Doc. 214, pgs. 35, 41). In any event, the Wexford Defendants suggest "there is no evidence such Wexford practices existed, let alone that they were the moving force in…[Decedent's] treatment." (Doc. 214, pgs. 35-42). They stress that Decedent was referred for outside treatment on August 31, 2018, as other inmates were on 940 occasions in 2018, and he "was routinely seen by multiple disciplines who assessed him to identify the etiology of his systems." (Doc. 214, pg. 35).

In response, Plaintiff admits she "is not pursuing either a final policymaker theory or an express policy theory." (Doc. 264, pgs. 94-95). While Plaintiff believes Defendants Siddiqui and Leven were deliberately indifferent to Decedent's care, she also argues Defendant Wexford can be liable under *Monell* regardless of anyone's individual liability. (Doc. 264, pgs. 92-93). Similarly, Plaintiff argues she introduced sufficient evidence for a reasonable jury to find Decedent's death was caused by Defendant Wexford's policies and practices of providing inadequate medical care, siloing healthcare staff in a way that prevents effective communication and continuity of care, refusing to implement quality assurance efforts, creating inadequate documentation, maintaining "crushing mental

health caseloads," and failing to implement a quality improvement program. (Doc. 264, pgs. 92-94). By introducing the medical records of 11 other IDOC inmates, with a report from an expert, Plaintiff also argues she showed "multiple instances of inadequate care based on the same dangerous widespread practices." (Doc. 264, pgs. 82, 95-97).

Here, the Court already found there is no genuine dispute of material fact about whether Defendants Siddiqui and Leven were deliberately indifferent to Decedent's serious medical condition, as to violate the Eighth Amendment. Absent such a constitutional violation by Defendants Siddiqui and Leven, who are the only individually named Wexford Defendants, the Court cannot find Defendant Wexford is liable for a constitutional tort arising from its policies or customs. *See Monell*, 436 U.S. at 690; *Stockton*, 44 F.4th at 616-17. Put another way, since the Court found there is no genuine dispute of material fact about whether Defendants Siddiqui and Leven violated Decedent's Eighth Amendment rights, based on their alleged failure to ensure adequate care before his death, the Court cannot find Defendant Wexford's policies or customs for providing care, organizing staff, implementing quality assurance guarantees and improvement plans, creating documentation, and maintaining proper caseloads, nevertheless gave rise to and were the moving force behind a constitutional tort, as suggested by Plaintiff. *See Monell*, 436 U.S. at 690; *Stockton*, 44 F.4th at 616-17; *Thomas*, 604 F.3d at 303; *see also Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013 ("An organization is answerable for its own policies, but if *a given policy* causes no harm to the plaintiff there is no possible relief…. It is unnecessary to decide what [Wexford's] policy may be, since [the plaintiff] has not established a constitutional problem with his treatment and thus did not suffer

34

actionable injury *from the policy* he attributes to the corporation.") (Emphasis added); *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 682 (7th Cir. 2023) ("Even if we were to agree with [the plaintiff] that Wexford was aware that its policies created a substantial risk of depriving inmates of adequate medical care, [the plaintiff] cannot prevail, because no jury could find that he was harmed *by Wexford's policies*. As discussed above, [the plaintiff] provides no evidence that the medical treatment he received…was inadequate.") (Emphasis added); *Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022) ("The *Monell* claim against Wexford itself suffers from two deficiencies: there is no proof of an underlying constitutional violation by any individual Wexford defendant nor any evidence that *an institutional policy* caused such a violation.") (Emphasis added); *Plummer v. Wexford Health Sources, Inc.*, 609 Fed. App'x 861, 863 (7th Cir. 2015) (rejecting the plaintiff's argument that Wexford's policies contributed to individually named doctors' deliberate indifference, as neither doctor was deliberately indifferent to the plaintiff's medical needs); *Williams v. Pittman*, No. 21-cv-448, 2024 WL 4363315, *5 (S.D. Ill. Sept. 30, 2024) (following *Arce* to hold: "Plaintiff has failed to demonstrate that any of the medical care provided by the Wexford employees amounted to deliberate indifference. As such, Plaintiff has failed to prove he suffered a constitutional harm, and thus, he cannot assert a *Monell* claim against Defendant Wexford.") (internal citation omitted); (Doc. 264, pgs. 92-94).

In any event, the Court stresses the treatment, discussed exhaustively in the section pertaining to Defendant Leven, that Decedent received from August 31 to September 5, 2018. That treatment included: visiting an outside hospital on August 31, 2018, where he received "IV fluid hydration," was "stable," had a normal EKG and lab

work, was "in no apparent distress," and was discharged "in stable condition" without "active home medications"; remaining on crisis watch and seeing nonparty medical and mental health staff between September 1 and 3, 2018, when Defendants Siddiqui and Leven were not working at the prison; having an in-person session with MHP Pappas and Defendant Leven on September 4, 2018, which resulted in a referral to nonparty psychiatrist, Dr. Floreani, and more frequent crisis watch checks; a telepsychiatry visit with Dr. Floreani that was attended by MHP Pappas; a trip to the infirmary and multiple trips to the healthcare unit, where he saw nonparty nurses and nurse practitioners, was the subject of a "jacket review," and had labs drawn and a urinalysis performed; an updated diagnosis, progress note, and "emergency rx" from Dr. Floreani in response to the email chain initiated by Dr. Goldman on September 5, 2018; an Ativan injection that was "[t]olerated well" with no "other s/s of acute distress"; and a plan for continued monitoring and a 10-minute crisis watch placement. (Docs. 264, pgs. 26-28, 30-31; 268-1, pgs. 39-40, 144-46; 268-22, pg. 30; 268-25, pgs. 2, 4, 9; 268-41, pg. 11; 268-46, pgs. 2-5; 268-50, pg. 3; 290, pgs. 40-44). The Court also stresses the following statement in Dr. Floreani's updated progress note, which was sent to the individuals on the September 5, 2018, email chain: "Medicine is aware of pt condition. Labs and treatment of dehydration per medicine. Will continue pt on crisis watch." (Docs. 268-1, pgs. 3, 150-51). As discussed as to individual liability, this statement is significant because: Defendant Siddiqui, the prion's medical director, was on vacation between August 31 and September 5, 2018, and he testified to not receiving the emails on the email chain; Defendant Leven, who was on

the email chain, was a mental health services director and a non-treating clinical psychologist; and no other medical personnel from Wexford are named as defendants.

On this record, the Court cannot conclude there is a genuine dispute of material fact about whether Defendant Wexford is liable for its policies or customs under Count I, especially where Defendants Siddiqui and Leven are not liable under that Count and Decedent's death was preceded by 1.5 hours of missed crisis watch checks after the provision of treatment. *See Monell*, 436 U.S. at 690; *Stockton*, 44 F.4th at 616-17; *Thomas*, 604 F.3d at 303. Again, Defendant Wexford can be liable for its own constitutional torts, arising from its policies or customs, but not for those of individual employees or agents. *See Stockton*, 44 F.4th at 617; *see also Howell*, 987 F.3d at 654 ("In applying *Monell* and avoiding respondeat superior liability, one key is to distinguish between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices."). Accordingly, summary judgment is **GRANTED** for Defendant Wexford on Count I.

### iv. IDOC Defendant Mitchell

Defendant Mitchell, who found Decedent unresponsive while working the crisis watch unit on September 5, 2018, filed a Motion for Summary Judgment separate from that of the other IDOC Defendants. (Docs. 222, pg. 1; 226; 235). He also adopts and incorporates the undisputed material facts and argument, relating to Decedent's cause of death and the lack of pleading or proof on novel causes of death, of the Wexford Defendants. (Docs. 222, pg. 2; 214). Plaintiff filed a Partial Motion for Summary Judgment, seeking a ruling only against Defendant Mitchell on Count I. (Doc. 228). The Court simultaneously resolves Defendant Mitchell and Plaintiff's arguments on Count I.

As a procedural matter, the Court notes the ordinary summary judgment standards, articulated above, apply to cross-motions for summary judgment like those now at issue. *See Tokio Marine Specialty Ins. Co. v. Altom Transp., Inc.*, 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022) (quoting *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017)). The Court evaluates cross-motions for summary judgment together; however, neither may be granted unless the evidence, as a whole, shows the absence of a genuine dispute of material fact. *Id.* (quoting *Bloodworth*, 475 F.App'x at 95). As such, each party must still bear their burden of proof under the summary judgment standards. *Wilson v. Baptiste*, No. 13-cv-7845, 2016 3878125, *2 (N.D. Ill. July 18, 2016) (quoting *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008)); *see also Chicago Wine Co. v. Holcomb*, 532 F. Supp. 3d 702, 708 (S.D. Ind. 2021) ("The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial."). Courts cannot assume cross-motions for summary judgment result in no undisputed material facts, and denying one cross-motion does not require granting the other cross-motion. *Wilson*, 2016 3878125 at *2 (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).

Defendant Mitchell argues Plaintiff failed to show he knew of, but disregarded, Decedent's serious medical condition. (Docs. 222, pgs. 7-8; 255, pg. 25). Besides being assigned to the crisis watch unit for the first time on September 5, 2018, Defendant Mitchell states he had no indication any inmate faced imminent harm. (Docs. 222, pg. 8; 255, pgs. 25-26). As to Decedent, Defendant Mitchell indicates they "had no prior history," he was not informed why Decedent was in the crisis watch unit, and he did not

witness strange behavior or signs of imminent danger by Decedent. (Docs. 222, pg. 9; 255,

pg. 25). Decedent "appeared to be sleeping." (Doc. 222, pg. 9). Upon realizing Decedent

was unresponsive, however, Defendant Mitchell notified his superior officers. (Doc. 255,

pg. 26). As a result, Defendant Mitchell, who admits to "[l]eaving his post for 1.5 hours

to assist with chow lines and [to] later falsifying records to reflect that he conducted the

watches," states his actions were merely negligent or errors in judgment, which cannot

support a claim of deliberate indifference." (Docs. 222, pgs. 9-10; 255, pg. 26).

Defendant Mitchell also seeks qualified immunity on Plaintiff's Eighth

Amendment claims. (Docs. 222, pgs. 2, 10-11; 255, pg. 26). He argues, as a new hire

working on the crisis watch unit for the first time, "there was not sufficient case law to

put him on notice that missing around 1.5 hours of crisis watch would subject him to

liability." (Doc. 222, pg. 11). And, despite later reviews and investigations, Defendant

Mitchell argues there is no agreed upon time and cause of death for Decedent or evidence

that his absence from the crisis watch unit created a more dangerous environment or

circumstance. (Docs. 222, pg. 10; 255, pgs. 26-27). Accordingly, even if the Court found a

violation of Decedent's constitutional rights, Defendant Mitchell argues he would be

entitled to qualified immunity because he followed his superior's order to assist with

chow lines and it is unclear whether watching over Decedent, as required on September

5, 2018, would have achieved a different outcome. (Docs. 222, pg. 10; 255, pgs. 26-27).

In response, Plaintiff argues Defendant Mitchell knew of, but disregarded,

Decedent's serious medical condition. (Docs. 263, pgs. 57-58; 228, pgs. 1, 12-17). Plaintiff

suggests he "was the sole crisis-watch officer" on the date of Decedent's death. (Docs.

263, pg. 58; 228, pg. 1). Despite knowing the risks associated with leaving Decedent unmonitored, Defendant Mitchell did so, without ensuring another correctional officer covered his post, for over 1.5 hours. (Docs. 263, pg. 58; 228, pgs. 1, 12-13, 15). Once Defendant Mitchell returned to his post and found Decedent unresponsive, Plaintiff argues he declined to seek emergency care. (Docs. 263, pg. 58; 228, pgs. 1, 12, 16). Further, he later admitted to falsifying documentation related to the missed crisis watch checks. (Docs. 263, pg. 58; 228, pgs. 1, 12-14). In Plaintiff's view, Defendant Mitchell's arguments to the contrary—*e.g.*, that he merely committed negligence, errors in judgment, or violations of the rules and guidelines in place for protecting inmates like Decedent—are illogical and foreclosed by the applicable case law. (Docs. 263, pgs. 59-60; 228, pg. 16).

Plaintiff also rejects Defendant Mitchell's assertion of qualified immunity. She argues Defendant Mitchell waived that affirmative defense "with conclusory and tautological arguments" that span a mere three paragraphs. (Doc. 263, pg. 71). Moreover, even if there was no such waiver, Plaintiff argues Defendant Mitchell violated clearly established law by deciding to abandon Decedent for 1.5 hours while he was catatonic and dehydrated. (Doc. 263, pg. 73). Upon finding Decedent unresponsive, Defendant Mitchell merely consulted with fellow correctional officers before falsifying documentation related to his missed crisis watch checks. (Doc. 263, pg. 73).

