## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

YOLANDA JACKSON, as Administrator )
of the Estate of KEVIN CURTIS, )
          )
      Plaintiff, )
          )
       v. )     No. 20-cv-0900-DWD
          )
NICKOLAS MITCHELL, et al., )
          )
      Defendants. )     Hon. David W. Dugan

## PLAINTIFF'S MOTION FOR SANCTIONS

Howard Kaplan
Sarah Grady
David Schmutzer
Adam J. Smith
Mattie Haag
**KAPLAN & GRADY LLC**
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
(312) 852-2184
sarah@kaplangrady.com

## INTRODUCTION

Three days before trial, the Illinois Department of Corrections produced the "lost" Crisis Watch Observation Logs for Kevin Curtis's last days. It is no exaggeration to say that the log is one of the single most important documents in the case. Its disappearance, despite innumerable requests for it from Defendants and IDOC, and last-minute production, has altered this case in profound and incalculable ways. The log, when considered alongside other discovery, is irrefutable proof that multiple Defendants and virtually all their IDOC associates *falsified* Kevin's logs, which were supposed to accurately depict Kevin's activity at short intervals, and for Kevin's own safety. Those who were deposed earlier in the case *perjured* themselves about what they did and what they knew. Without question, heavy sanctions against Defendants and IDOC are required to protect basic the integrity of this federal proceeding, and for a slew of other reasons.

As the Court is aware, Kevin Curtis died on crisis watch at Menard Correctional Center on September 5, 2018, where he was supposed to have been under close observation by Defendants and other employees of IDOC. For nearly six years, Defendants and IDOC have represented—in discovery responses, subpoena responses, FOIA responses, and repeated statements to Plaintiff and this Court—that Mr. Curtis's unabridged crisis-watch logs for the days leading up to his death had been lost. That was false.

On the eve of trial, in response to a subpoena seeking testimony from an IDOC records custodian that Mr. Curtis's crisis-watch logs, IDOC Master file, and video showing the hallway outside his cell on the evening of his death had been lost, IDOC produced the full set of Mr. Curtis's logs for September 1 through September 5, 2018. According to Menard's Legal Coordinator, the logs were found in Mr. Curtis's medical file, which both Defendants and IDOC purported to have produced in its entirety during discovery.

1

Defendants and IDOC have not offered any explanation for their failure to previously produce the logs in the 7½ years since Mr. Curtis's death or the 5½ years that this case has been pending. But no possible excuse could change the stark reality here. Defendants and IDOC knew by the evening of September 5, 2018, that all material evidence related to Mr. Curtis's death—among them his crisis-watch logs, his other medical and mental health records, and surveillance footage from Menard's crisis-watch gallery—needed to be preserved. Defendants and IDOC inarguably breached those duties as to the most critical evidence in this case.

Cross-referencing the newly produced logs with those portions of video Plaintiff was provided revealed that—contrary to *every* Defendant's sworn statements and submissions—virtually every officer assigned to keep Mr. Curtis safe abandoned him, fabricated his crisis-watch records, and lied about it. Defendant Charlie Frerking, who was re-deposed after this Court reopened discovery, has already admitted to committing perjury.

IDOC's failure to preserve and timely produce evidence has caused Plaintiff and this Court profound, irreversible prejudice. IDOC's failures—as a matter of agency law and equity—should be imputed to Defendants. Failure to do so would allow IDOC to undermine discovery, minimizing its financial and reputational exposure, while remaining immune from the consequences of its misconduct.

Had IDOC and Defendants complied with their basic discovery obligations, Plaintiff's case would have looked far different and the evidence and admissions orders of magnitude worse for Defendants. Indeed, Plaintiff would have likely sought leave to add additional defendants or claims, would have advanced more expansive legal theories against certain Defendants, would not have conceded to entry of summary judgment on her conspiracy claims, and would have had materially greater leverage that would likely have resulted in a negotiated resolution years ago.

Defendants and IDOC—through their discovery misconduct—ensured that none of that would happen. It is too late to re-do everything now.

Defendants should be sanctioned with entry of default judgments against all of them. Independently, the Court should require IDOC to pay Plaintiff's fees and costs reasonably related to their misconduct. Such a petition would include time for the multitude of hours wasted in preparation and re-preparation for this trial, as well as for portions of time spent during discovery impacted by the revelations of misconduct. Finally, should any portion of this case go to trial, the Court should specifically instruct the jury that it may draw adverse inferences against Defendants based on the destroyed evidence, including, and especially, the missing video of Kevin's last hours.

## FACTUAL SUMMARY

### I.    Kevin Curtis Is Placed on Crisis Watch, Where He Deteriorates and Dies.

Kevin Curtis was 31 years old when he died in IDOC custody at Menard Correctional Center on September 5, 2018. He spent his last five days in a segregation cell in 5 Gallery on crisis watch—a form of solitary confinement prescribed by physicians or mental health providers to prisoners at a serious risk of harm. Ex. 1 (9/1/18-9/5/18 Crisis Watch Logs).

Mr. Curtis's crisis watch prescription expressly and unconditionally required correctional officers to conduct verbal and visual line-of-sight monitoring at specified intervals, documenting exactly what Mr. Curtis was doing and exactly when. The logs were the sole mechanism by which staff recorded whether Mr. Curtis was eating, drinking, and maintaining basic physiological functions. Ex. 2 (Dep. Transcript of T. Rowland) at 66–69. Officers uniformly testified that there was never an acceptable reason to miss a check, to say nothing of missing a check and falsifying a crisis-watch log, which a chorus of Defendants and IDOC officials condemned as categorically unacceptable and endangering. Ex. 3 (Dep. Transcript of N. Mitchell) at 181; Ex. 4 (Dep.

Transcript of C. Frerking, Vol. I) at 150-51; Ex. 5 (Dep. Transcript of A. Bennett) at 53, 138-40; Ex. 6 (Dep. Transcript of J. Frerich) at 90, 119-20.

Mr. Curtis entered crisis watch on September 1 "unable to purposefully answer questions" with a diagnosis of "altered mental status." Ex. 7 (Chester Memorial Hospital Records) at P000477–78; Ex. 8 (Defs.' Incomplete IDOC Medical Records) at IDOC000142–43. Over the next several days, medical staff at Menard documented him pacing naked, sucking his thumb, screaming, urinating on himself, banging on his cell door, and consistently presenting as nonverbal with poor hygiene. *Id.* at IDOC000122–131. On September 4, a Wexford psychiatrist noted Mr. Curtis's "significant psychomotor retardation," that he was "largely unresponsive to verbal prompts" with "virtually no reaction to stimuli," that he had an elevated pulse of 126 bpm, and that he had "not been taking in fluids." *Id.* at IDOC000234–239. The psychiatrist elevated Mr. Curtis's observation interval from a 30-minute check to a 10-minute suicide watch. *Id.* at IDOC000232–233.