Here, the following facts are undisputed by Defendant Mitchell and Plaintiff. Defendant Mitchell worked the crisis watch for the first time on September 5, 2018. (Docs. 222, pg. 3; 263, pg. 8). He "knew of the importance of a prisoner's crisis-watch status," and he "was trained as a crisis-watch officer through the IDOC's mandatory, systemwide

mental-health cycle training." (Docs. 263, pgs. 42-43; 288, pg. 18). Based on that training, Defendant Mitchell "knew that prisoners on crisis watch were at risk of suffering serious harm if left unmonitored." (Docs. 263, pgs. 42-43; 288, pg. 18). He also knew Decedent was on a 10-minute crisis watch. (Docs. 228, pg. 5; 255, pg. 10; 263, pg. 43; 288, pg. 19).

Defendant Mitchell was directed by his supervising officer, Defendant Bennett, to assist with chow lines at dinner time. (Docs. 222, pg. 4; 228, pg. 6; 255, pgs. 11, 22; 263, pgs. 10, 45; 288, pg. 23; 291, pg. 4). After ensuring Decedent's chest was moving, Defendant Mitchell heeded Defendant Bennett's directive, resulting in Defendant Mitchell missing his crisis watch checks from 4:15 p.m. to 5:50 p.m. because he did not advise Defendant Bennett of the need to conduct his crisis watch checks or ensure another officer covered his post. (Docs. 222, pg. 5; 228, pg. 6; 255, pgs. 11-12; 263, pgs. 10, 45-46; 288, pgs. 23-25). It is IDOC policy for a crisis watch officer to ensure "he can perform the required crisis-watch checks…[and] communicate with his sergeant if he has been assigned to a task that would require him to miss a crisis check." (Docs. 263, pg. 55; 288, pg. 43). At some point after assisting with the chow lines, Defendant Mitchell "pencil whipped" his missed crisis watch checks, meaning "he went back to fill in times that were missing from checks he did not complete." (Docs. 222, pg. 5; 228, pgs. 9-10; 255, pgs. 20-21; 263, pgs. 10, 53; 288, pgs. 37-38). Upon returning to his post, Defendant Mitchell found Decedent unresponsive at around 5:53 p.m. (Docs. 222, pgs. 3, 5; 228, pg. 6; 255, pgs. 12-13; 263, pgs. 8, 11, 47; 288, pg. 27). Defendant Mitchell "continued to watch [Decedent] for another two minutes 'to see if he was breathing.'" (Docs. 263, pg. 47; 288, pgs. 27-28).

IDOC and Menard Correctional Center directives require correctional staff, "who have regular contact with prisoners[,] to receive regular emergency response and CPR training." (Docs. 263, pgs. 46, 53-54; 288, pgs. 25-26, 39-41). In a medical emergency, "correctional staff are trained to contact the facility's medical personnel immediately and to 'initiate life-saving first-aid procedures for the techniques in which training has been completed.' " (Docs. 263, pgs. 46, 53-54; 288, pgs. 26, 39-41). Defendant Mitchell was "trained on these policies for responding to medical emergencies." (Docs. 228, pg. 5; 255, pg. 9; 263, pgs. 46-47, 53-54; 288, pgs. 26, 39-41). Defendant Mitchell knew he was required to call a Code 3 medical emergency for an inmate experiencing a medical emergency and that he did not need a superior's prior approval to do so; nevertheless, he "did not call a Code 3 or otherwise attempt to provide or summon medical assistance" for Decedent in this case. (Docs. 228, pgs. 5, 7; 255, pgs. 9, 13; 263, pgs. 48, 53-54; 288, pgs. 28, 39-41).

Instead, Defendant Mitchell called Defendant Frerich "to double-check whether [Decedent] appeared to be breathing" and to ask "whether his 'eyes were deceiving' him." (Docs. 222, pg. 5; 228, pg. 7; 255, pgs. 13-14, 22-23; 263, pgs. 11-12, 48; 288, pg. 28; 291, pg. 5). Defendant Frerich, who arrived at around 5:55 p.m., allegedly indicated he did not believe Decedent's chest was moving, so he told Defendant Mitchell to call the gallery officer. (Docs. 228, pg. 7; 255, pg. 14; 263, pg. 48; 288, pgs. 28-29). Defendant Mitchell called Defendant Frerking, who "conduct[ed] gallery tours every 30 minutes." (Docs. 222, pg. 5; 255, pg. 23; 263, pgs. 12, 49; 288, pg. 30; 291, pg. 5). Defendant Frerking allegedly arrived at the cell at around 6:00 p.m., observed Decedent to be unresponsive, then left to retrieve Defendant Bennett. (Docs. 222, pg. 5; 228, pg. 7; 255, pgs. 14-15, 23;

42

263, pgs. 12, 49; 288, pg. 30; 291, pgs. 5-6). Defendant Mitchell "continued to watch…to 'see if he was breathing at all.' " (Docs. 228, pg. 7; 255, pg. 15; 263, pg. 49; 288, pg. 31).

Upon arriving at the cell at around 6:02 p.m., Defendant Bennett attempted, without success for two to three minutes, to get Decedent to respond. (Docs. 222, pg. 5; 263, pgs. 12, 49; 288, pgs. 31-32). At 6:05 p.m., Defendant Bennett allegedly radioed and left to retrieve a nonparty shift supervisor. (Docs. 255, pg. 23; 263, pg. 49; 288, pgs. 31-32; 291, pg. 6). The nonparty shift supervisor arrived at Decedent's cell at around 6:10 p.m. (Docs. 228, pg. 8; 255, pgs. 16-17; 263, pg. 50; 288, pg. 32). The nonparty shift supervisor spent "several minutes" trying to receive a response from Decedent before radioing and retrieving another nonparty superior officer. (Docs. 228, pg. 8; 255, pgs. 16-17; 263, pg. 50; 288, pg. 32). Once that superior officer arrived at around 6:19 p.m., he ordered the nonparty shift supervisor to call an emergency response team, which does not include medical staff. (Docs. 228, pg. 8; 255, pg. 17; 263, pg. 50; 288, pgs. 32-33). The emergency response team arrived at Decedent's cell at around 6:26 p.m. (Docs. 228, pg. 8; 255, pg. 18; 263, pg. 50; 288, pgs. 33-34). Again, between 5:53 p.m., when Defendant Mitchell observed that Decedent was unresponsive, and 6:26 p.m., when the emergency response team arrived at Decedent's cell, no Defendant called a medical emergency or attempted to provide or summon medical assistance. (Docs. 228, pgs. 6-9; 255, pgs. 12-20; 263, pgs. 47-51; 288, pgs. 27-36). The emergency response team entered the cell, secured Decedent in handcuffs, carried him out of the cell, and transported him to the infirmary. (Docs. 228, pg. 9; 255, pg. 18; 263, pg. 50; 288, pg. 34). Decedent was eventually transported to the healthcare unit to wait for an ambulance. (Docs. 228, pg. 9; 255, pg. 19; 263, pg. 51; 288,

pg. 35). Despite the administration of life-saving measures, Decedent was pronounced

dead at 6:37 p.m. (Docs. 228, pg. 9; 255, pgs. 19-20; 263, pg. 51; 288, pgs. 35-36).

Under these circumstances, the Court finds there are genuine disputes of material

fact that require a trial on Count I. Again, the parties do not appear to seriously dispute

that Decedent suffered from a serious medical condition for purposes of the objective

component to Count I. The Court agrees. In addition, on the subjective component to the

claim, the above-discussed circumstances reflect triable issues about whether Defendant

Mitchell knew of facts from which to infer a substantial risk of serious harm to Decedent,

drew such an inference, and responded with a reckless or intentional disregard for the

serious medical condition through inaction or woefully inadequate action. *See Jones*, 2

F.4th at 612-13, 615; *Eagan*, 987 F.3d at 695; *McGowan*, 612 F.3d at 640; *Campbell*, 936 F.3d

at 549; *Orlowski*, 872 F.3d at 425; *Hoban*, 502 Fed. App'x at 577; *Lewis*, 864 F.3d at 563.

In addition, the Court concludes Defendant Mitchell is not entitled to qualified

immunity on Count I, which "protects government officials from damages liability

'insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.' " *See Campbell*, 936 F.3d at 545

(quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)); *accord Lewis*, 864

F.3d at 565; *see also Mabes v. Thompson*, 136 F.4th 697, 706 (7th Cir. 2025) ("Because

qualified immunity is an affirmative defense 'available to each individual defendant in

his individual capacity,' a court must structure its analysis defendant-by-defendant and

claim-by-claim."). The above facts, when viewed most favorably for Plaintiff, suggest

Defendant Mitchell violated the Eighth Amendment's prohibition on cruel and unusual

punishment by engaging in conduct that reflects deliberate indifference to Decedent's serious medical condition. *See Campbell*, 936 F.3d at 545 (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009)); *Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021) (quoting *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004); *Warlick v. Cross*, 969 F.2d 303, 305 (7th Cir. 1992); citing *Rakovich v. Wade*, 850 F.2d 1180, 1201–02 (7th Cir. 1988)).

The Court also concludes Decedent's constitutional rights under the Eighth Amendment were clearly established on September 5, 2018. *See Campbell*, 936 F.3d at 545; *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476. Reasonable correctional officers with Defendant Mitchell's training and knowledge of the circumstances would have understood that leaving Decedent unmonitored for 1.5 hours, despite his 10-minute crisis watch placement, and then declining to initiate an emergency response that included medical personnel and potentially lifesaving first-aid procedures, would violate the Eighth Amendment. *See Campbell*, 936 F.3d at 545-46 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014); *Taylor v. Barkes*, 575 U.S. 822, 825 (2015); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018); *see also Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) (noting courts "consider 'whether the violative nature of *particular* conduct is clearly established'") (Emphasis in original); *Green v. Carlson*, 826 F.2d 647, 652 (7th Cir. 1987) ("[W]hen a claim of qualified immunity arises as part of a summary judgment motion, the district court should…look at all of the undisputed evidence in the record, construed in a light most favorable to the non-movant. If the undisputed facts…show that the defendant's conduct, as a matter of law, violated no clearly established legal norms, then the district court must grant the defendant qualified immunity. However, if there are issues of disputed fact

45

upon which the question of immunity turns, or if it is clear that the defendant's conduct did violate clearly established norms, the case must proceed to trial.") (internal citation omitted); *Pyka v. Vill. of Orland Park*, 906 F. Supp. 1196, 1225 (N.D. Ill. 1995) (observing the latter statement from *Green* "makes sense only in light of the legal fiction that the qualified immunity question and the merits of the underlying claim are 'conceptually distinct.' "). Indeed, if officials ignore an inmate or utterly fail to provide care for a serious medical condition, the constitutional violation is obvious, so "qualified immunity offers little protection." *See Campbell*, 936 F.3d at 548-49; *see also Orlowski*, 872 F.3d at 422, 425.[8]

For these reasons, summary judgment is **DENIED** in relation to both Defendant Mitchell and Plaintiff on Count I. *See Tokio Marine Specialty Ins. Co.*, 618 F. Supp. 3d at 795; *Wilson*, 2016 3878125 at *2; *Chicago Wine Co.*, 532 F. Supp. 3d at 708.

### v. IDOC Defendants Walls, Bennett, Frerich, and Frerking

Defendants Walls, Bennett, Frerich, and Frerking argue Defendant Walls, who worked in an administrative position, never provided direct care to inmates. (Doc. 226, pgs. 17-18). However, Decedent "received extensive medical treatment" from other providers. (Doc. 226, pg. 17). Defendant Walls coordinated the necessary communications between the providers, but she "did not have any role as to what care doctors or providers provided to" inmates. (Doc. 226, pgs. 17-19). Instead, medical decisions on courses of treatment were left to the treating physicians. (Doc. 226, pg. 17). And, to the extent Plaintiff suggests Defendant Walls knew of deficiencies in Decedent's

---

[8] The Court stresses, in its qualified immunity analyses in this Memorandum & Order, it viewed that issue as "conceptually distinct" from the merits. *See Green*, 826 F.2d at 652; *Pyka*, 906 F. Supp. at 1225. The Court also notes those analyses would not have been possible before the completion of discovery.

care, the IDOC Defendants argue she did not act with deliberate indifference. (Doc. 226, pg. 18). Defendant Walls reasonably understood that Decedent was being treated by other medical providers, on whom she could rely for his care. (Doc. 226, pgs. 18-19).