On the morning of September 5, Dr. Lisa Goldman, an IDOC psychologist at Menard, warned staff by email that Mr. Curtis appeared "extremely dehydrated" and catatonic, urging intervention because Mr. Curtis's "***dehydration with a combination of this heat could be lethal***." Ex. 9 (Sept. 5, 2018 Email Chain) at 4 (emphasis added). Defendant Gail Walls, Menard's Healthcare Unit Administrator, was added to the email chain to provide "input on what has been done" about Mr. Curtis's dehydration. *Id.* Walls responded that "if he is on watch we should be able to tell if he is eating and taking fluids." *Id.* at 3. Dr. Goldman then reported a conversation in which a correctional sergeant told her that "it was written down" (in the fabricated crisis-watch

logs) that Mr. Curtis was drinking and that his food trays were empty.[1] Ex. 10 (Sept. 5, 2018 Email Chain).

That afternoon, Defendant Bennett ordered Defendant Mitchell to abandon his post as the sole crisis watch officer to help "run chow" (i.e., the process by which other prisoners in general population in the unit, not on crisis watch, were permitted to leave the housing unit to eat in a dining hall before returning to their cells). Ex. 11 (IA Report) at Mitchell000011. Bennett later admitted that a crisis-watch officer should "never" be pulled for chow lines, *see* Ex. 5 at 138–40, although IDOC's own investigation quotes him admitting that he did. Ex. 11 at Mitchell000012. By all accounts, when Defendant Mitchell abandoned Mr. Curtis at 4:10 p.m., Mr. Curtis was alive.

When Mitchell returned at approximately 5:50 p.m., he found Mr. Curtis unresponsive. What followed, in Defendants' telling, was more than thirty minutes of inexplicable inaction: Mitchell watching Mr. Curtis for two minutes "to see if he was breathing," then calling Defendant Jeremy Frerich (who left without summoning help), then calling Defendant Frerking, who left to find Defendant Andrew Bennett (who knocked on the cell window for several minutes), who in turn summoned Lieutenant Caleb Zang (who did the same), who summoned Major Page (who ordered an Emergency Response Team to Mr. Curtis's cell). E7x. 3 at 82–135. It is undisputed that not one of these officers called a Code 3, the radio code for a medical emergency that any officer could invoke at the push of a button and without anybody else's approval. *Id.* at 101–112, 194–195. Mr. Curtis was pronounced dead at 6:37 p.m. Ex. 8 at IDOC000132–140.

Sometime before or after finding Mr. Curtis unresponsive—a fact the parties dispute and one the deleted video would have answered definitively—Mitchell falsified the crisis-watch logs,

---

[1] Plaintiff moved *in limine* to bar speculation that Mr. Curtis was eating or drinking in the days before his death, based in part on the fact that IDOC had reported the crisis-watch logs were lost. Dkt. 343 at 31-35. Defendants successfully opposed that motion, and the Court denied Plaintiff's motion *in limine* (Mot. No. 8). Dkt. 373 at 2.

leaving the impression that Mitchell had in fact been monitoring Mr. Curtis and every other crisis-watch prisoner during his lengthy absence. Ex. 11 at Mitchell000011–12; Ex. 3 at 141–144. Mitchell came clean to an IDOC internal investigator later that same night about falsifying records.

For years, Mitchell was the only Defendant to have admitted to his fabrication—and any objective observer would be compelled to agree that, given his admitted lies, Mitchell's risk of liability and significant damages was extremely high. The eve-of-trial appearance of Mr. Curtis's crisis-watch logs revealed, however, that more than a dozen IDOC employees, including multiple Defendants, similarly participated in neglecting their duties to Mr. Curtis and falsifying state records to cover it up. Indeed, over the course of Mr. Curtis's time on crisis watch, it appears that more than 40% of all recorded checks during that period were falsified.

## II.    IDOC Investigates Mr. Curtis's Death, Triggering Its Duty to Preserve Evidence.

There are several categories of relevant evidence in this case that IDOC has claimed was lost or destroyed. But two primary pieces of evidence form the basis of Plaintiff's motion: (1) Menard's crisis-watch logbooks, which purport to document what Mr. Curtis was doing each time he was checked on while on crisis watch, and (2) surveillance footage from the afternoon and evening of the day of Mr. Curtis's death. The former were suppressed until a few weeks ago. The latter was spoliated—destroyed *after* all involved knew that this crucial evidence had to be preserved.

After Mr. Curtis's death, IDOC officials testified that they took steps to preserve relevant evidence. Brad Thomas, an Internal Affairs Investigator who led IDOC's investigation into Mr. Curtis's death, testified that the day after Mr. Curtis's death (September 6), Warden Lashbrook ordered the 5 Gallery DVR—a hard drive that stored the footage from a camera on the gallery—removed and secured in the Internal Affairs vault so that the footage would be preserved. Ex. 12

(Dep. Transcript of B. Thomas) at 156. According to Thomas, preserving video footage is "[t]he first thing" that IDOC does when conducting an investigation. *Id.* at 45. And IDOC's own Rule 30(b)(6) designee regarding the lost video testified that any such video evidence is secured within the Internal Affairs vault and maintained in perpetuity. Ex. 13 (Dep. Transcript of K. Reichert, Vol. II) at 24. In fact, IDOC has acknowledged that its policies expressly prohibit any such evidence from *ever* being destroyed, even *decades* later. *Id.* Access to the Internal Affairs vault is highly restricted, *id.* at 20-21, and there is no other case—other than this one—in which evidence secured in the Internal Affairs vault has been lost or destroyed. *Id.* at 25-26.

Thomas testified that he reviewed the after-noon surveillance footage of September 5 from the DVR "more than once," and that his supervisors at Internal Affairs reviewed the footage as well. Ex. 12 at 158. He further testified that he asked Menard IT staff to make a copy of the footage and was subsequently told that Menard staff had permitted the DVR to be written over and the footage deleted. *Id.* at 156-57. Thomas admitted that this was wholly inappropriate, as only the Chief of Investigations for the IDOC writ-large had the authority to issue such an order. *Id.*

As to the crisis-watch logs, Thomas testified that it was his practice to immediately gather the crisis-watch logs "to make sure [correctional staff] are doing their routine checks." *Id.* at 56. IDOC policy dictates that the logs are mental health records, which must be filed within the prisoner's medical records and preserved in perpetuity. Ex. 14 (POMR) at P007379. In short, Thomas's testimony shows he obtained both the crisis-watch logs and the surveillance footage during his investigation, and knew he was required to preserve them. Yet both disappeared.[2]

---

[2] Apart from the notice supplied by Mr. Curtis's death itself, IDOC had independent duties to preserve the information at issue. Freedom of Information Act requests were submitted by a separate law firm less than a week after Mr. Curtis's death, seeking audio and video footage related to Mr. Curtis. At minimum, this request required IDOC and Defendants to preserve the destroyed video footage.