As to Defendant Bennett, who was a sergeant responsible for supervising correctional officers, including Defendant Mitchell, the IDOC Defendants admit he "told Mitchell to assist with the chow lines." (Doc. 226, pg. 20). However, Defendant "Mitchell had enough time to make his checks and at no time did Defendant Bennett tell him not to continue his 10 and 15-minute crisis watch checks." (Doc. 226, pg. 20). The IDOC Defendants indicate Defendant Mitchell never told Defendant Bennett he needed to continue running crisis watch checks or asked whether someone else was assigned that responsibility. (Doc. 226, pg. 20). Instead, Defendant Mitchell falsified documentation to indicate the checks he missed, over a period of 1.5 hours, were completed, which Defendant Bennett only learned during a subsequent internal affairs investigation. (Doc. 226, pgs. 20-21). Therefore, the IDOC Defendants argue Defendant Bennett believed Defendant Mitchell performed the required checks. (Doc. 226, pgs. 20-22). Once notified Decedent was unresponsive, however, Defendant Bennett allegedly "took quick action…so…the Emergency Response Team could be activated." (Doc. 226, pgs. 21-22).

As to Defendants Frerich and Frerking, the IDOC Defendants argue they were not assigned to crisis watch checks on September 5, 2018. (Doc. 226, pgs. 22-23). They reiterate Defendant Mitchell, who was assigned to crisis watch checks on that date, failed to conduct the required checks before falsifying documentation about the checks. (Doc. 226, pgs. 23-24). Defendant Frerking checked on Decedent, who was observed as

unresponsive, only after being asked to do so by Defendant Mitchell. (Doc. 226, pgs. 22-23). Similarly, Defendant Frerich was asked by Defendant Mitchell to "come here" after Decedent was found unresponsive. (Doc. 226, pg. 23). He was unsuccessful in getting a response from Decedent. (Doc. 226, pg. 223). After observing Decedent, Defendants Frerking and Frerich allegedly alerted Defendant Bennett. (Doc. 226, pgs. 22-23).

Finally, Defendants Walls, Bennett, Frerich, and Frerking seek qualified immunity on Plaintiff's Eighth Amendment claims. (Doc. 226, pgs. 30-31). They reiterate that Decedent's constitutional rights were not violated. (Doc. 226, pgs. 29-30). Instead, Defendants Walls, Bennett, Frerich, and Frerking acted based on their understanding of the law, as they "would not know that they could be held liable for failing to correct a problem outside of their ability and control to correct." (Doc. 226, pg. 30). Further, although they believe the evidence shows their actions were prompt and reasonable, Defendants Walls, Bennett, Frerich, and Frerking argue it is insufficient under the Eighth Amendment to merely show an official was negligent or unreasonable. (Doc. 226, pg. 30).

In response, Plaintiff argues each IDOC Defendant knew of, but disregarded, Decedent's serious medical condition. (Doc. 263, pg. 57). As to Defendant Walls, Plaintiff argues she was responsible for ensuring emergencies were addressed and for following up on patient needs. (Doc. 263, pg. 67). Notwithstanding her administrative role, Plaintiff argues Defendant Walls was "intimately involved" in Decedent's care. (Doc. 263, pg. 67). Plaintiff notes on September 5, 2018, Defendant Walls was added to the email authored by Dr. Goldman. (Doc. 263, pg. 67). Defendant Walls replied to emails on that chain. (Doc. 263, pg. 67). Later that day, Decedent's medical providers allegedly relied upon

Defendant Walls to assess and provide updates on his treatment. (Doc. 263, pgs. 67-68). For example, Defendant Walls was allegedly asked whether Decedent's dehydration was addressed, whether Decedent refused the prescribed medications, and how often it was appropriate to take Decedent's vital signs. (Doc. 263, pgs. 67-68). Plaintiff alleges Defendant Walls failed to respond to those inquiries. (Doc. 263, pg. 68). Also, according to Plaintiff, Defendant Walls fails to recall whether she took action to ensure someone addressed Decedent's dehydration, to determine whether Decedent required enforced medication, or to verify whether someone took Decedent's vital signs. (Doc. 263, pg. 68).

Plaintiff argues Defendant Bennett, despite understanding the risks associated with leaving Decedent unattended, allegedly instructed Defendant Mitchell to leave his crisis watch post to assist with chow lines without ensuring the necessary checks were still completed. (Doc. 263, pgs. 63-66). Plaintiff also argues Defendant Bennett failed to properly respond to Decedent's unresponsiveness, as he did not call a Code 3 or perform CPR until medical personnel could take over the situation. (Doc. 263, pgs. 63, 66-67).

Likewise, after finding Decedent unresponsive, Plaintiff notes it is undisputed that Defendant Mitchell "sought out [Defendant] Frerking's confirmation that…[his] 'eyes did not deceive [him].' " (Doc. 263, pg. 61). Thereafter, Defendant Frerking, without providing or summoning emergency medical care for Decedent, merely radioed, and left the area to retrieve, Defendant Bennett. (Doc. 263, pgs. 61-62). As a result, Plaintiff argues a reasonable jury could find Defendant Frerking, who had the requisite medical training and admitted to the requirement that a correctional officer must call a Code 3 for medical emergencies, acted with deliberate indifference in this case. (Doc. 263, pgs. 62-63).

49

As to Defendant Frerich, Plaintiff argues he knew Decedent required emergency medical care but "simply walked away." (Doc. 263, pg. 60). Plaintiff notes it is undisputed Defendant Mitchell contacted Defendant Frerich "soon after encountering [Decedent] in an apparent state of unconsciousness and respiratory arrest." (Doc. 263, pg. 60). Defendant Frerich also "tried to elicit a response from" Decedent. (Doc. 263, pg. 60). Once that effort failed, Defendant Frerich allegedly "declined to call for healthcare staff or attend to [Decedent's] medical needs himself." (Doc. 263, pg. 60). Plaintiff suggests Defendant Frerich's mental state and subsequent actions, *i.e.*, whether he left Decedent's cell-front to radio Defendant Bennett, remain disputed. (Doc. 263, pg. 61). Also, as with Defendant Frerking, Plaintiff argues Defendant Frerich responded in this way despite having, and being required to employ, the requisite medical training. (Doc. 263, pg. 61).

Lastly, Plaintiff rejects the notion that the IDOC Defendants are entitled to qualified immunity. Initially, she argues the IDOC Defendants waived that affirmative defense "with conclusory and tautological arguments" that span a mere four paragraphs. (Doc. 263, pg. 71). Even if there was no such waiver, Plaintiff argues the IDOC Defendants violated clearly established law in the following ways: (1) Defendant Walls, the highest-ranking healthcare official at Menard Correctional Center, knew Decedent was catatonic and dehydrated yet failed to do anything to address those issues; and (2) Defendants Bennett, Frerich, and Frerking admitted to not providing or summoning emergency medical care for Decedent after observing he was unresponsive. (Doc. 263, pgs. 74-75).

Here, the summary judgment record reflects that Defendant Walls, a registered nurse, was employed as the healthcare unit administrator. (Docs. 226, pg. 13; 263, pgs. 31,

36; 295, pg. 3). In her role as healthcare unit administrator, Defendant Walls did not provide direct medical care to inmates. (Doc. 226, pg. 13; 263, pg. 32). However, Defendant Walls admits it was her "responsibility to follow up on a patient and to make sure the patient received what he needed." (Docs. 226, pg. 226; 263, pg. 32).

On September 5, 2018, Defendant Walls participated in the email chain initiated by Dr. Goldman. She was added to the email chain by Assistant Warden Jones at 11:01 a.m. (Doc. 268-46, pgs. 4-5). When doing so, Assistant Warden Jones stated as follows:

> The dehydration part of this should be a medical issue if I am not mistaken. I have added Dr. Siddiqui, and Gail Walls (HCUA) to the email for their input on what has been done for that. Regarding the emergency enforced medication; I understand he was seen by a Psychiatrist yesterday, and it was determined not to put him on emergency meds at that time. I also copied Dr. Floreani since I believe she was the individual that dealt with Curtis yesterday for input.

(Doc. 268-46, pgs. 4-5).

At 11:32 a.m., Defendant Walls responded:

> It is my understanding he was showered yesterday. Today they straight cath him for a urine sample and drew blood on him for a wide variety of things. We will have the results tomorrow. If he is on watch we should be able to tell if he is eating and taking fluids as well. The nurses say he acknowledges them when they talk to him but doesn't verbally respond to questions.

(Doc. 268-46, pg. 4).

At 11:41 a.m., Dr. Goldman asked: "Gail did they address his hydration?" (Doc. 268-49, pg. 2). The record does not indicate Defendant Walls responded to that question, and it is unclear whether she "took action to determine whether medical staff addressed [Decedent's] hydration." (Docs. 263, pg. 41; 295, pg. 12). However, at 1:07 p.m., which

was after the emails resulting in Dr. Floreani changing her diagnosis and prescribing an "emergency rx," Defendant Walls stated: "Dr. Floreani could you please also send us a progress note to address the reason why the script was written? We are processing the order now and he will receive the med soon." (Doc. 268-46, pgs. 2-4). At 1:29 p.m., Dr. Goldman stated: "Thank you very much. Great team work today." (Doc. 214-17, pg. 4).

As noted above, the progress note of a nonparty nurse, at 1:30 p.m., states: "I/m had an episode of 'unresponsiveness.' I/m pulled out, labs ordered and obtained. PRN Ativan injection per MD Goldman. Tolerated well. [No] other s/s of acute distress." (Doc. 268-1, pg. 42). The plan was to "cont. to monitor" and to "cont. [crisis] watch as ordered." (Doc. 268-1, pg. 42). At 2:41 p.m., Dr. Floreani sent the following email with a new progress note: "Here is his PN. Please let me know if he refuses his now dose of PO Ativan and requires an injection. Also, how often can vitals be taken?" (Doc. 268-46, pg. 2). The parties agree there is no evidence that Defendant Walls responded to this email, took action to determine whether Decedent required an injection, or determined how often medical staff were taking Decedent's vitals. (Docs. 263, pg. 42; 295, pg. 15). They also agree Defendant Walls does not recall taking any action in response to that email. (Docs. 263, pg. 42; 295, pg. 15). The parties dispute whether Defendant Walls could have requested for Decedent's "blood work [to] be sent 'stat' to a local hospital for quicker results." (Docs. 263, pg. 40; 295, pg. 11). Dr. Floreani's updated progress note stated:

> Pt with a PPH Catatonia per Chester Mental Health records obtained 9/5/18, who presented on 9/4/18 with near mutism, mundane posturing, fixed gaze, motiveless response to instructions, with unstable vitals, and staff report of poor po intake. He was sent to medicine for medical work up which indicated dehydration. In the interim, mental health records of

Catatonia history have been obtained and pt presentation along with his history and lack of any other medical etiology together indicate current Catatonia. Given the urgent nature of his condition with poor po intake and tachycardia, will immediately initiate ativan rx, and continue to evaluate pt response. Medicine is aware of pt condition. Labs and treatment of dehydration per medicine. Will continue pt on crisis watch.

(Docs. 268-1, pgs. 3, 150-51).

Later in the day, it is undisputed Defendant Bennett directed Defendant Mitchell to assist with chow lines at dinner time. (Docs. 263, pg. 45; 295, pgs. 20-21). This is even though Defendant Bennett testified, during his deposition, that there is no circumstance in which a crisis watch officer would be expected to help with chow lines. (Docs. 263, pgs. 44, 55; 295, pgs. 19, 44-45). Defendant Bennett "knew the importance of a prisoner's crisis-watch status," and he "was trained as a crisis-watch officer through the IDOC's mandatory, systemwide mental-health cycle training." (Docs. 263, pg. 44; 295, pgs. 19-20). Based on that training, Defendant Bennett "knew that prisoners on crisis watch were at risk of suffering serious harm if left unmonitored." (Docs. 263, pg. 44; 295, pgs. 19-20).