### III.    Plaintiff Initiates This Action and Serves Discovery Requests on Defendants and a Third-Party Subpoena on IDOC.

Plaintiff Yolanda Jackson, Mr. Curtis's mother and the administrator of his estate, filed this action on September 4, 2020. In April 2021, Plaintiff served discovery requests—including document requests and interrogatories—on Defendants. Among other requests, Plaintiff sought production of (a) Mr. Curtis's medical and mental health records (Req. No. 7), (b) logs relating to Mr. Curtis (Req. No. 10), (c) materials related to the investigation into Mr. Curtis's death (Req. No. 22), (d) Mr. Curtis's Master file (Req. No. 5), and (e) video records regarding the case (Req. No. 32). Ex. 15 (IDOC Dfts' Resp. to Pl.'s 1st RFPs) at 7-9, 15, 20. Plaintiff also served a subpoena on IDOC itself, seeking these same materials. Ex. 16 (Pl.'s 2022 IDOC Subpoena) at (Req. Nos. 1 and 3), 7 (Req. No. 7), 8 (Req. No. 16), 10 (Req. No. 26).

*Crisis-watch logs.* In response, Defendants Bennett, Frerking, Frerich, and Walls produced what they represented to be Mr. Curtis's complete medical file. Ex. 15 at 7-8. Indeed, in their Rule 26(a)(1) initial disclosures, they represented that the records they produced were those within IDOC's possession (not just their own). Ex. 17 (IDOC Dfts' Initial Rule 26(a)(1) Disc.) at 5. Notably, the records they produced did not include the crisis-watch logs and no supplement was ever provided. IDOC similarly failed to produce the crisis-watch logs that were stored within Mr. Curtis's medical records. Instead, only a single page—covering Mitchell's September 5 entries— was ever produced during discovery.

*Master file and death-investigation file.* Regarding Mr. Curtis's Master file and death-investigation file, IDOC was required by statute to maintain both in perpetuity. 730 ILCS 5/3-5-1(a). Yet both were reported "lost."

*Surveillance footage.* Multiple senior IDOC Internal Affairs staff, including Thomas, reviewed video footage of Mitchell abandoning his post on September 5. Ex. 18 (Dep. Transcript

of K. Reichert, Vol. I) at 75–77. IDOC policy required preserving all footage from "before, during, and after" an in-custody death. *Id.* Yet for four years, IDOC and Defendants denied the footage existed. In July 2022, counsel for Defendants Bennett, Frerking, Frerich, and Walls reported that "[t]here is no video." Ex. 19 (July 2022 Email Exchange). And counsel for the IDOC gave a similar report a few months later. Ex. 20 (September 2022 Email Exchange).

Accepting IDOC's and Defendants' representations at face value, Plaintiff sent a subpoena to IDOC for a designee to testify as to "why and at whose direction . . . . [video] footage has not been located and/or produced in this case." Ex. 18 at 25. It was only during the deposition of IDOC's designee, Kevin Reichert, that Plaintiff learned that any video footage existed. Specifically, when asked during his deposition if he knew "when [the] video went missing," Reichert responded, "[t]here is some video." *Id.* at 76. Reichert revealed during that deposition that he had learned the day before that some—but not all—of the video footage IDOC had previously represented was deleted had in fact been preserved. *Id.* What IDOC eventually produced—nearly a month later—was materially incomplete and in a non-native form. It omitted 12 hours of footage on September 2, 10 hours of footage on September 3, and more than an hour of footage on September 4. Still missing, moreover, was the most relevant footage of all: the afternoon and evening of September 5, 2018.

Even after IDOC's production, without this footage, Plaintiff was forced to reconstruct the evening's timeline entirely from deposition testimony that, as the record now makes clear, was pervasively false. Plaintiff acknowledged as much at summary judgment. Dkt. 263 at 44 n.4 (noting that "the timeline of events relevant to Plaintiff's claims presents a material issue for a factfinder to resolve" because IDOC "did not preserve any video footage from the evening of Mr. Curtis's death").

**IV.    Defendants and IDOC Witnesses Lie Under Oath.**

Even after IDOC's and Defendants' false representations about the video footage were revealed, without the crisis-watch logs, Plaintiff could not confront any Defendant with contemporaneous evidence of falsification, dereliction of duty, and lies. Indeed, the evidentiary gap that IDOC created through spoliation and suppression is the same gap that Defendants exploited to lie. The result was a fraudulent account in which crisis watch was portrayed as functioning essentially as designed, marred only by Mitchell's isolated bad decision to abandon his post. Every other Defendant pointed at Mitchell alone. Dkt. 263 at 1–2. It was only through this last-minute, happenstance production that Plaintiff discovered Defendants' and IDOC's pervasive lies and misconduct.

*Defendant Frerking.* In April 2022, Frerking denied under oath ever falsifying any official form, ever missing a crisis-watch check, or having any knowledge of other officers doing so. Without the logs, Plaintiff could not impeach him.

On February 6, 2026, with the logs in hand, Frerking instantly changed course and admitted that a majority of his entries on the newly produced logs were fabrications. He admitted that he knew the entries were false when he wrote them, and that he was absent from the gallery for substantial periods during which his entries purported to reflect observations of Mr. Curtis. ***Frerking further testified that—contrary to his earlier sworn assertions—it was in fact common knowledge at Menard that officers skipped crisis-watch checks and that logs were routinely falsified.*** Ex. 21 (Dep. Transcript of C. Frerking Vol. II) at 22, 27-28. He also testified that his prior testimony to the contrary under oath was a knowing lie—in other words, he admitted to committing perjury. *Id.* at 12-13.

10

Frerking's lies were not harmless. He was the overnight crisis-watch officer who fabricated some of the last checks before Mr. Curtis died. As a direct result of his perjury and the spoliation that enabled it, he was treated throughout this litigation as someone whose liability focused on his role in Mr. Curtis's care only *after* Mitchell had abandoned his post to find Mr. Curtis unresponsive. Instead, Frerking's involvement began much earlier and was more central to Mr. Curtis's death. A review conducted in light of the newly produced logs reveals that Frerking was responsible for conducting 44 checks across that shift—he actually drew only 12 checks, "whipping" the remaining 32.

*Defendant Bennett.* In May 2022, Bennett denied ever lying on any official form and denied awareness of anyone other than Mitchell falsifying records. He testified that a crisis-watch officer should "never" be pulled for chow lines—contradicting IDOC's own investigation, which quotes him admitting he did exactly that. Ex. 11 at Mitchell000012; Ex. 5 at 138–40. The crisis-watch logs generated under Bennett's supervision were rife with fabricated entries. He will now have a choice to honestly admit that he knew logs were routinely fabricated or to double-down on his lies.