Defendant Mitchell missed his crisis watch checks from 4:15 p.m. to 5:50 p.m., at least in part, because he did not advise Defendant Bennett of the need to conduct his crisis watch checks or ensure another officer covered his post. (Docs. 222, pg. 5; 228, pg. 6; 255, pgs. 11-12; 263, pgs. 10, 45-46, 55; 288, pgs. 23-25, 43; 295, pgs. 22-23). The IDOC Defendants and Plaintiff agree "IDOC policy…requires a crisis watch officer to take action to ensure that he is able to perform the checks as required based on the frequency that's been ordered." (Docs. 226, pg. 15; 263, pgs. 34, 55; 295, pg. 46). The crisis watch officer must also "communicate with the sergeant if his responsibilities regarding

running lines for mealtimes exceeds the time when he is due to be back to perform one of those checks." (Docs. 226, pg. 15; 263, pgs. 34, 55; 295, pg. 46). Assuming it is proper for a crisis watch officer to assist with chow lines, the IDOC Defendants and Plaintiff also agree "[i]t would be important for the sergeant to communicate to the crisis watch officer if ten minutes or more had gone by before the officer was freed up to go back to the area to check on the individuals." (Docs. 226, pg. 14; 263, pgs. 34, 55; 295, pgs. 44-46). Defendant Bennett does not recall telling Defendant Mitchell "to make sure that he was able to get back for his ten-minute suicide checks or instructing [him] to make sure that someone else covered his crisis-watch checks." (Docs. 263, pg. 46; 295, pg. 23).

It is undisputed that IDOC and Menard Correctional Center directives require correctional staff to, at a minimum, "receive annual CPR training and…first-aid training." (Docs. 263, pgs. 46, 53; 295, pgs. 23-24, 40-41). Also, "[a]ccording to Menard's emergency-response policies, '[n]otification to the Health Care Unit shall be made immediately by anyone observing a medical emergency situation and upon such notification Health Care staff member(s) shall respond to the scene immediately.' " (Docs. 263, pg. 53; 295, pgs. 41-42). In a medical emergency, "correctional staff are trained to contact the facility's medical personnel immediately and to 'initiate life-saving first-aid procedures for the techniques in which training has been completed.' " (Docs. 263, pgs. 46, 53; 295, pgs. 24, 41-42). Defendants Mitchell, Bennett, Frerich, and Frerking were trained on these policies and could "call a Code 3 without any approval from a supervisor." (Docs. 226, pg. 15; 263, pgs. 46-47; 295, pgs. 24-25, 40-42). Indeed, the parties agree that "[i]t would be contrary

54

to IDOC policy for an officer to suspect that a prisoner was having a medical emergency and do anything other than call[] a Code 3." (Docs. 263, pgs. 53-54; 295, pg. 42).

After being summoned to Decedent's cell by Defendant Mitchell to see "whether his 'eyes were deceiving' him," Defendant Frerich observed Decedent to be unresponsive. (Docs. 226, pg. 13; 263, pgs. 30-31, 48; 295, pgs. 27-28). The parties dispute whether Defendant Frerich, after failing to prompt a response from Decedent, left to retrieve Defendant Bennett or told Defendant Mitchell to summon the gallery officer. (Doc. 263, pg. 48; 295, pgs. 28-29). Defendant Frerking, who was summoned by Defendant Mitchell, observed Decedent to be unresponsive, so he left to retrieve Defendant Bennett. (Docs. 226, pgs. 11-12; 263, pgs. 29-30, 49; 295, pgs. 29-31). Upon arriving at the cell, Defendant Bennett attempted, without success for two to three minutes, to prompt a response from Decedent. (Docs. 263, pgs. 49; 295, pgs. 32-33). He then radioed and left to retrieve a nonparty shift supervisor. (Docs. 226, pg. 9; 263, pg. 49; 295, pgs. 32-33). That nonparty shift supervisor allegedly tried to prompt a response from Decedent before radioing and retrieving another nonparty superior officer. (Docs. 226, pg. 9; 263, pg. 50; 295, pgs. 33-34). Once that superior officer arrived at Decedent's cell, he ordered the nonparty shift supervisor to call an emergency response team, which does not include medical staff. (Docs. 226, pg. 9; 263, pg. 50; 295, pg. 34). During this timeframe, it is undisputed that no Defendant called a medical emergency or attempted to provide or summon medical assistance for Decedent. (Docs. 263, pgs. 47-51; 295, pgs. 28-37). The emergency response team entered the cell, secured Decedent in handcuffs, carried him out of the cell, and transported him to the infirmary. (Docs. 226, pg. 9; 263, pg. 50; 295,

pg. 35). Decedent was eventually taken to the healthcare unit to wait for an ambulance. (Docs. 263, pg. 51; 295, pgs. 36-37). Despite the administration of life-saving measures, he was pronounced dead at 6:37 p.m. (Docs. 226, pg. 9; 263, pg. 51; 295, pgs. 36-37).

On this record, the Court finds there are genuine disputes of material fact that require a trial on Count I. Decedent undisputedly suffered from a serious medical condition for purposes of the objective component to Count I. As with Defendant Mitchell, the above circumstances also present factual questions about whether Defendants Walls, Bennett, Frerich, and Frerking knew of facts from which to infer a substantial risk of serious harm, drew such an inference, and responded with a reckless or intentional disregard for the serious medical condition through inaction or woefully inadequate action on the subjective component to Count I. *See Jones*, 2 F.4th at 612-13, 615; *Eagan*, 987 F.3d at 695; *McGowan*, 612 F.3d at 640; *Campbell*, 936 F.3d at 549; *Orlowski*, 872 F.3d at 425; *Roe*, 631 F.3d at 857; *Hoban*, 502 Fed. App'x at 577; *Lewis*, 864 F.3d at 563.

The Court also concludes Defendants Walls, Bennett, Frerich, and Frerking are not entitled to qualified immunity on Count I. *See Campbell*, 936 F.3d at 545 (quoting *Estate of Clark*, 865 F.3d at 549-50); *accord Lewis*, 864 F.3d at 565; *see also Mabes*, 136 F.4th at 706. Beginning with Defendant Walls, the Court finds the above facts, when viewed most favorably for Plaintiff, suggest she violated the Eighth Amendment's prohibition on cruel and unusual punishment by engaging in conduct that amounts to deliberate indifference to Decedent's serious medical condition. *See Campbell*, 936 F.3d at 545 (quoting *Gonzalez*, 578 F.3d at 540); *Smith*, 10 F.4th at 734. Decedent's constitutional rights under the Eighth Amendment were also clearly established as of September 5, 2018. *See Campbell*, 936 F.3d

56

at 545; *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476. In other words, reasonable persons in Defendant Walls's position, and with her knowledge of Decedent's condition, would have understood that failing to follow up with Decedent to ensure he received the necessary treatment would violate the Eighth Amendment. *See Campbell*, 936 F.3d at 545-46 (quoting *Plumhoff*, 572 U.S. at 778-79; *Taylor*, 575 U.S. at 825; *Kisela*, 584 U.S. at 104); *see also Leiser*, 933 F.3d at 702; *Green*, 826 F.2d at 652; *Pyka*, 906 F. Supp. at 1225.

The Court reaches the same conclusion for Defendants Bennett, Frerich, and Frerking, who were similarly situated under the above-discussed factual circumstances. The facts of record, when viewed in a light most favorable to Plaintiff, suggest they violated the Eighth Amendment's prohibition on cruel and unusual punishment by engaging in conduct that constitutes deliberate indifference to Decedent's serious medical condition. *See Campbell*, 936 F.3d at 545 (quoting *Gonzalez*, 578 F.3d at 540); *Smith*, 10 F.4th at 734. Further, Decedent's constitutional rights under the Eighth Amendment were clearly established on September 5, 2018. *See Campbell*, 936 F.3d at 545; *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476. As for Defendant Bennett, reasonable correctional officers with his training and knowledge of the circumstances would have understood that directing a crisis watch officer away from his post to assist with chow lines, without ensuring coverage for that post, and then declining to initiate an emergency response that included medical personnel and potentially lifesaving first-aid procedures, would violate the Eighth Amendment. *See Campbell*, 936 F.3d at 545-46 (quoting *Plumhoff*, 572 U.S. at 778-79; *Taylor*, 575 U.S. at 825; *Kisela*, 584 U.S. at 104); *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476; *Leiser*, 933 F.3d at 702; *Green*, 826 F.2d at 652; *Pyka*, 906 F. Supp. at 1225.

Similarly, reasonable correctional officers with Defendants Frerich and Frerking's training and knowledge of the circumstances would have understood the latter conduct—*i.e.*, declining to initiate an emergency response that included medical personnel and potentially lifesaving first-aid procedures—would violate the Eighth Amendment. *See Campbell*, 936 F.3d at 545-46 (quoting *Plumhoff*, 572 U.S. at 778-79; *Taylor*, 575 U.S. at 825; *Kisela*, 584 U.S. at 104); *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476; *Leiser*, 933 F.3d at 702; *Green*, 826 F.2d at 652; *Pyka*, 906 F. Supp. at 1225.  As noted with Defendant Mitchell, if officials ignore an inmate or utterly fail to provide care for a serious medical condition, the constitutional violation is obvious, so "qualified immunity offers little protection." *See Campbell*, 936 F.3d at 548-49; *see also Orlowski*, 872 F.3d at 422, 425.

For these reasons, summary judgment is **DENIED** for Defendants Walls, Bennett, Frerich, and Frerking on Count I.

### 2. Count III: Failure to Intervene by Defendants Leven, Mitchell, Walls, Bennett, Frerking, and Frerich under the Eighth Amendment and § 1983

The Seventh Circuit has long recognized that a state actor's failure to intervene, in order to prevent an ongoing violation of a constitutional right by a fellow state actor, may lead to liability under the Eighth Amendment and § 1983. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (quoting *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); citing *Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004); *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982); *Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974)); *Baker v. City of Chicago*, 483 F. Supp. 3d 543, 558-59 (N.D. Ill. 2020). To succeed on such a claim, however, it is essential that there was an underlying constitutional violation, *e.g.*, deliberate

indifference, that requires intervention. *Harper*, 400 F.3d at 1064 (citing *Fillmore*, generally); *accord Woods v. Village of Bellwood*, 502 F. Supp. 3d 1297, 1319 (N.D. Ill. 2020). A plaintiff must prove: (1) the state actor knew of the underlying constitutional violation; (2) the state actor had a reasonable opportunity to prevent the underlying constitutional violation; (3) the state actor failed to take reasonable steps to prevent the underlying constitutional violation; and (4) the victim of the underlying constitutional violation suffered harm as a result of the state actor's failure to intervene. *See Baker*, 483 F. Supp. 3d at 558-59 (citing *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017)); *Johnson v. Mathias*, No. 21-cv-1362, 2022 WL 836816, *3 (C.D. Ill. March 21, 2022) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). A state actor has a reasonable opportunity to prevent the underlying constitutional violation if he or she has a chance to warn the fellow state actor of the need to stop. *See Harris v. City of La Crosse*, 745 F. Supp. 3d 733, 754 (W.D. Wisc. Aug. 14, 2024) (quoting *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014)). Whether a state actor had time to intervene in order to prevent the harm is, generally, one for the jury; however, a court can decide that question if the evidence reveals a reasonable jury could not possibly reach a contrary conclusion. *See Woods*, 502 F. Supp. 3d at 1319 (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005)).

### i. Defendant Leven

The Wexford Defendants reiterate that no constitutional violation was committed against Decedent, so the failure to intervene claim must fail as a matter of law. (Doc. 214, pg. 44). They also argue, after Defendant Leven saw Decedent, he was immediately referred to psychiatry and then seen by other medical staff. (Doc. 214, pg. 44). This

resulted in new medical records, a new diagnosis, and new treatment; however, "no one knew [Decedent] had ingested a substance that promptly caused his death." (Doc. 214, pg. 44). Therefore, the Wexford Defendants argue Defendant Leven did not know of any constitutional violation. (Doc. 214, pg. 44). Even if that were not so, they argue Defendant Leven, a psychologist, had "no realistic opportunity to intervene," as she could not prescribe medication or assess and diagnose medical conditions. (Doc. 214, pg. 44).

In response, Plaintiff argues she raised a genuine dispute of material fact about whether the Wexford Defendants committed a constitutional violation related to Decedent's care. (Doc. 264, pgs. 101-02). Plaintiff argues it is genuinely disputed whether Defendant Leven knew of the constitutional violation yet "failed to take action or provide the necessary information to enable effective life-saving treatment." (Doc. 264, pg. 102).

Here, the Court notes it found there is no genuine dispute of material fact about whether Defendants Siddiqui and Leven, who are the only individually named Wexford Defendants, violated Decedent's Eighth Amendment rights. More specifically, the Court found neither Defendant Siddiqui nor Defendant Leven could be liable for their alleged deliberate indifference to Decedent's serious medical condition. Likewise, the Court found Defendant Wexford, by itself, was not liable for its policies or customs under *Monell*. Therefore, at present, there was no underlying constitutional violation, *i.e.*, deliberate indifference, by a Wexford Defendant that required Defendant Leven to intervene. *See Harper*, 400 F.3d at 1064; *Baker*, 483 F. Supp. 3d at 558-59; *Woods*, 502 F. Supp. 3d at 1319. Importantly, the Court will not speculate, on what is surely an incomplete record, about potential underlying constitutional violations of unspecified nonparties.