*Defendant Walls.* Walls testified that she had no responsibilities regarding prisoner medical care and no role in determining what care providers gave. Ex. 22 (Dep. Transcript of G. Walls) at 78, 80. This is contradicted by the September 5 email chain, in which providers relied on Walls to process Mr. Curtis's emergency prescription, assess his treatment status, determine whether he had refused medication, and ensure his vitals were monitored. Ex. 9. The suppression of the crisis-watch logs is critical to Walls's liability: her assurance that "if he is on watch we should be able to tell if he is eating and taking fluids" rested on the assumed accuracy of fabricated records, which Frerking acknowledged were well known to be routinely falsified. Ex. 9 at 3; Ex. 21.

*Other witnesses.* Plaintiff's analysis of the newly produced logs and comparing it with the incomplete video footage is ongoing but reveals that at least 16 nonparty officers also falsified checks for Mr. Curtis. Specifically, from the period of August 31 to September 5, Plaintiff's review reflects that at least 44% of the crisis-watch log entries are utter fabrications, with many of the remainder being dubious at best (for example, video during a time claimed to be a check showing only an officer casually walking down the hall without looking into any cells as required by policy) or occurring significantly before or after the times listed on the log.

## LEGAL STANDARDS

In light of the sweeping discovery abuses committed in this case, this Court has several independent bases on which to impose terminating, monetary, and evidentiary sanctions. The Court's inherent power and Rules 37(b) and 37(c) govern the fabrication, perjury, and discovery fraud that pervade this case. Rule 37(e) controls the Court's analysis of IDOC's destruction of surveillance footage and other electronic evidence. Both agency principles and equitable considerations require imputing IDOC's misconduct to Defendants.

### I.    Rules 37(b) and (c) – Failure to Comply with Discovery

Rule 37(c)(1) provides that when a party fails to provide information as required by Rules 26(a) or (e), the Court may, after giving the party an opportunity to be heard, "impose other appropriate sanctions including those listed in Rule 37(b)(2)(A)(i)–(vi)." Among the sanctions available under Rule 37(b)(2)(A) is "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(vi). Rule 37(b) further authorizes default judgment where a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A).

Unlike inherent-power sanctions, terminating sanctions under Rules 37(b) and (c) do not require a finding of bad faith, intentionality, or even recklessness. *Brown v. Columbia Sussex*

*Corp.*, 664 F.3d 182, 191 (7th Cir. 2011). Rather, to terminate, the Court need only find "fault" with a party's behavior—that is, "unreasonable behavior," something greater than "a mere mistake." *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 191 (7th Cir. 2011).

Counsel's failure to conduct a reasonable investigation to ensure the completeness of discovery responses is independently sanctionable. *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 839, 953 (N.D. Ill. 2021) ("Courts must impose sanctions under Rule 26(g)(3) when attorneys fail in their duties 'to make a reasonable investigation to assure that their clients have provided all available responsive information and documents.'" (quoting *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1333 (S.D. Fla. 2007)).

## II.    Rule 37(e)(2) – Loss of ESI

The Court can also impose sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Courts have similarly imputed nonparty misconduct under Rule 37(e) to parties. *See, e.g.*, *Johns v. Gwinn*, 503 F. Supp. 3d 452, 463 (W.D. Va. 2020) (imputing spoliation sanctions under Rule 37(e) and emphasizing that "to not impute spoliation to [d]efendant here would lead to absurd results").

If such loss of information results in prejudice, the court may "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If the court finds that a party "acted with the intent to deprive another party of the information's use in the litigation," however, the court may "enter a default judgment." Fed. R. Civ. P. 37(e)(2).

Because intent to deprive is, as a general matter, rarely proved by direct evidence, courts have substantial leeway to consider circumstantial evidence and witness credibility in their totality.

*Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir. 2004); *see also Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 623 (N.D. Ill. 2022) ("The evidence used to establish intent is almost always circumstantial, not that there is anything wrong with that."). Courts thus may infer intent from the totality of the relevant circumstances, including:

- ***Violation of statutory preservation duties.*** *See, e.g.*, *Blazer v. Gall*, 2019 WL 3494785, at *5 (D.S.D. 2019).

- ***Affirmative steps taken to preserve evidence, followed by destruction or concealment.*** *See Johns*, 503 F. Supp. 3d at 464 (imputation to individual defendant proper where department of corrections used video in investigation and then allowed footage to be destroyed).

- ***Internally inconsistent and non-credible explanations for the loss.*** *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, 657 B.R. 475, 487 (D. Minn. 2022) (inconsistent representations about email backup tapes was "circumstantial evidence of [bank's] intent to deprive party of the use of information").

- ***Selective preservation of some materials but not others.*** *Awalt v. Marketti*, 74 F. Supp. 3d 909, 946 (N.D. Ill. 2014) (viable spoliation claim where jail officials only preserved portions of video footage); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 475–76 (E.D. Pa. 2020).

The standard of proof under Rule 37(e) is a preponderance of the evidence. *Ramirez*, 845 F.3d at 781; *OmniGen Research, LLC v. Wang*, 321 F.R.D. 367, 372 (D. Or. 2017). And a finding of intent—*i.e.*, unreasonable conduct in the face of duty to preserve—eliminates any need to demonstrate prejudice. *See, e.g.*, *OmniGen*, 321 F.R.D. at 371–72. Importantly, the Court's inherent authority to redress Defendants' and IDOC's fabrication, perjury, and discovery fraud is not displaced by Rule 37(e). *Cf. Secrease*, 800 F.3d at 402 ("[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system[.]").

### III.    Inherent Power – Abusive and Fraudulent Discovery Misconduct

Federal courts additionally possess "inherent power" to sanction "conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). This power is "broader than" that provided by the Federal Rules. *Salmeron v. Enterprise Recovery Systems, Inc.*,

579 F.3d 787, 793 (7th Cir. 2009). The inherent power encompasses the authority to enter default judgment against a defendant who "has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Id.* (citation omitted). Critically, these powers apply equally "to default judgments against defendants as well as to dismissals against plaintiffs." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401–02 (7th Cir. 2015).

The Court's inherent power is "particularly appropriate when the offending parties have practiced a fraud upon the court." *Chambers*, 501 U.S. at 44–45. "[W]hen false evidence or testimony is provided under oath, knowingly and with intent to deceive, a party commits a fraud on the court." *Garcia v. Berkshire Life Ins. Co. Of Am.*, 569 F.3d 1174, 1181 (10th Cir. 2009).

The misconduct at issue, because of its tie to the most important evidence in the case, caused nothing less than wholesale corruption of the discovery record and is a form of fraud. "Submitting a false discovery document—or fabricating evidence—has been referred to as the most egregious misconduct which justifies a finding of fraud upon the Court." *Kenno v. Colorado's Governor's Off. of Info. Tech.*, 2021 WL 2682619, at *19 (D. Colo. June 30, 2021) (cleaned up); *see also Secrease*, 800 F.3d at 402 ("[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system."); *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118–20 (1st Cir. 1989). The same is true of perjury, which is "among the worst kinds of misconduct." *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014) (collecting cases).