60

Alternatively, the Court cannot find there is a genuine dispute of material fact about whether Defendant Leven took reasonable steps to prevent an underlying constitutional violation about which she was aware. *See Baker*, 483 F. Supp. 3d at 558-59; *Johnson*, 2022 WL 836816 at *3. She did so, including by consulting with MHP Pappas on an in-person session with Decedent at 12:45 p.m. on September 4, 2018. (Doc. 268-1, pgs. 144-45). Defendant Leven also "recall[ed] going over to the healthcare unit" at some point, "having a discussion about the current status" of Decedent, and having "some brief discussion about labs or blood work that had been ordered." (Doc. 214-9, pg. 115). And, as discussed at length above, the record makes clear Decedent was being treated within the scopes of practice of other medical and mental health professionals, including a nonparty psychiatrist, Dr. Floreani, to whom Defendant Leven, a non-treating clinical psychologist, could not "[p]rovide guidance, direction, training [or] clinical supervision." (Doc. 268-34, pg. 2). That record includes Decedent's treatment records and Dr. Goldman's September 5, 2018, email, about which Defendant Leven testified: "I vaguely recall there had been some responses by the time I had…seen it initially, but I don't remember how many. But there were multiple people in addition to myself on that e-mail and several of those people had responded." (Doc. 214-9, pg. 113; 268-46, pgs. 2-5). One response included an "emergency rx" for Ativan, which Defendant "[t]olerated well" and with "[no] other s/s of acute distress." (Doc. 268-1, pg. 42). Another response included Dr. Floreani's updated progress note, which indicated: "Medicine is aware of pt condition. Labs and treatment of dehydration per medicine. Will continue pt on crisis watch." (Doc. 268-1, pgs. 3, 150-51). Finally, Defendant Leven, a non-treating clinical

psychologist, clocked out at 4:32 p.m. on September 5, 2018, which was before the missed crisis watch checks that preceded Decedent's death. (Sealed Doc. 217, pgs. 7, 10). Accordingly, summary judgment is **GRANTED** for Defendant Leven on Count III.

### ii. Defendant Mitchell

As discussed above, Defendant Mitchell seeks qualified immunity for Plaintiff's Eighth Amendment claims. (Doc. 222, pgs. 2, 10-11). Aside from those arguments, the Court has been unable to discern any argument by Defendant Mitchell on Count III.

Plaintiff, for her part, argues the record contains ample evidence for a jury to find Defendant Mitchell knew of, but did nothing to stop or remedy, the unconstitutional treatment of Decedent. (Doc. 263, pg. 75). His arguments to the contrary allegedly rest on a "construction of disputed material facts." (Doc. 263, pg. 76). For example, after Decedent was found unresponsive in his cell, Defendant Mitchell could be found liable for failing to provide or summon emergency medical care. (Doc. 263, pgs. 76-77).

Here, the Court finds there are genuine disputes of material fact that require a trial on Count III. Initially, as discussed regarding Count I, there is a genuine dispute of material fact about an underlying constitutional violation that required Defendant Mitchell's intervention. *See Harper*, 400 F.3d at 1064; *Woods*, 502 F. Supp. 3d at 1319. Specifically, there are genuine disputes of material fact about Defendant Bennett's directive for Defendant Mitchell to assist with chow lines at dinner time, which resulted in 1.5 hours of missed crisis watch checks, and Defendants Bennett, Frerich, and Frerking's response to observing Decedent in an unresponsive condition. (Docs. 222, pgs. 4-5; 228, pg. 6; 255, pgs. 11-12, 22; 263, pgs. 10, 45-46; 288, pgs. 23-25; 291, pg. 4). In light

of Defendant Mitchell's knowledge of the importance of Decedent's crisis watch status and its associated risks of harm, Defendant Mitchell's training for the crisis watch and for responding to medical emergencies, the IDOC policy for crisis watch officers to ensure the performance of crisis watch checks, Defendant Mitchell's "pencil whipping" of the missed crisis watch checks, the IDOC and Menard Correctional Center directives for regular emergency response and CPR training, and Defendant Mitchell's response or nonresponse to Decedent's unresponsiveness, there are also genuine disputes of material fact about whether Defendant Mitchell had sufficient knowledge of an underlying constitutional violation, had a reasonable opportunity to intervene, and took reasonable steps to prevent an underlying constitutional violation. *See Harper*, 400 F.3d at 1064; *Baker*, 483 F. Supp. 3d at 558-59; *Johnson*, 2022 WL 836816 at *3; *Harris*, 745 F. Supp. 3d at 754; *Woods*, 502 F. Supp. 3d at 1319; (Docs. 222, pgs. 3, 5; 228, pgs. 5-10; 255, pgs. 9-10, 12-23; 263, pgs. 8, 10-12, 42-43, 46-51, 53-55; 288, pgs. 18-19, 25-41, 43; 291, pg. 5). Finally, a jury should decide whether Decedent suffered harm from any failure to intervene by Defendant Mitchell. *See Baker*, 483 F. Supp. 3d at 558-59; *Johnson*, 2022 WL 836816 at *3.

By extension, the Court concludes Defendant Mitchell is not entitled to qualified immunity on Count III. *See Campbell*, 936 F.3d at 545 (quoting *Estate of Clark*, 865 F.3d at 549-50); *accord Lewis*, 864 F.3d at 565; *see also Mabes*, 136 F.4th at 706. When viewed most favorably for Plaintiff, the above-discussed facts suggest Defendant Mitchell violated the Eighth Amendment by failing to intervene in the constitutional violations of Defendants Bennett, Frerich, and Frerking. *See Campbell*, 936 F.3d at 545; *Smith*, 10 F.4th at 734. The Court also concludes the constitutional rights under the Eighth Amendment were clearly

established on September 5, 2018. *See Harper*, 400 F.3d at 1064; *Baker*, 483 F. Supp. 3d at 558-59; *Woods*, 502 F. Supp. 3d at 1319; *Johnson*, 2022 WL 836816 at *3; *Harris*, 745 F. Supp. 3d at 754; *Campbell*, 936 F.3d at 545; *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476. As was true for Count I, reasonable correctional officers with Defendant Mitchell's training and knowledge of the circumstances would have understood that leaving Decedent unmonitored for 1.5 hours, despite his 10-minute crisis watch placement, and then declining to initiate an emergency response that included medical personnel and potentially lifesaving first-aid procedures, would violate the Eighth Amendment. *See Campbell*, 936 F.3d at 545-46 (quoting *Plumhoff*, 572 U.S. at 778-79; *Taylor*, 575 U.S. at 825; *Kisela*, 584 U.S. at 104); *Leiser*, 933 F.3d at 702; *Green*, 826 F.2d at 652; *Pyka*, 906 F. Supp. at 1225. Again, if officials ignore an inmate or utterly fail to provide care for a serious medical condition, the constitutional violation is obvious, so "qualified immunity offers little protection." *See Campbell*, 936 F.3d at 548-49; *see also Orlowski*, 872 F.3d at 422, 425.

Accordingly, summary judgment is **DENIED** for Defendant Mitchell on Count III.

### iii. IDOC Defendants Walls, Bennett, Frerking, and Frerich

Defendants Walls, Bennett, Frerich, and Frerking argue there is no evidence to show they knew of a constitutional violation involving Decedent or, by extension, that they had a reasonable opportunity to intervene. (Doc. 226, pg. 26). Instead, they argue the evidence indicates Defendants Bennett, Frerich, and Frerking were unaware Defendant Mitchell failed to complete the required crisis watch checks, yet they took "immediate action to notify the chain of command" once alerted to Decedent's unresponsiveness. (Doc. 226, pg. 26). Similarly, the evidence purportedly shows Defendant Walls

"attempted to assist in ensuring [Decedent] received the appropriate medical treatment from his providers." (Doc. 226, pg. 26). And, again, the IDOC Defendants request qualified immunity on the Eighth Amendment claims. (Doc. 226, pgs. 29-30).

In response, Plaintiff argues a jury could find each IDOC Defendant knew of, but did nothing to stop or remedy, the unconstitutional treatment of Decedent. (Doc. 263, pg. 75). Defendants Bennett, Frerich, and Frerking's arguments allegedly rest on a "construction of disputed material facts." (Doc. 263, pg. 76). For example, Defendant Bennett knew Defendant Mitchell was not completing crisis watch checks after being told to assist with chow lines. (Doc. 263, pg. 76). And, after Decedent was found unresponsive, Defendants Bennett, Frerich, and Frerking allegedly failed to provide or summon emergency medical care. (Doc. 263, pgs. 76-77). Finally, Plaintiff argues Defendant Walls, given her personal involvement and authority as a healthcare unit administrator, knew of the need to ensure Decedent received adequate medical care. (Doc. 263, pgs. 77-78).

Here, beginning with Defendant Walls, the Court notes she is the only medical or mental health professional who must proceed to trial on Count I. By contrast, the Court found there were no genuine disputes of material fact about whether Defendant Wexford or Defendants Siddiqui and Leven, a medical director who was on vacation and a non-treating clinical psychologist who served as a mental health services director, respectively, could be liable for deliberate indifference to Decedent's serious medical condition under Count I. For this reason, the Court finds Defendant Walls did not fail to intervene, to prevent an underlying constitutional violation by a fellow state actor, as necessary for liability on Count III. *See Harper*, 400 F.3d at 1064; *Baker*, 483 F. Supp. 3d at

558-59; *Woods*, 502 F. Supp. 3d at 1319. Put another way, under the factual circumstances relating to the medical and mental health staff, there was no deliberate indifference that required Defendant Walls's intervention. *See Harper*, 400 F.3d at 1064; *Baker*, 483 F. Supp. 3d at 558-59; *Woods*, 502 F. Supp. 3d at 1319. As explained elsewhere in this Memorandum & Order, the Court will not speculate about potential underlying constitutional violations of unspecified nonparties. It is notable, too, Defendant Walls's conduct occurred before that of Defendants Mitchell, Bennett, Frerich, and Frerking, so she would not have known of or had a reasonable opportunity to stop their alleged deliberate indifference. *See Baker*, 483 F. Supp. 3d at 558-59; *Johnson*, 2022 WL 836816 at *3; *Harris*, 745 F. Supp. 3d at 754. For these reasons, summary judgment is **GRANTED** for Defendant Walls on Count III.

As to Defendants Bennett, Frerich, and Frerking, the Court finds there are genuine disputes of material fact that require a trial on Count III. For those Defendants, there is a genuine dispute of material fact about whether an underlying constitutional violation required their intervention. *See Harper*, 400 F.3d at 1064; *Woods*, 502 F. Supp. 3d at 1319. For example, there are genuine disputes of material fact about Defendant Bennett's directive for Defendant Mitchell to assist with chow lines, which resulted in 1.5 hours of missed crisis watch checks, and Defendants Mitchell, Bennett, Frerich, and Frerking's response to observing Decedent in an unresponsive condition. (Docs. 226, pgs. 9, 11-15; 263, pgs. 10, 29-31, 34, 44-51, 53-55; 295, pgs. 19-25, 27-37, 40-42, 44-46). In light of Defendant Bennett's knowledge of the importance of a prisoner's crisis watch status, training as a crisis watch officer, and knowledge of crisis watch policies and practices, as well as Defendants Bennett, Frerich, and Frerking's observation of Decedent in a state of

unresponsiveness, emergency response training, and CPR and first-aid training, there are also genuine disputes of material fact about whether they had sufficient knowledge of an underlying constitutional violation, had a reasonable opportunity to intervene, and took reasonable steps to prevent an underlying constitutional violation. *See Harper*, 400 F.3d at 1064; *Baker*, 483 F. Supp. 3d at 558-59; *Johnson*, 2022 WL 836816 at *3; *Harris*, 745 F. Supp. 3d at 754; *Woods*, 502 F. Supp. 3d at 1319; (Docs. 226, pgs. 9, 11-15; 263, pgs. 10, 29-31, 34, 44-51, 53-55; 295, pgs. 19-25, 27-37, 40-42, 44-46). In addition, a jury must answer whether Decedent suffered harm as a result of a failure to intervene by Defendants Bennett, Frerich, and Frerking. *See Baker*, 483 F. Supp. 3d at 558-59; *Johnson*, 2022 WL 836816 at *3.