The "willfulness, bad faith, [and] fault" that may support default need **not** be proven by a "showing of intent." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) (collecting cases) (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976) (per curiam)). On the contrary, a finding of fault "presumes that the sanctioned party was guilty of

'extraordinarily poor judgment' or 'gross negligence' rather than mere 'mistake or carelessness.'" *Id.* (quoting *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992)).

### IV.    IDOC's Discovery Misconduct Must be Imputed to Defendants

District courts routinely impute a correctional department's discovery abuses to individual officer-defendants where circumstances and equities warrant, as they certainly do here. That is because "state correctional departments and municipalities ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners, and so their failure to preserve evidence may be imputed to individual officer defendants." *Johns*, 503 F. Supp. 3d at 463 (cleaned up).[3] Here the basis for imputation is obvious, where the individual IDOC Defendants have repeatedly held themselves out as agents of IDOC throughout discovery. They cannot disavow that connection now.

***Special relationship between Defendants and IDOC.*** The duty to preserve evidence generally does not extend to non-parties "unless some special relationship or duty arising by reason of an agreement, contract, statute, or other special circumstance counsels in favor of an exception." *Wilson v. Beloit Corp.*, 921 F.2d 765, 767 (8th Cir. 1990). Such special circumstances exist in prisoner litigation because state correctional departments "ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners," and so their failures may be imputed to individual defendants "in order to avoid unfair prejudice" to prisoner-litigants. *Harvey v. Hall*, 2019 WL 1767568, at *6 (W.D. Va. Apr. 22, 2019); *accord Woods v. Scissons*, 2019 WL 3816727,

---

[3] *See also, e.g.*, *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137 (D. Mont. 2009) (granting spoliation sanction of default judgment against defendant officers because dashboard video of the arrest at the core of the claim was lost after being uploaded to a police department computer and viewed by several officers); *Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D.N.J. 2008) (permitting an adverse inference instruction against an individual defendant after surveillance video evidence of an alleged assault by prison guards was lost because it was never downloaded or recorded onto a videotape).

at *4 (D. Ariz. Aug. 14, 2019); *Muhammad v. Mathena*, 2016 WL 8116155, at *8 (W.D. Va. Dec.

12, 2016); *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1106 (D. Ariz. 2014).

Courts focus on several factors in considering whether to impute an employer's spoliation

to individual employee-defendants. In this case, all of them counsel in favor of imputing liability

for IDOC's conduct to Defendants:

- ***IDOC controlled the evidence***. IDOC had sole custody and control over the surveillance footage, crisis-watch logs, medical records, and Master file. While the individual Defendants "did not personally maintain or control" this evidence, the agency that would stand to benefit most from the spoliation—IDOC—had control. *Taylor v. Null*, 2019 WL 4673426, at *5 (E.D. Mo. Sept. 25, 2019); *see also Vogt v. MEnD Corr. Care, PLLC*, 2023 WL 2414551, at *13 (D. Minn. Jan. 30, 2023).

- ***Defense counsel in this case repeatedly demonstrated unique access to materials in IDOC custody.*** In this case, defense counsel repeatedly engaged in affirmative conduct that reflected unique access to materials in IDOC custody. As noted above, counsel for Defendants Bennett, Frerking, Frerich, and Walls affirmatively represented to Plaintiff that their production of Mr. Curtis's medical records (which omitted the logs that are stored there) were what was within the IDOC's possession, custody, and control. Ex. 17 at 4; *see also* Ex. 15 at 7-8 (responding to Plaintiff's request for Mr. Curtis's medical records without any indication, like they raised elsewhere, that Defendants lacked access or possession). And when the IDOC was called upon to produce emails that were stored in its servers, that production was made by counsel for Defendants Bennett, Frerking, Frerich, and Walls.

- ***IDOC is defending and indemnifying Defendants.*** Illinois law requires the Attorney General to represent Defendants and other IDOC employees, as well as the IDOC itself. 5 ILCS 350/2(a) (representation of state employees); Ill. Const. art. 5, § 15 ("The Attorney General shall be the legal officer of the State"). Illinois law further requires the State to indemnify Defendants for any judgment against them.[4] 5 ILCS 350/2(d). Accordingly, "[a]ny sanction against Defendant[s] will be in many important respects a sanction felt most acutely by" the State—i.e., the IDOC. *See Johns*, 503 F. Supp. at 463; *Pettit*, 45 F. Supp. 3d at 1106 (same).

---

[4] Defendants, through their counsel, reported to the Court in opposing discovery into their net worth, that "it is expected that they will be indemnified by the State of Illinois" and the fact that they are being represented by the Attorney General's office "is an outward demonstration that the expectation continues to be" that they will be indemnified. Ex. 23 (Parties' Joint Written Disco. Report) at 21-24. That is consistent with the experience of Plaintiff's counsel, who has never seen a judgment against IDOC employees represented by the Attorney General's office not paid by the IDOC, even when such a judgment included substantial punitive damages.

- ***Defendant Mitchell successfully argued after discovery closed that Plaintiff's state-law claims against him were really ones against the State of Illinois***. At summary judgment—long after discovery had closed—Defendant Mitchell successfully obtained judgment on Plaintiff's state-law claims by arguing that those claims were "actually claims against the State of Illinois." Dkt. 324 at 79; *see also Murphy v. Smith*, 844 F.3d 653, 658 (7th Cir. 2016) (reiterating that when analyzing state-law claims against individual employees, the real claim is "against the State of Illinois itself" and that the "State of Illinois is the party vitally interested" (quoting *Sass v. Kramer*, 381 N.E.2d 975, 977 (1978)). That argument, and Defendant Mitchell's assertion of it at the outset of discovery, reveal that, as to Plaintiff's state-law claims, it was the IDOC and not Defendant Mitchell who was responsible for participating in discovery on those claims. It also further shows the inextricable link between Defendant Mitchell and the IDOC.

- ***IDOC and Defendants have used and benefitted from the spoliated evidence***. IDOC used the crisis-watch logs and video footage to investigate Mr. Curtis's death, discipline Mitchell, and presumably assess Defendants' potential exposure to civil or criminal liability. By enjoying the benefits of this evidence before choosing to suppress or destroy it, IDOC rendered its defendant-employees responsible for that evidence's spoliation. *See Johns*, 503 F. Supp. 3d at 464 (imputation proper where prison used video to reject plaintiff's grievance, then allowed footage to be destroyed before plaintiff could access it); *cf. Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591–92 (4th Cir. 2001) (imputing spoliation by plaintiff's experts to plaintiff where experts examined and repaired alleged defects before defendant's examination).