Finally, the Court holds Defendants Bennett, Frerich, and Frerking are not entitled to qualified immunity on Count III. *See Campbell*, 936 F.3d at 545 (quoting *Estate of Clark*, 865 F.3d at 549-50); *accord Lewis*, 864 F.3d at 565; *see also Mabes*, 136 F.4th at 706. When viewed most favorably for Plaintiff, the summary judgment record suggests those Defendants violated the Eighth Amendment by failing to intervene in each other's constitutional violations or that of Defendant Mitchell. *See Campbell*, 936 F.3d at 545; *Smith*, 10 F.4th at 734. Decedent's constitutional rights under the Eighth Amendment were also clearly established as of September 5, 2018. *See Harper*, 400 F.3d at 1064; *Baker*, 483 F. Supp. 3d at 558-59; *Woods*, 502 F. Supp. 3d at 1319; *Johnson*, 2022 WL 836816 at *3; *Harris*, 745 F. Supp. 3d at 754; *Campbell*, 936 F.3d at 545; *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476. As was true for these Defendants on Count I, reasonable correctional officers with their training and knowledge of the circumstances would have understood that directing a crisis watch officer away from his post to assist with chow lines, without

ensuring coverage for that post, and/or declining to initiate an emergency response that included medical personnel and potentially lifesaving first-aid procedures, would violate the Eighth Amendment. *See Campbell*, 936 F.3d at 545-46 (quoting *Plumhoff*, 572 U.S. at 778-79; *Taylor*, 575 U.S. at 825; *Kisela*, 584 U.S. at 104); *Smith*, 10 F.4th at 734; *Board*, 394 F.3d at 476; *Leiser*, 933 F.3d at 702; *Green*, 826 F.2d at 652; *Pyka*, 906 F. Supp. at 1225. Ignoring an inmate or utterly failing to provide care for a serious medical condition makes a constitutional violation obvious, such that "qualified immunity offers little protection." *See Campbell*, 936 F.3d at 548-49; *see also Orlowski*, 872 F.3d at 422, 425.

For these reasons, summary judgment is **DENIED** for Defendants Bennett, Frerich, and Frerking on Count III.

### 3. Counts IV and V: Wrongful Death and Survival Actions Against Defendants under 740 ILCS 180/1 and 755 ILCS 5/27-6[9]

In Count IV, Plaintiff invokes § 1 of the Wrongful Death Act, which serves "to compensate the parents and siblings of [a] deceased family member for pecuniary losses resulting from that family member's death" by providing as follows:

> Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, including punitive damages when applicable…then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, including punitive damages when applicable, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

---

[9]The Court notes Counts IV and V generically invoke § 1 of the Wrongful Death Act and § 27-6 of the Survival Act against "All Defendants." (Doc. 1, pgs. 15-17). In other words, Plaintiff's allegations and theories do not distinguish between Defendants with a medical versus a correctional background.

740 ILCS 180/1; *Caterpillar, Inc. v. Wilhelm*, 824 F. Supp. 2d 828, 835 (C.D. Ill. 2009) (citing

*Hardnick v. U.S.*, No. 7-cv-1330, 2009 WL 1810106, *12 (N.D. Ill. June 25, 2009); *Elliott v.*

*Willis*, 92 Ill.2d 530, 540 (1982)).

Similarly, § 27-6 of the Survival Act, which is invoked by Plaintiff in Count V and

"compensate[s] the estate of [a] decedent for injuries and damages…suffered prior to

death," states: "In addition to the actions which survive by the common law, the

following also survive…actions to recover damages, including punitive when applicable,

for an injury to the person." 755 ILCS 5/27-6; *Caterpillar, Inc.*, 824 F. Supp. 2d at 835 (citing

*Nat'l Bank of Bloomington v. Norfolk & Western Ry. Co.*, 73 Ill.2d 160, 174, 180 (1978)).

To succeed under §§ 1 and 27-6, a plaintiff must prove the defendant owed a duty

to the decedent, the defendant breached that duty, the breach proximately caused the

decedent's death, and damages arose to persons designated under the statutes. *Thompson*

*v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd.*

*P'ship*, 252 Ill. App. 3d 260, 264 (1993)); *Givens v. City of Chicago*, 2021 IL App (1st) 192434,

¶ 1, *aff'd, in part, rev'd, in part*, 2023 IL 127837 (citing *Bovan v. Am. Fam. Life Ins. Co.*, 386 Ill.

App. 3d 933, 938 (2008); *Messmore v. Silvis Operations, LLC*, 2018 IL App (3d) 170708,

¶¶ 24-28; *Williams v. Manchester*, 228 Ill.2d 404, 421-22 (2008)); *see also Alcorn v. City of*

*Chicago*, 631 F. Supp. 3d 534, 549 (N.D. Ill. 2022) (stating these elements and noting, "[t]he

proximate cause element includes both cause in fact and legal cause," the latter of which

is "established when an injury is 'reasonably foreseeable' "); *Hooper v. County of Cook*, 366

Ill. App. 3d 1, 7 (2006) ("A claim of medical malpractice is proven when the plaintiff

shows there was a standard of care by which to measure the defendant's conduct, the

defendant negligently breached that standard of care and the defendant's breach was the proximate cause of the plaintiff's injury. A plaintiff must prove these elements by presenting medical expert testimony.") (internal citation omitted); *Ramirez v. Carobene*, 2025 IL App (1st) 240203, ¶ 29 (recognizing the proximate cause element in a medical malpractice case must be established to a reasonable degree of medical certainty, and that causal connection cannot be contingent, speculative, or merely possible). Whether a duty exists is a question of law for the Court. *Espinoza v. Elgin, Joliet and Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995) (citing *Wojdyla v. City of Park Ridge*, 148 Ill.2d 417, 421 (1992); *Ward v. K Mart Corp.*, 136 Ill.2d 132, 140 (1990)). As long as there is a genuine dispute of material fact surrounding a potential breach or proximate cause, those issues present questions of fact for a jury. *Id.* (citing *Thompson v. County of Cook*, 154 Ill.2d 374, 382 (1993)).

Relevant to the §§ 1 and 27-6 claims against the IDOC Defendants, § 4-103 of the Local Governmental and Governmental Employees Tort Immunity Act states: "Neither a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein. Nothing in this Section requires the periodic inspection of prisoners." 745 ILCS 10/4-103; *see also Hayes v. City of Des Plaines*, 182 F.R.D. 546, 552-53 (N.D. Ill. 1998) (observing § 4-103 does not provide an exception for willful and wanton conduct). Similarly, § 4-105 provides:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody…[unless] the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and,

through willful and wanton conduct, fails to take reasonable action to summon medical care.

745 ILCS 10/4-105.

The Seventh Circuit has noted "the standard for assessing whether conduct is willful and wanton is 'remarkably similar' to the deliberate indifference standard." *Jones*, 2 F.4th at 615 (quoting *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001) (cleaned up); *see also Bragado v. City of Zion/Police Dept.*, 839 F. Supp. 551, 554 (N.D. Ill. 1993) ("The definition of 'willful and wanton' is essentially the same as the definition of 'deliberate indifference' under the federal constitutional law."); 745 ILCS 10/1-210 (" 'Willful and wanton conduct' as used in this Act means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property.").

### i. The Wexford Defendants

The Wexford Defendants argue Plaintiff failed to produce an affidavit to support her claims under 735 ILCS 5/2-622. (Doc. 214, pgs. 45-46, 48). Further, in their view, Plaintiff's expert witness reports do not support a medical malpractice claim because they do not sufficiently review the records at issue, set forth a standard of care that was also breached, or prove a cause of death. (Doc. 214, pgs. 45-46, 49-51). The Wexford Defendants also suggest the state law claims contained in Counts IV and V must fail for the same reasons as Count I, *i.e.*, Defendant Siddiqui was on vacation, Defendant Leven could not prescribe treatment, Decedent was referred to other nonparty medical providers, and Defendant Wexford is not liable in *respondeat superior*. (Docs. 214, pgs. 10,

13, 43, 47-49; 264, pg. 8). As to Defendant Wexford, the Wexford Defendants argue there is no allegation of institutional negligence, including what a reasonably careful hospital would do under the circumstances. (Doc. 214, pg. 48). They again state Plaintiff's claims are improperly based on unpled allegations against nonparties. (Doc. 214, pgs. 48-49).

In response, as to section 2-622, which admittedly "speaks to what should be filed with the complaint" in a medical malpractice lawsuit, Plaintiff argues that provision is now "superfluous." (Doc. 264, pg. 104). In addition, Plaintiff argues Defendants Siddiqui and Leven owed a duty of care to Decedent. (Doc. 264, pg. 106). Plaintiff suggests a special relationship, creating a duty of care, can exist absent meetings between a physician and patient. (Doc. 264, pg. 106). This is allegedly true when a physician performs services for the benefit of the patient, *i.e.*, by taking affirmative action to care for, evaluate, diagnosis, or treat the patient. (Doc. 264, pg. 106). Plaintiff notes Defendant Leven was the 24-hour on-call crisis care leader, she encountered Decedent in his final days of life, and she consulted with and supervised colleagues on his care. (Doc. 264, pg. 106). Similarly, Defendant Siddiqui was the prison's medical director. (Doc. 264, pgs. 106-07).

As to Defendant Wexford, Plaintiff suggests it admits claims of institutional liability for medical negligence are permitted in Illinois. (Doc. 264, pg. 107). Plaintiff also argues her experts "offer extensive testimony on the standards for adequate care in the correctional context and the ways in which Wexford's care…fell short." (Doc. 264, pg. 107). However, even if Plaintiff cannot directly proceed on a medical negligence claim based on institutional liability, she argues Defendant Wexford is still liable for the actions of its agents or employees—*i.e.*, Defendants Siddiqui and Leven or other

nondefendants—pursuant to a *respondeat superior* theory. (Doc. 264, pgs. 107-08). Lastly, Plaintiff argues a reasonable jury could find, within a reasonable degree of medical certainty, that the Wexford Defendants caused Decedent's death. (Doc. 264, pg. 108).

Here, even assuming Counts IV and V are procedurally proper in light of section 2-622, which is disputed by the Wexford Defendants, the Court concludes there is no genuine dispute of material fact that prevents summary judgment for the Wexford Defendants. First, as to Defendant Siddiqui, it is undisputed that he was on vacation between August 31 and September 5, 2018. (Docs. 214, pg. 10; 264, pg. 8; Sealed Doc. 217, pgs. 8-12). Therefore, he was not present and working at Menard Correctional Center on the day of, or during the five days leading up to, Decedent's death. Defendant Siddiqui did not treat Decedent during that time, and the record reflects Decedent received care from other medical and mental health professionals both inside and outside of the prison.

Further, Defendant Siddiqui was the medical director of the prison, but the Court cannot find that gave rise to an ever-present duty of care, regardless of whether he was present and working at the prison, treating an inmate, or even consulted about the treatment of an inmate. Defendant Siddiqui, so long as he was in the country, was on call during his vacation, but there is no evidence that he was called by medical staff at Menard Correctional Center at all, let alone about Decedent, between August 31 and September 5, 2018. (Docs. 264, pg. 61; 268-64, pgs. 15-18; 290, pgs. 58, 72-73). Indeed, Defendant Siddiqui stated he "was available…all the time," but nobody contacted him by phone. (Doc. 268-64, pgs. 24-25). At most, Defendant Siddiqui, while on vacation, was eventually copied onto Dr. Goldman's September 5, 2018, email chain "for…input on what ha[d]

been done" about Decedent's dehydration. (Docs. 264, pgs. 28-29, 44-48; 268-46; 290, pgs. 41, 58). However, the IDOC email address, which was the email address copied onto the email chain, "was broke and they were…never able to fix it." (Doc. 268-64, pgs. 11-12, 14-15, 24). As a result, he "didn't see the e-mail" chain. (Doc. 268-64, pgs. 24-26).

Under these circumstances, which indicate Defendant Siddiqui did not even know of Decedent's medical condition, the Court finds there is no genuine dispute of material fact about whether he owed, and then breached, a duty to Decedent. *See Thompson*, 472 F.3d at 457; *Givens*, 2021 IL App (1st) 192434 at ¶ 1; *Hooper*, 366 Ill. App. 3d at 7; *Espinoza*, 165 Ill. 2d at 114. Alternatively, the Court finds these facts do not reflect any act or omission of Defendant Siddiqui could have proximately caused Decedent's death. *See Thompson*, 472 F.3d at 457; *Alcorn*, 631 F. Supp. 3d at 549; *Hooper*, 366 Ill. App. 3d at 7; *Ramirez*, 2025 IL App (1st) 240203 at ¶ 29; *Espinoza*, 165 Ill. 2d at 114. Accordingly, summary judgment is **GRANTED** for Defendant Siddiqui on Counts IV and V.