- ***Denying imputation would cause an "absurd" result, encouraging similar misconduct.*** efusing to recognize a special relationship would "lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits." *Johns*, 503 F. Supp. 3d at 464–65. IDOC cannot be named in a § 1983 suit for damages, and it may not be held vicariously liable. Any other outcome besides imputation "would encourage barriers to accountability for failure to preserve material evidence and undermine the integrity of the judicial process that depends on the adversarial presentation of evidence in order to uncover the truth." *Id.*; *accord Muhammad*, 2016 WL 8116155, at *7; *Pettit*, 45 F. Supp. 3d at 1106, 1110.

Refusing imputation would be untenable here, where Defendants' misconduct and IDOC's misconduct are inextricably intertwined. Defendants fabricated the crisis-watch logs that IDOC later suppressed. Defendants then benefited directly from the evidentiary gaps that IDOC's misconduct created. They committed perjury to sustain the fiction that those logs would have reflected. They filed false interrogatory responses to the same end. IDOC was therefore "not merely a disinterested third party" with respect to Mr. Curtis's death, this lawsuit, or its employees'

potential multimillion-dollar liability. *Pettit*, 45 F. Supp. 3d at 1110. IDOC was closely aligned with Defendants, and neither should be permitted to hide behind the other as a means to avoid accountability for this egregious discovery misconduct.

## ARGUMENT

### I.    IDOC Had a Duty to Preserve Relevant Evidence

When a party knows that evidence is or may be relevant to forthcoming litigation, it has a duty to preserve that information. *See Lewis v. McLean*, 864 F.3d 556, 565 (7th Cir. 2017). State law also imposes a duty on the IDOC to preserve "[a]ll records created or received by or under the authority of or coming into the custody, control, or possession of public officials" and commands that such records "may not be mutilated, destroyed, transferred, removed, or otherwise damaged or disposed of, in whole or in part, except as provided by law."[5] 5 ILCS 160/3.

Here, Mr. Curtis's death was alone sufficient to trigger the duty to preserve. *Id.* at 946 ("[T]he testimony of the Sheriff's Office's representative that it was the Jail's practice to preserve surveillance video in circumstances like Awalt's death is sufficient evidence for a reasonable jury to conclude that the Sheriff's Office had a duty to do so."); *see also Hargis v. Overton Cnty.*, 2023 WL 8604139, at *7 (M.D. Tenn. Dec. 12, 2023) ("A number of courts have found that government defendants reasonably should have anticipated litigation from the time an inmate was seriously injured or died in custody."); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 469 (E.D. Pa. 2020) (same). Layer on that statutory duties, FOIA obligations, and this lawsuit, and the preservation obligations of the IDOC and Defendants are beyond question.

---

[5] Courts in this Circuit have observed that violations of this statute "appear to be criminal matters." *Cooney v. Rossiter*, 2008 WL 3889945, at *18 (N.D. Ill. Aug. 20, 2008), *aff'd,* 583 F.3d 967 (7th Cir. 2009).

## II.    Enabled by IDOC's Misconduct, Defendants Committed Perjury

The missing logs and video go to the heart of Plaintiff's case. As discussed above, this allowed the Defendants and IDOC employees to lie with impunity in discovery—*for years*.

*Defendant Frerking.* In his April 2022 deposition, Frerking denied ever falsifying any official form in any correctional position. He denied ever missing a crisis-watch check. He denied knowledge of any other officer at Menard failing to perform crisis-watch checks or falsifying records. As discussed, he has now admitted to perjuring himself about his own actions and the actions of his colleagues and co-Defendants. Even standing alone, Frerking's admissions warrant terminating sanctions against him. *See id.*; *see also, e.g.*, *Dotson v. Bravo*, 202 F.R.D. 559, 567, 575 (N.D. Ill. 2001), *aff'd*, 21 F.3d 663 (7th Cir. 2003) ("Knowingly incomplete and misleading answers to written interrogatories constitutes perjury, as well as fraud," justifying dismissal).

*Defendant Bennett.* In his May 2022 deposition, Bennett denied ever lying on any official form. He denied even *hearing* of anyone other than Mitchell ever falsifying crisis-watch records. He testified that a crisis-watch officer should "never" be pulled to help with chow lines, that he "would not have told [Mitchell] . . . to assist with chow lines," and that he had "never had a crisis watch officer assist with meal lines." Ex. 5 at 138–40, 157, 161. Plaintiff is still waiting for Defendants to present Bennett for a subsequent deposition, but regardless, the newly produced logs demonstrate by a preponderance of the evidence that Bennett lied under oath. As the crisis watch Sergeant, Bennett managed a process where records were systematically falsified, but denied under oath that any such falsification occurred. Bennett's now-impossible-to-believe testimony depended on the logs remaining hidden.

*Defendant Walls.* The missing crisis-watch logs make plain the gravity of Walls's indifference to Mr. Curtis's dehydration. On the morning of September 5, Walls, a long-time IDOC

20

employee, advised her colleagues that if Mr. Curtis was "on watch we should be able to tell if he is eating and taking fluids as well." Ex. 9 at 3. That assurance rested on the broad IDOC-led ruse that crisis-watch logs reflect what is actually happening on crisis watch and when.

Whether Walls specifically knew Mr. Curtis's logs were unreliable, or only knew what everybody knew—that, as Defendant Frerking admitted, crisis-watch logs were frequently falsified—she benefitted directly from the suppression of evidence that minimized Mr. Curtis's emergent condition. Per Defendant Frerking (and as is obvious, given their pervasive falsification), everyone knew the logs were baloney, and, with that knowledge, Defendant Walls's failure to take any action in response to alerts about Mr. Curtis's dire condition is substantially more culpable. *See Alexander v. Caraustar Indus., Inc.*, 930 F. Supp. 2d 947, 961–62 (N.D. Ill. 2013) (dismissing complaint with prejudice where plaintiffs' "pervasive, mutually corroborating" lies constituted "the core of their cases").

*Other witnesses.* Plaintiff's cross-referential review of other deposition testimony, investigatory statements, and video-surveillance footage against the newly produced logs reveals a stunning and persistent abdication of duty on crisis watch. The entire enterprise is a farce. Across each day that Mr. Curtis spent on crisis watch, there are hours and hours of missed checks by Defendants and nonparty IDOC employees alike. This fact only came into focus and became provable with the late production of the logs.

Throughout the many years after video footage was destroyed and the logs were secretly withheld, Defendants and IDOC were permitted to present a defense they knew to be false without accountability, and to forcibly narrow the scope of Plaintiff's case, including by prohibiting her from naming other defendants or witnesses, and forcing her to concede dismissal of her conspiracy claims. By exercising the utmost diligence (and working virtually around the clock) in the days

after receiving the logs (over Defendant Mitchell's objection), Plaintiff has finally been able to identify and verify *some* of the Defendants' lies. But with critical video footage still missing, Plaintiff obviously cannot possibly undo the harm she has suffered as a result of Defendants' and the IDOC's misconduct.