Second, the Court reaches a similar conclusion as to Defendant Leven. In terms of personally treating Decedent, Defendant Leven, at most, consulted with MHP Pappas on an in-person session after returning to work on September 4, 2018. (Doc. 268-1, pgs. 144-45). At that time, it was observed that "[t]here was no presence of distress or agitation." (Doc. 268-1, pgs. 144-45). Nevertheless, the in-person consultation immediately resulted in a referral to a nonparty psychiatrist, Dr. Floreani, who declined to prescribe medicine, and Decedent's placement on a more frequent crisis watch. (Doc. 268-1, pgs. 144-147; 268-38, pg. 2). Defendant Leven also "recall[ed] going over to the healthcare unit" at some

point, discussing "the current status" of Decedent, and briefly discussing "labs or blood work that had been ordered." (Docs. 214-9, pgs. 114-15; 268-29, pgs. 8, 17).

Otherwise, Defendant Leven was a non-treating clinical psychologist who, as the Wexford Defendants contend, was limited in her ability to assess, diagnose, and treat medical conditions or to prescribe medicine. *See* 225 ILCS 15/2(5), 4(b). And, importantly, as discussed exhaustively above, Decedent was treated within the scopes of practice of other nonparty medical and mental health professionals at the prison between September 1 and 5, 2018, including Dr. Floreani, to whom Defendant Leven could not "[p]rovide guidance, direction, training [or] clinical supervision." (Doc. 268-34, pg. 2). It is also true that Dr. Goldman raised concerns with Defendant Leven about Decedent's health on September 5, 2018, including on her email chain, after receiving a call from Plaintiff. But Defendant Leven, as a non-treating clinical psychologist, was not in a position to interfere with or contradict the decisions of medical and mental health professionals, like Dr. Floreani, who actually encountered Decedent within the scopes of their practice. It is also notable that Dr. Goldman's email chain actually resulted in her concerns about Decedent's health being addressed by medical and mental health staff, particularly Dr. Floreani. (Doc. 268-46, pgs. 2-5). Dr. Floreani changed her diagnosis, updated her progress note, and wrote an "emergency rx" that Decedent "[t]olerated well" with "[no] other s/s of acute distress." (Docs. 268-1, pg. 42; 268-46, pgs. 2-3). As noted elsewhere in this Memorandum & Order, the updated progress note indicated: "Medicine is aware of pt condition. Labs and treatment of dehydration per medicine. Will continue pt on crisis watch." (Doc. 268-1, pgs. 3, 150-51). Defendant Leven clocked out for the day at 4:32 p.m.,

which was around 2 hours before Decedent was pronounced dead after 1.5 hours of missed crisis watch checks. (Sealed Doc. 217, pgs. 7, 10; Docs. 264, pg. 51; 268-1, pgs. 46-47; 290, pg. 64).

On this record, the Court finds there is no genuine dispute of material fact about whether Defendant Leven owed, and then breached, a duty to Decedent. *See Thompson*, 472 F.3d at 457; *Givens*, 2021 IL App (1st) 192434 at ¶ 1; *Hooper*, 366 Ill. App. 3d at 7; *Espinoza*, 165 Ill. 2d at 114. Alternatively, the Court finds these facts do not reflect that an act or omission of Defendant Leven could have proximately caused Decedent's death. *See Thompson*, 472 F.3d at 457; *Alcorn*, 631 F. Supp. 3d at 549; *Hooper*, 366 Ill. App. 3d at 7; *Ramirez*, 2025 IL App (1st) 240203 at ¶ 29; *Espinoza*, 165 Ill. 2d at 114. Accordingly, summary judgment is **GRANTED** for Defendant Leven on Counts IV and V.

Third, as to Defendant Wexford, the Court stresses that it has found no genuine dispute of material fact as to the liability of Defendants Siddiqui and Leven, a medical director who was on vacation and a non-treating clinical psychologist who also served as a mental health services director, respectively, under Counts IV and V. They are the only individual Wexford Defendants named by Plaintiff. Consequently, given the nature of Plaintiff's claims, the Court cannot accept a vicarious liability theory extending from their acts or omissions. *See Lash v. Sparta Cmty. Hosp. Dist.*, 38 F.4th 540, 542 (7th Cir. 2022) (noting, under Illinois law, a hospital can be vicariously liable for the negligence of its agents). Moreover, the Court will not speculate, on what is certainly an incomplete record, about whether Defendant Wexford could be vicariously liable for the acts or omissions of other unspecified nonparties who were involved in Decedent's care.

The Court also agrees with the Wexford Defendants that there is insufficient evidence for a genuine dispute of material fact as to Defendant Wexford's institutional liability. *See Wilcox v. Advoc. Condell Med. Ctr.*, 2024 IL App (1st) 230355, ¶ 41 (noting, "[i]n actions alleging medical negligence, Illinois law provides that a hospital may be held directly liable for its own institutional negligence"). Plaintiff has not established a duty, owed to Decedent in this context, that was also breached by Defendant Wexford. *See Essig v. Advoc. BroMenn Med. Ctr.*, 2015 IL App (4th) 140546, ¶ 60 (" '[A] defendant hospital is judged against what a reasonably careful hospital would do under the same circumstances.' Ordinarily, the hospital's institutional duty of care is 'administrative or managerial in character.' ") (Internal citations omitted); *Longnecker v. Loyola Univ. Med. Ctr.*, 383 Ill. App. 3d 874, 888 (2008) (observing, as to a breach of duty "[i]n an institutional negligence case, '[a] hospital owes a duty to its patients to exercise reasonable care in light of apparent risk.' "); *Wilcox*, 2024 IL App (1st) 230355 at ¶¶ 42-43 ("Illinois law recognizes a duty on the part of hospitals to review and supervise the treatment of their patients, and this duty is administrative or managerial in character. In explaining the nature of this duty, our supreme court in *Advincula* quoted a decision by this court explaining that it involves not medical expertise, but administrative expertise, to enforce rules and regulations adopted to ensure a smoothly run hospital and adequate patient care. By contrast, [a] duty under the theory of institutional negligence does not encompass, whatsoever, a hospital's responsibility for the conduct of its agent or employee medical professionals. Likewise, absent notice, a hospital's administration does not have a duty to ensure that the independent physicians on the hospital's staff will conform to the

standard of care that those physicians owe to the patients they treat within the hospital.")
(cleaned up). Indeed, there is insufficient evidence of this type contained in the record.

In any event, though, the Court also cannot conclude there is a genuine dispute of
material fact about whether Defendant Wexford proximately caused Decedent's death.
Again, Decedent received care from various medical and mental health professionals,
inside and outside of Menard Correctional Center, between August 31 and September 5,
2018. That care culminated in an "emergency rx" that Decedent "[t]olerated well" with
"[no] other s/s of acute distress." (Doc. 268-1, pg. 42). Further, as previously noted, Dr.
Floreani's updated progress note indicated: "Medicine is aware of pt condition. Labs and
treatment of dehydration per medicine. Will continue pt on crisis watch." (Doc. 268-1,
pgs. 3, 150-51). The provision of medical and mental health care was followed,
undisputedly, by 1.5 hours of missed crisis watch checks. For these reasons, summary
judgment is **GRANTED** for Defendant Wexford on Counts IV and V. *See Thompson*, 472
F.3d at 457; *Givens*, 2021 IL App (1st) 192434 at ¶ 1; *Alcorn*, 631 F. Supp. 3d at 549; *Hooper*,
366 Ill. App. 3d at 7; *Ramirez*, 2025 IL App (1st) 240203 at ¶ 29; *Espinoza*, 165 Ill. 2d at 114.

### ii. IDOC Defendant Mitchell

Defendant Mitchell argues, in part, he is entitled to immunity under the State Law
Immunity Act (745 ILCS 5/1 *et seq*), which purportedly "provides for sovereign immunity
in Illinois and prevents suits against the State in any court except as provided by the
Court of Claims Act, 705 ILCS 505/8." (Doc. 222, pgs. 15-17). Defendant Mitchell reasons
that his acts or omissions occurred pursuant to his duties as a correctional officer, and he
had the authority for those acts or omissions on September 5, 2018. (Doc. 222, pgs. 16-17).

In response, Plaintiff argues, in part, no statutory immunity supports a grant of summary judgment. (Doc. 263, pg. 78). She argues there is an exception to the state-law sovereign immunity doctrine that applies when agents of the State of Illinois violate statutory or constitutional rights. (Doc. 263, pgs. 79-80). As such, Plaintiff argues her claims do not invoke the sovereign immunity of the State of Illinois. (Doc. 263, pg. 80).

Here, the Court must hold Counts IV and V are barred by state-law sovereign immunity.[10] This is because, "[e]xcept as provided in the Illinois Public Labor Relations Act, the Court of Claims Act, the State Officials and Employees Ethics Act, and Section 1.5 of this Act, the State of Illinois shall not be made a defendant or party in any court." *See* 745 ILCS 5/1. Importantly, § 8 of the Court of Claims Act provides: "The court shall have exclusive jurisdiction to hear and determine the following matters…All claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit." *See* 705 ILCS 505/8(d); *see also Woods v. Cook Cnty., Illinois*, No. 13-cv-2607, 2014 WL 340422, *4 (N.D. Ill. Jan. 30, 2014) (noting, while it may not limit a federal court's jurisdiction in a case, state-law sovereign immunity is still a defense to a state-law claim against a state official in federal court); *Tucker v. Mezo*, 14-cv-1283, 2016 WL 6835092, *3 (S.D. Ill. Sept. 21, 2016) (same)

Plaintiff's claims for damages under § 1 of the Wrongful Death Act and § 27-6 of the Survival Act, as alleged in Counts IV and V against Defendant Mitchell in his personal capacity, are actually claims against the State of Illinois. *See Murphy v. Smith*, 844 F.3d 653,

---

[10]The Court observes, unlike the other IDOC Defendants, Defendant Mitchell does not invoke the Local Governmental and Governmental Employees Tort Immunity Act. *See* 745 ILCS 10/4-103, 4-105.

658 (7th Cir. 2016) (quoting *Healy v. Vaupel*, 133 Ill.2d 295, 309 (1990)); *see also T.S. v. Cnty. of Cook, Illinois*, 67 F.4th 884, 893-94 (7th Cir. 2023) (recognizing, in cases where a lawsuit is brought against a state employee in his personal capacity, the factors set forth in *Healy* must be applied to determine whether " 'the real claim is against the State of Illinois itself' "). Based on the Court's reading of the Complaint and the summary judgment record, there is no allegation or evidence that Defendant Mitchell acted beyond the scope of his authority when committing the alleged wrongful acts (*e.g.*, by harboring personal animosity toward Decedent or acting for reasons other than what was perceived as in the best interests of the IDOC), the duty allegedly breached by Defendant Mitchell was not owed to the general public independent of his employment with the State of Illinois, and the alleged wrongful acts involve matters within Defendant Mitchell's normal and official functions for the State of Illinois. *See Murphy*, 844 F.3d at 658 (quoting *Healy*, 133 Ill.2d at 309); *Tucker*, 2016 WL 6835092 at *4 (citing *Cortright v. Doyle*, 386 Ill. App. 3d 895, 902-03 (2008)); *see also Richman v. Sheahan*, 270 F.3d 430, 442 (7th Cir. 2001) ("[I]f there are no allegations that the defendant was acting for a purpose unrelated to his employment, the fact that the conduct was wilful and wanton does not take the conduct outside the defendant's scope of agency for purposes of sovereign immunity."); *Green v. State*, 2023 IL App (1st) 220245, ¶ 27 ("As we have repeatedly held, '[a] State employee's violation of policy, regulation, or even statute does not necessarily avert the application of sovereign immunity.' "); *Jackson v. Alverez*, 358 Ill. App. 3d 555, 561 (2005) ("Because sovereign immunity presupposes the possibility of a legal wrong by a state employee, and legal wrongs are, *per se,* unauthorized, the relevant question cannot be whether the employee

had authority to commit the legal wrong. Instead, the question is whether the employee intended to perform some function within the scope of his or her authority when committing the legal wrong.") (cleaned up); (Doc. 1, pgs. 4-5) ("At all times relevant to his involvement in this case, Defendant Nickolas Mitchell was a correctional officer at Menard. Defendant Mitchell is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Mitchell was acting under color of law and within the scope of his employment with the IDOC."). Indeed, despite Defendant Mitchell's particular position on the state-law sovereign immunity issue, Plaintiff does not make a contrary responsive argument. (Docs. 222, pgs. 15-17; 263, pgs. 78-80).