### III. The Suppressed and Fabricated Crisis-Watch Logs Enabled Defendants' and IDOC's Fraud on the Court

Independent of the spoliation remedies provided by the Federal Rules, federal courts possess inherent authority to sanction intrinsic and extrinsic "fraud on the court," such as we see in this case. *Chambers*, 501 U.S. at 44–45. Here, Defendants and the IDOC's fraud on the Court includes fabrication of evidence and perjury in discovery.

*Fabrication.* Defendants fabricated the crisis-watch logs—the contemporaneous, officer-signed records that were supposed to document what they observed and when. These fabrications were affirmative lies, committed to official records in violation of Illinois law. *See* 5 ILCS 160/11 ("Any person who knowingly and without lawful authority alters, destroys, defaces, removes, or conceals any public record commits a Class 4 felony."). The fabricated logs impeded Mr. Curtis's medical care in real time, undermined the integrity of discovery, and altered Plaintiff's claims, theories, and efforts at resolution.

*Perjury.* With the logs suppressed, Defendants were able to testify under oath to a slew of rank falsehoods: that they had never fabricated records, that they never missed checks, and had no knowledge of other officers doing so. The logs prove that Defendants' testimony was not the product of their faded memories or honest confusion. *See* Ex. 21. Rather, their testimony was a calculated effort to maintain the fiction that crisis watch at Menard largely functioned as designed—a fiction that could survive only so long as the fabricated logs remained hidden and the incomplete surveillance footage remained just that.

22

Indeed, considered in the aggregate, IDOC's and Defendants' "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address." *Chambers*, 501 U.S. at 51; *see also Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993) (pattern of misconduct exhibiting "flagrant contempt for the court and its processes" warrants sanctions to protect "the integrity and credibility of the civil justice system"); *Schilling v. Walworth Cty. Park & Plan. Comm'n*, 805 F.2d 272, 275 (7th Cir. 1986) (courts must examine the "entire procedural history of the case" before imposing sanctions).

All of this constituted a patent fraud on this Court. There is no way to return to the status quo ante to re-run discovery to ameliorate the problems that Defendants and IDOC have created. *See Quela*, 2000 WL 656681, at *7–8. That ship has long since sailed.

## IV.  Default Judgment is the Appropriate Remedy

Default judgment is the appropriate sanction as to all Defendants because any "lesser sanctions [a]re not likely to be either sufficient or effective." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015). Certainly, if default judgment is not granted against all Defendants, it should be granted at least as to Defendant Frerking.

The recent revelations show that this case has been infected from the start by discovery abuses "so egregious, inexcusable, and destructive that no lesser sanction than [default judgment] could be adequate." *Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999). No lesser sanction—no adverse inference, no evidentiary exclusion, no monetary penalty—would sufficiently address the fraud Defendants and IDOC jointly perpetrated on the Court.

Defendants have exploited known fabrications and lies throughout this litigation to bend the case in their favor. Crisis watch, where Mr. Curtis and the most vulnerable prisoners are placed precisely because of their dire state, has been revealed as a farce. Mitchell's egregious misconduct

23

has been revealed as the normal procedure. As already highlighted, Defendant Frerking has now admitted as much. Ex. 21 at 22, 27-28.

The corruption of this case goes beyond evidence, distorting the claims and the Court's rulings. For example, Plaintiff conceded at summary judgment that she could not maintain a conspiracy claim against IDOC Defendants. The evidence now shows that it was widely known that officers would shirk their crisis watch obligations and fabricate the crisis-watch logs, casting that claim in an entirely different light. For example, when the Defendants huddled at Mr. Curtis's cell around the time of his death, permitting precious minutes to pass without response, all knew that they were sitting on a record of lies. The most sensible inference is that the meeting at Mr. Curtis's cell was as much about how to protect themselves from the coming investigation as anything related to reviving Mr. Curtis.

In short, Defendants and IDOC's "self-serving withholding of information" cannot be sufficiently remediated with a lesser sanction. *Handwerker v. AT&T Corp.*, 211 F.R.D. 203, 210 (S.D.N.Y. 2002). IDOC and Defendants together irreparably altered the course of this case and the search for the truth as to Mr. Curtis's death. *Bishop v. White*, 2023 WL 35157, at *13 (N.D. Ill. Jan. 4, 2023) ("No lesser sanction would provide adequate deterrence or punishment, particularly to the extent that [party] has either tainted the evidence in this case such that no court can ever be confident of reaching the truth of the matter.").

Indeed, sanctions short of default cannot, under these circumstances, vindicate the interests that sanctions are intended to protect. *See, e.g.*, *Rosa v. Bd. of Trs.*, 2024 WL 4800764, at *8 (N.D. Ill. 2024) ("Merely excluding the [fabricated evidence] would achieve neither punishment nor deterrence—it would only put the parties in the positions they were in before."); *Est. of Moreno v. Corr. Healthcare Cos.*, 2020 WL 5740265, at *9–10 (E.D. Wash. 2020) ("[I]t is not feasible to

draft an instruction that conveys or remedies the scope of the harm."); *Quela v. Payco-Gen. Am. Creditas, Inc.*, 2000 WL 656681, at *7–8 (N.D. Ill. 2000) (monetary sanctions "would insufficiently punish the gross abuse of process exhibited"); *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) (affirming terminating sanctions where excluding tainted evidence or testimony would have amounted to "functional equivalent of a dismissal").

For these reasons, courts have not hesitated to impose default judgments as sanctions for comparable discovery misconduct. *See, e.g.*, *Greviskes v. Univs. Rsch. Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005) (affirming sanction of dismissal where party compounded "initial wrongdoing" with "further fraud and deceit"); *Rosa*, 2024 WL 4800764, at *8 (dismissal for fabricated evidence and perjury); *Malibu Media, LLC v. Tashiro*, 2015 WL 2371597, at *37–38 (S.D. Ind. 2015) (default entered where defendants "spoiled evidence, committed perjury, and failed to discharge their duties to conduct discovery reasonably"); *Quela*, 2000 WL 656681, at *7–8 (default for coerced perjury on central issue); *Est. of Hill*, 2022 WL 1464830, at *15–16 (default judgment against county for willful spoliation of jail surveillance video); *Est. of Moreno*, 2020 WL 5740265, at *9–10 (default judgment against correctional healthcare provider for mass email destruction).

Defendants' misconduct implicates every strain of discovery abuse that federal caselaw considers culpable enough to impose default: nearly a decade of pre-litigation and mid-litigation fabrication, spoliation, suppression, and serial perjury. It is further distinguished by its victim—a vulnerable young man whose caretakers hid, destroyed, and lied about virtually everything to which they subjected him, even before he died a sordid death in their neglectful custody. "[O]nly a default judgment would adequately address the defendants' deliberate and fraudulent conduct." *Quela*, 2000 WL 656681, at *7–8.