Moreover, while Plaintiff is correct that "an important exception to sovereign immunity [exists] in suits against state officials or employees" who allegedly violate statutory or constitutional law, that "exception does not apply in a damages suit." *See Murphy*, 844 F.3d at 658-59 (quoting *Healy*, 133 Ill.2d at 308); *T.S.*, 67 F.4th at 894; *see also Parmar v. Madigan*, 2018 IL 122265, ¶ 26 ("[A] complaint seeking damages for a past wrong does not fall within the officer suit exception to sovereign immunity."). To the contrary, the exception only "applies when a plaintiff seeks to enjoin state officials from ongoing statutory or constitutional violations." *T.S.*, 67 F.4th at 894. To the extent that *Murphy* suggested otherwise, the Seventh Circuit has clarified: "[T]he court in *Murphy* did not discuss the injunctive nature of the relief sought in [the governing precedent] or the fact that [it] involved an official capacity suit." *See T.S.*, 67 F.4th at 894 (discussing *Murphy* and *Leetaru v. Bd of Trs. of Univ. of Illinois*, 2015 IL 117485). For these reasons, summary judgment is **GRANTED** for Defendant Mitchell on Counts IV and V.

### iii. IDOC Defendants Walls, Bennett, Frerich, and Frerking

To the extent Plaintiff is relying on a failure to supervise theory of liability, Defendants Walls, Bennett, Frerich, and Frerking argue they are entitled to absolute immunity under sections 4-103 and 4-105 of the Local Governmental and Governmental Employees Tort Immunity Act. (Doc. 226, pgs. 27-28); 745 ILCS 10/4-103, 4-105. Defendants Bennett, Frerich, and Frerking stress that they were not assigned to conduct crisis watch checks on September 5, 2018, and they were unaware that Defendant Mitchell was failing to complete the required crisis watch checks. (Doc. 226, pg. 28). Once they were aware that Decedent was unresponsive, though, Defendants Bennett, Frerich, and Frerking allegedly took "immediate action to notify the chain of command so that [Decedent] could…receive emergency medical treatment." (Doc. 226, pg. 28). And, as already discussed, Defendants Walls, Bennett, Frerich, and Frerking state there is no evidence to suggest they were deliberately indifferent to Decedent's serious medical condition or that they acted with the required level of culpability. (Doc. 226, pgs. 27-28).

As discussed with respect to Defendant Mitchell, Plaintiff responds by arguing neither the record evidence nor any statutory immunity entitles the IDOC Defendants to summary judgment. (Doc. 263, pg. 78). She also acknowledges Counts IV and V rise or fall on the Eighth Amendment claims in Counts I and III, as the record cannot support a finding that the IDOC Defendants engaged in willful and wanton misconduct if they were not deliberately indifferent under the Eighth Amendment. (Doc. 263, pg. 79). Thus, if a reasonable jury could find against the IDOC Defendants on Counts I and III, then Plaintiff argues that finding is also necessary on Counts IV and V. (Doc. 263, pg. 79).

Here, as with Counts I and III, the Court finds there are genuine disputes of material fact that require a trial on Counts IV and V. As an initial matter, by virtue of their respective positions in relation to Decedent on September 5, 2018, which was already discussed exhaustively for Counts I and III, the Court concludes Defendants Walls, Bennett, Frerich, and Frerking owed a duty to Decedent for purposes of Counts IV and V. *See Thompson*, 472 F.3d at 457; *Givens*, 2021 IL App (1st) 192434 at ¶ 1; *Alcorn*, 631 F. Supp. 3d at 549; *Espinoza*, 165 Ill. 2d at 114; *see also West v. State of Illinois*, 67 Ill. Ct. Cl. 147, 148-49 (2014) (observing the State of Illinois "owes a duty of protection to prisoners and must exercise such reasonable care toward them as their known conditions require," and correctional officers have a duty to protect inmates from harm); *Bynum v. State of Illinois*, 44 Ill. Ct. Cl. 1, 5 (1992) (holding, *inter alia*, "[t]he State of Illinois, the Department of Corrections, and their employees breached their duty of care to Claimant by denying him adequate medical supplies, treatment, and care"). Further, in light of the above-discussed factual circumstances involving these Defendants on September 5, 2018, the Court concludes genuine disputes of material fact exist about whether they breached their duties and, by extension, proximately caused Decedent's death. *See Thompson*, 472 F.3d at 457; *Givens*, 2021 IL App (1st) 192434 at ¶ 1; *Alcorn*, 631 F. Supp. 3d at 549; *Espinoza*, 165 Ill. 2d at 114. Indeed, the record on summary judgment makes plain that Plaintiff's own conduct, as well as his cause of death, are intensely disputed by the parties.

Finally, unlike Defendant Mitchell, Defendants Walls, Bennett, Frerich, and Frerking do not invoke state-law sovereign immunity. *See* 705 ILCS 505/8(d); 745 ILCS 5/1. They do invoke §§ 4-103 and 4-105 of the Local Governmental and Governmental

Employees Tort Immunity Act. However, the Court cannot accept Defendants' arguments for immunity under those statutory provisions at this juncture. As to § 4-103, Plaintiff's theory against Defendants Walls, Bennett, Frerich, and Frerking is not limited to only the "failure to provide sufficient…supervision." *See* 745 ILCS 10/4-103; *Hayes*, 182 F.R.D. at 552-53. For example, aside from the facts involving missed crisis watch checks, Plaintiff argues Defendants Bennett, Frerich, and Frerking's response or nonresponse to observing Decedent's unresponsiveness leads to liability. *See*, *e.g.*, *Thomas ex rel. Smith v. Cook Cnty. Sheriff*, 401 F. Supp. 2d 867, 876 (N.D. Ill. 2005) ("These allegations of wrongful death are not premised on any negligent failure to supervise or provide sufficient personnel, equipment, or facilities. Instead, these claims allege that the defendants had actual knowledge of Smith's medical needs and wilfully denied him medical treatment. Therefore, Section 4–103 does not shield the defendants from liability.").

Similarly, as noted above regarding § 4-105, the standards for deliberate indifference under federal law and willful and wanton conduct under Illinois law are "remarkably similar" or "essentially the same." *See* 745 ILCS 10/1-210, 4-105; *Jones*, 2 F.4th at 615-16; *Bragado*, 839 F. Supp. at 554. Consequently, since the Court has found genuine disputes of material fact about whether the conduct of Defendants Walls, Bennett, Frerich, and Frerking constituted deliberate indifference for purposes of Counts I and III, it also finds there are genuine disputes of material fact about whether their conduct was willful and wanton for purposes of § 4-105 and Counts IV and Count V.

For these reasons, the Court **DENIES** summary judgment for Defendants Walls, Bennett, Frerich, and Frerking on Counts IV and V.

### B. The Parties' Various Motions to Exclude Expert Opinions
### (Docs. 215, 216, 218, 219, 231, 233; Sealed Docs. 220, 232, 234)

Based on the foregoing analyses, the Motions to Exclude Expert Opinions of Plaintiff (Docs. 231, 233; Sealed Docs. 232, 234) and the Wexford Defendants (Docs. 215, 216, 218, 219; Sealed Docs. 220) are **DENIED as moot** between those parties. The Motions to Exclude Expert Opinions of the Wexford Defendants (Docs. 215, 216, 218, 219; Sealed Docs. 220), the briefing for which IDOC Defendant Mitchell joined (Docs. 225, 236, 289, 294), are **DENIED** between Plaintiff and IDOC Defendant Mitchell.

### C. Other Miscellaneous Motions (Docs. 221, 313, 320)

By virtue of the above rulings, the Wexford Defendants' Motion to Strike and Limit Disclosures under Federal Rule of Civil Procedure 26(a)(2)(C) is **DENIED as moot**.

In IDOC Defendant Mitchell's Motion to Amend Answer to Conform to the Evidence, he seeks to "mak[e] it clear that he knew [Decedent] was on crisis watch and later learned he was to be monitored every 10 minutes with both verbal and visual checks, but at the time, Defendant thought it was only a 'skin' check." (Doc. 313, pg. 1). Plaintiff responds with argument before stating: "Because Defendant Mitchell has refused to withdraw his summary judgment argument [on her failure to plead alternative causes of death], however, Plaintiff takes no position on the relief sought by Defendant Mitchell's motion." (Doc. 316, pgs. 1-3). Upon review of the parties' positions, and the fact that a resolution of this issue does not affect the summary judgment rulings, IDOC Defendant Mitchell's Motion to Amend Answer to Conform to the Evidence is **GRANTED**. He is **DIRECTED** to file his Amended Answer on the docket within 7 days of this date.

Finally, Defendants' present a Joint Motion to Continue Trial, which is opposed by Plaintiff. (Doc. 320). The jury trial is currently scheduled for January 20, 2026. (Doc. 312). In view of the Court's summary judgment rulings, it is only relevant to note that counsel for IDOC Defendants Walls, Bennett, Frerich, and Frerking has another jury trial scheduled for January 20, 2026. (Doc. 320, pgs. 1-2). Counsel for IDOC Defendant Mitchell has a bench trial scheduled for January 26, 2026. (Doc. 320, pg. 2). In light of the parties' representations, the Joint Motion to Continue Trial (Doc. 320) remains **UNDER ADVISEMENT**. Plaintiff and the IDOC Defendants are **DIRECTED** to meet and confer on the feasibility of the trial date after reviewing this Memorandum & Order. A Status Conference to discuss the trial date, as well as the parties' positions on a potential continuance, will be set by a separate order. However, absent an agreement of the parties or extraordinary circumstances, the Court is reluctant to continue the jury trial.

## III. CONCLUSION

The stay of the case is **LIFTED**. As explained above, the Court **GRANTS** the Wexford Defendants' Motion for Summary Judgment. (Docs. 213 & 214; Sealed Doc. 217). The Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment of Defendant Mitchell. (Doc. 222). The Court **DENIES** the Partial Motion for Summary Judgment of Plaintiff against Defendant Mitchell. (Doc. 228). The Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment of Defendants Walls, Bennett, Frerich, and Frerking. Broken down by Count of the Complaint, the Court's rulings are:

Count I: The Court **GRANTS** summary judgment for Defendants Siddiqui, Leven, and Wexford. The Court **DENIES** summary judgment for Plaintiff and Defendants Mitchell, Walls, Bennett, Frerich, and Frerking.

Count II: Due to Plaintiff's concessions, the Court **GRANTS** summary judgment for Defendants Siddiqui, Leven, Mitchell, Walls, Bennett, Frerich, and Frerking.

Count III: Due to Plaintiff's concessions, the Court **GRANTS** summary judgment for Defendant Siddiqui. The Court also **GRANTS** summary judgment for Defendants Leven and Walls. The Court **DENIES** summary judgment for Defendants Mitchell, Bennett, Frerich, and Frerking.

Count IV: The Court **GRANTS** summary judgment for Defendants Siddiqui, Leven, Wexford, and Mitchell. The Court **DENIES** summary judgment for Defendants Walls, Bennett, Frerich, and Frerking.

Count V: The Court **GRANTS** summary judgment for Defendants Siddiqui, Leven, Wexford, and Mitchell. The Court **DENIES** summary judgment for Defendants Walls, Bennett, Frerich, and Frerking.

The Clerk of the Court is **DIRECTED** to enter judgment accordingly at the close of the case. Further, the Motions to Exclude Expert Opinions of Plaintiff (Docs. 231, 233; Sealed Docs. 232, 234) and the Wexford Defendants (Docs. 215, 216, 218, 219; Sealed Docs. 220) are **DENIED as moot** as to those parties. The Motions to Exclude Expert Opinions of the Wexford Defendants (Docs. 215, 216, 218, 219; Sealed Docs. 220), the briefing for which was joined by only IDOC Defendant Mitchell (Docs. 225, 236, 289, 294), are **DENIED** as between Plaintiff and IDOC Defendant Mitchell. Finally, the Wexford

Defendants' Motion to Strike and to Limit Disclosures under Rule 26(a)(2)(C) (Doc. 221) is **DENIED as moot**, IDOC Defendant Mitchell's Motion to Amend Answer to Conform to the Evidence (Doc. 313) is **GRANTED**, and Defendants' Joint Motion to Continue Trial (Doc. 320) remains **UNDER ADVISEMENT**. IDOC Defendant Mitchell is **DIRECTED** to file his Amended Answer on the docket within 7 days of this date.

      **SO ORDERED.**

      Dated: December 1, 2025.

                                      *s/ David W. Dugan*
                                        DAVID W. DUGAN
                                        United States District Judge