25

**V.    Independent of Default, The IDOC Should be Required to Pay Fees and Costs Plaintiff Incurred Due to Its Misconduct**

Regardless of the Court's decision on the imputation of IDOC's conduct to Defendants and default judgment against Defendants, the egregious circumstances here require the Court to impose a heavy monetary sanction directly on IDOC itself. *See Pable v. Chicago Transit Auth.*, 145 F.4th 712, 722 (7th Cir. 2025) (affirming six-figure monetary sanctions under Rule 37 where party intentionally spoliated ESI); *DR Distributors*, 513 F. Supp. 3d at 983 (assessing sanctions, including monetary sanction that included the "reimbursement of attorneys' fees"); *Sonrai Sys., LLC v. Romano*, 2022 WL 4551893, at *10 (N.D. Ill. Sept. 29, 2022) (assessing substantial monetary sanction for spoliating ESI under Rule 37(e)); *Am. Fam. Mut. Ins., Co. v. Roth*, 2009 WL 982788, at *10 n.13 (N.D. Ill. Feb. 20, 2009) (observing that an "evidentiary sanction of an adverse inference . . . promotes deterrence").

As discussed throughout, IDOC, as a practical reality, exercises complete control over civil rights cases brought against its employees. Indeed, IDOC "possesses" and maintains virtually all of the relevant documents in every such case. IDOC also has special access to witnesses (i.e., its employees), and, at least according to defense counsel in this case, exerts total control over all aspects of trial strategy and settlement. Unless held accountable, it is IDOC who benefits the most by its extremely reckless (or worse) conduct in discovery. Time and again, IDOC formally represented that the most important records in this case were "lost," and retreated from that claim only if and when Plaintiff caught them red-handed. Plaintiff has demonstrated the lies that such "lost" evidence permitted Defendants in this case to pursue. But there can be no realistic accounting of the numerous lies that would be exposed if the full breadth of responsive evidence that was reportedly destroyed and/or lost were actually recovered. Indeed, it is no exaggeration to say that IDOC's concealment of the falsified crisis-watch logs for Mr. Curtis during the last days

26

of his life cost Plaintiff millions of dollars in attorney's fees and costs. Perhaps worse still, it has delayed, frustrated, and delayed again Plaintiff's pursuit of justice, already more than six years in the making. This must stop now.

Independent of (and in addition to) any sanction imposed on the Defendants, IDOC itself must be held accountable for repeatedly "losing" or (in fact) concealing and then failing to produce evidence harmful to its own interests unless and until it is caught. This is not the first time IDOC has been forced to reckon with its misconduct in discovery. *See, e.g.*, *Mason v. Snell*, 2024 WL 4445513, at *2 (S.D. Ill. Sept. 30, 2024) (permitting "discovery on discovery" to investigate the "existence of video footage, video retention policies, whether IDOC issued a litigation hold, and whether IDOC staff viewed relevant footage and intentionally deleted it"); *Cozad v. Illinois Dep't of Corr.*, 2017 WL 9516611, at *2 (C.D. Ill. Aug. 22, 2017) (ordering sanctions under Rule 37 where IDOC had failed to produce responsive email correspondence). And yet, each of the sanctions cited above failed to correct IDOC's abject misconduct. Absent a meaningful financial sanction—necessary both to punish IDOC and to partially compensate Plaintiff for the harm she has suffered from IDOC's misconduct—there is absolutely no reason to believe that IDOC will make different choices to respect its obligations to preserve evidence or even to respect its basic obligations to reasonably investigate what evidence exists.

In sum, a financial sanction against IDOC (independent of any sanction against Defendants) is required to address the discovery misconduct, partially redress the harm Plaintiff has suffered as a result, and ensure that this agency which has repeatedly flouted discovery requirements and court orders finally heeds its obligations. Quite frankly, IDOC's time for reckoning, when it comes to its discovery obligations, is long overdue.

Accordingly, Plaintiff should be reimbursed by IDOC for fees and costs reasonably related to the discovery misconduct in this case. If the Court grants Plaintiff leave to do so, she will promptly submit a detailed fee petition with an hourly record of the relevant fees and costs incurred as a result of Defendants' and IDOC's discovery misconduct. Those fees and costs would include the wasted preparation and then re-preparation for trial, time spent obtaining and disputing perjured written discovery and testimony, costs for contract attorneys required for expedited review in light of the revelations about the pervasive lies of IDOC employees, and simple things like thousands of dollars in costs related to trial logistics that all had to be cancelled and reset. Plaintiff report as to the time and costs incurred that were reasonably related to the grave misconduct at issue here.

In sum, independent of appropriate sanctions against Defendants, to permit IDOC itself to escape from any responsibility for its misconduct would only embolden IDOC and encourage it to engage in similar (or worse) misconduct in the future. An aware of fees and costs is thus independently necessary to address the IDOC's misconduct.

## VI.   At Any Trial, The Court Should Order an Adverse Inference Against Defendants for Lost Evidence

If this case proceeds to trial on any basis, including a trial solely on the quantum of compensatory and punitive damages following default, the Court should instruct the jury to draw an adverse inference against Defendants for any remaining missing evidence. In particular, the jury needs to know that Defendants are chargeable for depriving them of a video record of what was happening at Mr. Curtis's cell around the time of his death. Under these circumstances of selective spoliation and perjury, the jury is entitled to know who had the duty to maintain that video and who conveniently lost it. *DR Distributors*, 513 F. Supp. 3d at 982 (ordering adverse jury

instructions as curative measure as sanction for defendants' spoliation). Plaintiff will promptly craft an instruction to comport with the Court's ruling on this motion.

## CONCLUSION

The Court should grant Plaintiff's motion and enter default judgments against all Defendants. Independently, the Court should allow Plaintiff to submit to IDOC a petition for costs and fees related to the discovery misconduct in this case. In addition, if there is any trial, the jury should be instructed that they may draw an adverse inference against Defendants for missing evidence.

Dated: February 17, 2026

Respectfully submitted,

/s/ Sarah Grady

Sarah Grady
Attorney for Plaintiff

Howard Kaplan
Sarah Grady
David Schmutzer
Adam J. Smith
Mattie Haag
**KAPLAN & GRADY LLC**
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
(312) 852-2184
sarah@kaplangrady.com

## CERTIFICATE OF SERVICE

I, Sarah Grady, an attorney, hereby certify that on February 17, 2026, I caused the foregoing to be filed using CM/ECF, which effected service on all counsel of record. I further certify that within 5 hours of filing, copies will be sent via electronic mail to counsel for the IDOC in this case:
Dimitrios Karabetsos (dimitrios.karabetsos@ilag.gov)
James Robinson (james.robinson@ilag.gov)

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff